U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET





**The following constitutes the ruling of the court and has the force and effect therein described.**

*Honli De Wayne Hale*

**United States Bankruptcy Judge**

**Signed November 16, 2010**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **DLH MASTER LAND HOLDING, LLC** | § | **Case No. 10-30561-HDH-11** |
| **ALLEN CAPITAL PARTNERS, LLC,** | § | |
| **RICHARD S. ALLEN, INC. and** | § | |
| **RICHARD S. ALLEN,** | § | |
| Debtors | § | |

### ORDER APPROVING SETTLEMENT BY AND
### BETWEEN DEBTORS, GREAT WESTERN BANK AND BB&T

**CAME ON TO BE CONSIDERED** on the 12th day of November, 2010 the "Expedited Motion to Approve Compromise and Settlement Between Debtors, Great Western Bank and BB&T" (Dkt. No. 650) (**"Motion"**) filed herein by Debtors DLH Master Land Holding, LLC ("**DLH**"), Allen Capital Partners, LLC ("**ACP**"), Richard S. Allen, Inc. ("**RSA**") and Richard S. Allen ("**Allen**") (collectively referred to herein as "**Debtors**"). The Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court further finds that this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The Court further finds that all creditors and parties-in-interest were provided notice and an opportunity to object to the relief requested in the Motion. After considering the evidence

presented and the arguments of counsel, the Court finds that good cause exists to grant the relief requested in the Motion. The Court further finds that the proposed settlement by and between Debtors, Great Western Bank and Branch Banking and Trust Company is in the best interests of Debtors and Debtors' bankruptcy estates and should be approved. It is therefore

**ORDERED** that the relief requested in the Motion is hereby in all things approved. It is further

**ORDERED** that the Settlement Agreement **("Settlement Agreement")** attached hereto as Exhibit "1" is hereby in all things approved. The terms and provisions of the Settlement Agreement are incorporated herein by reference for all purposes as if set forth verbatim. It is further

**ORDERED** that the provisions in the Settlement Agreement that provide for and apply the phrases Release Price[1], Drop Dead Date, Termination Option and the other terms and provisions of the Settlement Agreement and the granting of the mutual releases in Section 1.7 of the Settlement Agreement are hereby in all things approved. It is further

**ORDERED** that neither Debtors nor any persons related to or affiliated with Debtors (including the Guarantors, Rex Allen, R.E. Allen, Pointe Property Group, Inc. and Allen Investments, Inc.) shall take any direct or indirect action to interfere with the foreclosure of the ADESA Property as authorized in the Settlement Agreement and this Order. It is further

**ORDERED** that remedies granted to Great Western Bank and Branch Banking & Trust Company in the event of a default by Debtors, including the remedies included in Section 2.5 of the Settlement Agreement are hereby in all things approved. It is further

---

[1] The initial capitalized words or phrases in this Order shall have the meaning ascribed thereto in the attached Settlement Agreement unless the context clearly requires otherwise.

**ORDERED** that Debtors and other named signatory parties (excluding the Banks) shall execute the attached Settlement Agreement and deliver the executed original to counsel for Great Western Bank within five (5) calendar days after the date of entry of this Order. It is further

**ORDERED** that this Order and the Settlement Agreement are hereby binding and enforceable against Debtors, Debtors' bankruptcy estates and any successors or assigns including any subsequently appointed Chapter 11 trustee and/or Chapter 7 trustee, and all creditors and parties-in-interest. It is further

**ORDERED** that Debtors shall amend their respective plans of reorganization to incorporate the terms of this Order and the Settlement Agreement and shall not propose any plans of reorganization inconsistent with the terms of this Order or the Settlement Agreement. It is further

**ORDERED** that Debtors are hereby authorized and instructed to take all the actions necessary to implement the terms of this Order and the Settlement Agreement. It is further

**ORDERED** that notice of compliance or non-compliance or extension of the deadlines set forth in Sections 1.3 and 1.4 of the Settlement Agreement, and notice of exercise of the Termination Option in Section 1.5 of the Settlement Agreement and notice of a default in accordance with Section 2.5 of the Settlement Agreement, shall be given to counsel for the Official Committee of Unsecured Creditors (the "Committee") in the DLH and ACP cases by delivering a copy of such notice to Michael Warner, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, Texas 76102 and filed with the Court. The Committee may change the person designated to receive notices under this Order by providing written notice specifically referencing this Order to counsel for the Debtors, Michael W. Bishop (counsel for Great Western Bank) and Timothy Vineyard (counsel for BB&T). It is further

**ORDERED** that this Court retains jurisdiction to enforce the terms and provisions of this Order and the Settlement Agreement.

***END OF ORDER****

EXHIBIT 1 – Settlement Agreement with Exhibits

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** ("Agreement"), among **GREAT WESTERN BANK**, a bank chartered under the laws of South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010 ("**Great Western**"), **BRANCH BANKING & TRUST COMPANY,** a North Carolina State Banking Association, Successor in Interest to Colonial Bank f/k/a Colonial Bank, N.A. by Acquisition of Assets from the FDIC as Receiver for Colonial Bank("**BB&T**"), **DLH MASTER LAND HOLDING, LLC**, a Delaware limited liability company ("**DLH**"), **ALLEN CAPITAL PARTNERS, LLC**, a Delaware limited liability company ("**ACP**"), **RICHARD S. ALLEN,** a resident of the State of California ("**Allen**") and **RICHARD S. ALLEN, INC.**, a California Corporation **("RSAI")**, is executed to become effective as of the "**Effective Date**" (which is defined in Section 3.11 below).

## R E C I T A L S:

**A.** In July, 2008, DLH Hutchins Wintergreen 178, LLC ("**Original Borrower**") executed a Note Secured by Construction Security Agreement ("**Note**") payable to TierOne Bank, a federally chartered savings bank ("**TierOne**"), in the original principal sum of $47,777,365.00. The purpose of that loan ("**Loan**") was to allow the Original Borrower to develop approximately 174.595 acres of land located at the northwest corner of Wintergreen Road and Lancaster-Hutchins Road in the City of Hutchins, Texas (the "**ADESA Project**") in accordance with the terms of that certain Reverse Build-To-Suit Single-Tenant Lease (Triple Net), dated March 31, 2008 (as amended, the "**ADESA Lease**"), between the Original Borrower and ADESA Texas, Inc., a Texas Corporation ("**ADESA**").

**B.** In connection with the Loan, TierOne and the Original Borrower executed a number of agreements, security instruments, and other writings, including, without limitation, a Construction Loan Agreement, executed as of July 18, 2008 ("**Loan Agreement**"), a Construction Security Agreement/Deed of Trust and Security Agreement, executed as of July 18, 2008 ("**Deed of Trust**"), and an Assignment of Leases and Rents, dated as of July 18, 2008 (the "**Rents Assignment**"). TierOne and the Original Borrower also entered into a Loan Modification Agreement dated July 20, 2009 ("**Modification Agreement**"), which provided for the extension of the maturity date to August 1, 2010, and changed various other terms of the Note.

**C.** ACP, Allen, RSAI, and Allen Development, Inc., a California corporation ("**ADI**"), jointly and severally guaranteed the payment of the Loan pursuant to the terms of a separate Guaranty executed by each of them, dated as of July 18, 2008 (collectively the "**Guaranties**"). The Note, Loan Agreement, Deed of Trust, Rents Assignment, Modification Agreement, Guaranties, and other agreements, security instruments, and other writings executed in connection with the Loan will sometimes be collectively referred to as the "**Loan Documents**" in this Agreement.

**D.**     Pursuant to the terms of a Participation Agreement by and between TierOne and Colonial Bank, an Alabama state banking corporation ("**Colonial Bank**"), dated July 18, 2008, Colonial Bank acquired a fifty percent (50%) participation interest in the Loan.  BB&T is the successor in interest to Colonial Bank f/k/a Colonial Bank, N.A. of a fifty percent (50%) participation interest in the Loan by acquisition of certain assets from the FDIC, as Receiver of Colonial Bank. Great Western is the successor in interest to the loans of TierOne, by acquisition of assets from the FDIC as Receiver of TierOne, which was closed by the Office of Thrift Supervision on June 4, 2010. For purposes of convenience and clarity, Great Western and BB&T will sometimes be collectively referred to as the "**Banks**" in this Agreement.

