Mark E. MacDonald, TX Bar No. 12758300
Mark E. MacDonald, Jr. IL Bar No. 6217592
Daniel J. Artz, TX Bar No. 01365570
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220; Facsimile: (214) 890-0818
Email: mark@macdonaldlaw.com
**COUNSEL FOR DLH MASTER LAND HOLDING, LLC
AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS
AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| DLH Master Land Holding, LLC, | § | |
| Allen Capital Partners, LLC, | § | Case No. 10- 30561-HDH-11 |
| Richard S. Allen, Inc. | § | |
| Richard S. Allen, | § | Jointly Administered |
| | § | |
| Debtors. | § | |
| _____ | § | |

## DISCLOSURE STATEMENT FOR DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN SOLICITATION OF ACCEPTANCES OR REJECTIONS OF CHAPTER 11 PLAN. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.**

# I. INTRODUCTION

Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity Interests in and Claims against Debtors in connection with (i) solicitation of acceptances of the Plan filed by Debtors with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") and (ii) the hearing to consider Plan confirmation (the "Confirmation Hearing") scheduled for _____ at _____ p.m. (prevailing Central Time).

Debtors' Third Amended Joint Plan of Reorganization ("Plan") of the Bankruptcy is **Exhibit A** to this Disclosure Statement.

A ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that Debtors believe may be entitled to vote to accept or reject the Plan.

**THE ACP AND DLH DEBTORS EACH BELIEVE THAT THE PLAN WILL PROVIDE ALL CLAIMANTS AND INTEREST HOLDERS MORE THAN THEY WOULD HAVE RECEIVED IN A LIQUIDATION OF EACH DEBTOR'S ASSETS UNDER CHAPTER 7, AND SHOULD BE ACCEPTED. CONSEQUENTLY, EACH DEBTOR URGES IMPAIRED CLAIMANTS TO VOTE FOR THE PLAN.**

On _____, 2011, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A

DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, attached as **Exhibit B**, sets forth detailed deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning classification of Claims and Interests for voting purposes and tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide information to enable a hypothetical, reasonable investor, typical of the holders of such Claims or Interests, to make an informed judgment in exercising his, her or its rights either to accept or reject the Plan. In order for the votes cast pursuant to this solicitation to count, the Bankruptcy Court must find this Disclosure Statement contains information of the kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes being solicited to make an informed judgment about the Plan and must authorize Debtors to solicit acceptances of the Plan.

This Disclosure Statement describes Debtors' reorganization Plan. You are urged to study the Plan in full and to consult with your counsel about the Plan and its impact upon your legal rights. Please read this Disclosure Statement carefully before voting on the Plan.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN**

**PROVIDED BY DEBTORS' MANAGEMENT (AND CONSULTANTS/CONTRACTORS), UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.**

**NO REPRESENTATIONS CONCERNING DEBTORS ARE AUTHORIZED BY DEBTORS OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. DEBTORS RECOMMEND THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN, ATTACHED AS <u>EXHIBIT A</u>, IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH PARTY WHOSE CLAIM IS IMPAIRED IS URGED TO REVIEW THE PLAN PRIOR TO VOTING.**

## <u>II. SUMMARY OF PLAN</u>

Debtors' proposed Reorganization Plan contemplates that the Debtors will obtain sufficient Exit Financing from (i) insiders, (ii) third parties, or (iii) a combination of (i) and (ii)  to enable the Debtors to pay all Administrative and non-tax Priority Claims (other than the Debtor-in-Possession Financing) in full on the Effective Date. Debtors would have preferred to exit Chapter 11 utilizing third party debt or equity financing through obtaining a joint venture partner for ACP's subsidiary LPKC and a joint venture partner for DLH.  Although active negotiations continue concerning such potential joint ventures, Debtors are not in a position to continue to wait in soliciting votes for financial restructuring. As such, with certain fairly minimal contingencies, the Exit Financing described herein is being provided by insiders or entities controlled by insiders.

Unfortunately, it has also become clear while negotiating with third parties that the Dallas Logistics Hub Project at +/- 5,500 acres is currently too large for the current financing and development environment.  As such, the land in Pool 3 ("ABOT Pool") (consisting of

approximately 1,032 acres)  and Pool 4 ("Seller Finance Pool") (consisting of approximately 1,626 acres) will be transferred, either by deeds in lieu or via foreclosure sales, to the senior secured creditors with first liens on the respective parcels.  One of the reasons this is necessary is to reduce the outstanding Reorganized DLH indebtedness by approximately $55.4 million in estimated claims, which would otherwise accrue interest. DLH has insufficient funds available under the DIP Facility to pay the taxes by January 31, 2011 on the undeveloped parcels being abandoned or transferred back to the various secured creditors.  DLH anticipates individual creditors may elect to pay those taxes which would eliminate approximately $112,650 in anticipated administrative expenses.

**<u>DLH</u>**

The Debtors and DIP Lenders will convert the Debtor In Possession Financing for DLH into a Post-Confirmation Term Loan in the amount of approximately $2.6 Million, and will obtain additional exit financing from one or more of three possible sources.  Certain DLH Secured Claims will be satisfied on the Effective Date by the surrender of the land securing such Secured Claims. DLH will finance distributions to the other creditors from the sales of land or from subsequently negotiated joint ventures.  The Net Proceeds from any sale would be used first to pay necessary costs of closing, second, in payment of the Release Price necessary to satisfy in full the Secured Claims secured by such parcel, third, in payment of a Release Price on the Term Loan from the DIP Lenders, and fourth, a set aside sufficient to allow the Debtors and Debtor's owners to pay actual taxes incurred as a result of the taxable gains realized on such a sale. The remaining Net Proceeds from any such sale would be allocated as provided in the Plan between Reorganized DLH and the Creditors of DLH: (a) to fund the operating expenses of Reorganized DLH, including the costs of managing and marketing the DLH

Land, and (b) to fund distributions to Creditors. The projected DLH overhead expenses have been sharply reduced from prior projections.

Under the Plan, DLH creditors secured by vacant land are divided into four (4) pools.

**Pool 1 (the "Compass Pool")** contains parcels as set forth in **Exhibit A-1** to the Plan subject to the liens of Compass Bank. Most of the parcels in the Compass Pool are Development Ready. Compass has a perfected first lien on all of the parcels in the Compass Pool, all of which secure the Allowed Secured Claim of Compass. The Plan establishes Release Prices for each individual parcel in the Compass Pool such that the sum of the Release Prices do not exceed 136% of the Allowed Secured Claim of Compass. Specific Release Prices for each parcel are specifically reflected on Exhibit A-1 to the Plan ("Compass Release Prices"). To pay Compass's Pool 1 Allowed Secured Claim, Compass shall receive a Variable Pay Note which will be payable from two sources: 1) the net proceeds of any sale of a parcel in Pool 1 which is subject to the Compass lien, up to the Release Price for such Parcel; and 2) 30% of Pool 1 Net Sales Proceeds for that parcel and for any and all sales of other property contained in Pool 1. The Notes will accrue interest at 7.25% and mature not later than 5 years after the Plan Effective Date. To the extent that certain threshold amounts of distributions to Compass from sales of Pool 1 properties are not met, Reorganized DLH will be obligated to make certain structured sales, sealed-bids and or auctions of land in Pool 1.

**Pool 2 (the "Hutchins Industrial Pool")** contains parcels as set forth in **Exhibit A-2** to the Plan subject to various seller financing liens. All or substantially all of the parcels in the Hutchins Industrial Pool are Development Ready. Secured Creditors with Pool 2 Allowed Secured Claims will each receive a Variable Pay Note payable from two sources: 1) the net proceeds of any sale of a parcel in the Hutchins Industrial Pool which is subject to their lien, and 2) their pro-rata share of 30%

of Pool 2 Net Sales Proceeds for any and all sales of other property contained in Pool 2. The Pool 2 Notes will accrue interest at 7.25% and mature not later than 5 years after the Plan Effective Date. To the extent that certain threshold amounts of distributions to Pool 2 Creditors from sales of Pool 2 properties are not met, Reorganized DLH will be obligated to make certain structured sales, sealed-bids and or auctions of land in Pool 2.

Pool 3 (the "ABOT Pool") contains parcels as set forth in **Exhibit A-3** to the Plan subject to the liens of ABOT. Due to the location and current infrastructure needs, most of the land contained in the ABOT Pool will take longer to fully develop and sell. ABOT has a perfected first lien on all of the parcels in the ABOT Pool, all of which secure the Allowed Secured Claim of ABOT. DLH shall surrender to ABOT all of the Pool 3 Parcels on the Effective Date in full satisfaction of the Claim of ABOT and all guarantees by Debtors and other related parties.

Pool 4 (the "Seller Notes Pool") contains parcels as set forth in **Exhibit A-4** to the Plan subject to various non-recourse seller financing liens. Due to the location and current infrastructure needs, the land contained in Pool 4 will take longer to fully develop and sell. DLH shall surrender to each of the Secured Creditors holding Pool 4 Allowed Secured Claims all of the Pool 4 parcels securing such Claims on the Effective Date in full satisfaction all such Claims. Notwithstanding the foregoing, to the extent to which DLH has either moved to approve the sale of such parcel to a third party or has an executed agreement for the sale of such parcel, DLH may retain such a parcel for up to 90 days after the Effective Date. If the sale of the parcel is closed within that time period, the claims of the secured creditors with an interest in such parcel shall be fully satisfied from the proceeds of such sale.

With respect to the "Auction Parcels" designated in Exhibit A-4, prior to confirmation,

Debtors will place each these parcels individually or otherwise into a structured marketing program (i.e. sealed bid or auction) setting minimum reserve prices sufficient to pay the claim for each individual parcel and/or (iii) use such other marketing means to sell the parcel(s). The net sales proceeds generated by Debtors through these efforts shall be used to provide sufficient net cash flow to Debtor to fund bankruptcy costs and establish a short-term operating reserve. In the event any or all of these parcels are not successfully sold and closed by the 90th day after Effective Date, Debtor will surrender each such parcel to its respective creditor in full satisfaction of all claims.

DLH Secured Creditors which have claims secured by developed property are Great Western Bank (hereafter "Great Western"), which has a first lien on the ADESA Property, and Compass Bank, which has first liens on Buildings A and B.

**Great Western's Secured Claim** is being satisfied in the manner contemplated by a Compromise and Settlement Agreement between the Debtors and Great Western which was previously approved by the Bankruptcy Court , BB&T and the FDIC, unless Great Western for any reason exercises its right to terminate that Compromise and Settlement Agreement. Pursuant to that settlement, the ADESA property is being offered for sale prior to confirmation and may be sold before confirmation. In the event the Settlement Agreement is terminated by Great Western, the Plan provides that Great Western's claim be converted into a three (3) year note bearing interest at 6.25% payable monthly based on a 20 year amortization. DLH ADESA Parcel, LLC will pay on principal plus non-default interest until disputed reasonable attorneys' fees and any claim of default rate interest post petition pre-confirmation are finally resolved. The asset will cash flow and has been listed for sale prior to confirmation. Reorganized DLH and DLH ADESA Parcel, LLC will continue to make best efforts to sell the real property and accompanying facility. In the event the real property and

accompanying facility or DLH's interest in DLH ADESA Parcel, LLC is sold after the Effective Date, Great Western shall be paid at least fifteen million dollars ($15,000,000) against the Great Western Note from the sales proceeds. Provided the Great Western Note is paid down by $15,000,000 within six (6) months from the Effective Date, the term of the remaining note may be extended at Reorganized DLH's option so that the remaining loan has a 10 year balloon. Such a prepayment shall not change the monthly amount due under the Great Western Note.

**Compass Bank's Secured Claim** with respect to the Building Loans is being satisfied in the manner described in Section 4.03, Subclass 3F of the Plan. On the Effective Date, the Compass Bank Buildings will be contributed to DLH Buildings AB, LLC with DLH holding all ownership and economic interests and Compass holding a an option to purchase 5% of DLH Building AB, LLC for a *de minimis* amount. Compass Bank's Allowed Claim with respect to the Building Loans will be extended using a five year Variable Pay Note with interest at 6.25%. Compass will have the benefit of all net operating income (subject to ordinary and customary reserves and expenses) generated by the buildings, but is being asked to consider additional loans to DLH Building AB, LLC for tenant improvements and brokerage commissions to facilitate lease-up. DLH is actively negotiating multiple leases on Buildings A and B, and is currently marketing Buildings A and B for sale.

DLH has the option under the Plan, with respect to any parcel securing a Secured Claim, to surrender such parcel in full satisfaction of the Secured Claim secured by such parcel. In the case of any Secured Claim as to which the Secured Creditor has full recourse against DLH with respect to the Claim secured by a parcel to be surrendered by DLH, DLH shall request the Bankruptcy Court to determine the value of any such parcel to be surrendered to the Secured Creditor for purpose of calculating the amount to be credited against such Secured Creditor's Claim.

**DLH Exit Financing.** DLH anticipates obtaining Exit Financing from one or more of three (3) sources: (a) an auction and/or Section 363 sale of several parcels of land to be conducted prior to the Effective Date with Bankruptcy Court approval, but which may not close until after the Effective Date; and/or (b) a loan from Allen Opportunity Fund, a non-Debtor entity affiliated with DLH which owns a parcel of property near the DLH property, in an amount of up to $400,000; and/or (c) a loan from Richard S. Allen, individually, in amount of up to $750,000.00. The auction and/or Section 363 sale described above is anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the parcels to be sold, and generate excess cash which DLH may use to consummate the Plan. As set forth below, Debtor currently has various parcels of land listed for sale with Jones, Lang, LaSalle. At this time, however, the Debtor has not moved for approval of the auction and/or Section 363 sale but anticipates doing so shortly. Further, Richard S. Allen is currently a Debtor in his own Chapter 11 case, and any loan from Richard S. Allen is subject to obtaining approval of such loan from the Bankruptcy Court in the Richard S. Allen Chapter 11 case.

**DIP Lenders' Term Loan.** The Debtor-in-Possession Financing which remains unpaid on the Effective Date, which DLH estimates will be approximately $2.6 Million, shall be converted to a Term Loan (the "**Term Loan**"). The Term Loan shall retain its perfected subordinate liens on the DLH Property in Pools 1 and 2 (except to the extent any such property is sold prior to the Effective Date). The Plan establishes Release Prices for the Term Loan for each parcel, calculated at 150% of the allocable portion for each parcel in Pool 1 and Pool 2 (excluding any land sold prior to the Effective Date) of the initial balance of the Term Loan on the Effective Date of the Plan. The Term Loan shall bear a variable rate of interest at Prime plus ten percent (10%). Interest on the Term Loan shall accrue annually, and shall be payable solely from the Net

Sales Proceeds of the Pool 1 and Pool 2 properties and, if applicable, Parcel 69. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan. On the Effective Date, the balance of the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the outstanding balance of the DIP Loan on the Effective Date, and (b) all reasonable costs, including reasonable attorneys' fees, incurred by the DIP Lenders.

**DLH Unsecured Creditors.** DLH unsecured creditors will be paid over time from cash generated by DLH's operations and sales of property. Unsecured Allowed Claims against DLH total approximately $11.6 million, including approximately $100,000 in smaller claims (less than $18,000 each). The exact amount of Unsecured Allowed Claims against DLH will depend on Compass Bank's decision regarding the section 1111(b) election.

Treatment:    DLH proposes a cafeteria plan with options for Allowed Unsecured Claims:

A) Receive a Variable Pay Note in the principal amount of 50% of the electing holder's Allowed Claim, payable without interest from 75% of DLH Unsecured Creditor Net Proceeds. If not previously paid, these notes will mature and be fully payable seven years from the Effective Date.

B) Receive a Variable Pay Note in the principal amount of 100% of the electing holder's Allowed Claim payable from 25% of DLH Unsecured Creditor Net Proceeds, but only until the Option A notes are paid in full, and thereafter receiving all of the DLH Unsecured Creditor Net Proceeds. If not previously paid, these notes will mature and be fully payable ten years from the Effective Date, with interest accruing at the federal judgment rate in effect on the Effective Date. From September 27, 2010 to October 3, 2010, the federal judgment rate was 0.25%. The current federal judgment rate may be found online at:

   http://www.txnd.uscourts.gov/publications/pjrate.html.

C) An electing holder of an Allowed Unsecured Claim may convert its Allowed Claim to a ***Class B Preferred Callable Membership Interest*** in Reorganized DLH, with par

value equal to the amount of the Allowed Claim. The terms of the Class B Preferred Callable Membership Interest are described below.

**DLH Unsecured Creditor Net Proceeds are defined as: 5% of the Pool 1 Net Sales Proceeds and 5% of the Pool 2 Net Sales Proceeds.**

The Class B Preferred Callable Membership Interests are a preferred return on DLH equity which can be redeemed by DLH by payment of the par value (100% of the Allowed Claim amount), plus 3% interest per annum, at any time on or before the 10th anniversary of the Effective Date.

In the event of a Cramdown, DLH unsecured creditors will be paid up to 25% of their Allowed Unsecured Claims, without interest, from DLH Unsecured Creditor Net Proceeds. In the event of a Cramdown, DLH subordinated unsecured creditors will receive nothing under the Plan. At this time, it does not appear that there are any members of the class of subordinated unsecured creditors in DLH.

**DLH Equity Interests.** Except in the case of a Cramdown, except to the extent converted into redeemable preferred interests in Reorganized DLH or required for Exit Financing, current equity will retain their interests in Reorganized DLH and Reorganized ACP.

**ACP Plan:**

Generally, ACP creditors, both secured and unsecured, will be paid over time from cash generated by the operations of ACP's subsidiaries. The ACP Debtor in Possession Financing is expected to be paid in full on the Effective Date or within 60 days after the Effective Date, depending on the timing of anticipated closings, from funds available through transactions at LPKC.

In the alternative, providing ACP retains an interest in DLH, certain creditors of ACP have the option to hold a redeemable preferred return equity interest in DLH. In the event certain classes of

unsecured claims vote not to accept the Plan, the treatment set forth herein shall be significantly modified to allow for confirmation via cramdown.

**Guaranty Claims Against ACP**.  ACP is obligated on a substantial amount of Claims arising out of debts of DLH and direct and indirect subsidiaries of ACP which ACP has guaranteed.  With respect to each such guaranty Claim owed by ACP, ACP has an offsetting reimbursement and/or contribution claim against the principal obligor of such debt, either DLH or ACP's direct or indirect subsidiaries.  With respect to each holder of a Claim against ACP arising out of ACP's guaranty of the debt of DLH or a direct or indirect subsidiary, subject to the limitations on ACP Class 8 Claims in the Plan, that holder may elect either  (a) to allow the guaranty to "ride through" the Bankruptcy, with Reorganized ACP assuming the continuing liability on such guaranties, or (b) to accept Class B Preferred Callable Membership Interests in DLH (with respect to debts of DLH guaranteed by ACP) or Class C Preferred Callable Membership Interests in DLH (with respect to debts of ACP's direct or indirect subsidiaries guaranteed by ACP) in full satisfaction of such Claims. If the holders of these guaranty claims accepted the DLH securities in full payment, their claims against the principal obligor, either DLH or an ACP subsidiary, would be fully discharged, and they would lose their valuable first liens on tangible real property of DLH and ACP subsidiaries because those liens would have been paid and discharged.  Accordingly, ACP believes that no holder of a guarantee Claim will make this election, and that virtually all of the holders of ACP guarantees claims will elect to simply ride through ACP's case without distribution.

## ACP Secured Creditors

**Mr. Foley:**     Mr. Tim Foley has an approximately $6.5 million note fully secured by various rights of distribution to ACP, including the Kelly properties discussed later.  Those security interests

are preserved and paid under a Variable Pay Note. The ACP Secured Variable Pay Note issued to Mr. Foley will be paid from the proceeds and distributions received by ACP on which Mr. Foley has a validly perfected lien until the Allowed Amount of such claim is paid in full plus interest at 7.25% per annum or not later than five years after the Effective Date at which time all amounts will be due and owing.

**Pacific Western Bank:** Pacific Western has a $1.5 million note secured by an interest in substantially all ACP's subsidiaries. Pacific Western shall receive a Variable Pay Note which is entitled to 10% of all ACP Net Sales Proceeds, not to exceed $100,000 of principal and interest payments for any quarter of the calendar year. On each anniversary of the Effective Date, if Pacific Western has not received at least $250,000 in proceeds for the proceeding year, Reorganized ACP shall make an additional payment to Pacific Western within sixty (60) days equal to the difference between $250,000 and what proceeds Pacific Western received in the preceding year. Pacific Western's ACP Secured Variable Pay Note shall mature five (5) years after the Effective Date at which time the unpaid principal balance and all accrued but unpaid interest will be due and owing.

**ACP CLASS 5 (SUBORDINATED) AND ACP CLASS 7 CLAIMS (GUARANTEES):**

ACP Class 5 consists of all Subordinated Claims against ACP. However, by definition, no ACP Class 7 Claim shall be considered to be a subordinated claim, so those claims qualifying as ACP Class 7 Claims are excluded from both ACP Class 4 and ACP Class 5. ACP Class 7 Claims arose from one or more guaranties executed by ACP on obligations of either ACP's direct or indirect California subsidiaries or of DLH debt and form one class. Class 7 excludes all guarantees where (i) the value of the underlying collateral is less than the obligation which had been guaranteed by ACP, or (ii) where the underlying obligation has matured or will mature

within three (3) months of the Effective Date. The guaranty held by Compass Bank and most of the guaranties held by Bank of America are contingent and unliquidated at this time. The proposed treatment of unsecured claims relates only to any liquidated non-contingent portion of each Bank's claim.

Despite ACP's multiple requests, Compass Bank has not committed to what, if any, amount it intends to assert as its liquidated non-contingent claim. Compass Bank is fully secured by DLH collateral on its land loan; if Compass Bank elects Section 1111(b) treatment on its DLH building loan it would be fully secured at DLH as well. If that is its legal position, Compass Bank would either be paid on any guarantee Claim by ACP by a) accepting DLH Class B Preferred Callable Member Interests in the face amount of such guaranty Claim in full payment and satisfaction of its DLH and ACP claims; b) by accepting a ride through guaranty from Reorganized ACP not enforceable during the period of the ACP Plan so long as DLH is in compliance with its obligations under the DLH Plan; or c) if it accepts neither, ACP will request that the claims arising from the guaranties be disallowed.

If Compass Bank does not elect Section 1111(b) treatment on its building and obtains an Allowed Unsecured Claim in DLH and in ACP for any liquidated portion of its deficiency, Compass Bank may elect its cafeteria plan treatment for that Allowed Unsecured claim in each case; provided however, if Compass Bank elects the 50% payout option against either DLH or ACP it shall have no further recovery against the other or against Richard Allen or Richard S. Allen Inc.

Bank of America has recently indicated that Bank of America anticipates having a deficiency claim in ACP's bankruptcy of at least $9.8 million based on one completed foreclosure

(discussed below) and its anticipated shortfalls on certain other properties. Debtors continue to negotiate with Bank of America with respect to a variety of non-debtor subsidiaries of ACP and it is possible that one or more of the non-debtor subsidiaries will be forced into a bankruptcy proceeding in order to avoid foreclosure. Bank of America has foreclosed on one loan involving River Plaza. The deficiency at River Plaza, properly calculated, is estimated to be approximately $7.3 million. Unless Bank of America obtains an order excusing its late filing, Bank of America will be treated as a subordinated creditor (since its claim was late filed) to the extent it obtains an Allowed Claim reflecting this deficiency.

Holders of ACP Class 5 Claims (Subordinated Claims) may elect to receive one of the following treatments:

(a)     An ACP ten (10) year Variable Pay Note with a principal amount of 100% of the electing holder's Allowed Claim with interest accruing at the federal judgment rate on the Effective Date of the Plan, payable from payable from 20% of the ACP Unsecured Creditor Net Proceeds after the ACP 50% Notes are paid in full and 100% of ACP Unsecured Creditor Net Proceeds after the ACP 50% Notes and the ACP 100% Notes are paid in full, with a ten (10) year maturity from the Effective Date if not paid in full prior to that time; or

(b)     DLH Class C Preferred Callable Membership Interests in Reorganized DLH with par value equal to the electing holder's Allowed Claim. The terms of the DLH Class C Interests are described in section 13.15 of the Plan. In the event of DLH Plan is confirmed by cramdown, there will be no DLH Class C Preferred Callable Membership Interests available for ACP to distribute.

**OTHER ACP UNSECURED CREDITORS (ACP CLASS 4):**

## Claims and Treatment:

ACP unsecured creditors will be paid over time from cash generated by operations of ACP's subsidiaries or sales or property by such subsidiaries. In addition, except in the case of a Cramdown, Unsecured Creditors of ACP are offered the option to hold a callable preferred return equity interest in DLH. For all remaining unsecured ACP creditors, ACP proposes a cafeteria plan whose options shall be as follows:

A)   Receive a Variable Pay Note ("ACP 50% Notes") in the principal amount of 50% of the electing holder's Allowed Claim, payable without interest from their pro rata share of 75% of ACP Unsecured Creditor Net Proceeds. Unless previously paid, these notes mature seven years from the Effective Date.

B)   Receive a Variable Pay Note ("ACP 100% Notes") in the principal amount of 100% of the electing holder's Allowed Claim payable from 25% of ACP Unsecured Creditor Net Proceeds, but only until the Option A notes are paid in full, and thereafter receiving 80% of all of the ACP Unsecured Creditor Net Proceeds until the subordinated class notes are repaid in full. If not previously paid, these notes will mature and be fully payable ten years from the Effective Date, with interest accruing at the federal judgment rate on the Effective Date of the Plan.

C)   Class C Preferred Callable Preferred Membership Interests in DLH as described below.

ACP Unsecured Creditor Net Proceeds are determined at the end of each fiscal quarter as measured sixty days after the end of the quarter, and are equal to seventy percent (70%) of:

(a)   ACP Net Sales Proceeds for the fiscal quarter in question, less
(b)   the sum of
      (i)    general and administrative costs actually incurred by ACP for the fiscal quarter in question and
      (ii)   all distributions or payments on the ACP Exit Financing or on ACP Secured Variable Pay Notes made during the fiscal quarter in question.

Notwithstanding the foregoing, ACP Unsecured Creditor Net Proceeds shall not exceed $300,000 per calendar quarter during the first eight (8) calendar quarters under the Plan.

The DLH Class C Preferred Callable Membership Interests are a preferred return on DLH equity which can be called and redeemed by DLH by payment of par (100% of the Allowed Claim amount), plus 3% interest per annum, at any time on or before the 10th anniversary of the Effective Date. The Class C Preferred Callable Membership Interests are only senior to the membership interests retained by ACP in DLH. In the event the Plan for DLH is confirmed by Cramdown, no DLH Class C Preferred Callable Membership Interests will be issued and option c above will not be available.

In the event of a Cramdown, ACP unsecured creditors will be paid up to 50% of their Allowed Unsecured Claims, without interest, in quarterly payments from ACP Unsecured Creditor Net Proceeds. In the event of a Cramdown, ACP subordinated unsecured creditors will receive nothing under the Plan.

**Cramdown Plan**

The Debtors reserve the right to seek confirmation of this Plan by "cramdown" pursuant to Section 1129(b)(1) in the event that the Plan is rejected by the holders of either the Unsecured Claims or the Subordinated Claims in either the DLH Case or the ACP Case.

Under applicable bankruptcy law pertaining to cram down, the bankruptcy court must find that a plan is fair and equitable, which is customarily interpreted as indicating that creditors will receive the higher of reorganization value or the liquidation value of the business assets and that the Plan complies with the absolute priority rule. Reorganization value is a concept originally derived from the reorganization of businesses such as trains, industrial companies or other companies having reasonably predictable history of past cash flows. Neither DLH nor ACP meets the test of that legal model. By definition, raw land development is more speculative and less

predictable than established operating businesses with significant predictable cash flow.

Accordingly, Debtors believe that the reorganization value of both ACP and DLH is nothing, after providing for all Administrative Priority, and Secured Claims, under applicable legal standards even though the plans which DLH and ACP have proposed are feasible and ones that creditors should favorably consider. Liquidation value within the meaning of applicable bankruptcy case law is typically a sale within six months. In spring 2010, in connection with a contested hearing with TierOne Bank for use of cash collateral, a representative of CBRE Richard Ellis provided an estimate of liquidation value ($96.7 million) substantially equal to outstanding secured debt on the land, showing no equity in the DLH Land over secured debt. During the intervening period, DLH has been unable to sell any parcels although DLH will shortly attempt to use auction sales to sell certain specified parcels to generate cash to permit internal exit financing. DLH believes that the proposed amount to be paid over time as shown in projects attached as Exhibit E hereto substantially exceeds the liquidation value of its assets.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, or by the holders of Unsecured Claims (ACP Class 4) or Subordinated Claims (ACP Class 5) in the ACP Case, the ACP Plan provides that all equity interests in ACP will be cancelled, and new Equity Interests in ACP will be issued in exchange for one or more of the following: (a) a cash contribution by the owners of Allen Opportunity Fund in an amount up to $800,000, to be paid from the net proceeds of an auction of Parcel 2 owned by Allen Opportunity Fund; (b) a cash contribution of up to $750,000.00 from Richard S. Allen, to be paid from proceeds available to Richard S. Allen from other transactions; or (c) such additional sums as the Court may Order as to effect cramdown. The Equity Interests in Reorganized ACP in such an

event shall be distributed pro rata among the contributing parties based upon their contributions of new value to ACP. Further, the ACP Plan provides that Allowed Unsecured Claims (ACP Class 4) will be paid up to 50% of their Allowed Claims, without interest, in quarterly payments from ACP Unsecured Creditor Net Proceeds, and Subordinated Claims (ACP Class 5) will receive nothing under the Plan. At this time, Bank of America's claim is the only claim in ACP Class 5 known to the Debtors. Bank of America has filed a Motion which is being contested by the Creditors' Committee seeking to have its claim recharacterized into ACP Class 4.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, so that Cramdown is necessary in the DLH Case, the DLH Plan provides that all equity interests in DLH will be cancelled, and new Equity Interests in DLH will be issued in exchange for: (a) a cash contribution of $1.0 Million from ACP (subject to Bankruptcy Court approval, which is being requested as part of the ACP Plan), and (b) a contribution from the DIP Lenders of up to $1.20 Million, in the form of a credit on the DIP Loan (which will reduce the amount of the Term Loan on the Effective Date by the amount of such credit). The Equity Interests in Reorganized DLH shall be distributed pro rata among ACP and the DIP Lenders based upon their contributions of new value to DLH. Further, the DLH Plan will be modified to provide that Unsecured Claims (DLH Class 4) will be paid up to 25% of their Allowed Unsecured Claims, without interest, in quarterly payments from DLH Unsecured Creditor Net Proceeds, and Subordinated Claims (DLH Class 5) will receive nothing under the Plan.

Debtors reserve the right to amend the Plan as necessary to cramdown any non-consenting secured class of creditors.

## II.    EXPLANATION OF CHAPTER 11 CASES

Formulating the attached reorganization plan was Debtors' principal objective in Chapter 11. The Plan of Reorganization sets forth the means for satisfying claims against Debtors. Chapter 11 does not require that each holder of a claim against a debtor vote in favor of the plan in order for the bankruptcy court to confirm the plan. However, a plan must be accepted by the holders of at least one "impaired" class of claims, without regard to the votes of claims in that class held by "insiders," within the meaning of the Bankruptcy Code. A claim that will not be repaid in full or as to which legal rights are altered, or an interest that is adversely affected, is impaired. A holder of an impaired claim or interest is entitled to vote to accept or reject the plan if the claim or interest has been allowed under section 502 of the Bankruptcy Code. In order for a class of claims to be deemed to have accepted the plan, a majority in number and two-thirds in amount of total allowed class claims must vote in favor of the plan. In order for a class of interests to be deemed to have accepted the plan, two-thirds in amount of total interests of the class must actually vote in favor of the plan. Section 1125 of the Bankruptcy Code requires full disclosure to be received by all impaired parties before solicitation of acceptances of a plan of reorganization commences. This Disclosure Statement is presented to impaired claimants under the Plan to satisfy the requirements of section 1125 of the Bankruptcy Code.

Even if all classes of Claims accept the Plan, it might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth requirements for confirmation. Among other things, a plan of reorganization must be in the best interests of claimants and interest holders, and the value to be distributed to claimants and interest holders must not be less than the value such parties would receive if debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may confirm the Plan, even though less than all classes of impaired Claims or Interests accept, so long as one class of impaired Claims or Interests (excluding insider classes) accepts the Plan. Confirmation of the Plan over objection of one or more classes of Claims or Interests is generally referred to as a "cram-down." The circumstances under which the Bankruptcy Court may confirm the Plan over the objection of a class of Claims or Interests are set forth in section 1129(b) of the Bankruptcy Code. The Plan includes provisions reserving Debtors' rights to cram-down certain classes of Creditors.

Confirmation of the Plan will discharge Debtors from all pre-confirmation debts and liabilities except as expressly provided in the Plan, the order of the Bankruptcy Court confirming the Plan or section 1141(d) of the Bankruptcy Code. Confirmation makes the Plan binding upon Debtors and all Creditors, Interest Holders and other parties-in-interest, regardless of whether or not they have accepted the Plan.

The Plan will become fully consummated upon the entry of a final order of confirmation of the Plan and the first distribution on the Effective Date. The Plan Consummation will be evidenced by filing a certificate of consummation with the Bankruptcy Court.

## IV. VOTING-PROCEDURES

1. **Unimpaired Classes**. The votes of claimants whose Claims are not impaired under the Plan are not being solicited because those classes are deemed to have accepted the Plan. As a result, Debtors are not soliciting acceptances of the DLH or ACP Plan Classes 1, 2, and 5.

2. **Impaired Classes**. Debtors are seeking the acceptances of the Plan by claimants in DLH and ACP Classes 3 (including each subclass therein), 4, 6, 7, 8 and 9 whose Claims or Interest are impaired under the Plan.

Each holder of an Allowed Claim or Interest which is included in an impaired class may vote by completing, dating, and signing the ballot sent to such holder and filing the ballot as set forth below.  If you are a holder of a disputed, contingent or unliquidated Claim, you may petition the Bankruptcy Court to allow your Claim for voting purposes only by making timely application to the Bankruptcy Court pursuant to rule 3018 of the Bankruptcy Rules.  Such claimants are advised to seek the advice of their own counsel how to make such an application.  Each holder of an Allowed Claim may vote on the Plan by completing, dating, signing, and filing the ballot as set forth below.

Ballots are enclosed with this Disclosure Statement sent to each claimant eligible to vote on the Plan.  For all classes, ballots must be sent to

> Mark E. MacDonald
> MacDonald + MacDonald, P.C.
> 10300 N. Central Expressway, Suite 335
> Dallas, TX 75231
> (214) 237-4220; Facsimile: (214) 890-0818

by _____.

# V. CONFIRMATION OF THE PLAN

## A.     The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing to confirm a reorganization plan.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for _____. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B.      Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a reorganization plan.    Any objection to confirmation must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the objector's name, the nature and amount of Claims or Equity Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court and served upon and received no later than _____, 2010 at 4:00 p.m. (prevailing Central Time).

All objections must be served, so as to be received no later than _____, 2010, at 4:00 p.m. (prevailing Central Time), upon the following:

Mark E. MacDonald
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
Facsimile: (214) 890-0818

Daniel J. McAuliffe
DLH Master Land Holding, LLC
1700 Pacific Avenue, Suite 1250
Dallas, TX  75201
214 / 661 - 1851  Fax

Richard L. Wasserman
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
Fax: 410.244.7742

Michael D. Warner
301 Commerce Street
Suite 1700
Fort Worth, TX  76102
Fax:  817-810-5255

[Counsel for other creditors or parties in interest who wish to have the objections to confirmation served upon them.]

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## VI. REPRESENTATIONS

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT AND/OR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION HEREWITH SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH SINCE THE DATE HEREOF.**

**ANY BENEFITS OFFERED TO CREDITORS UNDER THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN REGISTERED WITH, REVIEWED BY OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OF THE UNITED STATES ("SEC"), THE TEXAS SECURITIES BOARD ("TSB"), OR ANY OTHER RELEVANT GOVERNMENTAL OR REGULATORY AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, THE SEC, TSB, OR ANY OTHER GOVERNMENTAL OR REGULATORY AUTHORITY HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.**

**NO REPRESENTATIONS CONCERNING DEBTORS ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. DEBTORS RECOMMEND THAT ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE THE VOTE OF A CLAIMANT WHICH IS OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, DEBTORS ARE UNABLE TO WARRANT OR**

REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS COMPLETE AND ACCURATE. THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. PRIOR TO VOTING ON THE PLAN CLAIMANTS HOLDING CLAIMS WHICH ARE IMPAIRED UNDER THE PLAN ARE URGED TO REVIEW IN FULL THIS DISCLOSURE STATEMENT AND THE PLAN, TOGETHER WITH ALL ATTACHED EXHIBITS AND SCHEDULES, AND ARE URGED TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE BY THE HOLDERS OF CLAIMS AND INTERESTS IN DEBTORS WHOSE CLAIMS OR INTERESTS ARE IMPAIRED UNDER THE PLAN TO ENABLE SUCH CLAIMANTS TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

ESTIMATES OF CLAIMS IN THIS STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT.

## VII. DESCRIPTION OF DEBTORS' BUSINESSES

### A. DLH'S BUSINESS

DLH's primary business is development of the real estate project known as the Dallas Logistics Hub located in Dallas County, Texas. The Dallas Logistics Hub was an approximately 6,000-acre multi-modal logistics park located 12 miles south of downtown Dallas. After the return of certain real property to DLH's lenders, and the successful sale of auction parcels, the remaining developable land is expected to be approximately 2,540 acres. Some of that land may be sold by auction (Section 363 sale) prior to or shortly after the Effective Date.

The Dallas Logistics Hub benefits from the convergence of multiple major interstate trucking highways, multiple rail lines, and a growing local airport, all located within the third largest industrial market in the Nation. For that reason, the Dallas Logistics Hub is uniquely positioned to serve as one

of the primary national hubs for the distribution of goods throughout the Central and Eastern United States.  A pivotal part of the accessibility of Dallas Logistics Hub is its proximity and access to four of Dallas/Fort Worth's primary interstate highways, connecting the DFW Metroplex and Dallas Logistics Hub to the greater transportation thoroughfares of the southern United States:

- Interstate 20…the primary east-west trucking corridor for the southern U.S., connecting Atlanta to Los Angeles, is the northern boundary of Dallas Logistics Hub.

- Interstate 35…the NAFTA Trade Corridor, connecting Mexico to Canada, is located approximately 4 miles to the west of Dallas Logistics Hub.

- Interstate 45…the direct route to the Port of Houston is the eastern boundary of Dallas Logistics Hub.

- Interstate 30… the direct route to Little Rock, Memphis and the northeastern US is located approximately 9 miles north of Dallas Logistics Hub.

- Planned Loop 9…the planned multi-billion dollar highway will run along the southern boundary of Dallas Logistics Hub.

With more than 1,774 acres (before certain acreage is given back) owned by DLH designated under Foreign Trade Zone 39, DLH is strategically positioned for tenants to receive, deliver and/or transload thousands of shipping containers each day. Currently, these import shipping containers predominantly originate from the Pacific Rim Countries and move in-bound into the Union Pacific Dallas Intermodal Terminal ("UPDIT") after entering the country primarily via the Western U.S. Ports. Long term, with the completion of the Panama Canal expansion, these trade routes will be expanded to include the Port of Houston and various ports in Mexico.

