Michael D. Warner, Esq. (TX Bar No. 00792304)
Rachel R. Obaldo, Esq. (TX Bar No. 24041617)
**COLE, SCHOTZ, MEISEL, FORMAN &**
**LEONARD, P.A.**
301 Commerce Street, Suite 1700
Fort Worth, Texas 76102
817-810-5250
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 Facsimile

Hamid R. Rafatjoo Esq. (Admitted *Pro Hac Vice*)
**VENABLE LLP**
2049 Century Park East
Suite 2100
Los Angeles, CA 90067
310-229-9900
310-229-9901 Facsimile

COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| DLH Master Land Holding, LLC, | § | |
| Allen Capital Partners, LLC, | § | Case No. 10-bk-30561-HDH-11 |
| Richard S. Allen, Inc., | § | Case No. 10-bk-30562-HDH-11 |
| Richard S. Allen, | § | |
| | § | |
| Debtors. | § | |
| | § | |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## TO THE PROPOSED DISCLOSURE STATEMENT FOR
## <u>DEBTORS' FOURTH JOINT PLAN OF REORGANIZATION</u>

The Official Committee of Unsecured Creditors (the "Committee") of DLH

Master Land Holding, LLC ("DLH") and Allen Capital Partners, LLC ("ACP" and collectively

with DLH, the "Debtors"), by and through its undersigned attorneys, files this objection (the

"Objection") to the proposed Disclosure Statement for Debtors' Fourth Joint Plan of

Reorganization (the "Disclosure Statement").  In support thereof, the Committee states as

follows:

## PRELIMINARY STATEMENT

The Disclosure Statement fails to provide "adequate information" as required by section 1125 of the Bankruptcy Code[1] and describes a plan that is unconfirmable; therefore, the Disclosure Statement cannot be approved. Without adequate information, creditors cannot make an informed decision about whether the Debtors' Fourth Joint Plan of Reorganization (the "Plan") is in their best interests and whether they should vote to accept or reject the Plan.

The Debtors' Plan is by and for the benefit of insiders.[2] The Plan perpetuates the control of Richard S. Allen ("Richard Allen") and his family, at the expense of creditors. This is hardly surprising, since the current Board of Directors of both Debtors is comprised of exclusively Allen family members, including Richard Allen, his father and his brother.

Notwithstanding that the Debtors have had over fourteen months with the exclusive right to file a plan in this case, the Plan now before this Court is seriously and fundamentally flawed and not confirmable on its face. Among other issues, the Plan is not feasible; the Plan makes a mockery of the absolute priority rule; and the Plan attempts to punish unsecured creditors if the unsecured class votes to reject the Plan.

Contrary to the grossly misleading preamble at the beginning of the Disclosure Statement, the Committee does not support the Plan. The Debtors have failed to make most of

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

[2] Under the Debtors' Plan, the current equity holders of the Debtors, the Allen family and affiliates, retain their equity interests. Any potential avoidance actions against insiders are waived. The officers and directors of the Debtors, including Allen family members, enjoy the benefit of the exculpation provisions of the Plan. The DIP Lenders (entities owned and controlled by Allen family members) will be receiving a new Term Loan in place of their DIP Loans which will bear interest at the rate of prime plus 10%, notwithstanding that it will have the protection of a junior security interest on assets of the Debtors. Compare this to the unsecured creditors, who are proposed to receive notes under the Plan bearing either no interest or interest at the federal judgment rate (which is currently 0.3% per annum). The Board of Directors of the Reorganized Debtors will be comprised of Allen family members (six Allen family members in the case of DLH and four Allen family members in the case of ACP) plus just one unsecured creditor representative. And perhaps most brazen, the Plan provides for cash distributions to insiders to protect them against adverse personal tax consequences resulting from the sales of property by the Reorganized Debtors ahead of any distributions to unsecured creditors. (See Plan, §§ 1.06(iii) and 1.44(d).)

the changes requested by the Committee. The implication in the Disclosure Statement that the Plan has been modified to meet the concerns of the Committee is factually inaccurate and totally misleading. In addition, as discussed more fully below, the Disclosure Statement is replete with other inaccuracies and misleading statements and assertions. For all these reasons, and as set forth in detail herein, the Court should deny approval of the Disclosure Statement and terminate exclusivity as to the Debtors.

**<u>BACKGROUND</u>**

1.      On January 25, 2010 (the "Petition Date"), the Debtors filed voluntary petitions with this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On January 29, 2010, the Court entered an order approving joint administration of the Debtors' Chapter 11 cases for administrative purposes only. On February 5, 2010, the Court entered an order designating the Debtors' Chapter 11 cases as complex.

3.      On February 4, 2010, the United States Trustee, pursuant to section 1102 of the Bankruptcy Code, appointed the Committee to represent the interests of all unsecured creditors in the Debtors' Chapter 11 cases.

4.      On May 3, 2010, Richard Allen and Richard S. Allen, Inc. ("RSAI" and, together with Richard Allen, the "Allen Debtors") filed voluntary petitions with this Court for relief under Chapter 11 of the Bankruptcy Code. On May 25, 2010, the Court entered an order approving joint administration of the Chapter 11 cases of the Allen Debtors with those of DLH and ACP.

5.      On July 31, 2010, the Debtors filed their First Joint Chapter 11 Plan.

6.      On August 11, 2010, the Debtors filed their First Amended Joint Plan of Reorganization and an accompanying proposed disclosure statement (the "Disclosure Statement").

7.      On October 8, 2010, the Debtors filed their Second Amended Joint Plan of Reorganization and an accompanying proposed disclosure statement.

8.      On January 10, 2011, the Debtors filed their Third Amended Joint Plan of Reorganization and an accompanying proposed disclosure statement.

9.      On February 22, 2011, the Debtors filed their Amended and Restated Third Amended Joint Plan of Reorganization and an accompanying proposed disclosure statement.

