Mark E. MacDonald, TX Bar No. 12758300
Daniel J. Artz, TX Bar No. 01365570
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220; Facsimile: (214) 890-0818
Email: mark@macdonaldlaw.com
**COUNSEL FOR DLH MASTER LAND HOLDING, LLC
AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS
AND DEBTORS IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| DLH Master Land Holding, LLC, | § | |
| Allen Capital Partners, LLC, | § | Case No. 10- 30561-HDH-11 |
| Richard S. Allen, Inc. | § | |
| Richard S. Allen, | § | Jointly Administered |
| | § | |
| Debtors. | § | |
| _____ | § | |

## DISCLOSURE STATEMENT FOR
## DEBTORS' AMENDED FIFTH JOINT PLAN OF REORGANIZATION

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTORS' AMENDED FIFTH JOINT CHAPTER 11 PLAN.**

# TABLE OF CONTENTS

**ARTICLE I – INTRODUCTION**.................................................................**5**

**ARTICLE II – SUMMARY OF PLAN** .....................................................**7**
    **A. DLH Plan** ..................................................................................**19**
    **B. ACP Plan** ..................................................................................**35**
    **C. Why Should Creditors Vote to Accept Debtors Plan?** ...........**39**
    **D. Why Should Creditors Vote for the ACP Plan?**......................**46**
    **E. Cramdown Plan** .......................................................................**52**

**ARTICLE III – EXPLANATION OF CHAPTER 11 CASES** ................**53**

**ARTICLE IV – VOTING PROCEDURES** ...............................................**55**
    **A. Unimpaired Classes** .................................................................**55**
    **B. Impaired Classes** .....................................................................**55**

**ARTICLE V – CONFIRMATION OF THE PLAN** .................................**56**
    **A. The Confirmation Hearing**......................................................**56**
    **B. Objections to Confirmation**....................................................**56**

**ARTICLE VI. – REPRESENTATIONS**....................................................**58**

**ARTICLE VII. – DESCRIPTION OF DEBTOR'S BUSINESS** ..............**59**
    **A. DLH'S Business**.......................................................................**59**
    **B. ACP'S Business** .......................................................................**62**

**ARTICLE VIII – SIGNIFICANT PRE-PETITION EVENTS** ...............**63**
    **A. Beginning Development of Dallas Logistics Hub** ...................**63**
    **B. December 2009 Merger**...........................................................**68**

**ARTICLE IX – OVERVIEW OF CHAPTER 11 CASES** ........................**68**
    **A. First Day Motions** ...................................................................**68**
    **B. DIP Financing**..........................................................................**69**
    **C. Use of Cash Collateral and Adequate Protection**...................**71**
        **1. TierOne / Great Western Bank** ......................................**71**
        **2. Compass Bank** .................................................................**76**
    **D. Retention of Brokers**...............................................................**77**
        **1. CB Richard Ellis** .............................................................**77**
        **2. Colliers International ("Colliers")** .................................**77**
        **3. Jones, Lang, LaSalle ("JLL")** ........................................**78**
    **E. Leases of Non-Residential Real Property Where a Debtor is Lessee** ....................**80**
    **F. Retention of NewSource Partners and Commission Agreements for Exit Financing** ........................**81**
    **G. Objections to Romanov Claim and Romanov Settlement with Committee** ........**81**
    **H. Search for Joint Venture Partners and/or Third Party Exit Financing**...............**84**

**ARTICLE X – RISK FACTORS**...............................................................**85**

**ARTICLE XI – GENERAL DISCHARGE** ..............................................**85**

**ARTICLE XII – CORPORATE GOVERNANCE AND MANAGEMENT OF PLAN DEBTORS AS REORGANIZED** ........................**86**
    **A. Continued Existence of the Reorganized Debtors**...................**86**

    B.  New Organizational Documents ...............................................................86
    C.  Directors and Officers / Oversight Committee ......................................87
    D.  Dissolution of the Committee..................................................................87
    E.  Segregation of Accounts by the Reorganized Debtors ..........................88
    F.  Corporate and Limited Liability Company Action................................89
    G.  Saturday, Sunday or Legal Holiday.......................................................89
**ARTICLE XII – TREATMENT OF EXECUTORY CONTRACTS AND LEASES............90**
    A.  Treatment of Remaining Executory Contracts and Unexpired Leases ...............90
    B.  Rejection Damages Bar Date...................................................................90
**ARTICLE XIV – DISTRIBUTIONS ...............................................................91**
    A.  General Provisions Concerning Distributions.......................................91
    B.  Disbursing Agent .....................................................................................92
    C.  Time and Manner of Distributions..........................................................93
    D.  Delivery of Distributions / Undeliverable or Uncashed Distributions .................93
    E.  Claim Administration Responsibility......................................................95
    F.  Procedures for Treating and Resolving Disputed and Contingent Claims...........98
    G.  Setoffs and Recoupment..........................................................................98
    H.  Allowance and Disallowance of Claims Subject to Section 502 of the
            Bankruptcy Code ...............................................................................98
    I.  Cancellation of Instrument and Agreements..........................................99
    J.  No Interest on Claims ..............................................................................99
    K.  Withholding Taxes..................................................................................100
    L.  Reports  .................................................................................................100
**ARTICLE XV – EFFECT OF CONFIRMATION.......................................100**
    A.  Vesting of Assets.....................................................................................100
    B.  Binding Effect .........................................................................................100
    C.  Discharge of Claims and Termination of Interests...............................101
    D.  Term of Injunction or Stays...................................................................101
    E.  Reservation of Causes of Action Reservation of Rights ......................101
    F.  Avoidance Actions/Objections...............................................................104
**ARTICLE XVI – CONDITIONS PRECEDENT..........................................105**
    A.  Conditions Precedent to Effective Date ...............................................105
    B.  Revocation, Withdrawal or Non-Consummation of the Plan ...............105
**ARTICLE XVII – ADMINISTRATIVE PROVISIONS...............................106**
    A.  Retention of Jurisdiction by The Bankruptcy Court............................106
    B.  Payment of Fees......................................................................................107
    C.  Headings  .................................................................................................107
    D.  Binding Effect of Plan............................................................................108
    E.  Final Order .............................................................................................108
    F.  Withholding and Reporting Requirements............................................108
    G.  Tax Exemption and Expedited Tax Determination...............................109
    H.  Governing Law........................................................................................110
    I.  Corporate Action....................................................................................110

J. Severability ................................................................................................................111
K. Revocation .................................................................................................................111
L. Substantial Consummation ......................................................................................111
M. Construction ..............................................................................................................111
N. Conflict .................................................................................................................112
O. Amendments and Modifications.............................................................................112
P. Notices .................................................................................................................113
Q. Filing of Additional Documents.............................................................................113
R. Direction to a Party..................................................................................................114
S. Successors and Assigns............................................................................................114
ARTICLE XVIII – EXEMPTION FROM SECURITIES LAW ...........................................114
ARTICLE XIX – ALTERNATIVES TO CONFIRMATION AND
                CONSUMMATION OF PLAN OF REORGANIZATION
                AND LIQUIDATION ANALYSIS ..............................................................119
A. Liquidation Under Chapter 7 .................................................................................119
B. Alternative Plan of Reorganization .......................................................................120
ARTICLE XX – CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN.............121
A. Payment of Taxes Arising from Asset Sales by Debtors .....................................122
B. Information Reporting and Withholding................................................................122
LIST OF EXHIBITS..............................................................................................................125

Note regarding Great Western Settlement Order…………………………………………… 126

# I. __INTRODUCTION__

Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity Interests in and Claims against Debtors in connection with (i) solicitation of acceptances of the Plan filed by Debtors with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") and (ii) the hearing to consider Plan confirmation (the "Confirmation Hearing") scheduled for June 21, 2011 at 9 AM (prevailing Central Time).

Debtors' Fifth Amended Joint Plan of Reorganization ("Plan" or "Reorganization Plan") filed with the Bankruptcy Court is **Exhibit A** to this Disclosure Statement.

A ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that Debtors believe may be entitled to vote to accept or reject the Plan.

**THE ACP AND DLH DEBTORS, AND THE OFFICIAL CREDITORS COMMITTEE, EACH BELIEVE THAT THE PLAN WILL PROVIDE ALL CLAIMANTS, AND INTEREST HOLDERS MORE THAN THEY WOULD HAVE RECEIVED IN A LIQUIDATION OF EACH DEBTOR'S ASSETS UNDER CHAPTER 7, AND SHOULD BE ACCEPTED. CONSEQUENTLY, EACH DEBTOR URGES IMPAIRED CLAIMANTS TO VOTE FOR THE PLAN.**

On or about May 19, 2011, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order, attached as **Exhibit B**, sets forth detailed deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning classification of Claims and Interests for voting purposes and tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to provide information to enable a hypothetical, reasonable investor, typical of the holders of such Claims or Interests, to make an informed judgment in exercising his, her or its rights either to accept or reject the Plan. In order for the votes cast pursuant to this solicitation to count, the Bankruptcy Court must find this Disclosure Statement contains information of the kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes being solicited to make an informed judgment about the Plan and must authorize Debtors to solicit acceptances of the Plan.

This Disclosure Statement describes Debtors' Reorganization Plan. You are urged to study the Plan in full and to consult with your counsel about the Plan and its impact upon your legal rights. Please read this Disclosure Statement carefully before voting on the Plan.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY DEBTORS' MANAGEMENT (AND CONSULTANTS/CONTRACTORS), UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES.**

**NO REPRESENTATIONS CONCERNING DEBTORS ARE AUTHORIZED BY DEBTORS OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. DEBTORS RECOMMEND THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN, ATTACHED AS EXHIBIT A, IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND EACH PARTY WHOSE CLAIM IS IMPAIRED IS URGED TO REVIEW THE PLAN PRIOR TO VOTING.**

## II.   SUMMARY OF PLAN

Debtors' proposed Reorganization Plan contemplates that Debtors will obtain sufficient Exit Financing from sales and loans from insiders to enable Debtors to pay all Administrative and non-tax Priority Claims (other than the Debtor-in-Possession Financing) in full on the Effective Date. Debtors believe that those funds will be available. ACP and DLH have actively negotiated potential joint ventures governing vertical development and land sales at LPKC and DLH. On May 3, 2011, LPKC executed a Joint Venture Option Agreement with ST Investors – LPKC, Inc which will provide build to suit financing and will provide a funding source, if required to meet a minimum take down of land under LPKC's modified option with BNSF. The Fifth Amendment to BNSF Option was executed on May 4, 2011. Details are contained in Exhibit F to the Disclosure Statement. DLH has a letter of intent for its joint venture and is completing final documentation.

### CHANGES NEGOTIATED WITH CREDITORS COMMITTEE

Since the original Plan, Debtors have met with representatives of the Official Committee of Unsecured Creditors of DLH and ACP (the "Committee"). Debtors made a number of changes in the

Plan to encourage the Committee to support the Plan. The Committee now supports the Plan. The Plan incorporates numerous material changes made at the specific request of the Committee:

a) The Plan now clarifies that Debtors are offering each Unsecured Creditor the ability to elect that any part of its claim can be reduced by 50% and paid on an accelerated basis compared to other unsecured claims. For example, if an Allowed Unsecured Claim elected to take 30% of its claim and select the "50% fast pay option" the overall creditor recovery would be 85%, i.e. 100% of 70%+50% of 30%. A second example would be that if a Creditor elects the 50% fast pay option for 75% of its claim its overall recovery would be 62.5%, i.e. 50% of 75%+100% of 25%. With the exception of Ed Romanov, a disputed ACP creditor who reached a partial settlement more particularly described below, and with the exception of the holders of Unsecured Claims who are insiders of the Debtor (who voluntarily agree to subordinate their Claims to the payment in full of non-insider Unsecured Creditors), every Unsecured Creditor can accept the blended claim recovery which he/she deems best for them. This is a change in Plan language not a change in Plan concept. All allowed Unsecured Creditors electing 100% payment now receive interest of at least 2% per annum on that portion of its claim.

b) The Plan now provides for a minimum distribution each year after the first year from the Effective Date to Unsecured Creditor Class 4. If the minimum is not met, Allowed Unsecured Claims are entitled to receive added interest. The DLH Minimum Annual Distributions means the annual minimum funding levels required to be paid by Reorganized DLH to the Disbursing Agent on behalf of non-insider

Class 4 Unsecured Creditors, who will be the beneficiaries of its 50% Notes and its 100% Notes, and must meet the following requirements:

(i)      in the first year after the Effective Date, no minimum annual funding by Reorganized DLH is required; and

(ii)     in the second through ninth years after the Effective Date, the minimum annual funding required by Reorganized DLH shall be $500,000 per year.

The annual minimum funding levels required to be paid by Reorganized ACP to the Disbursing Agent on behalf of non-insider Class 4 Unsecured Creditors, who will be the beneficiaries of its 50% Notes and its 100% Notes, must meet the following requirements:

(i)      in the first year after the Effective Date, no minimum annual funding by Reorganized ACP is required; and

(ii)     in the second and third years after the Effective Date, the minimum annual funding required by Reorganized ACP shall be $1,000,000 per year; and

(iii)    in the fourth through the ninth years after the Effective Date, the minimum annual funding required by Reorganized ACP shall be $1,500,000 per year.

Payments received by the Disbursing Agent from Unsecured Creditor Net Proceeds of Reorganized DLH or Reorganized ACP, or from Excess Cash Distributions from Reorganized DLH or Reorganized ACP, in any given year shall be credited against that year's minimum annual funding requirement for the entity, and, to the extent applicable, to the cure of any unfunded shortfall amounts on prior years minimum annual funding levels, together with interest thereon as provided below, for any prior years.

With respect to the Reorganized DLH, if at the end of any year beginning in the second year after the Effective Date, there is a shortfall in Reorganized DLH making its required minimum annual funding for its notes as set forth above (a "First Shortfall), the interest rate applicable on the unfunded shortfall amount for that year for that entity shall be (a) 4% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the 100% Notes and (b) 2% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the 50% Notes. When the unfunded shortfall amount together with the additional 2% interest on the unfunded amount is paid to the Disbursing Agent, the interest rate on the 100% Notes shall thereupon reset to 2% and there shall be no interest payable on the 50% Notes. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following the First Shortfall year (a "Second Consecutive Shortfall") by that entity, (x) the interest rate applicable on the 100% Notes shall immediately thereupon increase from 2% to 4% per annum on the total remaining unpaid balance under those notes, (y) the interest rate payable on all unfunded deficiency amounts applicable to the 50% Notes shall be set at 2% per annum until all shortfall amounts thereunder are paid in full to the Disbursing Agent together with the applicable interest thereon, and (z) in the event of a Second Consecutive Shortfall, Reorganized DLH shall suspend payment of Richard S. Allen's 40% of the Bonus Pool (and all such amounts shall be accrued, but not paid, by Reorganized DLH) until all required minimum annual distributions in arrears together with interest thereon

as applicable have been funded in full to the Disbursing Agent. With respect to a Second Consecutive Shortfall, if and when all shortfall amounts together with interest thereon as applicable are paid in full the Disbursing Agent, the interest rate payable on the remaining unpaid balance outstanding on the 100% Notes shall reset from 4% to 3% on the outstanding balance under those notes and shall remain at 3% thereafter unless there is a subsequent shortfall in funding its required minimum annual amount, in which event the interest rate on the 100% Notes shall reset to 4% per annum on the outstanding balance under those notes and remain at 4% thereafter.

With respect to Reorganized ACP, if at the end of any year beginning in the second year after the Effective Date, there is a shortfall in Reorganized ACP making its required minimum annual funding as set forth above (a "First Shortfall"), the interest rate applicable on the unfunded shortfall amount for that year shall be (a) 4% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the ACP 100% Notes and (b) 2% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the ACP 50% Notes. When the unfunded shortfall amount together with the additional 2% interest on the unfunded amount is paid by Reorganized ACP to the Disbursing Agent, the interest rate on the ACP 100% Notes shall thereupon reset to 2% and there shall be no interest payable on the ACP 50% Notes. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following the First Shortfall year (a "Second Consecutive Shortfall"), (x) the interest rate

applicable on the ACP 100% Notes shall immediately thereupon increase from 2% to 4% per annum on the total remaining unpaid balance under those notes and (y) the interest rate payable on all unfunded deficiency amounts applicable to the ACP 50% Notes shall be set at 2% per annum until all shortfall amounts thereunder are paid in full by Reorganized ACP to the Disbursing Agent together with the applicable interest thereon. The interest rate shall remain at 4% per annum on the total remaining unpaid balance under the ACP 100% Notes notwithstanding a cure of the unfunded shortfall amounts; however, if and when all shortfall amounts together with interest thereon as applicable are paid in full by Reorganized ACP to the Disbursing Agent, the ACP 50% Notes shall be reset to 0%. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following a Second Consecutive Shortfall year (a "Third Consecutive Shortfall"), the interest rate applicable on the ACP 100% Notes shall immediately thereupon increase from 4% to 6% per annum on the total remaining unpaid balance under those notes and the interest rate payable on all unfunded deficiency amounts applicable to the ACP 50% Notes shall continue at 2% per annum until all shortfall amounts thereunder are paid in full by Reorganized ACP to the Disbursing Agent together with the applicable interest thereon. With respect to a Third Consecutive Shortfall, if and when all shortfall amounts together with interest thereon as applicable are paid in full by Reorganized ACP to the Disbursing Agent, the interest rate payable on the remaining unpaid balance outstanding on the ACP 100% Notes shall reset from 6% to 4% on the outstanding balance under those notes and shall remain at 4% thereafter unless there is a subsequent shortfall in Reorganized ACP funding its required

minimum annual amount, in which event interest on the ACP 100% Notes shall immediately thereupon increase from 4% to 6% on the remaining unpaid balance under those notes.

The failure of Reorganized DLH or Reorganized ACP to pay to the respective Disbursing Agents the Minimum Annual Distributions due in any year for such entity will not constitute a default under the Plan. The consequence of any such failure will be limited to the interest due on any shortfalls and/or the increased interest due on the principal balance due under the DLH or ACP 100% Notes and/or the DLH or ACP 50% Notes and the suspension of Bonus Pool payments to Richard S. Allen, as described above. Any failure by Reorganized DLH or Reorganized ACP to pay to the respective Disbursing Agent all Unsecured Creditor Net Proceeds, as described in the Plan, as and when those payments are due, will constitute a default under the Plan.

In addition to the foregoing, Reorganized DLH shall also be required to make the following additional payments to the Disbursing Agent on behalf of the beneficiaries of the DLH 50% Notes and the DLH 100% Notes (the "Additional DLH Minimum Payments"):

> (i)      on any anniversary of the Effective Date on which there are amounts still owing by Reorganized DLH on the Term Loan, the Pool 1 Notes and the Pool 2 Notes, Reorganized DLH shall pay to the Disbursing Agent a minimum of 25% of its net cash (including cash equivalents), if any, after all current year and following year G&A expenses, real estate taxes and scheduled debt service (if any remains) for Reorganized DLH's Term Loan, Pool 1 and Pool 2 lenders have been reserved;

> (ii)      on any anniversary of the Effective Date after the Term Loan has been paid in full, the minimum percentage in subsection (i) shall increase to

50%;

(iii)     on any anniversary of the Effective Date after the Term Loan and the Pool 1 Notes have been paid in full, the minimum percentage in subsection (i) shall increase to 75%; and

(iv)     on any anniversary of the Effective Date after the Term Loan, the Pool 1 Notes and the Pool 2 Notes have been paid in full, the minimum percentage in subsection (i) shall increase to 100%.

c)   The definitions of DLH Net Sales Proceeds and ACP Net Sales Proceeds, as well as ACP Unsecured Creditor Net Proceeds, have been clarified, and certain deductions in those definitions have been limited.

d)   The definition of DLH Unsecured Creditors Net Sales Proceeds has been broadened to include proceeds from certain financing transactions.

e)   All cash balances of the Reorganized Debtors in excess of the cash required for working capital needs is required to be distributed to Creditors.

f)   Reorganized DLH would be required to distribute at the end of each calendar quarter all cash in excess of $2.75 Million.  Reorganized ACP would be required to distribute all cash in excess of $1.5 Million at the end of each calendar quarter in the first two years after the Effective Date.  The cash reserve requirement for Reorganized ACP is reduced to $1.25 Million in the third year after the Effective Date, and to $1.0 Million in the fourth and subsequent years after the Effective Date.

g)   Excess Cash (as defined in the Plan) could be distributed only for: (a) repayment of the Term Loan; (b) repayment of any other Exit Financing; (c) payments of principal and/or interest on Secured Claims (either scheduled payments or voluntary prepayments); and (d) distributions to non-insider Unsecured Creditors.  Although

the Reorganized Debtors retain discretion over how any Excess Cash may be distributed as among creditors, the requirement that Excess Cash must be distributed should accelerate repayment of all creditors.

h) Reorganized ACP and Reorganized DLH will each have at least one member of the Board of Directors representing non-insider Unsecured Creditors until all non-insider Unsecured Claims in that entity have been paid in accordance with the Plan.

i) Transactions involving insiders, affiliates, or senior management of the Reorganized Debtors, except for specified transactions described in the Plan, will require unanimous Board approval, including approval of the Board Member representing Unsecured Creditors. Notwithstanding the foregoing, a simple majority of the Board of Directors may approve any of the following transactions with insiders, affiliates or senior management:

(1) The renewal, extension or non-material modification of any existing agreement that has been approved by the Creditors Committee on or before the Effective Date with an insider, affiliate or senior management to provide services to the Reorganized Debtors, including any agreement to provide employment, accounting, tax reporting, or other services;

(2) Any payments under the Bonus Pool adopted for Reorganized DLH as such Bonus Pool has been approved by the Creditors Committee on or before the Effective Date;

(3) The repayment of the Term Loan from the DIP Lenders in accordance with its terms as approved by the Bankruptcy Court on or before the Confirmation Date including any voluntary prepayments from DLH Excess Cash Distributions;

(4) The repayment in accordance with its terms of any other loan or obligation to an insider, affiliate or senior management which loan or obligation has been approved by the Creditors Committee on or before the Effective Date, including but not limited to the repayment

of any loans made as part of the Exit Financing for DLH or ACP in accordance with terms approved by the Creditors Committee and payment in accordance with their terms of the service agreements described in subsection (1) above; and

(5) Any loan from Reorganized ACP to any direct or indirect subsidiary or other affiliate of Reorganized ACP, provided that such loan: (i) is not, itself or in combination with any other loans to such subsidiary or affiliate after the Confirmation Date, in excess of $500,000.00; (ii) is made in accordance with commercially reasonable business terms; and (iii) is either secured by adequate collateral or is determined to be reasonably necessary for Reorganized ACP to preserve or protect its investment in a direct or indirect subsidiary or affiliate.