**E.**     In late December, 2009, the Original Borrower and 70 other related entities were merged into DLH. ADI was also merged into ACP. For that reason, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Guarantors**" in this Agreement.

**F.**     DLH and ACP filed their respective petitions pursuant to Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") on January 25, 2010.  Allen and RSAI filed their respective petitions pursuant to Chapter 11 of the Bankruptcy on May 3, 2010. All four (4) of these bankruptcy cases are being jointly administered by the United States Bankruptcy Court under case no. 10-30561-HDH (collectively, the "**Bankruptcy Cases**"). DLH, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Debtors**" in this Agreement.

**G.**     A number of disputes have arisen between the Debtors and the Banks regarding the rights and obligations of DLH and the Banks under the Loan Documents, particularly about the use of the rents being paid by ADESA to DLH under the ADESA Lease ("**ADESA Rents**") and the request by the Banks that the automatic stay be lifted in order to allow the Banks to foreclose their liens and security interests under the Loan Documents.. These disputes have required a number of hearings before the Bankruptcy Court; are the subject of three (3) pending appeals in the United States District Court for the Northern District of Texas ("**Appeals**"); and will result in contested hearings on the disclosure statement and plan of reorganization which have been filed jointly by DLH and ACP, as the same may be amended, unless resolved as provided in this Agreement.

**H.**     Each of the parties to this Agreement has determined that it is in the best interest of that party to settle and compromise these disputes on the terms provided in this Agreement, and the purpose of this Agreement is to promote an orderly reorganization of DLH and the other Debtors, promote an orderly disposition of the Adesa Project, provide for the satisfaction of the Loan and the Debtors' respective obligations under the Loan Documents, and reduce the amount of attorneys' fees and other costs and expenses which would otherwise be incurred by the parties.

**NOW, THEREFORE,** in consideration of the mutual covenants, conditions, and agreements provided in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, the Banks and the Debtors have agreed as follows:

## ARTICLE 1

## SETTLEMENT TERMS

**1.1  Release Price.** Subject to and upon the terms and conditions provided in this Agreement, the Banks will accept a single payment in the amount of the Release Price in full and

final payment of the accrued indebtedness owed by DLH to the Banks under the terms of the Loan Documents. In order to obtain sufficient funds to pay the Release Price to the Banks, DLH is attempting to sell the ADESA Project (together with the ADESA Lease, the "**ADESA Property**"). The Release Price is to be paid by DLH in full to the Banks in cash, by wire transfer, or in certified funds at the closing of a sale of the ADESA Property ("**Closing**"). The phrase "**Release Price**" means (a) $48,000,000.00 plus (b) if, and only if, the Net Sale Proceeds from the sale of the ADESA Property are more than $50,750,000.00, twenty-five percent (25%) of the Net Sale Proceeds in excess of $50,750,000.00, without deduction or set-off. The phrase "**Net Sale Proceeds**" means the gross sales price of the ADESA Property less Closing Costs. The phrase "**Closing Costs**" means broker commissions, title company fees, title insurance premiums, escrow fees, recording fees, attorney fees, and other expense prorations and deductions applicable to the sale of the ADESA Property that are agreed to by DLH and the Buyer (defined in Section 1.2 below) and approved by the Bankruptcy Court. In no event is the amount of the Release Price to be reduced by any payment made by DLH (or by one or more Guarantors) to the Banks prior to Closing or otherwise.

      **1.2**    <u>**Sale of the ADESA Project**</u>. DLH is currently negotiating a sale of the ADESA Property with Greenfield Companies ('**Greenfield**") and other potential purchasers. If DLH enters into a contract to sell the ADESA Property to either Greenfield or another a qualified buyer who is reasonably acceptable to DLH ("**Buyer**") on terms and conditions acceptable to DLH and for an amount that will assure payment (a) of the Release Price to the Banks and (b) of all Closing Costs at Closing (**"Sale Contract"**), DLH will seek authority from the Bankruptcy Court to sell the ADESA Property to the Buyer (**"Sale Motion"**), instead of a sale under a Plan of Reorganization filed on behalf of DLH and/or any of the Guarantors. Because of the need to expedite the filing of the Sale Motion, DLH may file the Sale Motion based on a non-binding letter of intent before the Sale Contract has been executed by DLH and the Buyer if DLH believes in good faith that the letter of intent both accurately reflects the business terms to be included in the Sale Contract and that a Sale Contract based upon that letter of intent will be executed by DLH and the Buyer. In the event that the Sale Contract with an original Buyer is terminated for any reason prior to Closing, then DLH shall have until the Drop Dead Date (defined in Section 1.4 below) in which to close the sale of the ADESA Property in accordance with a new sale contract (**"Replacement Contract"**). In such event, the new buyer shall be a "Buyer" and the Replacement Contract shall be a "Sale Contract" for purposes of this Agreement. The Replacement Contract must provide for a purchase price that meets the requirements set forth in the second (2nd) sentence in this Section 1.2, and must comply and be in accordance with the other requirements in this Agreement.

      **1.3**    <u>**Procedural Requirement-Settlement Order**</u>. Debtors will file an emergency motion under Bankruptcy Rule 9019 seeking an order from the Bankruptcy Court approving the compromise and settlement between the Banks and the Debtors' upon the terms and conditions provided in this Agreement ("**Settlement Order**"). If (a) a Settlement Order in a form satisfactory to the Banks is not entered by the Bankruptcy Court on or before November 19, 2010, (b) the Federal Deposit Insurance Corporation ("**FDIC**") does not approve the execution of this Agreement by Great Western or Great Western's execution of this Agreement is rejected by the FDIC on or before December 23, 2010, or (c) the management of BB&T, which must approve BB&T's execution of this Agreement, does not give its approval to BB&T's execution of this Agreement or this Agreement is rejected by BB&T's management on or before December

23, 2010, this Agreement shall automatically become null and void as of the date of the first of such events to occur without further order of the Bankruptcy Court. Except as otherwise agreed by Banks in writing, the Settlement Order shall be identical in form and content, except for the completion of information in the blanks in that form, to the form of Settlement Order that is attached at <u>Exhibit "A"</u> to this Agreement and shall specifically approve and incorporate the provisions in this Agreement regarding the effect of the Drop Dead Date that are provided in Section 1.4 of this Agreement; the mutual releases provided in Section 1.7 of this Agreement; the rights of the Banks reserved in Section 2.3 of this Agreement; and other provisions from this Agreement that a party may deem to be reasonably necessary or prudent to have included.

       **1.4**    **Drop Dead Date**. The Closing of the sale of the ADESA Property and the payment of the Release Price to the Banks must both occur on or before June 30, 2011 (**"Drop Dead Date"**). The Settlement Order shall modify the automatic stay provided in the Bankruptcy Code so that if (i) the Bankruptcy Court, BB&T, and the FDIC have approved this Agreement by the deadlines set forth in Section 1.3 above and (ii) the Banks have not received payment of the Release Price in full on or before May 31, 2011, the Bankruptcy Code stay shall automatically partially terminate to allow the Banks to post the ADESA Property for foreclosure. If the specified approvals have been obtained and the Banks have not received payment of the Release Price on or before the Drop Dead Date, the Bankruptcy Code stay shall automatically terminate to allow the Banks to foreclose their liens and security interests on the ADESA Property on or after July 1, 2011, at any time they choose, without the necessity of any further order from the Bankruptcy Court. The Settlement Order shall also provide that neither the Debtors nor any persons related to or affiliated with Debtors (including Rex Allen, R.E. Allen, Pointe Property Group, Inc. and Allen Investments, Inc.) will take any direct or indirect action to interfere with the foreclosure of the ADESA Property as authorized in this Agreement. In the event the automatic stay lifts pursuant to the terms of this Agreement, DLH shall immediately turn over to the Banks all ADESA Rents which it may receive thereafter within two (2) business days of receipt.