When fully developed, the Dallas Logistics Hub as restructured pursuant to the terms of the Plan will be an Inland Port  adjacent or in close proximity to UPDIT, a potential BNSF intermodal facility, and four major highways (Interstates 20, 35, 45, and proposed Loop 9).  As an Inland Port,

Debtors anticipate that Dallas Logistics Hub will develop with an emphasis on logistics-oriented, automated high-bay warehouses, supplemented by light manufacturing, office, service retail, value office and residential.

More specifically, in addition to receiving infrastructure funding assistance from multiple governmental units as discussed below, the City of Dallas has been actively working to facilitate development of Dallas Logistics Hub, along with other major industrial developments in the region, as a part of its International Inland Port of Dallas (IIPOD) initiative, for more than 5 years. The IIPOD is a public-private partnership involving a consortium of 12 municipalities and led by the City of Dallas; the entity is a key driver in making Dallas the nation's premier logistics and distribution center.

IIPOD is a catalyst for Southern Sector investment, job growth and development of sustainable communities, with a goal of increasing the local tax base and employment. IIPOD, and Dallas Logistics Hub as a part of the IIPOD, has been identified as a key economic development focus for the City of Dallas. As a result, Dallas City Council members and staff have been involved from the very beginning, especially the Economic Development Committee.

DLH Master Land Holding, LLC (DLH) is a successor by merger to numerous limited liability companies (LLCs) which were directly and/or indirectly owned by Allen Capital Partners, LLC (ACP), by relatives of Richard S. Allen or entities owned directly or indirectly by Richard S. Allen and/or his relatives. DLH holds title to the land being developed as the Dallas Logistics Hub. A more detailed chart of ACP's ownership interest in DLH is attached as **Exhibit C**. DLH also owns a member interest in Midstate Hayes 184 Distribution Center, LLC, which owns California real estate which has been posted for foreclosure. ACP is successor by merger to four limited liability companies and DLH is successor by merger to more than seventy limited liability companies listed on **Exhibit D**.

ACP and DLH operate using three non-filed entities owned by ACP.

(a)       Allen Employment Services, Inc. (AES) is a wholly-owned subsidiary of ACP. AES is the entity actually employing the individuals who operate Debtors various businesses. AES has a contract with Debtors under which Debtors advance payroll and employee benefits for payment by AES.

(b)       Allen Development Partners, LLC, (ADP) is a wholly-owned subsidiary of ACP. ADP holds various membership interests in other LLCs which own, develop, and/or operate real estate in California as well as an indirect interest in DLH. Based upon restrictions in various LLC operating agreements which purport to terminate or modify rights in bankruptcy, ownership of those interests need to continue in a wholly-owned subsidiary of ACP; and

(c)       Allen Development of Central California, LLC (ADCC) is a wholly-owned subsidiary of ACP which is used by ACP to provide management and development services for substantially all of ACP's limited liability companies. ADCC, whose offices are located in Visalia, California, provides the central accounting functions for all ACP entities and for DLH. ADCC also indirectly owns an interest in DLH and manages specified properties of DLH for a management fee. ACP, DLH and AES have a contract with ADCC in which DLH advances or reimburses ADCC for expenses made on ACP's behalf.

Financial projections for DLH prepared by Debtors' management are attached as part of **Exhibit E-1** and are incorporated by reference.

## B. ACP'S BUSINESS

Allen Capital Partners, LLC ("ACP") is a real estate investment company.  ACP was formed in 1999 by Richard S. Allen and is wholly owned by Richard S. Allen and his wholly owned corporation Richard S. Allen, Inc.  Both Richard S. Allen and Richard S. Allen, Inc. are currently debtors in their own Chapter 11 cases, which are being jointly administered with the Debtor's case. ACP invests capital in office and industrial projects in California, Texas and Kansas.  ACP has invested capital of approximately $15,000,000 in current California and Kansas projects, $11,000,000 of which is still invested in the projects.  ACP has invested approximately $43,000,000 in DLH, all of which is still outstanding. In addition to the capital invested, ACP has provided construction loan

guarantees and, through its subsidiaries, the development expertise and resources required to develop its various investment projects. In exchange for those services, ACP typically receives an additional profits interest in each project ranging from 40% to 50% of the profits after capital and preferred return have been paid to the capital partners.

In addition to its' approximately 43% interest in DLH, ACP has interests in the following projects:

1. A future 530 acre Logistic Park in Kansas City ("LPKC")
2. A 84-acre planned development located along Rosedale Highway (State Hwy-58) in Bakersfield, California
3. The International Trade and Transportation Center ("ITTC"), a 700-acre rail-served logistics park located in Shafter, California, northwest of Bakersfield.
4. The Kelly Corporate Center, a planned 4-building office complex located in Carlsbad, California (3 buildings have been built to date). One of these buildings is subject to a lien in favor of Bank of America for which Bank of America has threatened foreclosure. The projections pertaining to Kelly represent the projected value of the remaining properties not subject to the Bank of America lien.
5. A 7,624 square foot office building in Visalia, California
6. A 102,000 square foot industrial building located in Visalia, California
7. Midstate Park, a 400-acre logistics and distribution center that offers direct mainline rail service from the Union Pacific Railroad located in Visalia, California.

A more detailed description of each of these projects and ACP's interest in these projects may be found in **Exhibit F**. Financial projections for ACP prepared by Debtors' management are attached as part of **Exhibit E-2** and incorporated by reference.

## VIII. SIGNIFICANT PRE-PETITION EVENTS

### A. BEGINNING DEVELOPMENT OF DALLAS LOGISTIC HUB

In 2003, the predecessors to DLH began to seek out strategic land positions around the planned new Union Pacific Intermodal facility in Dallas, Texas, which resulted in the creation of the Dallas Logistics Hub. At that time, the Union Pacific Intermodal facility had not yet begun

construction and was considered speculative. Based on the anticipated impact that the planned Union Pacific Intermodal would have on the region, the predecessors of DLH began assembling land adjacent to the new intermodal terminal. Because of its timing, DLH's predecessors were able to achieve reasonable seller financing terms and pricing on its land acquisition. The land assemblage for the Dallas Logistics Hub was completed in 2006 and 2007. Much of the land comprising Dallas Logistics Hub was acquired using 1031 exchanges generated from sales of California land and buildings owned by ACP subsidiaries.

The Union Pacific Dallas Intermodal Terminal adjacent to the land assemblage became fully operational in October, 2005. The +/-360-acre intermodal terminal is located on the eastern boundary of Dallas Logistics Hub, just 12 miles south of downtown Dallas within the city limits of Hutchins and Wilmer, adjacent to Interstate Highway 45. The UP intermodal facility is currently capable of handling approximately 365,000 lifts per year. In 2009 with the decrease in foreign trade, it is estimated that this facility handled +/- 300,000 lifts. It has been reported that approximately 97% of the containers arrive directly from the Ports of Los Angeles and Long Beach. At full build-out, Union Pacific has stated that the intermodal facility will have the capacity to process up to 600,000 lifts per year.

DLH's predecessors received Entitlements (annexation, zoning, and master planning), development agreements, and other municipal approvals for approximately 80% of the acreage of the Dallas Logistics Hub in 2007 and 2008. All of the land contained within the Dallas Logistics Hub as restructured pursuant to the Plan is located within the cities of Dallas and Hutchins and as a result, the remaining parcels in the restructured Dallas Logistics Hub are now, for the most part, zoned for development as an inland port logistics park.

Marketing of the Dallas Logistics Hub for sale and lease to users began in earnest in 2008. During 2008, 620 acres of land were absorbed through land sales, options, build-to-suits and/or vertical speculative developments at an average strike price of approximately $1.77 per square foot. Today, approximately 5,451 gross acres remain undeveloped, including 164 acres which is under option to the BNSF Railway.

Included in these totals were the following:

| Land Sales | | Build to Suit Projects | |
|---|---|---|---|
| BNSF Rail Road | 198 acres | ADESA Auto Auction | 175 acres |
| ONCOR Electric | 9 acres | Bridge Terminal Transport | 15 acres |
| | | | |
| Spec Buildings | | Land Under Option | |
| 4800 Langdon Road | 38 acres | BNSF | 164 acres |
| 4900 Langdon Road | 14 acres | | |

In addition to the activity above, DLH's predecessors were successful in executing a lease for +/-313,000 sq ft of its affiliate's first spec building located at 4800 Langdon Road, Dallas with Advanced H2O, LLC, reportedly the largest private label water bottling company in the US, for a production and distribution facility.

In May, 2008, Ron Natinsky, sitting Chairman of the Economic Development Committee of Dallas, Tennell Atkins, Dallas City Councilmember responsible for the IIPOD, Mayor Tom Leppert, and other city and community leaders, including Richard S. Allen, visited six major trading centers in China to promote Dallas, their IIPOD initiative and the Dallas Logistics Hub as a part of the IIPOD. In January of 2008, there was a similar trip to Mexico City and Monterey, Mexico.

In September of 2008, DLH's predecessors completed construction on the first two spec industrial buildings at Dallas Logistic Hub totaling more than 825,000 sq. ft. These buildings have been constructed using the parameters set forth by the US Green Building Council ("USGBC"). In

September 2009, the buildings were awarded LEED® Gold Certification by USGBC. These were the first industrial facilities in North Texas to earn such certification.

In the Fall of 2008, DLH's predecessors also commenced construction on the first two build-to-suit projects in the Dallas Logistics Hub, an approximately 15 acre container yard for Bridge Terminal Transport, a division of Maersk Inc., and a +/-175 acre auto auction facility for ADESA, Inc., the second largest auto auction firm in the U.S. In January, 2010 the ADESA facility was awarded LEED® Silver Certification by the USGBC.

In Fall 2009, the City of Dallas obtained Federal approvals to create the City of Dallas Regional Center (CDRC) program which allows foreign investors in the Dallas region (including 1056 acres of the DLH project) to potentially participate in the federal program EB-5; in essence, obtain "Green Cards" for themselves and their families subject to making the appropriate capital investment in a qualified project. Debtors will continue to work with Dallas's Economic Development Department on applications which would provide "below-market" interest rate loans to facilitate the development of approximately 1,056 acres in the portion of the Dallas Logistics Hub within the City of Dallas.

The cities of Dallas, Wilmer, Hutchins and Lancaster, each of whom have jurisdiction over portions of the Dallas Logistics Hub project, have also been very supportive of DLH.

## (1.) INFRASTRUCTURE AT DALLAS LOGISTIC HUB

The Dallas Logistics Hub as originally envisioned prior to the reduction in the project's size wa located within the jurisdictions of Dallas, Lancaster, Wilmer and Hutchins. As a result, achieving governmental support of the Dallas Logistics Hub and the required public infrastructure funding took an extraordinary amount of time, negotiation and effort. The funding for these public infrastructure

projects has added tremendous value to the development. These funds described below will finance most of the major arterial road improvements on the perimeter of and in close proximity to the Dallas Logistics Hub and provide vital links of the internal areas of the Dallas Logistics Hub to the interstate highways.

Since 2005, the area in and around the Dallas Logistics Hub has received in excess of $113 million in completed or funded public infrastructure projects, municipal bond projects, and grant funding commitments from various governmental entities for public infrastructure development. More specifically, the following is a summary table of the public funding committed to date by source:

### PUBLIC FUNDING COMMITTED FOR INFRASTRUCTURE IMPROVEMENTS

| Funding Entity | Approximate Funding Committed ($ Millions) |
|---|---|
| City of Dallas | $ 50.01 |
| City of Hutchins | 7.98 |
| Dallas County | 7.91 |
| FHWA | 10.60 |
| NCTCOG (MPO) | 6.10 |
| TXDoT | 31.11 |
| TOTAL  ESTIMATED | $ 113.71 |

Prior to the bankruptcy filing, there had been approximately $500 million invested or committed to the Dallas Logistic Hub and the immediately surrounding area from public and private sources including:

| $ Millions | |
|---|---|
| $154 | Infrastructure construction, bond projects, grants and earmarks |
| $125 | Construction of the Union Pacific Intermodal Terminal |
| $ 85 | Equity capital and loans from the Allen family |
| $ 55 | Construction of a 175-acre build-to-suit for ADESA Auto Auction |

| $ 40 | Construction of two speculative industrial buildings (827,000 sf) |
| $ 12 | Land purchase by the BNSF Railway |
| $ 3 | Construction of a 15-acre build-to-suit for Bridge Terminal Transport (Maersk) |
| $474 | ESTIMATED TOTAL |

To further enhance the funding of public infrastructure, DLH has also pursued the creation of various public-private partnerships ("PPP") with the City of Hutchins. These PPPs include tax increment reinvestment zones (TIRZ), reimbursement agreements, and other public finance vehicles available in Texas. Draft Preliminary Project & Financing Plans for TIRZs have been submitted to the City of Hutchins.

## B.    DECEMBER, 2009 MERGER

In December of 2009, each Debtor was involved in separate mergers in which numerous subsidiaries were collapsed into one of Debtors.  The DLH merger, which had been under consideration for more than two years, dramatically simplified an excessively complex financial structure created by Debtors' prior President, and made the legal structure more consistent with the way DLH was being marketed, financed, and managed.  Even with the consolidation and financial simplification, there are still a number of entities, some involving third party investors, which are owned wholly or in part by ACP.  Although some are inactive shell entities, other entities have their own stable lender relationships which ACP has no desire or financial benefit to disturb. A list of non filed ACP entities is attached as **Exhibit G**.

## IX. OVERVIEW OF CHAPTER 11 CASES

## A.    First Day Motions

Contemporaneously with the Bankruptcy Petition, Debtors filed the following motions and applications (collectively, the "First Day Motions"):  (1) Motion For Order Directing Joint

Administration of Debtors Chapter 11 Cases; (2) Motion For An Order Pursuant To Bankruptcy Rule 1007 Granting An Extension Of Time For Filing Schedules And Statements Of Financial Affairs; (3) Debtors' Motion For An Order Pursuant To 11 U.S.C. §105(a) And Bankruptcy Rule 2002 Establishing Notice Procedures; (4) Debtors' Motion For Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing Or Discontinuing Service, (II) Deeming the Utility Companies Adequately Assured Of Future Performance, (III) Authorizing Debtors To Maintain Their Prepetition Relationships And Practices With The Third Party Vendor; And (IV) Establishing Procedures For Determining Requests For Additional Adequate Assurance; (5) Debtors' Motion For Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To All Secured Lenders, And (III) Scheduling A Final Hearing; (6) Application To Employ Counsel For Debtors And Debtors In Possession; (7) Debtors' Motion To Approve DIP Financing; (8) Debtors' Application to Employ Lain Faulkner & Co., P.C. As Accountants For Debtors; and (9) Debtors' Motion for Order Pursuant To 11 U.S.C. §105(a) and Bankruptcy Rule 331 Establishing Procedures For Interim Compensation and Reimbursement of Expenses of Professionals. All of the First Day Motions were granted and largely uncontested except: (5) Debtors' Motion For Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To All Secured Lenders, And (III) Scheduling A Final Hearing and (7) Debtors' Motion To Approve DIP Financing.

## B. DIP Financing

Pre-petition, Pointe Property Group, Inc. and Allen Investments, Inc. (collectively, " DIP Lenders") had loaned Debtors approximately $ 585,000 secured by a junior lien on all DLH real estate involved in the Chapter 11 filing, in order to enable Debtors to fund retainers for its

professionals and continue operations until a bankruptcy filing could be effectuated. The DIP

Lenders are entities owned and or controlled by the father, brother and various family entities

related to Richard S. Allen, all of whom are insiders. After the Petition Date, the Debtors sought

Bankruptcy Court approval for Debtor in Possession Financing (the "DIP Facilty") from the DIP

Lenders up to a maximum amount of $3.50 million (including the pre-petition advance of

$585,000). The DIP Facility was potentially controversial in that (a) the monies were being loaned

by insiders, (b) a priming lien was granted to the extent to which DIP Facility proceeds were used

to pay real estate taxes due and owing on the various parcels, (c) a junior lien was granted to the

DIP Lenders by both DLH (on the land held by DLH) and ACP (on the various interests held by

ACP), and (d) the DIP Facility as proposed was joint and several between ACP and DLH. Each

of these issues was contested before the Court by one or more parties in interest.

Ultimately, the Court found (i) the terms of the line of credit was negotiated on an arm's-

length basis, (ii) a priming lien was appropriate on those parcels where the secured creditor did

not pay the real estate taxes which were due in the first weeks of the case, (iii) the junior lien on

all DLH land without vertical improvements and all ACP assets which could validly be granted as

security was appropriate and granted to secure the DIP Facility, and (iv) that ACP could only

borrow against the DIP Facility through July 15, 2010 and DLH could make payments under the

Service Agreement during that period. After July 15, 2010, DLH was no longer entitled to make

payments under the Service Agreement for employees of ACP or ADCC, and ACP was no

longer entitled to borrow under the DIP Facility.

As ACP could not borrow against the joint DIP Facility after July 15, 2010, Debtors

negotiated a separate DIP Facility for ACP with the existing DIP Lenders. This facility was

subsequently approved by the Court and the DIP Lenders were granted a junior lien on ACP's assets to secure their loans under this DIP Facility.

Subsequently, DLH extended the joint DIP Facility by agreement with the DIP Lenders through October. DLH also requested that the Court establish a procedure under which the joint DIP Facility could be extended further by simply submitting a revised budget to the Court. The Court granted DLH's request and established a procedure under which DLH could extend the DIP Facility without the necessity of a subsequent hearing.

## C.  Use of Cash Collateral and Adequate Protection

DLH's request to use cash collateral and offer to provide adequate protection to substantially all DLH secured creditors was also extensively contested and resulted in several hearings before the Court. DLH had offered to provide adequate protection to TierOne. and substantially all secured creditors of DLH with an interest in land without vertical development by providing a junior lien to all such creditors. Ultimately, the various secured creditors with liens on land without any vertical development declined the offer of adequate protection.

TierOne / Great Western Bank:        Debtors requested to use the cash collateral generated by the lease to ADESA (which was then pledged to Tier One Bank (hereafter "TierOne") as security for the construction loan which was used pre-petition to develop the ADESA facility and various infrastructure improvements   TierOne vigorously contested the request to use its cash collateral and later separately moved to lift the automatic stay, seeking permission for TierOne to foreclose on its collateral and prosecute certain guarantees. Ultimately, the Court ruled that certain pre-petition rents collected by the DLH were not cash collateral, granted Debtor DLH limited permission to use approximately $1.2 million of the ADESA rents from filing through July 31,

2010 directed DLH to pay the remaining ADESA rents to TierOne, and denied TierOne's motion

to lift the automatic stay so that the ADESA facility could not be foreclosed upon by TierOne.  In

addition, TierOne Bank was granted a junior lien in DLH land as substitute collateral for the cash

collateral actually being used by Debtors and TierOne was granted permission to prosecute its

guarantees against non-debtors.

TierOne Bank appealed certain of the Bankruptcy Court's Orders and those appeals are

currently pending before the Federal District Court for the Northern District of Texas.

Subsequently, TierOne Bank was seized by the FDIC and Great Western acquired the loan to

DLH from the FDIC in its capacity as a receiver for TierOne Bank.  Great Western has continued

the appeal. DLH has moved to dismiss the appeals of the cash collateral order as moot.

DLH filed a motion for permission to use added cash collateral after July 31, 2010, net of

the amounts from the ADESA rents necessary to commence interest only payments to Great

Western at the non default rate.  DLH's motion was granted and DLH was authorized to use

certain amounts from the ADESA rent through October, 2010. Subsequently, a settlement was

reached with Great Western and approved by both BB&T and the FDIC,  The terms of the

settlement are as follows:

**Release Price.** Subject to and upon the terms and conditions provided in Settlement

Agreement, Great Western Bank will accept a single payment in the amount of the Release Price

in full and final payment of the accrued indebtedness owed by DLH to Great Western Bank under

the terms of the Loan Documents. In order to obtain sufficient funds to pay the Release Price to

Great Western Bank, DLH is attempting to sell the ADESA Project (together with the ADESA

Lease, the "ADESA Property").  The Release Price is to be paid by DLH in full to Great Western

Bank in cash, by wire transfer, or in certified funds at the closing of a sale of the ADESA Property ("Closing"). The phrase "Release Price" means (a) $48,000,000.00 plus (b) if, and only if, the Net Sale Proceeds from the sale of the ADESA Property are more than $50,750,000.00, twenty-five percent (25%) of the Net Sale Proceeds in excess of $50,750,000.00, without deduction or set-off. The phrase "Net Sale Proceeds" means the gross sales price of the ADESA Property less Closing Costs. The phrase "Closing Costs" means broker commissions, title company fees, title insurance premiums, escrow fees, recording fees, attorney fees, and other expense prorations and deductions applicable to the sale of the ADESA Property that are agreed to by DLH and the Buyer and approved by the Bankruptcy Court. In no event is the amount of the Release Price to be reduced by any payment made by DLH (or by one or more Guarantors) to Great Western Bank prior to Closing or otherwise.

**Sale of the ADESA Project.** DLH is currently negotiating a sale of the ADESA Property with Greenfield Companies ('Greenfield") and other potential purchasers. If DLH enters into a contract to sell the ADESA Property to either Greenfield or another a qualified buyer who is reasonably acceptable to DLH  ("Buyer") on terms and conditions acceptable to DLH and for an amount that will assure payment (a) of the Release Price to Great Western Bank and (b) of all Closing Costs at Closing ("Sale Contract"), DLH will seek authority from the Bankruptcy Court to sell the ADESA Property to the Buyer ("Sale Motion"), instead of a sale under a Plan of Reorganization filed on behalf of  DLH and/or any of the Guarantors. Because of the need to expedite the filing of the Sale Motion, DLH may file the Sale Motion based on a non-binding letter of intent before the Sale Contract has been executed by DLH and the Buyer if DLH believes in good faith that the letter of intent both accurately reflects the business terms to be included in

the Sale Contract and that a Sale Contract based upon that letter of intent will be executed by DLH and the Buyer. In the event that the Sale Contract with an original Buyer is terminated for any reason prior to Closing, then DLH shall have until the Drop Dead Date in which to close the sale of the ADESA Property in accordance with a new sale contract ("Replacement Contract"). In such event, the new buyer shall be a "Buyer" and the Replacement Contract shall be a "Sale Contract" for purposes of Settlement Agreement. DLH is required under the Settlement Agreement to diligently prosecute the Sale Motion. While the Sale Motion may be based on a letter of intent between DLH and the Buyer, the Sale Order must specifically refer to and approve a Sale Contract that has been executed by DLH and the Buyer and the enforceability of which is only subject to the approval of the Bankruptcy Court and to any rights provided to the Buyer to terminate the Sale Contract on the basis of an inspection, title or financing contingency. The sale of the ADESA Property is subject to and conditioned upon the Bankruptcy Court entering (i) the Sale Order on or before 60 days prior to the Commencement of any confirmation hearing, but not later than February 15, 2011; and (ii) the Settlement Order on or before November 19, 2010. If the Bankruptcy Court refuses to enter the Sale Order, then the Sale Agreement shall be void and of no further force or effect. The Sale Motion may include a motion to assume and assign the ADESA Lease in connection with the sale of the ADESA Property, and the Sale Order may provide that (a) the assumption and assignment of the ADESA Lease is to be effective concurrent with the Closing and (b) both ADESA and KAR Holdings, Inc., a Delaware corporation and the guarantor of ADESA's obligations under the ADESA Lease ("KAR"), shall waive any claims against DLH and/or any Guarantor, including benefits relating to economic incentives and offsite infrastructure improvements effective as of the date of the Closing, regarding (i) any construction

or other obligations under the ADESA Lease and (ii) any claims arising with respect to any monies paid by the City of Hutchins to DLH or any Guarantor. If Settlement Agreement is approved by the Bankruptcy Court, the FDIC, and BB&T's management within the time periods set forth in Section 1.3 of Settlement Agreement, then DLH will use reasonable diligence to close the sale of the ADESA Property upon the terms set forth in the Sale Contract and the Sale Order.

**Drop Dead Date.** The Closing of the sale of the ADESA Property and the payment of the Release Price to Great Western Bank must both occur on or before June 30, 2011 ("Drop Dead Date"). The Settlement Order shall modify the automatic stay provided in the Bankruptcy Code so that if (i) the Bankruptcy Court, BB&T, and the FDIC have approved Settlement Agreement by the deadlines set forth in Section 1.3 above and (ii) Great Western Bank have not received payment of the Release Price in full on or before May 31, 2011, the Bankruptcy Code stay shall automatically partially terminate to allow Great Western Bank to post the ADESA Property for foreclosure. If the specified approvals have been obtained and Great Western Bank have not received payment of the Release Price on or before the Drop Dead Date, the Bankruptcy Code stay shall automatically terminate to allow Great Western Bank to foreclose their liens and security interests on the ADESA Property on or after July 1, 2011, at any time they choose, without the necessity of any further order from the Bankruptcy Court. The Settlement Order shall also provide that neither the Debtors nor any persons related to or affiliated with Debtors (including Rex Allen, R.E. Allen, Pointe Property Group, Inc. and Allen Investments, Inc.) will take any direct or indirect action to interfere with the foreclosure of the ADESA Property as authorized in Settlement Agreement. In the event the automatic stay lifts pursuant to the terms of Settlement Agreement, DLH shall immediately turn over to Great Western Bank all ADESA

Rents which it may receive thereafter within two (2) business days of receipt.

**Great Western Option to Cancel Settlement.**  If the Sale Contract with Buyer is not approved by the entry of the Sale Order on or before 60 days prior to the Commencement of any Confirmation hearing, but not later than February 15, 2011, then the Settlement Agreement may, at the sole election of Great Western Bank, be terminated after the applicable date, and be of no further force or effect ("Termination Option").

**Use of Cash Collateral.** As a modification of the existing court order related to ADESA Rents, DLH shall make monthly payments from the ADESA Rents to Great Western Bank in the amounts of (a) $245,134.15 during the period beginning on November 1, 2010, through January 31, 2011, and (b) $311,611.00 during the period beginning on February 1, 2011, through and including the earlier to occur of the date of Closing or June 30, 2011 (and prorated as of the date of Closing or June 30, 2011, whichever date is applicable).  DLH shall pay Great Western Bank on or before five (5) business days from the date of entry of the Settlement Order the sum of $245,134.15 with respect to post-petition rents collected by DLH under the ADESA Lease for the month of November, 2010.  Commencing December 1, 2010, and for each month prior to the Closing, DLH shall pay the monthly sums to Great Western Bank as required pursuant to the terms of Settlement Agreement within five (5) business days after DLH collects a monthly installment of the ADESA Rent from ADESA.  DLH may use the remaining cash collateral from the ADESA Rents, if any, through the earlier to occur of the date of Closing or June 30, 2011. The monthly payments, if any, received by Great Western Bank after February 1, 2011 pursuant to the terms of Settlement Agreement, shall be applied to DLH's debt to Great Western Bank as provided in the Note. Notwithstanding anything contained in Settlement Agreement seemingly to

the contrary, no payment made to Great Western Bank under or contemplated in this Section shall reduce or be credited against the Release Price.

**Releases.** Upon Great Western Bank' receipt of the Release Price or the completion of the foreclosure by Great Western Bank of their liens and security interests on the ADESA Property, the Guarantors and Great Western Bank shall each release the other and all employees, affiliates, and attorneys from all claims (including chapter 5 claims under the Bankruptcy Code), except for any claims arising under Settlement Agreement. The mutual release to be executed by the Guarantors and Great Western Bank shall be executed by each of those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "B" to Settlement Agreement. Subsequent to the satisfaction of the conditions stated in the preceding sentence and upon   the occurrence of either the receipt by Great Western Bank of the Release Price or the date on which Great Western Bank complete a foreclosure of the liens and security interests created under certain of the Loan Documents, DLH and Great Western Bank will each release the other and all employees, affiliates, and attorneys from all claims (including chapter 5 claims under the Bankruptcy Code), except for those claims arising under the Settlement Agreement. The mutual release to be executed by DLH and Great Western Bank shall be executed by those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in in form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "C" to Settlement Agreement. On the date that the Mutual Release between the Bank and DLH has been fully executed by all of those parties, Great Western Bank will also be deemed to

have waived and released any right to payment and any lien granted under the so-called "Replacement Lien" granted by the Bankruptcy Court pursuant to the Bankruptcy Court's "Final Order on Debtors' Motion Requesting Use of Cash Collateral" entered on April 23, 2010 (Dkt. No. 233) and the "Order Authorizing Debtor DLH Master Land Holding, LLC's to Use Cash Collateral Lease Payments for August through October 2010" entered on August 25, 2010 (Dkt. No. 514). If Great Western Bank receive payment of the Release Price in full at Closing, Great Western Bank will (a) release all liens and assignments which they may have related to the ADESA Property and under the Replacement Lien and (b) join with DLH in seeking dismissal of the Appeals, (c) withdraw all claims, votes and objections in the Bankruptcy Cases (d) cease to participate further in the Bankruptcy Cases and e) execute all releases.

Compass Bank:    Debtors requested to use the cash collateral generated by the rents from the current and future tenants of Buildings A and Buildings B (which were pledged to Compass Bank as successor to Guaranty Bank). Debtors and Compass Bank reached an agreement under which Compass Bank consented to DLH's use its cash collateral to care for and support Buildings A and Buildings B, including potentially using those funds for tenant improvements, subject to Compass Bank's review of the funds being expended and the applicable budget. DLH has requested use of certain amounts of cash collateral to make tenant improvements and pay lease brokerage fees in connection with certain potential new tenants. Compass Bank has indicated that the terms of at least one new lease is acceptable and counsel for Compass Bank is preparing a stipulation under which DLH will be entitled to use cash collateral for tenant improvements lease brokerage fees and other cost associated with the transaction.

**D.     Retention of Brokers**

To assist in DLH marketing efforts, with the permission of the Bankruptcy Court, DLH has retained C.B. Richard Ellis to market the ADESA facility and Jones Lang LaSalle to market the various DLH parcels without any existing vertical development. In addition, Colliers International has been retained by DLH to market for sale Building A and Building B. The pre-petition contract under which Colliers International was acting as lease broker for those two buildings has been assumed.

E.     **Leases of Non-residential Real Property Where a Debtor Is Lessee**

DLH assumed its office lease of certain space in the 1700 North Pacific building in Dallas. ACP received an agreed extension from its landlord with respect to whether to assume or reject its lease with ADSC Diamante, LLC for its offices in San Diego. ACP subsequently moved to assume the Diamante lease. As no party objected to the assumption of the Diamante lease, the Diamante lease has been assumed.

F.     **Retention of NewSource Partners and Commission Agreements for Exit Financing**

Debtors retained Mr. Dwayne Toler of NewSource Partners to act as Chief Financial Officer and assist Debtors in locating Exit Financing. In connection with the Exit Financing facility, Debtors have agreed to pay, on a non-exclusive basis, certain financial intermediaries up to 2% of the proceeds from the facility. Debtors filed a Motion for the Court to approve such a fee or commission and received an order authorizing Debtors to enter into agreements to pay such a fee or commission. Debtors have entered into several such agreements in connection with Debtors' search for the Exit Financing facility.

G.     **Objections to Romanov Claim and Romanov Settlement with Committee**

Edward B. Romanov, Jr. was recruited and hired as a consultant to manage the real estate

operations of Richard Allen and the group of companies known as "The Allen Group" in October of 2004. Thereafter, Romanov was hired as President and Chief Operating Officer of ACP in April of 2006 under an Employment Agreement. Pursuant to the Employment Agreement, Romanov was admitted as a member to ACP and held a Profits Interest in ACP. The day after Romanov terminated the Employment Agreement in 2008, Romanov contends ACP owed him well in excess of thirty million dollars ($30,000,000) in connection with the "repurchase" of Romanov's Profits Interest. On or about November 17, 2008, Romanov received $3,271,776.00 from ACP in addition to the forgiveness of certain indebtedness owed to Richard S. Allen, Inc. and ACP by Romanov. Romanov commenced an arbitration proceeding against a variety of parties, including ACP, seeking to recover the balance.

Romanov filed a proof of claim (claim #14) in the amount of $27,451,767 against ACP. Debtor ACP objected to the claim on a variety of grounds, including that Romanov's claim was capped under Bankruptcy Code section 502(b)(7). The Committee also objected to Romanov's amended claim on the grounds that the claim was actually a proof of interest and not a proof of claim. To date, the Bankruptcy Court has entered an order denying Debtor ACP's objection that Romanov's claim should be capped under Bankruptcy Code section 502(b)(7). Debtor ACP is currently appealing that decision, although ACP and Romanov are actively discussing abating that appeal until after the Plan has been confirmed.

Prior to the hearing on ACP's and the Committee's objections to Romanov's claim, Romanov and the Committee reached a settlement which they announced in open Court under which Romanov agreed to cap his claim in the bankruptcy proceeding at six million, five hundred thousand dollars ($6,500,000). Subject to the restrictions set forth below, Romanov's claim

would be allowed as follows:

a.  $3,500,000 as an Allowed ACP General Unsecured Claim (the "Romanov Unsecured Claim") and

b.  $3,000,000 as a subordinated Allowed ACP General Unsecured Claim, subordinated in rights and payment, to and until all Allowed ACP General Unsecured Claims shall have received Cash Distributions in the amount of 70% of such Allowed ACP General Unsecured Claims (the "Romanov Subordinated Unsecured Claim").

Following cash distributions to holders of all Allowed ACP General Unsecured Claims in the amount of 70% of such Allowed ACP General Unsecured Claims, the holder of the Romanov Subordinated Unsecured Claim will participate in subsequent Cash Distributions, if any, as follows:

a.  First, the holder of the Romanov Subordinated Unsecured Claim, shall receive the next $500,000 in cash distributions, before payment of any further cash distributions to holders of Allowed ACP General Unsecured Claims;

b.  Second and thereafter, all cash distributions, shall be made on a pro rata basis to all holders of Allowed ACP General Unsecured Claims; provided, however, that the Romanov Unsecured Claim will then be increased by the amount of $2,500,000 to an aggregate of $6,000,000 ($2,500,000 [the increase amount] plus $3,500,000 [the amount of the Romanov Unsecured Claim]) and thereafter the Romanov Unsecured Claim will be $6,000,000 for purposes of future cash distributions (the "Romanov Adjusted Unsecured Claim");

c.  No cash distributions will be made to the holder of the Romanov Adjusted Unsecured Claim to result in the holder of the Romanov Adjusted Unsecured Claim having received cash distributions equal to 70% of $6,000,000; rather, all Cash Distributions shall be made at the then pro rata basis of all Allowed ACP General Unsecured Claims (inclusive of the Romanov Adjusted Unsecured Claim).

d.  To illustrate the structure of the stipulation and by way of example only, assume: (a) that all Allowed ACP General Unsecured Claims equal $50,000,000 (inclusive of the Romanov Unsecured Claim); (b) that cash

distributions have already been made to holders of Allowed ACP General Unsecured Claims aggregating $35,000,000 (*to wit*: 70% of $50,000,000); and (c) cash distributions are to be made in the amount of $4,000,000, the same would be distributed as follows:

i.     The first $500,000 thereof to the holder of the Romanov Subordinated Unsecured Claim;

ii.     The next $3,500,000 to the holders of the Allowed ACP General Unsecured Claims, consisting of $52,500,000 ($50,000,000 plus $2,500,000 [the increased amount of the Romanov Unsecured Claim]), on a pro rata basis, with the holder of the of the Romanov Adjusted Unsecured Claim receiving $400,000 ($3,500,000 X $6,000,000/$52,500,000).

Notwithstanding the Stipulation between Romanov and the Committee, to the extent the Court ultimately finds that Romanov is entitled to an allowed claim against ACP in excess of the $6,500,000, Romanov unconditionally stipulated and agreed that, notwithstanding such court Order: (i) Romanov will not receive cash distributions in an amount exceeding $6,500,000; and (ii) Amended Claim 14 shall be paid on account of such claim, if at all, in accordance with the provisions described above. To the extent the Court's order on Romanov's claim provides that the claim is allowed in an amount less than $6,500,000 (the "Ordered Claim Amount"), Romanov unconditionally stipulates and agrees that: (i) the holder of Amended Claim 14, will not receive cash distributions in an amount exceeding the Ordered Claim Amount; and (ii) the Ordered Claim Amount shall be allowed and treated, with respect to cash distributions, as follows: (A) as an Allowed ACP General Unsecured Claim not to exceed to $3,500,000; and (B) the difference, if any, between the Ordered Claim Amount and $3,500,000 shall be (1) allowed as a subordinated Allowed ACP General Unsecured Claim, subordinated in rights and payment, to and until all Allowed ACP General Unsecured Claims have received cash distributions in the amount of 70% of such Allowed ACP General Unsecured

Claims; and (2) paid in the same "waterfall" manner as the Romanov Subordinated Unsecured Claim as described above.

### H. Search for Joint Venture Partners and/or Third Party Exit Financing

DLH has solicited potential debt or equity infusions from more than 100 parties, has established a virtual document room to facilitate due diligence by investors and has actively negotiated with a number of prospects. At this time DLH is still in active negotiations with two prospective investors, one of which was introduced by the financial advisor to the Official Creditors Committee.

ACP's most active development asset is LPKC, an entity which holds an option on more than 500 acres of land from the BNSF railroad. Numerous parties have executed non-disclosure agreements and have examined entering into joint ventures with LPKC. The Kansas City market has a very low vacancy factor for industrial buildings. The BNSF will commence construction of an intermodal facility adjacent to the property and LPKC is currently negotiating various sales and build to suit leases. Accordingly, there are two prospects who have each provided letters of intent concerning a joint venture with whom LPKC is actively continuing to negotiate and an additional prospect who is anticipated to provide a letter of intent shortly.

### X. RISK FACTORS

**The primary risk to creditors under the Plan is that Debtors will be unable to meet their sales and development projections which can be found in accompanying Exhibits E-1 and E-2.**

Although management regards the projections as reasonable and achievable, there is no guaranty Debtors will be able to achieve the results projected. Future prices for land are inherently uncertain and there can be no guaranty that Debtors will be able to sell either the volume of land projected or

realize the prices projected. More specifically, for ACP, the projections also include significant development activity at LPKC, primarily build to suit opportunities, which requires certain assumptions about the terms and conditions a capital partner would require to allow that development to occur. For a more traditional description of Risk Factors, see **Exhibit H**.

## XI. GENERAL DISCHARGE

Except with respect to Classes of Claims unimpaired pursuant to the Plan, the distributions and rights afforded in the Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and interests in Debtors or any of its assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in the Plan, all Claim holders and interest holders shall be precluded forever from asserting against Debtors or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, or causes of action belonging to Debtors pursuant to 11 U.S.C. § 541 which could arise up through the Effective Date of the Plan including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of either Debtor, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed, except with respect to and to the extent of Claims or the portions of Claims which are unimpaired pursuant to the Plan. As of the Effective Date, Debtors, their Affiliates and Principals shall be discharged and released from and shall hold all the assets and properties received or retained by it pursuant to the Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except Claims in Classes unimpaired pursuant to the Plan. All legal or other proceedings and actions seeking to establish or enforce

liabilities, liens, Claims and interests or obligations of any nature against either Debtor or assets or properties received or retained with respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in the Plan.

## XII. CORPORATE GOVERNANCE AND MANAGEMENT OF PLAN DEBTORS AS REORGANIZED

1.     Continued Corporate Existence of the Plan Debtors.

Subject to the restructuring and reorganization contemplated by, and described more fully in the Plan, each of the Plan Debtors shall continue to exist after the Effective Date as a separate entity, and all Interests held by a Plan Debtor in another Plan Debtor or a subsidiary thereof shall be reinstated, with all the powers available to such legal entity, in accordance with applicable law and pursuant to the Plan Debtor Constituent Documents, which shall become effective upon the occurrence of the Effective Date or such other later date contemplated thereby.