10.     The Debtors filed the Plan and Disclosure Statement on April 4, 2011.

11.     On August 19, 2010, the Allen Debtors filed a separate chapter 11 plan.

## OBJECTION

A.     **A Disclosure Statement Cannot Be Approved If It Either Describes a Plan That May Not Be Confirmed As a Matter of Law or Does Not Contain Adequate Information As Required by § 1125 of the Bankruptcy Code.**

12.     It is well-established that a court may refuse to approve a disclosure statement if the plan proposed thereby is not capable of being confirmed.  See, e.g., In re U.S. Brass Corp., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."); In re CRIIMI MAE, Inc., 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." (quoting In re Main St. AC, Inc., 234 B.R. 771, 775 (Bankr.

N.D. Cal.1999))); In re Mkt. Square Inn, Inc., 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) (holding that it is appropriate to refuse approval of a disclosure statement where the proposed plan is not confirmable); In re Moorpark Adventure, Inc., 161 B.R. 254, 256 (Bankr. C.D. Cal. 1993) (denying debtor's request for approval of disclosure statement because the debtor's proposed plan of reorganization was not confirmable); In re Felicity Assocs., 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (observing, "[i]t has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'" (citations omitted)); In re Bjolmes Realty Trust, 134 B.R. 1000, 1001-02 (Bankr. D. Mass. 1991) (observing that courts may rule on confirmation issues at disclosure hearing when plan is facially unconfirmable); In re Century Inv. Fund VIII L.P., 114 B.R. 1003, 1005 (Bankr. E.D. Wis. 1990) (holding that it is appropriate for a court not to approve a disclosure statement if the related plan is on its face not confirmable as a matter of law (citation omitted)); In re Valrico Square L.P., 113 B.R. 794, 795-96 (Bankr. S.D. Fla. 1990) (denying approval of debtor's disclosure statement based on related plan's impermissible classification of unsecured claims and rejecting debtor's argument that creditor's objection be deferred for consideration at confirmation hearing when it was evident at disclosure hearing that plan could not be confirmed); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (stating that approval of disclosure statement should be denied when it is apparent that plan will not comply with section 1129(a) of the Bankruptcy Code); In re Atlanta W. VI, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying approval of disclosure statement and holding that a court may refuse to approve a disclosure statement when it is apparent that the accompanying plan is not confirmable, such that sending the disclosure statement to solicit votes on the

proposed plan would be "a wasteful and fruitless exercise"); In re Weiss-Wolf, Inc., 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) (finding that approval of a disclosure statement should be denied when it is apparent that classification scheme in accompanying plan is improper); In re McCall, 44 B.R. 242, 243-44 (Bankr. E.D. Pa. 1984) (holding that approval of a disclosure statement should be denied when it is apparent that accompanying plan will not comply with section 1129(a) of the Bankruptcy Code).

13.     Further, in order to be approved, a disclosure statement must contain "adequate information." 11 U.S.C. § 1125(b). That is, it must contain:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); see also In re Fullmer, No. 09-50086, 2009 WL 2778303, at *2-3 (Bankr. N.D. Tex. Sept. 2, 2009) slip op. (stating that "[a]dequate information is generally defined as information of a kind, and in sufficient detail, given the nature and history of the debtor and the condition of the debtor's financial records that will enable the debtor's creditors and investors to make an informed judgment about the plan," and denying approval of disclosure statement).

14.     Approval of the Debtors' Disclosure Statement must be denied in this case because it fails to satisfy both of the foregoing requirements. As discussed in detail below, the Disclosure Statement describes a Plan that is unconfirmable on its face and severely lacks the requisite adequate information in multiple respects.

**B.     The Disclosure Statement Should Not Be Approved Because It Is Based on a Nonconfirmable Plan.**

15.     The Debtors' Plan is patently nonconfirmable because, among other things, the Plan is not feasible, it violates the Absolute Priority Rule, and it proposes to punish unsecured creditors if the unsecured creditor class votes to reject the Plan.  Accordingly, approval of the Disclosure Statement would be a "wasteful and fruitless exercise" and should therefore be denied.

*1.     The Plan is not confirmable because it does not meet the feasibility requirements of 1129(a)(11) of the Bankruptcy Code.*

16.     Section 1129(a)(11) of the Bankruptcy Code requires as a condition of confirmation that the court find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  In other words, to confirm a plan, a plan proponent must show that, among other things, the plan is feasible.  See Fin. Sec. Assurance Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.), 116 F.3d 790, 801 (5th Cir. 1997).  The feasibility requirement is designed to prevent the confirmation of visionary, unreasonable or speculative plans.  See, e.g., In re Nw. Timberline Enters., Inc., 348 B.R. 412, 430 (Bankr. N.D. Tex. 2006).  The focus of the feasibility test is the probability of *actual performance* of the provisions of the plan, and whether the matters to be undertaken post-confirmation can be undertaken as a practical matter.  See, e.g., Clakson v. Cooke Sales & Serv. Co. (In re Clarkson), 767 F.2d 417, 420 (8th Cir. 1985); In re M & S Assocs., Ltd., 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).

17.     Moreover, a number of courts, including this Court, have held that a plan is not feasible and thus not confirmable when it is submitted on a conditional basis.  See, e.g., In re Premiere Network Servs., Inc., No. 04-33402-HDH-11, 2005 WL 6443624, at *5 (Bankr.

N.D. Tex. 2005) (finding a plan not to be feasible and denying confirmation where the effective date was conditioned on sufficient funds which the debtors did not have); In re Made in Detroit, Inc., 299 B.R. 170, 177-78 (Bankr. E.D. Mich. 2003) (holding, "As a practical matter, the Debtor's Plan is not sufficiently concrete as to be feasible because it is contingent on exit financing from Kennedy and there is no reasonable assurance that the Kennedy loan will ever close or that the Property will be appraised at a value high enough."); In re Sis Corp., 120 B.R. 93, 95 (Bankr. N.D. Ohio 1990) (holding that uncertainty regarding plan implementation renders a plan infeasible).

18.     The Debtors' Plan is exactly the kind of visionary, unreasonable and speculative plan that the feasibility requirement prohibits from being confirmed.  The Plan is conditional upon the occurrence of a number of events, the occurrence of which is uncertain, at best.  Indeed, in lieu of any reasonably probable means of implementing the Plan, the Debtors offer only hopes, dreams and speculation.