If there is a dispute as to the terms of any agreement, the Bonus Pool or any loans or obligations that DLH or ACP has submitted to the Creditors Committee for approval on or before the Effective Date in accordance with subsections (b)(1), (2) or (4) of Section 6.05 of the Plan, such dispute shall be submitted upon motion to the Bankruptcy Court for determination. Any such agreement, Bonus Pool or loan or obligation which is approved by Final Order of the Bankruptcy Court shall satisfy the Creditors Committee approval requirement of subsections (b)(1), (2) and (4) of Section 6.05 of the Plan.

j) **Other Board Approval**. In addition, unanimous approval of the Board of Directors including approval by the Creditors Representative, shall be required for the following:

(1) Any merger, sale of all or substantially all assets or dissolution of Reorganized DLH or Reorganized ACP;

(2) Any sales, dispositions, transfers, non-cash exchanges, joint ventures, partnerships or similar transactions of Reorganized DLH,

Reorganized ACP or any direct or indirect Subsidiary of Reorganized ACP which involves, with respect to Reorganized DLH, 500 acres or more of land or $10,000,000 or more in transaction value (in one transaction or in combination with any related transactions), and, with respect to Reorganized ACP or any of its direct or indirect Subsidiaries other than LPKC, $3,000,000 or more In Value (in one transaction or in combination with any related transactions) and, with respect to LPKC, $8,000,000 or more In Value (in one transaction or in combination with any related transactions), provided however that as part of the Creditors Representative's approval of a joint venture transaction for any of Reorganized DLH, Reorganized ACP or a Subsidiary of Reorganized ACP, such approval may include advance approval by the Creditors Representative, upon such terms as may be agreed to by the Creditors Representative, of future transactions by the joint venture without requiring approval of each such future joint venture transaction on a transaction by transaction basis (any such approval must be documented in a writing signed by the Creditors Representative);

(3)     Any new liens or encumbrances after the Confirmation Date on property of Reorganized DLH, Reorganized ACP or direct or indirect Subsidiaries of Reorganized ACP other than any refinancings that do not involve additional debt or additional collateral and other than easements being granted in the ordinary course of business and according to commercially reasonable terms provided, however, that with respect to any direct or indirect Subsidiary of ACP or Reorganized ACP, any partnership, joint venture, or other venture agreement which contemplates the purchase or financing of any property of such Subsidiary may be submitted to the Creditors Representative for approval (whether or not such approval is required under subsection 6.05(c)(2) of the Plan), and such approval may include advance approval by the Creditors Representative, upon such terms as may be agreed to by the Creditors Representative, of future transactions by the joint venture without requiring approval of each such future joint venture transaction on a transaction by transaction basis (any such approval must be documented in a writing signed by the Creditors Representative), and any transaction approved or preapproved under subsection 6.05(c)(2) of the Plan shall be deemed approved under this subsection;

(4)     Any new bankruptcy filing by DLH or ACP, any bankruptcy filing by Reorganized DLH or Reorganized ACP and any consent to judgment or order for relief in bankruptcy or other insolvency proceeding by DLH, ACP, Reorganized DLH or Reorganized ACP; and

(5)    Any corporate or LLC restructuring of Reorganized DLH or Reorganized ACP, including, but not limited to, any amendments to the operating agreements of Reorganized DLH or Reorganized ACP that involve insiders, affiliates or senior management of Reorganized DLH or Reorganized ACP, that impact or may impact payments to creditors under the DLH 50% Notes, the DLH 100% Notes, the ACP 50% Notes or the ACP 100% Notes, or that impact or may impact the Creditors Representative or his/her rights and role with respect to Reorganized DLH or Reorganized ACP.

k)  Substantial consummation (the "Consummation Date") has been redefined as including completion of all acts required to be undertaken within ninety (90) days after the Effective Date.

l)  The Committee will continue in existence until the Consummation Date under the Plan, rather than the Effective Date.

m)  All professional fees claimed by the DIP Lenders in converting to term loans have been made subject to Court approval.

n)  The provisions for General Discharge of claims against affiliates and principals of Debtors have been deleted.

o)  The Class B Preferred Callable Membership Interests in DLH, which are to be issued in exchange for Reimbursement Claims of guarantors of the debt of DLH, are no longer callable prior to payment in full of Allowed Unsecured Claims, and Reorganized DLH is prohibited from paying any preferred return on these interests prior to payment in full of all Allowed Unsecured Claim.

p)  The limits on equity distributions at Reorganized DLH have been tightened so that no distributions can occur, other than distributions for the limited purpose of paying taxes actually incurred as a result of transactions of Reorganized DLH, unless

holders of DLH Allowed Unsecured Claims have been paid in full.

## A.     DLH Plan

<u>Sources of DLH Exit Funding</u>

On March 23, 2011 the Court entered the Sale Order approving the sale of ADESA to an entity controlled by Cardinal Industrial and Fortress Investments (Cardinal /Fortress) for an overall purchase price of $50,750,000. The agreed price to discharge the lien of Great Western Bank is $48 million with DLH and Great Western sharing rentals prior to closing. Closing is scheduled in late May 2011. By reason of entry of the Sale Order, Great Western/FDIC no longer has the right to terminate the Settlement Agreement.

The estimated net closing proceeds are approximately $2,100,000. Use of these proceeds are subject to two potential limitations: First, the cure costs required to assume and assign the ADESA lease for the amount of those cure costs, if not resolved before May 18, 2011 will be heard and determined by the Court at that time. Cure can be made not only from the net proceeds of the ADESA sale, but also from future payments by the City of Hutchins under a "380" Agreement. DLH had offered to compromise with ADESA for $350,000 cash from the proceeds of sale resulting from a sale that could have resulted with another entity, without use of any 380 Agreement proceeds. Although the 380 Agreement is held by Allen Group, Inc. a corporate entity 100% owned by Richard S. Allen, Allen Group, Inc. has agreed, subject to Court approval, to make a portion of the right to those funds available to DLH in order to enhance available cash to DLH on the ADESA sale Closing Date. Objections to the terms of the settlement have been filed by ADESA and the Committee which Debtors are seeking to resolve. ADESA and Debtors are in active negotiations to resolve the cure cost dispute. Upon the Court's approval of the settlement, DLH and the Allen

Group, Inc. will seek appropriate consent of the City of Hutchins.

Second, a hearing on the potential assertion by Tim Foley, a secured creditor of ACP, that he is entitled to "distributions" from the ADESA sale as a part of his collateral under a loan, will also be held on May 18, 2011. Mr. Foley's complaint is discussed at **Exhibit M**; however, DLH believes that any ruling in Mr. Foley's favor would be highly unlikely. In addition to numerous defenses raised by Debtors, the Committee has also suggested that the collateral grant to Mr. Foley giving rise to his claim against the ADESA sale proceeds may be avoidable as a preference or fraudulent conveyance.

Still another threat to the ADESA proceeds which had arisen since the Court's approval of the ADESA sale to Cardinal Fortress was a threatened suit by Greenfield, the unsuccessful purchaser of the ADESA Property against Cardinal/Fortress, the successful purchaser, asserting damages in excess of $50 million dollars. Concurrently, Altius, a money broker for Greenfield, sued Cardinal/Fortress for approximately $1.5 million dollars in Utah in the United States District Court. DLH filed a Motion to Show Cause why Greenfield, Altius, and their respective attorneys should not be held in contempt of the automatic stay and the injunction contained in the Sale Order.

ADESA did not appeal the Sale Order and did not in any way join in actions by Greenfield or Altius to disrupt the sale. Greenfield and Altius and their respective attorneys executed a mutual general release of DLH, Cardinal/Fortress and others in a form acceptable to Purchaser in order to resolve the potential contempt which is being carried on the docket pending closing of the sale of the property to Cardinal.

Accordingly, DLH believes that on the Effective Date it will have $2,000,000 or more available from the ADESA sale to pay:

| (a) | Estimated administrative expenses | $840,000 |
| (b) | Administrative Convenience DLH (Class 6) | $ 50,000, |

leaving funds to pay more than six months of operating expenses and scheduled interest payments for Pool 2 Notes even if no sales occur of Pool 1, Pool 2, or Pool 4 assets.

If required, DLH also anticipates obtaining Exit Financing from a loan from Richard S. Allen, individually, in amount of up to $750,000.00 with a lien junior to the junior lien of the Term Loan, subordinate in payment to the Term Loan.   Further, Richard S. Allen is currently a Debtor in his own Chapter 11 case, and any loan from Richard S. Allen is subject to obtaining approval of such loan from the Bankruptcy Court in the Richard S. Allen Chapter 11 case.  Richard S. Allen has up to $750,000 in current cash net of expenses in his own Chapter 11 potentially available for loans or capital contributions to ACP or DLH.

## DLH Plan Summary

It has become clear while negotiating with third parties that the Dallas Logistics Hub Project that +/- 5,500 acres is currently too large for the current financing and development environment. As such, the land in Pool 3 ("ABOT Pool") (consisting of approximately 1,032 acres) and Pool 4 ("Seller Notes Pool") (consisting of approximately 1,890 acres) will either be surrendered to the Secured Creditors holding liens on such land or sold on an expedited, but orderly basis through structured sales, sealed bid and/or auction sales over six months after the Effective Date.  This will reduce the outstanding Reorganized DLH indebtedness by approximately $59.5 million in estimated claims, which would otherwise accrue interest and potentially require servicing.

The auction, sealed bid, and/or structured sales described above are anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the

parcels to be sold, and generate excess cash which DLH may use to provide post Effective Date working capital.  As set forth below, DLH currently has various parcels of land listed for sale with Jones, Lang, LaSalle.  At this time, however, DLH has not moved for approval of an auction and/or Section 363 sale but anticipates doing so prior to the commencement of the Confirmation Hearing.

DLH and the DIP Lenders will convert the Debtor in Possession Financing for DLH into a Post-Confirmation Term Loan ("Term Loan") in the amount of approximately $2.782 Million including interest through June 30, 2011.  Certain DLH Secured Claims secured by land will be satisfied on or shortly after the Effective Date by the surrender of the land securing such Secured Claims. DLH will finance distributions to the other creditors from land sales of or from distributions from a joint venture involving build to suit projects in which the joint venture provides the funds to buy the land, construct buildings for resale, and collect rents pending sale.  DLH would receive distributions from a percentage of rents and sales proceeds, net of construction loan payments.  The Net Proceeds from any land sale would be used first to pay necessary costs of closing, second, in payment of the Release Price necessary to satisfy in full the Secured Claims secured by such parcel, third, in payment of a Release Price on the Term Loan from the DIP Lenders, and fourth, a set aside sufficient to allow DLH's owners to pay actual taxes incurred as a result of the taxable gains realized on such a sale net of existing usable tax losses attributed to their DLH investments. The remaining Net Proceeds from any such sale would be allocated as provided in the Plan between Reorganized DLH and the Creditors of DLH: (a) to fund the operating expenses of Reorganized DLH, including the costs of managing and marketing the DLH Land, and (b) to fund distributions to Secured and Unsecured Creditors.  The projected DLH overhead expenses have been sharply reduced from prior projections.  See **Exhibit L** – Build To Suit Pro Forma.

**DLH Marketing:**  In addition to continuing its current marketing and sales efforts through traditional real estate marketing methods, DLH intends to explore all methods available to satisfy the requirements under the Plan.

For instance, prior to the Effective Date, and from time to time after the Effective Date, DLH anticipates initiating a sealed bid program ("Program") through which it will offer for sale various parcels of land on an individual parcel basis.

The total acreage of all parcels included in the Program is expected to exceed 500 acres and will be comprised of Pool 2 and Pool 4 land parcels.

The basic features of the Program will include:

- A thirty (30) to forty-five (45) day marketing period – this is the time from the launch of the advertising campaign and the date all written offers are due to seller.

- A regional advertising program in prominent newspaper publications (i.e. The Wall Street Journal, Dallas Morning News, Dallas Business Journal, Houston Business Journal, etc.)

- An email blast campaign utilizing internal and third party email databases of real estate brokers, developers and investors

- A dedicated website which will be set up as a marketing platform as well as an electronic war room with property specific due diligence materials

- A Program specific set of rules and guidelines for the sale, including registration requirements, timelines for various transaction requirements (i.e. proof of funds, length of inspection period, closing dates, and earnest money requirements.)

Once offers are received, DLH will evaluate all offers to identify which are sufficient to pay the 100% of the Allowed Secured Claim, the normal and customary closing costs, an allocation of the marketing and advertising costs as well as conforms to the inspection and closing requirements. All offers which satisfy these requirements will become "Qualified Offers".

DLH will then further evaluate the Qualified Offers and interview offerors to select the most Qualified Offer based upon the price, terms of the contract, source of funds to close the transaction and other factors. The selected Qualified Offer shall be the "Winning Offer".

The Winning Offer will be finalized in a binding contract and proceed to closing process. To the extent that the contract involving a Winning Offer is executed prior to the Effective Date, DLH shall seek approval of the sale by the Court under Section 363.

In the event that for any given parcel of land DLH receives offers which do not otherwise satisfy the requirements to become a Qualified Offer, DLH shall first identify the best offer received and attempt to further negotiate the terms and conditions of the offer to a point that it becomes a Qualified Offer. If DLH is successful in negotiating the offer to a Qualified Offer, the sale process will proceed as specified above.

In the event that DLH is unable to negotiate an offer to a Qualified Offer, DLH shall contact the Noteholder and discuss the offer to determine what if any items in the offer Noteholder is prepared to accept (i.e. a discounted payoff amount of the Allowed Claim, extended closing timeline, etc.). To the extent that the Noteholder and DLH can agree on terms acceptable to Noteholder, DLH and the offeror, a contract will be entered into and the sale process will proceed as specified above. To the extent that an agreement cannot be reached by all parties, the discussions will cease and the property will be returned to Noteholder as provided herein.

DLH will not enter into any contract to sell any property which does not fully satisfy the Allowed Secured Claim, without the written consent and agreement of the Noteholder.

DLH intends, from time to time, to initiate various Programs of varying structure over the course of the Plan to accomplish the projected sales contained in the Plan

**DLH Secured Creditors:** Under the Plan, DLH creditors secured by vacant land are divided into four (4) pools.

**Pool 1 (the "Compass Pool")** contains parcels as set forth in **Exhibit A-1** to the Plan which are subject to the liens of Compass Bank ("Compass"). Most of the parcels in the Compass Pool are Development Ready. Compass has a perfected first lien on all of the parcels in the Compass Pool, all of which secure the Allowed Secured Claim of Compass on its land loan. Compass has a separate Secured Claim secured by liens on two tracts owned by DLH and improved with two Buildings. That Secured Claim (the "Compass Building Loan") is treated elsewhere in the Plan. The Plan establishes Release Prices for each individual parcel in the Compass Pool such that the sum of the Release Prices does not exceed 150% of the Allowed Secured Claim of Compass. Specific Release Prices for each parcel are specifically reflected on Exhibit A-1 to the Plan ("Compass Release Prices"). To pay Compass's Pool 1 Allowed Secured Claim, Compass shall receive a Variable Pay Note primarily payable from three sources: 1) the net proceeds of any sale of a parcel in Pool 1 subject to the Compass lien up to the Release Price for such Parcel; 2) 30% of Pool 1 Net Sales Proceeds for that parcel and for any and all sales of other property contained in Pool 1 and 3) discretionary payments of DLH Excess Cash Distributions. The Notes will accrue interest at 7.25% and mature on the fifth (5th) anniversary of the Plan Effective Date. To the extent that specific amounts of interest payments and Compass principal reductions from sales of Pool 1 properties are

not met at the close of the second, third and fourth year after the Effective Date and DLH has failed to make such payment from otherwise available funds, Compass may declare a default, and Reorganized DLH will be obligated to make certain structured sales, sealed-bids or auctions of land in Pool 1, or obtain funds from junior lien financing or from new equity within six months to cure the default. Detailed analysis of the projected cash flow, debt balance and absorption analysis requested by Compass are attached as **Exhibit O-1, O-2, and O-3**.

**Pool 2 (the "Hutchins Industrial Pool")** contains parcels as set forth in <u>**Exhibit A-2**</u> to the Plan, which are subject to various seller financing liens. All or substantially all of the parcels in the Hutchins Industrial Pool are Development Ready. Secured Creditors with Pool 2 Allowed Secured Claims will each receive a Note payable from three sources: 1) the net proceeds of any sale of a parcel in the Hutchins Industrial Pool shall be paid to the Pool 2 Secured Creditor holding the lien on such Parcel, in the amount of such Secured Creditor's Pool 2 Note, 2) all other Pool 2 Secured Creditors holding Pool 2 Notes shall receive their pro-rata share of 30% of Pool 2 Net Sales Proceeds for any and all sales of other property contained in Pool 2 and 3) discretionary payments of DLH Excess Cash Distributions. The Pool 2 Notes will accrue interest at 5.50% and mature 5 years after the Plan Effective Date, subject to three (3) one year options to extend that maturity. The Pool 2 Notes shall be payable in semi-annual payments in arrears, with interest only on such Pool 2 Notes payable for 3 years after the Effective Date, and thereafter in equal payments of principal and interest sufficient to fully amortize the then outstanding balance of the Pool 2 Notes over ten (10) years. The Pool 2 Notes shall be due and payable in full on the fifth (5th) anniversary of the Effective Date, except to the extent that Reorganized DLH exercises its option to extend the maturity date. Each such option to extend the Pool 2 Notes may be exercised independently, and

Reorganized DLH may elect, at its option, to exercise an extension option either for all Pool 2 Notes then outstanding, or for one or more, but less than all, of the Pool 2 Notes then outstanding. Reorganized DLH must give written notice to the holder of each Pool 2 Note to be extended not less than 60 days prior to its Maturity Date (as it may have been extended pursuant to any previously exercised extension option). In order for Reorganized DLH to exercise any of the extension options as to any of the Pool 2 Notes, Reorganized DLH must: (a) not be in default of any payment of principal and or interest due under the Pool 2 Notes being extended; (b) have timely given written notice of its election to exercise the extension option; and (c) make a principal reduction payment, on or before the fifth anniversary date of the Effective Date (for the first extension option), or on or before the then current maturity date of the Pool 2 Notes, as extended (for each subsequent extension option), in an amount equal to two percent (2%) of the then outstanding principal balance of the Pool 2 Notes being extended. Payments of interest on the Pool 2 Notes shall be due semiannually in arrears, with the first payment due one six months after the Effective Date. Failure of Reorganized DLH to make any scheduled payment of interest on a holder's Pool 2 Note shall constitute an occurrence of default and entitle the holder of the Pool 2 Note, upon ten (10) calendar days prior written notice to Reorganized DLH and subject to Reorganized DLH's right to cure within that time, to declare the entire balance of principal and interest immediately due and payable, together with all costs of collection, including reasonable attorney's fees and all expenses incurred in connection with protection of, or realization on, the parcel securing the holder's Pool 2 Note. Commencing after the third year after the Effective Date, Reorganized DLH shall make semiannual payments of principal and interest on each Pool 2 Note in equal semiannual amounts calculated to fully amortize the Pool 2 Notes over ten (10) years from such date. In addition, in order to provide the Pool 2 Noteholders

with some protection against inflation, commencing on the first anniversary of the Effective Date, and annually thereafter on each anniversary date of the Effective Date prior to the maturity date (as it may be extended), the then outstanding principal balance of each Pool 2 Note will be adjusted by an amount equal to the <u>product</u> of the principal balance of the Pool 2 Note being adjusted, multiplied by the lesser of: (1) the percentage increase in the Consumer Price Index during the immediately preceding year, or (2) 2.5%. The parcels in the Hutchins Industrial Pool are further encumbered by perfected subordinate liens securing the Debtor-in-Possession Financing, which shall be converted to a Term Loan (defined herein) upon the Effective Date. The Term Loan shall retain its perfected subordinate liens on the parcels in the Hutchins Industrial Pool.