       **1.5**    <u>**Condition to Obligations-the Sale Order**</u>. DLH will diligently prosecute the Sale Motion, but the Sale Motion must not be heard by the Bankruptcy Court before December 24, 2010, without the Banks' consent. While the Sale Motion may be based on a letter of intent between DLH and the Buyer, the Sale Order must specifically refer to and approve a Sale Contract that has been executed by DLH and the Buyer and the enforceability of which is only subject to the approval of the Bankruptcy Court and to any rights provided to the Buyer to terminate the Sale Contract on the basis of an inspection, title or financing contingency. The sale of the ADESA Property is subject to and conditioned upon the Bankruptcy Court entering (i) the Sale Order on or before 60 days prior to the Commencement of any confirmation hearing, but not later than February 15, 2011; and (ii) the Settlement Order on or before November 19, 2010. If the Bankruptcy Court refuses to enter the Sale Order, then the Sale Agreement shall be void and of no further force or effect. The Sale Motion may include a motion to assume and assign the ADESA Lease in connection with the sale of the ADESA Property, and the Sale Order may provide that (a) the assumption and assignment of the ADESA Lease is to be effective concurrent with the Closing and (b) both ADESA and KAR Holdings, Inc., a Delaware corporation and the guarantor of ADESA's obligations under the ADESA Lease ("**KAR**"), shall waive any claims against DLH and/or any Guarantor, including benefits relating to economic incentives and offsite infrastructure improvements effective as of the date of the Closing,

regarding (i) any construction or other obligations under the ADESA Lease and (ii) any claims arising with respect to any monies paid by the City of Hutchins to DLH or any Guarantor. If this Agreement is approved by the Bankruptcy Court, the FDIC, and BB&T's management within the time periods set forth in Section 1.3 of this Agreement, then DLH will use reasonable diligence to close the sale of the ADESA Property upon the terms set forth in the Sale Contract and the Sale Order. If the Sale Contract with Buyer is not approved by the entry of the Sale Order on or before 60 days prior to the Commencement of any Confirmation hearing, but not later than February 15, 2011, then the Settlement Agreement may, at the sole election of the Banks, be terminated after the applicable date, and be of no further force or effect ("**Termination Option**").

      **1.6**   **Use of Cash Collateral**. As a modification of the existing court order related to ADESA Rents, DLH shall make monthly payments from the ADESA Rents to the Banks in the amounts of (a) $245,134.15 during the period beginning on November 1, 2010, through January 31, 2011, and (b) $311,611.00 during the period beginning on February 1, 2011, through and including the earlier to occur of the date of Closing or June 30, 2011 (and prorated as of the date of Closing or June 30, 2011, whichever date is applicable). DLH shall pay Banks on or before five (5) business days from the date of entry of the Settlement Order the sum of $245,134.15 with respect to post-petition rents collected by DLH under the ADESA Lease for the month of November, 2010. Commencing December 1, 2010, and for each month prior to the Closing, DLH shall pay the monthly sums to Banks as required pursuant to the terms of this Agreement within five (5) business days after DLH collects a monthly installment of the ADESA Rent from ADESA. DLH may use the remaining cash collateral from the ADESA Rents, if any, through the earlier to occur of the date of Closing or June 30, 2011. The monthly payments, if any, received by the Banks after February 1, 2011 pursuant to the terms of this Agreement, shall be applied to DLH's debt to the Banks as provided in the Note. Neither the Bank's agreement to allow Debtor to use a portion of the ADESA Rents nor the intended incorporation of the provisions of this Section 1.5 into the Settlement Order shall ever be used to prejudice the Banks' pending Appeals. However DLH and Banks will move to abate the Appeals subject to the terms and conditions described in Section 2.3 of this Agreement. If (a) this Agreement is not approved by the Bankruptcy Court, the FDIC, and BB&T's management within the time limits set forth in this Agreement or is rejected by the FDIC or BB&T's management on or before December 23, 2010, or (b) the Closing of the sale of the ADESA Property does not occur on or before the Drop Dead Date, all ADESA Rents collected after the first such event to occur, shall be held by DLH and shall not be used by DLH except as authorized or directed by the terms of this Agreement or by an order of the Bankruptcy Court. In the event the automatic stay is lifted, terminated, or modified upon the occurrence of the Drop Dead Date or otherwise, DLH shall turn over all ADESA Rents which DLH may receive to the Banks within two (2) business days of receipt. Notwithstanding anything contained in this Agreement seemingly to the contrary, no payment made to the Banks under or contemplated in this Section shall reduce or be credited against the Release Price.

      **1.7**   **Releases.** Upon the last to occur of (i) the approval of the Settlement Agreement by the FDIC and BB&T's management, (ii) the entry of the Settlement Order by the Bankruptcy Court, and (iii) the Banks' receipt of the Release Price or the completion of the foreclosure by the Banks of their liens and security interests on the ADESA Property, the Guarantors and the Banks shall each release the other and all employees, affiliates, and attorneys from all claims

(including chapter 5 claims under the Bankruptcy Code), except for any claims arising under this Agreement. The mutual release to be executed by the Guarantors and the Banks shall be executed by each of those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "B" to this Agreement. Subsequent to the satisfaction of the conditions stated in the preceding sentence and upon the occurrence of either the receipt by the Banks of the Release Price or the date on which the Banks complete a foreclosure of the liens and security interests created under certain of the Loan Documents, DLH and the Banks will each release the other and all employees, affiliates, and attorneys from all claims (including chapter 5 claims under the Bankruptcy Code), except for those claims arising under the Settlement Agreement. The mutual release to be executed by DLH and the Banks shall be executed by those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "C" to this Agreement. On the date that the Mutual Release between the Bank and DLH has been fully executed by all of those parties, the Banks will also be deemed to have waived and released any right to payment and any lien granted under the so-called "Replacement Lien" granted by the Bankruptcy Court pursuant to the Bankruptcy Court's "Final Order on Debtors' Motion Requesting Use of Cash Collateral" entered on April 23, 2010 (Dkt. No. 233) and the "Order Authorizing Debtor DLH Master Land Holding, LLC's to Use Cash Collateral Lease Payments for August through October 2010" entered on August 25, 2010 (Dkt. No. 514). If the Banks receive payment of the Release Price in full at Closing, the Banks will (a) release all liens and assignments which they may have related to the ADESA Property and under the Replacement Lien and (b) join with DLH in seeking dismissal of the Appeals, (c) withdraw all claims, votes and objections in the Bankruptcy Cases (d) cease to participate further in the Bankruptcy Cases and e) execute all releases.

## ARTICLE 2
## PRE-CLOSING OBLIGATIONS AND PROCEDURE

**2.1     The ADESA Property**. DLH will diligently keep the ADESA Lease in full force and effect until the Closing or the Banks' foreclosure of the liens and security interest created by the Loan Documents on the ADESA Property. DLH will not (a) amend or agree to modify the ADESA Lease without obtaining the prior written consent of GWB (acting on behalf of both Banks), (b) release ADESA from any of ADESA's obligations under the ADESA Lease; (c) amend or agree to modify KAR's lease guaranty or release KAR from any of  KAR's obligations under that lease guaranty, (d) commit any acts of default under the ADESA Lease other those defaults or contested defaults that are currently existing and specifically listed on Exhibit "D" to this Agreement, and/or (e) do anything that might adversely affect the rights of the "Landlord" under the ADESA Lease or which are specifically prohibited under the Loan Documents with respect to the ADESA  Lease.  The Debtors, jointly and severally, represent and warrant that the list of Lease "alleged Landlord Defaults" on Exhibit "D" accurately and completely lists all alleged defaults for which Debtors have received written notice. DLH will continue to collect regular monthly payments of the ADESA Rents and may use the ADESA Rents only for the purposes as provided or authorized in this Agreement or by order of the Bankruptcy Court. DLH will not seek Bankruptcy Court approval to use any of the ADESA

Rents that is inconsistent with the terms and provisions of this Agreement. DLH shall continue to escrow payments received from ADESA which are applicable to ad valorem taxes assessed against the ADESA Project ("**Tax Escrow**") as required by prior orders of the Bankruptcy Court. At the Closing, the Seller's Statement (Form T-62) shall reflect the disposition of the funds in the Tax Escrow, whether by payment or set-off. If the ad valorem taxes on the ADESA Project become due while DLH is the owner, DLH will pay the necessary funds from the Tax Escrow to satisfy that tax obligation when such payment is due to the extent DLH has received sufficient funds from ADESA to do so. Contemporaneous with the payment of the ad valorem taxes on the ADESA Property, DLH shall provide written notice of such tax payment to the Banks. If the Banks foreclose on the ADESA Property, the funds in the Tax Escrow shall be delivered to the Banks within two (2) business days from the date of that foreclosure.