2.     New Organizational Documents

To the extent necessary, any Organizational Documents which will be revised or amended pursuant to the Plan shall be filed by Debtors with the Court at least seven (7) days prior to the Effective Date.

3.     Directors and Officers

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed initial director or officers following the Effective Date (and, to the extent such Person is an insider of the Plan Debtors, the nature of any compensation of such Person, as well as the related terms) shall be disclosed no later than two (2) calendar days prior to the Confirmation Hearing.

4.    Dissolution of the Committee

Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Committee after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date; provided, however, that to the extent any such fees and expenses are incurred after the date that is fifteen business days prior to the deadline to file final fee applications, any such fees and expenses must be submitted to the Reorganized Debtors.

5.    Funding of the Plan

Cash Distributions to be made pursuant to the Plan will be made from (i) Exit Financing on hand on the Effective Date, (ii) cash proceeds received by Debtors from the liquidation of assets as of the Effective Date and other funds then available, and (iii) to the extent that Cramdown is necessary

for either DLH or ACP or both, cash contributions made to ACP and/or DLH, as applicable, in exchange for new Equiaty Interest in Reorganized DLH, as the case may be.

Except as set forth in section 13.22 of the Plan, Reorganized Debtors shall not be obligated to physically segregate and maintain separate accounts for reserves or for distribution funds and separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable Reorganized Debtors to determine Distributable Cash, reserves and amounts to be paid to parties in interest.

Reorganized DLH shall segregate and maintain separate accounts for the following purposes:

    (i)    escrowing rents, common area maintenance and taxes received from the tenants of Building A and B unless and until Compass Bank consents to the commingling of all or a part of such funds,

    (ii)    escrowing monies received for taxes and insurance from ADESA until such time as those taxes and/or insurance bills are paid,

    (iii)    escrowing monies which are to be distributed quarterly to the unsecured creditors of ACP (ACP Unsecured Creditor Net Proceeds),

    (iv)    escrowing monies which are to be distributed quarterly to the unsecured creditors of DLH (DLH Unsecured Creditor Net Proceeds),

    (v)    escrowing monies which are to be distributed quarterly to the holders of Pool 1 Notes (Secured Creditor Pool 1 Net Proceeds), and

    (vi)    escrowing monies which are to be distributed quarterly to the holders of Pool 2 Notes (Secured Creditor Pool 2 Net Proceeds).

6.    Corporate and Limited Liability Company Action

On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company action of Debtors, including, but not limited to, actions requiring a vote or other

approval of the board of directors, members or shareholders, as applicable, and execution of all documentation incident to the Plan, notwithstanding any otherwise applicable non-bankruptcy law or the Organization Documents of Debtors, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, members or shareholders, as applicable, of Debtors.

7.        Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## XIII. TREATMENT OF EXECUTORY CONTRACTS AND LEASES

## A.      TREATMENT OF REMAINING EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan constitutes and incorporates one or more motions by the respective Debtor proponent to assume, as of the Confirmation Date and conditioned upon the occurrence of the Effective Date, all prepetition executory contracts and unexpired leases to which one or both of Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, or (b) are the subject of a separate motion (or appeal of the ruling on such motion) filed pursuant to section 365 of the Bankruptcy Code filed by one or both of Debtors prior to the Effective Date or a separate motion (or appeal of the ruling on such motion) to compel or permit assumption or rejection pursuant to section 365 of the Bankruptcy

Code filed by the Committee prior to the Effective Date and such unexpired lease or executory contract shall be assumed or rejected, as the case may be, by virtue of a Final Order of the Bankruptcy Court, which may be entered after the Effective Date.

DLH Hutchins Wintergreen 178, LLC (a predecessor to DLH) as landlord and ADESA Texas, Inc. were parties to a Reverse Build-to-Suit Single Tenant Lease (Triple Net) (as amended, the "**ADESA Lease**") and Project Improvement Agreement incorporated thereto (the "**ADESA PIA**") made and entered into as of March 31, 2008, as amended pursuant to that First Amended to Reverse Build-to-Suit Single Tenant Lease (Triple Net) and Projects Improvement Agreement dated July 18, 2008. Pursuant to the ADESA Lease and ADESA PIA, DLH agreed to make or cause to be made certain "Off-Site Improvements" which includes the expansion and extension of Wintergreen Road and provided certain economic incentives to ADESA. To date, DLH has not completed the "Off-Site Improvements" nor provided the economic incentives. If the property or Reorganized DLH's interests in DLH ADESA Parcel, LLC are sold within 180 days after confirmation of the Plan, the cost of any such Off-Site Improvements and economic incentives, if any, shall be charged against the proceeds realized from the sale unless such a claim is waived by ADESA. Prior to the confirmation date, DLH shall file a separate motion to assume or reject the ADESA Lease and the ADESA PIA.

## B.     REJECTION DAMAGES BAR DATE

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Bankruptcy Court and with the following persons:

and a copy served on counsel for Debtors, within thirty (30) days from the entry of the Confirmation Order, or such Claim shall be forever barred and shall not be entitled to a Distribution or be enforceable against Debtors, their Estates, Reorganized Debtors, their successors, or their assigns. Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in the applicable Class (General Unsecured Claims). Nothing in the Plan extends or modifies any previously applicable Bar Date.

## XIII. DISTRIBUTIONS

### A. GENERAL PROVISIONS CONCERNING DISTRIBUTIONS

All Allowed Unsecured Claims held by a single creditor against a Debtor shall be aggregated and treated as a single Claim against that Debtor. At the written request of Reorganized Debtors, any creditor holding multiple Allowed Unsecured Claims shall provide Reorganized Debtors a single address to which any Distributions shall be sent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Debtors may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that Debtors may have against the claimant, but neither the failure to do so nor the

allowance of any Claim hereunder shall constitute a waiver or release by Debtors, of any such claim they may have against such claimant.

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## B.     DISBURSING AGENT

Reorganized Debtors shall be the Disbursing Agent unless otherwise ordered by the Court in the Confirmation Order, and the Disbursing Agent shall make all distributions under the Plan.

## C.     TIME AND MANNER OF DISTRIBUTIONS

Reorganized Debtors shall have the power, to make interim distributions to Holders of Allowed Claims if Reorganized Debtors determine that such interim distributions are warranted and economical; provided that Reorganized Debtors shall make interim distributions at least annually if such distributions would not exceed the amount of Excess Cash. If Reorganized Debtors determine to make interim distributions to Holders of Allowed General Unsecured Claims, Reorganized Debtors will determine the amount to be distributed by taking into account such factors as ongoing expenses, costs, and taxes.  At the option of Reorganized Debtors, any distributions under the Plan may be made either in cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a Distribution of

Cash in whole cents (rounded to the nearest whole cent when and as necessary). To the extent that the aggregate of such distributions never exceeds $25.00 within one year of when the funds would originally have been distributed, such funds shall be paid on the first anniversary of when de minimus distribution would otherwise have become due and payable except for the provisions of this section.

## D.   DELIVERY OF DISTRIBUTIONS

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (i) at the addresses set forth on the Proofs of Claim filed by such Holder (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or Debtors or Reorganized Debtors have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to Reorganized Debtors after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and Reorganized Debtors have not received a written notice of a change of address.

## E.   UNDELIVERABLE DISTRIBUTIONS

If a distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of a Claim shall be made unless and until Reorganized Debtors are notified of the then-current address of such Holder, at which time  all missed distributions shall be made to such Holder without interest. Amounts in respect of undeliverable distributions shall be returned to the Liquidating Trustee until such distributions are claimed. All funds or other undeliverable distributions returned to Reorganized Debtors in respect of any Claim and not claimed within four (4) months of return shall be forfeited and remain with and vest in Reorganized Debtors for distribution to other Holders of Allowed Claims

## F. CLAIMS ADMINISTRATION RESPONSIBILITY

1. Reservation of Rights to Object to Claims

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, Reorganized Debtors (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

2. Objections to Claims

Prior to the Effective Date, Debtors shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions, if any, with respect to all Claims. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims will be filed and served not later than 90 days after the Effective Date. Unless arising from an Avoidance Action, any Proof of Claim filed more than ninety (90) days after the Effective Date shall be of no force and effect and need not be objected to. All Contested Claims shall be litigated to Final Order unless estimated by the Bankruptcy Court for purposes of distribution; provided, however, Reorganized Debtors may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court.

Reorganized Debtors may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

3.      Filing of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if Reorganized Debtors effect service in accordance with Bankruptcy Rule 3007.

4.      Determination of Claims

Except as otherwise agreed by Reorganized Debtors, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, filed by Debtors or Reorganized Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this claim determination shall constitute or be deemed a waiver of any claim, right or Cause of Action that

Debtors or Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. § 157.

## G.    PROCEDURES FOR TREATING AND RESOLVING DISPUTED AND CONTINGENT CLAIMS

1.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

2.    Claim Estimation

Debtors or Reorganized Debtors may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code sections 502(c) and 502(e); provided, however, the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code section 502(c) and (ii) the timing and procedures for such estimation proceedings, if any.

## H.    SETOFFS AND RECOUPMENT

Reorganized Debtors may, pursuant to sections 553 and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any claims or Causes of Action of any nature whatsoever Debtors may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by Debtors of any setoff or recoupment Debtors may have against the Holder of such Claim, nor of any other claim or Cause of Action.

I. **ALLOWANCE AND DISALLOWANCE OF CLAIMS SUBJECT TO SECTION 502 OF THE BANKRUPTCY CODE**

Allowance and disallowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

J. **CANCELLATION OF INSTRUMENTS AND AGREEMENTS**

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; obligations of Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against Debtors, the Estates or Reorganized Debtors; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

K. **NO INTEREST ON CLAIMS**

Unless otherwise specifically provided for in the Plan, the Confirmation Order or a post-petition agreement in writing between Debtors and a Holder of a Claim and that has been approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**L.     WITHHOLDING TAXES**

Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan. As a condition to making any distribution under the Plan, Reorganized Debtors may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as Reorganized Debtors may deem necessary to comply with applicable tax reporting and withholding laws.

**M.     REPORTS**

From the Effective Date, until a Final Decree is entered, Reorganized Debtors shall submit quarterly reports to the United States Trustee setting forth all receipts and disbursements of Reorganized Debtors as required by the United States Trustee guidelines.

## XIV.   EFFECT OF CONFIRMATION

**A.     VESTING OF ASSETS**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, Reorganized Debtors Assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and all Reorganized Debtors Assets shall vest in Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, Reorganized Debtors may operate their  businesses  and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

**B.     BINDING EFFECT**

On and after the Effective Date, the provisions of the Plan shall bind any holder of a

Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

## C.  DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS

Except as provided in the Plan, the rights afforded in and the payments and Distributions to be made under the Plan shall terminate all Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in Debtors, or their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against Debtors and Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests shall be precluded and enjoined from asserting against Reorganized Debtors, its successors or assignees or any of its assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

## D.  INJUNCTION AND ENFORCEABILITY OF RENEWED GUARANTIES

As long as the Compass Bank Building Note is outstanding and not in default, Compass is enjoined from prosecuting any claims against guarantors.  In order to receive the benefit of the proposed injunction, the guarantors shall agree to toll the statute of limitation such that the applicable period(s) for any statute of limitation is not running while the New Note is outstanding.

Where ACP had guaranteed certain obligations of either DLH or its non-bankrupt subsidiaries, the holders of such guaranties, to the extent to which the value of the underlying

collateral is greater than the obligation which had been guaranteed by ACP, may elect to have their guarantee ride through as a guarantee of Reorganized ACP. However, the renewed guarantee is unenforceable under the Plan so long as (i) Reorganized DLH or the underlying non debtor affiliate of ACP, and (ii) Reorganized ACP are performing under the Joint Plan, and with respect to any debt aas to which a non-debtor subsidiary of ACP is the primary obligor, the primary obligor is performing under the applicable loan documents.

## E.    TERM OF INJUNCTIONS OR STAYS

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the entry of the Final Decree.

## G.    RESERVATION OF CAUSES OF ACTION/RESERVATION OF RIGHTS

Nothing contained in the Plan shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that Debtors or Reorganized Debtors may have or may choose to assert against any Person. All creditors and parties in interest are hereby placed on notice that despite provisions which may be contained in the Plan, including without limitation those providing for satisfaction of Claims, if Allowed, the Reorganized Debtors reserve the right, as advised by counsel, to (a) commence, prosecute to judgment, and to collect upon any cause of action, whether or not such cause of action is listed in the Schedules and Statements of Affairs as an asset of Debtors' chapter 11 Estate and to (b) include as defendants in a suit any and all parties which are, at this time, named and unnamed. Currently, the Reorganized Debtors are unable to estimate the size of any recovery from such a lawsuit. The Reorganized Debtors are authorized under the Plan, in their sole discretion, to litigate to

final judgment, prosecute appeals as are necessary and enter into such settlement agreements as are deemed appropriate with respect to any and all suits initiated as provided herein

Notwithstanding the foregoing, sections 11.01 and 13.29 in the Plan release certain claims which could otherwise have been brought by the Debtors. Section 11.01 of the Plan provides that, except with respect to Classes of Claims unimpaired pursuant to the Plan, the distributions and rights afforded in the Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and Interests in Debtors or any of their respective assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in the Plan, all Claim holders and Interest holders shall be precluded forever from asserting against Debtors, their respective affiliates and principals, their respective agents and attorneys or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, or causes of action belonging to Debtors pursuant to 11 U.S.C. § 541 which could arise up through the Effective Date of the Plan including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of Debtors, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed. As of the Effective Date, Debtors and their respective affiliates, and principals shall be discharged and released from and shall hold all the assets and properties received or retained by them pursuant to the Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except as set forth pursuant to the Plan. All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and interests or obligations of any nature against Debtors or assets or properties received or retained by Debtors with

respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in the Plan. Notwithstanding the foregoing, this provision shall not be interpreted to release any third party claims, liabilities or other causes of action against the affiliates and principals of the Debtors unless the claim or cause of action so released is derivative of a claim or cause of action which was or could have been asserted against a Debtor in this Bankruptcy, or constitutes property of either of the Debtors' bankruptcy estates.

Section 13.29 provides that neither the Debtors, nor the Committee, nor any of their respective members, officers, directors, employees, agents, advisors, affiliates, attorneys, accountants, nor any other professional person retained or employed by any of them (collectively, the "Exculpated Persons") shall have or incur any liability to any Creditor, Interest holder, or any other person or entity for any act taken or omission made in good faith in connection with or relating to the formulation, negotiation, implementation, confirmation, or consummation of the Plan, including any settlement referenced or described herein, or in connection with or relating to the Disclosure Statement or any document, instrument, note or agreement executed or to be executed and delivered pursuant to the Plan. The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, or any other party in interest in the Debtors' Bankruptcy Case, or any other person or entity, for actions taken or not taken under the Plan, in connection herewith, or with respect hereto, or arising out of their administration of the Plan or distributions of money or property under the Plan, in good faith, including, without limitation, the failure to obtain confirmation of the Plan, or the failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the

occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties, rights, and obligations under the Plan.

## H.    AVOIDANCE ACTIONS/OBJECTIONS

Generally, the Debtors waive all causes of action belonging to the estate pursuant to section 541 of the Bankruptcy Code, including but not limited to Avoidance Actions pursuant to sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code.  Notwithstanding the foregoing, all Avoidance Actions are preserved in the estate for the benefit of creditors if (a) such an Avoidance Action has been brought or otherwise asserted in a written pleading filed with the Bankruptcy Court prior to the Effective Date, or (b) such Avoidance Actions have been asserted as part of an objection to the claim where either (i) such objection was brought prior to the Confirmation Date, or (ii) the claim in question was filed after the applicable bar date for such claim.  Given Debtors were solvent on a balance sheet basis pre-petition, Debtors regard the value of the Avoidance Actions so waived to be *de minimis* and believe the costs of bringing and prosecuting such actions outweigh the likely recovery under those actions.

## XV. CONDITIONS PRECEDENT

## A.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

**The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:**

  a.  The Bankruptcy Court shall have approved a disclosure statement with respect to the Plan in form and substance acceptable to Debtors in their sole and absolute discretion;

  b.  The Confirmation Order shall be in form and substance acceptable to Debtors in their absolute discretion;

c.     The Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay of effectiveness; the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

d.     Reorganized Debtors' reasonably projected expenses do not exceed its reasonably projected revenue; and

e.     All documents necessary to consummate the Exit Financing shall be executed on or prior to the Effective Date; and

f.     Exit Financing in amounts and terms acceptable to ACP and DLH have been arranged and are ready to be funded.

g.     To the extent that any Exit Financing, or in the case of Cramdown, any new equity contribution (whether in the form of cash or conversion of a claim), is to be provided by Richard S. Allen or Richard S. Allen, Inc., the funding of any such amounts and the conversion of any claim held by such persons into new equity, shall have been approved by the Bankruptcy Court having jurisdiction over the Chapter 11 case of Richard S. Allen and Richard S. Allen, Inc.

## B.     REVOCATION, WITHDRAWAL OR NON-CONSUMMATION OF THE PLAN

If, after the Confirmation Order is entered, each condition precedent to the Effective Date has not been satisfied or duly waived by Debtors on or by ninety (90) days after the Confirmation Date, then upon motion by Debtors, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. **If the Confirmation Order is vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims against or Interests in Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or**

**Interest in Debtors, (iii) prejudice in any manner the rights of Debtors in the Chapter 11
Cases, or (iv) constitute a release, indemnification or exculpation by Debtors, the Estates or
any other party pursuant to the Plan. If the Confirmation Order is vacated, in order to
confirm a new Plan of Reorganization, a new Plan and Disclosure Statement would have to be
submitted to the Bankruptcy Court. In Debtors' judgment, such an event would increase the
risk that Debtors would not succeed in reorganizing their operations and instead would be
liquidated. In such an event, unsecured creditors are anticipated to receive nothing and many
otherwise fully secured creditors may not be able to realize the full value of their collateral,
resulting in deficiencies.**

## XVI. ADMINISTRATIVE PROVISIONS

## A. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided

under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy

Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by

applicable law, including any provisions permitting mandatory or discretionary withdrawal of such

jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including,

without limitation, the following:

    a.     all matters relating to the assumption or rejection or the assumption and
assignment of Executory Contracts, or Claims or disputes relating thereto;

    b.     all matters relating to the ownership of a Claim or Interest;

    c.     all matters relating to the distribution to holders of Allowed Claims and to
the determination of Claims;

d.      any and all matters involving Reorganized Debtors;

e.      all matters relating to or arising in connection with the allowance or estimation of Claims filed, both before and after the Confirmation Date, including any objections to the classification of any Claim;

f.       to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

g.      all matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

h.      all matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

i.       to consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

j.       all applications for allowance of compensation and reimbursement of Professional Fee Claims under Bankruptcy Code section 328, 330, 331, 503(b), 1103 and 1129(a)(4);

k.      to hear and determine all motions requesting allowance of an Administrative Claim;

l.       to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

m.      all Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets for Reorganized Debtors, as successor-in-interest to any of Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

n.  all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

o.  any other matter not inconsistent with the Bankruptcy Code;

p.  all disputes involving the existence, nature or scope of Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

q.  to enter the Final Decree closing the Chapter 11 Cases; and

r.  to enforce all orders previously entered by the Bankruptcy Court.

## B. PAYMENT OF STATUTORY FEES

All fees through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided to Debtors prior to the Effective Date. All fees invoiced after the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by Reorganized Debtors out of the liquidating assets.

## C. HEADINGS

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

## D. BINDING EFFECT OF PLAN

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, Debtors, the Estates, Reorganized Debtors and their respective successors or assigns, whether or not the Claim or Interest of such Holders is impaired under the Plan and whether or not such Holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred

to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, Reorganized Debtors and any trustee appointed for Debtors under chapters 7 or 11 of the Bankruptcy Code).

## E.     FINAL ORDER

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by Debtors upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

## F.     WITHHOLDING AND REPORTING REQUIREMENTS

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## G.  TAX EXEMPTION AND EXPEDITED TAX DETERMINATION

Pursuant to section 1146 of the Bankruptcy Code, any transfers from a Debtor or Reorganized Debtors to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of Debtors' or Reorganized Debtors' real or personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to Reorganized Debtors or by Reorganized Debtors of Debtors' or Reorganized Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfers of property by Reorganized Debtors) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax. Debtors and Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, on or behalf of, Debtors for any or all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

## H.     GOVERNING LAW

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) the Plan and the Plan Documents shall be governed by Texas Law, and, with respect to Debtors incorporated or organized in Delaware and Reorganized Debtors, corporate and limited liability company governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.

## I.     CORPORATE ACTION

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of a Debtor or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the State of Delaware, without any requirement of further action by the directors of Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of Delaware, in accordance with the applicable general business law of such jurisdiction.

## J.     SEVERABILITY

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied

to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively. Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

## K.     REVOCATION

Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date. If Debtors revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtors, the Committee or any other Person or to prejudice in any manner the rights of Debtors, the Committee or any Person in any further proceedings involving Debtors, or be deemed an admission by Debtors and/or the Committee.

## L.     SUBSTANTIAL CONSUMMATION

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## M.     CONSTRUCTION

The rules of construction as set forth in section 102 of the Bankruptcy Code shall apply to construction of the Plan. All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

## N.     CONFLICT

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence. The terms of

the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in the Disclosure Statement.

## O.    AMENDMENTS AND MODIFICATIONS

Debtors may agree to alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, any Debtor or Reorganized Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to those parties set forth in Bankruptcy Rule 2002, and the solicitation of all Creditors and other parties-in-interest shall not be required. Prior to the Effective Date,  Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Interests.  Debtors also reserve the right to amend treatment of any class as may be necessary or desirable to achieve cramdown in the event one or more classes vote against the Plan.

## P.    NOTICES

Any notices required under the Plan or any notices or requests of Debtors or Reorganized Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii)

reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given

when received by the following parties:

Mark E. MacDonald
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
Facsimile: (214) 890-0818

Jenny Saubert
125 S. Bridge Street, Suite 100
Visalia, CA 93291
Facsimile:

Daniel J. McAuliffe
DLH Master Land Holding, LLC
1700 Pacific Avenue, Suite 1250
Dallas, TX  75201
Facsimile:  (214) 661 - 1851


**Q.      FILING OF ADDITIONAL DOCUMENTS**

On or before substantial consummation of the Plan, and without the need for any further

order or authority, Debtors may file with the Bankruptcy Court such agreements or other

documents as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan.

**R.      DIRECTION TO A PARTY**

From and after the Effective Date, Debtors or Reorganized Debtors may apply to the

Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in

the execution or delivery of any instrument or document reasonably necessary or reasonably

appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act

(including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

## S. SUCCESSORS AND ASSIGNS

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

## ARTICLE XVII.    EXEMPTION FROM SECURITIES LAW

The Plan contemplates the issuance of Variable Pay Notes and Membership Interests (collectively, the "1145 Securities") to certain holders of Claims. In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of 1145 Securities will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts issuance of securities from such registration requirements if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate or are issued principally in such exchange and partly for cash or property.

Debtors believe that the exchange of 1145 Securities for Claims against Debtors under the circumstances provided in the Plan (other than with respect to entities deemed statutory underwriters, as described below) will satisfy the requirements of section 1145(a) of the Bankruptcy Code.  The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without

registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "statutory underwriter") or an "affiliate" of the issuer within the meaning of the Securities Act. In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities offered or sold under a plan for the holders of such securities, (iii) offers to buy securities offered or sold under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 2 1145 Securities shall not include securities received by underwriters in connection with the issuance of Membership Interests. 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with an issuer of securities. "Control" (as

defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration. Pursuant to no-action and interpretive guidance from the staff of the Securities and Exchange Commission (the "SEC"), an entity that is an "underwriter" pursuant to section 1145(b)(1) of the Bankruptcy Code, other than an "affiliate" of the issuer within the meaning of the Securities Act may nevertheless resell securities received under section 1145(a)(1) that are transferred in "ordinary trading transactions" made on a national securities exchange or in the over-the-counter markets, subject to the volume limitations contained in Rule 144 under the Securities Act. Persons that receive the 1145 Securities should note, however, that Debtors and Reorganized Debtors do not currently intend to list the Variable Pay Notes or any callable Membership Interests on any exchange.

What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") or (iii) payment of special compensation to brokers or dealers in connection with the sale. Resales by

persons that receive 1145 Securities pursuant to the Plan who are "affiliates" of the issuer within the meaning of the Securities Act may be made without registration under the Securities Act by complying with the conditions contained in Rule 144, except for the holding period requirement of Rule 144(d). These conditions include the requirement that there be available current public information with respect to the issuer, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" and that notice of the resale be filed with the SEC. Debtors cannot assure, however, that adequate current public information will exist with respect to Reorganized Debtors, and therefore the safe harbor provisions of Rule 144 of the Securities Act may not be available. In addition, Debtors and Reorganized Debtors do not currently intend to list the Variable Pay Notes Membership Interests on any exchange, and therefore the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" may not be able to be satisfied and the safe harbor provisions of Rule 144 of the Securities may not be available for "affiliates." Pursuant to the Plan, Variable Pay Notes and certificates evidencing Membership Interests received by Restricted Holders or by a holder that Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will each bear a legend substantially in the form below:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any Person entitled to receive the 1145 Securities who Debtors or Reorganized Debtors determine to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive Variable Pay Notes or certificates evidencing Membership Interests without such legend if, prior to the distribution of such securities, such person or entity delivers to Debtors or Reorganized Debtors, as the case may be, (i) an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors, as the case may be, to the effect that the Variable Pay Notes or Membership Interests to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code. Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for the 1145 Securities in exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to Debtors or Reorganized Debtors, as the case may be, an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to Debtors or Reorganized Debtors, as the case may be, an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors to the effect that (x) such securities are no longer subject to the restrictions under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act and such

securities may be sold without registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED DEBTORS, DEBTORS MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS**

## XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN OF REORGANIZATION AND LIQUIDATION ANALYSIS

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of Debtors under Chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

### A. LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. Debtors believe that liquidation under chapter 7 would result in materially smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a

cessation of Debtors' operations. More specifically, based on appraisal testimony provided by a representative of C.B. Richard Ellis, unsecured creditors would receive nothing in the event the DLH project is sold in bulk in the current market, thus destroying more than $40 million in ACP's assets as DLH's principal equity owner. See **Exhibit I** for a more detailed liquidation analysis for both ACP and DLH.

## B. ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, Debtors (or if Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization or continuation of Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, Debtors have explored various alternatives in connection with the formulation and development of the Plan. Debtors believe that their Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## XIX. CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN

## NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO

ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY DEBTORS WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER IS CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.

**IRS Circular 230 Notice:** To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

## A.  PAYMENT OF TAXES ARISING FROM ASSET SALES BY DEBTORS

The Plan provides for payments of taxes generated from sales or other dispositions of DLH and ACP assets, the operations of ACP and DLH, and any forgiveness of indebtedness associated with the Plan. Debtors are each solvent on a going concern basis and provision for payment of taxes is required by Debtors and their Interest Holders. Debtors believe that the Internal Revenue Service would potentially object to confirmation without such provisions because both Richard S. Allen and RSAI are currently in jointly administered Chapter 11 cases and assets should not be sold without provision

for payment of taxes.

## B. INFORMATION REPORTING AND WITHHOLDING

Distributions under the Plan are subject to applicable tax reporting and withholding. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS. Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its U.S. federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold. Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements. The foregoing summary and the further discussion found in **Exhibit J** is provided for informational purposes only. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences of the Plan.

DATED this 10 day of Jan, 2011.

Respectfully submitted,

DLH Master Land Holding, LLC,

By:_____

Its. _____ CEO _____

Allen Capital Partners, LLC,

By:_____

Its. _____ CEO _____

List of Exhibits

Exhibit A:            Plan

Exhibit B:            Disclosure Statement Order

Exhibit C:            ACP's Ownership Interest in DLH

Exhibit D:            List of Entities Merged into ACP and DLH

Exhibit E:            Financial Projections

Exhibit F:            ACP Project Description

Exhibit G:            ACP Non-Bankrupt Subsidiaries

Exhibit H:            Additional Risk Factors

Exhibit I:            Liquidation Analysis

Exhibit J:            Additional Discussion of Tax Implications

Exhibit K:            Requirements for Confirmation

Exhibit A:          Plan

Mark E. MacDonald, TX Bar No. 12758300
Mark E. MacDonald, Jr. IL Bar No. 6217592
Daniel J. Artz, TX Bar No. 01365570
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220; Facsimile: (214) 890-0818
Email: mark@macdonaldlaw.com
**COUNSEL FOR DLH MASTER LAND HOLDING, LLC**
**AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS**
**AND DEBTORS IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **DLH Master Land Holding, LLC,** | § | |
| **Allen Capital Partners, LLC,** | § | **Case No. 10- 30561-HDH-11** |
| **Richard S. Allen, Inc.** | § | |
| **Richard S. Allen,** | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | |
| | § | |

## THIRD AMENDED JOINT PLAN OF REORGANIZATION FOR ALLEN CAPITAL PARTNERS, LLC AND DLH MASTER LAND HOLDING, LLC

**TO ALL CREDITORS AND PARTIES-IN-INTEREST:**

Debtors DLH Master Land Holding, LLC ("**DLH**") and Allen Capital Partners, LLC ("**ACP**", collectively with DLH "**Debtors**") propose the following Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq*.

# TABLE OF CONTENTS

**SUMMARY OF PLAN** ......................................................................................2
**ARTICLE I. - DEFINITIONS** ......................................................................6
**ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS** .....................19
**ARTICLE III - IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND
INTERESTS** ..............................................................................................20
**ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS** ...........................20
**ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN**..................................36
**ARTICLE VI - MEANS OF IMPLEMENTATION AND GENERAL
DESCRIPTION OF THE PLAN** ..................................................................37
**ARTICLE VII - PROCEDURES FOR RESOLVING AND TREATING
CONTESTED AND CONTINGENT CLAIMS** .........................................41
**ARTICLE VIII - PROVISIONS GOVERNING DISTRIBUTION** .........................42
**ARTICLE IX - EXECUTORY CONTRACTS AND LEASES** ................................43
**ARTICLE X - MAINTENANCE OF CAUSES OF ACTION**..................................45
**ARTICLE XI - DISCHARGE** ........................................................................45
**ARTICLE XII - RETENTION OF JURISDICTION**..............................................46
**ARTICLE XIII - MISCELLANEOUS PROVISIONS** ............................................47

# SUMMARY OF PLAN

Debtors' proposed Reorganization Plan contemplates that the Debtors will obtain sufficient exit financing to enable the Debtors to pay all Administrative and non-tax Priority Claims (other than the Debtor-in-Possession Financing) in full on the Effective Date.

## DLH

The Debtors will convert the Debtor In Possession Financing into a Post-Confirmation Term Loan in the amount of approximately $2.6 Million, and will obtain additional exit financing from one or more of three possible sources. Certain of the Secured Claims will be satisfied on the Effective Date by the surrender of the land securing such Secured Claims. The Debtors will finance distributions to the other creditors from the sales of land. The Net Proceeds from any sale would be used first to pay necessary costs of closing, second, in payment of the Release Price necessary to satisfy in full the Secured Claims secured by such parcel, third, in payment of a Release Price on the Term Loan from the DIP Lenders, and fourth, a set aside sufficient funds to allow the Debtors and Debtor's owners to pay actual taxes incurred as a result of the taxable gains realized on such sale. The remaining Net Proceeds from any such sale would be allocated as herein provided between Reorganized DLH and the Creditors of DLH: (a) to fund the operating expenses of Reorganized DLH, including the costs of managing and marketing the DLH Land, and (b) to fund distributions to Creditors.

Under the Plan, DLH creditors secured by vacant land are divided into four (4)

pools.

Pool 1 (the "Compass Pool") contains parcels as set forth in **Exhibit A-1** hereto subject to the liens of Compass. Most of the parcels in the Compass Pool are Development Ready. Compass has a perfected first lien on all of the parcels in the Compass Pool, all of which secure the Allowed Secured Claim of Compass. The Plan establishes Release Prices for each individual parcel in the Compass Pool such that the sum of the Release Prices do not exceed 137% of the Allowed Secured Claim of Compass, those release prices are specifically reflected on Exhibit A-1-a (Compass Release Prices) Compass, with respect to its Pool 1 Allowed Secured Claim, shall receive a Variable Pay Note which will be payable from two sources: 1) the net proceeds of any sale of a parcel which is subject to the Compass lien, up to the Release Price for such Parcel; and 2) 30% of Pool 1 Net Sales Proceeds for any and all sales of other property contained in Pool 1. The Notes will accrue interest at 7.25% and mature not later than 5 years after the Plan Effective Date. To the extent that certain threshold amounts of distributions to Compass from sales of Pool 1 properties are not met, Reorganized DLH will be obligated to make certain structured sales, sealed-bids and or auctions of land in Pool 1.

Pool 2 (the "Hutchins Industrial Pool") contains parcels as set forth in **Exhibit A-2** hereto subject to various seller financing liens. All or substantially all of the parcels in the Hutchins Industrial Pool are Development Ready. Secured Creditors with Pool 2 Allowed Secured Claims will each receive a Variable Pay Note payable from two sources: 1) the net proceeds of any sale of a parcel in the Hutchins Industrial Pool which is subject to their lien, and 2) their pro-rata share of 30% of Pool 2 Net Sales Proceeds for any and all sales of other property contained in Pool 2. The Pool 2 Notes will accrue interest at 7.25% and mature not later than 5 years after the Plan Effective Date. To the extent that certain threshold amounts of distributions to Pool 2 Creditors from sales of Pool 2 properties are not met, Reorganized DLH will be obligated to make certain structured sales, sealed-bids and or auctions of land in Pool 2.

Pool 3 (the "ABOT Pool") contains parcels as set forth in **Exhibit A-3** hereto subject to the liens of ABOT. Due to the location and current infrastructure needs, most of the land contained in the ABOT Pool will take longer to fully develop and sell. ABOT has a perfected first lien on all of the parcels in the ABOT Pool, all of which secure the Allowed Secured Claim of ABOT. DLH shall surrender to ABOT all of the Pool 3 Parcels on the Effective Date in full satisfaction of the Claim of ABOT and all guarantees by Debtors and other related parties.

Pool 4 (the "Seller Notes Pool") contains parcels as set forth in **Exhibit A-4** hereto subject to various seller financing liens. Due to the location and current infrastructure needs, the land contained in Pool 4 will take longer to fully develop and sell. DLH shall surrender to each of the Secured Creditors holding Pool 4 Allowed Secured Claims all of the Pool 4 parcels securing such Claims on the Effective Date in full satisfaction all such Claims. Notwithstanding the foregoing, to the extent to which DLH has either moved to approve the sale of such parcel to a third party or has an

executed agreement for the sale of such a parcel, DLH may retain such a parcel for up to 90 days after the Effective Date. If the sale of the parcel is closed within that time period, the claims of the secured creditors with an interest in such parcel shall be fully satisfied from the proceeds of such sale.

DLH Secured Creditors which have claims secured by developed property are Great Western, which has a first lien on the ADESA Property, and Compass Bank, which has first liens on Buildings A and B.

Great Western's Secured Claim is being satisfied in the manner contemplated by a Compromise and Settlement Agreement between the Debtors and Great Western which was previously approved by the Bankruptcy Court, unless Great Western for any reason exercises its right to terminate that Compromise and Settlement Agreement. In the event that Great Western exercises a right to terminate the Compromise and Settlement Agreement, Great Western's Secured Claim shall be satisfied in the manner described in Section 4.03, Subclass 3E.

Compass Bank's Secured Claim with respect to the Building Loans is being satisfied in the manner described in Section 4.03, Subclass 3F.

DLH has the option under the Plan, with respect to any parcel securing a Secured Claim, to surrender such parcel in full satisfaction of the Secured Claim secured by such parcel. In the case of any Secured Claim as to which the Secured Creditor has full recourse against DLH with respect to the Claim secured by a parcel to be surrendered by DLH, DLH shall request the Bankruptcy Court to determine the value of any such parcel to be surrendered to the Secured Creditor.

## DLH Exit Financing

DLH anticipates obtaining Exit Financing from one or more of three (3) sources: (a) an auction of several parcels of land to be conducted prior to the Effective Date, with Bankruptcy Court approval, but which may not close until after the Effective Date which is anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the parcels to be sold, and excess cash which DLH may use to consummate the Plan; and/or (b) a loan from Allen Opportunity Fund, a non-Debtor entity affiliated with DLH which owns a parcel of property near the DLH property, in an amount of up to $400,000; and/or (c) a loan from Richard S. Allen, individually, in amount of up to $750,000.00.

## DIP Lenders' Term Loan

Except in the case of a Cramdown, the Debtor-in-Possession Financing which remains unpaid on the Effective Date, which DLH estimates will be approximately $2.6 Million, shall be converted to a Term Loan (the "**Term Loan**"). The Term Loan shall retain its perfected subordinate liens on the DLH Property other than the Pool 3 parcels and Pool 4 parcels being surrendered to the creditors in those pools. A new variable pay

note and new subordinate lien deed of trust shall be executed on the Effective Date to evidence and secure the Term Loan. The Plan establishes Release Prices for the Term Loan for each parcel, calculated at 150% of the allocable portion for each parcel in Pool 1 and Pool 2 (excluding any land sold prior to the Effective Date) of the initial balance of the Term Loan on the Effective Date of the Plan. The Term Loan shall bear a variable rate of interest at Prime plus ten percent (10%). Interest on the Term Loan shall accrue annually, and shall be payable solely from the Net Sales Proceeds of the Pool 1 and Pool 2 properties. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan. On the Effective Date, the balance of the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the outstanding balance of the DIP Loan on the Effective Date, and (b) all reasonable costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination of the Term Loan.

**DLH Unsecured Creditors**

Except in the case of a Cramdown, DLH unsecured creditors will be paid over time from cash generated by DLH's operations and sales of property.

In the event of a Cramdown, DLH unsecured creditors will be paid up to 25% of their Allowed Unsecured Claims, without interest, in quarterly payments from DLH Unsecured Creditor Net Proceeds.. In the event of a Cramdown, DLH subordinated unsecured creditors will receive nothing under the Plan.

**ACP**

ACP creditors, both secured and unsecured, will be paid over time from cash generated by the operations of ACP's subsidiaries. In the alternative, certain creditors of ACP have the option to hold a redeemable preferred return equity interest in DLH.

**ACP Unsecured Creditors**

Except in the case of a Cramdown, ACP unsecured creditors will be paid over time from cash generated by the operations of ACP's subsidiaries. In addition, certain creditors of ACP are offered the option to hold a callable preferred return equity interest in DLH.

In the event of a Cramdown, ACP unsecured creditors will be paid up to 50% of their Allowed Unsecured Claims, without interest, in quarterly payments from ACP Unsecured Creditor Net Proceeds. In the event of a Cramdown, ACP subordinated unsecured creditors will receive nothing under the Plan.

**Equity Interests**

Except in the case of a Cramdown, to the extent not converted into redeemable

preferred interests in Reorganized DLH or if additional equity interests are not required for Exit Financing, current equity will retain their interests in Reorganized DLH and Reorganized ACP.