19.     In order for the Debtors' Plan to go effective, certain conditions must be met including (a) obtaining exit financing, (b) obtaining new equity contributions in the event of a cramdown, and (c) the Reorganized Debtors' reasonably projected expenses not exceeding reasonably projected revenue.  (See Plan, § 13.14.)  To date, none of these conditions has been satisfied.  This Court should not put creditors through the further delay and cost of a contested confirmation hearing and a lengthy post-confirmation wait-and-hope period to see whether the conditions to the effectiveness of the Plan can be satisfied and whether the Plan will ever become effective.

20.     The Debtors' proposed exit financing is nothing more than wishful thinking.  Notwithstanding that the Debtors have had over fourteen months to obtain exit

financing, they have utterly failed to do so. Without exit financing in place, the Disclosure Statement should not be approved and the Debtors' Plan should not be permitted to proceed through the cost and delay of a contested confirmation process, which this case cannot afford.

21. With respect to DLH, the proposed Exit Financing is stated in the Plan to be comprised of (a) net proceeds from the sale of the ADESA Property, and/or (b) an auction or other type of structured sale or traditional sales of parcels of land to be conducted prior to or shortly after the Effective Date (but which will not close until after the Effective Date), and/or (c) a loan from Allen Opportunity Fund, a non-debtor affiliate of DLH, in an amount up to $400,000, and/or (d) a loan from Richard Allen, individually, in an amount up to $750,000, and/or (e) other resources available to DLH. (See Plan, p. 5.) There is no certainty as to any of these sources. A hope for adequate Exit Financing simply fails to meet the feasibility test under the Bankruptcy Code. See, e.g., In re Premiere Network Servs., Inc., No. 04-33402-HDH-11, 2005 WL 6443624, at *5.

22. The Disclosure Statement, when discussing the sources of DLH's Exit Financing, only discusses the sale of the ADESA Property, the auction or sale of parcels of land (which will probably not close until after the Effective Date) and a loan from Richard Allen. (See Disclosure Statement, pp. 7-9.) The ADESA sale is anything but a certainty. As this Court is aware, the proposed sale to Cardinal/Fortress is in an option period, with no binding obligation of Cardinal/Fortress to go forward with the proposed acquisition of the property. As to the potential ADESA sale proceeds, there is also uncertainty as to what the net proceeds to the DLH estate will be. With respect to Exit Financing through an auction or other sale of parcels of land, no such proposed sales are currently at hand, notwithstanding that the Debtors have had fourteen months to put together such sales, and there is no certainty as to the timing of any such sales or

the net proceeds to the DLH estate to be realized from such sales. The possible loan from Allen Opportunity Fund is not even mentioned in the Disclosure Statement, and the likelihood and amount of such loan are unknown (notwithstanding that the loan is completely within the control of insiders, no evidence of the loan is provided). Finally, a loan from Richard Allen in an amount up to $750,000 is fraught with problems since he is himself a debtor in a Chapter 11 case in this Court, and any such loan would require the support of his creditors and approval in his bankruptcy case.

23. The Disclosure Statement at pages 30-31 discusses the proposed sources of ACP Exit Financing. It appears that the proposed financing is coming from LPKC, which is said to be a wholly owned subsidiary of ACP. However, there is no adequate information in the Disclosure Statement with respect to the ownership and capital structure of LPKC.[3] Furthermore, a number of the transactions that form the alleged sources of ACP Exit Financing are still in negotiation, and there appears to be a major open item, BNSF's agreement to waive a capital requirement, which if not achieved would appear to restrict LPKC's ability to upstream funds to ACP. Another part of the proposed funding appears to be coming from a property sale by LPKC with an uncertain closing date. The proposed ACP Exit Financing is at best unclear and uncertain.

24. Similarly, with respect to the Plan's proposed new equity contributions in the event of a cramdown, each is fraught with problems, uncertainties and speculation, putting aside for the moment the legal impediments to such new value discussed in the next section of this Objection. With respect to DLH, a large part of the proposed new equity contribution in the

---

[3] No entity by the name of LPKC or with those initials appears to be listed as a subsidiary of ACP in Exhibit D to the First Day Declaration of Richard Allen. Indeed there are several LPKC entities that appear to have been "rolled up" into DLH on the eve of bankruptcy according to Exhibit C to the Allen First Day Declaration. Is The Allen Group - Kansas City LLC the entity that is referred to as LPKC in the Disclosure Statement? If so, more information is needed as to that entity. For example, is it the entity that holds the Kansas City real estate option?

event of cramdown is coming from ACP, itself a debtor in Chapter 11 before this Court. (See Plan, §4.07.) Any such contribution by or through ACP will require court approval and may or may not be achievable. The portion of the proposed DLH new equity contribution by conversion of an unsecured claim of DLH Development Manager, LLC (another insider affiliate owned and/or controlled, upon information and belief, by the Allen family) is simply not new value for cramdown purposes. With respect to ACP (see Plan, §4.12), the proposed new equity contributions are (a) from the owners of Allen Opportunity Fund out of funds obtained from an auction sale of Parcel 2 or a land contribution and (b) from a cash contribution by Richard Allen. No information is provided in the Plan or the Disclosure Statement as to the timing or achievability of the Allen Opportunity Fund auction sale or land contribution. Moreover, a cash contribution from Richard Allen, himself a Chapter 11 debtor before this Court, is fraught with problems and uncertainties as discussed above.

25. With respect to the condition requiring the Reorganized Debtors' reasonably projected expenses not to exceed reasonably projected revenue that also needs to be achieved before the Plan can go effective (see Plan, §13.14(d)), given the performance to date of the Debtors and the lack of any information to support the achievability of this condition, it is pure speculation that this condition can be satisfied.

26. Finally, with respect to Plan feasibility, the feasibility of the Debtors' long-term prospects and their projections as to future performance (see Exhibit E to the Disclosure Statement) are also highly suspect. They are subject to assumptions that are not supported by historical performance and are subject to very uncertain market conditions. The Plan and the Reorganized Debtors' future performance are at best speculative and do not support a finding by this Court that the Debtors' Plan is feasible.