"CPI" refers to the Consumer Price Index for All Urban Consumers, U.S. City Average (All Items; 1982-1984 = 100), as published monthly by the U.S. Bureau of Labor Statistics (without seasonal adjustment).

**Pool 3 (the "ABOT Pool")** contains parcels as set forth in **<u>Exhibit A-3</u>** to the Plan, which are subject to the liens of ABOT. Due to the location and current infrastructure needs, most of the land contained in the ABOT Pool will take longer to fully develop and sell. ABOT has a perfected first lien on all of the parcels in the ABOT Pool, all of which secure the Allowed Secured Claim of ABOT. DLH has stipulated to surrender to ABOT all of the Pool 3 Parcels in full satisfaction of the Claim of ABOT and all guarantees by Debtors and other related parties. Under the stipulation ABOT will foreclose in June 2011 with no deficiency claim. Accordingly, ABOT is no longer impaired and its vote is not required.

**Pool 4 (the "Seller Notes Pool")** contains parcels as set forth in **<u>Exhibit A-4</u>** to the Plan, which are subject to various seller financing liens. Due to the location and current infrastructure

needs, the land contained in Pool 4 will take longer to fully develop and sell. DLH shall surrender to the Secured Creditors holding Pool 4 Allowed Secured Claims on the Pool 4 parcels identified as Parcels 161-164 (Coffman Investments) and Parcels 93-95 and 156-157 (Southport Properties, LP) in full satisfaction of all such Claims pursuant to previous orders entered by the Court. On March 8, 2011, the Court entered an *Order Granting Secured Creditor SouthPort Properties, L.P.'s Motion for Relief from the Automatic Stay* [Docket No. 805] allowing SouthPort to post its collateral for foreclosure and sell the same at a non-judicial foreclosure sale no earlier than May 3, 2011. Coffman Investment LP has also been granted leave to foreclose. Accordingly, neither secured claim is impaired.

With respect to the remaining Pool 4 parcels, Reorganized DLH shall retain such parcels for up to six months after the Effective Date in order to market such Pool 4 parcels through auctions, sealed bid, and or other structured sales. Each Secured Creditor holding a lien on a Pool 4 parcel being retained by Reorganized DLH shall receive a Note (a "Pool 4 Note") in the full amount of the Allowed Claim of such Pool 4 Secured Creditor as of the Effective date. A form copy of the Pool 4 Note that will be issued will be filed not later than seven (7) days before the confirmation hearing. The Pool 4 Notes shall each bear interest at the non-default contract rate specified in the loan documents evidencing the claim of each such Pool 4 Secured Creditor and shall be secured by the existing liens on the Pool 4 Secured Creditor, modified to extend the maturity of such liens. The Pool 4 Notes shall be payable in full, with interest, on the earlier to occur of: (a) the closing of the sale of any Pool 4 parcel securing a Pool 4 Note; or (b) either (i) six months after the Effective Date, for any Pool 4 Note secured by a Pool 4 parcel which has not been sold by Reorganized DLH, and for which no binding contract for sale has been executed prior to six months after the Effective Date,

or (ii) for any Pool 4 Note secured by a Pool 4 parcel for which Reorganized DLH has received a binding contract to sell such parcel on or before six months after the Effective Date, sixty days after the end of the sixth month after the Effective Date.  Upon the maturity of any Pool 4 Note secured by a Pool 4 parcel which has not been sold by Reorganized DLH, Reorganized DLH shall, within twenty (20) days after such maturity date, either (1) pay the Pool 4 Note in full, both principal and interest, or (2) deliver to the holder of the Pool 4 Note secured by such Pool 4 parcel, either a deed in lieu of foreclosure or a written consent to immediate foreclosure and surrender of possession of such Pool 4 Parcel, together with a partial release of lien executed by the DIP Lenders releasing such Pool 4 parcel from the subordinate lien securing the Term Loan, at the option of the holder of the Pool 4 Note.   Any Secured Creditor in Pool 4 may elect at its option, exercisable not earlier than ninety (90) days after the Effective Date, and provided that the Pool 4 parcel which secures such Secured Creditor's Allowed Secured Claim has not been previously sold, and is not under contract to sell, which contract is scheduled to close within 60 days after such 90 day period, to receive the immediate surrender of its collateral in full satisfaction of its Pool 4 Note.  The surrender of any Pool 4 parcel to a Pool 4 Noteholder shall be accomplished by: (a) delivery by Reorganized DLH of a deed in lieu of foreclosure conveying such Pool 4 parcel to the Pool 4 Noteholder; (b) the immediate surrender by Reorganized DLH of possession and control of such Pool 4 parcel to the Pool 4 Noteholder; and (c) the delivery of a partial release of lien executed by the DIP Lenders releasing such Pool 4 parcel from the subordinate lien securing the Term Loan.

For any Secured Creditor in Pool 4 who elects for the immediate surrender of its collateral as described above, the automatic stay shall be deemed lifted and/or the post-confirmation injunction terminated as to that Pool 4 Secured Creditor only to allow it to foreclose on the collateral,  and the

DIP Lenders shall deliver a partial release of lien releasing such Pool 4 parcel from the subordinate lien securing the Term Loan. 2010 ad valorem taxes on the Pool 4 Secured Creditors' collateral have not been paid by DLH, and, except to the extent that such taxes have been paid by the Secured Creditor having lien on any Pool 4 parcel, penalties and interest thereon have accrued and will continue to accrue until the 2010 ad valorem taxes have been paid. If 2010 ad valorem taxes on Pool 4 collateral remain unpaid and there is no sale of such collateral, Pool 4 Secured Creditors will receive their collateral encumbered by statutory tax liens, which will include taxes, penalties, and interest. The parcels in the Seller Notes Pool are further encumbered by perfected subordinate liens securing the Debtor-in-Possession Financing, which shall be converted to a Term Loan (defined herein) upon the Effective Date. The Term Loan shall retain its perfected subordinate liens on the parcels in Pool4, but the DIP Lenders shall deliver an executed partial release of each Pool 4 Parcel from that subordinate lien for any Pool 4 parcel which is surrendered to the Pool 4 Noteholder under the Plan.

Four (4) holders of Pool 4 Secured Claims hold liens upon Pool 4 parcels for which the 2010 ad valorem property taxes have not been paid. Those property taxes became delinquent on February 1, 2011. The total of unpaid property taxes on those 4 Pool 4 parcels is approximately $23,900, including penalties and interest through May 31, 2011, of which approximately $22,900 relates to a single parcel. The holder of the Pool 4 Secured Claim secured by such Pool 4 parcel asserts that such unpaid 2010 property taxes are entitled to be treated as administrative expense claims under the Plan. The Debtors reserve the right to contest that assertion.

**DLH Secured Claims/Buildings:** DLH Secured Creditors which have claims secured by developed property are Great Western Bank (hereafter "**Great Western**"), which, together with

Branch Banking and Trust Company ("**BB&T**", has a first lien on the ADESA Property, and Compass Bank, which has first liens on Buildings A and B. These Secured Claims are being resolved by sales and/or settlements discussed below.

**Great Western's Secured Claim:**     Pursuant to the Great Western Settlement Agreement, sale of the ADESA Property has been authorized. The ADESA property should be sold before the Effective Date, should net DLH approximately $2.1 Million and should pay in full the Great Western Allowed Secured Claim.1

**Compass Bank's Building Loans:**     Compass Bank's Secured Claim with respect to the Building Loans is being satisfied by sale of the buildings. On May 16, 2011, the Compass Bank Buildings were be sold for $23,527,000.Under the order authorizing sale, Compass Bank receives an Unsecured Claim of approximately $2,992,325, pursuant to a settlement approved by the Court and Creditors Committee.

**General Secured Claim Terms**:     DLH has the option under the Plan, with respect to any parcel securing a Secured Claim, to surrender such parcel in full satisfaction of the Secured Claim secured by such parcel. In the case of any Secured Claim as to which the Secured Creditor has full recourse against DLH with respect to the Claim secured by a parcel to be surrendered by DLH, DLH shall request the Bankruptcy Court to determine the value of any such parcel to be surrendered to the Secured Creditor for purpose of calculating the amount to be credited against such Secured Creditor's Claim.

**DIP Lenders' DLH Term Loan:**     On the Effective Date, the Debtor-in-Possession Loan which remains unpaid, which DLH estimates will be approximately $2.782 Million (including

accrued interest thereon) as of June 30, 2011, shall be converted to a Term Loan (the "**Term Loan**").  The Term Loan shall retain its perfected subordinate liens on the DLH Property in Pools 1,2 and 4 (except to the extent any such property is sold prior to the Effective Date).  The Plan establishes Release Prices for the Term Loan for each parcel contained in Pools 1 & 2 calculated at 150% of the allocable portion for each parcel in Pool 1, and Pool 2 (excluding any land sold prior to the Effective Date) of the initial balance of the Term Loan on the Effective Date of the Plan. With respect to Release Prices for parcels contained in Pools 4, the release will be equal to 10% of the Net Sales Proceeds. There are also potential added payments from discretionary cash sweep payments. The Term Loan shall bear a variable rate of interest at Prime plus ten percent (10%) with prime capped at 5% per annum more than the prime rate on the Effective Date.  Interest on the Term Loan shall accrue annually, and shall be payable from the Net Sales Proceeds of the Pool 1, Pool 2 and Pool 4 properties, and discretionary payments of DLH Excess Cash Distributions. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan.  On the Effective Date, the balance of the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the outstanding balance of the DIP Loan on the Effective Date, and (b) all reasonable costs, including reasonable attorneys' fees, incurred by the DIP Lenders and approved by the Court.

**DLH Unsecured Creditors:** DLH non-insider Unsecured Creditors other than small administrative convenience claims will be paid over time from cash generated by DLH's operations and sales of property.  The Debtors estimate that the total of all Unsecured Allowed Claims against DLH will be approximately $14,830,000, excluding approximately $140,690 in administrative

1

convenience claims (less than $ 20,000 each). Of this total approximately $3,842,000 in insider claims would be voluntarily subordinated until all other Allowed DLH Unsecured Claims are paid in full, if the Plan is confirmed. The insider claims which have been voluntarily subordinated are identified on Schedule 1 to the Plan, and are referred to in the Plan as "Schedule 1 Unsecured Creditors". Although these insider claims are included in DLH Class 4, they have consented to a less favorable treatment than the other Allowed DLH Unsecured Claims, and the description below of treatment of DLH Allowed Unsecured Claims does not include the Schedule 1 Unsecured Claims.

**Treatment:** DLH proposes a cafeteria plan with options for Allowed Unsecured Claims (and each holder of an Allowed Unsecured Claim may divide its Claim between the two options):

> a.      Receive a Variable Pay Note in the principal amount of 50% of the electing holder's Allowed Claim, payable without interest from 75% of DLH Unsecured Net Proceeds, 75% of any DLH Excess Cash Distributions and 75% of the DLH Minimum Annual Distributions paid to the DLH Disbursing Agent, with a seven (7) year maturity from the Effective Date if not paid in full prior to that time ("**DLH 50% Note**"); or

> b.      Receive a Variable Pay Note in the principal amount of 100% of the electing holder's Allowed Claim payable with interest accruing at 2% per annum (unless Additional Interest applies) from 25% of DLH Unsecured Net Proceeds, 25% of any DLH Excess Cash Distributions and 25% of the DLH Minimum Annual Distributions paid to the DLH Disbursing Agent,  until the DLH 50%  Notes are paid in full, and thereafter payable from  100% of  DLH Unsecured Net Proceeds, 100% of any DLH Excess Cash Distributions and 100% of the DLH Minimum Annual Distributions paid to the DLH Disbursing Agent,  with a ten (10) year maturity from the Effective Date if not paid in full prior to that time ("**DLH 100% Note**").,

DLH Unsecured Net Proceeds are generally defined as: 5% of the Pool 1 Net Sales Proceeds, 5% of the Pool 2 Net Sales Proceeds, 5% of the Pool 4 Net Sales Proceeds and 5% of DLH Net

Financing Proceeds.

Notwithstanding the foregoing, DLH shall be entitled to reserve from funds otherwise payable any amount necessary to maintain a cash balance of $2,750,000 as of the close of each calendar quarter after the Effective Date.

DLH Schedule 1 Allowed Unsecured Claims, which includes insider claims which have been voluntarily subordinated, shall not receive any payments on such Claims until the DLH 50% Note and the DLH 100% Note have been paid in full. Thereafter, DLH Schedule 1 Allowed Unsecured Claims will be paid in full but without interest from cash available to Reorganized DLH.

**Equity Interests:** Except to the extent required for Exit Financing, current equity will retain their interests in Reorganized DLH and Reorganized ACP.

## B. ACP Plan

Generally, ACP creditors, both secured and unsecured, will be paid over time from cash generated by the operations of ACP's subsidiaries.

The ACP Debtor in Possession Financing would be converted to a term loan as follows:

1. Extension of DIP to a Term Loan (the "**ACP Term Loan**"), with a maturity date two (2) years after the Effective Date, bearing interest at 10% over prime(subject to a 5% cap on increases in the prime rate), interest payable semiannually with pre and post- petition liens maintained against collateral.

2. DIP Lenders will have two members of a five member Board of Directors until the ACP Term Loan is paid in full.

3. ACP shall pay 10% of ACP Net Sales Proceeds during year one and 20% of ACP Net Sales Proceeds during year two after the Effective Date with the remaining principal balance payable at maturity.

4. The ACP DIP Loan which is to be converted to the ACP Term Loan is currently projected to have an outstanding balance (including accrued interest thereon) of

$999,319 as of June 30, 2011.

Bank of America had anticipated having a deficiency claim in ACP's bankruptcy of at least $7.4 million based on one completed foreclosure (discussed below) and its anticipated shortfalls on certain other properties. Bank of America sought and was denied an order excusing the late filing of its claim. That ruling enables ACP to object to the allowance of any Claim asserted by Bank of America under Section 502(b)(9) of the Bankruptcy Code. ACP has objected to the allowance of Bank of America's Claim. Bank of America has appealed from the order denying it the right to file a late-filed claim, and that appeal is currently pending in the District Court.

**ACP Secured Creditor Tim Foley:** Mr. Tim Foley has an approximately $6.2 million note which Mr. Foley asserts is secured by various rights of distribution to ACP from Kelly Corporate Center II, LLP. Those asserted security interests are preserved and, to the extent allowed as a Secured Claim, will be paid under a Variable Pay Note. The ACP Secured Variable Pay Note issued to Mr. Foley will be paid from the proceeds and distributions received by ACP on which Mr. Foley has a validly perfected lien until the Allowed Amount of such claim is paid in full plus interest at 7.25% per annum but not later than five years after the Effective Date at which time all amounts will be due and owing. Based upon ACP's best projection of revenues generated from ACP collateral securing Foley, ACP estimates that the present value of the uncontested portion of Mr. Foley's collateral as of the Effective Date should not exceed $2,717,083 and that Mr. Foley should have an estimated unsecured claim for voting purposes of $3,313,917. Mr. Foley has recently filed a Complaint seeking to impose a constructive trust on ADESA proceeds which DLH and the Committee have contested. That will also force ACP to object to Mr. Foley's claim due to the

contested scope of collateral.

**Pacific Western Bank:** Pacific Western has a $1.5 million note allegedly secured by a perfected interest in substantially all ACP's subsidiaries. To the extent allowed as a Secured Claim, Pacific Western shall receive a Variable Pay Note which is entitled to 10% of all ACP Net Sales Proceeds, not to exceed $100,000 of principal and interest payments for any quarter of the calendar year. On each anniversary of the Effective Date, if Pacific Western has not received at least $250,000 in proceeds for the preceding year, Reorganized ACP shall make an additional payment to Pacific Western within sixty (60) days equal to the difference between $250,000 and what proceeds Pacific Western received in the preceding year. Pacific Western's ACP Secured Variable Pay Note shall mature five (5) years after the Effective Date at which time the unpaid principal balance and all accrued but unpaid interest will be due and owing.

**ACP Unsecured Creditors (ACP Class 4):** ACP Unsecured Creditors will be paid over time from cash generated by operations of ACP's subsidiaries or sales of property by such subsidiaries. The Debtors estimate that the total of all Unsecured Claims against ACP is approximately $17,056,000, plus approximately $17,000 of claims treated in the Administrative Convenience Class. Specific insider claims totaling approximately $361,900 are being voluntarily subordinated to the claims of all other ACP unsecured creditors if the Plan is confirmed. The insider claims which have been voluntarily subordinated are identified on Schedule 1 to the Plan, and are referred to in the Plan as "Schedule 1 Unsecured Creditors". While these insider claims are included in ACP Class 4, they have consented to a less favorable treatment than the other Allowed ACP Unsecured Claims, and the description below of treatment of ACP Allowed Unsecured Claims

does not include the Schedule 1 Unsecured Claims.

For all ACP Unsecured Creditors, ACP proposes a cafeteria plan with the following options (and ACP Unsecured Creditors may divide their Claims between the two options):

1.      Receive an ACP Variable Pay Note ("**ACP 50% Note**") in the principal amount of 50% of the electing holder's Allowed Claim payable without interest from 75% of ACP Unsecured Creditor Net Proceeds, 75% of ACP Excess Cash Distributions and 75% of the ACP Minimum Annual Distributions paid to the ACP Disbursing Agent, with a seven year maturity from the Effective Date if not paid in full prior to that time; or

2.      Receive an ACP Variable Pay Note ("**ACP 100% Note**") in the principal amount of 100% of the electing holder's Allowed Claim with interest accruing at 2% per annum (unless Additional Interest applies), payable from 25% of ACP Unsecured Creditor Net Proceeds, 25% of ACP Excess Cash Distributions and 25% of the ACP Minimum Annual Distributions until the ACP 50% Notes are paid in full, and thereafter payable from 100% of ACP Unsecured Creditor Net Proceeds, 100% of ACP Excess Cash Distributions and 100% of the ACP Minimum Annual Distributions with a ten year maturity from the Effective Date if not paid in full prior to that time.

ACP Unsecured Creditor Net Proceeds are determined at the end of each calendar quarter as measured sixty days after the end of the quarter, and are equal to seventy percent (70%) of:

(a)      ACP Net Sales Proceeds for the quarter in question, less the sum of
    (i)      general and administrative costs actually incurred by ACP and its subsidiaries for the fiscal quarter in question, and
    (ii)      all distributions or payments on the ACP Exit Financing or on ACP Secured Variable Pay Notes made during the fiscal quarter in question, plus
(b)      ACP Net Financing Proceeds for the quarter in question.

Notwithstanding the foregoing, Reorganized ACP shall be entitled to reserve from funds otherwise payable any amount necessary to maintain a cash balance of $1,500,000 as of the close of

each calendar quarter during the first two years after the Effective Date; thereafter, the cash reserve requirement for Reorganized ACP is reduced to $1.25 Million in the third year after the Effective Date, and to $1.0 Million in the fourth and subsequent years after the Effective Date . See the earlier discussion at page 6 describing the ACP Minimum Cash Reserve.

ACP Schedule 1 Allowed Unsecured Claims, which includes insider claims which have been voluntarily subordinated, shall not receive any payments on such Claims until the ACP 50% Note and the ACP 100% Note have been paid in full. Thereafter, ACP Schedule 1 Allowed Unsecured Claims will be paid in full but without interest from cash available to Reorganized ACP.

ACP Administrative Convenience Claims can elect to receive 20% of their Allowed Claims within 60 days after the Effective Date.

### C.     Why Should Creditors Vote to Accept Debtors Plan?

In addition to the projected cash flows from land sales, on April 14, 2011 DLH received a letter of intent for a build to suit joint venture which would include all land of Reorganized DLH. DLH has been seeking a joint venture participant throughout the Chapter 11 proceedings in order to fund build-to-suits ("BTS") and vertical development within the project. The principals of DLH have recently successfully negotiated an agreement with a substantial new potential equity participant that can substantially increase land absorption and will also allow DLH to share in the profits from vertical development. An understanding has been reached and final documentation of that understanding is being prepared. It is anticipated that a binding agreement will be completed and available prior to Confirmation.