2.2    **Cooperation Regarding the Sale of the ADESA Property**. Subject to the terms of and compliance with this Agreement, the Banks will exercise reasonable efforts to cooperate with DLH in closing the transaction contemplated by the Sale Contract and the Sale Order and will, if necessary, deposit the necessary executed lien releases and/or other closing documents required to be delivered by the Banks prior to the scheduled date of Closing in escrow with the title company that is handling the Closing, subject to customary closing instructions from the Banks or their attorneys. The required lien release shall be sufficient if substantially in the form, except for the completion of blanks, to the form of Release of Liens that is attached at Exhibit "E" to this Agreement. However, the Banks shall not be required to incur any costs or expenses in doing so except for expenses typically incurred by a lender in connection with the release of liens in a sale transaction.

2.3    **Regarding the Bankruptcy Cases**. Notwithstanding anything seemingly to the contrary in this Agreement and notwithstanding the Bankruptcy Court approval of this Agreement, the Banks may continue to participate in the Bankruptcy Cases and oppose DLH and the other Debtors in any matter until and unless this Agreement is approved by the FDIC, BB&T's management, and the Bankruptcy Court. Thereafter, and if the Banks have not exercised their Termination Option, the Banks will participate only as necessary to protect, vote and preserve their claims in the Bankruptcy Cases and to enforce compliance with the terms of this Agreement and/or the Settlement Order. Upon entry of the Settlement Order, the Banks will join DLH in filing motions to abate the Appeals pending the later of the Banks' receipt of the Release Price or the Banks' foreclosure on the ADESA Property. If the Settlement Agreement is not approved by the Banks or if the Banks exercise the Termination Option, the Parties to the Appeals will promptly join in an agreed order terminating the abatement of the Appeals. The terms of this Agreement and the Settlement Order shall be incorporated into any plans of reorganization and shall supersede any provision in any such plan seemingly to the contrary (including any injunction provided in a plan or confirmation order). Upon the later to occur of the Bankruptcy Court's entry of (a) the Settlement Order and (b) the Sale Order, the Banks will withdraw all outstanding document requests and interrogatories without prejudice to their rights to again seek discovery at a later time.

2.4    **FDIC Approval**. GWB will seek the FDIC's approval to GWB's participation in the settlement contemplated by this Agreement and will not oppose the Bankruptcy Court's approval of the settlement contemplated by, and upon the terms provided in, this Agreement unless the FDIC rejects the Settlement Agreement before it is heard by the Court.

**2.5** **Remedies Upon Debtors' Default.**  In the event that any of the Debtors breach any of their obligations to the Banks pursuant to the terms of this Agreement or the Settlement Order, the Banks may, after providing written notice to Debtors and Debtors' bankruptcy counsel of the existence of any such default and the failure of the Debtors to cure that default ten (10) calendar days from the effective date of that notice (as provided in Section 3.3 of this Agreement) seek an emergency hearing before the Bankruptcy Court (or another Court with jurisdiction) to seek such relief as the Court may deem just and proper (including foreclosure upon the ADESA Property) and Debtors consent to an emergency hearing.

## ARTICLE 3

## GENERAL PROVISIONS

*3.1* *Amendments. This Agreement may not be altered, changed, or amended except by an instrument in writing signed by both the Banks, and each of the Debtors' and approved by an appropriate order entered by the Bankruptcy Court.*

*3.2* *Non-Waiver. No course of dealing between the Banks and any Debtor or any other person, nor any delay on the part of the Banks in exercising any rights under this Agreement, nor any failure by the Banks to enforce any provision of this Agreement, shall operate as a waiver or a modification of the terms of this Agreement or of any right which the Banks have to demand strict compliance with the terms of this Agreement. Any waiver by the Banks of condition or provision of this Agreement  must be expressly set forth in a writing signed by the Banks and shall not be deemed to constitute a waiver of any subsequent breach of the same or any other agreement, condition, or provision contained in this Agreement.*

**3.3** **Notices**.  Any notice, demand, consent, approval, request, or other communication required or permitted to be given pursuant to this Agreement or by applicable law shall be in writing and shall be delivered by facsimile, or expedited delivery service or e-mail with proof of delivery, addressed to each party to this Agreement in care of the attorneys for that party as shown on the distribution list for the Bankruptcy Cases and to Counsel for the unsecured Creditors' Committee. Any such communication transmitted by facsimile, e-mail or personal delivery shall be deemed to have been delivered as of the date actually received by the addressee.

**3.4    Survival**.  *Except as expressly set forth herein, neither the Closing nor a foreclosure by the Banks of their liens on and security interests in the ADESA Property, by operation of law, or otherwise, shall ever relieve DLH or the Guarantors of their respective liabilities and obligations under this Agreement, all of which shall survive the Closing or a foreclosure.*

**3.5    Consent by the Banks**.  *In each circumstance under this Agreement in which the prior consent or permission of the Banks (or either of them) is required before DLH and/or any Guarantor is authorized to take any particular type of action, the decision of whether to grant or deny such consent or permission shall be within the sole and exclusive judgment and discretion of each Bank. Neither DLH nor any Guarantor shall have any claim against either of the Banks or any defense to their performance of any covenant, duty, or obligation under this Agreement on the basis that either or both of the Banks delayed or withheld the granting of such consent or permission.*

**3.6    <u>Legal Interpretation</u>.**  This Agreement, and the rights and obligations of the respective parties under this Agreement, shall be interpreted, construed, and enforced in accordance with the laws of the State of Texas and, to the extent applicable, the Bankruptcy Code.  All obligations of the parties under this Agreement shall be performable in Dallas County, Texas. Any legal action to enforce or construe this Agreement shall be instituted in the Bankruptcy Court if prior to the effective date of the respective plans of reorganization for the Debtors and, thereafter, in the appropriate state or federal court located in Dallas County, Texas All defined terms and other words used in this Agreement shall include the singular and plural, as applicable. Words which are not used as defined terms in this Agreement shall be construed in accordance with the meanings commonly ascribed to those words, relative to the context in which each is used.  The word "including" shall be construed as if followed, in each instance, by the phrase "but not limited to."  All article and section headings used in this Agreement are for reference and identification purposes only and are not intended to, and shall not under any circumstances, alter, amend, amplify, vary, or limit the express provisions in this Agreement. All rights, powers, and remedies provided in this Agreement may be exercised only to the extent that their exercise does not violate any applicable law and are intended to be limited to the extent necessary so that such provision will not render this Agreement invalid or unenforceable under applicable law.  In the event that any provision in this Agreement, or the application of such provision to any person or circumstance, shall be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.  Each party to this Agreement hereby respectively acknowledge that each such party has substantial experience in negotiation of commercial real estate transactions, that this Agreement is the product of extensive negotiations between the parties, and that, therefore, none of the parties shall be charged with having promulgated this Agreement and that no rule of strict construction with respect to the provisions of this Agreement shall be applicable. Each Exhibit (and, if applicable, addenda, riders, or other attachments to this Agreement) are attached to and incorporated in this Agreement for all purposes.

**3.7    <u>Entire Agreement</u>**.  Each party to this Agreement specifically acknowledges  that (a) this Agreement supersedes and cancels any and all previous statements, negotiations, arrangements, agreements, and understandings, if any, between or among the parties with respect of

the subject matter of this Agreement and (b) there are no representations, agreements or warranties (express or implied, oral or written) between the Banks and any of the Debtors with respect to the subject matter of this Agreement other than as set forth in this Agreement.

     **3.8**    **Time of the Essence**. In all instances in which a party to this Agreement is required to pay any sum or do any act at a particular time or within a particular period, it is understood that time is of the essence.

     **3.9**    **Counterparts**. This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original; but such counterparts shall together constitute one and the same instrument.