**<u>Cramdown Plan</u>**

The Debtors reserve the right to seek confirmation of this Plan by "cram down" pursuant to Section 1129(b)(1) in the event that the Plan is rejected by the holders of either the Unsecured Claims or the Subordinated Claims in either the DLH Case or the ACP Case.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, or by the holders of Unsecured Claims (ACP Class 4) or Subordinated Claims (ACP Class 5) in the ACP Case, the ACP Plan will be modified to provide that all equity interests in ACP will be cancelled, and new Equity Interests in ACP will be issued in exchange for: (a) a cash contribution by the owners of Allen Opportunity Fund in the amount of approximately $800,000, to be paid from the net proceeds of an auction of parcel 2 owned by Allen Opportunity Fund; (b) a cash contribution of up to $1,000,000.00 from Richard S. Allen; and (c) a cash contribution of up to $400,000 from Luke Allen, to be paid from proceeds available to Richard S. Allen from other transactions. The Equity Interests in Reorganized ACP shall be distributed pro rata among the owners of Allen Opportunity Fund and Richard S. Allen based upon their contributions of new value to ACP. Further, the ACP Plan will be modified to provide that Unsecured Claims (ACP Class 4) will be paid up to 50% of their Allowed Unsecured Claims, without interest, in quarterly payments from ACP Unsecured Creditor Net Proceeds and Subordinated Claims (ACP Class 5) will receive nothing under the Plan.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, so that Cramdown is necessary in the DLH Case, the DLH Plan will be modified to provide that all equity interests in DLH will be cancelled, and new Equity Interests in DLH will be issued in exchange for: (a) a cash contribution of $1.0 Million from ACP, and (b) a contribution from the DIP Lenders of up to $1.20 Million, in the form of a credit on the DIP Loan (which will reduce the amount of the Term Loan on the Effective Date by $1.2 Million). The Equity Interests in Reorganized DLH shall be distributed pro rata among ACP and the DIP Lenders based upon their contributions of new value to DLH. Further, the DLH Plan will be modified to provide that Unsecured Claims (DLH Class 4) will be paid up to 25% of their Allowed Unsecured Claims, without interest, from DLH Unsecured Creditor Net Proceeds, and Subordinated Claims (DLH Class 5) will receive nothing under the Plan.

## <u>ARTICLE I. - DEFINITIONS</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in this Plan. Any term used

in initially capitalized form in this Plan that is not defined herein but which is defined in the Bankruptcy Code shall have the meaning assigned to such term in the Bankruptcy Code.

1.01 **ABOT** means American Bank of Texas, a Secured Creditor of DLH, holding one or more loans secured by first liens on the parcels which comprise Pool 3, the ABOT Pool.

1.02 **ABOT Pool** means Pool 3, as identified on Exhibit A hereto, consisting of the parcels of land on which ABOT holds a first lien.

1.03 **ACP** means Allen Capital Partners, LLC.

1.04 **ACP Net Sales Proceeds** means gross cash proceeds received by Reorganized ACP from any distribution from Reorganized DLH, any future joint venture, sales of real estate or an option concerning real estate ("ACP Transaction") by its direct or indirect subsidiary, <u>less</u>:

    (i)    any liens, commissions, and customary closing costs incurred by a subsidiary in connection with the sale;

    (ii)    any sums paid to the holders of any Allowed Secured Claim to discharge any perfected lien or security interest covering any distributions from DLH or other direct or indirect ACP subsidiary;

    (iii)    any sums distributed for the purpose of paying Taxes associated with such underlying distribution, sale, option exercise or related forgiveness of indebtedness as the case may be; and

    (iv)    any funds required under the terms of any agreement associated with a Transaction related to seller's obligations to fund infrastructure improvements, provide allowances or otherwise.

Notwithstanding the foregoing, the following are explicitly excluded from the definition of ACP Net Sales Proceeds:

    (a)    reimbursement of expenses incurred as Development Partner;

    (b)    reimbursement of tenant improvement expenses;

    (c)    payments to any future joint venture partner or other holder of an interest in the real estate so sold, or

    (d)    repayment of any loan made by ACP after the Effective Date.

1.05 **ACP Unsecured Creditor Net Proceeds** means, at the end of each calendar quarter, determined sixty (60) days after the end of such quarter, seventy percent (70%) of:

(a)     ACP Net Sales Proceeds for such calendar quarter, less

(b)     the sum of

(i)     general and administrative costs actually incurred by ACP for such calendar quarter, and

(ii)    all distributions or payments made by Reorganized ACP on the Exit Financing or on the ACP Secured Variable Pay Notes during such calendar quarter.

Notwithstanding the foregoing, ACP Unsecured Creditor Net Proceeds shall not exceed $300,000 per calendar quarter during the first eight (8) calendar quarters after the Effective Date under the Plan.

     1.06    **Administrative Expense** means a Claim of any kind which is allowed as a cost or expense of administration of the Chapter 11 Case of Debtors under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of Debtors, any actual and necessary expenses of operating the business of Debtors, including without limitation all compensation or reimbursement of fees, expenses or other professional charges of any nature to the extent allowed by the Bankruptcy Court under Sections 327, 330, 331, or 503 of the Bankruptcy Code.

     1.07    **Administrative Expense Bar Date** means the date set by the Court as the deadline for filing any motion or application to have any Claim classified as an Administrative Expense under subsections 503(b) and 507(a)(1) of the Bankruptcy Code.

     1.08    **Allowed** means, when used with respect to a Claim, a Claim (i) which is not Contested; or (ii) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (A) as to which no objection was filed by the Objection Deadline, unless such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (B) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order.

     1.09    **Allowed General Unsecured Claim** means any Claim which has been Allowed, which is not an Allowed Secured Claim, a Subordinated Claim, or a Reimbursement Claim.

     1.10    **Allowed Secured Claim** means any Claim which is both Allowed and is secured by either: (a) a valid and perfected lien upon or security interest in any property of the Debtors, or (b) an enforceable right of setoff against any pre-petition obligation which the holder of such Claim owed to a Debtor. The amount of an Allowed Secured Claim shall be determined based upon the value of the Debtor's interest in property subject to such lien, security interest, or setoff right as of the Petition Date, and, for any holder of an Allowed Secured Claim for which the Debtor's interest in property subject to such creditor's lien, security interest or setoff right, as the case may be, exceeds the value

of such creditor's Claim as of the Petition Date, the amount of such Allowed Secured Claim as of the Effective Date shall include, to the extent permitted under Section 506(b) of the Bankruptcy Code (a) interest on the principal amount of such Claim from the Petition Date to the Effective Date, calculated at the non-default rate of interest provided in any note or other instrument or agreement evidencing such Allowed Secured Claim, and (b) reasonable attorneys' fees incurred by the holder of such Allowed Secured Claim in connection with the Debtors' Bankruptcy, if and to the extent permitted under any note, deed of trust, instrument, or other agreement evidencing or securing such Allowed Secured Claim, in an amount which is either agreed to by the Debtor, or as approved by the Bankruptcy Court by a Final Order entered after notice and an opportunity for a hearing.

1.11    **Avoidance Actions** means any cause of action under any of sections 544, 545, 546, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, which actions are waived except as specified in the Plan in Debtors' respective estates, as appropriate.

1.12    **Bankruptcy Code** means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code.

1.13    **Bankruptcy Court** means the United States Bankruptcy Court or such other court having jurisdiction over all or any part of the Chapter 11 Case.

1.14    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 case, including applicable local rules of the Bankruptcy Court.

1.15    **Bar Date** means the last date established by the Bankruptcy Court for filing proofs of Claim in the Chapter 11 Case, provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor or holder of an Equity Interest may file a Proof of Claim (as defined and used in the Bankruptcy Code) or proof of interest, the date set with respect to such Creditor or holder of an Equity Interest shall be the Bar Date, but only as to such Creditor or holder of an Equity Interest.

1.16    **Business Day** means a day which is not a Saturday, Sunday or any day designated as a legal holiday by the Federal Government.

1.17    **Claim** means (a) a right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; and (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.18    **Class** means all of the holders of Claims against Debtors or of Interests in Debtors having characteristics substantially similar to the other Claims or Interests which have been designated in Article II of the Plan.

1.19    **Compass** means BBVA Compass Bank, a Secured Creditor of DLH

holding notes secured by first liens on: (a) the Compass Pool; and (b) the Building A & Building B parcels.

1.20   **Compass Pool** means Pool 1, as identified on Exhibit A hereto, consisting of the parcels of undeveloped land on which Compass holds a first lien.

1.21   **Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

1.22   **Confirmation Date** means the date of entry of the Confirmation Order.

1.23   **Confirmation Hearing** means the hearing or hearings which will be held before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider Confirmation of the Plan.

1.24   **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.25   **Contested Claim** means a Disputed Claim.

1.26   **Cramdown** means confirmation of either the DLH Plan or the ACP Plan, or both, pursuant to 11 U.S.C. §1129(b)(1), by reason of the fact that an impaired Class of Creditors votes to reject such Plan.  As used herein, "**Cramdown**" is used to refer to the circumstance where the DLH Plan or the ACP Plan, or both, as the case may be, must be confirmed pursuant to Section 1129(b)(1) of the Bankruptcy Code by reason of the rejection of such Plan by either the Class of Unsecured Creditors (DLH Class 4 or ACP Class 4) or the Class of Subordinated Creditors (DLH Class 5 or ACP Class 5) in either or both such Plans.  The Debtors expressly reserve the right to move for confirmation of one or both the DLH Plan or the ACP Plan by cramdown pursuant to Section 1129(b)(1) in the event that the Plan is rejected by any Class of the Secured Creditors in either DLH or ACP, but may not, in such instance, invoke the changes to the treatment of  DLH Classes 4, 5, or 8 or ACP Classes 4, 5, or 8 described in the Plan as "**Cramdown Treatment**" for such Classes.

1.27   **Creditor** means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.28   **Debtors** mean DLH Master Land Holding, LLC and Allen Capital Partners, LLC.

1.29   **Development Ready** means, with respect to any parcel or tract of land (i) all utilities necessary for the development and operation of the subject tract of land for a use permitted by the zoning for such tract of land (including, without limitation, sanitary sewer, storm sewer, water, electricity, natural gas, and telephone) are presently available to the perimeter boundaries of that tract, (ii) the subject tract is currently annexed and zoned within the limits of a municipality, and (iii) the subject tract has access to and from a road or thoroughfare that is dedicated for public use and such road or thoroughfare is

currently improved to a level adequate to support the use of the subject tract.

1.30 **DIP Lenders** means Pointe Property Group, Inc., a Tennessee Corporation, and Allen Investments, Inc., a Florida corporation, the Lenders with respect to: (a) a Pre-Petition Loan made to DLH in the amount of $585,000.00, closed on December 31, 2009; and (b) a Post-Petition Loan made to the Debtors pursuant to Orders entered by the Bankruptcy Court authorizing Debtor-in-Possession Financing up to the aggregate amount of $3.5 Million.

1.31 **DIP Loan** means, collectively, (a) that certain Pre-Petition Loan made by the DIP Lenders to DLH in the amount of $585,000.00, closed on December 31, 2009; and (b) a Post-Petition Loans made by the DIP Lenders to the Debtors pursuant to Orders entered by the Bankruptcy Court authorizing Debtor-in-Possession Financing up to the aggregate amount of $3.5 Million as may be increased by origination fees and legal fees on the Effective date.

1.32 **Disallowed** means, when used with respect to a Claim, a Claim or the portion thereof which is fully and finally (a) denied allowance, or (b) estimated for purposes of payment or other Plan distributions at zero ($0.00), in either case by Final Order of the Bankruptcy Court. Disallowed means, when used with respect to an Administrative Expense of a professional that is a Fee Claim, an Administrative Expense or portion thereof that is denied by Final Order of the Bankruptcy Court or other court of competent jurisdiction or that is estimated by Final Order of the Bankruptcy Court for purposes of payment or other Plan distributions at zero ($0.00).

1.33 **Disbursing Agent** means the Reorganized Debtors or, if the Bankruptcy Court orders otherwise, such person or individual designated in the Confirmation Order or other order of the Bankruptcy Court to hold the consideration to be distributed to holders of contingent, disputed or unliquidated Claims pursuant to the Confirmation Order prior to the time such Claims become Allowed Claims, in his, her, or its capacity as the agent of the Reorganized Debtors.

1.34 **Disclosure Statement** means the written statement, filed concurrent herewith, as amended, supplemented, or modified, from time to time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.35 **Disputed Claim** means any Claim that is listed in Debtors' Schedules as disputed, contingent, or unliquidated, any Claim that is the subject of a claims objection filed in the Bankruptcy Court, and any Claim that is disputed by Debtors in any litigation, lawsuit or adversary proceeding pending in the Bankruptcy Court or in any other court of competent jurisdiction.

1.36 **DLH** means DLH Master Land Holding, LLC.

1.37 **DLH Class B Interest** means the callable, preferred return Membership Interest in Reorganized DLH described and defined in section 13.15 of the Plan.

1.38 **DLH Class C Interest** means the callable, preferred return Membership Interest in Reorganized DLH described and defined in section 13.15 of the Plan.

1.39 **DLH Net Sales Proceeds** means, with respect to the sale, exchange or other disposition of any parcel of land by Reorganized DLH (but not with respect to the initial contribution by Reorganized DLH of any parcel into any new joint venture, partnership, limited liability company, or otherwise, except as expressly provided by Section 6.11 of the Plan), the remaining proceeds from such sale after payment of:

    (a)    all reasonable and customary closing costs, including title insurance, survey costs, escrow and recording fees, brokerage commissions, and all accrued but unpaid real estate taxes on such parcel,

    (b)    the Release Price for such parcel of land;

    (c)    the Term Loan Release Price for such parcel of land;

    (d)    any sums distributed for the purpose of paying Taxes associated with such underlying distribution, sale, option exercise or related forgiveness of indebtedness as the case may be; and

    (e)    any funds required under the terms of any agreement associated with a Transaction related to seller's obligations to fund infrastructure improvements, provide allowances or otherwise, with respect to such parcel.

In the event the purchaser of a parcel of real estate sold by Reorganized DLH assumes any obligation or a part of such obligation of Reorganized DLH in connection with such a purchase, and/or Reorganized DLH provides seller financing of any portion of the purchase price, the portion of the sales price attributed to such an assumption of liabilities and/or seller financing shall not be included in the calculation of DLH Net Sales Proceeds either as an addition to the purchase price or as a deduction as an amount paid to the holder or holders of such obligation. However, subsequent repayments by the purchaser to Reorganized DLH under such an obligation shall be considered DLH Net Sales Proceeds.

1.40 **DLH Unsecured Creditor Net Proceeds** means 5% of the Pool 1 Net Sales Proceeds and 5% of the Pool 2 Net Sales Proceeds.

1.41 **Effective Date** means the first Business Day that is the later of (a) fifteen days after the Confirmation Date if the Confirmation Order is not stayed prior to such date or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay or (b) the date the Exit Financing is available to fund payments under the Plan, but no later than seventy-five (75) days after the Confirmation Order becomes a Final Order. Provided, if the Confirmation Order has not become a Final Order by virtue of the commencement of any motion for rehearing or new trial pertaining to the Confirmation Order or by virtue of the filing of a notice of appeal from the Confirmation Order, and provided the Confirmation Order has not been stayed, Debtors may, in their sole discretion, elect to defer the Effective Date until a date that is not later than fifteen days after the Confirmation Order has become a Final Order.

1.42  **Estate** means each Estate created by section 541 of the Bankruptcy Code upon the commencement of each Case.

1.43  **Fee Claim** means Claims that are for professional fees, contingency fees or bonuses, expenses incurred in connection with the rendition of professional fees, any claim for attorneys' fees based on any "common fund" theory, any theory of "equitable attorneys' fees", and any other theory that may be asserted or consideration that may be claimed by or awarded to any professional (including without limitation any attorney or forwarding attorney) as an Allowed Administrative Expense Claim under Section 327 and/or 330 and/or 331 of the Bankruptcy Code or as "substantial contribution" under Section 503 of the Bankruptcy Code.

1.44  **Final Order** means an order or judgment of the Bankruptcy Court from which an appeal of right (as opposed to a motion for leave to appeal) could have been perfected but as to which (a) no motion for rehearing, new trial, reconsideration, or for vacation of such order was timely filed and the time for filing any such motion has expired or, if a timely motion of such nature was filed, all such motions have been dismissed or withdrawn without the possibility of reinstatement or ultimately determined on the merits by denying such motions and sustaining the subject order in all material respects, and, with respect to the orders denying, dismissing, or withdrawing any such motion of such nature, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction, (b) no notice of appeal was timely filed and all times for filing a notice of appeal have expired or, if a timely notice of appeal was filed, all such appeals have been dismissed or withdrawn without the possibility of reinstatement or ultimately determined on the merits by denying such appeals and sustaining the subject order in all material respects, and, with respect to the orders denying, dismissing, or withdrawing any such appeal, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction, or (c) with respect to any order or judgment from which an appeal has been timely taken, no order staying the implementation of such order has been entered, or, if any such stay order was entered, such stay order has expired and has not been renewed, reinstated, or superseded by another stay order staying the subject order, and, with respect to any orders terminating or refusing to reinstate any such stay, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction.

1.45  **Guarantors** mean ACP, Richard S. Allen, or Richard S. Allen, Inc.

1.46  **Insider** means any person defined by the Bankruptcy Code as an insider of Debtors.

1.47  **Parcel Note** means, in connection with any parcel of land owned by DLH, the applicable Pool 1 Note or Pool 2 Note associated with the Parcel Senior Lien.

1.48  **Parcel Noteholder** means, in connection with any parcel of land owned by DLH, the holder of the Parcel Note and Parcel Senior Lien which encumbers such parcel, and their assignees or successors in interest.

1.49   **Parcel Senior Lien** means, for any claim in either DLH Class 3 Subclass A or DLH Class 3 Subclass B, the existing validly perfected lien or liens which secured such Allowed Secured Claim as of the Petition Date, for which a Pool 1 Note or a Pool 2 Note will be issued under the Plan, as modified by the Parcel Senior Lien Modification to be executed and recorded on the Effective Date.

1.50   **Parcel Senior Lien Modification** means any Modification of Deed of Trust and Lien, to be executed by and between DLH and the holder of an Allowed Secured Claim in DLH Class 3 Subclass A and DLH Class 3 Subclass B (a separate Parcel Senior Lien Modification shall be executed by each holder of such an Allowed Secured Claim), which shall provide: (a) that the Allowed Secured Claim shall be evidenced by the Pool 1 Note or the Pool 2 Note, as the case may be; (b) that the Allowed Secured Claim shall continue to be secured by the Parcel Senior Lien held by the holder of such Allowed Secured Claim; (c) that the Pool 1 Note or the Pool 2 Note, as the case may be, held by the holder of such Allowed Secured Claim shall be further secured by the rights to participate in and receive distributions from the Pool 1 Net Sales Proceeds or the Pool 2 Net Sales Proceeds, as the case may be, as provided in Section 4.03 of this Plan; (d) that the Parcel Senior Lien shall be renewed and extended to the maturity date of the Pool 1 Note or the Pool 2 Note, as applicable; (e) that the Parcel Senior Lien shall be released and discharged with respect to any parcel upon payment in full of the Release Price for such parcel, as determined in accordance with this Plan; (f) that the holder of the Parcel Senior Lien with respect to Pool 2 consents to the granting of a subordinate lien, subject and subordinate in all respects to the Parcel Senior Liens, upon the parcels in Pool 2 to secure the rights of holders of the Pool 2 Notes to receive distributions from the Pool 2 Net Sales Proceeds, (g) permitting Reorganized DLH to grant such utility and right-of-way easements and/or dedications as may be reasonably necessary for the development of such parcel or as may be reasonably necessary to allow the construction of infrastructure improvements to enhance the value of such parcel, and (h) such other modifications or amendments to the Parcel Senior Lien as may be reasonably agreed to by DLH and the holder of the Allowed Secured Claim secured by such Parcel Senior Lien which are not inconsistent with the terms of this Plan. The delivery by DLH of a Pool 1 Note or a Pool 2 Note may be conditioned upon the execution and delivery of a Parcel Senior Lien Modification in form and substance reasonably satisfactory to Reorganized DLH and consistent with the terms of this Plan. The Parcel Senior Lien Modifications shall be recorded in the Deed Records of Dallas County, Texas.

1.51   **Person** means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

1.52   **Petition Date** means January 25, 2010, the day Debtors commenced their jointly administered bankruptcy cases.

1.53   **Plan** means this Plan of Reorganization, either in its present form or as it may be altered, amended, or modified by Debtors from time to time.

1.54    **Pool 1 Net Sales Proceeds** means the DLH Net Sale Proceeds associated with the sale of a parcel of land included in the Pool 1 Parcels or any payment on account of a retained interest associated with land included in the Pool 1 Parcels.

1.55    **Pool 1 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 1 in **Exhibit A-1** hereto, but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel prior to the Effective Date.

1.56    **Pool 2 Net Sales Proceeds** means the DLH Net Sale Proceeds from the sale of a parcel of land included in the Pool 2 Parcels or any payment on account of a retained interest associated with land included in the Pool 2 Parcels.

1.57    **Pool 2 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 2 in **Exhibit A-2** hereto but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel on or prior to the Effective Date.

1.58    **Pool 3 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 3 in **Exhibit A-3** hereto, but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel prior to the Effective Date.

1.59    **Pool 4 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 4 in **Exhibit A-4** hereto but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel prior to the Effective Date.

1.62    **Priority Claim** means a Claim other than an Administrative Claim to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.63    **Priority Non-Tax Claim** means a Claim entitled to priority pursuant to sections 507(a)(1) - 507(a)(7) of the Bankruptcy Code.

1.64    **Priority Tax Claim** means a Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.65    **Release Price** means for any parcel of land owned by Reorganized DLH:

(a)     As of the Effective Date, for claims which are secured by only a single parcel of vacant land, the Release Price of the parcel shall be the total amount of the Allowed Secured Claim secured by the parcel in question unless the Parcel Noteholder consents to a lesser price.

(b)     For claims which are secured by a lien on more than one parcel of vacant land, the Release Price for each such parcel as of the Effective Date shall be as set forth in Exhibit A attached hereto; however, the total of the Release Prices for all parcels so set

shall not be greater than 150% of the total Allowed Secured Claim of such Parcel Noteholder.

(c)     Once established as of the Effective Date of the Plan, the Release Price for each parcel shall automatically increase annually, on each anniversary date of the Effective Date of the Plan, by an amount equal to the annual interest accrued on the applicable Parcel Note.

(d)     To the extent to which a junior lien is granted to the holders of the Pool 2 Notes against any parcel pursuant to this Plan, the Release Price shall not include that junior lien interest. Any junior liens granted as additional security will be released automatically once the appropriate share of DLH Net Proceeds to be paid to creditors has been placed into escrow for the benefit of the holders of the Pool 2 Notes.

(e)     In the event Reorganized DLH requests the release of a partial parcel, or requests the consent of the holder of a Parcel Senior Lien to DLH's grant of an easement or dedication of right of way, any affected Parcel Noteholder and Reorganized DLH shall negotiate in good faith an allocation of the Release Price as of the Effective Date with respect to the release of the partial parcel, or the grant of an easement or dedication of right of way and the Release Price as of the Effective Date associated with the remaining parcel or, in the case of an easement or dedication of right of way, the parcel now subject to the easement or dedication of right of way. Thereafter, the partial parcel, easement or dedication of right of way and the remaining parcel shall be treated as if the parcels had been divided and the release price so allocated as of the Effective Date.

Where (a) the Parcel Note is non-recourse note and (b) Reorganized DLH and Parcel Noteholder are unable, after good faith negotiations, to reach an agreement concerning the Release Prices for both (i) the partial parcel, easement or right of way and (ii) the remaining parcel within thirty (30) days after the request for the release of a partial parcel, or the grant of an easement or right of way, Reorganized DLH may elect to notify Parcel Noteholder that Reorganized DLH intends to transfer the parcel or parcels subject to the Parcel Senior Lien to Parcel Noteholder in full and complete satisfaction of the Parcel Note held by Parcel Noteholder. Reorganized. DLH shall promptly notify Parcel Noteholder of such an election. Thirty (30) days after providing Parcel Noteholder with notice of its intent to transfer, to the extent that no agreement to the contrary with Parcel Noteholder is reached, Reorganized DLH shall transfer to Parcel Noteholder its interests in the undivided parcel or parcels subject to the Parcel Senior Lien in full and complete satisfaction of the Parcel Note held by Parcel Noteholder.

1.66     **Reorganized ACP** means Allen Capital Partners, LLC as of the Effective Date, reorganized pursuant to the terms of this Plan.

1.67     **Reorganized Debtors** means Reorganized DLH and Reorganized ACP.

1.68     **Reorganized DLH** means DLH Master Land Holdings, LLC as of the Effective Date, reorganized pursuant to the terms of this Plan.

1.69     **Reimbursement Claim** means any claim which ACP, Richard S. Allen,

or Richard S. Allen, Inc. (collectively "Guarantors") has against DLH for any payments or other distributions made by any of the Guarantors to a creditor of DLH on account of an obligation where the Guarantors executed a guaranty of such an obligation and DLH was directly liable under the obligation. Reimbursement Claim shall also mean any claim Richard S. Allen or Richard S. Allen, Inc. has against ACP for any payments or other distributions made by either of them on a debt where ACP is the primary obligor or a co-guarantor of such debt.

1.70 **Rejection Claim** means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any executory contract or unexpired lease.

1.71 **Secured Claim** means a claim which is secured pursuant to 11 U.S.C. § 506(a) of the Bankruptcy Code

1.72 **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statement have been or may be subsequently amended.

1.73 **Secured Creditor Pool 1 Net Proceeds** means 30% of the Pool 1 Net Sales Proceeds.

1.74 **Secured Creditor Pool 2 Net Proceeds** means 30% of the Pool 2 Net Sales Proceeds.

1.75 **Subordinated Claim** means a Allowed Claim (a) that is subordinated in payment to Class 4 General Unsecured Claims by contract or by Final Order of the Bankruptcy Court declaring that such Claim is subordinated in right of payment by virtue of the applicable provisions of the Bankruptcy Code, any enforceable agreement, or under applicable state law, or (b) that was tardily filed under section 501(a) of the Bankruptcy Code, or (c) where, and only to the extent that, such an Allowed Claim is for any fine, penalty or forfeiture, or for multiple, exemplary, or punitive damages, where Debtors' conduct triggering or creating the fine, penalty or forfeiture, or for multiple, exemplary, or punitive damages occurred prior to the Petition Date and to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim. Notwithstanding the foregoing, no ACP Class 7 Claim shall be considered to be a subordinated claim.

1.76 **Taxes** shall mean and include any and all federal, state or local income, franchise, or business taxes, including any tax based upon income, gross receipts from a sale, exchange or distribution of money or property, and, with respect to any sale, exchange or distribution of property, shall include, stamp, transfer, or other taxes imposed upon a conveyance of property as well as any unpaid real estate taxes or allocation of unpaid real estate taxes.

1.77 **Term Loan** means that certain Term Loan, more particularly described in Section 6.07 of the Plan, pursuant to which the DIP Loan is to be satisfied.

1.78    **Term Loan Release Price** means, for any parcel of land owned by Reorganized DLH, the Release Price payable to the holders of the Term Loan upon a sale of any such parcel in consideration of a release of the subordinate lien on such parcel securing the Term Loan. The Term Loan Release Price for any parcel shall be determined in accordance with Section 6.07 below.

1.79    **Unclaimed Funds** means any cash, distribution, or any other property of Debtors unclaimed for a period of one (1) year after the applicable distribution date as set forth in the Plan.

1.80    **Unsecured Claim** means a Claim of a Creditor that is not a Secured Claim, an Administrative Claim, Priority Claim, or Subordinated Claim.

# ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS

The following is a designation of the Classes of Claims and Interests under this Plan. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. Except as expressly provided within or with respect to the terms of any Class, a Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

Any act by either Debtor to supply cash or other property to either Debtor in order to assist with implementation of the Plan shall not constitute an assumption of any such obligation. However, the definitions and treatment of the Classes of each of DLH and ACP, except as specified elsewhere in the Plan, shall be identical. Notwithstanding the foregoing, each of ACP and DLH shall maintain their own separate classes, one from the other, and they shall not assume any liability for any obligation of the other except as set forth otherwise in this Plan. Where appropriate, such Classes for ACP will be referred to as "ACP Class 1," "ACP Class 2," "ACP Class 3," etc., on the one hand, and, for DLH, as "DLH Class 1," "DLH Class 2," "DLH Class 3," etc., on the other hand. Otherwise, references to "Class 1," "Class 2," "Class 3," etc. shall refer to the respective Class of both of the Debtors, unless context requires that it refer to the specific Class of only one of the Debtors. Any holders of Allowed Claims which are jointly and severally owed by DLH and ACP shall be permitted to participate as creditors in both the DLH and ACP distributions under this Plan, but shall be subject to the "single recovery rule", and any such Allowed Claims against DLH shall be reduced *pro tanto* by the amount of any distributions under this Plan from Reorganized ACP, and any such Allowed Claims against ACP shall be reduced *pro tanto* by the amount of any distributions under this Plan from Reorganized DLH. For each Debtor, respectively, the following Class designations shall apply:

A. **Claims**

2.01  **Class 1** shall consist of all Allowed Administrative Expense Claims.

2.02  **Class 2** shall consist of all Allowed Priority Claims, including any Priority Claims which also claim security.

2.03  **Class 3** (including DLH Subclasses 3A, 3B, 3C, 3D, 3E, and 3F) shall consist of all Allowed Secured Claims. Each creditor in Class 3 shall constitute its own class; however, participants in any such claim shall not constitute a separate subclass. Each member of a Subclass, provided they are not mere participants in an Allowed Secured Claim, shall constitute its own Class as well.

2.04    **Class 4** shall consist of all Allowed General Unsecured Claims.

2.05    **Class 5** shall consist of all Subordinated Claims.

2.06    **Class 6** shall consist of Reimbursement Claims.

2.07    **Class 7** shall consist of claims arising from guaranties.

**B. Interests**

2.08    **Class 8** shall consist of all Interests.

## ARTICLE III - IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

3.01    **Unimpaired Classes of Claims and Interests**.  The following Classes are deemed unimpaired under the Plan:  Class 1 — Administrative Expense Claims; Class 2 — Priority Claims.

3.02    **Impaired Classes of Claims and Interests**.  With the exception of the unimpaired Classes specified above, all Classes of Claims and Interests are impaired under the Plan.

## ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS

4.01    **Class 1 — Allowed Administrative Expense Claims (Unimpaired)**.

<u>Description:</u> This Class consists of all Allowed Administrative Expense Claims against Debtors.  This Class will also include any claim for an award by any party for any Fee Claim, including without limitation any Fee Claim for substantial contribution rendered to the estate or to any claimant or class (*i.e.*, in the sense of a class action) of claimants which results in any award by the Bankruptcy Court (by Final Order) of attorneys' fees payable by a Debtor's estate as Allowed Administrative Expense Claims.

<u>Treatment:</u>  All Allowed Administrative Expenses shall be treated as follows:

(a) <u>Administrative Expenses Bar Date (For Administrative Expense Claims Other than Fee Claims)</u>.  The holder of any Administrative Expense Claim other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by Debtors, or (iii) a previously Allowed Administrative Expense, must file with the Bankruptcy Court and serve on Debtors and its counsel, notice of such Administrative Expense within 15 days after the Confirmation Date.  At a minimum, such notice must identify (i) the name of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  Failure to file this notice timely and properly shall result in the Administrative Expense being forever barred and discharged.

(b) <u>Deadlines for Filing Fee Claim Estimates and Applications</u>. Each person asserting any Fee Claim which is in whole or in part an Administrative Expense Claim, including without limitation any claim for "substantial contribution" under Section 503 of the Bankruptcy Code, shall be required to file with the Bankruptcy Court, and serve on Debtors and its counsel, (i) five (5) business days or more prior to the commencement of the Confirmation Hearing, a binding Fee Estimate, by which any Fee Claim Claimant or applicant shall set forth the upper limits of its Fee Claim and as to which the Bankruptcy Court may estimate a binding upper limit to such Fee Claims, and (ii) within 60 days after the Effective Date, a formal Fee Application, by which any and all Fee Claims shall be Allowed or Disallowed. Failure to file either a timely Fee Estimate or a timely Fee Application shall result in the Fee Claim of such Claimant or applicant being forever barred and discharged.

(c) <u>Payment of Allowed Administrative Expenses</u>. Each holder of an Allowed Claim for an Administrative Expense shall receive (i) the amount of such holder's Allowed Claim in cash on the later of (w) the Effective Date of the Plan, (x) the date such Claim was due and payable by its terms, (y) a date agreed to by the holder of such Claim and (z) within 30 days following the date such Claim, if contested, is Allowed by Final Order.

4.02 **Class 2 — Allowed Priority Claims (Unimpaired)**.

**Description:** Class 2 consists of all Allowed Priority Non-Tax Claims and Priority Tax Claims.

**Treatment:** All Allowed Class 2 Claims, if any, shall be paid in full on the later of (v) the Effective Date of the Plan, (w) the date such Claim was due and payable by its terms, (x) a date agreed to by the holder of such Claim, (y) within 30 days following the date such Claim, if contested, is Allowed by Final Order, and (z) if applicable and at the sole discretion of the Reorganized Debtors, the date(s) specified in 11 U.S.C. § 1129(a)(9)(C) with equal monthly installments of principal plus interest at 7% determined pursuant to applicable bankruptcy or federal law.

4.03 **DLH Class 3 — Allowed Secured Claims (Impaired)**.

**Description:** Class 3 (and each Subclass and subdivision thereof, respectively) consists of Claims against DLH that are Secured Claims by virtue of 11 U.S.C. § 506(a) of the Bankruptcy Code, to the extent of the value of Debtors' interest in the property securing such Claim.

DLH Secured Creditors fall into six general subclasses:

**DLH Class 3 Subclass A**. **Pool 1: Compass Bank Land Loan.**

Claims: All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 1. Pool 1 contains parcels subject to the liens of Compass as set forth in **Exhibit A-1** hereto. Most parcels in Pool 1 are Development Ready.

**DLH Class 3 Subclass B**.    **Pool 2:  Hutchins Industrial Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 2.  Pool 2 contains parcels subject to the liens of various seller financings as set forth in **Exhibit A-2** hereto.  All or substantially all of the parcels in Pool 2 are Development Ready.

**DLH Class 3 Subclass C**.    **Pool 3:  ABOT Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 3.  Pool 3 contains parcels subject to the liens of ABOT as set forth in **Exhibit A-3** hereto.  While some parcels in the ABOT Pool are Development Ready, others are anticipated to take longer to develop.

**DLH Class 3 Subclass D**.    **Pool 4:  Seller Financing Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 4.  Pool 4 contains parcels subject to the liens of various seller financings as set forth in **Exhibit A-4** hereto.  While some parcels in the Seller Financing Pool are Development Ready, the majority of the parcels in Pool 4 are anticipated to take longer to be developed or sold.

**DLH Class 3 Subclass E**.    **Great Western Bank**

Claim:    The Allowed Secured Claim of Great Western Bank for a loan of approximately $47.4 million as of the Petition Date secured by (i) a first lien on land and improvements on a 178 acre auto auction facility leased to ADESA, Inc. under a 20 year, triple net lease, and (ii) a $1.2 million replacement lien provided by the Bankruptcy Court without prejudice to whether payments are under the replacement lien are to be applied to principal or interest.

**DLH Class 3 Subclass F.**    **Compass Bank – Building Loan**

Claim:    The Allowed Secured Claim of Compass Bank for a loan of approximately $26.3 million as of the Petition Date, secured by liens on the real property and improvements identified by DLH as Buildings A and B.  The Claim of Compass Bank in Subclass D is less than fully secured due to low occupancy, but with substantial upside value.

**Treatment:**

**DLH Class 3 Subclass A:  Pool 1 – Compass Pool**

(a)    <u>Creation of Pool 1 Notes</u>.  Compass, as the holder of an Allowed Secured Claim against DLH secured by a lien against all of the Pool 1 Parcels, shall receive a Pool 1 Variable Pay Note (the "**Pool 1 Note**") in the amount of such Allowed Secured Claim. The Pool 1 Note will be issued by Reorganized DLH.  All Parcel Senior Liens securing Allowed Secured Claims in this Subclass shall remain in place, as modified and extended

pursuant to the Parcel Senior Lien Modifications to be executed and recorded concurrently with the issuance of the Pool 1 Note, and shall continue to be valid and perfected liens upon the Pool 1 Parcels until the earlier of the following: (i) any Parcel Senior Lien is released as described below, (ii) a Parcel Noteholder forecloses upon the Parcel Senior Lien and Reorganized DLH has no remaining rights under applicable law to redeem the property so foreclosed, (iii) Reorganized DLH transfers any parcel or parcels subject to a Parcel Senior Lien to the applicable Parcel Noteholder in full or partial satisfaction of the Parcel Note, or (iv) the Pool 1 Note issued to the holder of the Allowed Secured Claim in this Subclass has been paid in full.

(b)     Terms of Pool 1 Note. Pool 1 Note shall accrue interest at 7.25% per annum and all unpaid principal and interest accrued shall become due and payable on the fifth (5th) anniversary of the Effective Date. The Pool 1 Note will be paid from the (i) Release Price as to any parcel, when and if Compass is requested to release the Parcel Senior Lien on such a parcel, parcels or the remainder of a parcel securing such a Pool 1 Note, and (ii) quarterly from Secured Creditor Pool 1 Net Proceeds. All payments on the Pool 1 Notes shall be applied first to payment of accrued but unpaid interest and then in reduction of the principal balance.

(c)     Security for Pool 1 Note. The Pool 1 Note shall be secured by the existing Parcel Senior Liens securing the Allowed Secured Claim for which the Pool 1 Note is issued, as modified by the Parcel Senior Lien Modification.

Upon receiving the lesser of (i) the Release Price for any parcel, (ii) an agreed amount negotiated between Reorganized DLH and the Pool 1 Noteholder, or (iii) the remaining amount due and owing on the related Pool 1 Note, the Pool 1 Noteholder shall release the Parcel Senior Liens on such a parcel, parcels or the remainder of a parcel. To the extent to which Parcel Noteholder agrees to release all of its Parcel Senior Liens for an amount less than the remaining amount due and owing on the related Pool 1 Note, such a Pool 1 Note shall be cancelled and the creditor shall not be entitled to assert an unsecured claim for any deficiency. Notwithstanding the definition of DLH Net Sales Proceeds, a Parcel Noteholder shall not be required to release its Parcel Senior Lien unless such Parcel Noteholder actually receives the full amount set forth in this paragraph. More specifically, no deduction from this amount shall be made for any of the adjustments set forth in the definition of DLH Net Sales Proceeds.

(d)     Reporting to Parcel Noteholders.     Reorganized DLH will provide quarterly reports, not later than sixty (60) days after the end of each calendar quarter, to the holder of the Pool 1 Note stating (i) whether any Pool 1 properties were sold during that quarter, and if so, setting forth the calculation of total Pool 1 Net Sales Proceeds for the quarter.   To the extent the holders of a Pool 1 Note execute an acceptable confidentiality agreement, as part of the quarterly report, Reorganized DLH shall make the additional information with respect to the individual property sales available and shall provide a brief report regarding the current status of Reorganized DLH's attempts to sell the Pool 1 Parcels. Upon request by the holder of a Pool 1 Note and after the holder of the Pool 1 Note executes a confidentiality agreement, Reorganized DLH shall provide all offers to purchase all or any portion of the Pool 1 Note's collateral to the Pool 1 Note

holder within five (5) business days after receipt.

(e) <u>Each Claim Separately Classified.</u>  Each Allowed Claim in this group which has its own identifiable and separate collateral will be in its own class under the Plan such that each secured claim in this group will constitute its own class for purposes of voting on the Plan; however, participants in any such claim do not constitute a separate class.