27.     In <u>Premiere Network</u>, this Court recognized that:

> Courts are typically reluctant to confirm a plan that shifts risk to the claimants.  The plan of reorganization must provide the claimants with at least as much as they would receive in liquidation.  Although the present Plan proposes to pay claimants required to be paid on the effective date, extending and creating uncertainty as to the effective date forces these priority claimants to subsidize the proposed joint Plan and bear the risks of failure.

<u>See</u> No. 04-33402-HDH-11, 2005 WL 6443624, at *6.  The Debtors' Plan proposes to do just that – shift all of the risk to the creditors.  Accordingly, the Plan is not confirmable and the Disclosure Statement describing the Plan should not be approved.

### 2.     *The Plan is not confirmable because it violates the Absolute Priority Rule.*

28.     Simply stated, the Absolute Priority Rule provides that "old equity" interests cannot retain their existing equity interests or obtain "new equity" interests or other property on account of those old equity interests unless, among other things, all classes of unsecured claims approve such treatment or all unsecured claims are paid in full.  <u>See</u> 11 U.S.C. § 1129(b)(2)(B); <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434 (1999).

29.     The Debtors' Plan provides, putting aside for the moment the cramdown options, that the holders of the existing equity interests in both DLH and ACP will retain their equity interests.  (See Plan, §§ 4.07 and 4.12.)  In order to confirm a plan over the objection of the unsecured creditors' class, the unsecured creditors must be paid in full, including a market rate of interest if they are being paid over time.  Neither of the options provided for unsecured creditors in the Plan provides for unsecured creditors to receive payments of a value, as of the Effective Date, equal to the allowed amount of such unsecured creditors' claims.  Simply stating that it's a 100% plan for unsecured creditors does not make it so.  Among other issues, the interest rate on the 10-year notes is only the federal judgment rate (approximately 0.3%) and no

interest will be paid on the 7-year notes.  Unless the classes of unsecured creditors vote in favor of the Plan, the Plan in this respect violates the Absolute Priority Rule and cannot be confirmed. The Committee cannot support the Plan.

30.     With respect to Debtors' cramdown options under the Plan (see Plan, §§ 4.07 and 4.12), they too fail the Absolute Priority Rule and cannot be confirmed.  Regarding the first cramdown option, where the existing equity interests of the Debtors are proposed to be cancelled, the Debtors have designated who will be the recipients of the new equity interests (that right to designate the new equity holders itself being a property interest on account of old equity), and the new equity is being offered exclusively to insiders (including Richard Allen) selected by the Debtors.  The purported consideration for such new equity does not begin to satisfy the "new value" exception or corollary to the Absolute Priority Rule.  The total of the purported "value" being paid or contributed comes nowhere close to the equity value of the Reorganized Debtors.

31.     With respect to the second cramdown alternative for DLH, the so-called sealed bid auction (see Plan, § 6.11), this is anything but a full and fair proposed sale of the DLH property.  It has been purposely limited to a self-selected group of potential bidders, including insiders.  It is on an unreasonably fast track with limited marketing and opportunity for interested parties to do the necessary due diligence.  If, over the course of fourteen months, the Debtors have been unable to find a party interested in buying the DLH property for fair value, how can fair value for that property be obtained by a closed, expedited auction process?  This is tantamount to giving the property away and certainly will not realize fair value.  Moreover, this process does not expose the equity interests in DLH to the market.  This process is flawed in every respect.  Because DLH has retained exclusivity throughout this case, this proposed

cramdown treatment does not satisfy the Bankruptcy Code § 1129(b)(2) requirements articulated by the Supreme Court in the 203 North LaSalle Street Partnership case and the Plan is not confirmable.

> ### 3. The Plan attempts to punish Unsecured Creditors if their class does not vote in favor of the Plan. As such, the Plan is not confirmable.

32. The Plan creates a "deathtrap" treatment of unsecured creditors. See, e.g., In re Mcorp Fin., Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992) (denying confirmation of a plan because the plan provided for certain treatment to three classes of equity holders, but only if all three classes voted in favor of the plan); In re Allegheny Int'l, Inc., 118 B.R. 282, 325 (Bankr. W.D. Pa. 1990) (rejecting provision that provided different treatment for equity classes based upon whether such classes voted to accept the plan).

33. In §§ 4.04 and 4.09 of the Plan, if unsecured creditors in Class 5 vote to reject the Plan, instead of an option to receive so-called 100% Notes or 50% Notes, the Unsecured Creditors will only receive 25% of their claims "over time" without interest, and in the case of ACP, there is also a cap on how much unsecured creditors will receive. There is no explanation in the Plan or the Disclosure Statement of what "over time" means. The class of unsecured creditors is truly being punished if it exercises its Bankruptcy Code-given right to vote to reject the Debtors' Plan. Accordingly, this Court should deny approval of the Disclosure Statement and avoid spending the time and cost to proceed to a contested confirmation hearing on a patently unconfirmable Plan.

## C. The Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information As Required by § 1125 of the Bankruptcy Code.

34. The primary purpose of a disclosure statement is to give creditors the information necessary to decide whether to accept a debtor's plan. See, e.g., Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Co-op, Inc.), 150 F.3d 503, 518 (5th Cir. La. 1998).

35.     "Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996); see also, e.g., Eastover Bank for Sav. v. Smith (In re Little), 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court."); In re Microwave Prods. of Am., Inc., 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) (providing that a disclosure statement should contain "all factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." (internal quotations omitted)).

36.     Courts applying § 1125 to determine whether a disclosure statement provides adequate information have created the following non-exhaustive list of factors:

(1)     the events which led to the filing of a bankruptcy petition;
(2)     a description of the available assets and their value;
(3)     the anticipated future of the company;
(4)     the source of information stated in the disclosure statement;
(5)     a disclaimer;
(6)     the present condition of the debtor while in Chapter 11;
(7)     the scheduled claims;
(8)     the estimated return to creditors under a Chapter 7 liquidation;
(9)     the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
(10)    the future management of the debtor;
(11)    the Chapter 11 plan or a summary thereof;
(12)    the estimated administrative expenses, including attorneys' and accountants' fees;
(13)    the collectability of accounts receivable;
(14)    financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
(15)    information relevant to the risks posed to creditors under the plan;
(16)    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
(17)    litigation likely to arise in a nonbankruptcy context;
(18)    tax attributes of the debtor; and

(19)    the relationship of the debtor with the affiliates.