This significant new participant in the DLH project has a 70 year history and track record and has developed more than 60 million square feet of industrial, office and specialty retail projects

throughout the USA. The company has established strong relationships with leading national tenants and the brokerage community that represents and advises them. They have put together a team of support companies which provides project financing and architectural and engineering services. With this new joint venture participant, DLH now will be able to greatly increase land absorption in the Dallas Logistics Hub by adding BTS capability and thus increase project cash flow. The new participant will a) provide all of the marketing relationships and services to secure BTS clients, b) pay DLH for all land going in to BTS projects at start of project construction, c) provide 100% of the capital and guarantees required to lease, construct and sell the BTS project and, d) provide DLH with a 25% participation in the profits from the lease and sale of these BTS projects.

This new agreement will not restrict DLH from selling land to other users outside of BTS transactions. The credibility and strength brought to DLH by this participant will greatly enhance the Dallas Logistics Hub project's viability, cash flow and credibility within the national industrial markets. We look forward to sharing the participant's identity and capabilities with the Court and creditors shortly.

An example of how build to suit capability should enhance DLH cash flows and payments to creditors is attached as **Exhibit L-1**.

1.     **DLH Is Better Positioned To Survive and Prosper in a Depressed Real Estate Market**

Reorganized DLH will have a similar Board of Directors post-confirmation as pre-confirmation, plus an independent Creditors Representative selected by the Committee. A majority of the Board has effected substantial management and operating changes at DLH within the last several months which substantially improves DLH's ability to operate and thrive in a changed real

estate market. The majority of the Board of Directors, who own the entities which have provided the DIP lending to DLH and ACP during these jointly administered cases, have implemented the following changes designed to more aggressively market the property in light of continuing distressed market conditions and substantially reduce operating overhead.

a) Dan McAuliffe, President of DLH, no longer reports through Richard S. Allen to the Board, but now directly reports to the entire Board and takes instruction from the entire Board which has commenced frequent meetings in order to effectuate the new operating direction.

b) Pursuant to that direction, Dan McAuliffe, Dwayne Toler, DLH's interim Financial Advisor, Laura Jefferies (a Board Member, daughter of Rex Allen and niece of Richard S. Allen) and Richard S. Allen have actively cooperated to make significant operating cost reductions which are expected to continue post-confirmation. The Board majority has the operating philosophy that extremely low operating costs are essential to ongoing land sales and potential vertical development. Projected annual operating costs for general & administrative costs for DLH (for the first year post-confirmation) have been reduced from more than $3.0 million at the time of the initial Disclosure Statement to $944,000 at the time of the current Disclosure Statement.

c) The change in operating philosophy has been accompanied by a change in DLH compensation tying it to level of land sales. Post-confirmation, Dan McAuliffe will function as President for a base compensation of $250,000 per year plus a 40% share of the Performance Based Management Fee Pool – described in the Plan as the

"Bonus Pool". The Performance Based Management Fee Pool is calculated as 5% of "DLH Net Sales Proceeds" (as defined in the Plan) during a given year. This 5% is to be paid from DLH's 65% of Net Sales Proceeds. Richard S. Allen will no longer receive a salary from DLH, but instead will also share in 40% of the Performance Based Management Fee Pool. The remaining 20% of the Performance Based Management Fee Pool will be allocated to other members of the DLH management team.

### 2. Unsecured Creditors Should Accept the DLH Plan.

**Administrative Convenience Claims:** For Administrative Convenience Claims, DLH Class 5, a cash payment of 20% of the Allowed Claim payable within sixty (60) days after the Effective Date may be desirable compared to the delays and uncertainties of payments over time to General Unsecured Creditors. Any holder of an Administrative Convenience Claim has the option to be treated as a General Unsecured Claim, and recover up to 100% of its claim over time.

**General Unsecured Claims**. For DLH Unsecured Creditor Class 4, DLH believes that a vote in favor of the Plan involves a reasonable probability that the creditor will collect 100% plus interest at 2% per annum over a period of 8 to 10 years. **Exhibit T** is a summary of fair market appraisals of some but not all Pool 1 Land and Pool 2 Land. It shows fair market value of more than $78.5 million, approximately 4 times the Compass debt. It shows more than $60.3 million in fair market value, more than 2 times the Pool 2 secured debt. **If the case is converted to Chapter 7,** DLH **believes that the Unsecured Creditors will receive nothing .**

In reviewing the Plan some Unsecured Creditors may question why a deduction is made for payment of any additional Taxes incurred by members of existing equity. DLH and its DIP lenders

which are being asked to commit to a three year Term Loan and existing equity are unwilling to support any Plan which does not contain that provision. Based upon calculations from DLH's tax accountant, if DLH abandoned all secured assets as of the Effective Date, the existing equity have sustained sufficient losses on its investment that members would have Internal Revenue Code Section 1231 losses aggregating more than $17 million dollars attributable to DLH investments. Section 1231 losses may be deducted dollar for dollar against future ordinary income, and in a Chapter 7 case, all of the economic benefits of those losses would be retained by the equity owners of DLH. The netting provisions of the Plan mean that the economic benefits of those currently existing losses would be available to increase distributions to Unsecured Creditors of DLH. The aggregate of all Allowed DLH Unsecured Claims net of agreed subordination is less than $14 million.

The next principal risk which might concern Unsecured Creditors would be that DLH would be unable to either meet its current projections or make sufficient payments so that Unsecured Creditors could be paid in full within ten (10) years. The Plan gives a potential recovery of 100 cents whereas an independent third party appraisal obtained in February 2010 for TierOne at a time when TierOne was hotly engaged in litigation against DLH predicted a "$0" recovery to Unsecured Creditors in the event of a quick liquidation sale of all land assets. If existing DLH management and equity are wrong in their projections and assumptions, and Unsecured Creditors of DLH ultimately receive only 30-50% of their Allowed Unsecured Claims, the existing equity interests in DLH will have received no distributions on more than $60 million dollars invested in DLH to date, other than monies distributed to pay Taxes assessed against the net income and gains earned by Reorganized DLH, less existing tax losses. Those tax liabilities of the equity owners of DLH simply would not

have been incurred (as a result of their use of 1231 losses) but for the reorganization of DLH, and the net income and gains earned by Reorganized DLH will accrue to the benefit of the Creditors of DLH by making cash available for distributions. The same appraiser which appraised DLH as having a "$0" quick liquidation value also appraised the DLH undeveloped land as having a net equity in excess of Creditor Claims of more than $90 million dollars in a longer term orderly sale scenario.

### 3. Secured Creditors Should Vote in Favor of the DLH Plan

**Compass Bank (Pool 1)**. Compass should vote in favor because the DLH Plan provides for potential payments from the quarterly cash sweep for Creditors, orderly payments generated by sales of land in the ordinary course, structured sales and/or auctions if required, refinancing through junior lien borrowing the proceeds of which are paid to Compass and or new equity contributions. The Plan assures Compass not only of scheduled interest payments, but also minimum principal reductions by two years, three years and four years after the Effective Date. In the event that those objectives have not been reached, the cure periods simply provide DLH the time necessary to obtain payment of the minimum funds. The projections from **Exhibit O** coupled with a 1:4 loan to collateral ratio should fully protect Compass.

**Hutchins Industrial Land (Pool 2)**. The current Plan provides for notes with specified interest payments for the initial three years of the note terms, thereafter converting to scheduled principal & interest payments for the next two years, with potential extensions in exchange for principal reductions for 2% of each extension. Pool 2 creditors will receive the greater of the scheduled payments of interest and principal or a prorated distribution of 30% of Net Sales Proceeds generated from the sale of any other Pool 2 creditor's parcel. Further, the terms of the Pool

2 Notes will include some protection against inflation by providing for annual adjustments of the principal balances by the lesser of the annual change in the Consumer Price Index or 2.5%.

If one or more such holders do not accept the Plan, the Plan retains the flexibility to modify its terms with respect to such a non-consenting holder in order to effect cramdown. Pool 2 is substantially over secured with a 1:2 loan to value ratio. See **Exhibit T**.

**ABOT (Pool 3).** ABOT and DLH have stipulated that ABOT may foreclose in June with no deficiency claims. Thus ABOT is no longer impaired.

**Seller Notes Pool (Pool 4).** At least two non-recourse subclasses held by creditors Coffman Investments LP and by Southport Properties, LP have obtained orders vacating the automatic stay and permitting foreclosure. DLH did not wish to retain these parcels for sale. Those parties are no longer impaired, and their votes are not required. Pool 4 parcels which secure Pool 4 subclasses will be actively and aggressively marketed by DLH through various auctions and or structured sales programs as well as its current marketing program for a period up to six months following the Effective Date, provided that for any such sales which had gone to binding contract, but then had failed to close, DLH would have an additional sixty (60) days to close such sale and pay the full Allowed Secured Claim. Any Pool 4 Secured Creditor will have the option, ninety (90) days after the Effective Date, to require DLH to surrender its collateral in full satisfaction of its Pool 4 Note, unless the Pool 4 parcel securing that Note has already been sold or is under a binding contract for sale.

**D.      Why Should Creditors Vote for the ACP Plan?**

**1.      Unsecured Creditors Should Accept the ACP Plan**ACP  Administrative Convenience Claims. Just as in the DLH Plan, small Unsecured Creditors of ACP (those less than

$20,000 or those that are willing to reduce their Claim to $20,000) can receive prompt cash payment of 20% of an Allowed Administrative Convenience Claim within sixty (60) days after the Effective Date. This is a meaningful sum in light of the delays and risks of accepting alternative treatment as an Unsecured Creditor. Any small Unsecured Creditor holding a Claim in the ACP Administrative Convenience Class who does not want to accept a 20% discounted cash payment has the right to elect that its Claim be treated as an ACP General Unsecured Claim and receive 100% of the Claim, over time or elect the faster 50% payout alternative.

**ACP General Unsecured Claims. For members of the non-insider ACP Unsecured Creditor Class, Class 4, the alternative is between a payment over time of 100% on the dollar (unless the creditor accepts the faster 50% payout alternative), or liquidation which would result in an estimated recovery of "$0" to Unsecured Creditors.**

The principal funds to pay Unsecured Claims are projected to be generated from two sources, The Allen Group-Kansas City, LLC ("LPKC"), and Allen Rosedale Land I, LLC ("Rosedale"), both 100% owned subsidiaries of ACP. ACP's interest in Rosedale is held through Allen Rosedale Land I, LLC as an intermediary subsidiary of ACP, and is subject to the rights (including a preferred return) of FKM Associates, LLC, the majority owner in the Rosedale Development.

LPKC currently holds only an option to acquire land from the BNSF Railroad. Richard S. Allen has an excellent personal working relationship with BNSF based on prior performance by LPKC in obtaining public improvements to the property to enhance the value of the overall acreage. Those improvements are expected by public authorities to potentially generate significant jobs. The original contract between LPKC and BNSF obligated LPKC to obtain approximately $24 million in such improvements. In fact, LPKC obtained commitments for approximately $100 million in such

improvements.

During the ACP Chapter 11 case, BNSF modified the option agreement which would have required LPKC to make a lump sum payment of $12 million dollars to exercise the option by allowing LPKC to have until May 31, 2011 to demonstrate that either it has (i) $5 million dollars of equity or (ii) obtained a financial partner capable of funding "build to suit" projects on the property. Binding agreements with the joint venture partner and with BNSF described at Exhibit F were executed on May 3 and May 4, 2011.

Richard S. Allen is regarded as a leading expert in the United States on the topic of intermodal development such as will be required at LPKC. He was initially selected as the party BNSF wanted as developer. There is absolutely no assurance that any party who successfully bids on the LPKC ownership would be acceptable to BNSF or that Cisterra owned by a prior business associate of Richard S. Allen would participate with another party. BNSF is constructing an international terminal adjacent to the site and Kansas City is an extremely good market for new industrial buildings due to a very low vacancy rate. A substantial number of parties have expressed an interest in potential "build to suit" transactions at LPKC. There are no binding build to suit agreements; however, there is one contract for the sale of land to a user, DeLong Grain. The earnest money is non-refundable to the purchaser. The sale is scheduled to close before confirmation.

FKM Associates, LLC is a member of Rosedale Land Venture I, LLC. Rosedale Land Venture I, LLC's primary asset is an interest in a venture involving undeveloped real property located near Bakersfield, California.

The operations of Rosedale Land Venture I, LLC are governed by an Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (dated June 15, 2006). The operating

agreement was amended via a First Amendment to Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (effective as of August 17, 2009).

Notwithstanding any other provision in the Plan, the Disclosure Statement, or the Confirmation Order to the contrary, it is expressly provided that neither the Plan nor the confirmation thereof, nor the Confirmation Order shall be deemed or construed to affect or impair in any way the rights of Allen Rosedale Land Venture I, LLC or FKM Associates, LLC to enforce the Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (dated June 15, 2006) and the First Amendment to Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (effective as of August 17, 2009)(collectively, the "Operating Agreement"), in accordance with applicable law.

Rosedale Land Venture I, LLC has Allen Rosedale Land I, LLC as its managing member, and FKM Associates, LLC. as its other member  ACP owns 100% of Allen Rosedale Land I, LLC.

The Rosedale development provides a complex set of issues.  FKM Associates, LLC, the co-owner (with Allen Rosedale Land I, LLC) of the Rosedale Project, is represented by one of the two co-chairs of the Creditors Committee. FKM holds an Unsecured Note containing a provision which appears to permit forfeiture of the interest of ACP's subsidiary in the Rosedale development in the event that payment was not made in full by February 2010.  On April 17, 2011 ACP filed an objection to the FKM claim including a counterclaim which would seek to declare void and prevent enforcement of this provision.  Litigation is inherently uncertain; thus, although the ACP subsidiary has a preferred return under the Operating Agreement to recover at least $500,000 of expenses incurred plus interest (approximately $600,000 in the aggregate as of June 30, 2011), FKM (whose representative is a Creditors Committee Co-Chairman, and which is owned by two other members of

the Creditors Committee, Mike Kranyak and Majid Mojibi, who are creditors of DLH) thereafter has a preferred return from Rosedale in excess of $20 million. Accordingly, even assuming that the litigation against enforcement of the forfeiture clause is successful, any distributions to Allen Rosedale Land I, LLC (and thus to ACP) in excess of approximately $600,000 may be significantly deferred even if the overall project is successful and even if the Allen Rosedale Land I, LLC continues as managing member. An additional risk to the potential availability of the projected Rosedale income stream is a buy-sell agreement which could be triggered by either party to the LLC. ACP had been actively negotiating with FKM to see if any acceptable business settlement could be achieved before any objection was filed. A motion to compromise with FKM will be filed shortly under which the forfeiture clause will not be enforceable, the monetary claim allowed, and ACP has added plan language requested by FKM.

The other principal Unsecured Claim is Ed Romanov, the former COO of ACP and DLH. His Claim remains disputed, but he will be allowed for voting purposes a $3.5 million Unsecured Claim against ACP. Romanov also has a significant inducement to vote in favor of the Plan since under the agreement he struck with the Committee, he capped his claim at $6.5 million dollars with $3 million dollars of that sum only to participate once other Allowed ACP General Unsecured Claims members have received 70% recovery of their respective Claims

Finally, all ACP creditors have an additional significant inducement to vote in favor of the ACP Plan. Due to a late filing of claim in the Chapter 11 case and the failure of Bank of America to demonstrate grounds to authorize late filing of the claim, a potential ACP Chapter 11 claim of Bank of America between $7.3 and $20 million is being eliminated since late filed claims are barred under Section 502(b)(9) of the Bankruptcy Code. Bank of America's failure to timely file its Claim harms

Richard S. Allen personally because that Bank of America claim remains allowable in his personal bankruptcy, but improves the rights of ACP General Unsecured Creditors so long as the disallowance of Bank of America's Chapter 11 claims is affirmed on appeal. This disallowance materially reduces the total Allowed Unsecured Claims under ACP's Plan. If ACP fails to confirm its plan and ACP is converted to Chapter 7 liquidation, Bank of America would have a new bar date for filing claims. Bank of America has moved for leave to vote a $50 million, claim, ACP and the Committee will object.

**ACP Secured Creditors.** ACP believes that two secured creditor classes, Tim Foley and Pacific Western Bank should vote in favor of the Plan because continued operation by ACP insures development of LPKC through which Pacific Western can be paid over time and ensures distributions from the Kelly Land and Kelly II GSA Building which are collateral of Tim Foley. The scope of the Foley collateral is disputed by Debtors.

Tim Foley is projected to have a significant Unsecured Claim of approximately $3,513,917 based upon ACP's current valuation of his collateral. Although Foley has additional security granted by Richard S. Allen personally and a Richard S. Allen, Inc. entity, Foley needs to maximize recovery on his Unsecured Claim. Compass Bank is expected to be allowed an Unsecured Deficiency Claim on its building loan to DLH and ACP's guarantee of that loan of approximately $2.99 million dollars. Compass has a significant incentive to vote its Unsecured Claim in favor of the Plan.

### Sources of ACP Exit Financing

LPKC, a wholly owned subsidiary of ACP holds an option on real estate in Kansas City, Kansas from BNSF immediately adjacent to an intermodal terminal being constructed by BNSF.

LPKC has a signed contract for sale of acreage to DeLong Grain scheduled to close by the Effective Date for the approximate total of $1,080,000 net to LPKC.  LPKC additionally holds approximately $400,000 arising from the sale of an earlier ACP subsidiary land sale.   Those two sums are projected to be sufficient to pay (a) projected ACP costs of administration and (b) the ACP Administrative Convenience Class, leaving funds to pay ACP and LPKC overhead through September 30, 2011, so long as the DIP lenders consent to a Term Loan. The conditions to obtain that consent are separately discussed.

On May 3, 2011 The Allen Group – Kansas City, LLC ("LPKC"), a wholly-owned subsidiary of Allen Capital Partners, entered into a Joint Venture Option Agreement ("JV Agreement") with ST-Investors-LPKC, LLC ("STI").  The purpose of the JV Agreement is to acquire all of the Logistics Park Kansas City Property ("LPKC Property") in an orderly manner and to develop LPKC Property with commercial and industrial improvements on a build-to suit basis for lease or sale to third parties.

On May 4, 2011, LPKC entered into the Fifth Amendment To Option Agreement ("Fifth Amendment") with BNSF Railway Company.  The Fifth Amendment is consistent with the orderly takedown of the LPKC Property identified in the JV Agreement between LPKC and STI and establishes a requirement for LPKC to purchase no less than fifty acres of LPKC Property annually. LPKC shall purchase the first fifty acres of LPKC Property on or before May 31, 2012 in order to preserve the option to acquire additional LPKC Property.   Subject to meeting the annual requirement, LPKC preserves the ongoing option to purchase 50 acres of LPKC Property annually.

Under the terms of the JV Agreement, LPKC is designated as the "Developer" of LPKC

Property and has the ongoing primary role and responsibility for marketing the LPKC Property, sourcing Build-to-Suit Clients, and general responsibilities for pre-development functions relating to the initiation and prosecution of Build-to-Suit Clients' Projects.

The JV Agreement provides LPKC with the ability to generate cash from Developer fees, land sales, and distributions from Build-to-Suit projects. Excluding developer fees, it is anticipated that the JV Agreement will result in approximately $45 million of distributions to LPKC over the next ten (10) years.

If required, Richard Allen is prepared to lend up to $750,000 to ACP secured as Exit Financing junior to the Secured Claims of Pacific Western and Foley, and to the Term Loan.

In addition, post Effective Date funds are projected from land sales at the ITTC subsidiary of ACP. The land is located in Bakersfield, California. The land is free and clear of liens and thus not subject to any risk of foreclosure. There has been a flurry of activity at ITTC arising from both external and internally constructed infrastructure at those locations. The internally generated infrastructure, which benefits remaining parcels, arose from land sales to BJ Services closed in December 2010 and to Baker Hughes closed in February 2011.

**E.  Cramdown Plan.** Debtors reserve the right to seek confirmation of this Plan by "cramdown" pursuant to Section 1129(b)(1) of the Bankruptcy Code in the event that the Plan is rejected by the holders of the Secured or Unsecured Claims in either the DLH Case or the ACP Case.

Under applicable bankruptcy law pertaining to cram down, the bankruptcy court must find that a plan is fair and equitable, which is customarily interpreted as indicating that creditors will receive the higher of reorganization value or the liquidation value of the business assets, and that the Plan complies with the absolute priority rule.

In Spring 2010, in connection with a contested hearing with TierOne Bank for use of cash collateral, a representative of CBRE Richard Ellis provided an estimate of liquidation value ($96.7 million) substantially equal to outstanding secured debt on the land, showing no equity in the DLH land over secured debt. During the intervening period, DLH has been unable to sell any parcels, although DLH will shortly attempt to use auction sales and or sealed bid sales to sell certain specified parcels to generate cash to permit internal exit financing. **DLH believes that the proposed amount to be paid to all DLH Creditors over time as shown in the projections attached as <u>Exhibit E</u> hereto substantially exceeds the liquidation value of its assets**.