     **3.10**    **Effective Date.** The submission of this Agreement to any party for examination does not constitute a binding settlement, and this Agreement shall become effective only upon its execution by all of the parties and the entry of the Settlement Order. The term "Effective Date" shall mean the last to occur of (a) the date on which this Agreement has been fully executed by all of the parties and (b) the date of the Settlement Order. Because of the need to expedite the settlement contemplated by this Agreement and, therefore, the short time periods in which certain actions to effectuate this settlement are to be accomplished, no action taken by any party prior to the Effective Date shall create a binding obligation for any party under this Agreement, it being the intent of the parties that (x) this Agreement shall not become effective solely on the basis of a course of dealing, (y) no party shall invoke the doctrine of justifiable reliance as a basis for a claim that this Agreement has become effective, each party hereby waiving any such claim, and (z) this Agreement shall not become effective until the specified conditions to the Effective Date have actually occurred.

     **3.11**    **Successors and Assigns**. From and after the Effective Date, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by each the parties to this Agreement and their respective successors and assigns. As used in this Agreement, the phrase "successors and assigns" is used in its broadest possible context and includes, as applicable, the respective heirs, personal representatives, successors, and assigns of each of the parties to this Agreement and any person, partnership, corporation, or other entity succeeding to any interest in this Agreement.

     **IN WITNESS WHEREOF,** Great Western, BB&T, DLH, ACP, RSAI, and Allen have each executed this Agreement as of the date set forth beside the respective signature lines for that party, but intend that this Agreement shall not be effective until, and as of, the Effective Date.

**THE BANKS**

Date Executed on            **GREAT WESTERN BANK**,

Behalf of Great Western Bank:     a bank chartered under the laws of the State of

November ___, 2010        South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010

By: _____

Its Authorized Representative


_____

Print Name and Title


Date Executed On
Behalf of BB&T:

November ___, 2010

**BRANCH BANKING AND TRUST COMPANY**,

a North Carolina State Banking

successor in interest to Colonial Bank, f/k/a

Colonial Bank, N.A., by acquisition of assets from

the FDIC, as Receiver of Colonial Bank


By: _____

Its Authorized Representative


_____

Print Name and Title


### THE DEBTORS

Date Executed on
Behalf of DLH:

November ___, 2010

**DLH MASTER LAND HOLDINGS, LLC,**

 a Delaware limited liability company


By: _____

_____

Print Name and Title

Date Executed on                    **ALLEN CAPITAL PARTNERS, LLC**,
Behalf of ACP:                      a Delaware limited liability company
November ___, 2010

By:_____

_____
Print Name and Title


Date Executed on                    **RICHARD S. ALLEN, INC.,**
Behalf of RSAI:                     a California Corporation
November ___, 2010

By: _____

_____
Print Name and Title


Date Executed by                    _____
Allen:                              **RICHARD S. ALLEN, Individually**
November ___, 2010


## JOINDER


Rex Allen (individually), R.E. Allen (individually), Pointe Property Group, Inc., and Allen Investment, Inc. are executing this Agreement solely for the purpose of acknowledging their respective agreements to be bound by the provisions in Section 1.4 of this Agreement.


Date Executed by                    _____
Rex Allen:                          **REX ALLEN, Individually**
November ___, 2010

Date Executed by

R.E. Allen:

_____

**R.E. ALLEN, Individually**

November ___, 2010


Date Executed on

Behalf of Pointe Property:

November ___, 2010

**POINTE PROPERTY GROUP, INC.**

a Tennessee corporation

By: _____

_____

Print Name and Title


Date Executed on

Behalf of Allen Investments:

November ___, 2010

**ALLEN INVESTMENTS, INC.**

a Florida Corporation

By: _____

_____

Print Name and Title

EXHIBIT "A"

TO

<u>SETTLEMENT AGREEMENT</u>

<u>"FORM SETTLEMENT ORDER"</u>

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Chapter 11** |
| **DLH MASTER LAND HOLDING, LLC** | § | **Case No. 10-30561-HDH-11** |
| **ALLEN CAPITAL PARTNERS, LLC,** | § | |
| **RICHARD S. ALLEN, INC. and** | § | |
| **RICHARD S. ALLEN,** | § | |
| **Debtors** | § | |

**ORDER APPROVING SETTLEMENT BY AND**

**BETWEEN DEBTORS, GREAT WESTERN BANK AND BB&T**

**CAME ON TO BE CONSIDERED** on the 12th day of November, 2010 the "Expedited Motion to Approve Compromise and Settlement Between Debtors, Great Western Bank and BB&T" (Dkt. No. 650) (**"Motion"**) filed herein by Debtors DLH Master Land Holding, LLC ("**DLH**"), Allen Capital Partners, LLC ("**ACP**"), Richard S. Allen, Inc. ("**RSA**") and Richard S. Allen ("**Allen**") (collectively referred to herein as "**Debtors**"). The Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court further finds that this matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The Court further finds that all creditors and parties-in-interest were provided notice and an opportunity to object to the relief requested in the Motion. After considering the evidence presented and the arguments of counsel, the Court finds that good cause exists to grant the relief requested in the Motion. The Court further finds that the proposed settlement by and between

Debtors, Great Western Bank and Branch Banking and Trust Company is in the best interests of Debtors and Debtors' bankruptcy estates and should be approved. It is therefore

**ORDERED** that the relief requested in the Motion is hereby in all things approved. It is further

**ORDERED** that the Settlement Agreement **("Settlement Agreement")** attached hereto as Exhibit "A" is hereby in all things approved. The terms and provisions of the Settlement Agreement are incorporated herein by reference for all purposes as if set forth verbatim. It is further

**ORDERED** that the provisions in the Settlement Agreement that provide for and apply the phrases Release Price[2], Drop Dead Date, Termination Option and the other terms and provisions of the Settlement Agreement and the granting of the mutual releases in Section 1.7 of the Settlement Agreement are hereby in all things approved. It is further

**ORDERED** that neither Debtors nor any persons related to or affiliated with Debtors (including the Guarantors, Rex Allen, R.E. Allen, Pointe Property Group, Inc. and Allen Investments, Inc.) shall take any direct or indirect action to interfere with the foreclosure of the ADESA Property as authorized in the Settlement Agreement and this Order. It is further

**ORDERED** that remedies granted to Great Western Bank and Branch Banking & Trust Company in the event of a default by Debtors, including the remedies included in Section 2.5 of the Settlement Agreement are hereby in all things approved. It is further

**ORDERED** that Debtors and other named signatory parties (excluding the Banks) shall execute the attached Settlement Agreement and deliver the executed original to counsel for Great Western Bank within five (5) calendar days after the date of entry of this Order. It is further

**ORDERED** that this Order and the Settlement Agreement are hereby binding and enforceable against Debtors, Debtors' bankruptcy estates and any successors or assigns including any subsequently appointed Chapter 11 trustee and/or Chapter 7 trustee, and all creditors and parties-in-interest. It is further

**ORDERED** that Debtors shall amend their respective plans of reorganization to incorporate the terms of this Order and the Settlement Agreement and shall not propose any plans of reorganization inconsistent with the terms of this Order or the Settlement Agreement. It is further

**ORDERED** that Debtors are hereby authorized and instructed to take all the actions necessary to implement the terms of this Order and the Settlement Agreement. It is further

**ORDERED** that this Court retains jurisdiction to enforce the terms and provisions of this Order and the Settlement Agreement.

---

[2] The initial capitalized words or phrases in this Order shall have the meaning ascribed thereto in the attached Settlement Agreement unless the context clearly requires otherwise.

EXHIBIT "B"

TO

SETTLEMENT AGREEMENT


MUTUAL RELEASE

(Banks and Guarantors)

EXHIBIT "B"

TO

SETTLEMENT AGREEMENT


MUTUAL RELEASE


THIS MUTUAL RELEASE ("**Release**") among **GREAT WESTERN BANK**, a bank chartered under the laws of South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the Federal Deposit Insurance Corporation ("**FDIC**") as Receiver of TierOne Bank, which was closed by the by the Office of Thrift Supervision on June 4, 2010 ("**Great Western**"), **BRANCH BANKING & TRUST COMPANY,** a North Carolina State Banking Association, Successor in Interest to Colonial Bank f/k/a Colonial Bank, N.A. by Acquisition of Assets from the FDIC as Receiver for Colonial Bank("**BB&T**"), **ALLEN CAPITAL PARTNERS, LLC**, a Delaware limited liability company ("**ACP**"), **RICHARD S. ALLEN,** a resident of the State of California ("**Allen**"), and **RICHARD S. ALLEN, INC.,** a California Corporation **("RSAI")**, is executed to become effective as of _____ __, 201_ ("**Effective Date**").