(f) <u>Trigger for Required Structured Sales.</u>  In addition to the foregoing, at the end of each month following the second (2nd) and fourth (4th) anniversary dates of the Effective Date of the Plan (each such date being a "**Trigger Date**"), if the cumulative sum of all distributions to the holder of the Pool 1 Note is less than the amount necessary to pay current through such Trigger Date all accrued but unpaid interest on the Pool 1 Note, then Reorganized DLH shall, at its option, either (1) pay interest current through such Trigger Date on the Pool 1 Note out of other funds available to Reorganized DLH, or (2) convey the remaining Pool 1 property back to the Pool 1 Noteholder in full satisfaction of the Pool 1 Note, or (3) offer a structured sale, sealed bid or auction ("Structured Sale") of a sufficient portion of Pool 1 property to pay such interest current through the Trigger Date.  The reserve price for such parcels in such a Structured Sale shall be (i) at least equal to the Release Price for each parcel included in the Structured Sale, plus all normal and customary closing costs, and (ii) no greater than 175% of the Release Price for such a parcel unless the holder of the Pool 1 Note consents.  In the event the Reserve Prices are not met for one or more parcels, Reorganized DLH shall consult with the Pool 1 Noteholder with respect to the appropriate disposition of the parcels.  If the parties cannot reach an agreement with respect to the appropriate disposition, Reorganized DLH may, at its sole discretion, either (a) retain such a parcel for subsequent sale, or (b) transfer each parcel or parcels subject to the applicable Parcel Senior Lien to Pool 1 Noteholder in satisfaction of the applicable Pool 1 Note. Reorganized DLH shall notify the Pool 1 Noteholder in writing of its election not later than thirty (30) days after any such Trigger Date.  If Reorganized DLH elects to pay the accrued but unpaid interest on the Pool 1 Note current through the Trigger Date out of other available funds, such payment shall be made concurrently with the notice of such election.  In the event that Reorganized DLH elects to conduct a Structured Sale, the written notice of such election shall include a description of the parcel or parcels selected for such Structured Sale, the proposed reserve prices for such parcels, and the manner in which such Structured Sale shall be conducted.  Any Structured Sale must be closed and funded not later than six (6) months after the applicable Trigger Date.

(g) <u>No Additional Liens or Refinancing Allowed Without Consent.</u>  Unless the Pool 1 Noteholder consents, beginning sixty (60) days after the Effective Date, Reorganized DLH may not grant a new or additional liens on any Pool 1 Parcel until all of the outstanding Pool 1 Notes have been paid in full or will be paid in full as a result of the grant of such a lien.

**DLH Class 3 Subclass B**:     **Pool 2 – Hutchins Industrial Pool**

(a) <u>Creation of Pool 2 Notes.</u>  Each holder of an Allowed Secured Claim

against DLH secured by a lien against one or more of the Pool 2 Parcels shall receive a Pool 2 Variable Pay Note (a "**Pool 2 Note**", and collectively the "**Pool 2 Notes**") in the amount of such Allowed Secured Claim. The Pool 2 Notes will be issued by Reorganized DLH. All Parcel Senior Liens securing Allowed Secured Claims in this Subclass shall remain in place, as modified and extended pursuant to the Parcel Senior Lien Modifications to be executed and recorded concurrently with the issuance of the Pool 2 Notes, and shall continue to be valid and perfected liens upon the Pool 2 Parcels until the earlier of the following: (i) any Senior Parcel Lien is released as described below, (ii) Parcel Noteholder forecloses the Senior Parcel Lien upon the parcel or parcels on which they have a lien and Reorganized DLH has no remaining rights under applicable law to redeem the property so foreclosed, (iii) Reorganized DLH transfers any parcel or parcels subject to a Parcel Senior Lien to the applicable Parcel Noteholder in satisfaction of the Parcel Note, or (iv) until the Pool 2 Note issued to the holder of the Allowed Secured Claim in this Subclass has been paid in full.

(b)    Terms of Pool 2 Notes.  Pool 2 Notes shall accrue interest at 7.25% per annum and all unpaid principal and interest accrued shall become due and payable on the fifth (5th) anniversary of the Effective Date. To the extent to which the underlying Allowed Secured Claim which gave rise to a Pool 2 Note was non-recourse to DLH, the Pool 2 Note issued to the holder of such Allowed Secured Claim shall also be non-recourse to DLH. Each such Pool 2 Note will be paid from the (i) Release Price when and if Parcel Noteholder is requested to release the Parcel Senior Lien on such a parcel, parcels or the remainder of a parcel securing such a Pool 2 Note, and (ii) quarterly from Secured Creditor Pool 2 Net Proceeds (which shall be distributed pro rata based on the then outstanding balance on all remaining Pool 2 Notes after taking into account distribution of the Release Price to the various holders of Pool 2 Notes during the quarter in question). All payments on the Pool 2 Notes shall be applied first to payment of accrued but unpaid interest and then in reduction of the principal balance

(c)    Special Treatment for Short Sales Recommended by Reorganized DLH. Notwithstanding any other provision in this section, in the event that the parcel or parcels securing the Allowed Secured Claim for which a non-recourse Pool 2 Note was issued are sold to a third party on the recommendation of Reorganized DLH and the Pool 2 Note has not been paid in full as a result of such sale, such a Pool 2 Note shall continue to participate in distributions, if any, of Secured Creditor Pool 2 Net Proceeds until either the Pool 2 Note has been paid in full or the Pool 2 Note matures according to its terms.

(d)    Security for Pool 2 Notes.  Each Pool 2 Note is secured by (a) the existing Parcel Senior Lien securing the Allowed Secured Claim for which the Pool 2 Note was issued, and (b) an additional *pro rata* interest in a subordinate lien on all other Pool 2 Parcels. Reorganized DLH shall file in the Deed Records of Dallas County, Texas a Subordinate Lien Deed of Trust on the Pool 2 Parcels upon the later to occur of (i) the Effective Date, or (ii) the receipt by DLH of fully executed Parcel Senior Lien Modifications executed by the holders of all Pool 2 Notes. DLH, as the agent of the Pool 2 Noteholders, shall have full power and authority to execute and deliver partial releases from the Subordinate Lien Deed of Trust on the Pool 2 Parcels conditioned only upon delivery of directions to a Title Insurance Company or Escrow Agent to deliver the

Secured Creditor Pool 2 Net Proceeds into an escrow account for the benefit of the holders of the Pool 2 Notes. No holder of a Pool 2 Note, either individually or collectively, shall have the right to foreclose upon the subordinate lien described herein unless and until the earlier of: (a) sixty (60) days after the final Maturity Date of the Pool 2 Notes; or (b) after any default by Reorganized DLH in (i) paying over any Secured Creditor Pool 2 Net Proceeds to an escrow account for the benefit of the holders of the Pool 2 Notes, or (ii) causing or directing the payment of quarterly distributions of the Secured Creditor Pool 2 Net Proceeds to the holders of the Pool 2 Notes, and either such default is not cured within ten (10) business days after written notice from any Pool 2 Note holder. In the event that a foreclosure of the Subordinate Lien Deed of Trust is authorized under the preceding sentence, such foreclosure shall be commenced upon the written consent and direction of the holders of two-thirds (2/3) in amount of the remaining outstanding balance of the Pool 2 Notes directed to the Trustee named in the Subordinate Lien Deed of Trust.

Upon receiving the lesser of (i) the Release Price for any parcel, (ii) an agreed amount negotiated between Reorganized DLH and a Parcel Noteholder, or (iii) the remaining amount due and owing on the related Pool 2 Note, Parcel Noteholder shall release its Parcel Senior Lien on such a parcel. To the extent to which a creditor agrees to release all of its retained liens for an amount less than the remaining amount due and owing on the related Pool 2 Note, such a Pool 2 Note shall be cancelled and the creditor shall not be entitled to assert an unsecured claim for any deficiency. Notwithstanding the definition of DLH Net Sales Proceeds, Parcel Noteholder shall not be required to release their Parcel Senior Lien unless the creditor actually receives the amount set forth in this paragraph. More specifically, no deduction from this amount shall be made for any of the adjustments set forth in the definition of DLH Net Sales Proceeds.

With respect to any parcel in Pool 2, once the Secured Creditor Pool 2 Net Proceeds, if any, are directed to be deposited into an escrow or reserve account or are actually paid or distributed to the holders of the Pool 2 Notes, the subordinated lien granted against that parcel pursuant to this section shall be released and discharged automatically pursuant to this Plan. In such circumstances, Reorganized DLH shall have full power and authority to execute, as agent for the holders of the Pool 2 Notes, and deliver to any Title Company or closing agent, any partial release of the subordinated lien on the Pool 2 parcels, and the written consent of any Parcel Noteholder shall not be required to release and discharge the subordinated lien.. In addition, to the extent to which Reorganized DLH transfers a parcel to the applicable Parcel Noteholder holding the Parcel Senior Lien on that parcel in satisfaction of the Parcel Note, the subordinate lien granted against such a Parcel so transferred shall be automatically released and discharged as well, and Reorganized DLH shall be fully authorized and empowered to execute and deliver a partial release of the subordinate lien in connection with any transfer in lieu of foreclosure of a Parcel Senior Lien on a Pool 2 parcel without any further consent of the remaining holders of the Pool 2 Notes.

(e)     Reporting to Parcel Noteholders. Reorganized DLH will provide quarterly reports, not later than sixty (60) days after the end of each calendar quarter, to all holders of Pool 2 Notes stating whether any Pool 2 properties were sold during that quarter, and

if so, setting forth the calculation of total Pool 2 Net Sales Proceeds for the quarter. To the extent the holders of Pool 2 Notes execute an acceptable confidentiality agreement, as part of the quarterly report, Reorganized DLH shall make the additional information with respect to the individual property sales available and shall provide a brief report regarding the current status of Reorganized DLH's attempts to sell the Pool 2 Parcels.

(f)     Each Claim Separately Classified.  Each Allowed Claim in this group which has its own identifiable and separate collateral will be in its own class under the Plan such that each secured claim in this group will constitute its own class for purposes of voting on the Plan; however, participants in any such claim do not constitute a separate class.

(g)     Trigger for Required Structured Sales.  In addition to the foregoing, at the end of each month following the second (2nd) and fourth (4th) anniversary dates of the Effective Date of the Plan (each such date being a "**Trigger Date**"), if the cumulative sum of all distributions to the holder of the Pool 2 Notes is less than the amount necessary to pay current through such Trigger Date all accrued but unpaid interest on the Pool 2 Notes, then Reorganized DLH shall, at its option, either (1) pay interest current through such Trigger Date on the Pool 2 Notes out of other funds available to Reorganized DLH, or (2) convey the remaining Pool 2 property back to the Pool 2 Noteholders in full satisfaction of the Pool 2 Notes, or (3) offer a structured sale, sealed bid or auction ("Structured Sale") of a sufficient portion of Pool 2 property to pay such interest through the Trigger Date.  The reserve price for such parcels in such a Structured Sale shall be (i) at least equal to the Release Price for each parcel included in the Structured Sale, plus all normal and customary closing costs, and (ii) no greater than 175% of the Release Price for such a parcel unless the holder of the Pool 2 Note secured by such a parcel consents.  In the event the Reserve Prices are not met for one or more parcels, Reorganized DLH shall consult with Parcel Noteholders holding the Parcel Senior Lien(s) on such parcels with respect to the appropriate disposition of the parcels. If the parties cannot reach an agreement with respect to the appropriate disposition, Reorganized DLH may, at its sole discretion, either (a) retain such a parcel for subsequent sale, or (b) transfer each parcel or parcels subject to the applicable Parcel Senior Lien to Parcel Noteholder in satisfaction of the applicable Pool 2 Note. Reorganized DLH shall notify the Pool 2 Noteholders in writing of its election not later than thirty (30) days after any such Trigger Date.  If Reorganized DLH elects to pay the accrued but unpaid interest on the Pool 2 Note current through the Trigger Date out of other available funds, such payment shall be made concurrently with the notice of such election.  In the event that Reorganized DLH elects to conduct a Structured Sale, the written notice of such election shall include a description of the parcel or parcels selected for such Structured Sale, the proposed reserve prices for such parcels, and the manner in which such Structured Sale shall be conducted.  Any Structured Sale must be closed and funded not later than six (6) months after the applicable Trigger Date.

(h)     No Additional Liens or Refinancing Allowed Without Consent.  Unless 70% of all Parcel Noteholders holding a Parcel Senior Lien on each Pool 2 Parcel owned by Reorganized DLH consent, beginning sixty (60) days after the Effective Date, Reorganized DLH may not grant a new or additional liens on any Pool 2 Parcel unless

and until all of the remaining Pool 2 Notes have been paid in full or will be paid in full as a result of the grant of such a lien.

### DLH Class 3 Subclass C:     Pool 3 ABOT  Pool

On the Effective Date, DLH shall surrender all of the property in the ABOT Pool to ABOT in full and complete satisfaction of ABOT's Claims.

### DLH Class 3 Subclass D:     Pool 4 Seller Financing Pool

On the Effective Date,  DLH shall surrender all of the property in Pool 4 property; each parcel in Pool 4 shall be surrendered to the holder the Secured Claims secured by each such parcels in Pool 4 in full and complete satisfaction of each such Secured Creditor's Claim.  Notwithstanding the foregoing, to the extent to which DLH has either moved to approve the sale of such parcel to a third party or has an executed agreement for the sale of such a parcel, DLH may retain such a parcel for up to 90 days after the Effective Date.  If the sale of the parcel is closed within that time period, the claims of the secured creditors with an interest in such parcel shall be fully satisfied from the proceeds of such sale.

### DLH Class 3 Subclass E.     Great Western Bank

Treatment:  In the event the real property and accompanying facility securing Great Western Bank's Allowed Secured Claim has not been sold as of the Effective Date, the parcels leased to ADESA and upon which Great Western Bank has a lien will be contributed to DLH ADESA Parcel, LLC.  Great Western Bank will receive a new note issued by DLH ADESA Parcel, LLC and guaranteed by Reorganized DLH (the "**Great Western Note**").    The terms of the Great Western Note shall be as set forth in the Compromise and Settlement between Debtors and Great Western approved by the Bankruptcy Court.

In the event the settlement with Great Western Bank is terminated for any reason, and the real property and accompanying facility securing Great Western Bank's Allowed Secured Claim has not been sold as of the Effective Date, the parcels leased to ADESA and upon which Great Western Bank has a lien will be contributed to DLH ADESA Parcel, LLC.  Great Western Bank will receive a new note issued by DLH ADESA Parcel, LLC and guaranteed by Reorganized DLH (the "**Great Western Note**") which shall mature three (3) years from the Effective Date.  The Great Western Note shall be secured by Great Western Bank's existing collateral, accrue interest at 6.25% per annum, payable monthly based on a 20 year amortization.  DLH ADESA Parcel, LLC will pay on principal plus non-default interest until disputed reasonable attorneys' fees and any claim of default rate interest post petition pre-confirmation are finally resolved.  The asset will cash flow and has been listed for sale prior to confirmation.  Reorganized DLH and DLH ADESA Parcel, LLC will continue to make best efforts to sell the real property and accompanying facility.  In the event the real property and accompanying facility or DLH's interest in DLH ADESA Parcel, LLC is sold after the Effective Date, Great Western shall be paid at least fifteen million dollars ($15,000,000) against the Great

Western Note from the sales proceeds. Provided the Great Western Note is paid down by $15,000,000 within six (6) months from the Effective Date, the term of the remaining note may be extended at Reorganized DLH's option so that the remaining loan has a 10 year balloon. Such a prepayment shall not change the monthly amount due under the Great Western Note.

Great Western's guarantee claim against ACP is treated in ACP Class 7.

**DLH Class 3 Subclass F.        Compass Bank – Building Loan**

Treatment:      The following treatment, for purposes of discussion, assumes the current value of the buildings "as is" is $24,500,000 and the face value of claims secured by the buildings is $26,313,000.

Building A and Building B shall be placed in their own subsidiary ("**DLH Buildings AB, LLC**") with DLH holding a 100% equity interest and Compass Bank receiving an option to purchase a 5% equity interest for $10.

Compass Bank shall receive a Note with face value equal to Compass Bank's Allowed Secured Claim secured by Building A and Building B ("**Compass Bank Building Note**"), secured by its existing liens on DLH Buildings A and B, which shall accrue interest at 6.25% per annum and mature in 5 years. These Buildings are currently being offered for sale by DLH.

The Compass Bank Building Note will be guaranteed by Reorganized ACP and Reorganized DLH, and any other party not subject to the jurisdiction of the Bankruptcy Court which had guaranteed the obligation to Guaranty Bank on the loan on Building A and Building B. As long as the Compass Bank Building Note is outstanding and not in default, Compass is enjoined from prosecuting any claims against guarantors. In order to receive the benefit of the proposed injunction, the guarantors shall agree to toll the statute of limitation such that the applicable period(s) for any statute of limitation is not running while the New Note is outstanding.

In the event Compass Bank makes an 1111(b) election, there will be a pre-payment penalty on the Compass Bank Building Note such that Compass will be guaranteed to receive payments over time discounted at 7% per annum equal to or greater than the allowed amount of its Allowed Secured Claim and Compass Bank shall receive total payments equal to its Allowed Secured Claim in order for Compass's lien to be released.

Compass Bank will receive all cash flow from buildings A and B after reasonable actual expenses and agreed amounts of reserves, including market property management fees payable to DLH or its designee. Certain monies which would otherwise be paid to Compass Bank pursuant to this provision will be put into an escrow account (in which Compass Bank will hold a security interest) and used for costs necessary for design, permitting and construction of tenant improvements and legal and brokerage fees incurred in connection with new leases ("**Leasing Escrow Account**").

Monies for real estate tax payments shall be escrowed from rents (for reorganized debtor) and from the additional reimbursements paid by tenants on a monthly basis. Compass Bank shall also be granted a security interest in that escrow account.

4.04    **DLH Class 4 — Allowed General Unsecured Claims (Impaired)**.

**Description:** Class 4 consists of all Allowed General Unsecured Claims against DLH, as more fully described and defined in the Article I definitions hereof but shall exclude all Allowed General Unsecured Claims which are part of either DLH Class 5, or DLH Class 6.

**Treatment:**  Except in the case of a Cramdown, if the holder of an Allowed Claim in DLH Class 4 votes to accept the plan, the holder of the Claim may elect one or more of the following treatment options:

a)    Receive  a Variable Pay Note in the principal amount of  50% of the electing holder's Allowed Claim payable without interest from 75% of DLH Unsecured Creditor Net Proceeds with a seven (7) year maturity from the Effective Date if not paid in full prior to that time ("**DLH 50% Notes**"); or

b)    Receive a Variable Pay Note in the principal amount of 100% of the electing holder's Allowed Claim payable with interest accruing at the federal judgment rate in effect on the Effective Date from 25% of DLH Unsecured Creditor Net Proceeds until the DLH 50% Notes are paid in full and thereafter payable from 100% of DLH Unsecured Net Proceeds, with a ten (10) year maturity from the Effective Date if not paid in full prior to that time ("**DLH Ten Year Notes**"); or

c)    Receive a DLH Class B Interest with par value equal to the amount of the Allowed Claim.   The terms of the DLH Class B Interests are described in section 13.15 of the Plan.

In the event the holder of the Claim elects, in part or in whole, option (a) above and the holder of the Claim also has a guaranty of the claim from any of the Guarantors, the holder of the Claim shall be deemed to have waived their claim under the guaranty.

In the event the holder of an Allowed Claim votes not to accept the Plan, but Class 4 still votes to accept the Plan, the associated Claim will be deemed to have elected option (b) above, and will receive in full satisfaction of such Claim a DLH Ten Year Note in the principal amount of 100% of the holder's Allowed Claim.

**Treatment in a Cramdown:**  In the event that a Cramdown of the DLH Plan is necessary because the DLH Plan is rejected by DLH Class 4 or DLH Class 5, the holders of Allowed Claims in DLH Class 4 shall receive payment over time of up to 25% of their Allowed Claims, without interest, in quarterly payments from the DLH Unsecured Creditor Net Proceeds.

4.05    DLH **Class 5 –Subordinated Claims (Impaired)**.

**Description:**  Class 5 consists of all Subordinated Claims against DLH, as more fully described and defined in the Article I definitions hereof.

**Treatment:**  Except in the case of a Cramdown, each holder of a Class 5 Claim in the DLH proceeding may select which of the following treatments will be applied to their claim:

        a)      Receive a Variable Pay Note in the principal amount of 100% of the electing holder's Allowed Claim payable with interest accruing at the federal judgment rate in effect on the Effective Date from 100% of DLH Unsecured Net Proceeds after the DLH 50% Notes and the DLH 100% Notes are paid in full, with a ten year maturity from the Effective Date if not paid in full prior to that time; or

        b)      Receive DLH Class B Interest with par value equal to the amount of the Allowed Claim.  The terms of the DLH Class B Interests are described in section 13.15 of the Plan.

**Treatment in a Cramdown:**  In the event that a Cramdown of the DLH Plan is necessary because the DLH Plan is rejected by DLH Class 4 or DLH Class 5, the holders of Allowed Claims in DLH Class 5 shall receive nothing under the DLH Plan.

### 4.06    **DLH Class 6 - Reimbursement Claims Against DLH (Impaired)**

**Description:**  ACP has guaranteed approximately $88 Million of indebtedness owed by DLH, consisting of: (a) approximately $47.4 Million owed to Great Western Bank; and (b) approximately $40 Million owed to Compass Bank.  In addition, Richard S. Allen and Richard S. Allen, Inc. have also guaranteed certain indebtedness owed by DLH.

**Treatment:**  If any DLH creditor holding a guarantee from ACP elects under the Plan to receive the DLH Class B Interest with respect to its Guaranty Claim against ACP,  ACP, as the guarantor, shall be issued in satisfaction of its Reimbursement Claim against DLH an additional DLH Class B Interest having a Par Value equal to the amount of DLH guaranteed debt paid.  DLH shall issue such DLH Class B Interest directly to the creditor holding the guaranty of ACP under the Plan in satisfaction of both (a) the creditor's claim against ACP under the Guaranty, and (b) ACP's Reimbursement Claim against DLH, and such creditors' claim against DLH shall be reduced *pro tanto* (or eliminated) based upon payment by the guarantor of its guaranteed indebtedness.  The terms of the DLH Class B Interests are described in section 13.15 of the Plan.

To the extent to which (i) Richard S. Allen and/or Richard S. Allen, Inc. makes a payment under one or more of their guaranties of DLH indebtedness and (ii) such payment satisfies or otherwise discharges Reorganized DLH from its obligations under the Plan to the holder of the guaranty, Richard S. Allen and/or Richard S. Allen, Inc. as appropriate shall be subrogated and entitled to receive any payment or other distribution which would otherwise have been subsequently made to the holder of the guaranty under this Plan.

### 4.07    DLH Class 8 — Equity Interest Holders (Impaired).

**Description:**  Class 8 consists of all holders of equity Interests in DLH.

**Treatment:**  Except in the case of a Cramdown, except for (i) equity interests in DLH issued as part of the Exit Financing with the consent of the existing interest holders and/or (ii) certain current Equity Interests in DLH held by ACP and its direct or indirect subsidiaries which shall be converted on the Effective Date to DLH Class C Interests so that such DLH Class C Interests can be distributed by ACP to creditors holding Allowed Claims against ACP other than claims for which ACP would be entitled to reimbursements from DLH, all equity holders in DLH shall retain their existing equity interests in DLH,.  If any DLH Class B Interests are used by ACP under the Plan to pay guarantees of DLH, ACP shall be entitled to receive an added DLH Class B Interest with par value equal to the amount paid.  Any DLH Class B Interest and DLH Class C Interest which have not been distributed to creditors of ACP under the Plan within 120 days after the Effective Date of the Plan shall be automatically reconverted to Class A Membership Interests in DLH without any further action, and any unpaid preferred return on such DLH Class B Interests or DLH Class C Interests shall be cancelled.  Existing Equity Interests in DLH are impaired under the Plan as a result of: (a) the dilution of the interests of existing Equity Interest holders resulting from the issuance of any new Equity Interests required as part of the Exit Financing, and the issuance of new Equity Interests with preferences as to both returns and liquidation distributions over existing Equity Interests with the creation and distribution of the DLH Class B Interests and the DLH Class C Interests; and (b) the dilution of existing Equity Interests' control over Reorganized DLH resulting from the voting rights of all new Equity Interests issued, as a result of the Exit Financing or under the Plan, and the right of the holders of the new DLH Class B Interests and DLH Class C Interests to elect a director of Reorganized DLH.

**Treatment in a Cramdown:**  In the event that a Cramdown of the DLH Plan is necessary because the DLH Plan is rejected by DLH Class 4 or DLH Class 5, all existing Equity Interests in DLH (but specifically excluding any new Equity Interests in DLH, including DLH Class B Interests and DLH Class C Interests to be issued to Creditors under this Plan) shall be cancelled, and the holders of such existing Equity Interests in DLH shall receive nothing under the DLH Plan on account of such Interests.  In such event, new DLH Class A Interests in DLH shall be issued pro rata to: (a) ACP, in consideration of a cash contribution of $1.0 Million from ACP out of funds ACP will obtain from the owners of Allen Opportunity Fund; and (b) the DIP Lenders, in consideration of a credit against the outstanding balance of the DIP Loan (and an equal reduction in the initial balance of the Term Loan) in the amount of $1.2 Million.

### 4.08    ACP Class 3 — Allowed Secured Claims (Impaired).

**Description:**  Class 3 (and each Subclass and subdivision thereof, respectively) consists of Allowed Secured Claims against ACP that are secured Claims by virtue of 11 U.S.C. § 506(a) of the Bankruptcy Code, to the extent of the value of Debtors' interest in

the property securing such Claim.

**Treatment:**

Each holder of an Allowed Secured Claim secured by a lien against assets of ACP will receive an ACP Secured Variable Pay Note ("**ACP Secured Variable Pay Note**" or collectively "**ACP Secured Variable Pay Notes**") in the amount of such Allowed Claim. Each ACP Secured Variable Pay Note shall be secured by the security interest securing the applicable Allowed Secured Claim.

ACP Secured Variable Pay Notes shall accrue interest at 7.25% per annum.

(i) **Tim Foley Claim**. Tim Foley's Allowed Secured Claim is secured by member interests and distribution rights from various ACP subsidiaries and distributions from DLH. The ACP Secured Variable Pay Note issued to Mr. Foley will be paid from the proceeds and distributions received by ACP on which Mr. Foley has a validly perfected lien until the Allowed Amount of such claim is paid in full plus interest at 7.25% per annum or five years after the Effective Date at which time all amounts will be due and owing.

(ii) **Pacific Western Claim.** Pacific Western shall receive 10% of all ACP Net Sales Proceeds, not to exceed $100,000 of principal and interest payments for any quarter of the calendar year. On each anniversary of the Effective Date, if Pacific Western has not received at least $250,000 in proceeds for the preceeding year, Reorganized ACP shall make an additional payment to Pacific Western within sixty (60) days equal to the difference between $250,000 and what proceeds Pacific Western received in the preceeding year. Pacific Western's ACP Secured Variable Pay Note shall mature five (5) years after the Effective Date at which time all amounts will be due and owing.

### 4.10 **ACP Class 4 — Allowed General Unsecured Claims (Impaired)**.

**Description:** ACP Class 4 consists of all Allowed General Unsecured Claims against ACP, as more fully described and defined in the Article I definitions hereof but shall exclude all Allowed General Unsecured Claims which are part of either ACP Class 5, ACP Class 6 or ACP Class 7.

**Treatment:** Except in the case of a Cramdown, if the holder of an Allowed Claim in ACP Class 4 votes to accept the plan, the holder of the Claim may elect one or more of the following treatment options:

(a) An ACP Variable Pay Note in the principal amount of 50% of the electing holder's Allowed Claim payable without interest from 75% of ACP Unsecured Creditor Net Proceeds with a seven year maturity from the Effective Date if not paid in full prior to that time ("ACP 50% Notes"); or

(b) 10 year ACP Variable Pay Notes with a principal amount of 100% of the electing holder's Allowed Claim with interest accruing at the federal

judgment rate on the Effective Date of the Plan, payable from 25% of ACP Unsecured Creditor Net Proceeds until the ACP 50% Notes are paid in full, thereafter payable from 80% of ACP Unsecured Creditor Net Proceeds until any note issued pursuant to 4.11(a) is paid in full and thereafter payable from 100% of ACP Unsecured Creditor Net Proceeds with a ten year maturity from the Effective Date if not paid in full prior to this that time; or

(c) DLH Class C Preferred Callable Membership Interests in Reorganized DLH with par value equal to the electing holder's Allowed Claim. The terms of the DLH Class C Interests are described in section 13.15 of the Plan.

In the event the holder of the Claim elects, in part or in whole, option (b) above and the holder of the Claim also has a guaranty of the claim from any of the Guarantors, the holder of the Claim shall be deemed to have waived their claim under the guaranty.

In the event the holder of an Allowed Claim votes not to accept the Plan, the associated Claim will receive a Variable Pay Note with a principal amount of 100% of the electing holder's Allowed Claim with interest accruing at the federal judgment rate on the Effective Date of the Plan, payable from 25% of ACP Unsecured Creditor Net Proceeds until the ACP 50% Notes are paid in full and thereafter payable from 100% of ACP Unsecured Creditor Net Proceeds with a ten year maturity from the Effective Date if not paid in full prior to this that time.

Notwithstanding the foregoing, the terms of the stipulation between Committee and Edward B. Romanov, Jr. are hereby incorporated into the Plan and treatment of ACP Class 4.

**Treatment in a Cramdown:** In the event that a Cramdown of the ACP Plan is necessary because the ACP Plan is rejected by ACP Class 4 or ACP Class 5, the holders of Allowed Claims in ACP Class 4 shall receive payment over time of up to 50% of their Allowed Claims, without interest, from ACP Unsecured Creditor Net Proceeds .

4.11 **ACP Class 5 — Subordinated Claims (Impaired)**.

**Description**: ACP Class 5 consists of all Subordinated Claims against ACP, as more fully described and defined in the Article I definitions hereof.

**Treatment**: Holders of ACP Class 5 Claims may elect to receive one of the following treatments:

(a) An ACP ten (10) year Variable Pay Note with a principal amount of 100% of the electing holder's Allowed Claim with interest accruing at the federal judgment rate on the Effective Date of the Plan, payable from 20% of ACP Unsecured Net Proceeds after the ACP 50% Notes are paid in fullor 100% of the ACP Unsecured Net Proceeds after both the ACP 50% Notes and the ACP 100% Notes are paid in full, with a ten (10) year maturity from the Effective Date if not paid in full prior to that time; or

(b)     DLH Class C Preferred Callable Preferred Membership Interests in Reorganized DLH with par value equal to the electing holder's Allowed Claim. The terms of the DLH Class C Interests are described in section 13.15 of the Plan.

**Treatment in a Cramdown:**  In the event that a Cramdown of the ACP Plan is necessary because the ACP Plan is rejected by ACP Class 4 or ACP Class 5, the holders of Allowed Claims in ACP Class 5 shall receive nothing under the ACP Plan.  In the event of a Cramdown of the DLH Plan is necessary, option (b) described above will not be available and all ACP Class 5 Claims will receive the note described in option (a).

### 4.12     **ACP Class 6 - Reimbursement Claims Against ACP (Impaired)**

**Description:**  Richard S. Allen and Richard S. Allen, Inc. have guaranteed certain indebtedness owed by ACP.

**Treatment:**  If any ACP creditor holding a guarantee receives a payment from Richard S. Allen or Richard S. Allen, Inc., the party paying the obligation of ACP shall receive a 10 year ACP Variable Pay Note with a principal amount equal to the payment to the creditor of ACP with interest accruing at the federal judgment rate on the Effective Date of the Plan, payable from 25% of ACP Unsecured Creditor Net Proceeds until the ACP 50% Notes are paid in full and thereafter payable from 100% of ACP Unsecured Creditor Net Proceeds with a ten year maturity from the Effective Date if not paid in full prior to this that time

### 4.13     **ACP Class 7 – Claims Arising from Guarantees (Impaired)**

**Description:**  These claims arose from one or more guaranties executed by ACP on obligations of either ACP's direct or indirect California subsidiaries or of DLH debt and form one class, but shall excludes all guarantees where (i) the value of the underlying collateral is less than the obligation which had been guaranteed by ACP or the creditor made a section 1111(b) election or (ii) where the underlying obligation has matured or will mature within six (6) months of the Effective Date.

**Treatment:**  Each creditor in this class with an Allowed Claim may elect either (a) to have its ACP guarantees ride through as a guarantee of Reorganized ACP (applicable to the renewed, extended and modified debt of Reorganized DLH for those guarantees of DLH's obligations) without enforcement so long as (i) Reorganized DLH or the underlying non debtor affiliate of ACP, and (ii) Reorganized ACP are performing under the joint plan, or (b) such creditor shall receive, in full payment and satisfaction of its Allowed Claim, DLH Class B Interest (if the obligation guaranteed was an obligation of DLH) or DLH Class C Interest having a Par Value equal to the amount of its Allowed Claim.  The terms of the DLH Class B Interest and the DLH Class C Interests are described in section 13.15 of the Plan.

Any creditor which accepts the DLH Class B Interest in full or partial satisfaction of its Allowed Claim against ACP shall reduce or eliminate the balance of such creditor's

secured debt against DLH. For any such guaranteed debt of DLH satisfied in full or in part by ACP with DLH Class B Interests, ACP or its direct or indirect subsidiaries holding such Membership Interests will be entitled to an allowed reimbursement claim against DLH, and shall receive on account of such reimbursement claim Class B Membership Interests in DLH in value equal to the Class B claims used to pay claims against DLH.

Any creditor which accepts the DLH Class C Interest in full or partial satisfaction of its Allowed Claim against ACP shall reduce or eliminate the balance of such creditor's secured debt against the applicable non-debtor affiliate of ACP. For any guaranteed debt of a non-debtor affiliate of ACP satisfied by ACP with Class C Membership Interests in DLH, ACP or its direct or indirect subsidiaries holding such Membership Interests shall have a reimbursement claim against the affiliate whose debt is satisfied, and shall receive additional equity in the form of capital stock or membership interests, as the case may be, in the applicable subsidiary's entity equal in value to the subsidiary's secured debt paid.

**Treatment in a Cramdown:**

In the event ACP's interest in DLH is cancelled as a result of a cramdown under the DLH Plan, no shares of DLH Class C Interests shall be available to creditors under this section and such creditors may opt to assert an ACP Class 4 Claim if the creditor does not elect to allow the guaranty to run through this bankruptcy proceeding.

4.14 **ACP Class 8 — Equity Interest Holders (Impaired)**.

**Description**: ACP Class 8 consists of all holders of equity Interests in ACP.

**Treatment**: Except in the event of a Cramdown, and except for equity interests issued as a part of the Exit Financing with the consent of the interest holders, all equity or interest holders in ACP shall retain their existing equity or interests in ACP. Existing Equity Interests in ACP are impaired under the Plan as a result of the dilution of the interests of existing Equity Interest holders resulting from the issuance of any new Equity Interests in ACP required as part of the Exit Financing.

**Treatment in a Cramdown:** In the event that a Cramdown of the ACP Plan is necessary because the ACP Plan is rejected by ACP Class 4 or ACP Class 5, all existing Equity Interests in ACP shall be cancelled, and the holders of such existing Equity Interests in ACP shall receive nothing under the ACP Plan on account of such Interests. In such event, new Interests in ACP shall be issued pro rata to: (a) the owners of Allen Opportunity Fund, in consideration of a cash contribution of $800,000 to ACP out of funds which the owners of Allen Opportunity Fund will obtain from an auction sale of Parcel 2; (b) Richard S. Allen, in consideration of a cash contribution of up $1,000,000 which Richard S. Allen shall obtain from scheduled transactions of non-debtor entities; and (c) a cash contribution from Luke Allen of up to $400,000.

## ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN

5.01 **Classes Entitled to Vote**. Each impaired Class of Claims shall be entitled

to vote separately to accept or reject the Plan. Moreover, any Unimpaired Class of Claims or Interests as defined herein is deemed to have accepted the Plan shall not be entitled to vote to accept or reject the Plan.

5.02 **Class Acceptance Requirement**. As provided more fully in the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the authorized, issued, and outstanding equity securities in such Class that have voted on the Plan. Any Class of Claims or Interests which receives nothing under the Plan (which only happens in the event of a Cramdown) is deemed to have rejected the Plan. In addition, in order to confirm the Plan, there must be at least one impaired Class of Claims which accepts the Plan as outlined above and the acceptance must be determined without including any acceptance of the Plan by any insider.

### ARTICLE VI - MEANS OF IMPLEMENTATION AND GENERAL DESCRIPTION OF THE PLAN

6.01 **Vesting of Assets**. Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date, all property of Debtors' estate, wherever situated, shall vest in the Reorganized Debtors, free and clear of all Claims to the full extent permitted by law including the Bankruptcy Code.

6.02 **Resolution of Claims**. Commencing on the Effective Date, the Reorganized Debtors shall be authorized to object to, settle or liquidate all Claims entitled to payment from the Distribution Fund which Claims are not otherwise Allowed Claims pursuant to the terms of this Plan. All costs and expenses relating to the foregoing, including, without limitation, fees of Professional Persons, shall be paid from the proceeds of liquidation.

6.03 **No Merger or Substantive Consolidation**. Debtors shall not be merged with or into or substantively consolidated with or into any entity.

6.04 **Sale of Properties Subject To Non-Recourse Note**. Certain claims against DLH are based on non-recourse notes issued pre-petition. Those non-recourse notes are receiving new non-recourse notes pursuant to this Plan. Within the six months prior to any such a note maturing, to the extent to which the property securing the claim has not been sold or the note otherwise repaid, in consultation with Parcel Noteholder, Reorganized DLH shall create a structured sale, sealed bid or auction ("Structured Sale") for such a parcel. If (i) Reorganized DLH fails to begin such a Structured Sale within four months of the non-recourse note maturing, (ii) Parcel Noteholder notifies Reorganized DLH of its default under this provision and requests Reorganized DLH to commence such a Structured Sale and (iii) the Structure Sale does not commence within thirty (30) days of Reorganized DLH receiving the notice of default and request from Parcel Noteholder, the Parcel Note shall become a recourse obligation of Reorganized DLH.

The reserve price for such parcels in such a Structure Sale shall be (i) at least equal to the Release Price for such parcel plus all normal and customary closing costs and (ii) no greater than 175% of the Release Price for such a parcel unless Parcel Noteholder consents. In the event the Reserve Price is not met, Reorganized DLH shall consult with Parcel Noteholders holding the Parcel Senior Lien on such parcels with respect to the appropriate disposition of the parcel. If the parties cannot reach an agreement with respect to the appropriate disposition, Reorganized DLH may, at its sole discretion, either (a) retain such a parcel for subsequent sale or (b) transfers each parcel or parcels subject to the applicable Parcel Senior Lien to Parcel Noteholder in satisfaction of the applicable Parcel Note. In the event Reorganized DLH retains the parcel for subsequent sale, the applicable Parcel Note shall become a recourse obligation of Reorganized DLH.