See In re U.S. Brass Corp., 194 B.R. at 424-425 (citing In re Metrocraft Publ'g Servs., Inc., 39

B.R. 567, 568 (Bank. N.D. Ga. 1984)).

37.    Disclosure of all factors is not necessary in each case.  In re U.S. Brass

Corp. 194 B.R. at 425.  Rather, these factors are "but a yardstick against which the adequacy of

disclosure may be measured; the precise information required will be governed by the facts and

circumstances presented in each case."  In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr.

S.D. Ohio 1990).

38.    As discussed more fully below, the Debtors' Disclosure Statement is

riddled with inaccurate, inadequate and misleading information.  Therefore, the Disclosure

Statement does not meet the standard for adequate information under § 1125 of the Bankruptcy

Code and cannot be approved.

*1.*    ***Issue by issue analysis of lack of adequate information in the Disclosure Statement.***

39.    The Disclosure Statement fails to provide an adequate description of the

events leading to bankruptcy, particularly the mergers in late-December 2009, on the eve of the

January 2010 bankruptcy filings, of numerous affiliates of the Debtors into DLH and ACP.

These mergers, according to the Debtors' Statements of Financial Affairs, included over seventy

predecessor companies.  This is a critical event concerning the Debtors that needs to be fully

explained to creditors to afford them the ability to meaningfully assess the corporate structure of

the Debtors, the assets and liabilities of the Debtors before and after the mergers, the impact of

such mergers on creditors of the predecessor companies, and whether there was any value lost to

the Debtors' estates resulting from the mergers.  Stated another way, the pre-filing mergers were

effectively a non-confirmation approved substantive consolidation.  There is no disclosure by

each predecessor entity on whether or not each was solvent or insolvent on the Petition Date. Moreover, recoveries from avoidable transfers may effectively be lost by the mergers.

40. Another important disclosure issue is that a separate letter on Committee counsel's letterhead accompanying the Disclosure Statement and the Disclosure Statement itself need to include a statement regarding whether the Committee recommends that unsecured creditors vote in favor of or against the Plan. As presently drafted, there is no such statement in the Disclosure Statement. Instead, the Disclosure Statement begins on page 4 with an inaccurate and grossly misleading preamble, entitled "Changes Negotiated with Creditors Committee." This section needs to be removed from the Disclosure Statement. Contrary to the impression and implications conveyed by this 3-page section of the Disclosure Statement, the Committee does not support the Debtors' Plan. The Debtors have made a superficial, half-hearted effort to revise their Plan, but it is still woefully lacking as a matter of economics, fairness and substance. It is a plan distinctly for the benefit of insiders, designed to protect them and retain their control of the Debtors, all at the expense of creditors. To suggest or imply that by making modest changes to their earlier plans, the Debtors now have a Plan that is the product of negotiations with the Committee is inaccurate and grossly misleading. Particularly if the "Changes Negotiated with Creditors Committee" section remains in the Disclosure Statement, the Committee should be permitted to (i) circulate a separate letter on Committee counsel's letterhead accompanying the Disclosure Statement stating whether the Committee recommends that unsecured creditors vote in favor of or against the Plan; and (ii) insert a section immediately following it setting forth its responses to the Debtors' assertions. Only in this way will parties reading the Disclosure Statement, including other creditors, get an accurate and balanced disclosure of the facts.

41.     Moreover, most of the information in the Debtors' "Changes Negotiated with Creditors Committee" section is a discussion of the substance of confidential settlement negotiations between the Debtors and the Committee.  Such confidential settlement discussions should not be unilaterally disclosed by the Debtors and should not appear in the Disclosure Statement.

42.     On page 5 of the Disclosure Statement, in the second sentence of the first full paragraph, the Debtors state, "[a]ssuming that the Unsecured Creditor Classes of DLH and ACP each vote in favor of the Plan . . . ."  It is not clear where this assumption comes from.  It does not appear in the Plan.  As such, it should be deleted from the Disclosure Statement.

43.     The discussion of the potential exit funding for DLH beginning in the middle of page 7 of the Disclosure Statement is incomplete and very misleading.  Nowhere in that discussion do the Debtors disclose that the proposed sale of ADESA to an entity controlled by Cardinal/Fortress is subject to an option period, at the end of which buyer may decide not to go forward with the proposed purchase.  There is no binding obligation of the buyer to purchase the ADESA property.  It is a wholly contingent possible sale transaction that may never happen.  Even if the sale moves forward, there is uncertainty as to what the net proceeds to the DLH estate will be.  Full and fair disclosure is required, and the Disclosure Statement needs to be amended in this regard.

44.     Beginning on page 15 of the Disclosure Statement, the Debtors purport to discuss the "DIP Lenders' DLH Term Loan."  That discussion omits a critical fact that creditors need to know; namely, that the DIP Lenders are insiders – they are owned and controlled by Allen family members, Richard Allen's father and brother.  Full and fair disclosure requires that this information be included when discussing the conversion of the Debtor-in-Possession

Financing into a new proposed Term Loan, purporting to bear non-default interest at prime plus ten percent (10%) as compared to the proposed nominal interest (if any) offered to unsecured creditors.

45.     On page 16 of the Disclosure Statement, in subparagraph (a), the last sentence states that the DLH 50% Notes will be fully payable five years from the Effective Date. This statement is inaccurate. Section 4.04(a) of the Plan provides that the maturity of such notes is seven years after the Effective Date. Moreover, there is no disclosure as to the pertinent note terms such as default provisions, accrual of non-payments at a default or non-default rate, etc. The notes essentially appear to lack the characteristics of a negotiable instrument.