**ACP believes that the proposed amount to be paid to all ACP Creditors over time as shown in the projections attached as <u>Exhibit E</u>, substantially exceeds the liquidation value of its assets**.

As set forth in and subject to the terms of Section 13.12 of the Plan, Debtors reserve the right to amend the Plan as necessary to cramdown any non-consenting class or subclass of creditors.

## III. EXPLANATION OF CHAPTER 11 CASES

Formulating the attached reorganization plan was Debtors' principal objective in Chapter 11. The Plan of Reorganization sets forth the means for satisfying claims against Debtors. Chapter 11 does not require that each holder of a claim against a Debtor vote in favor of the Plan in order for the Court to confirm the Plan. However, a Plan must be accepted by the holders of at least one "impaired" class of claims, without regard to the votes of claims in that class held by "insiders," within the meaning of the Bankruptcy Code. A claim that will not be repaid in full or as to which legal rights are altered, or an interest that is adversely affected, is impaired. A holder of an impaired claim or interest is entitled to vote to accept or reject the Plan if the claim or interest has been

allowed under section 502 of the Bankruptcy Code. In order for a class of claims to be deemed to have accepted the plan, a majority in number and two-thirds in amount of total allowed class claims must vote in favor of the Plan. In order for a class of interests to be deemed to have accepted the plan, two-thirds in amount of total interests of the class must actually vote in favor of the Plan. Section 1125 of the Bankruptcy Code requires full disclosure to be received by all impaired parties before solicitation of acceptances of a Plan of reorganization commences. This Disclosure Statement is presented to impaired claimants under the Plan to satisfy the requirements of section 1125 of the Bankruptcy Code.

Even if all classes of Claims accept the Plan, it might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth requirements for confirmation. Among other things, a plan of reorganization must be in the best interests of claimants and interest holders, and the value to be distributed to claimants and interest holders must not be less than the value such parties would receive if debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may confirm the Plan, even though less than all classes of impaired Claims or Interests accept, so long as one class of impaired Claims or Interests (excluding insider classes) accepts the Plan. Confirmation of the Plan over objection of one or more classes of Claims or Interests is generally referred to as a "cram-down." The circumstances under which the Bankruptcy Court may confirm the Plan over the objection of a class of Claims or Interests are set forth in section 1129(b) of the Bankruptcy Code. The Plan includes provisions reserving Debtors' rights to cram-down certain classes of Creditors.

Confirmation of the Plan will discharge Debtors from all pre-confirmation debts and liabilities except as expressly provided in the Plan, the order of the Bankruptcy Court confirming the

Plan or section 1141(d) of the Bankruptcy Code. Confirmation makes the Plan binding upon Debtors and all Creditors, Interest Holders and other parties-in-interest, regardless of whether or not they have accepted the Plan.

The Plan will become fully consummated six months after the entry of a final order of confirmation of the Plan and the first distribution on the Effective Date. The Plan Consummation will be evidenced by filing a certificate of consummation with the Bankruptcy Court.

## IV. VOTING-PROCEDURES

A. **Unimpaired Classes**. The votes of claimants whose Claims are not impaired under the Plan are not being solicited because those classes are deemed to have accepted the Plan. As a result, Debtors are not soliciting acceptances of the DLH or ACP Plan Classes 1 and 2. Further, those Secured Creditors of DLH which are receiving a surrender of their collateral on the Effective Date and/or have been granted leave to foreclose such as Southport, Coffman Investments, and American Bank of Texas, plus Great Western and the Compass Bank Building Loan (assuming that the sale of the ADESA Property and the Building is securing the Compass Building Loan are closed by the Effective Date are also Unimpaired under the Plan.

B. **Impaired Classes**. Debtors are seeking the acceptances of the Plan by claimants in DLH and ACP Classes 3 (including each Impaired Subclass therein), 4, 5, 6, and 7 whose Claims or Interest are impaired under the Plan.

Each holder of an Allowed Claim or Interest which is included in an impaired class may vote by completing, dating, and signing the ballot sent to such holder and filing the ballot as set forth below. If you are a holder of a disputed, contingent or unliquidated Claim, you may petition the Bankruptcy Court to allow your Claim for voting purposes only by making timely application to the

Bankruptcy Court pursuant to rule 3018 of the Bankruptcy Rules. Such claimants are advised to seek the advice of their own counsel how to make such an application. Each holder of an Allowed Claim may vote on the Plan by completing, dating, signing, and filing the ballot as set forth below.

Ballots are enclosed with this Disclosure Statement sent to each claimant eligible to vote on the Plan. For all classes, ballots must be sent to:

Mark E. MacDonald
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220 Office
(214) 890-0818 Facsimile

The deadline for voting on the Plan has been set in the Disclosure Statement Order as June 15, 2011.

## V.      CONFIRMATION OF THE PLAN

### A.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing to confirm a reorganization plan. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for June 21, 2011 at 9 AM. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a reorganization plan. Any objection to confirmation must be in writing, must conform to the Federal Rules of Bankruptcy Procedure, must set forth the objector's name, the

nature and amount of Claims or Equity Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court and served upon and received no later than June 17, 2011 at 4:00 p.m. (prevailing Central Time).

All objections must be served, so as to be received no later than June 17, 2011, at 4:00 p.m. (prevailing Central Time), upon the following:

Mark E. MacDonald
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
Facsimile: (214) 890-0818

Daniel J. McAuliffe
DLH Master Land Holding, LLC
1700 Pacific Avenue, Suite 1250
Dallas, TX 75201
214 / 661 - 1851 Fax

Richard L. Wasserman
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
Fax: 410.244.7742

Michael D. Warner
301 Commerce Street
Suite 1700
Fort Worth, TX 76102
Fax: 817-810-5255

[Counsel for other creditors or parties in interest who wish to have the objections to confirmation served upon them.]

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT**

MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## VI. REPRESENTATIONS

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT AND/OR ANY ACTION TAKEN IN RELIANCE THEREUPON SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH SINCE THE DATE HEREOF.

ANY BENEFITS OFFERED TO CREDITORS UNDER THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN REGISTERED WITH, REVIEWED BY OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OF THE UNITED STATES ("SEC"), THE TEXAS SECURITIES BOARD ("TSB"), OR ANY OTHER RELEVANT GOVERNMENTAL OR REGULATORY AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, THE SEC, TSB, OR ANY OTHER GOVERNMENTAL OR REGULATORY AUTHORITY HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

NO REPRESENTATIONS CONCERNING DEBTORS ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. DEBTORS RECOMMEND THAT ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE THE VOTE OF A CLAIMANT WHICH IS OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS COMPLETE AND ACCURATE. THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. PRIOR TO VOTING ON THE PLAN CLAIMANTS HOLDING CLAIMS WHICH ARE IMPAIRED UNDER THE PLAN ARE URGED TO REVIEW IN FULL THIS DISCLOSURE STATEMENT AND THE PLAN, TOGETHER WITH ALL ATTACHED EXHIBITS AND SCHEDULES, AND ARE URGED TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE

UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN.

**THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE BY THE HOLDERS OF CLAIMS AND INTERESTS IN DEBTORS WHOSE CLAIMS OR INTERESTS ARE IMPAIRED UNDER THE PLAN TO ENABLE SUCH CLAIMANTS TO MAKE AN INFORMED DECISION ABOUT THE PLAN.**

**ESTIMATES OF CLAIMS IN THIS STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT.**

## VII    DESCRIPTION OF DEBTORS' BUSINESSES

### A.    DLH's Business

DLH's primary business is development of the real estate project known as the Dallas Logistics Hub located in Dallas County, Texas. The Dallas Logistics Hub was an approximately 6,000-acre multi-modal logistics park located 12 miles south of downtown Dallas. After the return of certain real property to DLH's lenders, and the successful sale of auction or structured sale parcels, the remaining developable land is expected to be approximately 2,540 acres. Some of that land may be sold by auction (Section 363 sale) prior to or shortly after the Effective Date.

The Dallas Logistics Hub benefits from the convergence of multiple major interstate trucking highways, multiple rail lines, and a growing local airport, all located within the third largest industrial market in the Nation. For that reason, the Dallas Logistics Hub is uniquely positioned to serve as one of the primary national hubs for the distribution of goods throughout the Central and Eastern United States. A pivotal part of the accessibility of Dallas Logistics Hub is its proximity and access to four of Dallas/Fort Worth's primary interstate highways, connecting the DFW Metroplex and Dallas Logistics Hub to the greater transportation thoroughfares of the southern United States:

-    Interstate 20…the primary east-west trucking corridor for the southern U.S., connecting Atlanta to Los Angeles, is the northern boundary of Dallas Logistics Hub.

- Interstate 35…the NAFTA Trade Corridor, connecting Mexico to Canada, is located approximately 4 miles to the west of Dallas Logistics Hub.

- Interstate 45…the direct route to the Port of Houston is the eastern boundary of Dallas Logistics Hub.

- Interstate 30… the direct route to Little Rock, Memphis and the northeastern US is located approximately 9 miles north of Dallas Logistics Hub.

- Planned Loop 9…the planned multi-billion dollar highway will run along the southern boundary of Dallas Logistics Hub and around the D/FW Metroplex.

With more than 1,774 acres (before certain acreage is given back or sold) owned by DLH designated under Foreign Trade Zone 39, DLH is strategically positioned for tenants to receive, deliver and/or transload thousands of shipping containers each day. Currently, these import shipping containers predominantly originate from the Pacific Rim Countries and move in-bound into the Union Pacific Dallas Intermodal Terminal ("UPDIT") after entering the country primarily via the Western U.S. Ports. Long term, with the completion of the Panama Canal expansion, these trade routes will be expanded to include the Port of Houston and various ports in Mexico.

When fully developed, the Re-Sized Dallas Logistics Hub will be an Inland Port adjacent or in close proximity to UPDIT, a potential BNSF intermodal facility, and four major highways (Interstates 20, 35, 45, and proposed Loop 9). As an Inland Port, Debtors anticipate that Dallas Logistics Hub will develop with an emphasis on logistics-oriented, automated high-bay warehouses, supplemented by light manufacturing, office, service retail, value office and residential.

In addition to receiving infrastructure funding assistance from multiple governmental units as discussed below, the City of Dallas has been actively working to facilitate development of Dallas Logistics Hub, along with other major industrial developments in the region, as a part of its

International Inland Port of Dallas (IIPOD) initiative, for more than 5 years. The IIPOD is a public-private partnership involving a consortium of 12 municipalities and led by the City of Dallas; the entity is a key driver in making Dallas the nation's premier logistics and distribution center. IIPOD is a catalyst for Southern Sector investment, job growth and development of sustainable communities, with a goal of increasing the local tax base and employment. IIPOD, and Dallas Logistics Hub as a part of the IIPOD, has been identified as a key economic development focus for the City of Dallas. As a result, Dallas City Council members and staff have been involved from the very beginning, especially the Economic Development Committee.

DLH Master Land Holding, LLC (DLH) is a successor by merger to numerous limited liability companies (LLCs) which were directly and/or indirectly owned by Allen Capital Partners, LLC (ACP), by relatives of Richard S. Allen or entities owned directly or indirectly by Richard S. Allen and/or his relatives. DLH holds title to the land being developed as the Dallas Logistics Hub. A more detailed chart of ACP's ownership interest in DLH is attached as **Exhibit C**. DLH also owns a member interest in Midstate Hayes 184 Distribution Center, LLC, which owns California real estate which has been posted for foreclosure and has filed a Chapter 11 seeking joint administration[i]. ACP is successor by merger to four limited liability companies and DLH is successor by merger to more than seventy limited liability companies listed on **Exhibit D**. The merger is extensively discussed on Exhibit H.

ACP and DLH operate using three non-filed entities owned by ACP.

(a) Allen Employment Services, Inc. (AES) is a wholly-owned subsidiary of ACP. AES is the entity actually employing the individuals who operate Debtors various businesses. AES has a contract with Debtors under which Debtors advance payroll and employee benefits for payment by AES.

(b)     Allen Development Partners, LLC, (ADP) is a wholly-owned subsidiary of ACP. ADP holds various membership interests in other LLCs which own, develop, and/or operate real estate in California as well as an indirect interest in DLH. Based upon restrictions in various LLC operating agreements which purport to terminate or modify rights in bankruptcy, ownership of those interests need to continue in a wholly-owned subsidiary of ACP; and

(c)     Allen Development of Central California, LLC (ADCC) is a wholly-owned subsidiary of ACP which is used by ACP to provide management and development services for substantially all of ACP's limited liability companies. ADCC, whose offices are located in Visalia, California, provides the central accounting functions for all ACP entities and for DLH. ADCC also indirectly owns an interest in DLH and manages specified properties of DLH for a management fee. ACP, DLH and AES have a contract with ADCC in which DLH advances or reimburses ADCC for expenses made on ACP's behalf.

Financial projections for DLH prepared by Debtors' management are attached as part of **Exhibit E-1** and are incorporated by reference.

## B.     ACP's Business

Allen Capital Partners, LLC ("ACP") is a real estate investment company. ACP was formed in 1999 by Richard S. Allen and is wholly owned by Richard S. Allen and his wholly owned corporation Richard S. Allen, Inc. Both Richard S. Allen and Richard S. Allen, Inc. are currently debtors in their own Chapter 11 cases, which are being jointly administered with the Debtors' cases.

ACP invests capital in office and industrial projects in California, Texas and Kansas. ACP has invested capital of approximately $15,000,000 in current California and Kansas projects, $11,000,000 of which is still invested in the projects. ACP has invested approximately $43,000,000 in DLH, all of which is still outstanding. In addition to the capital invested, ACP has provided construction loan guarantees and, through its subsidiaries, the development expertise and resources required to develop its various investment projects. In exchange for those services, ACP typically receives an additional profits interest in each project ranging from 40% to 50% of the profits after

capital and preferred return have been paid to the capital partners.

In addition to its' approximately 43% interest in DLH, ACP has direct or indirect interests in the following projects:

1.  A future 530 acre Logistic Park in Kansas City ("LPKC")
2.  A 84-acre planned development located along Rosedale Highway (State Hwy-58) near Bakersfield, California ("<u>Rosedale</u>")
3.  The International Trade and Transportation Center ("ITTC"), a 700-acre rail-served logistics park located in Shafter, California, northwest of Bakersfield.
4.  The Kelly Corporate Center, a planned 4-building office complex located in Carlsbad, California (3 buildings have been built to date) ("<u>Kelly</u>"). One of these buildings is subject to a lien in favor of Bank of America which matures in July 2011 and which Bank of America has indicated that it will not renew. That building was sold on April 29, 2011 paying Bank of America approximately $10,000,000 after paying the Kelly owner, ACP will net approximately $100,000. The projections pertaining to Kelly represent the projected value of the remaining properties (the Kelly Land and the GSA Building) not subject to the Bank of America lien.
5.  A 7,624 square foot office building in Visalia, California
6.  A 102,000 square foot industrial building located in Visalia, California
7.  Midstate Park, a 400-acre logistics and distribution center that offers direct mainline rail service from the Union Pacific Railroad located in Visalia, California.

A more detailed description of each of these projects and ACP's interest in these projects may be found in **Exhibit F**. Financial projections for ACP prepared by Debtors' management are attached as part of **Exhibit E-2** and incorporated by reference.

## VIII.  SIGNIFICANT PRE-PETITION EVENTS

### A.  Beginning Development of Dallas Logistic Hub

In 2003, the predecessors to DLH began to seek out strategic land positions around the planned new Union Pacific Dallas Intermodal Terminal in Dallas County, Texas, which resulted in the creation of the Dallas Logistics Hub. At that time, the Union Pacific Intermodal facility had not yet begun construction and was considered speculative. Based on the anticipated impact that the planned Union Pacific Dallas Intermodal Terminal would have on the region, DLH began

assembling land adjacent to the new intermodal terminal. Because of its timing, DLH's predecessors were able to achieve reasonable seller financing terms and pricing on its land acquisition. The land assemblage for the Dallas Logistics Hub was completed in 2006 and 2007. Much of the land comprising Dallas Logistics Hub was acquired using 1031 exchanges generated from sales of California land and buildings owned by ACP subsidiaries.

The Union Pacific Dallas Intermodal Terminal adjacent to the land assemblage became fully operational in October, 2005. The +/-360-acre intermodal terminal is located on the eastern boundary of Dallas Logistics Hub, just 12 miles south of downtown Dallas within the city limits of Hutchins and Wilmer, adjacent to Interstate Highway 45. The UP intermodal facility is currently capable of handling approximately 365,000 lifts per year. In 2009 with the decrease in foreign trade, it is estimated that this facility handled less than 300,000 lifts. It has been reported that approximately 97% of the containers arrive directly from the Ports of Los Angeles and Long Beach. At full build-out, Union Pacific has stated that the intermodal facility will have the capacity to process up to 600,000 lifts per year.

DLH's predecessors received Entitlements (annexation, zoning, and master planning), development agreements, and other municipal approvals for approximately 80% of the acreage of the Dallas Logistics Hub in 2007 and 2008. All of the land contained within the Re-Sized Dallas Logistics Hub is located within the cities of Dallas and Hutchins and as a result, Re-Sized Dallas Logistics Hub is now, for the most part, zoned for its ultimate development as an inland port logistics park.

Marketing of the Dallas Logistics Hub for sale and lease to users began in earnest in 2008. During 2008, 620 acres of land were absorbed through land sales, options, build-to-suits and/or

vertical speculative developments at an average strike price of approximately $1.77 per square foot.

Today, approximately 5,465gross acres remain undeveloped, including 164 acres which was under

option to the BNSF Railway, which option has expired.


Included in the foregoing totals for Land Sales, options, build-to-suits and vertical development are the following:

| Land Sales | | Build to Suit Projects | |
|---|---|---|---|
| BNSF Rail Road | 198 acres | ADESA Auto Auction | 175 acres |
| ONCOR Electric | 9 acres | Bridge Terminal Transport | 15 acres |
| | | | |
| Spec Buildings | | Land Under Option | |
| 4800 Langdon Road | 38 acres | BNSF | 164 acres |
| 4900 Langdon Road | 14 acres | | |

In addition to the activity above, DLH's predecessors were successful in executing a lease for

+/-313,000 sq ft of its affiliate's first spec building located at 4800 Langdon Road, Dallas with

Advanced H2O, LLC, reportedly the largest private label water bottling company in the US, for a

production and distribution facility.

In May, 2008, Ron Natinsky, sitting Chairman of the Economic Development Committee of

Dallas, Tennell Atkins, Dallas City Councilmember responsible for the IIPOD, Mayor Tom Leppert,

and other city and community leaders, including Richard S. Allen, visited six major trading centers

in China to promote Dallas, their IIPOD initiative and the Dallas Logistics Hub as a part of the

IIPOD.  In January of 2008, there was a similar trip to Mexico City and Monterey, Mexico.

In September of 2008, DLH's predecessors completed construction on the first two spec

industrial buildings at DLH totaling more than 825,000 sq. ft.  These buildings were constructed

using the parameters set forth by the US Green Building Council ("USGBC"). In September 2009,

the buildings were awarded LEED® Gold Certification by USGBC. These were among the first

industrial facilities in North Texas to earn such certification.

In the Fall of 2008, DLH's predecessors also commenced construction on the first two build-to-suit projects in the Dallas Logistics Hub, an approximately 15 acre container yard for Bridge Terminal Transport, a division of Maersk Inc., and a +/-175 acre auto auction facility for ADESA, Inc., the second largest auto auction firm in the U.S. In January, 2010 the ADESA facility was awarded LEED® Silver Certification by the USGBC.

In Fall 2009, the City of Dallas obtained Federal approvals to create the City of Dallas Regional Center (CDRC) program which allows foreign investors in the Dallas region (including 1056 acres of the DLH project) to potentially participate in the federal program EB-5; in essence, obtain "Green Cards" for themselves and their families subject to making the appropriate capital investment in a qualified project. Debtors will continue to work with Dallas's Economic Development Department on applications which would provide "below-market" interest rate loans to facilitate the development of approximately 1,056 acres in the portion of the Dallas Logistics Hub within the City of Dallas.

The cities of Dallas, Wilmer, Hutchins and Lancaster, each of whom have jurisdiction over portions of the original Dallas Logistics Hub project, have also been very supportive of DLH.

(1.) INFRASTRUCTURE AT DALLAS LOGISTIC HUB

The Re-Sized Dallas Logistics Hub is located within the jurisdictions of Dallas, and Hutchins. Achieving governmental support of the Dallas Logistics Hub and the required public infrastructure funding took an extraordinary amount of time, negotiation and effort. The funding for these public infrastructure projects has added tremendous value to the development. These funds described below will finance most of the major arterial road improvements on the perimeter of and

in close proximity to the Dallas Logistics Hub and provide vital links of the internal areas of the Dallas Logistics Hub to the interstate highways.