R E C I T A L S:

A.    In July, 2008, DLH Hutchins Wintergreen 178, LLC ("**Original Borrower**") executed a Note Secured by Construction Security Agreement ("**Note**") payable to TierOne Bank, a federally chartered savings bank ("**TierOne**"), in the original principal sum of $47,777,365.00. The purpose of that loan ("**Loan**") was to allow the Original Borrower to develop approximately 174.595 acres of land located at the northwest corner of Wintergreen Road and Lancaster-Hutchins Road in the City of Hutchins, Texas (the "**ADESA Project**") in accordance with the terms of that certain Reverse Build-To-Suit Single-Tenant Lease (Triple Net), dated March 31, 2008 (as amended ,the "**ADESA Lease**"), between the Original Borrower and ADESA Texas, Inc., a Texas Corporation ("**ADESA**").

**B.**     In connection with the Loan, TierOne and the Original Borrower executed a number of agreements, security instruments, and other writings, including, without limitation, a Construction Loan Agreement, executed as of July 18, 2008 ("**Loan Agreement**"), a Construction Security Agreement/Deed of Trust and Security Agreement, executed as of July 18, 2008 ("**Deed of Trust**"), and an Assignment of Leases and Rents, dated as of July 18, 2008 (the "**Rents Assignment**"). TierOne and the Original Borrower also entered into a Loan Modification Agreement dated July 20, 2009 ("**Modification Agreement**"), which provided for the extension of the maturity date to August 1, 2010, and changed various other terms of the Note.

**C.**     ACP, Allen, RSAI, and Allen Development, Inc., a California corporation ("**ADI**"), jointly and severally guaranteed the payment of the Loan pursuant to the terms of a separate Guaranty executed by each of them, dated as of July 18, 2008 (collectively the "**Guaranties**"). The Note, Loan Agreement, Deed of Trust, Rents Assignment, Modification Agreement, Guaranties, and other agreements, security instruments, and other writings executed in connection with the Loan will sometimes be collectively referred to as the "**Loan Documents**" in this Release.

**D.**     Pursuant to the terms of a Participation Agreement by and between TierOne and Colonial Bank, an Alabama state banking corporation ("**Colonial Bank**"),dated July 18, 2008, Colonial Bank  acquired a fifty percent (50%) participation interest in the Loan.  BB&T is the successor in interest to Colonial Bank f/k/a Colonial Bank, N.A. of a  fifty percent (50%) participation interest in the Loan by acquisition of certain assets from the FDIC, as Receiver of Colonial Bank. Great Western is the successor in interest to the loans of TierOne, by acquisition of assets from the FDIC as Receiver of TierOne, which was closed by the Office of Thrift Supervision on June 4, 2010. For purposes of convenience and clarity, Great Western and BB&T will sometimes be collectively referred to as the "**Banks**" in this Release.

**E.**     In late December, 2009, the Original Borrower and 70 other related entities were merged into DLH Master Land Holdings, LLC, a Delaware limited liability company ("**DLH**"). ADI was also merged into ACP. For that reason, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Guarantors**" in this Release.

**F.**     DLH and ACP filed their respective petitions pursuant to Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") on January 25, 2010.   Allen and RSAI filed their respective petitions pursuant to Chapter 11 of the Bankruptcy on May 3, 2010. All four (4) of these bankruptcy cases are being jointly administered by the United States Bankruptcy Court under case no. 10-30561-HDH (collectively, the "**Bankruptcy Cases**"). DLH, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Debtors**" in this Release.

**G.**     A number of disputes have arisen between the Debtors and the Banks regarding the rights and obligations of DLH and the Banks under the Loan Documents, particularly about the use of the rents being paid by ADESA to DLH under the ADESA Lease ("**ADESA Rents**") and the request by the Banks that the automatic stay be lifted in order to allow the Banks to foreclose their liens and security interests under the Loan Documents.. These disputes have required a number of hearings before the Bankruptcy Court and are the subject of three (3) pending appeals in the United States District Court for the Northern District of Texas ("**Appeals**").

**H.** The Banks, the Guarantors, and DLH have, with the approval of the Bankruptcy Court, entered into a Settlement Agreement effective as _____, 2010 ("**Settlement Agreement**"), under the terms of which the Banks and the Guarantors have agreed to execute a mutual release of claims. This Release is the mutual release contemplated by the Settlement Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants, conditions, and agreements provided in this Release and in the Settlement Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, the Banks and the Guarantors have agreed as follows:

## ARTICLE 1

## RELEASES

**1.1** **By Guarantors**. Subject to and except as provided in Section 2.2 below, the Guarantors, for themselves and on behalf of their respective bankruptcy estates, hereby release, acquit and forever discharge the Banks, both jointly and severally**,** and their respective officers, directors, agents, servants, employees, attorneys, affiliates and predecessors (including the FDIC in both its corporate capacity and as the receiver of TierOne and Colonial Bank), from any and all claims, actions, demands, rights, damages, costs, complaints, allegations, or causes of action of any kind whatsoever, at common law, by statute, case law, or otherwise which the Guarantors, or any of them, now have or might have, known or unknown, now existing, directly or indirectly attributable to or arising out of any transactions, dealings, or occurrences related to the Loan or the Loan Documents or which could have been or was asserted in the Bankruptcy Cases or the Appeals and including any causes of action pursuant to Chapter 5 of the Bankruptcy Code and/or arising out of the Bankruptcy Cases.

**1.2** **By the Banks**. Subject to and except as provided in Section 2.2 below, the Banks hereby release, acquit and forever discharge the Guarantors, both jointly and severally**,** and their respective officers, directors, agents, servants, employees, attorneys, and affiliates, from any and all claims, actions, demands, rights, damages, costs, complaints, allegations, or causes of action of any kind whatsoever, at common law, by statute, case law, or otherwise which the Banks, or either of them, now have or might have, known or unknown, now existing, directly or indirectly attributable to or arising out of any transactions, dealings, or occurrences related to the Loan or the Loan Documents or which could have been or was asserted in the Bankruptcy Cases or the Appeals.

## ARTICLE 2

## GENERAL PROVISIONS

**2.1** **Notices**. Any notice, demand, consent, approval, request, or other communication required or permitted to be given pursuant to this Release or by applicable law shall be in writing and shall be delivered by facsimile, or expedited delivery service or e-mail with proof of delivery, addressed to each party to this Release in care of the attorneys for that party as shown on the distribution list for the Bankruptcy Cases. Any such communication transmitted by facsimile, e-mail or personal delivery shall be deemed to have been delivered as of the date actually received by the addressee.

*2.2* **Survival**. Notwithstanding anything in this Release or in the Settlement Agreement seemingly to the contrary, the rights and obligations of the parties under the Settlement Agreement shall survive the Effective Date.

2.3 **Legal Interpretation.** This Release, and the rights and obligations of the respective parties under this Release, shall be interpreted, construed, and enforced in accordance with the laws of the State of Texas and, to the extent applicable, the Bankruptcy Code. All obligations of the parties under this Release shall be performable in Dallas County, Texas. Any legal action to enforce or construe this Release shall be instituted in the Bankruptcy Court if prior to approval of the respective plans of reorganization for the Debtors and, thereafter, in the appropriate state or federal court located in Dallas County, Texas. All defined terms and other words used in this Release shall include the singular and plural, as applicable. Words which are not used as defined terms in this Release shall be construed in accordance with the meanings commonly ascribed to those words, relative to the context in which each is used. The word "including" shall be construed as if followed, in each instance, by the phrase "but not limited to." All article and section headings used in this Release are for reference and identification purposes only and are not intended to, and shall not under any circumstances, alter, amend, amplify, vary, or limit the express provisions in this Release. In the event that any provision in this Release, or the application of any provision to any person or circumstance, shall be invalid or unenforceable to any extent, the remainder of this Release, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby. Each party to this Release acknowledges that such party has substantial experience in the negotiation of commercial real estate transactions, that this Release is the product of extension negotiations between the parties, and that, therefore, none of the parties shall be charged with having promulgated this Release and no rule of strict construction with respect to the provisions of this Release shall be applicable.