6.05. **Formation of DLH ADESA Parcel, LLC** In the event that the real property and improvements securing the Allowed Secured Claim of Great Western Bank (the "ADESA Property") have not been sold prior to the Effective Date, DLH shall form DLH ADESA Parcel, LLC as a Delaware Limited Liability Company by filing an appropriate Certificate of Organization with the Secretary of State of Delaware. Reorganized DLH shall be the sole member of DLH ADESA Parcel, LLC, and shall contribute to DLH ADESA Parcel, LLC all of its right, title, and interest in the ADESA Property and the ADESA Lease, subject to the existing liens and security interests in favor of Great Western Bank, in exchange for such interest. The Operating Agreement for DLH ADESA Parcel, LLC shall be substantially identical to the Operating Agreement which previously existed for DLH Hutchins Wintergreen 178, LLC (the owner of the ADESA Property prior to its merger into DLH), with only such changes as Great Western Bank and Reorganized DLH may agree upon. Effective upon the transfer of the ADESA Property to DLH ADESA Parcel, LLC, Reorganized DLH shall execute and deliver to Great Western Bank a Continuing Guaranty, in form and substance substantially identical to the guaranty previously delivered by ACP to Great Western Bank's predecessor in interest, of all obligations of DLH ADESA Parcel, LLC under the Great Western Note described in Section 4.03, DLH Class 3, Subclass C, above.

6.06. **Formation of DLH Buildings AB, LLC** The real property and improvements securing the Allowed Secured Claim of Compass Bank in DLH Class 3, Subclass D ("Buildings A & B") shall be transferred into a newly formed entity, DLH Buildings AB, LLC. On the Effective Date, DLH shall form DLH Buildings AB, LLC as a Delaware Limited Liability Company by filing an appropriate Certificate of Organization with the Secretary of State of Delaware. Reorganized DLH shall be the sole member of DLH Buildings AB, LLC, and shall contribute to DLH Buildings AB, LLC all of its right, title, and interest in Buildings A & B, together with all rights under any and all leases thereon, subject to the existing liens and security interests in favor of Compass Bank, in exchange for such interest. The Operating Agreement for DLH Buildings AB, LLC shall be substantially identical to the Operating Agreement which previously existed for DLH Master Parcel #85-89, 97, 139, LLC (the owner of Building A prior to its merger into DLH), with only such changes as Compass Bank and Reorganized DLH may agree upon. Effective upon the transfer of Buildings A & B to DLH Buildings AB, LLC, Reorganized DLH and Reorganized ACP shall execute and deliver to Compass Bank a Continuing Guaranty, in form and substance substantially

identical to the guaranty previously delivered by DLH and ACP to Compass Bank, of all obligations of DLH Buildings AB, LLC under the Compass Bank Building Note described in Section 4.03, DLH Class 3, Subclass D, above.

6.07. **Conversion of DIP Loan to Term Loan.** On the Effective Date, the DIP Loan (including that portion of the DIP Loan which was advanced to DLH prepetition) shall be satisfied by converting the DIP Loan into the Term Loan. DLH estimates that, as of the Effective Date, the outstanding principal balance of the DIP Loan will be approximately $3.0 Million; all of such principal balance, together with all accrued but unpaid interest thereon as of the Effective Date, shall be converted to the Term Loan. The Term Loan shall be evidenced by a new note executed on the Effective Date. The Term Loan shall retain its perfected subordinate liens on the DLH Property but excluding any Pool 3 or Pool 4 property surrendered to the secured creditors with a senior interest in such property and excluding any property sold or surrendered by DLH prior to the Effective Date, and a Subordinate Lien Deed of Trust on the Pool 1 and Pool 2 Properties shall be filed on the Effective Date to evidence and perfect such liens; that Subordinate Lien Deed of Trust shall be expressly subject and subordinate to any Senior Parcel Lien securing the claim of any Pool 1 or Pool 2 Noteholder. The Plan establishes Release Prices for the Term Loan for each parcel, as set forth on Exhibit A attached hereto, calculated at 150% of the allocable portion of the Term Loan for each parcel on the Effective Date of the Plan. The Term Loan shall bear a variable rate of interest, adjusted quarterly on the first business day of each calendar quarter, which is equal, from time to time, at the prime rate of interest published by the Wall Street Journal plus ten percent (10%). Interest on the Term Loan shall accrue annually, and shall be payable solely from the Net Sales Proceeds of the Pool 1 and Pool 2 properties. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan. On the Effective Date, the amount of the DIP Loan to be converted into the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the initial principal balance of the Term Loan, and (b) all reasonable fees and costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination of the Term Loan.

6.08. **Provision for Exit Financing.** DLH anticipates obtaining Exit Financing from one or more of three (3) sources: (a) an auction of several parcels of land to be conducted prior to the Effective Date, with Bankruptcy Court approval which shall be closed and funded within 60 days of the Effective Date, which is anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the parcels to be sold, and excess cash which DLH may use to consummate the Plan; and/or (b) a loan from Allen Opportunity Fund, a non-Debtor entity affiliated with DLH which owns a parcel of property near the DLH property, in an amount of up to $800,000; and/or (c) a loan from Richard S. Allen, individually, in amount of up to $750,000.00. DLH shall use such Exit Financing to pay Administrative Expenses and other costs necessary to exit Bankruptcy, and to provide a reserve to pay for operating, marketing, and administrative costs of Reorganized DLH until Reorganized DLH can generate cash flow from sales of its property.

The ACP Debtor in Possession Financing is expected to be paid in full on the

Effective Date or within 60 days after the Effective Date, depending on the timing of anticipated closings, from funds available through transactions relating to the BNSF logistics park in Kansas City ("LPKC"). In the event insufficient funds from LPKC are available on the Effective Date, ACP may receive bridge financing from the same sources which are otherwise available to DLH as described above.

6.09. **Modifications to the DLH Plan and/or ACP Plan to Resolve Objections**. Debtors reserve the right to modify the treatment of any Class of Creditors under the Plan in order to resolve any objections to Confirmation of the Plan, or in order to obtain confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any non-consenting Class. Provided that any such modifications do not materially and adversely affect the treatment of any other Class of Creditors or Interest Holders under the Plan (without the consent of such Creditors or Interest Holders), Debtors shall not be required to resolicit acceptances of the Plan as so modified, and any accepting Class of Creditors or Interest Holders which has either consented to the modification, or whose treatment under the Plan is not materially and adversely affected by any such modification, shall be deemed to have accepted the Plan as so modified.

6.10. **Cramdown of DLH Plan and/or ACP Plan.** The Debtors reserve the right to seek confirmation of this Plan by "cramdown" pursuant to Section 1129(b)(1) in the event that the Plan is rejected by the holders of either the Unsecured Claims or the Subordinated Claims in either the DLH Case or the ACP Case.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, or by the holders of Unsecured Claims (ACP Class 4) or Subordinated Claims (ACP Class 5) in the ACP Case, the ACP Plan will be modified to provide that all equity interests in ACP will be cancelled, and new Equity Interests in ACP will be issued in exchange for: (a) a cash contribution by the owners of Allen Opportunity Fund in the amount of approximately $800,000, to be paid from the net proceeds of an auction of parcel 2 owned by Allen Opportunity Fund; (b) a cash contribution of up to $1,000,000.00 from Richard S. Allen, to be paid from proceeds available to Richard S. Allen from other transactions; and (c) a cash contribution of up to $400,000 from Luke Allen. The Equity Interests in Reorganized ACP shall be distributed pro rata among the owners of Allen Opportunity Fund, Luke Allen and Richard S. Allen based upon their contributions of new value to ACP. Further, the ACP Plan will be modified to provide that Unsecured Claims (ACP Class 4) will be paid up to 50% of their Allowed Unsecured Claims, without interest, in quarterly payments from ACP Unsecured Creditor Net Proceeds, and Subordinated Claims (ACP Class 5) will receive nothing under the Plan.

In the event that the Plan is rejected by the holders of Unsecured Claims (DLH Class 4) or Subordinated Claims (DLH Class 5) in the DLH Case, so that Cramdown is necessary in the DLH Case, the DLH Plan will be modified to provide that all equity interests in DLH will be cancelled, and new Equity Interests in DLH may be issued in exchange for one or more of the following: (a) a cash contribution of up to $1.0 Million

from ACP, and (b) a contribution from the DIP Lenders of up to $1.20 Million, in the form of a credit on the DIP Loan (which will reduce the amount of the Term Loan on the Effective Date by $1.2 Million).  The Equity Interests in Reorganized DLH shall be distributed pro rata among ACP and the DIP Lenders based upon their contributions of new value to DLH.  Further, the DLH Plan will be modified to provide that Unsecured Claims (DLH Class 4) will be paid up to 25% of their Allowed Unsecured Claims, without interest, from DLH Unsecured Net Proceeds, and  Subordinated Claims (DLH Class 5) will receive nothing under the Plan.

6.11.  **Contributions of Property by Reorganized DLH.**  Notwithstanding anything to the contrary in the Plan,  Reorganized DLH shall have the right, from time to time, to contribute any one or more parcels of the Pool 1 Property or the Pool 2 Property, subject to the Parcel Senior Liens secured by such property and, with respect to any Pool 2 Parcel, the Subordinate Lien securing the payment of any portion of Pool 2 Net Sales Proceeds to the holders of the Pool 2 Notes, and subject to the lien securing the Term Loan, to any partnership, joint venture, limited liability company, or other entity formed for the purpose of developing or constructing improvements on such parcel or parcels.  Provided that the contribution is solely in exchange for an ownership interest in such newly formed entity, any such contribution shall not be deemed a sale or transfer of such parcel for purposes of calculating DLH Net Sales Proceeds, and the transfer of any such parcel shall be ignored for purposes of calculating subsequent distributions of DLH Net Sales Proceeds to the holders of the Pool 1 Note and the Pool 2 Notes.  To the extent that: (a) DLH receives any cash consideration as part of any such contribution of a Pool 1 Parcel or a Pool 2 Parcel to any such newly formed entity, or (b) DLH receives distributions from any such entity resulting from the proceeds of any sale, lease, or other disposition,  then all such cash consideration and distributions to DLH shall be deemed to be DLH Net Sales Proceeds with respect to such parcel, and shall be distributed in accordance with the Plan.

## ARTICLE VII - PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS

7.01  **Objection Deadline**.  Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed by ninety (90) days after the Effective Date.  Unless arising from an Avoidance Action, any Proof of Claim filed more than ninety (90) days after the Effective Date shall be of no force and effect and need not be objected to.  All Contested Claims shall be litigated to Final Order unless estimated by the Bankruptcy Court for purposes of distribution; provided, however, that the Reorganized Debtors may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court.

7.02  **Distributions on Account of Contested Claims**.  (a)  No Distribution Pending Allowance.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim by Final Order or is estimated for purposes of distribution by the Bankruptcy Court.  In the case of a holder of a Claim who is also

alleged to be holding property that is recoverable by virtue of any Avoidance Action or liable on any Avoidance Action brought, filed, joined, or adopted by Debtors as of the date of a particular distribution, such holder's Claim shall then be and shall thereafter continue to be a Contested Claim until such Avoidance Action is fully resolved by Final Order and, if and to the extent the holder of such Claims is found to be obliged to turnover property or to pay a monetary amount, such Final Order is fully performed and satisfied by such holder, such holder shall receive no distributions under this Plan.

(b) <u>Distribution After Allowance</u>. As soon as practicable after a Contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount of dollars equal to the aggregate of all the distributions which such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date. Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs. The Reorganized Debtors or Disbursing Agent shall have the right to make or direct the making of all distributions to the holders of Allowed Claims.

7.03 **Reservation of Rights to Object to Claims.** Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, the Reorganized Debtors (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

7.04 **Standing and Responsibility to Object to Claims.** Prior to the Effective Date, except as otherwise specified under the Bankruptcy Code and Bankruptcy Rules, Debtors shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions, if any, with respect to all Claims.

7.05 **Service.** An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if Reorganized Debtors effect service in accordance with Bankruptcy Rule 3007.

## ARTICLE VIII - PROVISIONS GOVERNING DISTRIBUTION

8.01 **Distributions to be Made by Reorganized Debtors**. Unless expressly otherwise provided in the Confirmation Order, distributions to Creditors required pursuant to the Plan shall be made by the Reorganized Debtors.

8.02 **Means of Cash Payment**. Payments of cash to be made by the

Reorganized Debtors or the Disbursing Agent, as the case may be, pursuant to the Plan shall be made by check drawn on a domestic bank, by wire transfer or by ACH.

8.03 **Delivery of Distributions**. Distributions of cash to holders of Allowed Claims shall be made at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Reorganized Debtors or the Disbursing Agent, as the case may be, have been notified in writing of a change of address). If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtors or the Disbursing Agent, as the case may be, is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. All claims for undeliverable distributions shall be made on or before the one-year anniversary of the distribution to the Creditor that was undeliverable. After such date, such undeliverable distributions shall become an asset available to the Reorganized Debtors and the Creditors entitled to the undeliverable distributions shall thereafter have no further rights or entitlements to the undeliverable distributions.

8.04 **Time Bar to Payments and Distributions**. Checks issued by the Reorganized Debtors or Disbursing Agent, as the case may be, on account of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors or the Disbursing Agent, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first (1st) anniversary of the Initial Distribution Date or ninety (90) days after the date of the issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the subject funds shall become an asset available to Reorganized Debtors.

8.05 **De minimis Distributions.** Any distribution of less than $25.00 will be considered *de minimis*, and Holders of Allowed Claims that are entitled to any distribution of less than $25.00 may not receive any distribution (at the sole discretion of the Reorganized Debtors) unless and until the aggregate of such distributions exceeds $25.00. To the extent that the aggregate of such distributions does not exceed $25.00 within one year of when the funds would originally have been distributed, such funds shall be paid on the first anniversary of when *de minimis* distribution would otherwise have become due and payable except for the provisions of this section.

8.06 **Rounding of Fractional Distributions.** Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Any such distributions will be in whole cents (rounded to the nearest whole cent when and as necessary).

## ARTICLE IX - EXECUTORY CONTRACTS AND LEASES

### 9.01 **General Treatment - If Not Rejected, Assumed**.

The Plan constitutes and incorporates one or more motions by the respective

Debtor proponents to assume, as of the Confirmation Date and conditioned upon the occurrence of the Effective Date, all prepetition executory contracts and unexpired leases to which one or both of the Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, or (b) are the subject of a separate motion (or appeal from the ruling on such motion) filed pursuant to section 365 of the Bankruptcy Code by one or both of the Debtors prior to the Effective Date or a separate motion (or appeal of the ruling from such motion) to compel or permit assumption or rejection pursuant to section 365 of the Bankruptcy Code filed by the Committee prior to the Effective Date and such unexpired lease or executory contract shall be assumed or rejected, as the case may be, by virtue of a Final Order of the Bankruptcy Court, which may be entered after the Effective Date.

9.02 **Bar to Rejection Damages**. If the rejection of an executory contract or an unexpired lease results in damages to the other party to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the Confirmation Date.

9.03 **Service Agreement.** Reorganized ACP and Allen Employment Services, LLC shall continue to provide certain services for Reorganized DLH. The Services Agreement shall be amended to reflect the services and changes in payment amounts set forth in the budgets, from time to time, anticipated to be provided by ACP and AES to Reorganized DLH. As amended, the Services Agreement shall be assumed by Reorganized ACP and Reorganized DLH pursuant to the Plan. The form of the Amendment to the Services Agreement shall be filed by the Debtors with the Bankruptcy Court five (5) business days prior to the Confirmation Date.

9.04 **ADESA Texas, Inc. Lease.** DLH Hutchins Wintergreen 178, LLC (a predecessor to DLH) as landlord and ADESA Texas, Inc. were parties to a Reverse Build-to-Suit Single Tenant Lease (Triple Net) (as amended, the "**ADESA Lease**") and Project Improvement Agreement incorporated thereto (the "**ADESA PIA**") made and entered into as of March 31, 2008, as amended pursuant to that First Amended to Reverse Build-to-Suit Single Tenant Lease (Triple Net) and Projects Improvement Agreement dated July 18, 2008. Pursuant to the ADESA Lease and ADESA PIA, DLH agreed to make or cause to be made certain "Off-Site Improvements" which includes the expansion and extension of Wintergreen Road. Wintergreen Road is currently being expanded and extended by the City of Hutchins. Also contained in the ADESA Lease is a provision which provides certain conditions and opportunities for the sharing of Economic Incentives between ADESA and Debtor DLH which have not as yet been reconciled. If the property or Reorganized DLH's interests in DLH ADESA Parcel, LLC are sold within 180 days after confirmation of the Plan, the cost of any such expansion and or the settlement of the Economic Incentive matter shall be charged against the proceeds realized from the sale. Prior to the confirmation date, DLH shall file a separate motion to assume or reject the ADESA Lease and the ADESA PIA.

# ARTICLE X - MAINTENANCE OF CAUSES OF ACTION

10.01 **Treatment of Avoidance Actions**.  Generally, the Debtors waive all causes of action belonging to the estate pursuant to section 541 of the Bankruptcy Code, including but not limited to Avoidance Actions pursuant to sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code.  Notwithstanding the foregoing, all Avoidance Actions are preserved in the estate for the benefit of creditors if (a) such an Avoidance Action has been brought or otherwise asserted in a written pleading filed with the Bankruptcy Court prior to the Effective Date, or (b) such Avoidance Actions have been asserted as part of an objection to the claim where either (i) such objection was brought prior to the Confirmation Date, or (ii) the claim in question was filed after the applicable bar date for such claim.

10.02 **Maintenance of Causes of Action**.  All creditors and parties in interest are hereby placed on notice that despite provisions which may be contained in this Plan, including without limitation those providing for satisfaction of Claims, if Allowed, the Reorganized Debtors reserve the right, as advised by counsel, to (a) commence, prosecute to judgment, and to collect upon any cause of action, whether or not such cause of action is listed in the Schedules and Statements of Affairs as an asset of Debtors' chapter 11 Estate and to (b) include as defendants in a suit any and all parties which are, at this time, named and unnamed.  Currently, the Reorganized Debtors are unable to estimate the size of any recovery from such a lawsuit.  The Reorganized Debtors are authorized under the Plan, in their sole discretion, to litigate to final judgment, prosecute appeals as are necessary and enter into such settlement agreements as are deemed appropriate with respect to any and all suits initiated as provided herein.  Persons subject to a successful Avoidance Action may file a Claim, as appropriate, within such time as is established by the Bankruptcy Court.

# ARTICLE XI - DISCHARGE

11.01 **General Discharge Under Plan**.  Except with respect to Classes of Claims unimpaired pursuant to this Plan, the distributions and rights afforded in this Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and Interests in Debtors or any of their respective assets or properties of any nature whatsoever.  Commencing on the Effective Date, except as expressly otherwise provided in this Plan, all Claim holders and Interest holders shall be precluded forever from asserting against Debtors,  their respective affiliates and principals, their respective agents and attorneys or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, or causes of action belonging to Debtors pursuant to 11 U.S.C. § 541 which could arise up through the Effective Date of the Plan including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of Debtors, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed.  As of the Effective Date, Debtors and their respective affiliates, and principals shall be discharged and released from and shall hold all the assets and properties received or retained by them pursuant to

this Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except as set forth pursuant to this Plan. All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and interests or obligations of any nature against Debtors or assets or properties received or retained by Debtors with respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in this Plan. Notwithstanding the foregoing, this provision shall not be interpreted to release any third party claims, liabilities or other causes of action against the affiliates and principals of the Debtors unless the claim or cause of action so released is derivative of a claim or cause of action which was or could have been asserted against a Debtor in this Bankruptcy, or constitutes property of either of the Debtors' bankruptcy estates.

11.02 **Cancellation Of Instruments And Agreements.** Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest (but expressly excluding: (a) the Parcel Senior Liens, as modified by the Parcel Senior Lien Modifications, and any other Mortgage, Deed of Trust, Security Agreement, Financing Statement or other lien or security interest, evidencing any lien or security interest which is to survive the Effective Date under the terms of this Plan; (b) any Guaranty Agreement executed by ACP for which the holder of such Guaranty elects to have the Guaranty ride through unaffected by the Plan; and (c) the Operating Agreements of ACP and DLH, as amended pursuant to the Plan) shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; obligations of Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against Debtors, the Estates or the Reorganized Debtors; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan. Notwithstanding the foregoing, the cancellation of such instruments and agreements shall be solely effective as to the Debtors' obligation under such Instruments and Agreements and shall not be interpreted to discharge or release any claims against guarantors or any claims against any third party under those Instruments or Agreements.

## ARTICLE XII - RETENTION OF JURISDICTION

12.01 **Retention of Jurisdiction**. Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Case and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

a. to hear and determine all Claims and Objections to Claims, including all Fee Claims and all Claims arising from the rejection of any executory contract or unexpired lease and any Objections which may be made thereto;

b. to liquidate or estimate the amount or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

c. to adjudicate all Claims (and other claims) and controversies arising during the pendency of the Case;

d. to allow or disallow any Fee Claim and any request for compensation or reimbursement of expenses by a professional related to post-confirmation services, but only for services rendered prior to the Effective Date of the Plan;

e. to enter any orders which may be necessary and appropriate to carry out and enforce the provisions of the Plan;

f. to determine and allow amendments or modifications to the Plan, to the extent permitted in the Bankruptcy Code;

g. to hear and determine any and all adversary proceedings, applications, or contested matters, including any remands or appeals;

h. to hear, determine, adjudicate, and enforce any and all adversary proceedings which may be commenced before or after the Effective Date to avoid or recovery any preference, fraudulent transfer or other avoidable transfer, lien or security interest whatsoever under 11 U.S.C. §§ 544, 545, 547, 548, 549, 550, 551, 552 or 553(b), and any and all adversary proceedings to recover any claim, direct or derivative, of Debtors or its estate against any Insider of Debtors, including any remands or appeals;

i. to enable the Reorganized Debtors as successor to Debtors-in-Possession to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties or damages to which Debtors may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between Debtors and any other party, including but not limited to, the retained Causes of Action and Avoidance Actions; and,

j. to enter a Final Decree pursuant to § 350 of the Bankruptcy Code and Bankruptcy Rule 3022.

## ARTICLE XIII - MISCELLANEOUS PROVISIONS

13.01 **Continued Existence of Reorganized Debtors.** Subject to the restructuring and reorganization contemplated by, and described more fully in this Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, and all Interests held by a Debtor in another Debtor or a subsidiary thereof shall be reinstated, with all the powers available to such legal entity, in accordance with

applicable law and pursuant to the Plan Debtor Constituent Documents, which shall become effective upon the occurrence of the Effective Date or such other later date contemplated thereby.

13.02  **Compliance With All Applicable Laws**.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, Debtors shall comply with such law, rule, regulation, or order; provided that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of Debtors.  Confirmation of this Plan shall constitute a determination by the Bankruptcy Court that no provision of this Plan violates any applicable state or federal law or regulation; however, if any person, party, or governmental agency obtains a determination from the Bankruptcy Court or other court of competent jurisdiction that any provision of this Plan violates any state or federal law, such provision shall be severed from the Plan and the remainder of the Plan shall constitute the Plan.

13.03  **Binding Effect**.  The Plan shall be binding upon, and shall inure to the benefit of Debtors, any Disbursing Agent, the holders of Claims or Interests and their respective successors and assigns.  On and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

13.04  **Governing Law**.  Except as hereinafter provided, unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.  Notwithstanding the foregoing, any agreements, documents, or instruments executed pursuant to this Plan which, by their terms, are to be governed by the laws of another jurisdiction, including, but not limited to: (a) the Certificates of Organization and LLC Operating Agreements for DLH ADESA Parcel, LLC and DLH Buildings AB, LLC (which are to be governed by Delaware law); (b) the Amendment to the LLC Operating Agreement of DLH as provided in Section 13.15 of the Plan (which is to be governed by Delaware law); and (c) any new Membership Interests in either ACP or DLH, including the DLH Class B Interests and the DLH Class C Interests, issued pursuant to this Plan (which shall be governed by Delaware law), shall be construed and interpreted in accordance with the laws of the jurisdiction specified in any such agreement, document, or instrument.

13.05  **Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date.  All fees through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided

to the Debtors prior to the Effective Date. All fees invoiced after the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by Reorganized Debtors.

13.06 **Timing of Distributions**. Any payment or distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

13.07 **Post Confirmation Notices**. After the Confirmation Date but before the Effective Date, unless otherwise directed by the Bankruptcy Court, notice of any motion creating a contested matter shall be given under the 20-day provision of Local Bankruptcy Rule 9007 to the parties on the service list maintained by Debtors which may be amended or supplemented to include any party in interest requesting notice. In addition, any notices required under the Plan or any notices or requests of Debtors or Reorganized Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties: (a) Mark E. MacDonald, (b) Jenny Saubert, (c) Richard S. Allen, and (d) Daniel J. McAuliffe at the address designated in the Order confirming this Plan of Reorganization.

13.08 **General Savings Clause**. If any provision or portion of this Plan or consideration issued hereunder is subsequently determined to be illegal (*i.e.*, to violate a criminal statute so that the actions or inactions by Debtors or any party under the Plan would constitute a crime) or to violate any applicable law or regulation, such violative provision shall thereupon be deleted and expunged from this Plan, notwithstanding substantial consummation thereof, and the remainder of this Plan shall thereafter be construed to exclude such violative provision, portion or consideration and shall be enforced to the full extent legally permitted in the absence thereof.

13.09 **Reservation of Right to Seek Confirmation under 1129(b)**. The proponent of the Plan expressly reserves the right, pursuant to section 1129(b) of the Bankruptcy Code, to request the Court to confirm the Plan if all of the applicable requirements of section 1129(a) of the Bankruptcy Code have been met other than those of section 1129(a)(8).

13.10 **Dates.** The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Plan.

13.11 **Further Action.** Nothing contained in the Plan shall prevent Debtors or its successor from taking such actions as may be necessary to consummate the Plan, even though such actions may not specifically be provided for within the Plan.

13.12 **Plan Amendments.** Debtors may propose amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time before the Confirmation Date. Prior to the Confirmation Date, Debtors specifically reserve the right to change the treatment for any class of secured creditors, including the interest rate, term and duration of any note to be provided under the Plan or, in the alternative, to

provide that the property securing any secured claim be sold via a Structure Sale or to provide that such property be transferred to the holder of the secured claim in full satisfaction of such a secured claim.

Provided that any amendment or modification to the Plan proposed by a Debtor does not materially and adversely the treatment of any Creditor or Interest holder affected by such amendment or modification, the amendment or modification shall be deemed to comply with section 1125 of the Bankruptcy Code without the need for any additional disclosure by the Debtors through a new Disclosure Statement, and Debtors will not be required to resolicit votes on the Plan. The Debtors expressly reserve the right to agree to amendments or modifications to the Plan requested by any Creditor in a Class which has rejected the Plan, and to permit such Creditor to withdraw its rejection of the Plan and change its vote to acceptance of the Plan after the voting deadline, and such amendment or modification shall be deemed to comply with Section 1125 of the Bankruptcy Code without the need for additional disclosure or a resolicitation of votes on the Plan so long as it is consented to by any Class of Creditors or Interest holders (if any) adversely affected by such amendment or modification.

After the Confirmation Date, Debtors or their successors may, subject to section 1127(b) of the Bankruptcy Code and with Bankruptcy Court approval, and so long as it does not materially or adversely affect the rights set forth in the Plan of Creditors and other parties in interest, amend or modify the Plan to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner that may be necessary to carry out the purposes and intent of the Plan. At the Confirmation Hearing, Debtors may, either in writing or on oral motion, request a modification of any provision of the Plan to address any objection to confirmation of the Plan and may seek confirmation of the Plan, as modified. In addition to the foregoing, on or before substantial consummation of the Plan, and without the need for any further order or authority, Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.13 **Substantial Consummation.** The Plan shall be deemed substantially consummated immediately on the completion of all actions required to be undertaken at the Effective Date.

13.14 **Contingencies to Effectiveness of Plan.** The Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

a. The Bankruptcy Court shall have approved a disclosure statement with respect to the Plan in form and substance acceptable to the Debtors in their sole and absolute discretion;

b. The Confirmation Order shall be in form and substance acceptable to the Debtors in their absolute discretion;

c.     The Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to any stay of effectiveness; the Confirmation Date shall have occurred and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

d.     Reorganized Debtors' reasonably projected expenses do not exceed its reasonably projected revenue;

e.     All documents necessary to consummate the Term Loan shall be executed on or prior to the Effective Date;

f.     Exit Financing in amounts and terms acceptable to ACP and DLH have been arranged and are ready to be funded; and

g.     To the extent that any Exit Financing, or in the case of Cramdown, any new equity contribution (whether in the form of cash or conversion of a claim), is to be provided by Richard S. Allen or Richard S. Allen, Inc., the funding of any such amounts and the conversion of any claim held by such persons into new equity, shall have been approved by the Bankruptcy Court having jurisdiction over the Chapter 11 case of Richard S. Allen and Richard S. Allen, Inc.

13.15   **Creation of Class B and C Preferred Callable Membership Interests.** The LLC Agreement for DLH shall be amended to provide for separate Class B and C Membership Interests as follows:

(a)     The DLH Class B Membership Interests shall have a stated par value, a cumulative preference on returns at 3% per annum, and a preference on liquidation to receive the par value of such Interests, so that all DLH Class B Membership Interests shall receive a return of their Par Value plus accrued but unpaid preferred return before any distributions to Class A Membership Interests as described below.

(b)     The DLH Class C Membership Interests, arising from existing Membership Interests in DLH held by ACP or its direct or indirect subsidiaries, shall have a stated par value, a cumulative preference on returns at 3% per annum, and a preference on liquidation to receive the par value of such Interests, *provided, however*, that such preference on returns and liquidation shall be a preference only as to ACP's aggregate existing Membership Interests in DLH (directly or through its direct or indirect subsidiaries), and shall otherwise be on a par with (and have no preference over, as to either return or distributions on liquidation) other existing Membership Interests in DLH. In the event the Plan for DLH is confirmed via Cramdown, these DLH Class C Membership Interests shall not be issued to ACP.

(c)     The DLH Class B and Class C Membership Interests shall be callable, in

whole or in part, at any time that it is legally permissible for DLH to redeem Membership Interests under applicable law (i.e., the Delaware Limited Liability Company Act), for a period of ten (10) years after the Effective Date of the DLH Plan.

(d)     The DLH Class B and Class C Membership Interest Holders shall have voting rights in Reorganized DLH as required by applicable law, but the DLH Class B and Class C Membership Interests shall have no right to vote on any proposal to call and redeem, in whole or in part, the DLH Class B and/or Class C Membership Interests.

(e)     The DLH Class B and Class C Membership Interests shall have the right to vote separately as a single class to elect one (1) additional director to the board of DLH.  Such right to elect a director shall continue in effect for so long as: (i) the aggregate outstanding par value of the DLH Class B Interests and the DLH Class C Interests exceeds $2,000,000.00, or (ii) any accrued preference as to returns on either the DLH Class B Interests or the DLH Class C Interests remains unpaid.

(f)     Provided that all accrued preferences as to returns on the DLH Class B Interests and the DLH Class C Interests have been paid currently, Reorganized DLH may, to the extent permitted by governing Delaware law, by the Exit Financing, and by any other contract or agreement by which it is bound, make additional distributions to DLH Class A Interests.  The DLH Class B Interests and the DLH Class C Interests shall have no right to share in any additional distributions to the equity interests in DLH over and above the preferred returns on the DLH Class B Interests and the DLH Class C Interests.  Notwithstanding the preference in returns granted to the DLH Class B Interests and the DLH Class C Interests, Reorganized DLH shall be permitted to make distributions to the existing DLH Interest holders on an annual basis, but only if and to the extent that such distributions are necessary for the payment of Taxes actually incurred (on a cash basis) by the holders (direct or indirect) of such DLH Interests as a direct result of taxable income or gains recognized by such holders (direct or indirect) of DLH Interests resulting from the sale, exchange, or other disposition of property by Reorganized DLH, or any forgiveness of indebtedness income, or income from the operations of DLH.

13.16   **Board Representation in Reorganized DLH**.  The existing members of the Board for DLH shall become members of the Board for Reorganized DLH.  In addition, the holders of DLH Class B Interests and DLH Class C Interests shall have the right to elect one additional director to the Board, based on the par value of their interests. The right of the DLH Class B Interests and the DLH Class D interests to elect a director for Reorganized DLH shall terminate when: (a) the aggregate outstanding par value of the DLH Class B Interests and the DLH Class C Interests has been reduced, by redemption or otherwise, below the amount of $2,000,000.00, and (ii) all accrued preference as to returns on both the DLH Class B Interests and the DLH Class C Interests has been paid current.  Notwithstanding the foregoing and prior to any election of the additional director, the identity and affiliations of each proposed initial director or officers following the Effective Date (and, to the extent such Person is an insider of the Debtors, the nature of any compensation of such Person, as well as the related terms)

shall be disclosed no later than two (2) calendar days prior to the Confirmation Hearing.

13.17 **Limits on Equity Distributions at Reorganized DLH**. While the obligations under the Exit Financing are outstanding, no distributions to interest holders of DLH shall be made, whether for the annual preferred return on the callable DLH Class B or DLH Class C Interests or otherwise, unless:

a) Allowed under the terms of the Term Loan, and

b) All Secured Creditors in Pools 1, 2, 3 and 4 have received payment of at least the amount of interest, at 7.25% per annum, accrued on their Allowed Secured Claims from the Effective Date until the end of the calendar quarter immediately preceding the payment date.

After Maturity or prepayment of the Term Loan, no distributions to interest holders of DLH shall be made, whether for the annual preferred return on the callable DLH Class B or DLH Class C Interests or otherwise, unless:

a) All Secured Creditors in Pools 1, and 2 have received payment of: (i) all interest, at 7.25% per annum, accrued on their Allowed Secured Claims, from the Effective Date until the end of the calendar quarter immediately preceding the payment date, and (ii) all fees and expenses currently due to the Secured Creditors under the Plan, including any interest, fees and expenses incurred prior to or in connection with the Plan, have been paid, and

b) The holders of the DLH Ten Year Notes have received at least interest payable on the notes from the Effective Date until the end of the calendar quarter immediately preceding the payment date, plus an amount of principal equal to the principal which would have been paid on the DLH Ten Year Notes based upon equal quarterly payments on a twenty year amortization.

Notwithstanding the foregoing, and notwithstanding the preference as to returns of the DLH Class B Interests and the DLH Class C Interests, Reorganized DLH shall be allowed to make distributions to the holders of existing DLH Interests on an annual basis, but only to the extent of and for the limited purpose of paying Taxes actually incurred (on a cash basis) by the holders (direct or indirect) of such DLH Interests as a direct result of taxable income or gains recognized by such holders (direct or indirect) of DLH Interests resulting from the sale, exchange or other disposition of property by Reorganized DLH, or any forgiveness of indebtedness income, or income from the operations of DLH.

13.18 **Setoff**. The Reorganized Debtors or Disbursing Agent, as the case may be, may, but shall not be required to, set off against any Claim and the payment or other distributions to be made pursuant to this Plan in respect of such Claim, fully liquidated, non-contingent Claims of any nature whatsoever Debtors may have against the holder of

such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such Claim that Debtors may have against such holder.

13.19    **Dissolution of the Committee.**  Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or  other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Committee after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date; provided, however, that to the extent any such fees and expenses are incurred after the date that is fifteen business days prior to the deadline to file final fee applications, any such fees and expenses must be submitted directly to the Reorganized Debtors.

13.20    **Matters Requiring Board or Member Authorization**.  On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company action of  Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors, members or shareholders, as applicable, and execution of all documentation incident to the Plan, notwithstanding any otherwise applicable non-bankruptcy law or the Organization Documents of Debtors, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, members or shareholders, as applicable, of the Debtors.

13.21    **Saturday, Sunday or Legal Holiday.**   If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.22    **No Segregation of Reserves or Funds to Be Distributed.**
Notwithstanding any contrary provision contained herein, except as set forth in this section, Reorganized Debtors shall not be obligated to physically segregate and maintain separate accounts for reserves or for distribution funds and separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable Reorganized Debtors to determine Distributable Cash, reserves and amounts to be paid to parties in interest.

Reorganized DLH shall segregate and maintain separate accounts for the following purposes:

     (i)     escrowing rents, common area maintenance and taxes received from the tenants of Building A and B unless and until Compass Bank consents to the commingling of all or a part of such funds,

     (ii)     escrowing monies received for taxes and insurance from ADESA until such time as those taxes and/or insurance bills are paid,

     (iii)     escrowing monies which are to be distributed quarterly to the unsecured creditors of ACP (ACP Unsecured Creditor Net Proceeds),

     (iv)     escrowing monies which are to be distributed quarterly to the unsecured creditors of DLH (DLH Unsecured Creditor Net Proceeds),

     (v)     escrowing monies which are to be distributed quarterly to the holders of Pool 1 Notes (Secured Creditor Pool 1 Net Proceeds), and

     (vi)     escrowing monies which are to be distributed quarterly to the holders of Pool 2 Notes (Secured Creditor Pool 2 Net Proceeds).
.

     13.23  **Creditors Holding Multiple Claims.**  All Claims held by a single creditor against a Debtor in a single class shall be aggregated and treated as a single Claim in such a class against that Debtor. At the written request of Reorganized Debtors, any creditor holding multiple Allowed Claims shall provide Reorganized Debtors a single address to which any Distributions shall be sent.

     13.24  **Revocation, Withdrawal Or Non-Consummation Of The Plan**.  If, after the Confirmation Order is entered, each condition precedent to the Effective Date has not been satisfied or duly waived by Debtors on or by ninety (90) days after the Confirmation Date, then upon motion by Debtors, the Confirmation Order  may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in Debtors, (iii) prejudice in any manner the rights of Debtors in the Chapter 11 Cases, or (iv) constitute a release, indemnification or exculpation by Debtors, the Estates or any other party pursuant to the Plan.

     13.25  **Organizational Documents.**  To the extent necessary, any Organizational Documents which will be revised or amended pursuant to the Plan or to effectuate the provisions of the Plan shall be filed by Debtors with the Court at least seven (7) days prior to the Effective Date.

     13.26  **Plan Consumation.**  The Plan will become fully consummated six months after the entry of a final order of confirmation of the Plan and the first distribution on the Effective Date.  The Plan Consummation will be evidenced by filing a certificate of consummation with the Bankruptcy Court.

13.27 **Duties of Parcel Noteholders.** No Parcel Noteholder shall have any express or implied duties to any other Parcel Noteholder.

13.28 **Ability to Confirm Plan as to DLH Only.** In the event the Plan is confirmed with respect to DLH and not with respect to ACP, the Plan may become Effective as to DLH and not as to ACP. In the event the Plan is confirmed with respect to ACP and not with respect to DLH, the Plan may become Effective as to ACP and not as to DLH.

13.29. **Exculpation.** Neither the Debtors, nor the Committee, nor any of their respective members, officers, directors, employees, agents, advisors, affiliates, attorneys, accountants, nor any other professional person retained or employed by any of them (collectively, the "**Exculpated Persons**") shall have or incur any liability to any Creditor, Interest holder, or any other person or entity for any act taken or omission made in good faith in connection with or relating to the formulation, negotiation, implementation, confirmation, or consummation of this Plan, including any settlement referenced or described herein, or in connection with or relating to the Disclosure Statement or any document, instrument, note or agreement executed or to be executed and delivered pursuant to the Plan. The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, or any other party in interest in the Debtors' Bankruptcy Case, or any other person or entity, for actions taken or not taken under the Plan, in connection herewith, or with respect hereto, or arising out of their administration of the Plan or distributions of money or property under the Plan, in good faith, including, without limitation, the failure to obtain confirmation of the Plan, or the failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties, rights, and obligations under the Plan.

13.30 **Additional Documents to Be Filed With the Bankruptcy Court.** Certain additional documents necessary for the implementation of the Plan, like the form of the notes to be issued under this Plan, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents so filed may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims or Interests without their consent. The documents so filed are incorporated into and made a part of the Plan as if set forth in full herein. Notwithstanding the foregoing, the terms set forth in the additional documents will be consistent with the provisions and terms set forth in this Plan.