46.     On page 17 of the Disclosure Statement, the discussion of the ACP Plan begins with a discussion of the ACP Debtor-in-Possession Financing. That discussion is inaccurate, incomplete and/or misleading in multiple respects. The current outstanding amount of the ACP DIP Loan should be disclosed. Subparagraph 2 on page 17 of the Disclosure Statement states that the DIP Lenders will have two members of Board of Directors of Reorganized ACP until the Term Loan is paid in full. However, this provision does not appear in the Plan. Where does this come from? With respect to subparagraph 3, the Disclosure Statement states that the new Term Loan will be paid from 10% of the ACP Net Sales Proceeds during year one after the Effective Date. However, in the discussion of the Term Loan on page 7 of the Plan, there is no mention of the 10% number. Either the Plan needs to be revised or the Disclosure Statement. Also, as stated above, it should be disclosed in this discussion of the ACP Debtor-in-Possession Financing that the holders of the ACP Debtor-in-Possession Financing and the proposed new Term Loan are insiders owned and controlled by Richard Allen's father and brother.

47.     In the discussion of the treatment of Tim Foley on page 18 of the Disclosure Statement, the word "allegedly" should be inserted in the second line after the word "note" and before the word "secured," and the word "alleged" should be inserted in the third line of that paragraph after the word "Those" and before the word "security."  Moreover, there should be additional disclosure so as to permit a creditor to determine whether or not there is a potential avoidable transfer with respect to the Debtors' transactions with Mr. Foley.

48.     Likewise, in the discussion of Pacific Western Bank on page 18 of the Disclosure Statement, the word "allegedly" should be inserted in the first line of that paragraph after the word "note" and before the word "secured."

49.     On page 19 of the Disclosure Statement, in the section discussing the treatment of ACP Unsecured Creditors, the Disclosure Statement should include information as to what the Debtors believe is or will be the total aggregate amount of allowed unsecured claims against ACP.

50.     Also on page 19 of the Disclosure Statement, in the second line of the discussion of ACP Unsecured Creditors, the word "or" after the word "sales" and before the word "property" should be changed to the word "of."  More substantively, subparagraph 2 on page 19 is inconsistent with the Plan in a number of material respects (See Plan, § 4.09.)  That subparagraph should be revised to read as follows:

> 2.      Receive a Variable Pay Note ("ACP 100% Notes") in the principal amount of 100% of the electing holder's Allowed Claim with interest accruing at the federal judgment rate on the Effective Date of the Plan, payable from 25% of ACP Unsecured Creditor Net Proceeds (shared pro rata with the holders of Allowed ACP Class 6 Claims, if any) until the ACP 50% Notes are paid in full, and thereafter receiving 100% of ACP Unsecured Creditor Net Proceeds (shared pro rata with the holders of all of the Allowed ACP Class 6 Claims, if any) until the ACP 100% Notes are repaid in full.  Unless previously paid, these notes mature ten years from

the Effective Date, with interest accruing at the federal judgment rate in effect on the Effective Date of the Plan.

51.     On page 20 of the Disclosure Statement in the first paragraph of Section C.1., the words "the same Board of Directors" should be changed to "a similar Board of Directors."  Upon information and belief, the proposed new directors, all Allen family members other than the one independent creditor representative, are not the same as the three current Allen family members who comprise the current DLH Board of Directors.  A couple of additional Allen family members are proposed to be added to the new Board.  (See Plan, §13.17.)

52.     The discussion of why unsecured creditors should vote in favor of the Plan on page 22 of the Disclosure Statement is one-sided and therefore misleading to creditors.  The Committee disagrees with the Debtors when they assert that "the Unsecured Creditors will be compelled to take to take [sic] 25% of their Allowed Claim over time by cramdown."  The Committee does not believe that the cramdown proposed by the Debtors can or will be approved by this Court – it violates the absolute priority rule and the requirements of the Supreme Court in the 203 North LaSalle Street Partnership case.  If this statement remains in the Disclosure Statement, the Committee requests that a statement be added that the Committee does not believe that the proposed cramdown treatment meets the applicable requirements of the Bankruptcy Code both in the Disclosure Statement itself as well as in the separate letter on Committee counsel's letterhead to be circulated with the Disclosure Statement.

53.     Furthermore, in the same paragraph on page 22 of the Disclosure Statement, the Committee objects to and opposes the inclusion of a box on the ballot for Unsecured Creditors requesting creditors to indicate their preference as to the two undesirable and unconfirmable cramdown alternatives.  Such a tactic is misleading to creditors by suggesting or implying that these are the only choices they have if they vote "no" on the Debtors' Plan, and

the results of such voting may be misused by the Debtors to suggest creditor support for either of these alternatives.

54.     On page 27 of the Disclosure Statement, the second sentence of the first paragraph states that Richard Allen is the "sole current owner of ACP." This statement is misleading. RSAI owns 86.91% of ACP and is itself a debtor in a Chapter 11 case pending before this Court. The estate of RSAI, not Richard Allen, is the real owner of RSAI's equity interest in ACP. The Disclosure Statement needs to be amended, and if RSAI is mentioned, it should be made clear that RSAI is a Chapter 11 debtor in this Court.

55.     On page 32 of the Disclosure Statement, there is a misleading discussion of valuation. In the first full paragraph on that page, the Debtors purport to discuss "reorganization value." By limiting what they define as reorganization value, the Debtors reach the conclusion that the reorganization value of the Debtors is "0." The Committee takes issue with both the Debtors' analysis and conclusion. For example, reorganization value with respect to a real estate project including raw land can be determined by the projected sales value of the project given sufficient time to market and sell the project as a whole or in segments. Liquidation value, by contrast, involves a sale in a shortened time period. These statements set forth on page 32 of the Disclosure Statement are incomplete and misleading to creditors.

56.     On page 33 of the Disclosure Statement in the next to the last sentence of the first full paragraph, there is a reference to ACP Creditors indicating on their ballot which cramdown alternative they would prefer. As set forth in paragraph 53 above, the Committee objects to any such provisions in the ballots and believes that they should be stricken.