Since 2005, the area in and around the Dallas Logistics Hub has received in excess of $114 million in completed, committed or funded public infrastructure projects, municipal bond projects, and grant funding commitments from various governmental entities for public infrastructure development. More specifically, the following is a summary table of the public funding committed to date by source:

### PUBLIC FUNDING COMMITTED FOR INFRASTRUCTURE IMPROVEMENTS

| Funding Entity | Approximate Funding Committed ($ Millions) | |
|---|---|---|
| City of Dallas | $ | 50.01 |
| City of Hutchins | | 8.11 |
| Dallas County | | 8.41 |
| FHWA | | 10.60 |
| NCTCOG (MPO) | | 6.10 |
| TXDoT | | 31.11 |
| TOTAL  ESTIMATED | $ | 114.34 |

Prior to the bankruptcy filing, there had been approximately $500 million invested or committed to the Dallas Logistic Hub and the immediately surrounding area from public and private sources including:

| $ Millions | |
|---|---|
| $154 | Infrastructure construction, bond projects, grants and earmarks |
| $125 | Construction of the Union Pacific Intermodal Terminal |
| $ 85 | Equity capital and loans from the Allen family |
| $ 55 | Construction of a 175-acre build-to-suit for ADESA Auto Auction |
| $ 40 | Construction of two speculative industrial buildings (827,000 sf) |
| $ 12 | Land purchase by the BNSF Railway |
| $  3 | Construction of a 15-acre build-to-suit for Bridge Terminal |

|       | Transport (Maersk) |
|-------|--------------------|
| $474  | ESTIMATED TOTAL    |

To further enhance the funding of public infrastructure, DLH has also pursued the creation of various public-private partnerships ("PPP") with the City of Hutchins. These PPPs include tax increment reinvestment zones (TIRZ), reimbursement agreements, and other public finance vehicles available in Texas. Draft Preliminary Project & Financing Plans for TIRZs have been submitted to the City of Hutchins; it is believed that the creation of this zone will be forthcoming. Exhibit P attached hereto provides greater detail on infrastructure improvements made to or committed for the Dallas Logistics Hub.

### B.    December 2009 Merger

In December of 2009, each Debtor was involved in separate mergers in which numerous subsidiaries were collapsed into one of Debtors. The DLH merger, which had been under consideration for more than two years, dramatically simplified an excessively complex financial structure created by Debtors' prior COO, and made the legal structure more consistent with the way DLH was being marketed, financed, and managed. Even with the consolidation and financial simplification, there are still a number of entities, some involving third party investors, which are owned wholly or in part by ACP. Although some are inactive shell entities, other entities have their own stable lender relationships which ACP has no desire or financial benefit to disturb. A list of non-filed ACP entities is attached as **Exhibit G**.

## IX.    OVERVIEW OF CHAPTER 11 CASES

### A.    First Day Motions

Contemporaneously with the Bankruptcy Petition, Debtors filed the following motions and

applications (collectively, the "First Day Motions"): (1) Motion For Order Directing Joint Administration of Debtors Chapter 11 Cases; (2) Motion For An Order Pursuant To Bankruptcy Rule 1007 Granting An Extension Of Time For Filing Schedules And Statements Of Financial Affairs; (3) Debtors' Motion For An Order Pursuant To 11 U.S.C. §105(a) And Bankruptcy Rule 2002 Establishing Notice Procedures; (4) Debtors' Motion For Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing Or Discontinuing Service, (II) Deeming the Utility Companies Adequately Assured Of Future Performance, (III) Authorizing Debtors To Maintain Their Prepetition Relationships And Practices With The Third Party Vendor; And (IV) Establishing Procedures For Determining Requests For Additional Adequate Assurance; (5) Debtors' Motion For Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To All Secured Lenders, And (III) Scheduling A Final Hearing; (6) Application To Employ Counsel For Debtors And Debtors In Possession; (7) Debtors' Motion To Approve DIP Financing; (8) Debtors' Application to Employ Lain Faulkner & Co., P.C. As Accountants for Debtors; and (9) Debtors' Motion for Order Pursuant To 11 U.S.C. §105(a) and Bankruptcy Rule 331 Establishing Procedures For Interim Compensation and Reimbursement of Expenses of Professionals. All of the First Day Motions were granted and largely uncontested except: (5) Debtors' Motion For Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection To All Secured Lenders, And (III) Scheduling A Final Hearing and (7) Debtors' Motion To Approve DIP Financing.

### B. DIP Financing

Pre-petition, Pointe Property Group, Inc. and Allen Investments, Inc. (collectively, " DIP Lenders") had loaned Debtors approximately $ 585,000 secured by a junior lien on all DLH real

estate involved in the Chapter 11 filing, in order to enable Debtors to fund retainers for its professionals and continue operations until a bankruptcy filing could be effectuated. The DIP Lenders are entities owned and or controlled by the father, brother and various family entities related to Richard S. Allen, all of whom are insiders and have direct and indirect ownership positions in DLH. After the Petition Date, the Debtors sought Bankruptcy Court approval for Debtor in Possession Financing (the "DIP Facility") from the DIP Lenders up to a maximum amount of $3.50 million (including the pre-petition advance of $585,000). The DIP Facility was potentially controversial in that (a) the monies were being loaned by insiders, (b) a priming lien was granted to the extent to which DIP Facility proceeds were used to pay real estate taxes due and owing on the various parcels, (c) a junior lien was granted to the DIP Lenders by both DLH (on the land held by DLH) and ACP (on the various interests held by ACP), and (d) the DIP Facility as proposed was joint and several between ACP and DLH. Each of these issues was contested before the Court by one or more parties in interest.

Ultimately, the Court found (i) the terms of the line of credit were negotiated on an arm's-length basis, (ii) a priming lien was appropriate on those parcels where the secured creditor did not pay the real estate taxes which were due in the first weeks of the case, (iii) the junior lien on all DLH land without vertical improvements and all ACP assets which could validly be granted as security was appropriate and granted to secure the DIP Facility, and (iv) that ACP could only borrow against the DIP Facility through July 15, 2010 and DLH could make payments under the Service Agreement during that period. After July 15, 2010, DLH was no longer entitled to make payments under the Service Agreement for employees of ACP or ADCC, and ACP was no longer entitled to borrow under the DIP Facility.

As ACP could not borrow against the joint DIP Facility after July 15, 2010, Debtors negotiated a separate DIP Facility for ACP with the existing DIP Lenders. This facility was subsequently approved by the Court and the DIP Lenders were granted a junior lien on ACP's assets to secure their loans under this DIP Facility.

Subsequently, DLH extended the joint DIP Facility by agreement with the DIP Lenders through October. DLH also requested that the Court establish a procedure under which the joint DIP Facility could be extended further by simply submitting a revised budget to the Court. The Court granted DLH's request and established a procedure under which DLH could extend the DIP Facility without the necessity of a subsequent hearing. The DIP Facility has since been extended from time to time as required.

**C.      Use of Cash Collateral and Adequate Protection**

DLH's request to use cash collateral and offer to provide adequate protection to substantially all DLH secured creditors was also extensively contested and resulted in several hearings before the Court. DLH had offered to provide adequate protection to TierOne and substantially all secured creditors of DLH with an interest in land without vertical development by providing a junior lien to all such creditors. Ultimately, the various secured creditors with liens on land without any vertical development declined the offer of adequate protection.

**1.      TierOne / Great Western Bank:**      Debtors requested to use the cash collateral generated by the lease to ADESA (which was then pledged to Tier One Bank (hereafter "TierOne") as security for the construction loan which was used pre-petition to develop the ADESA facility and various infrastructure improvements   TierOne vigorously contested the request to use its cash collateral and later separately moved to lift the automatic

stay, seeking permission for TierOne to foreclose on its collateral and prosecute certain guarantees. Ultimately, the Court ruled that certain pre-petition rents collected by the DLH were not cash collateral, granted Debtor DLH limited permission to use approximately $1.2 million of the ADESA rents from filing through July 31, 2010 directed DLH to pay the remaining ADESA rents to TierOne, and denied TierOne's motion to lift the automatic stay so that the ADESA facility could not be foreclosed upon by TierOne. In addition, TierOne Bank was granted a junior lien on DLH land as substitute collateral for the cash collateral actually being used by Debtors and TierOne was granted permission to prosecute its guarantees against non-debtors.

TierOne Bank appealed certain of the Bankruptcy Court's Orders and those appeals are currently pending before the Federal District Court for the Northern District of Texas. Subsequently, TierOne Bank was seized by the FDIC and Great Western acquired the loan to DLH from the FDIC in its capacity as a receiver for TierOne Bank. Great Western continued the appeal. DLH moved to dismiss the appeals of the cash collateral order as moot.

DLH filed a motion for permission to use added cash collateral after July 31, 2010, net of the amounts from the ADESA rents necessary to commence interest only payments to Great Western at the non-default rate. DLH's motion was granted and DLH was authorized to use certain amounts from the ADESA rents through October, 2010. Subsequently, a settlement was reached with Great Western and approved by both BB&T and the FDIC, The terms of the settlement are as follows:

**Release Price.** Subject to and upon the terms and conditions provided in Settlement Agreement, Great Western Bank will accept a single payment in the amount of the Release Price in full and final payment of the accrued indebtedness owed by DLH to Great Western Bank under the

terms of the Loan Documents. In order to obtain sufficient funds to pay the Release Price to Great

Western Bank, DLH is attempting to sell the ADESA Project (together with the ADESA Lease, the

"ADESA Property"). The Release Price is to be paid by DLH in full to Great Western Bank in cash,

by wire transfer, or in certified funds at the closing of a sale of the ADESA Property ("Closing").

The phrase "Release Price" means (a) $48,000,000.00 plus (b) if, and only if, the Net Sale Proceeds

from the sale of the ADESA Property are more than $50,750,000.00, twenty-five percent (25%) of

the Net Sale Proceeds in excess of $50,750,000.00, without deduction or set-off. The phrase "Net

Sale Proceeds" means the gross sales price of the ADESA Property less Closing Costs. The phrase

"Closing Costs" means broker commissions, title company fees, title insurance premiums, escrow

fees, recording fees, attorney fees, and other expense prorations and deductions applicable to the sale

of the ADESA Property that are agreed to by DLH and the Buyer and approved by the Bankruptcy

Court. In no event is the amount of the Release Price to be reduced by any payment made by DLH

(or by one or more Guarantors) to Great Western Bank prior to Closing or otherwise.

The Closing of the sale of the ADESA Property currently scheduled for May 23, 2011 and

the payment of the Release Price to Great Western Bank must both occur on or before June 30, 2011

("Drop Dead Date"). The Settlement Order shall modify the automatic stay provided in the

Bankruptcy Code so that if (i) the Bankruptcy Court, BB&T, and the FDIC have approved

Settlement Agreement by the deadlines set forth in Section 1.3 above and (ii) Great Western Bank

have not received payment of the Release Price in full on or before May 31, 2011, the Bankruptcy

Code stay shall automatically partially terminate to allow Great Western Bank to post the ADESA

Property for foreclosure. If the Great Western Bank has not received payment of the Release Price

on or before the Drop Dead Date, the Bankruptcy Code stay shall automatically terminate to allow

Great Western Bank to foreclose its liens and security interests on the ADESA Property on or after July 1, 2011, at any time they choose, without the necessity of any further order from the Bankruptcy Court. The Settlement Order also provided that neither the Debtors nor any persons related to or affiliated with Debtors (including Rex Allen, R.E. Allen, Pointe Property Group, Inc. and Allen Investments, Inc.) will take any direct or indirect action to interfere with the foreclosure of the ADESA Property as authorized in Settlement Agreement. In the event the automatic stay lifts pursuant to the terms of Settlement Agreement, DLH shall immediately turn over to Great Western Bank all ADESA Rents which it may receive thereafter within two (2) business days of receipt.

**Use of Cash Collateral.** As a modification of the existing court order related to ADESA Rents, DLH has made monthly payments from the ADESA Rents to Great Western Bank in the amounts of (a) $245,134.15 during the period beginning on November 1, 2010, through January 31, 2011, and (b) and shall pay $311,611.00 per month during the period beginning on February 1, 2011, through and including the earlier to occur of the date of Closing or June 30, 2011 (and prorated as of the date of Closing or June 30, 2011, whichever date is applicable).  DLH may use the remaining cash collateral from the ADESA Rents, if any, through the earlier to occur of the date of Closing or June 30, 2011.  The monthly payments, if any, received by Great Western Bank after February 1, 2011 pursuant to the terms of Settlement Agreement, shall be applied to DLH's debt to Great Western Bank as provided in the Note. Notwithstanding anything contained in Settlement Agreement seemingly to the contrary, no payment made to Great Western Bank under or contemplated in this Section shall reduce or be credited against the Release Price.

**Releases.** Upon Great Western Bank' receipt of the Release Price or the completion of the foreclosure by Great Western Bank of their liens and security interests on the ADESA Property, the

Guarantors and Great Western Bank shall each release the other and all employees, affiliates, and attorneys from all claims (including chapter 5 claims under the Bankruptcy Code), except for any claims arising under Settlement Agreement. The mutual release to be executed by the Guarantors and Great Western Bank shall be executed by each of those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "B" to Settlement Agreement. Subsequent to the satisfaction of the conditions stated in the preceding sentence and upon the occurrence of either the receipt by Great Western Bank of the Release Price or the date on which Great Western Bank complete a foreclosure of the liens and security interests created under certain of the Loan Documents, DLH and Great Western Bank will each release the other and all employees, affiliates, and attorneys from all claims (including chapter 5 claims under the Bankruptcy Code), except for those claims arising under the Settlement Agreement. The mutual release to be executed by DLH and Great Western Bank shall be executed by those parties within five (5) business days from the date on which the applicable event which triggers that release occurs and shall be in a form and content, except for the completion of blanks, identical to the form of Mutual Release that is attached at Exhibit "C" to Settlement Agreement. On the date that the Mutual Release between the Bank and DLH has been fully executed by all of those parties, Great Western Bank will also be deemed to have waived and released any right to payment and any lien granted under the so-called "Replacement Lien" granted by the Bankruptcy Court pursuant to the Bankruptcy Court's "Final Order on Debtors' Motion Requesting Use of Cash Collateral" entered on April 23, 2010 (Dkt. No. 233) and the "Order Authorizing Debtor DLH Master Land Holding, LLC's to Use Cash Collateral Lease Payments for August

through October 2010" entered on August 25, 2010 (Dkt. No. 514). If Great Western Bank receive payment of the Release Price in full at Closing, Great Western Bank will (a) release all liens and assignments which they may have related to the ADESA Property and under the Replacement Lien and (b) join with DLH in seeking dismissal of the Appeals, (c) withdraw all claims, votes and objections in the Bankruptcy Cases (d) cease to participate further in the Bankruptcy Cases and e) execute all releases.

2. **Compass Bank:**  Debtors requested to use the cash collateral generated by the rents from the current and future tenants of Buildings A and Buildings B (which were pledged to Compass Bank as successor to Guaranty Bank). Debtors and Compass Bank reached an agreement under which Compass Bank consented to DLH's use its cash collateral to care for and support Buildings A and Buildings B, including potentially using those funds for tenant improvements, subject to Compass Bank's review of the funds being expended and the applicable budget. DLH has requested use of certain amounts of cash collateral to make tenant improvements and pay lease brokerage fees in connection with certain potential new tenants. Compass Bank has indicated that the terms of at least one new lease was acceptable and DLH to use cash collateral for tenant improvements lease brokerage fees and other cost associated with the transaction

DLH has sold the two buildings which secure the Compass Bank Building Loan. Compass Bank was paid at the closing of such sale in full satisfaction of its DLH Class 3 Subclass F Claim the full amount due to Compass from the sale proceeds (less all reasonable and necessary closing costs, including but not limited to title costs, survey, brokerage fees, tax prorations and all contractual obligations related to the EnKon Lease), and any Cash Collateral of Compass Bank (which may be used by Reorganized Debtor to satisfy any obligations to any tenant under any lease, and to pay tax

prorations and costs of closing the sale) as provided by the terms of the Bankruptcy Court's Order approving such sale (the "**Compass Sale Order**"), and Compass Bank shall have an Allowed Unsecured Claim against DLH as a result of the deficiency in an amount calculated as provided in such Compass Sale Order. Compass Bank's Secured Claim with respect to the Building Loan was fully satisfied at the closing, and this Class is Unimpaired under the Plan.

### D. Retention of Brokers

In an effort to increase cash flow to the estate and reduction of debt of creditors, DLH, with the permission of the Bankruptcy Court real estate professionals as follows:

1.   **CB Richard Ellis** – The team of Jack Fraker and Josh McArtor were retained on June 11, 2010 under a Commercial Listing Agreement to market and sell the ADESA Property. Over the course of several months of marketing the property, responding to inquiries from various prospective purchasers, and executing a "Best & Final" offering, a purchaser was ultimately selected, a Letter of Intent negotiated, a contract executed by DLH and purchaser and the transaction was approved by the creditors and the Bankruptcy Court on March 24, 2011. Closing is projected to occur on May 27, 2011. The sales price is $50,750,000.

2.   **Colliers International ("Colliers")** – The team of Tom Pearson and Chris Teasdale were retained by DLH to provide (a) Exclusive Leasing services and (b) Exclusive Sales services for the buildings known as the Compass Buildings or 4800 & 4900 Langdon Road.

During the terms of these engagements, Colliers responded to multiple requests for information from prospective tenants. One tenant lease for EnKon was executed for +/-

40,900 square feet of space in the building at 4900 Langdon Road.

With respect to the sales initiative, Colliers solicited interest from approximately 50 prospective investors, resulting in seven (7) offers from highly qualified purchasers. After a "Best & Final" offering the sale was ultimately negotiated and approved at $23,537,000.  Closing occurred on May 16, 2011.

3. **Jones, Lang, LaSalle ("JLL")** – On June 9, 2010, DLH entered into an Exclusive Listing Agreement with JLL to market and sell land contained within the DLH Project. During this engagement JLL has completed or are continuing the following tasks / actions:

   1. Meeting with local economic executives of the various South Dallas organizations to make them aware of the offering of the property and better understand the incentive packages that can be offered to potential users or developers.

   2. Installed marketing signs throughout the project.

   3. Initiated a regular rotation of email broadcasts to groups, such as:

      - North Texas Commercial Association of Realtors

      - Local, Regional, National & International Industrial Brokers –

      - JLL Industrial Brokers - Internationally

      - Society of Office & Industrial Brokers – Nationally

      - Drayage Contractors

      - Equipment Rental Companies

- Nation Industrial Development Companies

- Freight Companies

- Third-Party Logistics Companies

- Trucking Companies

➢ *Over the course of the past nine (9) months, JLL has sent out **75 email broadcasts**, with a total of more than **31,000 recipients**.* See **Exhibit S.**

4. Registered the property in all available property databases including: CoStar, Loop Net, etc.

5. Developed marketing collateral, with input from DLH, including a well-planned promotional brochure designed to be bottom-line-oriented that will stress the strong points and amenities of the sites. The brochure includes color photographs, maps, aerial photographs and highlights of the sites.

6. Personal contact and follow-up with all prospective purchasers and/or their brokers.

➢ *Over the past eleven (11) months, JLL has had conversations with, toured the project and or issued proposals to more than **85** prospective purchasers and/or their brokers*

7. Ensured that the Property offering is continually in front of the brokerage community at least once each month.

8. Established regular internal marketing team conferences and reports to supervise progress.

Over the course of the marketing term, JLL has generated the following offers which DLH has worked and or negotiated:

A) **Build to Suit / Land Sale** - A BTS / Land Sale proposal on +/- 5 acres for a retail outlet for a construction materials supplier. This opportunity is no longer active because the company was not prepared to acquire the land and would not enter into a lease for more than 5 years.

B) **Land Sale** – A land sale proposal for +/- 30 acres of land to a user. This sale is no longer active because the land acquisition was tied to the award of a municipal contract which the prospect was not awarded.

C) **Land Sale** – A land sale proposal for +/- 80 acres of land to a national developer. Conversations with this prospect are on-going.

D) **Land Sale** – A land sale proposal for +/- 2 acres of land to retailer. This sale did not materialize due to the land use restrictions.

E) **Land Sale** – A land sale proposal for +/- 15 acres of land for trucking maintenance facility. Contract negotiations are on-going. Transaction could be completed within 45 days of contract execution. The Committee has approved the economic terms.

F) **Land Sale** - A land sale proposal for +/- 5 acres of land for two (2) restaurants. This sale did not materialize due to land pricing.

### E. Leases of Non-residential Real Property Where a Debtor Is Lessee

DLH assumed its office lease of certain space in the 1700 North Pacific building in Dallas. ACP received an agreed extension from its landlord with respect to whether to assume or reject its lease with ADSC Diamante, LLC for its offices in San Diego. ACP subsequently moved to assume

the Diamante lease. As no party objected to the assumption of the Diamante lease, the Diamante lease has been assumed.