2.4 **Entire Agreement**. Each party to this Release specifically acknowledges that (a) this Release and the Settlement Agreement supersede and cancel any and all previous statements, negotiations, arrangements, agreements, and understandings, if any, between or among the parties with respect of the subject matter of this Release and (b) there are no representations, agreements or warranties (express or implied, oral or written) between the Banks and any of the Debtors with respect to the subject matter of this Release other than as set forth in this Release or in the Settlement Agreement.

2.5 **Counterparts.** This Release may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original; but such counterparts shall together constitute one and the same instrument

2.6 **Successors and Assigns**. From and after the Effective Date, this Release shall be binding upon, inure to the benefit of, and be enforceable by each of the parties to this Release and their respective successors and assigns. As used in this Release, the phrase "successors and assigns" is used in its broadest possible context and includes, as applicable, the respective heirs, personal representatives, successors, and assigns of each of the parties to this Release and any person, partnership, corporation, or other entity succeeding to any interest in this Release.

**IN WITNESS WHEREOF,** Great Western, BB&T, ACP, RSAI, and Allen have each executed this Release to be effective as of the Effective Date.

**THE BANKS**

**GREAT WESTERN BANK**,

a bank chartered under the laws of the State of

South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010

By: _____

   Its Authorized Representative


_____

   Print Name and Title


**BRANCH BANKING AND TRUST**

**COMPANY**,

a North Carolina State Banking

successor in interest to Colonial Bank, f/k/a

Colonial Bank, N.A., by acquisition of assets from

the FDIC, as Receiver of Colonial Bank


By: _____

   Its Authorized Representative


_____

   Print Name and Title

**THE GUARANTORS**

**ALLEN CAPITAL PARTNERS, LLC**,
a Delaware limited liability company
and its bankruptcy estate


By:_____


_____
Print Name and Title

**RICHARD S. ALLEN, INC.,**
a California Corporation
and its bankruptcy estate


By: _____


_____
Print Name and Title


_____
**RICHARD S. ALLEN,** individually and on
behalf of if his bankruptcy estate

MUTUAL RELEASE

(Banks and DLH)

THIS MUTUAL RELEASE ("**Release**") among **GREAT WESTERN BANK**, a bank chartered under the laws of South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the Federal Deposit Insurance Corporation ("**FDIC**") as Receiver of TierOne Bank, which was closed by the by the Office of Thrift Supervision on June 4, 2010 ("**Great Western**"), **BRANCH BANKING & TRUST COMPANY,** a North Carolina State Banking Association, Successor in Interest to Colonial Bank f/k/a Colonial Bank, N.A. by Acquisition of Assets from the FDIC as Receiver for Colonial Bank("**BB&T**"), **DLH MASTER LAND HOLDING, LLC**, a Delaware limited liability company ("**DLH**"), is executed to become effective as of _____ __, 201_ ("**Effective Date**").

R E C I T A L S:

A.    In July, 2008, DLH Hutchins Wintergreen 178, LLC ("**Original Borrower**") executed a Note Secured by Construction Security Agreement ("**Note**") payable to TierOne Bank, a federally chartered savings bank ("**TierOne**"), in the original principal sum of $47,777,365.00. The purpose of that loan ("**Loan**") was to allow the Original Borrower to develop approximately 174.595 acres of land located at the northwest corner of Wintergreen Road and Lancaster-Hutchins Road in the City of Hutchins, Texas (the "**ADESA Project**") in accordance with the terms of that certain Reverse Build-To-Suit Single-Tenant Lease (Triple Net), dated March 31, 2008 (as amended ,the "**ADESA Lease**"), between the Original Borrower and ADESA Texas, Inc., a Texas Corporation ("**ADESA**").

B.    In connection with the Loan, TierOne and the Original Borrower executed a number of agreements, security instruments, and other writings, including, without limitation, a Construction Loan Agreement, executed as of July 18, 2008 ("**Loan Agreement**"), a Construction Security Agreement/Deed of Trust and Security Agreement, executed as of July 18, 2008 ("**Deed of Trust**"), and an Assignment of Leases and Rents, dated as of July 18, 2008 (the "**Rents Assignment**"). TierOne and the Original Borrower also entered into a Loan Modification Agreement dated July 20, 2009 ("**Modification Agreement**"), which provided for the extension of the maturity date to August 1, 2010, and changed various other terms of the Note.

C.    Allen Capital Partners, LLC, a Delaware limited liability company ("**ACP**"), Richard S. Allen, a resident of the State of California ("**Allen**"), Richard S. Allen, Inc., a California corporation ("**RSAI**"), and Allen Development, Inc., a California corporation

("**ADI**"), jointly and severally guaranteed the payment of the Loan pursuant to the terms of a separate Guaranty executed by each of them, dated as of July 18, 2008 (collectively the "**Guaranties**"). The Note, Loan Agreement, Deed of Trust, Rents Assignment, Modification Agreement, Guaranties, and other agreements, security instruments, and other writings executed in connection with the Loan will sometimes be collectively referred to as the "**Loan Documents**" in this Release.

      **D.**     Pursuant to the terms of a Participation Agreement by and between TierOne and Colonial Bank, an Alabama state banking corporation ("**Colonial Bank**"),dated July 18, 2008, Colonial Bank acquired a fifty percent (50%) participation interest in the Loan. BB&T is the successor in interest to Colonial Bank f/k/a Colonial Bank, N.A. of a fifty percent (50%) participation interest in the Loan by acquisition of certain assets from the FDIC, as Receiver of Colonial Bank. Great Western is the successor in interest to the loans of TierOne, by acquisition of assets from the FDIC as Receiver of TierOne, which was closed by the Office of Thrift Supervision on June 4, 2010. For purposes of convenience and clarity, Great Western and BB&T will sometimes be collectively referred to as the "**Banks**" in this Release.

      **E.**     In late December, 2009, the Original Borrower and 70 other related entities were merged into DLH. ADI was also merged into ACP. For that reason, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Guarantors**" in this Release.

      **F.**     DLH and ACP filed their respective petitions pursuant to Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") on January 25, 2010. Allen and RSAI filed their respective petitions pursuant to Chapter 11 of the Bankruptcy on May 3, 2010. All four (4) of these bankruptcy cases are being jointly administered by the United States Bankruptcy Court under case no. 10-30561-HDH (collectively, the "**Bankruptcy Cases**"). DLH, ACP, Allen, and RSAI will sometimes be collectively referred to as the "**Debtors**" in this Release.

      **G.**     A number of disputes have arisen between the Debtors and the Banks regarding the rights and obligations of DLH and the Banks under the Loan Documents, particularly about the use of the rents being paid by ADESA to DLH under the ADESA Lease ("**ADESA Rents**") and the request by the Banks that the automatic stay be lifted in order to allow the Banks to foreclose their liens and security interests under the Loan Documents.. These disputes have required a number of hearings before the Bankruptcy Court and are the subject of three (3) pending appeals in the United States District Court for the Northern District of Texas ("**Appeals**").

      **H.**     The Banks, the Guarantors, and DLH have, with the approval of the Bankruptcy Court, entered into a Settlement Agreement, effective as of _____, 2010 ("**Settlement Agreement**"), under the terms of which the Banks and DLH have agreed to execute a mutual release of claims. This Release is the mutual release contemplated by the Settlement Agreement.

      **NOW, THEREFORE,** in consideration of the mutual covenants, conditions, and agreements provided in this Release and in the Settlement Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, the Banks and DLH have agreed as follows:

## ARTICLE 1

## RELEASES

**1.2    By DLH**. Subject to and except as provided in Section 2.2 below, DLH, for itself and on behalf of its bankruptcy estate, hereby release, acquit and forever discharge the Banks, both jointly and severally**,** and their respective officers, directors, agents, servants, employees, attorneys, affiliates, and predecessors (including the FDIC in both its corporate capacity and as the receiver of TierOne and Colonial Bank),  from any and all claims, actions, demands, rights, damages, costs, complaints, allegations, or causes of action of any kind whatsoever, at common law, by statute, case law, or otherwise which the DLH now has or might have, known or unknown, now existing, directly or indirectly attributable to or arising out of any transactions, dealings, or occurrences related to the Loan or the Loan Documents or which could have been or was asserted in the Bankruptcy Cases or the Appeals and including any causes of action pursuant to Chapter 5 of the Bankruptcy Code and/or arising out of the Bankruptcy Cases.