Respectfully submitted,

By: /s/ Mark E. MacDonald
Mark E. MacDonald, TX Bar No. 12758300
Mark E. MacDonald, Jr. IL Bar No. 6217592

MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220; Facsimile: (214) 890-0818
Email: mark@macdonaldlaw.com
**COUNSEL FOR DLH MASTER LAND HOLDING, LLC
AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS
AND DEBTORS IN POSSESSION**

# EXHIBIT A - 1
## POOL 1 - "COMPASS POOL"

| Parcel # | Gross Acres | COMPASS BANK RELEASE PRICE Estimated Claim @ Confirmation | PAR Value - $ / GSF | Total | $ /GSF | $ / Gross Acre | % of PAR | TERM LOAN RELEASE PRICE Estimated Claim @ Confirmation | PAR Value - $ / GSF | Total | $ /GSF | $ / Gross Acre | % of PAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | 12.49 | $ 154,423 | $ 0.28 | $ 38,606 | $ 0.07 | $ 3,091 | 25% | $12,692 | $0.02 | $ 19,039 | $ 0.03 | $ 1,524 | 150% |
| 43 | 129.09 | $ 1,596,032 | $ 0.28 | $ 2,793,056 | $ 0.50 | $ 21,637 | 175% | $131,183 | $0.02 | $ 196,774 | $ 0.03 | $ 1,524 | 150% |
| 44 | 9.95 | $ 123,019 | $ 0.28 | $ 215,283 | $ 0.50 | $ 21,637 | 175% | $10,111 | $0.02 | $ 15,167 | $ 0.03 | $ 1,524 | 150% |
| 45 | 53.92 | $ 666,652 | $ 0.28 | $ 1,166,640 | $ 0.50 | $ 21,637 | 175% | $54,794 | $0.02 | $ 82,191 | $ 0.03 | $ 1,524 | 150% |
| 46 | 52.68 | $ 651,321 | $ 0.28 | $ 1,139,811 | $ 0.50 | $ 21,637 | 175% | $53,534 | $0.02 | $ 80,301 | $ 0.03 | $ 1,524 | 150% |
| 47 | 90.97 | $ 1,124,727 | $ 0.28 | $ 1,968,273 | $ 0.50 | $ 21,637 | 175% | $92,445 | $0.02 | $ 138,667 | $ 0.03 | $ 1,524 | 150% |
| 48 | 0.41 | $ 5,069 | $ 0.28 | $ 7,604 | $ 0.43 | $ 18,546 | 150% | $417 | $0.02 | $ 625 | $ 0.03 | $ 1,524 | 150% |
| 49 | 2.46 | $ 30,415 | $ 0.28 | $ 45,622 | $ 0.43 | $ 18,546 | 150% | $2,500 | $0.02 | $ 3,750 | $ 0.03 | $ 1,524 | 150% |
| 50 | 9.50 | $ 117,455 | $ 0.28 | $ 176,183 | $ 0.43 | $ 18,546 | 150% | $9,654 | $0.02 | $ 14,481 | $ 0.03 | $ 1,524 | 150% |
| 51 | 0.18 | $ 2,225 | $ 0.28 | $ 3,338 | $ 0.43 | $ 18,546 | 150% | $183 | $0.02 | $ 274 | $ 0.03 | $ 1,524 | 150% |
| 52 | 83.09 | $ 1,027,301 | $ 0.28 | $ 1,540,952 | $ 0.43 | $ 18,546 | 150% | $84,437 | $0.02 | $ 126,656 | $ 0.03 | $ 1,524 | 150% |
| 53 | 5.66 | $ 69,979 | $ 0.28 | $ 94,471 | $ 0.38 | $ 16,691 | 135% | $5,752 | $0.02 | $ 8,628 | $ 0.03 | $ 1,524 | 150% |
| 55 | 0.05 | $ 618 | $ 0.28 | $ 835 | $ 0.38 | $ 16,691 | 135% | $51 | $0.02 | $ 76 | $ 0.03 | $ 1,524 | 150% |
| 56 | 81.02 | $ 1,001,708 | $ 0.28 | $ 2,003,416 | $ 0.57 | $ 24,727 | 200% | $82,334 | $0.02 | $ 123,500 | $ 0.03 | $ 1,524 | 150% |
| 57 | 19.00 | $ 234,911 | $ 0.28 | $ 352,366 | $ 0.43 | $ 18,546 | 150% | $19,308 | $0.02 | $ 28,962 | $ 0.03 | $ 1,524 | 150% |
| 58 | 55.34 | $ 684,208 | $ 0.28 | $ 1,026,312 | $ 0.43 | $ 18,546 | 150% | $56,237 | $0.02 | $ 84,356 | $ 0.03 | $ 1,524 | 150% |
| 59 | 13.06 | $ 161,470 | $ 0.28 | $ 201,838 | $ 0.35 | $ 15,455 | 125% | $13,272 | $0.02 | $ 19,908 | $ 0.03 | $ 1,524 | 150% |
| 60 | 8.79 | $ 108,677 | $ 0.28 | $ 135,846 | $ 0.35 | $ 15,455 | 125% | $8,933 | $0.02 | $ 13,399 | $ 0.03 | $ 1,524 | 150% |
| 61 | 9.85 | $ 121,783 | $ 0.28 | $ 152,228 | $ 0.35 | $ 15,455 | 125% | $10,010 | $0.02 | $ 15,015 | $ 0.03 | $ 1,524 | 150% |
| 64 | 25.69 | $ 317,624 | $ 0.28 | $ 397,030 | $ 0.35 | $ 15,455 | 125% | $26,106 | $0.02 | $ 39,160 | $ 0.03 | $ 1,524 | 150% |
| 66 | 37.87 | $ 468,214 | $ 0.28 | $ 468,214 | $ 0.28 | $ 12,364 | 100% | $38,484 | $0.02 | $ 57,726 | $ 0.03 | $ 1,524 | 150% |
| 67 | 106.20 | $ 1,313,027 | $ 0.28 | $ 1,313,027 | $ 0.28 | $ 12,364 | 100% | $107,922 | $0.02 | $ 161,883 | $ 0.03 | $ 1,524 | 150% |
| 68 | 100.00 | $ 1,236,372 | $ 0.28 | $ 1,236,372 | $ 0.28 | $ 12,364 | 100% | $101,621 | $0.02 | $ 152,432 | $ 0.03 | $ 1,524 | 150% |
| 70 | 53.61 | $ 662,819 | $ 0.28 | $ 994,228 | $ 0.43 | $ 18,546 | 150% | $54,479 | $0.02 | $ 81,719 | $ 0.03 | $ 1,524 | 150% |
| 71.2 | 33.53 | $ 414,555 | $ 0.28 | $ 559,650 | $ 0.38 | $ 16,691 | 135% | $34,074 | $0.02 | $ 51,110 | $ 0.03 | $ 1,524 | 150% |
| 79 | 3.80 | $ 46,982 | $ 0.28 | $ 63,426 | $ 0.38 | $ 16,691 | 135% | $3,862 | $0.02 | $ 5,792 | $ 0.03 | $ 1,524 | 150% |
| 80 | 15.42 | $ 190,648 | $ 0.28 | $ 257,375 | $ 0.38 | $ 16,691 | 135% | $15,670 | $0.02 | $ 23,505 | $ 0.03 | $ 1,524 | 150% |
| 81 | 5.00 | $ 61,819 | $ 0.28 | $ 83,455 | $ 0.38 | $ 16,691 | 135% | $5,081 | $0.02 | $ 7,622 | $ 0.03 | $ 1,524 | 150% |
| 82 | 5.00 | $ 61,819 | $ 0.28 | $ 83,455 | $ 0.38 | $ 16,691 | 135% | $5,081 | $0.02 | $ 7,622 | $ 0.03 | $ 1,524 | 150% |
| 83 | 5.00 | $ 61,819 | $ 0.28 | $ 83,455 | $ 0.38 | $ 16,691 | 135% | $5,081 | $0.02 | $ 7,622 | $ 0.03 | $ 1,524 | 150% |
| 84 | 5.30 | $ 65,528 | $ 0.28 | $ 81,910 | $ 0.35 | $ 15,455 | 125% | $5,386 | $0.02 | $ 8,079 | $ 0.03 | $ 1,524 | 150% |
| 85 | 4.20 | $ 51,928 | $ 0.28 | $ 70,102 | $ 0.38 | $ 16,691 | 135% | $4,268 | $0.02 | $ 6,402 | $ 0.03 | $ 1,524 | 150% |
| 86 | 49.61 | $ 613,364 | $ 0.28 | $ 828,041 | $ 0.38 | $ 16,691 | 135% | $50,414 | $0.02 | $ 75,621 | $ 0.03 | $ 1,524 | 150% |
| 88 | 19.85 | $ 245,420 | $ 0.28 | $ 368,130 | $ 0.43 | $ 18,546 | 150% | $20,172 | $0.02 | $ 30,258 | $ 0.03 | $ 1,524 | 150% |

## EXHIBIT A - 1
## POOL 1 - "COMPASS POOL"

| | | COMPASS BANK | | | | | | TERM LOAN | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | RELEASE PRICE | | | | | | RELEASE PRICE | | | | | |
| Parcel # | Gross Acres | Estimated Claim @ Confirmation | PAR Value - $ / GSF | Total | $ /GSF | $ / Gross Acre | % of PAR | Estimated Claim @ Confirmation | PAR Value - $ / GSF | Total | $ /GSF | $ / Gross Acre | % of PAR |
| 89 | 95.49 | $ 1,180,611 | $ 0.28 | $ 885,458 | $ 0.21 | $ 9,273 | 75% | $97,038 | $0.02 | $ 145,557 | $ 0.03 | $ 1,524 | 150% |
| 97 | 10.38 | $ 128,335 | $ 0.28 | $ 173,253 | $ 0.38 | $ 16,691 | 135% | $10,548 | $0.02 | $ 15,822 | $ 0.03 | $ 1,524 | 150% |
| 104 | 25.11 | $ 310,453 | $ 0.28 | $ 388,066 | $ 0.35 | $ 15,455 | 125% | $25,517 | $0.02 | $ 38,276 | $ 0.03 | $ 1,524 | 150% |
| 108 | 8.99 | $ 111,150 | $ 0.28 | $ 83,362 | $ 0.21 | $ 9,273 | 75% | $9,136 | $0.02 | $ 13,704 | $ 0.03 | $ 1,524 | 150% |
| 109 | 8.98 | $ 111,026 | $ 0.28 | $ 83,270 | $ 0.21 | $ 9,273 | 75% | $9,126 | $0.02 | $ 13,688 | $ 0.03 | $ 1,524 | 150% |
| 110 | 8.97 | $ 110,903 | $ 0.28 | $ 83,177 | $ 0.21 | $ 9,273 | 75% | $9,115 | $0.02 | $ 13,673 | $ 0.03 | $ 1,524 | 150% |
| 111 | 8.96 | $ 110,779 | $ 0.28 | $ 83,084 | $ 0.21 | $ 9,273 | 75% | $9,105 | $0.02 | $ 13,658 | $ 0.03 | $ 1,524 | 150% |
| 115 | 18.41 | $ 227,616 | $ 0.28 | $ 170,712 | $ 0.21 | $ 9,273 | 75% | $18,708 | $0.02 | $ 28,063 | $ 0.03 | $ 1,524 | 150% |
| 139 | 1.08 | $ 13,353 | $ 0.28 | $ 18,026 | $ 0.38 | $ 16,691 | 135% | $1,098 | $0.02 | $ 1,646 | $ 0.03 | $ 1,524 | 150% |
| 140 | 3.52 | $ 43,520 | $ 0.28 | $ 58,752 | $ 0.38 | $ 16,691 | 135% | $3,577 | $0.02 | $ 5,366 | $ 0.03 | $ 1,524 | 150% |
| 188 | 4.50 | $ 55,637 | $ 0.28 | $ 75,110 | $ 0.38 | $ 16,691 | 135% | $4,573 | $0.02 | $ 6,859 | $ 0.03 | $ 1,524 | 150% |
| 197 | 4.03 | $ 49,826 | $ 0.28 | $ 67,265 | $ 0.38 | $ 16,691 | 135% | $4,095 | $0.02 | $ 6,143 | $ 0.03 | $ 1,524 | 150% |
| 71-1 | 28.32 | $ 350,140 | $ 0.28 | $ 350,140 | $ 0.28 | $ 12,364 | 100% | $28,779 | $0.02 | $ 43,169 | $ 0.03 | $ 1,524 | 150% |
| 71-3 | 0.58 | $ 7,171 | $ 0.28 | $ 7,171 | $ 0.28 | $ 12,364 | 100% | $589 | $0.02 | $ 884 | $ 0.03 | $ 1,524 | 150% |
| 72-1 | 8.57 | $ 105,957 | $ 0.28 | $ 105,957 | $ 0.28 | $ 12,364 | 100% | $8,709 | $0.02 | $ 13,063 | $ 0.03 | $ 1,524 | 150% |
| 72-2 | 2.54 | $ 31,404 | $ 0.28 | $ 31,404 | $ 0.28 | $ 12,364 | 100% | $2,581 | $0.02 | $ 3,872 | $ 0.03 | $ 1,524 | 150% |
| 72-3 | 6.70 | $ 82,837 | $ 0.28 | $ 82,837 | $ 0.28 | $ 12,364 | 100% | $6,809 | $0.02 | $ 10,213 | $ 0.03 | $ 1,524 | 150% |
| | | | | | | | | | | | | | |
| | 1,352.72 | 16,724,645 | $ 0.28 | $ 22,697,593 | $ 0.39 | $ 16,779 | 136% | $1,374,651 | $0.02 | $ 2,061,976 | $ 0.03 | $ 1,524 | 150% |

|  |  |
|---|---|
| Total Releases as % of Estimated Claim   136% | Total Releases as % of Estimated Claim   150% |
| Estimated Claim @ Confirmation  $ 16,724,645 | Estimated Balance of Term Loan @ Confirmation  $ 2,600,000 |
| Par Value - $ / Acre  $  12,364 | Estimated # of Gross Acres in Pools 1 & 2 @ Confirmation   2,558.52 |
| Par Value - $ / Gross SF  $  0.28383 | Par Value - $ / Acre  $  1,016 |
| | Par Value - $ / Gross SF  $  0.02333 |

**Exhibit A - 2**
**Pool 2 - Hutchins Industrial Pool**

| | | | Acreage | | Secured Creditors | | Term Loan | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Parcel # | Secured Creditor | Pool | Gross | Usable | Estimated Claim at Confirmation | Release Price | Estimated Claim at Confirmation | Par Value - $/psf | Total | $/GSF | $/Gross Acre | % of Par |
| 3 | Van de Green Investments Tract | Pool 2 - Hutchins | 44.18 | 36.79 | $ 2,356,916 | $ 2,356,916 | $ 44,896 | $ 0.02 | $ 67,344 | $ 0.03 | $ 1,524 | 150% |
| 4 | 1086 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 2 - Hutchins | 82.02 | 82.02 | $ 2,247,659 | $ 2,247,659 | $ 83,350 | $ 0.02 | $ 125,025 | $ 0.03 | $ 1,524 | 150% |
| 5 | 1087 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 2 - Hutchins | 133.64 | 130.22 | $ 4,476,910 | $ 4,476,910 | $ 135,807 | $ 0.02 | $ 203,710 | $ 0.03 | $ 1,524 | 150% |
| 8 | Wintergreen 42 Acre Dev. Tract | Pool 2 - Hutchins | 42.73 | 42.73 | $ 957,028 | $ 957,028 | $ 43,423 | $ 0.02 | $ 65,134 | $ 0.03 | $ 1,524 | 150% |
| 9 | Wintergreen Realty Corp. | Pool 2 - Hutchins | 50.80 | 50.80 | $ 1,422,948 | $ 1,422,948 | $ 51,624 | $ 0.02 | $ 77,435 | $ 0.03 | $ 1,524 | 150% |
| 10 | Wintergreen Investment Tract | Pool 2 - Hutchins | 67.75 | 67.75 | $ 1,829,495 | $ 1,829,495 | $ 68,848 | $ 0.02 | $ 103,273 | $ 0.03 | $ 1,524 | 150% |
| 11 | Wintergreen 188 Tract | Pool 2 - Hutchins | 141.51 | 141.51 | $ 3,822,524 | $ 3,822,524 | $ 143,804 | $ 0.02 | $ 215,706 | $ 0.03 | $ 1,524 | 150% |
| 13 | Dallas County Farm Joint Vent. | Pool 2 - Hutchins | 215.62 | 215.62 | $ 4,160,735 | $ 4,160,735 | $ 219,116 | $ 0.02 | $ 328,674 | $ 0.03 | $ 1,524 | 150% |
| 20 | Dallas County Dev. Tract No. 5 | Pool 2 - Hutchins | 99.67 | 95.91 | $ 2,284,558 | $ 2,284,558 | $ 101,286 | $ 0.02 | $ 151,929 | $ 0.03 | $ 1,524 | 150% |
| 28 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 2 - Hutchins | 39.46 | 39.46 | $ 553,207 | $ 553,207 | $ 40,100 | $ 0.02 | $ 60,150 | $ 0.03 | $ 1,524 | 150% |
| 29 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 2 - Hutchins | 31.91 | 31.91 | $ 447,361 | $ 447,361 | $ 32,427 | $ 0.02 | $ 48,641 | $ 0.03 | $ 1,524 | 150% |
| 30 | Forty-Three Acre Investment | Pool 2 - Hutchins | 43.12 | 43.12 | $ 780,837 | $ 780,837 | $ 43,819 | $ 0.02 | $ 65,729 | $ 0.03 | $ 1,524 | 150% |
| 31 | Forty-Three Investment Tract 2 | Pool 2 - Hutchins | 43.06 | 43.06 | $ 779,751 | $ 779,751 | $ 43,758 | $ 0.02 | $ 65,637 | $ 0.03 | $ 1,524 | 150% |
| 34 | 55-Acre Investment Tract | Pool 2 - Hutchins | 55.38 | 55.38 | $ 763,442 | $ 763,442 | $ 56,278 | $ 0.02 | $ 84,417 | $ 0.03 | $ 1,524 | 150% |
| 114 | T.E. Frossard, Jr. | Pool 2 - Hutchins | 114.95 | 114.95 | $ 967,450 | $ 967,450 | $ 116,814 | $ 0.02 | $ 175,220 | $ 0.03 | $ 1,524 | 150% |
| **Pool 2 Totals** | | | **1,205.80** | **1,191.23** | **$ 27,850,821** | **$ 27,850,821** | **$ 1,225,349** | **0.02** | **$ 1,838,024** | **0.03** | **$ 1,524** | |

Note:
All estimated claims will be established at confirmation.  Exhibit A will be
amended accordingly thereafter and substituted in the final confirmation plan.

**Exhibit A - 3**
**Pool 3 - ABOT Pool**

| Parcel # | Secured Creditor | Pool | Acreage | | Secured Creditors | | Term Loan | |
|---|---|---|---|---|---|---|---|---|
| | | | Gross | Usable | Estimated Claim at Confirmation | Release Price | Estimated Claim at Confirmation | Release Price |
| 21 | ABOT | Pool 3 - ABOT | 202.24 | 202.24 | $ 3,510,653 | n/a | n/a | n/a |
| 33 | ABOT | Pool 3 - ABOT | 173.53 | 161.82 | $ 3,338,669 | n/a | n/a | n/a |
| 41 | ABOT | Pool 3 - ABOT | 186.47 | 186.47 | $ 3,590,244 | n/a | n/a | n/a |
| 54 | ABOT | Pool 3 - ABOT | 54.08 | 54.08 | $ 1,041,086 | n/a | n/a | n/a |
| 87 | ABOT | Pool 3 - ABOT | 156.00 | 114.99 | $ 3,025,594 | n/a | n/a | n/a |
| 198-200 | ABOT | Pool 3 - ABOT | 62.52 | 61.19 | $ 2,488,228 | n/a | n/a | n/a |
| 35&38 | ABOT | Pool 3 - ABOT | 121.62 | 121.62 | $ 2,341,424 | n/a | n/a | n/a |
| 39&40 | ABOT | Pool 3 - ABOT | 75.61 | 75.61 | $ 1,455,643 | n/a | n/a | n/a |
| Pool 3 Totals ………………………………………………………………… | | | 1,032.07 | 978.02 | $ 20,791,540 | | | |

Note:

All estimated claims will be established at confirmation.  Exhibit A will be
amended accordingly thereafter and substituted in the final confirmation plan.

**Exhibit A - 4**
**Pool 4 - Seller Notes Pool**

| Parcel # | Secured Creditor | Pool | Acreage | | Secured Creditors | | Term Loan | |
| | | | Gross | Usable | Estimated Claim at Confirmation | Release Price | Estimated Claim at Confirmation | Release Price |
|---|---|---|---|---|---|---|---|---|
| 6 | 1088 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 4 - Other | 106.65 | 104.10 | $ 2,971,811 | n/a | n/a | n/a |
| 14 | 99 Acre Investment Tract | Pool 4 - Other | 98.84 | 98.84 | $ 3,785,438 | n/a | n/a | n/a |
| 15 | Talco Investment Tract | Pool 4 - Other | 101.45 | 94.94 | $ 2,100,623 | n/a | n/a | n/a |
| 19 | Pleasant Run Investment Tract | Pool 4 - Other | 212.33 | 170.38 | $ 4,654,293 | n/a | n/a | n/a |
| 26 | Beltline Investment Tract | Pool 4 - Other | 111.58 | 111.58 | $ 2,491,094 | n/a | n/a | n/a |
| 27 | Greene Road Investment Tract | Pool 4 - Other | 76.10 | 76.10 | $ 1,698,999 | n/a | n/a | n/a |
| 78 | Juanita, Celeste & Eleno Madrigal | Pool 4 - Other | 39.82 | 38.41 | $ 661,916 | n/a | n/a | n/a |
| 16,17,18 | Dallas 216 AC. J.V. | Pool 4 - Other | 215.27 | 200.79 | $ 4,271,740 | n/a | n/a | n/a |
| 161-164 | Coffman Investments | Pool 4 - Other | 94.18 | 77.08 | $ 1,969,465 | n/a | n/a | n/a |
| 22,23 | Pilsner Holding Corp. | Pool 4 - Other | 314.62 | 314.62 | $ 5,355,888 | n/a | n/a | n/a |
| 24,25 | Beltline Investment Tract | Pool 4 - Other | 95.57 | 95.57 | $ 1,921,685 | n/a | n/a | n/a |
| 69 | None | Pool 4 - Other **Auction** | 47.85 | 47.85 | $ - | n/a | n/a | n/a |
| 7 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | Pool 4 - Other - **Auction** | 27.01 | 20.01 | $ 512,732 | n/a | n/a | n/a |
| 177 | William and Linda Ernst | Pool 4 - Other **Auction** | 24.17 | 17.37 | $ 216,116 | n/a | n/a | n/a |
| 98-99 | Roza Frumkin | Pool 4 - Other **Auction** | 193.01 | 170.65 | $ 1,858,588 | n/a | n/a | n/a |
| 93-95 &156-157 | Southport Properties, LP | Pool 4 - Other | 102.82 | 64.61 | $ 2,710,402 | n/a | n/a | n/a |
| **Pool 4 Totals** …………………………………………………………… | | | **1,861.27** | **1,702.90** | **$ 37,180,790** | | | |

Note:
All estimated claims will be established at confirmation.  Exhibit A will be
amended accordingly thereafter and substituted in the final confirmation plan.

Exhibit B:          Disclosure Statement Order

The Disclosure Statement has not yet been approved by the Court, so no such Order exists at this time.  Once the Court has approved the Disclosure Statement, the Order approving the Disclosure Statement will be attached after this page.

Exhibit C:   ACP's Ownership Interest in DLH

# Exhibit A - Summary of ACP and DLH Relationship



**Notes**

When the ownership is expressed as 2 percentages the form x (y), that means the entity owns x% of the capital of the subsidiary and has a y% share in the future income of that subsidiary. The profit percentages (y) in the upper tier entities will apply to future profits only to the extent of Series B Capital in DLH Master Land Holding, LLC.  Once all of Series B Capital has been returned, all future profits will be distributed from the upper tier entities based on the capital percentages (x).  Distributions of future profits from DLH Master Land Holding, LLC will still be based on (y).

Exhibit D:              List of Entities Merged into ACP and DLH

The following entities were merged into Allen Capital Partners, LLC in December, 2009:

Allen Development Limited Partner, LLC, a Delaware limited liability company
Allen Development of Southern California, LLC, a Delaware limited liability company
Allen Development, Inc., a California Corporation

The following entities were merged into the DLH Master Land Holdings, LLC in December, 2009:

Allen Development of Texas, LLC, a Delaware limited liability company
DLH Dallas Langdon 193, LLC, a Delaware limited liability company
DLH Dallas Langdon 634, LLC, a Delaware limited liability company
DLH Hutchins Wintergreen 178, LLC, a Delaware limited liability company
DLH Master Parcel #69, LLC, a Delaware limited liability company
DLH Master Parcel #108-111, LLC, a Delaware limited liability company
DLH Master Parcel #156-157, LLC, a Delaware limited liability company
DLH Master Parcel #16-18, LLC, a Delaware limited liability company
DLH Master Parcel #161-164, LLC, a Delaware limited liability company
DLH Master Parcel #22-23, LLC, a Delaware limited liability company
DLH Master Parcel #24-25, LLC, a Delaware limited liability company
DLH Master Parcel #35-38, LLC, a Delaware limited liability company
DLH Master Parcel #39-40, LLC, a Delaware limited liability company
DLH Master Parcel #42-52 (444.75 Acres), LLC, a Delaware limited liability company
DLH Master Parcel #42-52, LLC, a Delaware limited liability company
DLH Master Parcel #53, 64-65, LLC, a Delaware limited liability company
DLH Master Parcel #55-58, LLC, a Delaware limited liability company
DLH Master Parcel #59-61, LLC, a Delaware limited liability company
DLH Master Parcel #67-68, LLC, a Delaware limited liability company
DLH Master Parcel #70-72 (131.90 Acres), LLC, a Delaware limited liability company
DLH Master Parcel #70-72, LLC, a Delaware limited liability company
DLH Master Parcel #80-83, LLC, a Delaware limited liability company
DLH Master Parcel #85-89, 97, 139, LLC, a Delaware limited liability company
DLH Master Parcel #93-95, LLC, a Delaware limited liability company
DLH Master Parcel #98-99, LLC, a Delaware limited liability company
DLH Master Parcel #10, LLC, a Delaware limited liability company
DLH Master Parcel #104, LLC, a Delaware limited liability company
DLH Master Parcel #106, LLC, a Delaware limited liability company
DLH Master Parcel #11, LLC, a Delaware limited liability company
DLH Master Parcel #114, LLC, a Delaware limited liability company
DLH Master Parcel #115, LLC, a Delaware limited liability company
DLH Master Parcel #13, LLC, a Delaware limited liability company
DLH Master Parcel #14, LLC, a Delaware limited liability company
DLH Master Parcel #140, LLC, a Delaware limited liability company
DLH Master Parcel #15, LLC, a Delaware limited liability company

The following entities were merged into the DLH Master Land Holdings, LLC in December, 2009 (continued):

DLH Master Parcel #177, LLC, a Delaware limited liability company
DLH Master Parcel #188, LLC, a Delaware limited liability company
DLH Master Parcel #19, LLC, a Delaware limited liability company
DLH Master Parcel #197, LLC, a Delaware limited liability company
DLH Master Parcel #21, LLC, a Delaware limited liability company
DLH Master Parcel #198-200, LLC, a Delaware limited liability company
DLH Master Parcel #20, LLC, a Delaware limited liability company
DLH Master Parcel #26, LLC, a Delaware limited liability company
DLH Master Parcel #27, LLC, a Delaware limited liability company
DLH Master Parcel #28, LLC, a Delaware limited liability company
DLH Master Parcel #29, LLC, a Delaware limited liability company
DLH Master Parcel #3, LLC, a Delaware limited liability company
DLH Master Parcel #30, LLC, a Delaware limited liability company
DLH Master Parcel #31, LLC, a Delaware limited liability company
DLH Master Parcel #32, LLC, a Delaware limited liability company
DLH Master Parcel #33, LLC, a Delaware limited liability company
DLH Master Parcel #34, LLC, a Delaware limited liability company
DLH Master Parcel #4, LLC, a Delaware limited liability company
DLH Master Parcel #41, LLC, a Delaware limited liability company
DLH Master Parcel #5, LLC, a Delaware limited liability company
DLH Master Parcel #54, LLC, a Delaware limited liability company
DLH Master Parcel #6, LLC, a Delaware limited liability company
DLH Master Parcel #66, LLC, a Delaware limited liability company
DLH Master Parcel #7, LLC, a Delaware limited liability company
DLH Master Parcel #78, LLC, a Delaware limited liability company
DLH Master Parcel #79, LLC, a Delaware limited liability company
DLH Master Parcel #8, LLC, a Delaware limited liability company
DLH Master Parcel #84, LLC, a Delaware limited liability company
DLH Master Parcel #87, LLC, a Delaware limited liability company
DLH Master Parcel #9, LLC, a Delaware limited liability company
DLH SPE A, LLC, a Delaware limited liability company
DLH SPE B, LLC, a Delaware limited liability company
LPKC 12-16, 18 South Tail, LLC, a Delaware limited liability company
LPKC 1-5, 17, LLC, a Delaware limited liability company
LPKC 6-11, LLC, a Delaware limited liability company
LPKC North Tail, LLC, a Delaware limited liability company

Exhibit E-1 and Exhibit E-2 Financial Projections

The Financial Projections for Reorganized ACP and Reorganized DLH will be filed as a supplement to this Disclosure Statement.

**EXHIBIT F**
**ACP NON DLH ASSETS**

The following is a summary of the assets of Allen Capital Partners, LLC outside of its investment in DLH.

**PROJECT 1: LOGISTICS PARK KANSAS CITY**

The following is an overview and executive summary regarding the development of 530 acres within the development referred to herein as the Logistics Park Kansas City ("LPKC"). The 1,000-acre master-planned development is one of the most sophisticated multi-modal logistics facilities in North America. Unique to the Kansas City Metropolitan Area and the State of Kansas, LPKC is situated adjacent to the NAFTA Corridor ( IH-35), enjoys close proximity to IH-70, IH-29, future IH-49 and New Century Executive Airport, and is adjacent to Burlington Northern Santa Fe's ("BNSF") southern transcontinental main line and proposed Intermodal Facility, which has a planned construction start date in the first quarter of 2011`.

***Kansas City's Logistics and Transportation Profile***
Kansas City's confluence of Interstate Highways, adjacency to BNSF's southern transcontinental main rail line, rail service by four Class I Railroads, major trucking industry, lack of congestion, and proximity to major population centers are all factors making Kansas City is a major transportation and logistics hub.
The Kansas City Metropolitan Area received the following recognition in 2009:

- *Area Development* magazine ranked Kansas City Number 5 for "Top U.S. Distribution Logistics Locations."
- The State of Kansas ranked Number 7 on CNBC's list of "America's Top States for Business in 2009."
- Kansas City is one of the least congested major urban areas in the nation, according to the annual Texas Transportation Institute study of urban mobility.
- *Inbound Logistics* ranked Kansas City as one of the top 15 logistics hotspots in the nation.
- Kansas City was featured in *World Trade Magazine* as one of the best cities for a company expansion or relocation project.
- MarketWatch ranked Kansas City in the top 25 Best cities for business.

In addition, Kansas City has the following attributes:

- The largest rail center in the United States by tonnage
- More Foreign Trade Zone space than any other U.S. city
- Located at the intersection of three of the nation's major interstate highways ( I-35, I-70, I-29) and soon to be a fourth – I-49.
- The heart of the NAFTA corridor
- Third largest trucking hub in the U.S.

Finally, LPKC has all of the characteristics of an Inland Port. According to a report produced by Heitman Real Estate, an investment management firm, an Inland Port is characterized by seven (7) key attributes:

- Access to major container seaports
- Intermodal facility serviced by a Class I railroad
- Minimum of 1,000 acres of total land
- Foreign Trade Zone status
- Strong local market access (e.g. near a major metropolitan area)
- Nearby access to north/south and/or east /west interstate highways
- Access to a strong local labor pool

### *LPKC Real Estate*

With inexpensive land costs, lease and drayage rates, as well as a strong available workforce from nearby farming communities and convenient interstate highway access, LPKC is extraordinarily equipped to be one of America's premier logistics facilities. Production workers in Kansas City contribute 40% more value added per hour than the national average, as measured by the U.S. Bureau of the Census. LPKC is adjacent to the planned 570-acre Burlington Northern Santa Fe Intermodal Facility ("IMF"), which will begin construction in the first quarter of 2011 and be fully operational in the First Quarter of 2013. The new IMF will replace BNSF's existing international and domestic container and trailer transloading facilities that are currently located in Kansas City, Kansas. Upon completion of the new intermodal facility in Edgerton, Kansas, BNSF will transfer all of its Kansas City intermodal operations to the new facility.

Today, BNSF's existing IMF is operating at +/-300,000 lifts per year and has a capacity of approximately +/-330,000 lifts per year. Upon completion of the new IMF located at LPKC, BNSF will have an operating capacity of +/-500,000 lifts per year and will have the ability to expand to +/-1,000,000 lifts per year. The incremental increase from +/- 300,000 lifts per year to +/- 500,000 lifts per year represents approximately 11,000,000 square feet of warehouse demand. The future expansion to +/- 1,000,000 lifts per year represents a demand for an additional 26,000,000 square feet of warehouse/distribution center space in the Kansas City Metropolitan Market.

As an illustration of the impact of BNSF's project, approximately 4,200,000 square feet of distribution space has been built in the Kansas City Metropolitan area citing BNSF's Intermodal Facility as a factor in the location decision. The majority of this space has been built in the South Johnson County sub-market, home of LPKC.

BNSF's plans to increase intermodal capacity in Kansas City represents a substantial real estate opportunity. Every 10,000 containers represents approximately 1,000,000 square feet of vertical development opportunities. The near term increase from +/- 300,000 lifts per year to +/- 500,000 lifts per year represents 20,000,000 square feet of vertical development opportunities. BNSF's future expansion from +/- 500,000 lifts per year to +/- 1,000,000 lifts per year, represents 50,000,000 square feet of additional vertical development opportunities for a total potential

impact of 70,000,000 square feet of vertical development. LPKC seeks to capture a relatively small portion of this growth.

In addition to the demand generated by the incremental growth in intermodal shipping containers, near term opportunities include the relocation of existing facilities from the vicinity of BNSF's Argentine Intermodal facility to LPKC and traditional rail-served buildings. Approximately ½ of the LPKC site will provide for direct rail-served buildings. According to local real estate brokers, a number of rail-served real estate opportunities currently bypass the Kansas City market due to the lack of rail-served sites. LPKC will remedy this through an agreement with BNSF that will provide for the construction of an industrial lead track to serve LPKC buildings.

According to CBRE's fourth quarter 2009 industrial real estate report for the Kansas City Metropolitan Area, the market includes 233,505,447 square feet of industrial space, the market absorbed 1,668,477 square feet in the fourth quarter, and the vacancy rate at the end of the quarter was 8.2%. There is a lack of modern distribution space in the market. One broker reported that there are less than five vacant spaces in the market available to provide over 100,000 square feet of contiguous Class A distribution space, and the vacancy rate in the over 100,000 square feet market segment is less than 3.5%. Combining the incremental growth in intermodal shipping, relocation opportunities brought about by the ultimate closure of Argentine, the development of much needed direct rail-served sites and relatively little space available in the market results in substantial near term opportunities for LPKC.

In response to the announcement that BNSF will begin construction in 2010, ACP has received strong feedback from end users. As of August 10th, 2010, ACP has responded to a build-to-suit lease proposal for a 317,000 square foot distribution center and has total prospect activity of 3,077,000 square feet, representing approximately 250 acres of development.

### *Public-Private Partnerships/ Infrastructure Advantages*
With full build-out planned to include more than seven million square feet of distribution, warehouse, and office (flex) space, it is estimated that LPKC will create more than 7,000 new direct and indirect jobs and generate a total estimated economic impact in excess of $7 billion to the State of Kansas.

| PUBLIC FUNDING COMMITTED FOR INFRASTRUCTURE IMPROVEMENTS | |
|---|---|
| **Funding Entity** | **Funding Committed** |
| City of Edgerton | $ 42,000,000 |
| Johnson County | $ 14,000,000 |
| State of Kansas Inducement to BNSF | $ 35,000,000 |
| Kansas Department of Transportation (KDOT) | $ 25,000,000 |
| TOTAL | $ 116,000,000 |

Since 2007, LPKC has received approval of State Legislation to backstop bonds associated with the public infrastructure and has received in excess of $116 million in grant and public/private partnership commitments from various government entities for public infrastructure development. Because the logistics park provides positive economic impacts for multiple jurisdictions (City of Edgerton, Johnson County, and State of Kansas), achieving this government support took an extraordinary amount of negotiation and effort. The funding for these public infrastructure projects has added tremendous value to the development. These funds will finance the major arterial road improvements on the perimeter of LPKC and provide vital links from LPKC to the interstate highways, inclusive of a new interchange on Interstate 35.

 As part of the public-private partnership, the City has agreed to fund in excess of $15 million in infrastructure improvements within the LPKC site. This is extremely rare in the Johnson County sub-market and represents a substantial competitive advantage for LPKC. By comparison, a nearby 98 acre site in southern Olathe is subject to a $6 million contribution by the developer for offsite infrastructure in order to develop the "pad ready" site. This has the net effect of increasing the land costs by $1.41/sf.

The existing street infrastructure and contemplated staging of additional street improvements, combined with limited sanitary sewer and water infrastructure present substantial barriers to competitors entering the market within five miles of LPKC. These development agreements providing infrastructure along with our low land basis will make it extremely dfficult for competitors to enter the market seved by BNSF's new intermodal facility.

Concurrent with the issuance of a Notice to Proceed by BNSF, the City will begin construction of sewer and water infrastructure, the County will begin construction of 191st Street, and ACP will begin site grading valued at $6mm to prepare 200 acres of LPKC for pad-ready development. The ultimate goal is to create bulk land fully improved and equipped for sale, ground lease, or vertical development.

## LPKC Project Specific Risk Factors
One of LPKC's primary assets is its option to purchase land from BNSF. At this time, the option exercise date would require LPKC to pay BNSF approximately fourteen million ($14,000,000), potentially as soon as May, 2011.

ACP believes that so long as Richard Allen maintains ownership and management of LPKC that the business relationships that he has developed with the BNSF will lead BNSF to not require strict compliance with the option exercise date for the LPKC land totally approximately $14 million dollars in 2012. That good will with the BNSF has been generated because the Allen team far exceeded the performance expectations of BNSF under the original option agreement. That original agreement only required LPKC to obtain approximately $12 million dollars in public funding support for the project. In fact, LPKC successfully obtained more than $100 million dollars of such support for the project by the effective date of the ACP plan.

ACP believes that it is reasonably likely that it will have generated approximately $5 million dollars in cash which should meet the LPKC capitalization requirements to extend option past May 2011. Separately, LPKC is continuing to actively pursue several joint venture prospects.

One projection concerning LPKC attached to this disclosure statement assumes that LPKC closed under the terms of a letter of intent from one such prospect and, received $4.5 million dollars of cash which could be upstreamed to LPKC and obtained a carried interest for 25% of the projected proceeds less advances for operating overhead. That offer was made at a time when LPKC would not have been able to generate the cash fund which it anticipates as of the effective date of ACP's plan and at a time prior to substantial overhead reduction projections concerning LPKC administrative overhead. Whether better terms could be obtained is as yet undetermined.