57.     In the second paragraph on page 33 of the Disclosure Statement, the reference to a cash contribution of up to "$750,000" is contrary to the Plan. In § 4.07 of the

Plan, the cash consideration is stated to be "$1.0 million."  Also in the same paragraph of the Disclosure Statement, for full and fair disclosure purposes, it is important that the reference to "DIP Lenders" be followed by a parenthetical or other disclosure that the DIP Lenders are insiders owned and controlled by Richard Allen's father and brother.  Similarly, at the top of page 34 of the Disclosure Statement, the reference to DLH Development Manager, LLC should be clarified by stating that this is another insider entity, including a statement of who owns and/or controls this entity.

58.    With respect to the first full paragraph on page 34 of the Disclosure Statement, the Committee disputes that DLH has engaged in a full marketing of its property.  The Committee believes that this paragraph is misleading.  For example, upon information and belief, DLH has insisted that certain interested parties sign non-disclosure agreements with overly restrictive terms that have prevented such interested parties from getting due diligence information with respect to the property.  Such restrictive actions by DLH have included one or more parties who are financially capable of doing a substantial transaction with respect to the DLH property.

59.    The discussion on pages 34 and 35 of the Disclosure Statement regarding the proposed sealed bid auction alternative describes a hopelessly flawed process that intentionally limits the bidding and, not surprisingly, favors insiders.  For example, in subparagraph 3 on page 35, reference is again made to the DIP Lenders, but there is no disclosure that these are insiders.  There is again on page 35 a discussion of the ballot provision asking creditors to indicate their preference among the Debtors' proposed cramdown alternatives, which provision the Committee opposes as discussed above.  This entire section misleads creditors by implying that the cramdown alternatives set forth in the Debtors' Plan are

the only alternatives for creditors. The Plan is hopelessly flawed in its cramdown proposals and the Disclosure Statement compounds these flaws.

60.     On page 37 of the Disclosure Statement, the first sentence in the third full paragraph is contrary to the Plan. Section 13.26 of the Plan states that "the Plan will become fully consummated six months after the entry of a final order of confirmation of the Plan and the first distribution on the Effective Date." The Disclosure Statement is inconsistent with the Plan.

61.     The discussion of unimpaired classes on page 37 of the Disclosure Statement is incorrect. Class 5 is not an unimpaired class under the Plan. (See §§ 3.01, 4.05 and 4.10 of the Plan.)

62.     On page 40 of the Disclosure Statement, in the second sentence of the first paragraph in the section on Representations, the phrase "and/or any exchange of rights made in connection herewith" is used. The Committee does not understand what exchange of rights the Debtors are referring to. If this is not simply an erroneous insertion in this paragraph, the statement needs to be clarified.

63.     On page 64 of the Disclosure Statement, in the first line on that page, the reference to "their Affiliates and Principals" needs to be deleted. The inclusion of those words in the Disclosure Statement is inconsistent with the Plan. (See Plan, § 11.01.)

64.     On page 65 of the Disclosure Statement, the last sentence in the paragraph discussing dissolution of the Committee, should be revised to change the words "Effective Date" the first time that it appears in that sentence to the words "Consummation Date." A similar change should be made in the Plan. As provided earlier in that paragraph, the Committee will continue in existence until the Consummation Date and will need its counsel during that period. (See Plan, § 13.20.)

65.     There is no information concerning or analysis specifically identifying the executory contracts and unexpired leases to be assumed or rejected or the potential cure costs for executory contracts and unexpired leases to be assumed under the Plan.  Not only is this information important to particular creditors who hold such executory contracts and unexpired leases, but it may also bear upon feasibility of the Plan which is dubious, at best, even without the inclusion of such costs.  (See the discussion of executory contracts at pp. 67-68 of the Disclosure Statement.)

66.     On page 71 of the Disclosure Statement, in the paragraph addressing undeliverable distributions, there is a reference to a "Liquidating Trustee."  It appears that this is an erroneous reference because there is no reference to a Liquidating Trustee in the Plan.  Perhaps the Debtors intended that this should be a reference to the Disbursing Agent?  In any event, this needs to be clarified.  In addition, there is no disclosure as to whether a Liquidating Trustee or a Disbursing Agent will hold the notes on behalf of the beneficiaries so as to avoid a "race to the courthouse."  If so, it needs to be disclosed whether the Liquidating Trustee or Disbursing Agent will hold one note (for all noteholders), two notes (one for DLH noteholders and another for ACP noteholders), or four notes (one for DLH 50% noteholders, one for DLH 100% noteholders, one for ACP 50% noteholders, and one for ACP 100% noteholders).  If multiple notes are held, it needs to be clear how a Liquidating Trustee or a Disbursing Agent should enforce default provisions.  Lastly, the proposed compensation for a Liquidating Trustee and/or a Disbursing Agent should be disclosed.

67.     On page 78 of the Disclosure Statement, in the paragraph beginning "Notwithstanding the foregoing," the word "by" at the end of the first sentence should be changed to the word "against."  In addition, in the same paragraph, in the sentence that begins

"Commencing on the Effective Date," the words "their respective affiliates and principals," should be deleted. Likewise, in that same paragraph, in the sentence beginning "As of the Effective Date," the words "and their respective affiliates, and principals" should also be deleted. These words do not appear in the comparable section in the Plan. (See Plan, § 11.01.)

68.     The Disclosure Statement, on page 80, fails to adequately describe the potential value of claims and causes of action that may be brought by the Debtors. Under, § 10.01 of the Plan, the Debtors purport to waive certain claims, including potential avoidance actions against insiders and other parties. However, there is absolutely no meaningful information in the Disclosure Statement analyzing such potential clams, including potential claims against insiders, or the value of such claims. Instead, the Plan and Disclosure Statement contain only bald, unsupported assertions that the Debtors have analyzed potential avoidance actions and determined that there are no material avoidance actions. How can creditors assess the impact of the Debtors' proposal to waive all such claims? Without more information and a reasonable estimate of the value of the avoidance claims, creditors cannot make a determination as to whether waiving these claims is in their best interests or whether they would recover more in a Chapter 7 liquidation. As previously discussed, there may be recoveries available from avoidable transfers related to Tim Foley, insiders, or the mergers of the Debtors' predecessor entities. Someone other than the Debtors should have the opportunity to analyze these potential avoidable transfers and obtain recoveries on behalf of the unsecured creditors.