**F.      Retention of NewSource Partners and Commission Agreements for Exit Financing**

Debtors retained Mr. Dwayne Toler of NewSource Partners to act as Chief Financial Officer and assist Debtors in locating Exit Financing. In connection with the Exit Financing facility, Debtors have agreed to pay, on a non-exclusive basis, certain financial intermediaries up to 2% of the proceeds from the facility. Debtors filed a Motion for the Court to approve such a fee or commission and received an order authorizing Debtors to enter into agreements to pay such a fee or commission. Debtors have entered into several such agreements in connection with Debtors' search for the Exit Financing facility.

**G.      Objections to Romanov Claim and Romanov Settlement with Committee**

Edward B. Romanov, Jr. was recruited and hired as a consultant to manage the real estate operations of Richard S. Allen and the group of companies known as "The Allen Group" in October of 2004. Thereafter, Romanov was hired as President and Chief Operating Officer of ACP in April of 2006 under an Employment Agreement. Pursuant to the Employment Agreement, Romanov was admitted as a member to ACP and held a Profits Interest in ACP. The day after Romanov terminated the Employment Agreement in 2008, Romanov contended ACP owed him well in excess of thirty million dollars ($30,000,000) in connection with the "repurchase" of Romanov's Profits Interest. On or about November 17, 2008, Romanov received $3,271,776.00 from ACP in addition to the forgiveness of certain indebtedness owed to Richard S. Allen, Inc. and ACP by Romanov. Romanov commenced an arbitration proceeding against a variety of parties, including ACP, seeking

to recover the balance.

Romanov filed a proof of claim (claim #14) in the amount of $27,451,767 against ACP. Debtor ACP objected to the claim on a variety of grounds, including that Romanov's claim was capped under Bankruptcy Code section 502(b)(7). The Committee also objected to Romanov's amended claim on the grounds that the claim was actually a proof of interest and not a proof of claim. To date, the Bankruptcy Court has entered an order denying Debtor ACP's objection that Romanov's claim should be capped under Bankruptcy Code section 502(b)(7). Debtor ACP is currently appealing that decision, although ACP and Romanov have abated that appeal until after the Plan has been confirmed.

Prior to the hearing on ACP's and the Committee's objections to Romanov's claim, Romanov and the Committee reached a settlement which they announced in open Court under which Romanov agreed to cap his claim in the bankruptcy proceeding at six million, five hundred thousand dollars ($6,500,000). Subject to the restrictions set forth below, Romanov's claim would be allowed as follows:

    a.    $3,500,000 as an Allowed ACP General Unsecured Claim (the "Romanov Unsecured Claim") and

    b.    $3,000,000 as a subordinated Allowed ACP General Unsecured Claim, subordinated in rights and payment, to and until all Allowed ACP General Unsecured Claims shall have received Cash Distributions in the amount of 70% of such Allowed ACP General Unsecured Claims (the "Romanov Subordinated Unsecured Claim").

Following cash distributions to holders of all Allowed ACP General Unsecured Claims in the amount of 70% of such Allowed ACP General Unsecured Claims, the holder of the Romanov Subordinated Unsecured Claim will participate in subsequent Cash Distributions, if any, as follows:

a.      First, the holder of the Romanov Subordinated Unsecured Claim, shall receive the next $500,000 in cash distributions, before payment of any further cash distributions to holders of Allowed ACP General Unsecured Claims;

b.      Second and thereafter, all cash distributions, shall be made on a pro rata basis to all holders of Allowed ACP General Unsecured Claims; provided, however, that the Romanov Unsecured Claim will then be increased by the amount of $2,500,000 to an aggregate of $6,000,000 ($2,500,000 [the increase amount] plus $3,500,000 [the amount of the Romanov Unsecured Claim]) and thereafter the Romanov Unsecured Claim will be $6,000,000 for purposes of future cash distributions (the "Romanov Adjusted Unsecured Claim");

c.      No cash distributions will be made to the holder of the Romanov Adjusted Unsecured Claim to result in the holder of the Romanov Adjusted Unsecured Claim having received cash distributions equal to 70% of $6,000,000; rather, all Cash Distributions shall be made at the then pro rata basis of all Allowed ACP General Unsecured Claims (inclusive of the Romanov Adjusted Unsecured Claim).

d.      To illustrate the structure of the stipulation and by way of example only, assume: (a) that all Allowed ACP General Unsecured Claims equal $50,000,000 (inclusive of the Romanov Unsecured Claim); (b) that cash distributions have already been made to holders of Allowed ACP General Unsecured Claims aggregating $35,000,000 (*to wit*: 70% of $50,000,000); and (c) cash distributions are to be made in the amount of $4,000,000, the same would be distributed as follows:

> i.   The first $500,000 thereof to the holder of the Romanov Subordinated Unsecured Claim;
>
> ii.  The next $3,500,000 to the holders of the Allowed ACP General Unsecured Claims, consisting of $52,500,000 ($50,000,000 plus $2,500,000 [the increased amount of the Romanov Unsecured Claim]), on a pro rata basis, with the holder of the of the Romanov Adjusted Unsecured Claim receiving $400,000 ($3,500,000 X $6,000,000/$52,500,000).

Notwithstanding the Stipulation between Romanov and the Committee, to the extent the Court ultimately finds that Romanov is entitled to an allowed claim against ACP in excess of the

$6,500,000, Romanov unconditionally stipulated and agreed that, notwithstanding such court Order: (i) Romanov will not receive cash distributions in an amount exceeding $6,500,000; and (ii) Amended Claim 14 shall be paid on account of such claim, if at all, in accordance with the provisions described above. To the extent the Court's order on Romanov's claim provides that the claim is allowed in an amount less than $6,500,000 (the "Ordered Claim Amount"), Romanov unconditionally stipulates and agrees that: (i) the holder of Amended Claim 14, will not receive cash distributions in an amount exceeding the Ordered Claim Amount; and (ii) the Ordered Claim Amount shall be allowed and treated, with respect to cash distributions, as follows: (A) as an Allowed ACP General Unsecured Claim not to exceed to $3,500,000; and (B) the difference, if any, between the Ordered Claim Amount and $3,500,000 shall be (1) allowed as a subordinated Allowed ACP General Unsecured Claim, subordinated in rights and payment, to and until all Allowed ACP General Unsecured Claims have received cash distributions in the amount of 70% of such Allowed ACP General Unsecured Claims; and (2) paid in the same "waterfall" manner as the Romanov Subordinated Unsecured Claim as described above.

## H.  Search for Joint Venture Partners and/or Third Party Exit Financing

DLH has solicited potential debt or equity infusions from and entered into Confidentiality & Non-Disclosure Agreements ("CNDAs") with more than 45 parties, has established a virtual document room to facilitate due diligence by investors and has actively negotiated with a number of prospects.

ACP's most active development asset is LPKC, an entity which holds an option on more than 500 acres of land from the BNSF railroad. Numerous parties have executed non-disclosure agreements and have examined entering into joint ventures with LPKC. The Kansas City market has

a very low vacancy factor for industrial buildings. The BNSF will commence construction of an intermodal facility adjacent to the property and LPKC is currently negotiating various sales and build to suit leases.

## X.  RISK FACTORS

**The primary risk to creditors under the Plan is that Debtors will be unable to meet their sales and development projections which can be found in accompanying Exhibits E-1 and E-2.** Although management regards the projections as reasonable and achievable, there is no guaranty Debtors will be able to achieve the results projected. Future prices and demand for land are inherently uncertain and there can be no guaranty that Debtors will be able to sell either the volume of land projected or realize the prices projected. More specifically, for ACP, the projections also include significant development activity at LPKC, primarily build to suit opportunities, which requires certain assumptions about the terms and conditions a capital partner would require to allow that development to occur. For a more traditional description of Risk Factors, see **Exhibit H**.

## XI.  GENERAL DISCHARGE

Except with respect to Classes of Claims unimpaired pursuant to the Plan, the distributions and rights afforded in the Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and interests in Debtors or any of its assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in the Plan, all Claim holders and interest holders shall be precluded forever from asserting against Debtors or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of either Debtor, based on any act or

omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or Interest, whether or not Allowed, except with respect to and to the extent of Claims or the portions of Claims which are unimpaired pursuant to the Plan. As of the Effective Date, the Debtors, shall be discharged and released from and shall hold all the assets and properties received or retained by them pursuant to the Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except Claims in Classes unimpaired pursuant to the Plan and as otherwise provided in the Plan. All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and interests or obligations of any nature against either Debtor or assets or properties received or retained with respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in the Plan.

## XII. CORPORATE GOVERNANCE AND MANAGEMENT OF PLAN DEBTORS AS REORGANIZED

### A. Continued Existence of the Reorganized Debtors.

Subject to the restructuring and reorganization contemplated by, and described more fully in the Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, and all Interests held by a Debtor in another Debtor or a subsidiary thereof shall be reinstated, with all the powers available to such legal entity, in accordance with applicable law and pursuant to the Plan Debtor Constituent Documents, which shall become effective upon the occurrence of the Effective Date or such other later date contemplated thereby.

### B. New Organizational Documents

To the extent necessary, any Organizational Documents which will be revised or amended pursuant to the Plan shall be filed by Debtors with the Court at least seven (7) days prior to the Effective Date.

**C.      Directors and Officers / Oversight Committee**

The identity of the proposed initial directors of Reorganized DLH following the Effective Date will be Richard Allen, Rex Allen, Laura Jeffries, Luke Allen, R. E. Allen, Brian Allen, and a representative designated by the Committee.  Each director other than the Creditors Representative serves without compensation.  The Creditors Representative is entitled to compensation of $10,000 per annum plus costs and expenses and reasonable  counsel fees not to exceed $25,000 per annum.  The Creditors Committee has selected Harold J. Kessler, of Barrier Advisors, to serve as the Creditors Representative for Reorganized DLH and Reorganized ACP.

The initial Board of Directors of Reorganized ACP following the Effective Date will be Richard Allen, Luke Allen, Rex Allen, Laura Jefferies and the  Creditors Representative selected by the Committee whose compensation and attorney's fees are the same as received by the DLH director and who  may be the same individual.

The Oversight Committee which has the power and discretion to remove the creditor representative director or replace that director if he is unable to act will initially consist of Chuck Nichols, Committee Co-Chairman; Fred Sainick, Committee Co-Chairman; and Marvin Hansen, an officer of Valley Business Bank, a large ACP creditor.  The Oversight Committee serves without compensation.

**D.      Dissolution of the Committee**

Upon the Consummation Date (see page 15 above), the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Committee after the Consummation Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Consummation Date or filed after the Consummation Date; provided, however, that to the extent any such fees and expenses are incurred after the date that is fifteen business days prior to the deadline to file final fee applications, any such fees and expenses must be submitted to the Reorganized Debtors.

### E. Segregation of Accounts by the Reorganized Debtors

Except as set forth in Section 13.22 of the Plan, Reorganized Debtors shall not be obligated to physically segregate and maintain separate accounts for reserves or for distribution funds and separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable Reorganized Debtors to determine Distributable Cash, reserves and amounts to be paid to parties in interest.

Reorganized DLH shall segregate and maintain separate accounts for the following

purposes:

(i)     escrowing rents, common area maintenance and taxes received from the tenants of Building A and B unless and until Compass Bank consents to the commingling of all or a part of such funds or the buildings are sold,

(ii)    escrowing monies received for taxes and insurance from ADESA until such time as those taxes and/or insurance bills are paid,

(iii)   escrowing monies which are to be distributed quarterly to the unsecured creditors of ACP (ACP Unsecured Creditor Net Proceeds),

(iv)    escrowing monies which are to be distributed quarterly to the unsecured creditors of DLH (DLH Unsecured Creditor Net Proceeds),

(v)     escrowing monies which are to be distributed quarterly to the holders of Pool 1 Notes (Secured Creditor Pool 1 Net Proceeds), and

(vi)    escrowing monies which are to be distributed quarterly to the holders of Pool 2 Notes (Secured Creditor Pool 2 Net Proceeds).

**F.      Corporate and Limited Liability Company Action**

On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company action of Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors, members or shareholders, as applicable, and execution of all documentation incident to the Plan, notwithstanding any otherwise applicable non-bankruptcy law or the Organization Documents of Debtors, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, members or shareholders, as applicable, of Debtors.

**G.      Saturday, Sunday or Legal Holiday**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## XIII.   TREATMENT OF EXECUTORY CONTRACTS AND LEASES

### A.      Treatment of Remaining Executory Contracts and Unexpired Leases

The Plan constitutes and incorporates one or more motions by the respective Debtor proponent to assume, as of the Confirmation Date and conditioned upon the occurrence of the Effective Date, all prepetition executory contracts and unexpired leases to which one or both of Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, or (b) are the subject of a separate motion (or appeal of the ruling on such motion) filed pursuant to section 365 of the Bankruptcy Code filed by one or both of Debtors prior to the Effective Date or a separate motion (or appeal of the ruling on such motion) to compel or permit assumption or rejection pursuant to section 365 of the Bankruptcy Code filed by the Committee prior to the Effective Date and such unexpired lease or executory contract shall be assumed or rejected, as the case may be, by virtue of a Final Order of the Bankruptcy Court, which may be entered after the Effective Date.  Expected cure costs on all executory contracts other than the ADESA lease which is separately discussed are expected to be minimal.

### B.      Rejection Damages Bar Date

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Bankruptcy Court and with the following persons:

```
Jenny Saubert
125 S. Bridge Street, Suite 100
Visalia, CA 93291
```

and a copy served on counsel for Debtors, within thirty (30) days from the entry of the Confirmation Order, or such Claim shall be forever barred and shall not be entitled to a Distribution or be enforceable against Debtors, their Estates, Reorganized Debtors, their successors, or their assigns. Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in the applicable Class (General Unsecured Claims). Nothing in the Plan extends or modifies any previously applicable Bar Date.

## XIV. DISTRIBUTIONS

### A. General Provisions Concerning Distributions

To the extent that any Creditor may obtain payment from either DLH or ACP or both, or from either Debtor and any other sources, including any guarantor of a Claim on which DLH or ACP is the principal obligor, the "single recovery rule" shall apply, and any such Creditor shall not be entitled to receive any further distributions on its claim after its claim has been fully satisfied, taking into consideration payments on such claim from all sources. By way of example, if a Secured Creditor of DLH also has an unsecured claim against ACP by reason of any guaranty or other agreement, or has a claim against Richard S. Allen or Richard S. Allen, Inc., once the total of distributions to such creditor from all sources are sufficient to fully satisfy that creditor's claim, that

creditor shall not be entitled to any further distributions from any source on account of the satisfied claim.

At the written request of Reorganized Debtors, any creditor holding multiple Allowed Unsecured Claims shall provide Reorganized Debtors a single address to which any Distributions shall be sent. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Debtors may, but shall not be required to, set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtors, of any such claim they may have against such claimant.

To the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## B. Disbursing Agent

Unless expressly otherwise provided in the Plan or in the Confirmation Order, distributions to Creditors required pursuant to the Plan shall be made by the Reorganized Debtors. All distributions to the holders of non-Schedule 1 DLH Class 4 Claims and ACP Class 4 Claims shall be

made by the Disbursing Agent for DLH and ACP, as the case may be. After all DLH 50% Notes and all DLH 100% Notes have been repaid in full, Reorganized DLH shall be responsible for distributions to Schedule 1 DLH Class 4 Claims, and, after all ACP 50% Notes and all ACP 100% Notes have been repaid in full, Reorganized ACP shall be responsible for distributions to Schedule 1 ACP Class 4 Claims.

### C.    Time and Manner of Distributions

Payments of cash to be made by the Reorganized Debtors or the Disbursing Agent, as the case may be, pursuant to the Plan shall be made by check drawn on a domestic bank, by wire transfer or by ACH.

Any distribution of less than $25.00 will be considered *de minimis*, and Holders of Allowed Claims that are entitled to any distribution of less than $25.00 may not receive any distribution (at the sole discretion of the Reorganized Debtors or the Disbursing Agent, as applicable) unless and until the aggregate of such distributions exceeds $25.00. To the extent that the aggregate of such distributions does not exceed $25.00 within one year of when the funds would originally have been distributed, such funds shall be paid on the first anniversary of when *de minimis* distribution would otherwise have become due and payable except for the provisions of this section.

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Any such distributions will be in whole cents (rounded to the nearest whole cent when and as necessary).

### D.    Delivery of Distributions / Undeliverable or Uncashed Distributions

Distributions of cash to holders of Allowed Claims shall be made at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if

no Proof of Claim is filed or if the Reorganized Debtors or the Disbursing Agent, as the case may be, have been notified in writing of a change of address).  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtors or the Disbursing Agent, as the case may be, is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  All claims for undeliverable distributions shall be made on or before the one-year anniversary of the distribution to the Creditor that was undeliverable.  After such date, such undeliverable distributions shall become an asset available to the Reorganized Debtors, or the respective DLH Creditors Trust or ACP Creditors Trust in the case of distributions to non-Schedule 1 Class 4 Claims, and the Creditors entitled to the undeliverable distributions shall thereafter have no further rights or entitlements to the undeliverable distributions.

Checks issued by the Reorganized Debtors or Disbursing Agent, as the case may be, on account of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtors or the Disbursing Agent, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of the first (1st) anniversary of the Initial Distribution Date or ninety (90) days after the date of the issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred and the subject funds shall become an asset available to Reorganized Debtors or the respective DLH Creditors Trust or ACP Creditors Trust in the case of distributions to non-Schedule 1 Allowed Class 4 Claims.

E.    **Claim Administration Responsibility**

## 1. Reservation of Rights to Object to Claims

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, Reorganized Debtors (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

## 2. Objections to Claims

Prior to the Effective Date, Debtors shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions, if any, with respect to all Claims. The Reorganized Debtors shall consult with the Disbursing Agent and the Creditors Committee, while it is still in existence, with regard to issues relating to objections to Claims. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims will be filed and served not later than 90 days after the Effective Date. Unless arising from an Avoidance Action, any Proof of Claim filed more than ninety (90) days after the Effective Date shall be of no force and effect and need not be objected to. All Contested Claims shall be litigated to Final Order unless estimated by the Bankruptcy Court for purposes of distribution; provided, however, Reorganized Debtors may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court.

Reorganized Debtors may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

### 3. Filing of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if Reorganized Debtors effect service in accordance with Bankruptcy Rule 3007.

### 4. Determination of Claims

Commencing on the Effective Date, the Reorganized Debtors shall be authorized to object to, settle or liquidate all Claims entitled to payment which Claims are not otherwise Allowed Claims pursuant to the terms of this Plan. The Reorganized Debtors shall consult with the Disbursing Agent and the Creditors Committee while it is still in existence with regard to issues relating to objections to Claims. All costs and expenses relating to the foregoing, including, without limitation, fees of Professional Persons, shall be paid from the proceeds of liquidation.

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim by Final Order or is estimated for purposes of distribution by the Bankruptcy Court. In the case of a holder of a Claim who is also alleged to be holding property that is recoverable by virtue of any Avoidance Action or liable on any Avoidance Action brought, filed, joined, or adopted by Debtors as of the date of a particular distribution, such holder's Claim shall then be and shall thereafter continue to be a Contested Claim until such Avoidance Action is fully resolved by Final

Order and, if and to the extent the holder of such Claims is found to be obliged to turnover property or to pay a monetary amount, such Final Order is fully performed and satisfied by such holder, such holder shall receive no distributions under this Plan.

As soon as practicable after a Contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount of dollars equal to the aggregate of all the distributions which such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date. Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs. The Reorganized Debtors or Disbursing Agent shall have the right to make or direct the making of all distributions to the holders of Allowed Claims.

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, the Reorganized Debtors (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

**F.      Procedures for Treating and Resolving Disputed and Contingent Claims**

1.      No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

2.      Claim Estimation

Debtors or Reorganized Debtors may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code sections 502(c) and 502(e); provided, however, the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code section 502(c) and (ii) the timing and procedures for such estimation proceedings, if any.

**G.      Setoffs and Recoupment**

The Reorganized Debtors or Disbursing Agent, as the case may be, may, but shall not be required to, set off or exercise recoupment rights against any Claim including any payments or other distributions to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such Claim that Debtors may have against such holder.

**H.      Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code**

Allowance and disallowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

## I. Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided in the Plan, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; obligations of Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against Debtors, the Estates or Reorganized Debtors; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

## J. No Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order or a post-petition agreement in writing between Debtors and a Holder of a Claim and that has been approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

## K. Withholding Taxes

Reorganized Debtors and the Disbursing Agent, as applicable, shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan. As a condition to making any distribution under the Plan, Reorganized Debtors and the Disbursing Agent, as applicable, may

require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as Reorganized Debtors or the Disbursing Agent may deem necessary to comply with applicable tax reporting and withholding laws.