**1.2    By the Banks**. Subject to and except as provided in Section 2.2 below, the Banks hereby release, acquit and forever discharge DLH**,** and its officers, directors, agents, servants, employees, attorneys, and  affiliates,  from any and all claims, actions, demands, rights, damages, costs, complaints, allegations, or causes of action of any kind whatsoever, at common law, by statute, case law, or otherwise which the Banks, or either of them, now have or might have, known or unknown, now existing, directly or indirectly attributable to or arising out of any transactions, dealings, or occurrences related to the Loan or the Loan Documents or which could have been or was asserted in the Bankruptcy Cases or the Appeals.

# ARTICLE 2

## GENERAL PROVISIONS

**2.1    Notices**.    Any notice, demand, consent, approval, request, or other communication required or permitted to be given pursuant to this Release or by applicable law shall be in writing and shall be delivered by facsimile, or expedited delivery service or e-mail with proof of delivery, addressed to each party to this Release in care of the attorneys for that party as shown on the distribution list for the Bankruptcy Cases. Any such communication transmitted by facsimile, e-mail or personal delivery shall be deemed to have been delivered as of the date actually received by the addressee.

*2.2*    **Survival**.    Notwithstanding anything in this Release seemingly to the contrary, the rights and obligations of the parties under the Settlement Agreement shall survive the Effective Date of this Release..

**2.3    Legal Interpretation.**    This Release, and the rights and obligations of the respective parties under this Release, shall be interpreted, construed, and enforced in accordance with the laws of the State of Texas and, to the extent applicable, the Bankruptcy Code.  All obligations of the parties under this Release shall be performable in Dallas County, Texas.  Any legal action to enforce or construe this Release shall be instituted in the Bankruptcy Court if prior to approval of DLH's plan of reorganization and, thereafter, in the appropriate state or federal court located in Dallas County, Texas  All defined terms and other words used in this Release shall include the singular and plural, as applicable. Words which are not used as defined terms in this Release shall be construed in accordance with the meanings commonly ascribed to those words, relative to the context in which each is used.  The word "including" shall be construed as if followed, in each instance, by the phrase "but not limited to."  All article and section headings used in this Release are for reference and identification purposes only and are not intended to,

and shall not under any circumstances, alter, amend, amplify, vary, or limit the express provisions in this Release.  In the event that any provision in this Release, or the application of any provision to any person or circumstance, shall be invalid or unenforceable to any extent, the remainder of this Release, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.  Each party to this Release acknowledges that such party has substantial experience in the negotiation of commercial real estate transactions, that this Release is the product of extension negotiations between the parties, and that, therefore, none of the parties shall be charged with having promulgated this Release and no rule of strict construction with respect to the provisions of this Release shall be applicable.

       **2.4**    <u>**Entire Agreement**</u>.  Each party to this Release specifically acknowledges  that (a) this Release and the Settlement Agreement supersede and cancel any and all previous statements, negotiations, arrangements, agreements, and understandings, if any, between or among the parties with respect of the subject matter of this Release and (b) there are no representations, agreements or warranties (express or implied, oral or written) between the Banks and any of the Debtors with respect to the subject matter of this Release other than as set forth in this Release or in the Settlement Agreement.

       **2.5**    <u>**Counterparts**</u>.  This Release may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original; but such counterparts shall together constitute one and the same instrument

       **2.6**    <u>**Successors and Assigns**</u>.  From and after the Effective Date, this Release shall be binding upon, inure to the benefit of, and be enforceable by each of the parties to this Release and their respective successors and assigns.  As used in this Release, the phrase "successors and assigns" is used in its broadest possible context and includes, as applicable, the respective heirs, personal representatives, successors, and assigns of each of the parties to this Release and any person, partnership, corporation, or other entity succeeding to any interest in this Release.

       **IN WITNESS WHEREOF,** Great Western, BB&T and DLH have each executed this Release to be effective as of  the Effective Date.

<u>**THE BANKS**</u>

**GREAT WESTERN BANK**,

a bank chartered under the laws of the State of

South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010

By: _____

     Its Authorized Representative

_____

Print Name and Title


**BRANCH BANKING AND TRUST
COMPANY**,

a North Carolina State Banking
successor in interest to Colonial Bank, f/k/a
Colonial Bank, N.A., by acquisition of assets from
the FDIC, as Receiver of Colonial Bank


By: _____

Its Authorized Representative


_____

Print Name and Title


**DLH MASTER LAND HOLDING, LLC**

a Delaware limited liability company
and its bankruptcy estate


By:_____


_____

Print Name and Title

## EXHIBIT "D"

### TO

### SETTLEMENT AGREEMENT

### LANDLORD LEASE DEFAULTS

To the best of Debtors' knowledge, the only defaults or contested defaults by and between DLH Master Land Holding, LLC ("Landlord") and ADESA Texas, Inc. ("Tenant") under the REVERSE BUILD-TO-SUIT SINGLE-TENANT LEASE (TRIPLE NET)("Lease") AND PROJECT IMPROVEMENTS AGREEMENT ("PIA") dated March 31, 2008, as amended are related to:

1) Lease - Paragraph 33. **Economic Incentives.**

    This provision sets out the terms under which Tenant could share in any benefit received by Landlord or Tenant from various taxing authorities, in various forms of benefit, including reimbursement of costs from the City of Hutchins to Landlord for Offsite Improvements (as defined in the PIA).

2) PIA - Paragraph 2      **Completion of Improvements.**

    (a) **Off-Site Improvements -**      This provision contains the obligations of Landlord to use commercially reasonable efforts, with the cooperation and direct involvement with the City of Hutchins, to provide or cause to be delivered the specific off-site improvements described in the PIA.

**EXHIBIT "E"**

**TO**

**SETTLEMENT AGREEMENT**

**RELEASE OF LIEN**

| | |
|---|---|
| **THE STATE OF TEXAS** § | |
| § | **KNOW ALL MEN BY THESE PRESENTS:** |
| **COUNTY OF DALLAS** § | |

**THAT**, the undersigned, is the present legal and equitable owner and holder of that certain Note Secured by Construction Security Agreement, dated as of July 18, 2008 (as modified and extended, the "Note"), in an original principal amount not to exceed Forty-Seven Million Seven Hundred Seventy-Seven Thousand Three Hundred Sixty-Five and No/100's Dollars ($47,777,365.00) , which Note is described in and secured as to payment by the lien of that certain  Construction Security Agreement/Deed of Trust and Security Agreement, dated July 18, 2008, ("Deed of Trust"), which was recorded in the Official Public Records of Dallas County, Texas under Document No. 20080240115, against those certain tracts or parcels of real property which are more particularly described in Exhibit A attached hereto and incorporated herein by reference for all purposes ("Subject Tracts").

**FOR GOOD AND VALUABLE CONSIDERATION** paid to the undersigned, the receipt and sufficiency of which is hereby acknowledged and confessed, the undersigned hereby FULLY RELEASES and DISCHARGES the Subject Tracts from the lien of the Deed of Trust, and hereby fully and completely releases, for all purposes, all liens and security interests created by the Deed of Trust and by any other document that secured the payment of the loan evidenced by the Note, including, but not limited to, that certain Assignment of Leases and Rents, dated July 18, 2008, recorded in the Official Public Records of Dallas County, Texas under Document No. 20080240116.

**EXECUTED**  this ____ day of _____, 201_.

**BENEFICIARY:**

**GREAT WESTERN BANK**,

> a bank chartered under the laws of the State of South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver

of TierOne Bank, which was closed by the Office of
Thrift Supervision on June 4, 2010

By: _____

Its Authorized Representative


_____

Print Name and Title



THE STATE OF _____          §


COUNTY OF _____          §


    **This instrument was acknowledged before me on _____ __, 201__, by** _____, _____ of **GREAT WESTERN BANK,** a bank chartered under the laws of the State of South Dakota, successor in interest to the loans of TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010**,** on behalf of said company.



_____

Notary Public, State of _____



**WHEN RECORDED, RETURN TO:**

**EXHIBIT "A"**

**TO**

**RELEASE OF LIEN**


**LEGAL DESCRIPTIO N**


**[TO BE ATTACHED TO EXECUTION COPY]**


###End of Order###