Whether LPKC simply sells land and attempts limited vertical development based upon presale of bill to suits involving highly credit worthy tenants is still open to question. The industrial building market in Kansas City substantially differs from Dallas in that there is approximately 1% vacancy in industrial buildings; furthermore BNSF is actively engaged in constructing its Kansas City intermodal which is generating substantial interest in the project.

## LPKC Expense Reimbursement – Edgerton
In addition to the foregoing, ACP will receive an expense reimbursement from the city of Edgerton, Kansas, when BNSF begins construction on the intermodal facility. Construction is scheduled to begin in the fourth quarter of 2010.

## Project Summary
LPKC represents a unique real estate opportunity in a market that has relatively low vacancy rates, near term demand drivers, barriers to competition, public support, and significantly reduced risks.
Considerable project risks have been mitigated to date by:
1) The acquisition of the 1,000 acre by BNSF Railway.

2) BNSF's $60 million spent to date in the development of their new IMF.
3) The State of Kansas' commitment to provide $35 million to BNSF in order to support the construction of the intermodal facility.
4) Agreements with the City of Edgerton to grant real estate property tax abatements.
5) More than $100 million dollars of public infrastructure support, and
6) Securing all necessary entitlements for the development of LPKC"s land.

ACP has the exclusive right to purchase the 530 acres of land associated with LPKC. ACP has started the design for the horizontal development of the critical road, water and sewer infrastructure expansions and upgrades.

### Conclusion

ACP has expended significant resources to secure the option to purchase the land, aggregate and secure entitlements for the underlying property that will constitute LPKC.

With continued growth in global trade driving a specific need for an Inland Port with warehouse and distribution facilities within a two day drive of two thirds of the U.S. population, the unique features of LPKC will mitigate market risks. The LPKC has leveraged ACP's 20 years of industrial real estate experience to assemble and entitle this massive new Inland Port project. Using a strategy of build-to-suit, limited speculative building and land sales, the asset will generate a very significant risk-adjusted rate of return over a 10-year period.

## PROJECT 2: ROSEDALE

The Rosedale Project is an 84-acre planned development located along Rosedale Highway (State Hwy-58) in Bakersfield, California. This 84-acre tract is located in the center of the City, in an area primed for redevelopment because of new road infrastructure which is now under construction.

The site fronts on Rosedale Highway, one of the busiest roads in the City, and is less than 2 miles west of Highway 99. Because of increasing traffic congestion in the area, the City of Bakersfield has recently commenced construction on a new north/south road which will come out of the central business district to the south of this site, cross the Kern River and Rosedale Highway, and bisect the center of our 84-acre tract. At full build-out, this road will be a 6-lane divided road providing direct access to Bakersfield's central business district and its intersection with Rosedale Highway will create the highest traffic count intersection in the City.

Given the obvious advantages this new road will create in terms of access and exposure for this land, coupled with a lack of quality retail developments in the Bakersfield market, ACP believes this is a prime location for a major mixed-use project.

### Asset History

This project is a Joint Venture with the original land owners, which was entered into in 2006. ACP has spent several years master planning a large regional mall with office and hospitality elements, hired marketing and planning consultants, and presented the project in major retail trade shows. ACP also negotiated an Annexation and Development Agreement with the City of Bakersfield and agreed to the dedication of right of way and the alignment of the proposed new road through the site.

However, when the economic downturn occurred, ACP was forced to put the project on-hold because the majority of the retail tenants ACP was in discussions with stopped expanding. Since that time ACP has rethought the project on a somewhat smaller scale as a true mixed-use development. The new plan includes equal elements of retail and office, as well as hospitality and food and beverage pads.

In early 2010, the City of Bakersfield began construction on the new north/south road. ACP anticipates it will be 18-24 months before the bridge over the Kern River is complete and the road is completed to the southern boundary of our property. At that point, work to extend the road through the subject property will commence and ACP believes it will actively begin closing deals on the site.

*Capital Structure*

This is a Joint Venture with the original land owner and is structured in such a way that ACP will enjoy 50% of all vertical development profits and 20% of any land sale profits.

The joint venture partners have contributed the land to the Joint Venture in exchange for a Capital Account credit that is now worth approximately $20,000,000. The vast majority of early cash flow from the project will go to reduce their Capital Account, so it will be several years into the development before ACP begins to realize substantial funds. Aside from the Capital Account Credit, there is no other debt on the project.

*Project Specific Risk Factors*

There appears to be little doubt that the joint venture entities with which an ACP's subsidiary participates in the Rosedale LLC will attempt to forfeit or buyout the ACP subsidiary's interest at a de minimis price if ACP does not continue in operation and control of Rosedale. A motion to vacate stay was filed and subsequently withdrawn by those joint venture parties because they sit on the Official Creditors Committee and the US Trustee would have insisted that they leave the committee if they moved to terminate the interest during the bankruptcy case. The revenue from Rosedale is behind a preferred return to the co-venture parties of more than $17 million

dollars and is not projected to occur until approximately six years after the effective date. Although ACP regards its interest in Rosedale as valuable and arguably could protect its interest from forfeiture or lowball buyout by bringing in an additional investment partner in its position, any event which would terminate ACP's control, like the appointment of a Chapter 7 Trustee for ACP, would probably result in ACP being unable to preserve and protect the Rosedale asset.

*Exit Strategy*

The plan is to begin developing the project in approximately 2 years to coincide with the completion of the new north/south road. ACP anticipates it will take 10 years to fully develop the entire 84-acre site. ACP envisions initial development will include a hotel and food and beverage pad sales, along with speculative office construction. By 2013, ACP believes the economy will be sufficiently recovered to allow it to begin marketing a large retail center on the site and plans to build and lease up this 39-acre retail center over the course of 3 years - eventually selling it in 2016. The remainder of the land will be developed for office use at the rate of one 43,000 square foot building a year, with all buildings being marketed for sale as soon as they are stabilized.

## PROJECT 3: INTERNATIONAL TRADE AND TRANSPORTATION CENTER

The International Trade and Transportation Center (ITTC) is a 700-acre rail-served logistics park located in Shafter, California, northwest of Bakersfield. Located just 2 hours north from the Ports of Los Angles and Long Beach and 4 hours from the Port of Oakland, ITTC is well positioned in the California's southern central valley for west coast distribution.

ITTC provides customers with direct rail service from the BNSF Railway's mainline and easy access to both Interstate 5 and State Highway 99 – California's two major trucking corridors. In addition to these logistical advantages, ITTC also offers features such as a Foreign Trade Zone (#202), California Enterprise Zone and access to air-cargo facilities at the Bakersfield International Airport.

Being located in the greater Bakersfield area provides access to a vast labor pool, low real estate costs and adjacent rail and highway infrastructure. This all contributes to make ITTC the perfect logistics solution to reduce a company's overall operating costs and streamline the supply chain process.

*Asset History*

ACP began acquiring land for what would eventually become the ITTC in the mid 1990's. The purchase of the land was negotiated as an optioned-take down with the land sellers. To date,

ACP has exercised its option and closed on approximately 500 acres of land within the park and retains a very inexpensive option to purchase the remaining 200 acres of land at a future time should ACP decide to do so.

Of the 500 acres ACP has taken down to date, approximately 200 acres has been developed. ACP sold the majority of those 200 acres to Target in 2003 to allow them to build what has now become a 2 million square foot distribution center in the park. In addition to the Target facility, ACP has completed 2 speculative industrial buildings within the park; the 168,000 square foot ITB Building #1 completed in 2001, and the 288,000 square foot ITB Building #6 completed in 2007. Both buildings are fully leased. As discussed below, ITB Building #6 was subsequently sold during the Chapter 11 proceedings.

ACP, through its subsidiaries, currently owns approximately 300 acres of land at the ITTC for future development. There is no debt on this land.

*Capital Structure*

ITTC Land is owned by entities owned and controlled by Allen family members. Specifically, the ownership structure of ITT Land is as follows:

- Allen Capital Partners                         25%
- Allen Family Partnership                       45%
- Commercial Marketing Group (Rex Allen)         25%
- RE Allen                                        5%.

*Transaction during Chapter 11 Proceeding*

On or about September 30, 2010, 38.07 acres in this project were sold to a third party buyer in an arms' length transaction. ACP received proceeds of $106,000 from this transaction. ITTC Land, LLC held back $426,000 from the total proceeds to provide for parcel maps, surface waivers and other similar costs required to allow for future land sales.

On or about October 26, 2010, ITTC Building #6, LLC sold its industrial building to a third party buyer in an arms length transaction. ACP's share of the proceeds was $693,250.

*Exit Strategy*

ACP believes the quickest and most efficient exit strategy for the park would be to aggressively pursue land sales. ACP has recently completed negotiations with an oil field services company to purchase 40 acres within the park, and has received interest from several other similar companies regarding additional land purchases.

Based on straight land sales assumptions, ACP believes it will sell the remaining 300 acres within 8 years. This assumes an average of 38 acres sold each year, which ACP believes to be a fairly conservative estimate given that mega users such as Target have already validated the park as a viable location for 2 million-plus square foot distribution facilities. Based on ACP's history and experience with the speculative buildings it has constructed in the past, ACP believes the Bakersfield market would be receptive to additional buildings; however, given the current debt market, ACP does not believe it can acquire the required financing at this time. Perhaps in the future, as the debt markets improve, speculative construction can be considered; however, for cash flow projection purposes (see **Exhibit E**), ACP has taken the more conservative approach of only considering land sales.

## PROJECT 4: KELLY CORPORATE CENTER

*Asset Description and History*

The Kelly Corporate Center is a planned 4-building office complex located in Carlsbad, California. Currently, 3 of the 4 planned buildings have been completed, and a 3.7 acre vacant land parcel exists for future construction of the 4th building. The three existing buildings can be described as follows;

### Kelly Corporate Center I

Kelly I is a 2-story 72,000 square foot multi-tenant office building. The building was completed in 2001 and is currently 42% leased.

ACP is a partner in this building with the original land owners, the Kelly family. ACP has a 40% promote interest in the building, and a 32% interest in the remaining 60% capital interest in the building. Based on these interests, ACP is entitled to approximately 53% of any net proceeds from a sale of the asset.

The building is currently encumbered with permanent debt of approximately $10,300,000.

### Kelly Corporate Center IIB

Kelly IIB is a 48,000 square foot 2-story office building. This building was completed in 2002 and has been entirely occupied by the GSA Department of Fish and Wildlife since that time. The GSA lease expires later this year, but ACP is currently negotiating an extension and believes they will remain as a tenant in the majority of the building.

ACP is a partner in this building with the original land owners, the Kelly family. The entity which owns Kelly I described above is a 55% owner in Kelly IIB, making for a relatively complicated ownership structure as it flows through to the partners. Based on these interests, ACP is entitled to approximately 45% of any net proceeds from a sale of the asset.

The building is currently encumbered with permanent debt of approximately $7,600,000.

**Kelly Corporate Center IIC**

Kelly IIC is a 75,000 square foot 3-story multi-tenant office building. This building was completed in 2007 and is still in the initial lease-up phase. The building is currently 40% leased.

ACP is a partner in this building with the original land owners, the Kelly family. As with Kelly IIB, the entity which owns Kelly I is a 55% owner in Kelly IIC, making for a relatively complicated ownership structure as it flows through to the partners. Based on these interests ACP is entitled to approximately 57% of any net proceeds from a sale of this asset.

The building is currently encumbered with debt of approximately $13,000,000; however, this is a construction loan and a permanent loan needs to be negotiated with the current lender or new lender within 12-18 months. The vacant portion of this building is also in shell condition, so as future leases are completed we will need to draw down TI allowances from the construction loan to complete the lease up.

*Project Specific Risk Factors*

ACP's interest in the Kelly property (which is subject to the security interest of Tim Foley for any revenues received from that property) is actively being threatened for foreclosure by Bank of America. Although ACP has been actively negotiating to attempt to induce it to provide further breathing space to turn around Kelly properties, there is no assurance that the bank will cooperate. If that property is lost and Foley does not intervene to attempt to preserve his collateral, the amount of unsecured claims in ACP would be increased by approximately $8 million dollars. We believe that it highly unlikely that a Chapter 7 trustee could obtain agreement of the bank when ACP with many years of positive banking relationships with that institution has been unable to do so.

*Exit Strategy*

ACP believes Kelly IIB can be placed on the market for sale as soon as it finalizes the lease renewal with GSA. This should occur within the next 12 months.

Both Kelly I and Kelly IIC will require substantial time for lease-up given the current state of the Carlsbad office market. ACP has conservatively estimated that it can have both of these buildings fully leased-up within the next 4 years, at which time ACP would place both of these buildings on the market for sale.

Rather than developing the 4th planned building ourselves, ACP believes the quickest path to liquidity would be to sell the vacant 3.7 acre parcel to a developer/user. ACP anticipates it will sell the parcel within 2 years.

## PROJECT 5: VISALIA OFFICE

### *Asset Description and History*

ADCC Visalia Office Partners, LLC owns a 7,624 square foot office building in Visalia, California. The building was constructed in 2003 and is currently fully leased to the following tenants;

- Allen Development of Central California, LLC (subsidiary of ACP) – 2,663 square feet
- Teter Consultants (Architect and Engineering Firm) – 4,961 square feet

### *Capital Structure*

ACP, through its wholly owned subsidiaries, owns 75% of ADCC Visalia Office Partners, LLC. The remaining 25% is owned by TDR Partnership, an affiliate of Teter Consultants.

The building currently has approximately $1,131,000 of debt.

### *Exit Strategy*

We are considering placing the building on the market. We currently have a local group who has expressed interest in acquiring the building. If their interest does not result in a sale, a local broker will be retained to formally market the property.

## PROJECT 6: TUCKER BUILDING REIMBURSMENT

### *Asset Description and History*

Allen Capital Partners, LLC holds a 20% interest in Tucker B Partners, LLC which owns a 102,000 square foot industrial building located in Visalia, California. The building was constructed in 1998 and is currently fully leased to the following tenants;

- Jim's Formal Wear – 34,000 square feet
- Walco International – 68,000 square feet

In 2003, Walco leased 68,000 square feet, requiring significant tenant improvements. ACP provided the funds for the improvements and currently carries a balance of approximately $380,000 as a receivable from Tucker B Partners, LLC. ACP is receiving monthly payments of principal and interest in the amount of $8,147 and the balance will fully amortize in 2017.

Tucker B Partners, LLC is currently working on refinancing a maturing 10-year loan. The projected proceeds from the refinance will be sufficient to payoff of the entire $380,000 due to ACP.

## PROJECT 7: MIDSTATE JACUZZI 117

The Jacuzzi Land is a 117-acre tract that is part of the larger Midstate 99 Distribution Center ("Midstate Park" or "Park") located in Visalia, California. The Midstate Park is a 400-acre logistics and distribution center that offers direct mainline rail service from the Union Pacific Railroad.

The main logistical advantage of the Midstate Park is its location in the geographic and population center of the state, making it an excellent location for companies needing to distribute their goods to both northern and southern California. The park is located just minutes from Hwy-99 and enjoys the advantage that the City of Visalia is the only place in the state which offers overnight ground shipping via UPS to 98% of California. Because of this geographical advantage, the Visalia market, and Midstate Park in particular, have become the location of choice for numerous UPS shippers.

In addition to the logistical advantages, the Park also offers Foreign Trade Zone and California Enterprise Zone benefits to users who choose to locate there.

### *Asset History*
ACP began acquiring the land that would become the Midstate 99 Distribution Center in the late 1990's. Since that time, nearly 200 acres of the Park have been sold or developed, resulting in the construction of 11 different buildings totaling over 2,700,000 square feet.

Examples of the largest deals in the Park include a 600,000 square foot facility for JoAnne Stores, a 250,000 square foot build to suit for International Paper, and an approximate 1,000,000 square foot facility for Vanity Fair Corporation.

In addition to these large deals, another 8 speculative industrial buildings, ranging in size from 98,000 to 220,000 square feet, have been constructed and leased up over the last 10 years.

The Park currently has approximately 200 acres of undeveloped land available for sale or building construction, of which the Midstate Jacuzzi 117 acre tract is a part.

### Capital Structure

ITTC Land is owned by entities owned and controlled by Allen family members. Specifically, the ownership structure of ITT Land is as follows:

The capital structure of Jacuzzi Land is as follows:

- Allen Capital Partners      25%
- Allen Family Partnership      45%
- Point Property Group (Rex Allen)      25%
- RE Allen      5%.

In addition to the capital side of the project, the structure of the profits interest is as follows:

- Allen Capital Partners      15%
- Allen Development of Central California      40%
- Allen Family Partnership      27%
- Pointe Property Group (Rex Allen)      15%
- RE Allen      3%.

The current debt on the land totals approximately $4,200,000.

### Exit Strategy

ACP believes the quickest and most efficient exit strategy for the remaining land in the Park would be to aggressively pursue land sales. Keeping in mind that the 117-acre Jacuzzi tract would be marketed in conjunction with the other remaining land in the Park, ACP anticipates it will sell off the 117 acres in 6 years.

Based on ACP's history and experience with the spec buildings it has constructed in the past, ACP believes the Visalia Market would be receptive to additional spec vertical development; however, given the current debt market ACP, does not believe it can acquire the required financing at this time. Perhaps in the future as the debt markets improve, speculative construction can be considered on this land; however, for cash flow projection purposes (see Exhibit E), ACP has taken the more conservative approach of only considering land sales.

**EXHIBIT G - ALLEN CAPITAL PARTNERS, LLC NON-FILED SUBSIDIARIES**

| Entity Name | Purpose of Entity | ACP Direct or Indirect Ownership |
|---|---|---|
| **Entities owning completed buildings - some fully leased others partially leased or vacant.** | | |
| Midstate Hayes Building No.5, LLC | Owns an industrial building in Visalia, CA | 40.00% |
| Midstate Hayes Building No.6, LLC | Owns an industrial building in Visalia, CA | 40.00% |
| ADCC Visalia Office Partners, LLC | Owns and office building in Visalia, CA | 75.00% |
| ADI Coast Partners, LP | Owns an industrial building in Visalia, CA | 5.00% |
| Tucker B Partners, LLC | Owns an industrial building in Visalia, CA | 20.00% |
| ITTC Building No. 6, LLC | Owns an industrial building in Shafter, CA | 55.00% |
| Kelly Corporate Center IA, LLC | Owns office building in Carlsbad, CA | 54.29% |
| Kelly Corporate Center IIA, LLC | Owns office building in Carlsbad, CA | 47.91% |
| Kelly Corporate Center IIC, LLC | Owns office building in Carlsbad, CA | 47.91% |
| River Plaza Partners II, LLC | Owns office condo project and 5 acres of land in Sacramento, CA | 50.00% |
| | | |
| **Entities owning land held for development or sale** | | |
| Midstate 99 Distribution Center, LLC | Owns 117 Acres of Industrial Land in Visalia, CA | 55.00% |
| BF Airport Partners, LLC | Owns 107 acres in Bakersfield CA | 50.00% |
| Rosedale Land Ventrure, LLC | Owns 87 Acres in Bakersfield CA | 50.00% |
| ITTC Land, LLC | Owns 277 acres in Shafter CA | 25.00% |
| DLH Master Parcel #62-63, LLC | Owns 50 acres in DLH | 100.00% |
| | | |
| **Commercial Developer Entities** | | |
| Allen Development of Central CA, LLC | Development and Management Services for CA and DLH | 100.00% |
| Allen Development of ITTC,LLC | Developer for the ITTC Industrial Park | 100.00% |
| Internatial Trade & Transportation Center, LLC | Developer for the ITTC Industrial Park | 100.00% |
| Allen Development of Sacramento, LLC | Developer of Sacramento Projects | 100.00% |
| The Allen Group - Kansas City, LLC | Developer of the Kansas Industrial Park | 100.00% |
| | | |
| **Various other types of entities - mostly holding companies** | | |
| Allen Development Partners, LLC | Holding Company, owns ADCC, ADS and ADITTC | 100.00% |
| Allen Employment Services, Inc. | Employer | 100.00% |
| Allen Homebuilding Partners, LLC | Holding Company, owns AHCC, AHN, AHIV, AHSC | 100.00% |
| Allen Industrial Partners, LLC | Capital Investor in CA Industrial Parks | 25.00% |
| Central Valley Holdings, LLC | Capital Investor in residential projects | 100.00% |
| TAG Holdings, LLC | Capital Investor in DLH | 28.12% |
| Allen Rosedale Land I, LLC | Holds the promote interest in Rosedale Land Venture I | 100.00% |
| ITTC Building, LLC | Holding company for ITTC Buildings | 55.00% |
| ADI River Plaza, LLC | Holds the promote interest in River Plaza Partners II, LLC | 50.00% |
| Kelly Corporate Center I, LLC | Holding Company for Kelly I building and holds an interest in Kelly II holding company | 54.29% |
| Kelly Corporate Center II, LLC | Holding Company for Kelly IIA and IIC Buildings | 47.91% |

**EXHIBIT G - ALLEN CAPITAL PARTNERS, LLC NON-FILED SUBSIDIARIES**

| Entity Name | Purpose of Entity | ACP Direct or Indirect Ownership |
|---|---|---|

**Commerical Entities - no longer hold any real property assets.  Buildings have been sold, only minor cash**
**balances retained for final tax, accounting etc.  Entity is kept alive for 2 years following year of sale.**

| Entity Name | Purpose of Entity | ACP Direct or Indirect Ownership |
|---|---|---|
| Midstate 99 Distribution Building No. 2, LLC | No activity - previously owned a building | 55.00% |
| Midstate Hayes Building No.1, LLC | No activity - previously owned a building | 55.00% |
| Midstate Hayes Building No.2, LLC | No activity - previously owned a building | 55.00% |
| Midstate Hayes Building No.3, LLC | No activity - previously owned a building | 55.00% |
| Midstate Hayes Building No.4, LLC | No activity - previously owned a building | 40.00% |
| ADSC Diamante, LLC | Previously owned a building in San Diego | 60.00% |

**EXHIBIT G - ALLEN CAPITAL PARTNERS, LLC NON-FILED SUBSIDIARIES**

| Entity Name | Purpose of Entity | ACP Direct or Indirect Ownership |
|---|---|---|
| **Old Residential Entities - no longer hold any real property assets.  Only have minimal cash balances, no other assets or liabilities.  Entity is kept alive for 10 years after last home sale.** | | |
| Allen Homes of Central California, LLC | Developer of central CA residential projects | 100.00% |
| Allen SJV Housing Investors I, L.P. | Capital investor in central CA residential proejcts | 6.25% |
| Allen SJV Housing Investors II, L.P. | Capital investor in central CA residential proejcts | 6.25% |
| Craftsman Collection at Claremont Grove Holding, LLC | Holding company for residential project | 100.00% |
| Craftsman Collection at Del Lago Holding, LLC | Holding company for residential project | 100.00% |
| Craftsman Collection at Glennview Holding, LLC | Holding company for residential project | 25.00% |
| Craftsman Collection at Linwood Ranch Phase III Holding, LLC | Holding company for residential project | 25.00% |
| Craftsman Collection at Selma Holding, LLC | Holding company for residential project | 100.00% |
| Craftsman Collection at Sierra Ranch Holding, LLC | Holding company for residential project | 100.00% |
| Craftsman Collection at Sierra Ranch Phase IIC Holding, LLC | Holding company for residential project | 25.00% |
| Heritage at Del Lago Holding, LLC | Holding company for residential project | 100.00% |
| Hunters Crossing Holding, LLC | Holding company for residential project | 25.00% |
| MAH Linwood Ranch Holding, LLC | Holding company for residential project | 100.00% |
| MAH Rancho Santa Barbara Holding, LLC | Holding company for residential project | 100.00% |
| MAH Suncrest Holding, LLC | Holding company for residential project | 100.00% |
| Allen Homes of Imperial Valley, LLC | Developer of Imperial VAlley residential projects | 100.00% |
| AHIV Holding, LLC | Holding company for residential project | 70.00% |
| Allen Homes of Nevada, LLC | Developer of Nevada residential projects | 100.00% |
| Aleln Construction Services, LLC | Developer of Nevada residential projects | 100.00% |
| Altair at Green Valley, LLC | Developed and sold condos in Las Vegas | 55.00% |
| Covington Crossing, LLC | Developed and sold condos in Las Vegas | 55.00% |
| Rancho Santa Fe at Mesquite, LLC | Developed and sold homes in Mesquite | 47.50% |
| Sedona at Mesquite, LLC | Developed and sold homes in Sedona | 55.00% |
| Town Center Associates, LLC | Developed and sold condos in Las Vegas | 27.50% |
| ACP/SCH Holdings, LLC | Holding company for residential project | 80.00% |
| Allen Homes of Southern CA, LLC | Developer of Southern CA residential projects | 100.00% |
| Allen Hermosa Homes Holding, LLC | Holding company for residential project | 59.60% |
| SCH Torrey II, LLC | Developed and sold homes in Southern CA | 32.00% |
| SCH Torrey III, LLC | Developed and sold homes in Southern CA | 75.00% |

Exhibit H:              Additional Risk Factors

A revised Exhibit H will be filed as a supplement to this Disclosure Statement.

# Exhibit I    Liquidation Analysis

The following is a discussion of the liquidation of the assets of Allen Capital Partners, LLC ("ACP"). It assumes that an impartial trustee is appointed by the bankruptcy court to administer the case and liquidate ACP's non-exempt assets over a 6-month period. In the case of ACP, all of the assets are non-exempt.

ACP is an entity formed in 1999 and is wholly owned by Richard S. Allen. It invests capital in office and industrial projects in California, Texas and Kansas.

In addition to the capital invested, it has provided construction loan guarantys and, through its subsidiaries, the development expertise and resources required to develop its various investment projects. In exchange for those services, ACP typically receives an additional profits interest in each project ranging from 40% to 50% of the profits after capital and preferred return have been paid to the capital partners.

ACP has invested capital of approximately $15,000,000 in current California and Kansas projects. $11,000,000 is still invested in the projects.

Generally, the majority of assets held by ACP are either option agreements on land (Logistics Park Kansas City) or partnership interests (limited and general).

## Logistics Park Kansas City

ACP has an exclusive Option Agreement ("Agreement") with the BNSF Railway Company ("BNSF") to purchase approximately 530 acres of real property located in Johnson County, Kansas. ACP paid $1,000,000 for the option in April 2007. The Agreement has been modified several times. BNSF is developing and constructing an intermodal facility in an adjacent site. Development is scheduled to begin in the fourth quarter 2010. ACP intends to develop the site, sell various tracts and develop vertical property on the remaining tracts.

ACP was able to negotiate the Agreement with BNSF because of its unique expertise in development of industrial and logistics parks.

The Agreement states that "Except for assignments in whole to any entity to which is controlled by, controls or is under common control with Buyer, this Agreement may not be assigned by Buyer without the prior written approval of Seller, which approval may withhold in its sole discretion". Due to the unique expertise required by BNSF for the holder of the Agreement and BNSF's right to unilaterally not approve an assignment of the Agreement, the value of the Agreement in a liquidation scenario is estimated at $0.

**Rosedale Development**

The Rosedale Project is an 84-acre planned development located along Rosedale Highway (State Hwy-58) in Bakersfield, California. This 84-acre tract is located in the center of the City, in an area primed for redevelopment because of new road infrastructure which is now under construction.

This is a Joint Venture with the original land owner and is structured in such a way that ACP will enjoy 50% of all vertical development profits and 20% of any land sale profits.

The joint venture "partners" have contributed the land to the Joint Venture in exchange for a Capital Account credit that is now worth approximately $20,000,000. The vast majority of early cash flow from the project will go to reduce their Capital Account, so it will be several years into the development before ACP begins to realize substantial funds. Aside from the Capital Account Credit, there is no other debt on the project.

ACP was able to enter into the Joint Venture because of its development expertise. The other partners have the right to terminate the development agreement with ACP in the event of a bankruptcy filing. The joint venture partners would undoubtedly additionally assert that appointment of a Chapter 7 Trustee would means that ACP's subsidiary lost the right to manage the project and they had a right to terminate the joint venture.

Given the long-term nature of the development and the uncertainty of a new owner being able to retain any promoted interest in the project, the value of the Rosedale interest in a liquidation scenario is estimated at $0.


**ITTC Land Sales**

The International Trade and Transportation Center (ITTC) is a 700-acre rail-served logistics park located in Shafter, California, northwest of Bakersfield. Located just 2 hours north from the Ports of Los Angles and Long Beach and 4 hours from the Port of Oakland, ITTC is well positioned in the California's southern central valley for west coast distribution.

The Allen Family currently owns approximately 300 acres of land at the ITTC for future development. There is no debt on this land.

ITTC Land is owned by entities owned and controlled by Allen family members. Specifically, the ownership structure of ITT Land is as follows:

- Allen Capital Partners                           25%
- Allen Family Partnership                       45%
- Commercial Marketing Group (Rex Allen)   25%
- RE Allen                                            5%
-

A purchaser of ACP's interest would lose all control over sales activity in the project. Also, the purchaser would be a minority partner in a family-controlled partnership. Given these two facts and the uncertainty of the California real estate market, the value of the ITTC Land sales profit interest in a liquidation scenario is estimated at $0.

## ITB Building #6

ACP is currently negotiating a contract to sell the building.

The building is in the ITTC project. ACP has a 25% partnership interest in the building. The other partners are members of the Allen family.

Given the uncertain nature of the California real estate market and the lack of control over timing and ultimate sales price of the building, the interest in ITB Building #6 in a liquidation scenario would not exceed $500,000, approximately 50% of the going concern value. In a Chapter 7 scenario Bank of America might commence foreclosure which would result in no monies received by the Chapter 7 Trustee.

## Kelly

The Kelly Corporate Center is a planned 4-building office complex located in Carlsbad, California. Currently, 3 of the 4 planned buildings have been completed, and a 3.7 acre vacant land parcel exists for future construction of the 4th building. The three existing buildings can be described as follows:

### Kelly Corporate Center I

Kelly I is a 2-story 72,000 square foot multi-tenant office building. The building was completed in 2001 and is currently 42% leased.

ACP is a partner in this building with the original land owners, the Kelly family. ACP has a 40% promote interest in the building, and a 32% interest in the remaining 60% capital interest in the building. Based on these interests, ACP is entitled to approximately 53% of any net proceeds from a sale of the asset.

The building is currently encumbered with permanent debt of approximately $10,300,000.

### Kelly Corporate Center IIB

Kelly IIB is a 48,000 square foot 2-story office building. This building was completed in 2002 and has been entirely occupied by the GSA Department of Fish and Wildlife since that time. The GSA lease expires later this year, but ACP is currently negotiating an extension and believes they will remain as a tenant in the majority of the building.

ACP is a partner in this building with the original land owners, the Kelly family. The entity which owns Kelly I described above is a 55% owner in Kelly IIB, making for a relatively complicated ownership structure as it flows through to the partners. Based on these interests, ACP is entitled to approximately 45% of any net proceeds from a sale of the asset.

The building is currently encumbered with permanent debt of approximately $7,600,000.

**Kelly Corporate Center IIC**

Kelly IIC is a 75,000 square foot 3-story multi-tenant office building. This building was completed in 2007 and is still in the initial lease-up phase. The building is currently 40% leased.

ACP is a partner in this building with the original land owners, the Kelly family. As with Kelly IIB, the entity which owns Kelly I is a 55% owner in Kelly IIC, making for a relatively complicated ownership structure as it flows through to the partners. Based on these interests ACP is entitled to approximately 57% of any net proceeds from a sale of this asset.

The building is currently encumbered with debt of approximately $13,000,000; however, this is a construction loan and a permanent loan needs to be negotiated with the current lender or new lender within 12-18 months. The vacant portion of this building is also in shell condition, so as future leases are completed we will need to draw down TI allowances from the construction loan to complete the lease up.

The Kelly family does not have the management expertise to manage the properties within the Kelly partnership.

Given the uncertain nature of the California real estate market and the complexity of the partnership agreements, the value of the Kelly interest in a liquidation scenario is estimated at $0.

**Visalia Office Building**

ADCC Visalia Office Partners, LLC owns a 7,624 square foot office building in Visalia, California. The building was constructed in 2003 and is currently fully leased to the following tenants:

- Allen Development of Central California, LLC (subsidiary of ACP) – 2,663 square feet
- Teter Consultants (Architect and Engineering Firm) – 4,961 square feet

ACP, through its wholly owned subsidiaries, owns 75% of ADCC Visalia Office Partners, LLC. The remaining 25% is owned by TDR Partnership, an affiliate of Teter Consultants.

The building currently has approximately $1,131,000 of debt.

If ACP liquidates, approximately 33% of the building will become vacant. With the current debt on the property, there will be no equity value in the building. The value of the interest in the Visalia office building in a liquidation scenario is estimated at $0.


**Tucker Building Reimbursement**

Allen Capital Partners, LLC holds a 20% interest in Tucker B Partners, LLC which owns a 102,000 square foot industrial building located in Visalia, California. The building was constructed in 1998 and is currently fully leased to the following tenants:

- Jim's Formal Wear – 34,000 square feet
- Walco International – 68,000 square feet

In 2003, Walco leased 68,000 square feet, requiring significant tenant improvements. ACP provided the funds for the improvements and currently carries a balance of approximately $380,000 as a receivable from Tucker B Partners, LLC. ACP is receiving monthly payments of principal and interest in the amount of $8,147 and the balance will fully amortize in 2017.

Tucker B Partners, LLC is currently working on refinancing a maturing 10-year loan. The projected proceeds from the refinance will be sufficient to payoff of the entire $380,000 due to ACP.

There is value in a liquidation scenario for this asset, however, given the long-term nature of the receivable and the immaterial amount, full value of $380,000 will be difficult to achieve.

The value is a liquidation scenario is estimated at $190,000, approximately 50% of the going-concern value.


**LPKC Expense Reimbursement – City of Edgerton**

ACP will receive an expense reimbursement from the city of Edgerton, Kansas, when BNSF begins construction on the intermodal facility. Construction is scheduled to begin in the fourth quarter of 2010.

Given that the City of Edgerton has approved the payment of these funds and there are no other known limiting factors affecting collection of the amount other than BNSF beginning construction on the intermodal facility, there is value in the asset. Assuming an appropriate discount for the fact that BNSF has not begun construction of the intermodal and the uncertainty of the economy, the value of the asset in a liquidation scenario is estimated at $211,000, approximately 50% of the going-concern value.

**Midstate Jacuzzi 117 Land**

The Midstate Jacuzzi Land is a 117-acre tract that is part of the larger Midstate 99 Distribution Center ("Midstate Park" or "Park") located in Visalia, California. The Midstate Park is a 400-acre logistics and distribution center that offers direct mainline rail service from the Union Pacific Railroad.

Midstate Jacuzzi 117 Land is owned by entities owned and controlled by Allen family members. Specifically, the ownership structure of Midstate Jacuzzi 117 Land is as follows:

The capital structure of Midstate Jacuzzi 117 Land is as follows:
- Allen Capital Partners                    25%
- Allen Family Partnership                 45%
- Point Property Group (Rex Allen)     25%
- RE Allen                                        5%.

In addition to the capital side of the project, the structure of the profits interest is as follows:
- Allen Capital Partners                    15%
- Allen Development of Central California    40%
- Allen Family Partnership                 27%
- Pointe Property Group (Rex Allen)    15%
- RE Allen                                        3%.

The current debt on the land totals approximately $4,200,000.

Given its location in a third-tier city and the fact the new owner of the interest would be a minority member of a family-controlled partnership, the value of the interest is estimated at $0.

**Dallas Logistics Hub**

DLH is located 12 miles south of Dallas' CBD, adjacent to Union Pacific's Southern Dallas Intermodal Terminal, a potential BNSF intermodal facility, four major highway connectors (I-20, I-45, I-35 and Loop 9) and Lancaster Airport.

DLH, which spans across the communities of Dallas, Lancaster, Wilmer and Hutchins, will serve as a major Inland Port for regional and national distribution.

Today, DMLH owns +/- 5,558 acres of the initial 6,085 acres of land acquired at this location (527 acres has been sold or developed since 2007).

Due to the complexity of the project, the size of the project, the uncertain capital markets, and the fact the interest is a minority ownership interest, it is highly unlikely any prospective purchaser would be interested in purchasing the approximate 43% interest in DLH. The liquidation value is estimated at $0.

| Allen Capital Partners | |
| :---: | :---: |
| **Liquidation Scenario - Summary** | |
| | |
| | **6-month** |
| | **Liquidation** |
| **Asset:** | **Value** |
| | |
| Logistics Park Kansas City | 0 |
| | |
| Rosedale Development | 0 |
| | |
| ITTC Land Sales | 0 |
| | |
| ITB Building #6 | 500,000 |
| | |
| Kelly | 0 |
| | |
| Visalia Office Building | 0 |
| | |
| Tucker Building Reimbursement | 190,000 |
| | |
| LPKC Expense Reimbursement - City of Edgerton | 211,000 |
| | |
| Midstate Jacuzzi 117 Land | 0 |
| | |
| Dallas Logistic Hub | 0 |
| | 901,000 |
| | |
| After payment of perfected secured claims of | |
| Pacific Western Bank and ACP DIP Lenders, available to | |
| Chapter 7 Trustee | 0 |

Exhibit J:             Additional Discussion of Tax Implications

A revised Exhibit J will be filed as a supplement to this Disclosure Statement.

**EXHIBIT K**           **REQUIREMENTS FOR CONFIRMATION**

**1. Requirements of Section 1129(a) of the Bankruptcy Code**

    **a. General Requirements**

    At the confirmation hearing for the Plan, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means proscribed by law.

4.     Any payment made or promised by Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.     Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of Debtors, an affiliate of Debtors participating in a Plan with Debtors or a successor to Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and Debtors have disclosed the identity of any insider that will be employed or retained by Debtors and the nature of any compensation for such insider.

6.     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

7.     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

9.      At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtors or any successor to Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

11.     The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period Debtors have obligated themselves to provide such benefits, if any.

## b. Best Interests Test

Each Holder of a Claim or Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims and Interests of each impaired class would receive if Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of Debtors in a chapter 7 liquidation case. The proceeds that would be available for satisfaction of Claims and Interests would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of Debtors and the cash held by Debtors at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of Debtors and the use of chapter 7 for the purposes of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by Debtors during the Chapter 11 Cases, such as compensation for

attorneys, financial advisors, accountants and costs that are allowed in the chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay unsecured Claims arising on or before the Petition Date. To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Interests under the Plan (the "Best Interests Test").

In applying the Best Interests Test, it is possible that Claims and Interests in the chapter 7 cases may not be classified according to the seniority of such Claims and Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all unsecured Claims arising on or before the Petition Date which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of Debtors. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no stockholder receives any distribution until all creditors are paid in full with interest. After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the chapter 11 cases, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (iii) the adverse effects on the salability of business segments as a result of the likely departure of key employees; and (iv) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the chapter 11 cases, Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Interest with a greater recovery than it would receive pursuant to liquidation of Debtors under chapter 7 of the Bankruptcy Code. Debtors' liquidation analysis is attached as Exhibit __ to the Disclosure Statement.

**c. Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. These projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on _____, 2010. The projections include statements of cash flows and are included as Exhibit __ attached to the Disclosure Statement. Based upon the projections, Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

## 2. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.  In the event one or more classes of claims or interests do not accept the Plan, Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement with respect to such a dissenting class.

a. No Unfair Discrimination.

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

b. Fair and Equitable Test.

This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

• Unsecured Claims.
Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to

the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- Equity Interests.

    Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.