69.     The Disclosure Statement, on page 88, also makes reference to a Plan Supplement that is to be filed but includes no description of what will be included in the Plan Supplement. The Disclosure Statement should be amended to explain what documents or

exhibits the Plan Supplement will include, as those documents may be important to an understanding of the Debtors' Plan and the treatment of creditors thereunder.

70.      Notwithstanding the statement on page 97 of the Disclosure Statement that Exhibit I contains a more detailed liquidation analysis for DLH, there is no such detailed liquidation within Exhibit I or anywhere else in the Disclosure Statement.  Indeed, the Disclosure Statement lacks any meaningful liquidation analysis for DLH.  A liquidation analysis with respect to DLH is necessary information for creditors.  It is necessary for § 1129(a)(7) best interests purposes and to determine the estimated return to creditors under a Chapter 7 liquidation.

71.      With respect to the ACP liquidation analysis (Exhibit I to the Disclosure Statement), the information and analysis provided is incomplete, limited and arbitrary.  For example, on page 6 of Exhibit I to the Disclosure Statement, the Debtors assert that the value of ACP's 43% interest in DLH is "0."  Although it is unstated, this must assume that DLH is also being liquidated.  What would the value of that interest be if DLH were reorganized?  Further, the ACP liquidation analysis assumes that the liquidation period would be six months.  This is an arbitrary liquidation period; there should be a sensitivity analysis reflecting potential additional value that may be realized in a liquidation over a longer period of time.  There is no discussion of or valuation of potential claim recoveries, including avoidance power claims against third parties and insiders that a trustee would pursue.  That is an asset whose value must be included in the ACP liquidation analysis.  It is striking how facile ACP is in reaching the conclusion that most of its ownership interests in other projects, including DLH, are worthless in liquidation.

72.      The Disclosure Statement is confusing, incomplete and inadequate in its description of and discussion of several other important features of the Debtors' Plan from the

perspective of creditors. In §§ 1.06, 1.07, 1.43, and 1.44 of the Plan, certain waterfalls are created with respect to sale and financing proceeds realized by the Reorganized Debtors. Many of the subsections in those definitions are very open-ended, ambiguous and confusing. They need clarity. Payments to unsecured creditors and partial payments to certain secured creditors will be made out of these net sales and net financing proceeds. What amounts are authorized to be deducted before any payments reach creditors needs to be clear and not ambiguous.

73. Similarly, the Plan provides for the issuance of notes to various creditors as part of their treatment under the Plan. Critical details concerning these notes are not included in the Plan or the Disclosure Statement. More information is necessary. For example, with respect to unsecured creditors, will each holder of an allowed unsecured claim receive a note? Will each note be made payable directly to the creditor? What is the role of the Disbursing Agent? Perhaps a creditors' trust structure should be considered? More clarity with respect to the creditor notes and their terms is needed in the Plan and/or the Disclosure Statement.

74. The Disclosure Statement also fails to provide sufficient disclosure and adequate information regarding the related plan for the Allen Debtors and the treatment of creditors under that plan. That information is important to creditors in these cases in a number of respects. Many creditors in the Debtors' cases hold guaranty claims against the Allen Debtors and their treatment in the Allen Debtors' cases will affect such creditors' overall recovery under these jointly administered cases. Furthermore, there are multiple interrelationships between the Debtors and the Allen Debtors and their respective cases, and in a number of its provisions the Debtors' Plan expressly deals with and impacts the Allen Debtors. (See, e.g., Plan, §§ 4.06, 4.07, 4.11 and 4.12.) Nowhere does the Disclosure Statement provide adequate information

concerning these issues. The proposed treatment of related party and related debtor claims, obligations and interests needs to be fully and conspicuously disclosed.

75. There are other issues that are not addressed at all or inadequately disclosed in the Disclosure Statement including, but not limited to, compensation to Richard Allen on a go-forward basis, the waterfall of dollars to unsecured creditors, how the sale projections were prepared, and the rationale for constantly refilling the $2.75 million for DLH and $1.5 million for ACP operating expenses.

76. Finally, the Disclosure Statement is quite lengthy and it would assist creditors if there was a table of contents at the beginning of the Disclosure Statement.

## CONCLUSION

77. The Committee hereby reserves its rights to raise additional issues at the Disclosure Statement hearing and to further object to the Plan at Confirmation on the grounds set forth herein and any other grounds.

78. The Disclosure Statement cannot be approved as it fails to provide adequate information and is based upon an unconfirmable Plan. For the reasons set forth herein, the Disclosure Statement should not be approved and exclusivity as to the Debtors should be terminated.

WHEREFORE, the Official Committee of Unsecured Creditors of DLH Master Land Holding, LLC and Allen Capital Partners, LLC respectfully requests that the Court deny approval of the Disclosure Statement, and grant such other relief as is just and proper.

DATED: April 11, 2011          By:  */s/ Michael D. Warner*
                                    Michael D. Warner, Esq. (TX Bar No. 00792304)
                                    Rachel R. Obaldo, Esq. (TX Bar No. 24041617)
                                    **COLE, SCHOTZ, MEISEL, FORMAN &**
                                    **LEONARD, P.A.**
                                    301 Commerce Street, Suite 1700
                                    Fort Worth, Texas  76102
                                    817-810-5250
                                    817-810-5255  Facsimile

                                    and

                                    Hamid R. Rafatjoo, Esq. (Admitted *Pro Hac Vice*)
                                    **VENABLE LLP**
                                    2049 Century Park East
                                    Suite 2100
                                    Los Angeles, CA  90067
                                    310-229-9900
                                    310-229-9901 Facsimile

                                    Counsel to the Official Committee of Unsecured
                                    Creditors of DLH Master Land Holding, LLC and Allen
                                    Capital Partners, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2011, a true and correct copy of the foregoing was served by ECF notification on those parties registered for electronic notification and by email on Mark MacDonald, Sr. via electronic mail.

                                    */s/ Michael D. Warner*
                                    Michael D. Warner