### L. Reports

From the Effective Date, until a Final Decree is entered, Reorganized Debtors shall submit quarterly reports to the United States Trustee setting forth all receipts and disbursements of Reorganized Debtors as required by the United States Trustee guidelines.

## XV. EFFECT OF CONFIRMATION

### A. Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, Reorganized Debtors' assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and all Reorganized Debtors' assets shall vest in Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### B. Binding Effect

On and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

### C. Discharge of Claims and Termination of Interests

Except as provided in the Plan, the rights afforded in and the payments and Distributions to be made under the Plan shall terminate all Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in Debtors, or their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against Debtors and Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests shall be precluded and enjoined from asserting against Reorganized Debtors, its successors or assignees or any of its assets or properties, any other or further Claim or Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

### D.     Term of Injunction or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the entry of the Final Decree.

### E.     Reservation of Causes of Action Reservation of Rights

Nothing contained in the Plan shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that Debtors or Reorganized Debtors may have or may choose to assert against any Person.  All creditors and parties in interest are hereby placed on notice that despite provisions which may be contained in the Plan, including without limitation those providing for satisfaction of Claims, if Allowed, Reorganized Debtors and the respective Creditors Trust Trustee reserve the right

to (a) commence, prosecute to judgment, and to collect upon any cause of action, whether or not such cause of action is listed in the Schedules and Statements of Affairs as an asset of Debtors' chapter 11 Estate and to (b) include as defendants in a suit any and all parties which are, at this time, named and unnamed. Currently, the Reorganized Debtors are unable to estimate the size of any recovery from such a lawsuit. The Reorganized Debtors and the respective Creditors Trust Trustee are authorized under the Plan, in their sole discretion, to litigate to final judgment, prosecute appeals as are necessary and enter into such settlement agreements as are deemed appropriate with respect to any and all suits initiated as provided herein.

Notwithstanding the foregoing, sections 11.01 and 13.29 in the Plan release certain claims which could otherwise have been brought against the Debtors. Section 11.01 of the Plan provides that, except with respect to Classes of Claims unimpaired pursuant to the Plan, the distributions and rights afforded in the Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and Interests in Debtors or any of their respective assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in the Plan, all Claim holders and Interest holders shall be precluded forever from asserting against Debtors, their respective agents and attorneys or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of Debtors, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed. As of the Effective Date, Debtors shall be discharged and released from and shall hold all the assets and properties

received or retained by them pursuant to the Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except as set forth pursuant to the Plan. All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and interests or obligations of any nature against Debtors or assets or properties received or retained by Debtors with respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in the Plan. Notwithstanding the foregoing, this provision shall not be interpreted to release any third party claims, liabilities or other causes of action against the affiliates and principals of the Debtors unless the claim or cause of action so released is derivative of a claim or cause of action which was or could have been asserted against a Debtor in this Bankruptcy, or constitutes property of either of the Debtors' bankruptcy estates.

Section 13.29 provides that neither the Debtors, nor the Committee, nor any of their respective members, officers, directors, employees, agents, advisors, affiliates, attorneys, accountants, nor any other professional person retained or employed by any of them (collectively, the "Exculpated Persons") shall have or incur any liability to any Creditor, Interest holder, or any other person or entity for any act taken or omission made in good faith in connection with or relating to the formulation, negotiation, implementation, confirmation, or consummation of the Plan, including any settlement referenced or described herein, or in connection with or relating to the Disclosure Statement or any document, instrument, note or agreement executed or to be executed and delivered pursuant to the Plan. The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, or any other party in interest in the Debtors' Bankruptcy Case, or any other person or entity, for actions taken or not taken under the Plan, in connection herewith, or with

respect hereto, or arising out of their administration of the Plan or distributions of money or property under the Plan, in good faith, including, without limitation, the failure to obtain confirmation of the Plan, or the failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties, rights, and obligations under the Plan.

### F. Avoidance Actions/Objections

All Avoidance Actions, including but not limited to Avoidance Actions pursuant to sections 544, 545, 546, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, are preserved in the estate for the benefit of creditors. All Avoidance Actions shall, by operation of the Confirmation Order, be assigned free and clear of all liens (as defined in Section 101(37) of the Bankruptcy Code), Claims and Interests to the respective DLH Creditors Trust or ACP Creditors Trust on the Effective Date, and after the Effective Date, the Creditors Trust Trustee(s) may pursue, release, abandon, settle or otherwise resolve any and all Avoidance Actions or claims relating to Avoidance Actions. The net proceeds and recoveries from any Avoidance Actions brought by the DLH or ACP Creditors Trust Trustee shall be added to funds available to the Disbursing Agent to distribute to Allowed Class 4 Claims. Any costs and expenses including professional fees incurred pursuing Avoidance Actions by or on behalf of the DLH Creditors Trust or the ACP Creditors Trust shall be paid out of funds in the respective Creditors Trust. The Creditors Trust Trustee may, but is not required to, retain professionals on a contingency basis.

## XVI. CONDITIONS PRECEDENT

### A. Conditions Precedent to Effective Date

CONDITIONS PRECEDENT TO THE EFFECTIVE DATE HAVE BEEN
DELETED FROM THE PLAN.

### B.    Revocation, Withdrawal or Non-Consummation of the Plan

If, after the Confirmation Order is entered, each condition precedent to the Effective Date has not been satisfied or duly waived by Debtors on or by ninety (90) days after the Confirmation Date, then upon motion by Debtors, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. **If the Confirmation Order is vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims against or Interests in Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in Debtors, (iii) prejudice in any manner the rights of Debtors in the Chapter 11 Cases, or (iv) constitute a release, indemnification or exculpation by Debtors, the Estates or any other party pursuant to the Plan.   If the Confirmation Order is vacated, in order to confirm a new Plan of Reorganization, a new Plan and Disclosure Statement would have to be submitted to the Bankruptcy Court.  In Debtors' judgment, such an event would increase the risk that Debtors would not succeed in reorganizing their operations and instead would be liquidated.  In such an event, unsecured creditors are anticipated to receive nothing and many otherwise fully secured creditors may not be able to realize the full value of their collateral, resulting in deficiencies.**

## XVII.    ADMINISTRATIVE PROVISIONS

## A. Retention of Jurisdiction by the Bankruptcy Court

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

a. to hear and determine all Claims and Objections to Claims, including all Fee Claims and all Claims arising from the rejection of any executory contract or unexpired lease and any Objections which may be made thereto;

b. to liquidate or estimate the amount or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

c. to adjudicate all Claims (and other claims) and controversies arising during the pendency of the Case;

d. to allow or disallow any Fee Claim and any request for compensation or reimbursement of expenses by a professional related to post-confirmation services, but only for services rendered prior to the Effective Date of the Plan;

e. to enter any orders which may be necessary and appropriate to carry out and enforce the provisions of the Plan, including but not limited to the resolution of any dispute between Reorganized DLH and any Secured Creditor concerning the Release Price applicable to the sale of any partial parcel in Pool 1, Pool 2, or Pool 4;

f. to determine and allow amendments or modifications to the Plan, to the extent permitted in the Bankruptcy Code;

g. to hear and determine any and all adversary proceedings, applications, or contested matters, including any remands or appeals;

h. to hear, determine, adjudicate, and enforce any and all adversary proceedings or contested matters which may be commenced before or after the Effective Date, including, but not limited to, all Avoidance Actions and any other adversary proceeding to avoid or recover any preference, fraudulent transfer or other avoidable

transfer, lien or security interest whatsoever under 11 U.S.C. §§ 544, 545, 547, 548, 549, 550, 551, 552 or 553(b), and any and all adversary proceedings to recover any claim, direct or derivative, of Debtors or its estate against any Insider of Debtors, including any remands or appeals;

i.    to enable the Reorganized Debtors as successor to Debtors-in-Possession and, as applicable, the Creditors Trust Trustee on behalf of the DLH Creditors Trust or ACP Creditors Trust, as representatives of the estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties or damages to which Debtors may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between Debtors and any other party, including but not limited to, the retained Causes of Action and Avoidance Actions; and,

j.    to enter a Final Decree pursuant to § 350 of the Bankruptcy Code and Bankruptcy Rule 3022.

## B.    Payment of Fees

All fees through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided to Debtors prior to the Effective Date. All fees invoiced after the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by Reorganized Debtors out of the liquidating assets.

## C.    Headings

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

## D.    Binding Effect of Plan

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, Debtors, the Estates, Reorganized Debtors and their respective successors or assigns, whether or not the Claim or Interest of such Holders is impaired under the Plan and whether or

not such Holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, Reorganized Debtors and any trustee appointed for Debtors under chapters 7 or 11 of the Bankruptcy Code).

### E. Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by Debtors upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

### F. Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### G.     Tax Exemption and Expedited Tax Determination

Pursuant to section 1146 of the Bankruptcy Code, any transfers from a Debtor or Reorganized Debtors to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of Debtors' or Reorganized Debtors' real or personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to Reorganized Debtors or by Reorganized Debtors of Debtors' or Reorganized Debtors' property in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfers of property by Reorganized Debtors) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax. Debtors and Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, on or behalf of, Debtors for any or all taxable periods (or portions thereof) ending after the Petition Date through and including the Effective Date.

### H.     Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) the Plan and the Plan Documents shall be governed by Texas Law, and, with respect to Debtors incorporated or organized in Delaware and Reorganized Debtors, corporate and limited liability company governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.

## I.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of a Debtor or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the State of Delaware, without any requirement of further action by the directors of Debtors or Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of Delaware, in accordance with the applicable general business law of such jurisdiction.

## J.    Severability

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the

Holder of such Claim as to which the provision is illegal, respectively. Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### K.     Revocation

Debtors reserve the right to revoke and withdraw the Plan prior to the Confirmation Date. If Debtors revoke or withdraw the Plan, then the Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtors, the Committee or any other Person or to prejudice in any manner the rights of Debtors, the Committee or any Person in any further proceedings involving Debtors, or be deemed an admission by Debtors and/or the Committee.

### L.     Substantial Consummation

Ninety days after the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### M.     Construction

The rules of construction as set forth in section 102 of the Bankruptcy Code shall apply to construction of the Plan. All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### N.     Conflict

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan shall control and take precedence. The terms of the Confirmation Order shall govern in the event of any inconsistency with the Plan or the summary of the Plan set forth in the Disclosure Statement.

### O. Amendments and Modifications

Subject to Section 13.12 of the Plan, Debtors may agree to alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. Subject to Section 13.12 of the Plan, after the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, any Debtor or Reorganized Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to those parties set forth in Bankruptcy Rule 2002, and the solicitation of all Creditors and other parties-in-interest shall not be required. Prior to the Effective Date, Debtors may, subject to Section 13.12 of the Plan, make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Interests. Subject to Section 13.12 of the Plan, Debtors also reserve the right to amend treatment of any class as may be necessary or desirable to achieve cramdown in the event one or more classes vote against the Plan.

### P. Notices

Any notices required under the Plan or any notices or requests of Debtors or Reorganized Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii)

reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given

when received by the following parties:

Mark E. MacDonald
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
Facsimile: (214) 890-0818

Jenny Saubert
125 S. Bridge Street, Suite 100
Visalia, CA 93291
Facsimile:

Daniel J. McAuliffe
DLH Master Land Holding, LLC
1700 Pacific Avenue, Suite 1250
Dallas, TX  75201
Facsimile:  (214) 661 - 1851

### Q.     Filing of Additional Documents

On or before substantial consummation of the Plan, and without the need for any further

order or authority, Debtors may file with the Bankruptcy Court such agreements or other

documents as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan.

### R.     Direction to a Party

From and after the Effective Date, Debtors or Reorganized Debtors may apply to the

Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in

the execution or delivery of any instrument or document reasonably necessary or reasonably

appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act

(including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

### S.  Successors and Assigns

The rights, duties and obligations of any Person named or referred to in the Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

## XVIII.  EXEMPTION FROM SECURITIES LAW

The Plan contemplates the issuance of Variable Pay Notes and Membership Interests (collectively, the "1145 Securities") to certain holders of Claims. In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of 1145 Securities will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts issuance of securities from such registration requirements if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate or are issued principally in such exchange and partly for cash or property.

Debtors believe that the exchange of 1145 Securities for Claims against Debtors under the circumstances provided in the Plan (other than with respect to entities deemed statutory underwriters, as described below) will satisfy the requirements of section 1145(a) of the Bankruptcy Code.  The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without

registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "statutory underwriter") or an "affiliate" of the issuer within the meaning of the Securities Act.  In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states.  However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (ii) offers to sell securities offered or sold under a plan for the holders of such securities, (iii) offers to buy securities offered or sold under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 2 1145 Securities shall not include securities received by underwriters in connection with the issuance of Membership Interests. 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with an issuer of securities. "Control" (as

defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144 or any other applicable exemption from registration. Pursuant to no-action and interpretive guidance from the staff of the Securities and Exchange Commission (the "SEC"), an entity that is an "underwriter" pursuant to section 1145(b)(1) of the Bankruptcy Code, other than an "affiliate" of the issuer within the meaning of the Securities Act may nevertheless resell securities received under section 1145(a)(1) that are transferred in "ordinary trading transactions" made on a national securities exchange or in the over-the-counter markets, subject to the volume limitations contained in Rule 144 under the Securities Act. Persons that receive the 1145 Securities should note, however, that Debtors and Reorganized Debtors do not currently intend to list the Variable Pay Notes or any callable Membership Interests on any exchange.

What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") or (iii) payment of special compensation to brokers or dealers in connection with the sale. Resales by

persons that receive 1145 Securities pursuant to the Plan who are "affiliates" of the issuer within the meaning of the Securities Act may be made without registration under the Securities Act by complying with the conditions contained in Rule 144, except for the holding period requirement of Rule 144(d). These conditions include the requirement that there be available current public information with respect to the issuer, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" and that notice of the resale be filed with the SEC.  Debtors cannot assure, however, that adequate current public information will exist with respect to Reorganized Debtors, and therefore the safe harbor provisions of Rule 144 of the Securities Act may not be available. In addition, Debtors and Reorganized Debtors do not currently intend to list the Variable Pay Notes Membership Interests on any exchange, and therefore the requirement that the securities be sold in a "brokers transaction," in a transaction directly with a "market maker" or in a "riskless principal transaction" may not be able to be satisfied and the safe harbor provisions of Rule 144 of the Securities may not be available for "affiliates."  Pursuant to the Plan, Variable Pay Notes and certificates evidencing Membership Interests received by Restricted Holders or by a holder that Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will each bear a legend substantially in the form below:

> **THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY**

**RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

Any Person entitled to receive the 1145 Securities who Debtors or Reorganized Debtors determine to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive Variable Pay Notes or certificates evidencing Membership Interests without such legend if, prior to the distribution of such securities, such person or entity delivers to Debtors or Reorganized Debtors, as the case may be, (i) an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors, as the case may be, to the effect that the Variable Pay Notes or Membership Interests to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code. Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for the 1145 Securities in exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) such holder delivers to Debtors or Reorganized Debtors, as the case may be, an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to Debtors or Reorganized Debtors, as the case may be, an opinion of counsel reasonably satisfactory to Debtors or Reorganized Debtors to the effect that (x) such securities are no longer subject to the restrictions under the Securities Act and such securities may be sold without

registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act and such securities may be sold without registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED DEBTORS, DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS**

## XIX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN OF REORGANIZATION AND LIQUIDATION ANALYSIS

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of Debtors under Chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

### A. Liquidation Under Chapter 7

If no plan can be confirmed, Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. **Debtors believe that liquidation under chapter 7 would result in materially smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection**

**of leases and other executory contracts in connection with a cessation of Debtors' operations.**
More specifically, based on appraisal testimony provided by a representative of C.B. Richard Ellis, unsecured creditors would likely receive nothing in the event the DLH project is sold in bulk in the current market, thus destroying more than $40 million in ACP's assets as DLH's principal equity owner. See **Exhibit I** for a more detailed liquidation analyses for both ACP and DLH.

### B.      Alternative Plan of Reorganization

If the Plan is not confirmed, Debtors (or if Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization or continuation of Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, Debtors have explored various alternatives in connection with the formulation and development of the Plan. Debtors believe that their Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## XX.      CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN

NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY DEBTORS WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER IS CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

**IRS Circular 230 Notice:** To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

### A.  Payment of Taxes Arising from Asset Sales by Debtors

The Plan provides for payments of taxes generated from sales or other dispositions of DLH and ACP assets, the operations of ACP and DLH, and any forgiveness of indebtedness associated with the Plan.  Debtors are each solvent on a going concern basis and provision for payment of taxes is required by Debtors and their Interest Holders. Debtors believe that the Internal Revenue Service would potentially object to confirmation without such provisions because both Richard S. Allen and

RSAI are currently in jointly administered Chapter 11 cases and assets should not be sold without provision for payment of taxes.

**B.     Information Reporting and Withholding**

Distributions under the Plan are subject to applicable tax reporting and withholding. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS. Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its U.S. federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold. Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements. The foregoing summary and the further discussion found in **Exhibit J** is provided for informational purposes only. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences of the Plan.

**REMAINDER OF PAGE INTENTIONALLY BLANK**

DATED this _18_ day of _MAy_, 2011.

Respectfully submitted,

DLH Master Land Holding, LLC,

By:  DLH Development Manager, LLC,
Its Manager

By:_____
        Daniel J. McAullife
Its.  President


Allen Capital Partners, LLC,

By:  Richard S. Allen, Inc.,
       A California corporation,   Manager

By:_____
        Richard S. Allen
Its.   Chief Executive Officer

List of Exhibits

| | |
|---|---|
| Exhibit A: | Plan |
| Exhibit B: | Disclosure Statement Order |
| Exhibit C: | ACP's Ownership Interest in DLH |
| Exhibit D: | List of Entities Merged into ACP and DLH |
| Exhibit E: | Financial Projections |
| Exhibit F: | ACP Project Description |
| Exhibit G: | ACP Non-Bankrupt Subsidiaries |
| Exhibit H: | Additional Risk Factors |
| Exhibit I: | Liquidation Analysis |
| Exhibit J: | Additional Discussion of Tax Implications |
| Exhibit K: | Requirements for Confirmation |
| Exhibit L: | Build to Suit Pro Forma |
| Exhibit M: | Foley Secured Claim and Compass Bank Land Loan/DLH and ACP Mergers |
| Exhibit N: | Estimated Administrative Expenses |
| Exhibit O-1: | Analysis of Cash Flow for BBVA Compass |
| Exhibit O-2: | Analysis of Debt Balance for BBVA Compass |
| Exhibit O-3: | Land Absorption Analysis for BBVA Compass |
| Exhibit P: | Infrastructure |
| Exhibit Q: | End of Quarter Cash Reserve Requirements |
| Exhibit R: | JLL and CBRE Marketing Reports |
| Exhibit S: | JLL E-mail Blast |
| Exhibit T: | Summary of Opinion of Value Reports |
| Exhibit U: | Compensation Summaries DLH / ACP / LPKC |

Great Western has requested that the following protective language be added to describe the settlement.

The Court entered the Great Western Settlement Order which contemplates, subject to the terms and conditions thereof, a global settlement by and between DLH and ACP, on the one hand, and Great Western and BB&T, on the other hand. The Court approved settlement provides for ongoing payments to the Banks from November 2010 forward, the limited use by DLH of certain of the rents generated from the Banks' collateral, and the granting of certain releases as set forth in the Great Western Settlement Order. Parties should review the Great Western Settlement Order and the attached Settlement Agreement for the entirety of the terms and conditions thereof. Great Western and BB&T shall retain all claims and rights and all liens, assignments of rents and other collateral as set forth in the relevant Loan Documents (as defined in the Great Western Settlement Order) to secure its claims against each and every of the Debtors in these bankruptcy cases. Notwithstanding anything contained herein seemingly to the contrary, the Great Western Settlement Order and the Settlement Agreement and all Loan Documents defined in the Great Western Settlement Order and the Settlement Agreement shall remain binding and enforceable against Debtors and their respective bankruptcy estates, Reorganized Debtors and their property, Great Western and BB&T, and all creditors and 'parties-in-interest. Debtors and Reorganized Debtors shall take any and all steps necessary to consummate and fully comply with the terms and provisions of the Great Western Settlement Order and the Settlement Agreement after confirmation of the Plan. It is not necessary for this provision to appear elsewhere in this document in order for it to apply to all provisions. Great Western is hereby granted an Allowed Secured DLH Class 3 Subclass C Claim in the amounts set forth in the Great Western Settlement Order and the Settlement Agreement.

After notice and a hearing, the Bankruptcy Court entered that certain "Order Approving Settlement by and between Debtors, Great Western and BB&T" on November 16, 2010 (Dkt. No. 665) (the "Great Western Settlement Order"), approving the Settlement Agreement attached thereto and incorporated therein (the "Settlement Agreement"). The Settlement Agreement was timely accepted, signed and delivered by all parties thereto and is in full force and effect. The Great Western Settlement Order and Settlement Agreement are incorporated herein by reference for all purposes.