**Exhibit A:** Plan

Mark E. MacDonald, TX Bar No. 12758300
Daniel J. Artz, TX Bar No. 01365570
MacDonald + MacDonald, P.C.
10300 N. Central Expressway, Suite 335
Dallas, TX 75231
(214) 237-4220; Facsimile: (214) 890-0818
Email: mark@macdonaldlaw.com
**COUNSEL FOR DLH MASTER LAND HOLDING, LLC**
**AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS**
**AND DEBTORS IN POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **DLH Master Land Holding, LLC,** | § | |
| **Allen Capital Partners, LLC,** | § | **Case No. 10- 30561-HDH-11** |
| **Richard S. Allen, Inc.** | § | |
| **Richard S. Allen,** | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | |
| _____ | § | |

**AMENDED FIFTH JOINT PLAN OF REORGANIZATION FOR ALLEN
CAPITAL PARTNERS, LLC AND DLH MASTER LAND HOLDING, LLC**

**TO ALL CREDITORS AND PARTIES-IN-INTEREST:**

Debtors DLH Master Land Holding, LLC ("**DLH**") and Allen Capital Partners,

LLC ("**ACP**", and, collectively with DLH, "**Debtors**") propose the following Fifth Joint

Plan of Reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et*

*seq.*

# TABLE OF CONTENTS

**SUMMARY OF PLAN** .................................................................................................. 5

**ARTICLE I - DEFINITIONS** ...................................................................................... 11

**ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS** ...................... 31

**ARTICLE III - IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS** ................................................................................................ 32

**ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS** ............................ 33

    4.01 Class 1 Allowed Administrative Expense Claims (Unimpaired)..............33

    4.02 Class 2 Allowed Priority Claims (Unimpaired)……….....………….…..34

    4.03 DLH Class 3 Allowed Secured Claims (Impaired)………....…………...34

    4.04 DLH Class 4 Allowed Unsecured Claims (Impaired)..…………………46

    4.05 DLH Class 5 Administrative Convenience Claims (Impaired)…......…...48

    4.06 DLH Class 6 Reimbursement Claims Against DLH (Impaired)...….……48

    4.07 DLH Class 7 Equity Interest Holders (Impaired)………………….…....49

    4.08 ACP Class 3 Allowed Secured Claims (Impaired)…………………......49

    4.09 ACP Class 4 Allowed Unsecured Claims (Impaired)………………….....50

    4.10 ACP Class 5 Administrative Convenience Claims (Impaired)……....…...52

    4.11 ACP Class 6 Reimbursement Claims Against ACP (Impaired)…………52

    4.12 ACP Class 7 Equity Interest Holders (Impaired)………………………53

**ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN** ................................. 53

    5.01 Classes Entitled to Vote………………………………………………53

    5.02 Class Acceptance Requirement…………………………………………53

**ARTICLE VI - MEANS OF IMPLEMENTATION AND GENERAL DESCRIPTION OF THE PLAN** .................................................................. 53

    6.01 Vesting of Assets………………………………………………...53

    6.02 Resolution of Claims………………………………………………54

    6.03 No Merger or Substantive Consolidation…………………………………54

    6.04 Mandatory Distributions of Excess Cash……………………………54

    6.05 Governance of Reorganized DLH and Reorganized ACP………………55

    6.06 Sale of Properties Subject To Non-Recourse Note……………………58

    6.07 Conversion of DIP Loan to Term Loan………………………………59

    6.08 Provision for Exit Financing……………………………………………60

    6.09 Modifications to the DLH Plan and/or ACP Plan to Resolve Objections….60

    6.10 Contributions of Property by Reorganized DLH…………………………...61

    6.11 Creditors Trusts…………………………………………………………61

**ARTICLE VII - PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS**..…………………………61

    7.01 Objection Deadline…………………………………………………61

    7.02 Distributions on Account of Contested Claims……………………………62

    7.03 Reservation of Rights to Object to Claims…………………………………62

    7.04 Standing and Responsibility to Object to Claims…………………………62

    7.05 Service……………………………………………………………………62

**ARTICLE VIII - PROVISIONS GOVERNING DISTRIBUTION** ......................... 62

    8.02 Means of Cash Payment……………………………………………63

    8.03 Delivery of Distributions……………………………………………63

  8.04 Time Bar to Payments and Distributions………………………………………..63
  8.05 De minimis Distributions…………………………………………………………63
  8.06 Rounding of Fractional Distributions……………………………………………64
  8.07 Single Recovery Rule……………………………………………………………64
**ARTICLE IX - EXECUTORY CONTRACTS AND LEASES**............................ 64
  9.01 General Treatment - If Not Rejected, Assumed……………………………64
  9.02 Bar to Rejection Damages……………………………………………………64
  9.03 Service Agreement……………………………………………………………65
  9.04 ADESA Texas, Inc. Lease……………………………………………………65
**ARTICLE X - MAINTENANCE OF CAUSES OF ACTION** .................. 65
  10.01 Treatment of Avoidance Actions……………………………………………65
  10.02 Maintenance of Causes of Action……………………………………...…65
**ARTICLE XI - DISCHARGE** ................................................................... 66
  11.01 General Discharge Under Plan………………………………………………66
  11.02 Cancellation Of Instruments And Agreements……………………………66
**ARTICLE XII - RETENTION OF JURISDICTION**……………………………67
  12.01 Retention of Jurisdiction………………………………………………………67
**ARTICLE XIII - MISCELLANEOUS PROVISIONS** ............................. 68
  13.01 Continued Existence of Reorganized Debtors…………………………..68
  13.02 Compliance With All Applicable Laws…………………………………..68
  13.03 Binding Effect………………………………………………………………69
  13.04 Governing Law………………………………………………………………69
  13.05 Payment of Statutory Fees …………………………………………………69
  13.06 Timing of Distributions ……………………………………………………69
  13.07 Post Confirmation Notices…………………………………………………70
  13.08 General Savings Clause ……………………………………………………70
  13.09 Reservation of Right to Seek Confirmation under 1129(b) …………….70
  13.10 Dates…………………………………………………………………………70
  13.11 Further Action………………………………………………………………70
  13.12 Plan Amendments……………………………………………………………70
  13.13 Substantial Consummation ...………………………………………………71
  13.14 Creation of Class B Preferred Callable Membership Interests in DLH….71
  13.15 Board Representation in Reorganized DLH……………………………..72
  13.16 Board Representation in Reorganized ACP……………………………..73
  13.17 Limits on Equity Distributions at Reorganized DLH……………………73
  13.18 Setoff and Recoupment……………………………………………………73
  13.19 Dissolution of the Creditors Committee ………………………………74
  13.20 Matters Requiring Board or Member Authorization ...…………………74
  13.21 Saturday, Sunday or Legal Holiday………………………………………74
  13.22 No Segregation of Reserves or Funds to Be Distributed………………..74
  13.23 Creditors Holding Multiple Claims………………………………………...75
  13.24 Revocation, Withdrawal Or Non-Consummation Of The Plan…………75
  13.25 Organizational Documents…………………………………………………75
  13.26 Plan Consummation………………………………………………………...76
  13.27 Duties of Parcel Noteholders………………………………………………76
  13.28 Ability to Confirm Plan as to DLH or ACP Only ………………………76

13.29  Exculpation………………………………………………………………76
13.30  Additional Documents to Be Filed With the Bankruptcy Court ………..76
13.31  No Effect on Rosedale Land Venture I, LLC Operating Agreement …..77

Schedule 1

## SUMMARY OF PLAN

Debtors' proposed Reorganization Plan contemplates that the Debtors will obtain sufficient Exit Financing to enable the Debtors to pay all Administrative and non-tax Priority Claims (other than the Debtor-in-Possession Financing) in full on the Effective Date.

## DLH

Debtors, with the agreement of the DIP Lenders, will convert the Debtor In Possession Financing into a Post-Confirmation Term Loan. The current projected balance of this facility is approximately $2.6 Million. Debtors will obtain additional Exit Financing from one or more possible sources. Certain Secured Claims will be satisfied on or shortly after the Effective Date by the surrender of the land securing such Secured Claims. Reorganized DLH will finance distributions to the other creditors from the sale of the ADESA Property, other sales of land, refinancing and or joint ventures. The proceeds from any sale would be used first to pay necessary costs of closing, second, in payment of the Release Price necessary to satisfy in full the Secured Claim secured by such parcel, third, in payment of a Release Price on the Term Loan from the DIP Lenders, and fourth, payment of sufficient funds to allow the Debtor's owners to pay actual state and federal income taxes incurred as a result of the taxable gains realized on such a sale, if any resulting in the Net Sales Proceeds. The Net Sales Proceeds from any such sale will be allocated generally between Reorganized DLH and Creditors holding Allowed Claims against DLH: (a) to fund the operating expenses of Reorganized DLH, including the costs of managing and marketing the DLH Land and to repay the Term Loan and Other Exit Financing, and (b) to fund distributions to Creditors.

Under the Plan, DLH creditors secured by vacant land are divided into four (4) pools.

**Pool 1 (the "Compass Pool")** contains parcels as set forth in **Exhibit A-1** which are subject to the liens of Compass. Most of the parcels in the Compass Pool are Development Ready. Compass has a perfected first lien on all parcels in the Compass Pool, all of which secure the Allowed Secured Claim of Compass. The Plan establishes Release Prices for each individual parcel in the Compass Pool such that the sum of the Release Prices does not exceed 150% of the Allowed Secured Claim of Compass. Those individual parcel Release Prices are specifically reflected on Exhibit A-1. Compass, with respect to its Pool 1 Allowed Secured Claim, shall receive a Variable Pay Note payable from three sources: 1) the net proceeds of any sale of a parcel which is subject to the Compass lien, up to the Release Price for such Parcel; and 2) 30% of Pool 1 Net Sales Proceeds for any and all sales of property contained in Pool 1 and 3) variable cash payments from DLH Excess Cash pursuant to Section 6.04. The Note will accrue interest annually at 7.25% and mature not later than 5 years after the Plan Effective Date. To the extent that certain threshold amounts of distributions to Compass from sales of Pool 1 properties are not met, Reorganized DLH will be obligated to make certain structured sales, sealed-bids and or auctions of land in Pool 1.

**Pool 2 (the "Hutchins Industrial Pool")** contains parcels as set forth in **Exhibit**

**A-2** hereto, which are subject to various seller financing liens. All or substantially all of the parcels in the Hutchins Industrial Pool are Development Ready. Secured Creditors with Pool 2 Allowed Secured Claims will each receive a Note payable from three sources: 1) the net proceeds of any sale of a parcel in the Hutchins Industrial Pool shall be paid to the Pool 2 Secured Creditor holding the lien on such Parcel, in the amount of such Secured Creditors Pool 2 Note, and 2) all other Pool 2 Secured Creditors holding Pool 2 Notes shall receive their pro-rata share (based on the then current principal balance of all Pool 2 Notes remaining unpaid) of 30% of Pool 2 Net Sales Proceeds for any and all sales of other property contained in Pool 2; and 3) variable cash payments from DLH Excess Cash pursuant to Section 6.04. The Pool 2 Notes will accrue interest annually at 5.50%, will have an annual adjustment to the principal amounts of the Pool 2 Notes based upon changes in the Consumer Price Index, up to a maximum of 2.5% per year commencing on the first anniversary of the Effective Date, and shall mature 5 years after the Effective Date, subject to three (3) one-year extension options which may be exercised by Reorganized DLH upon payment of a principal reduction equal to 2% of the then outstanding principal balances of the Pool 2 Notes. The Pool 2 Notes shall be payable in semi-annual payments commencing six months after the Effective Date, with interest only on such Pool 2 Notes payable for 3 years after the Effective Date, and thereafter in equal payments of principal and interest sufficient to fully amortize the then outstanding balance of the Pool 2 Notes over ten (10) years (calculated from the end of the Third year after the Effective Date). The Pool 2 Notes shall be due and payable in full five (5) years after the Effective Date, subject to the right of Reorganized DLH to exercise up to three (3) one-year extension options. Reorganized DLH may elect, at its option, to exercise an extension option for one or more, but less than all, of the Pool 2 Notes then outstanding, and shall give written notice to the holder of each Pool 2 Note to be extended not less than 60 days prior to its Maturity Date (as it may have been extended pursuant to any previously exercised extension option). In order for Reorganized DLH to exercise any of the extension options as to any of the Pool 2 Notes, Reorganized DLH must: (a) not be in default of any payment of principal and or interest due under the Pool 2 Notes being extended; (b) have timely given written notice of its election to exercise the extension option; and (c) make a principal reduction payment, on or before the fifth anniversary date of the Effective Date (for the first extension option), or on or before the then current maturity date of the Pool 2 Notes, as extended (for each subsequent extension option), in an amount equal to two percent (2%) of the then outstanding principal balance of the Pool 2 Notes being extended. In addition, commencing on the first anniversary of the Effective Date, and annually thereafter on each anniversary date of the Effective Date prior to the maturity date (as it may be extended), the then outstanding principal balance of each Pool 2 Note will be adjusted by an amount equal to the product of the principal balance of the Pool 2 Note being adjusted, multiplied by the lesser of: (1) the percentage increase in the Consumer Price Index during the immediately preceding year, or (2) 2.5%.

**Pool 3 (the "ABOT Pool")** contains parcels as set forth in **Exhibit A-3** hereto, which are subject to the liens of ABOT. Due to the location and current infrastructure needs, most of the land contained in the ABOT Pool will take longer to fully develop and sell. ABOT has a perfected first lien on all of the parcels in the ABOT Pool, all of which

secure the Allowed Secured Claim of ABOT. DLH shall surrender to ABOT all of the Pool 3 Parcels on or before fourteen (14) days after the Effective Date in full satisfaction of the Claim of ABOT and all guarantees by Debtors and other related parties, including but not limited to Richard S. Allen and Richard S. Allen, Inc.

**Pool 4 (the "Seller Notes Pool")** contains parcels as set forth in **Exhibit A-4** hereto which are subject to various seller financing liens and which because of the level of debt associated with each could provide a significant source of cash for Debtor. Due to the location and current infrastructure needs, the land contained in Pool 4 will take longer to fully develop and sell. DLH shall surrender to the Secured Creditors holding Pool 4 Allowed Secured Claims on the Pool 4 parcels identified as Parcels 161-164 (Coffman Investments) and Parcels 93-95 and 156-157 (Southport Properties, LP) on the Effective Date in full satisfaction all such Claims. These Pool 4 Creditors are Unimpaired under the Plan. With respect to the remaining Pool 4 parcels, Reorganized DLH shall retain such parcels for up to six (6) months after the Effective Date in order to market such Pool 4 parcels through its current marketing program, auctions, sealed bid, and or other structured sales. Each Secured Creditor holding a lien on a Pool 4 parcel being retained by Reorganized DLH shall receive a Note (a "Pool 4 Note") in the full amount of the Allowed Claim of such Pool 4 Secured Creditor as of the Effective Date. The Pool 4 Notes shall each bear interest at the non-default contract rate specified in the loan documents evidencing the claim of each such Pool 4 Secured Creditor and shall be secured by the existing liens on the parcels securing the Allowed Claim of each Pool 4 Secured Creditor, modified to extend the maturity of such liens. Each Pool 4 Note shall be payable in full, with interest, on the earlier to occur of: (a) the closing of the sale of the Pool 4 parcel securing the Pool 4 Note; or (b) either (i) six months after the Effective Date, for the Pool 4 Note secured by the Pool 4 parcel in the event that said parcel has not been sold by Reorganized DLH, and for which no binding contract for sale has been executed prior to one hundred eighty (180) days after the Effective Date, or (ii) for any Pool 4 Note secured by a Pool 4 parcel for which Reorganized DLH has received a binding contract to sell such parcel prior to 6 months after the Effective Date, sixty (60) days after the end of the sixth month after the Effective Date. Upon the maturity of any Pool 4 Note secured by a Pool 4 parcel which has not been sold by Reorganized DLH, Reorganized DLH shall, within twenty (20) days after such maturity date, either (1) pay the Pool 4 Note in full, both principal and interest, or (2) deliver to the holder of the Pool 4 Note secured by such Pool 4 parcel, either a deed in lieu of foreclosure or a written consent to immediate foreclosure and surrender of possession of such Pool 4 Parcel, at the option of the holder of the Pool 4 Note, and an executed partial release of the subordinate lien on such Pool 4 Parcel securing the Term Loan. If a Pool 4 Claimant elects to take a Deed in lieu or immediate foreclosure that is in full satisfaction of such Claimant's Pool 4 Note. Any Secured Creditor in Pool 4 may elect, at its option, exercisable not earlier than ninety (90) days after the Effective Date, and provided that the Pool 4 parcel which secures such Secured Creditor's Allowed Secured Claim has not been previously sold, and is not under contract and scheduled to close within 150 days after the Effective Date, to receive the immediate surrender of its collateral, together with an executed partial release of the subordinate lien on such parcel securing the Term Loan, in full satisfaction of its Pool 4 Note.

DLH Secured Creditors which have claims secured by developed property are Great Western, which has a first lien on the ADESA Property, and Compass Bank, which has first liens on Buildings A and B.

**Great Western Bank's** Secured Claim shall be satisfied in the manner contemplated by the Great Western Settlement Agreement between the Debtors and Great Western which was previously approved by the Bankruptcy Court. If the sale of the ADESA Property closes prior to the Effective Date, Great Western's Secured Claim shall be fully satisfied at the closing in accordance with the Great Western Settlement Agreement and the ADESA Sale Order, and this Secured Claim shall not be treated under the Plan.

**Compass Bank's** Secured Claim with respect to the Buildings Loan shall be satisfied in the manner described in Section 4.03, Subclass 3F. If the sale of Buildings A & B, as approved by the Bankruptcy Court in the Order Approving Expedited Motion to Sell the Langdon Road Property Free and Clear of Liens, Claims and Encumbrances and Amended Expedited Motion for the Approval of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. §365, entered on March 30, 2011 [Docket No. 844], as amended by Stipulation and Order Between Debtor DLH Master Land Holding, LLC and Compass Bank Regarding Order Approving Expedited Motion to Sell the Langdon Road Property Free and Clear of Liens, Claims and Encumbrances and Amended Expedited Motion for the Approval of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. §365, entered on April 12, 2011 [Docket No. 873] (collectively, the "Compass Buildings Sale Order"), is closed prior to the Effective Date, Compass Bank's Secured Claim with respect to the Buildings Loan shall be fully satisfied at the closing in accordance with the Compass Buildings Sale Order, and shall not be treated under the Plan. Compass Bank's unsecured deficiency claim, as determined in accordance with the Compass Buildings Sale Order, shall be treated as a DLH Class 4 Claim.

DLH has the option under the Plan, with respect to any parcel securing a Secured Claim, to surrender such parcel in full satisfaction of the Secured Claim secured by such parcel. In the case of any Secured Claim as to which the Secured Creditor has full recourse against DLH with respect to the Claim secured by a parcel to be surrendered by DLH, DLH shall request the Bankruptcy Court to determine the value of any such parcel to be surrendered to the Secured Creditor.

## DLH Exit Financing

DLH anticipates that it will have approximately $2,000,000 in available cash on the Effective Date in order to comply with its obligations under the Plan and exit bankruptcy. The obligations consist of an estimated $750,000 in Allowed but unpaid Administrative Expenses, an estimated $775,000 for payments to Creditors on Allowed Claims on or within 14 days after the Effective Date, and a working capital reserve to

cover budgeted operating expenses of the Reorganized Debtor and distributions under the Plan due within six months after the Effective Date.

DLH anticipates obtaining Exit Financing from one or more sources including: (a) the sale of the ADESA Property; and/or (b) an auction or other type of structured sale and or traditional sales of parcels of land and/or structured sale(s) to be conducted prior to or shortly after the Effective Date, with Bankruptcy Court approval, but which will not close until after the Effective Date, which is anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the parcels to be sold, a pay-down on the DIP Loan or Term Loan (depending upon the timing of such sale), and excess cash which DLH may use to consummate the Plan; and/or (c) a loan from Allen Opportunity Fund, a non-Debtor entity affiliated with DLH which owns a parcel of property near the DLH property, in an amount of up to $400,000; and/or (d) a loan from Richard S. Allen, individually, in an amount of up to $750,000.00; and/or (e) other resources available to DLH.

### DIP Lenders' Term Loan

The DLH Debtor-in-Possession Financing which remains unpaid on the Effective Date, which DLH estimates will be approximately $2.782 Million (including accrued interest thereon), shall be converted to a Term Loan (the "**Term Loan**"). The Term Loan shall retain its perfected subordinate liens on the DLH Property other than the Pool 3 parcels and Pool 4 parcels being surrendered to the Secured Creditors in those pools. A new variable pay note and new subordinate lien deed of trust shall be executed on the Effective Date to evidence and secure the Term Loan. The Plan establishes Release Prices for the Term Loan for each parcel, calculated at 150% of the allocable portion for each parcel in Pool 1 and Pool 2 (excluding any land sold prior to the Effective Date) of the initial balance of the Term Loan on the Effective Date of the Plan. With respect to parcels contained within Pool 4, the Release Price shall be equal to ten percent (10%) of the Net Sales Proceeds of each sale. The Term Loan shall bear a variable rate of interest at Prime plus ten percent (10%); provided that the Prime rate shall be capped at a rate no higher than 500 basis points above the Prime rate in effect on the Effective Date. Interest on the Term Loan shall accrue annually, and shall be payable solely from the Net Sales Proceeds of the Pool 1, Pool 2 and Pool 4 properties. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan. On the Effective Date, the balance of the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the outstanding balance of the DIP Loan on the Effective Date, and (b) all reasonable costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination of the Term Loan subject to approval by the Bankruptcy Court.

### DLH Unsecured Creditors

DLH unsecured creditors will be paid over time from cash generated by DLH's operations and sales, refinancing, or joint ventures of properties retained by Reorganized DLH.

**Equity Interests**

Except to the extent that additional equity interests are required to be issued by Reorganized DLH as a condition of obtaining Exit Financing, current equity will retain their interests in Reorganized DLH.

DLH also reserves the right to seek cram down in the event that any of the impaired Classes votes to reject the Plan.

## ACP

ACP creditors, both secured and unsecured, will be paid over time from cash generated by the operations of ACP's subsidiaries.

**ACP DIP Lenders' Term Loan**

The ACP Debtor-in-Possession Financing which remains unpaid on the Effective Date, which ACP estimates will be approximately $999,000 (including accrued interest thereon), shall be converted to a Term Loan (the "**Term Loan**"). The Term Loan shall retain its perfected subordinate liens on the ACP Property. A new variable pay note and new subordinate lien deed of trust shall be executed on the Effective Date to evidence and secure the Term Loan. The Term Loan shall bear a variable rate of interest at Prime plus ten percent (10%); provided that the Prime rate shall be capped at a rate no higher than 500 basis points above the Prime rate in effect on the Effective Date. Interest on the Term Loan shall accrue semiannually, and shall be payable solely from the ACP Net Sales Proceeds. The Term Loan shall mature on the last business day of the month occurring after the second (2nd) anniversary date of the Effective Date of the Plan. On the Effective Date, the balance of the Term Loan shall be increased by all reasonable costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination of the Term Loan, subject to Bankruptcy Court Approval. The Term Loan shall be payable from 10% of ACP Net Sales Proceeds during year one after the Effective Date and 20% of ACP Net Sales Proceeds during year two with any remaining principal paid at maturity.

**ACP Unsecured Creditors**

ACP unsecured creditors will be paid over time from cash distributed from the operations of ACP's subsidiaries.

**Equity Interests**

Current equity will retain their interests in Reorganized ACP.

ACP also reserves the right to seek cram down in the event that any of the impaired Classes votes to reject the Plan.

# ARTICLE I - DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in this Plan. Any term used in initially capitalized form in this Plan that is not defined herein but which is defined in the Bankruptcy Code shall have the meaning assigned to such term in the Bankruptcy Code.

1.01 **ABOT** means American Bank of Texas, a Secured Creditor of DLH, holding one or more loans secured by first liens on the parcels which comprise Pool 3, ABOT Pool.

1.02 **ABOT Pool** means Pool 3, as identified on Exhibit A hereto, consisting of the parcels of land on which ABOT holds a first lien.

1.03 **ACP** means Allen Capital Partners, LLC.

1.04 **ACP Cash Reserve** means a cash reserve for Reorganized ACP in the first and second years after the Effective Date of $1,500,000, in the third year after the Effective Date of $1,250,000, and in the fourth through ninth years after the Effective Date of $1,000,000.

1.05 **ACP Creditors Trust** means the creditors liquidating trust created under the Plan to undertake and implement certain provisions of the Plan with respect to the enforcement of rights and the making of distributions to the beneficiaries of the ACP 50% Notes and the ACP 100% Notes, which shall be treated as a grantor trust and the beneficiaries of the trust will be treated as the grantors and deemed owners of the trust for income tax purposes as further provided in a creditors trust agreement and documents to be executed in connection therewith.

1.06 **ACP Creditors Trust Agreement** means the agreement to be approved by the Bankruptcy Court at the Confirmation Hearing and to be effective on or before the Effective Date which shall govern the ACP Creditors Trust.

1.07 **ACP Excess Cash** means any cash held by Reorganized ACP at the end of any calendar quarter prior to payment in full of the ACP 50% notes and the ACP 100% Notes in excess of the ACP Cash Reserve.

1.08 **ACP Excess Cash Distributions** means the distributions which Reorganized ACP is required to make after the end of each calendar quarter if and to the extent that there is ACP Excess Cash at the end of such calendar quarter (but only until any ACP 50% Notes and ACP 100% Notes have been repaid), as provided in Section 6.04 of the Plan.

1.09 **ACP Minimum Annual Distribution** means the annual minimum

funding required to be paid by Reorganized ACP to the Disbursing Agent on behalf of the beneficiaries of the ACP 50% Notes and the ACP 100% Notes in accordance with the following schedule:

(i)     in the first year after the Effective Date, no minimum annual funding is required;

(ii)    in the second and third years after the Effective Date, the minimum annual funding required shall be $1,000,000 per year; and

(iii)   in the fourth through ninth years after the Effective Date, the minimum annual funding required shall be $1,500,000 per year.

Payments received by the Disbursing Agent from ACP Unsecured Creditor Net Proceeds and ACP Excess Cash Distributions in any given year shall be credited against that year's minimum annual funding requirement, and, to the extent applicable, to the cure of any unfunded shortfall amounts, together with interest thereon as provided below, for any prior years.

If at the end of any year beginning in the second year after the Effective Date, there is a shortfall in Reorganized ACP making its required minimum annual funding as set forth above (a "First Shortfall"), the interest rate applicable on the unfunded shortfall amount for that year shall be (a) 4% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the ACP 100% Notes and (b) 2% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the ACP 50% Notes. When the unfunded shortfall amount together with the additional 2% interest on the unfunded amount is paid by Reorganized ACP to the Disbursing Agent, the interest rate on the ACP 100% Notes shall thereupon reset to 2% and there shall be no interest payable on the ACP 50% Notes. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following the First Shortfall year (a "Second Consecutive Shortfall"), (x) the interest rate applicable on the ACP 100% Notes shall immediately thereupon increase from 2% to 4% per annum on the total remaining unpaid balance under those notes and (y) the interest rate payable on all unfunded deficiency amounts applicable to the ACP 50% Notes shall be set at 2% per annum until all shortfall amounts thereunder are paid in full by Reorganized ACP to the Disbursing Agent together with the applicable interest thereon. The interest rate shall remain at 4% per annum on the total remaining unpaid balance under the ACP 100% Notes notwithstanding a cure of the unfunded shortfall amounts; however, if and when all shortfall amounts together with interest thereon as applicable are paid in full by Reorganized ACP to the Disbursing Agent, the ACP 50% Notes shall be reset to 0%. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following a Second Consecutive Shortfall year (a "Third Consecutive Shortfall"), the interest rate applicable on the ACP 100% Notes shall immediately thereupon increase from 4% to 6% per annum on the total remaining unpaid balance under those notes and the interest rate payable on all unfunded deficiency amounts applicable to the ACP 50% Notes shall continue at 2% per annum until all shortfall amounts thereunder are paid in

full by Reorganized ACP to the Disbursing Agent together with the applicable interest thereon. With respect to a Third Consecutive Shortfall, if and when all shortfall amounts together with interest thereon as applicable are paid in full by Reorganized ACP to the Disbursing Agent, the interest rate payable on the remaining unpaid balance outstanding on the ACP 100% Notes shall reset from 6% to 4% on the outstanding balance under those notes and shall remain at 4% thereafter unless there is a subsequent shortfall in Reorganized ACP funding its required minimum annual amount, in which event interest on the ACP 100% Notes shall immediately thereupon increase from 4% to 6% on the remaining unpaid balance under those notes.

1.10 **ACP Net Financing Proceeds** means, with respect to financing or refinancing of secured debt of ACP or its direct or indirect subsidiaries which results in ACP receiving cash from such transaction (a "<u>Financing Transaction</u>"), the remaining net proceeds to Reorganized ACP from such Financing Transaction after payment of:

(a) all reasonable and customary closing costs, including but not limited to title insurance, survey costs, escrow, prepaid interest, origination fees, discount fees, legal fees, and recording fees, brokerage commissions, and all accrued but unpaid real estate taxes on any parcel refinanced in any Financing Transaction;

(b) any funds required by Reorganized ACP to pay any Administrative Expenses incurred in the Bankruptcy, or to pay any other payments or distributions required under the Plan to the paid within 120 days after the Effective Date; and

(c) any funds required by Reorganized ACP to achieve or maintain, as of the end of any calendar quarter after the Effective Date until the ACP 50% Notes and the ACP 100% Notes have been repaid, the ACP Cash Reserve.

1.11 **ACP Net Sales Proceeds** means gross cash proceeds received by Reorganized ACP from any distribution from Reorganized DLH or any direct or indirect subsidiary of ACP, any future joint venture, any sales, exchanges or other disposition of real estate or of any ownership interest in any direct or indirect subsidiary of ACP, or any option concerning real estate by ACP or any direct or indirect subsidiary of ACP (an "**<u>ACP Transaction</u>**"), <u>less</u>:

(i) any liens, title insurance, survey costs, escrow fees, commissions, legal fees, and customary closing costs incurred by a subsidiary in connection with the sale;

(ii) any sums paid to the holders of any Allowed Secured Claim to discharge any perfected lien or security interest covering any distributions from DLH or other direct or indirect ACP subsidiary;

(iii) any sums distributed for the purpose of paying Taxes associated with such

underlying distribution, sale, option exercise or related forgiveness of indebtedness as the case may be, provided that any such sums shall, unless otherwise approved by the Creditors Representative, not exceed 50% of the ACP Net Sales Proceeds (calculated without including any sums proposed to be distributed for the purpose of paying Taxes); and

(iv)     any funds required under the terms of any agreement governing that ACP Transaction and relating to seller's obligations to fund infrastructure improvements, provide allowances or otherwise.

Notwithstanding the foregoing, the following are explicitly excluded from the definition of ACP Net Sales Proceeds:

(a)     reimbursement of expenses incurred as Development Partner, exclusive of tenant improvement costs; and

(b)     reimbursement of tenant improvement expenses; and

(c)     payments to any future joint venture partner or other holder of an interest in the real estate so sold; and

(d)     repayment of any moneys borrowed by ACP after the Effective Date, including any required repayment on any Exit Financing obtained by ACP.

1.12     **ACP Unsecured Creditor Net Proceeds** means, at the end of each calendar quarter while any ACP 50% Notes or ACP 100% Notes remain unpaid, determined sixty (60) days after the end of such quarter, seventy percent (70%) of:

(a)     ACP Net Sales Proceeds for such calendar quarter, less the sum of

(i)     general and administrative costs actually incurred by ACP and its subsidiaries for such calendar quarter,

(ii)     all distributions or payments made by Reorganized ACP on the Exit Financing or on the ACP Secured Variable Pay Notes during such calendar quarter, and

(iii)     Funds which Reorganized ACP may need to retain in order to achieve or maintain the ACP Cash Reserve (as of the end of any calendar quarter); and

(b)     ACP Net Financing Proceeds.

ACP Unsecured Creditor Net Proceeds shall be calculated for each ACP Transaction, and shall be held in a segregated escrow account by the Disbursing Agent for ACP until such time as the Disbursing Agent is satisfied that Reorganized ACP has a cash balance equal

to the ACP Cash Reserve at the end of the quarter, and thereafter distributed to holders of Allowed ACP Class 4 Claims in accordance with the Plan.

1.13 **Additional DLH Minimum Payments** means the additional payments provided for in Section 1.59 below.

1.14 **Additional Interest** means the interest rate applicable upon a shortfall in a DLH Minimum Annual Distribution or an ACP Minimum Annual Distribution.

1.15 **ADESA Property** means the real property and improvements described in the Great Western Settlement Agreement, which is subject to a first lien in favor of Great Western Bank and Branch Banking and Trust Company and is leased to ADESA Texas, Inc.

1.16 **Administrative Expense** means, with respect to each Debtor, a Claim of any kind which is allowed as a cost or expense of administration of the Chapter 11 Case of Debtors under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of such Debtor, any actual and necessary expenses of operating the business of such Debtor, including without limitation all compensation or reimbursement of fees, expenses or other professional charges of any nature to the extent allowed by the Bankruptcy Court under Sections 327, 330, 331, or 503 of the Bankruptcy Code.  Notwithstanding anything to the contrary contained in the Plan, all Administrative Expenses shall be allocated to and paid by only the Debtor incurring same.

1.17 **Administrative Expense Bar Date** means the date set by the Court as the deadline for filing any motion or application to have any Claim classified as an Administrative Expense under subsections 503(b) and 507(a)(1) of the Bankruptcy Code.

1.18 **Allowed** means, when used with respect to a Claim, a Claim (i) which is not Contested; or (ii) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (A) as to which no objection was filed by the Objection Deadline, unless such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (B) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order.

1.19 **Allowed ACP Class 4 Claims** means Allowed Claims in ACP Class 4.

1.20 **Allowed Class 4 Claims** means the holders of Allowed DLH Class 4 Claims and Allowed ACP Class 4 Claims.

1.21 **Allowed DLH Class 4 Claims** means Allowed Claims in DLH Class 4.

1.22 **Allowed Secured Claim** means any Claim which is both Allowed and is secured by either: (a) a valid and perfected lien upon or security interest in any property of the Debtors, or (b) an enforceable right of setoff against any pre-petition obligation

which the holder of such Claim owed to a Debtor. The amount of an Allowed Secured Claim shall be determined based upon the value of the Debtor's interest in property subject to such lien, security interest, or setoff right as of the Petition Date, and, for any holder of an Allowed Secured Claim for which the Debtor's interest in property subject to such creditor's lien, security interest or setoff right, as the case may be, exceeds the value of such creditor's Claim as of the Petition Date, the amount of such Allowed Secured Claim as of the Effective Date shall include, to the extent permitted under Section 506(b) of the Bankruptcy Code (a) interest on the principal amount of such Claim from the Petition Date to the Effective Date, calculated at the non-default rate of interest provided in any note or other instrument or agreement evidencing such Allowed Secured Claim, and (b) reasonable attorneys' fees, costs, and charges incurred by the holder of such Allowed Secured Claim in connection with the Debtors' Bankruptcy, if and to the extent permitted under any note, deed of trust, instrument, or other agreement evidencing or securing such Allowed Secured Claim, in an amount which is either agreed to by the Debtor, or as approved by the Bankruptcy Court by a Final Order entered after notice and an opportunity for a hearing.

1.23 **Allowed Unsecured Claim** means any Unsecured Claim which has been Allowed.

1.24 **Avoidance Actions** means any cause of action under any of sections 544, 545, 546, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code.

1.25 **Bankruptcy Code** means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code.

1.26 **Bankruptcy Court** means the United States Bankruptcy Court or such other court having jurisdiction over all or any part of the Chapter 11 Case.

1.27 **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 case, including applicable local rules of the Bankruptcy Court.

1.28 **Bar Date** means the last date established by the Bankruptcy Court for filing proofs of Claim in the Chapter 11 Case, provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor or holder of an Equity Interest may file a Proof of Claim (as defined and used in the Bankruptcy Code) or proof of interest, the date set with respect to such Creditor or holder of an Equity Interest shall be the Bar Date, but only as to such Creditor or holder of an Equity Interest.

1.29 **Bonus Pool** means that incentive compensation paid by DLH with respect to sales of properties by DLH, of which 40% is payable to Richard S. Allen, 40% is payable to Daniel J. McAuliffe and 20% is payable to other persons working at or for DLH in the discretion of the board of directors of Reorganized DLH. The Bonus Pool shall be funded by 5% of the DLH Net Sales Proceeds.

1.30 **Business Day** means a day which is not a Saturday, Sunday or any day

designated as a legal holiday by the Federal Government.

1.31 **Claim** means (a) a right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; and (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.32 **Class** means all of the holders of Claims against Debtors or of Interests in Debtors having characteristics substantially similar to the other Claims or Interests which have been designated in Article II of the Plan.

1.33 **Compass** means BBVA Compass Bank, a Secured Creditor of DLH holding notes secured by first liens on: (a) the Compass Pool; and (b) the Building A & Building B parcels.

1.34 **Compass Pool** means Pool 1, as identified on Exhibit A hereto, consisting of the parcels of undeveloped land on which Compass holds a first lien.

1.35 **Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

1.36 **Confirmation Date** means the date of entry of the Confirmation Order.

1.37 **Confirmation Hearing** means the hearing or hearings which will be held before the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider Confirmation of the Plan.

1.38 **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.39 **Contested Claim** means a Disputed Claim.

1.40 **Cramdown** means confirmation of either the DLH Plan or the ACP Plan, or both, pursuant to 11 U.S.C. §1129(b), by reason of the fact that an impaired Class of Creditors votes to reject such Plan. The Debtors expressly reserve the right to move for confirmation of one or both the DLH Plan or the ACP Plan by cramdown pursuant to Section 1129(b) in the event that the Plan is rejected by any impaired Class of Creditors in either DLH or ACP.

1.41 **Creditor** means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.42 **Creditors Committee** means the Official Committee of Unsecured Creditors of DLH and ACP.

1.43    **Creditors Trust Trustee** means (i) with respect to DLH, that person or entity selected by the Creditors Committee to serve as the trustee of the DLH Creditors Trust for beneficiaries of the DLH 50% Notes and the DLH 100% Notes and (ii) with respect to ACP, that person or entity (who may be the same person or entity serving with respect to DLH) selected by the Creditors Committee to serve as the trustee of the ACP Creditors Trust for beneficiaries of the ACP 50% Notes and the ACP 100% Notes.

1.44    **Creditors Representative** means that person or persons selected by the Creditors Committee before the Confirmation Hearing and approved by the Bankruptcy Court in the Confirmation Order (and successors thereto selected by the Oversight Committee in its sole discretion) to serve on behalf of the holders of Allowed DLH Class 4 Claims and Allowed ACP Class 4 Claims on the boards of directors of Reorganized DLH and Reorganized ACP.  Reorganized DLH and Reorganized ACP shall each pay $10,000 per year in compensation to the DLH Creditors Representative and the ACP Creditors Representative, respectively, plus out-of-pocket costs and expenses and reasonable counsel fees incurred by such Creditors Representatives, provided that such counsel fees shall not exceed $25,000 per Reorganized Debtor in any one calendar year.

1.45    **Debtors** mean DLH Master Land Holding, LLC and Allen Capital Partners, LLC.

1.46    **Development Ready** means, (i) all utilities necessary for the development and operation of the subject tract of land for a use permitted by the zoning for such tract of land (including, without limitation, sanitary sewer, storm sewer, water, electricity, natural gas, and telephone) are presently available within a distance reasonably acceptable and for which extension of such Services to the perimeter boundaries of that tract can be extended by the owner, the municipality or other third party within a reasonable period of time and at a feasible cost or expense, (ii) the subject tract is currently annexed and zoned within the limits of a municipality, and (iii) the subject tract has access to and from a road or thoroughfare that is dedicated for public use and such road or thoroughfare is currently improved to a level adequate to support the use of the subject tract or if not, can be improved by the owner, the municipality or other third party within a reasonable period of time and at a feasible cost or expense.

1.47    **DIP Lenders** means Pointe Property Group, Inc., a Tennessee Corporation, and Allen Investments, Inc., a Florida corporation, the Lenders with respect to: (a) a Pre-Petition Loan made to DLH in the amount of $585,000.00, closed on December 31, 2009; and (b) a Post-Petition Loan made to the Debtors pursuant to Orders entered by the Bankruptcy Court authorizing Debtor-in-Possession Financing up to the aggregate amount of $3.5 Million as it may be subsequently amended.

1.48    **DIP Loan** means, collectively, (a) that certain Pre-Petition Loan made by the DIP Lenders to DLH in the amount of $585,000.00, closed on December 31, 2009; and (b) a Post-Petition Loans made by the DIP Lenders to the Debtors pursuant to Orders entered by the Bankruptcy Court authorizing Debtor-in-Possession Financing up to the aggregate amount of $3.5 Million as may be increased by origination fees and legal fees

on the Effective date.

1.49 **Disallowed** means, when used with respect to a Claim, a Claim or the portion thereof which is fully and finally (a) denied allowance, or (b) estimated for purposes of payment or other Plan distributions at zero ($0.00), in either case by Final Order of the Bankruptcy Court. Disallowed means, when used with respect to an Administrative Expense of a professional that is a Fee Claim, an Administrative Expense or portion thereof that is denied by Final Order of the Bankruptcy Court or other court of competent jurisdiction or that is estimated by Final Order of the Bankruptcy Court for purposes of payment or other Plan distributions at zero ($0.00).

1.50 **Disbursing Agent** means, with respect to each of the Reorganized Debtors, the Creditors Trust Trustee as approved by the Bankruptcy Court at Confirmation and designated in the Confirmation Order, such Disbursing Agent being responsible, among other things: (a) to hold for the benefit of Allowed Class 4 Claims all ACP Unsecured Creditor Net Proceeds or DLH Unsecured Creditor Net Proceeds, as the case may be, required to be held in escrow pursuant the Plan, and any other discretionary distributions made by the Reorganized Debtors to Allowed Class 4 Claims pursuant to the Plan; and (b) to distribute such funds required to be distributed to the holders of Allowed Class 4 Claims. The Reorganized Debtors shall have no obligation to make distributions on account of any contingent, disputed or unliquidated Claims unless and until such Claims become finally Allowed Claims, and the Disbursing Agent, prior to the time such Claims become Allowed Claims, shall have no obligation to either distribute or reserve funds on account of such Claims. All costs and expenses incurred by the Disbursing Agent, including reasonable compensation for the Disbursing Agents' services, shall be paid by each respective Reorganized Debtor.

1.51 **Disclosure Statement** means the written statement, filed concurrent herewith, as amended, supplemented, or modified, from time to time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.52 **Disputed Claim** means any Claim that is listed in Debtors' Schedules as disputed, contingent, or unliquidated, any Claim that is the subject of a claims objection filed in the Bankruptcy Court, and any Claim that is disputed by Debtors in any litigation, lawsuit or adversary proceeding pending in the Bankruptcy Court or in any other court of competent jurisdiction.

1.53 **DLH** means DLH Master Land Holding, LLC.

1.54 **DLH Class B Interest** means the callable, preferred return Membership Interest in Reorganized DLH described and defined in Section 13.14 of the Plan, which may be distributed to ACP, Richard S. Allen, or Richard S. Allen, Inc. in satisfaction of their DLH Class 6 Reimbursement Claims.

1.55 **DLH Creditors Trust** means the creditors liquidating trust created under the Plan to undertake and implement certain provisions of the Plan with respect to the

enforcement of rights and the making of distributions to the beneficiaries of the DLH 50% Notes and the DLH 100% Notes, which shall be treated as a grantor trust and the beneficiaries of the trust will be treated as the grantors and deemed owners of the trust for income tax purposes as further provided in a creditors trust agreement and documents to be executed in connection therewith.

1.56    **DLH Creditors Trust Agreement** means the agreement to be approved by the Bankruptcy Court at the Confirmation Hearing and to be effective on or before the Effective Date which shall govern the DLH Creditors Trust.

1.57    **DLH Excess Cash** means any cash held by Reorganized DLH at the end of any calendar quarter prior to the payment in full of the DLH 50% Notes and the DLH 100% Notes in excess of Reorganized DLH's cash balance of $2,750,000 required to meet Reorganized DLH's working capital needs.

1.58    **DLH Excess Cash Distributions** means the distributions which Reorganized DLH is required to make after the end of each calendar quarter if and to the extent that there is DLH Excess Cash at the end of such calendar quarter (but only until all DLH 50% Notes and DLH 100% Notes have been repaid), as provided in Section 6.04 of the Plan.

1.59    **DLH Minimum Annual Distribution** means the annual minimum funding required to be paid by Reorganized DLH to the Disbursing Agent on behalf of the beneficiaries of the DLH 50% Notes and the DLH 100% Notes in accordance with the following schedule:

(i)     in the first year after the Effective Date, no minimum annual funding is required; and

(ii)    in the second through ninth years after the Effective Date, the minimum annual funding required shall be $500,000 per year.

Payments received by the Disbursing Agent from DLH Unsecured Creditor Net Proceeds and DLH Excess Cash Distributions in any given year shall be credited against that year's minimum annual funding requirement, and, to the extent applicable, to the cure of any unfunded shortfall amounts, together with interest thereon as provided below, for any prior years.

If at the end of any year beginning in the second year after the Effective Date, there is a shortfall in Reorganized DLH making its required minimum annual funding as set forth above (a "First Shortfall"), the interest rate applicable on the unfunded shortfall amount for that year shall be (a) 4% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the DLH 100% Notes and (b) 2% per annum until the shortfall amount is funded with respect to that portion of the minimum annual funding allocable to the DLH 50% Notes. When the unfunded shortfall amount together with the additional 2% interest on the unfunded amount is paid by Reorganized DLH to the Disbursing Agent, the interest rate on the DLH 100% Notes

shall thereupon reset to 2% and there shall be no interest payable on the DLH 50% Notes. If there is a shortfall in the making of the required minimum annual funding amount at the end of the year immediately following the First Shortfall year (a "<u>Second Consecutive Shortfall</u>"), (x) the interest rate applicable on the DLH 100% Notes shall immediately thereupon increase from 2% to 4% per annum on the total remaining unpaid balance under those notes, (y) the interest rate payable on all unfunded deficiency amounts applicable to the DLH 50% Notes shall be set at 2% per annum until all shortfall amounts thereunder are paid in full by Reorganized DLH to the Disbursing Agent together with the applicable interest thereon, and (z) Reorganized DLH shall suspend payment of Richard S. Allen's 40% of the Bonus Pool (and all such amounts shall be accrued, but not paid, by Reorganized DLH) until all required minimum annual distributions in arrears together with interest thereon as applicable have been funded in full to the Disbursing Agent. With respect to a Second Consecutive Shortfall, if and when all shortfall amounts together with interest thereon as applicable are paid in full by Reorganized DLH to the Disbursing Agent, the interest rate payable on the remaining unpaid balance outstanding on the DLH 100% Notes shall reset from 4% to 3% on the outstanding balance under those notes and shall remain at 3% thereafter unless there is a subsequent shortfall in Reorganized DLH funding its required minimum annual amount, in which event the interest rate on the DLH 100% Notes shall reset to 4% per annum on the outstanding balance under those notes and remain at 4% thereafter.

In addition to the foregoing, Reorganized DLH shall also be required to make the following additional payments to the Disbursing Agent on behalf of the beneficiaries to the DLH 50% Notes and the DLH 100% Notes (the "Additional DLH Minimum Payments"):

    (i)    on any anniversary of the Effective Date on which there are amounts still owing by Reorganized DLH on the Term Loan, the Pool 1 Notes and the Pool 2 Notes, Reorganized DLH shall pay to the Disbursing Agent a minimum of 25% of its net cash (including cash equivalents), if any, after all current year and following year G&A expenses, real estate taxes and scheduled debt service (if any remains) for Reorganized DLH's Term Loan, Pool 1 and Pool 2 lenders have been reserved;

    (ii)    on any anniversary of the Effective Date after the Term Loan has been paid in full, the minimum percentage in subsection (i) shall increase to 50%;

    (iii)    on any anniversary of the Effective Date after the Term Loan and the Pool 1 Notes have been paid in full, the minimum percentage in subsection (i) shall increase to 75%; and

    (iv)    on any anniversary of the Effective Date after the Term Loan, the Pool 1 Notes and the Pool 2 Notes have been paid in full, the minimum percentage in subsection (i) shall increase to 100%.

1.60  **DLH Net Financing Proceeds** means, with respect to financing or refinancing of secured debt of DLH which results in DLH receiving cash from such transaction (a "**Financing Transaction**"), the remaining net proceeds to Reorganized DLH from such Financing Transaction after payment of:

(a)     all reasonable and customary closing costs, including but not limited to title insurance, survey costs, escrow, prepaid interest, origination fees, discount fees, legal fees, and recording fees, brokerage commissions, and all accrued but unpaid real estate taxes on each parcel refinanced in any Financing Transaction;

(b)     the Release Price required to be paid to the lienholder for each parcel of land refinanced in such Financing Transaction;

(c)     the Term Loan Release Price for each such parcel of land refinanced in such Financing Transactions;

(d)     any funds required under the terms of any agreement governing such Transaction and relating to seller's obligations to fund infrastructure improvements, platting, re-platting, or re-zoning, provide allowances, fees, or otherwise, with respect to such parcel;

(e)     any funds required by Reorganized DLH to pay any Administrative Expenses incurred in the Bankruptcy, or to pay any other payments or distributions required under the Plan to the paid within 120 days after the Effective Date; and

(f)     any funds required by Reorganized DLH to achieve or maintain, as of the end of any calendar quarter after the Effective Date until the DLH 50% Notes and the DLH 100% Notes have been repaid, a cash balance of $2,750,000.00 (after giving effect to any distributions to Reorganized DLH its share of DLH Net Sales Proceeds during such calendar quarter).

1.61  **DLH Net Sales Proceeds** means, with respect to the sale, exchange or other disposition of any parcel of land by Reorganized DLH (but not with respect to the initial contribution by Reorganized DLH of any parcel into any new joint venture, partnership, limited liability company, or otherwise, except as expressly provided by Section 6.10 of the Plan), the remaining proceeds from such sale or other transaction after payment of:

(a)     all reasonable and customary closing costs, including, but not limited to title insurance, survey costs, escrow and recording fees, brokerage commissions, legal fees and all accrued but unpaid real estate taxes on such parcel,

(b)     the Release Price for such parcel of land;

(c)     the Term Loan Release Price for such parcel of land;

(d)     any sums distributed for the purpose of paying Taxes associated with such underlying distribution, sale, option exercise or related forgiveness of indebtedness as the case may be, provided that any such sums shall, unless otherwise approved by the Creditors Representative, not exceed 50% of the DLH Net Sales Proceeds (calculated without including any sums proposed to be distributed for the purpose of paying Taxes);

(e)     any funds required under the terms of any agreement governing such Transaction and relating to seller's obligations to fund infrastructure improvements, platting, replatting, or re-zoning, provide allowances, fees, or otherwise, with respect to such parcel;

(f)     any funds required by Reorganized DLH to pay any Administrative Expenses incurred in the Bankruptcy, or to pay any other payments or distributions required under the Plan to the paid within 120 days after the Effective Date; and

(g)     any funds required by Reorganized DLH to achieve or maintain, as of the end of any calendar quarter after the Effective Date a cash balance of $2,750,000.00 (after giving effect to the distribution to Reorganized DLH its share of DLH Net Sales Proceeds during such calendar quarter).

In the event the purchaser of a parcel of real estate sold by Reorganized DLH assumes any obligation or a part of such obligation of Reorganized DLH in connection with such a purchase, and/or Reorganized DLH provides seller financing of any portion of the purchase price, the portion of the sales price attributed to such an assumption of liabilities and/or seller financing shall not be included in the calculation of DLH Net Sales Proceeds either as an addition to the purchase price or as a deduction as an amount paid to the holder or holders of such obligation. However, subsequent repayments by the purchaser to Reorganized DLH under such an obligation shall be considered DLH Net Sales Proceeds.

1.62    **DLH Unsecured Creditor Net Proceeds** means 5% of; (a) the Pool 1 Net Sales Proceeds, (b) the Pool 2 Net Sales Proceeds, (c) the Pool 4 Net Sales Proceeds; and (d) the DLH Net Financing Proceeds.

DLH Unsecured Creditor Net Proceeds shall be calculated for each DLH Transaction, and shall be held in a segregated escrow account by the Disbursing Agent for DLH until the Disbursing Agent is satisfied that Reorganized DLH has a cash balance of $2.75 Million at the end of the calendar quarter, and thereafter distributed to holders of Allowed DLH Class 4 Claims in accordance with the Plan.

1.63    **Effective Date** means the first Business Day that is the later of (a) fifteen days after the Confirmation Date if the Confirmation Order is not stayed prior to such date or, if the Confirmation Order is stayed, the first Business Day following the lifting,

dissolution, or removal of such stay, or (b) the date the Exit Financing is available to fund payments under the Plan, but no later than seventy-five (75) days after the Confirmation Order becomes a Final Order. Provided, if the Confirmation Order has not become a Final Order by virtue of the commencement of any motion for rehearing or new trial pertaining to the Confirmation Order or by virtue of the filing of a notice of appeal from the Confirmation Order, and provided the Confirmation Order has not been stayed, Debtors may, in their sole discretion, elect to defer the Effective Date until a date that is not later than fifteen days after the Confirmation Order has become a Final Order.

1.64 **Estate** means each Estate created by section 541 of the Bankruptcy Code upon the commencement of each Case.

1.65 **Fee Claim** means Claims that are for professional fees, contingency fees or bonuses, expenses incurred in connection with the rendition of professional fees, any claim for attorneys' fees based on any "common fund" theory, any theory of "equitable attorneys' fees", and any other theory that may be asserted or consideration that may be claimed by or awarded to any professional (including without limitation any attorney or forwarding attorney) as an Allowed Administrative Expense Claim under Section 327 and/or 330 and/or 331 of the Bankruptcy Code or as "substantial contribution" under Section 503 of the Bankruptcy Code.

1.66 **Fee Estimate** means a good faith estimate of the total unpaid amount of such person's expected Fee Claim through the Effective Date (assuming for purposes of such fee estimate that the Effective Date will be 21 days after the first day scheduled for the Confirmation Hearing).

1.67 **Final Order** means an order or judgment of the Bankruptcy Court from which an appeal of right (as opposed to a motion for leave to appeal) could have been perfected but as to which (a) no motion for rehearing, new trial, reconsideration, or for vacation of such order was timely filed and the time for filing any such motion has expired or, if a timely motion of such nature was filed, all such motions have been dismissed or withdrawn without the possibility of reinstatement or ultimately determined on the merits by denying such motions and sustaining the subject order in all material respects, and, with respect to the orders denying, dismissing, or withdrawing any such motion of such nature, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction, (b) no notice of appeal was timely filed and all times for filing a notice of appeal have expired or, if a timely notice of appeal was filed, all such appeals have been dismissed or withdrawn without the possibility of reinstatement or ultimately determined on the merits by denying such appeals and sustaining the subject order in all material respects, and, with respect to the orders denying, dismissing, or withdrawing any such appeal, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction, or (c) with respect to any order or judgment from which an appeal has been timely taken, no order staying the implementation of such order has been entered, or, if any such stay order was entered, such stay order has expired and has not been renewed, reinstated, or superseded by another stay order staying the subject order,

and, with respect to any orders terminating or refusing to reinstate any such stay, no further appeals, motions for rehearing, or applications for writs of certiorari may be filed in any court of competent jurisdiction.

1.68    **Great Western** means and refers to Great Western Bank and Branch Banking & Trust Company, collectively, as the holder of an Allowed Class 3 Subclass E Claim against DLH secured by the ADESA Property.

1.69    **Great Western Settlement Agreement** means that certain Settlement Agreement, by and between Great Western Bank, Brach Banking & Trust Company, DLH, ACP, Richard S. Allen, and Richard S. Allen, Inc., dated as of November 16, 2010, a copy of which is attached as Exhibit 1 to the Great Western Settlement Order.

1.70    **Great Western Settlement Order** means that certain Order Approving Settlement By and Between Debtors, Great Western Bank and BB&T, entered in the DLH Bankruptcy Case on November 16, 2010, as Docket No. 665.

1.71    **Guarantors** mean ACP, Richard S. Allen, or Richard S. Allen, Inc.

1.72    **In Value** means with respect to ACP or a direct or indirect ACP subsidiary, the economic value to ACP and/or its subsidiary, not including any value received or to be received by other parties.

1.73    **Insider** means any person defined by the Bankruptcy Code as an insider of Debtors.

1.74    **LPKC** means The Allen Group - Kansas City, LLC and direct and indirect subsidiaries thereof.

1.75    **Non-Schedule 1 Allowed Unsecured Claims** means the holders of Allowed Unsecured Claims other than those listed on Schedule 1 to the Plan.

1.76    **Oversight Committee** means that committee of three persons selected by the Creditors Committee to serve after the Effective Date to select a replacement Creditors Representative for Reorganized DLH and/or Reorganized ACP, or a replacement Creditors Trust Trustee, if a vacancy should arise in one of those positions due to resignation, death or other need to replace the Creditors Representative or Creditors Trust Trustee as determined by the Oversight Committee in its sole discretion. In the event of a vacancy on the Oversight Committee, the remaining members shall elect a new member of the committee. The Oversight Committee is authorized to adopt its own procedures and bylaws and may amend them from time to time. The Creditors Committee has selected Fred Sainik, Marvin Hansen, and Chuck Nichols as the initial members of the Oversight Committee.

1.77    **Parcel Note** means, in connection with any parcel of land owned by DLH, the applicable Pool 1 Note, Pool 2 Note, or Pool 4 Note associated with the Parcel Senior Lien.

1.78    **Parcel Noteholder** means, in connection with any parcel of land owned by DLH, the holder of the Parcel Note and Parcel Senior Lien which encumbers such parcel, and their assignees or successors in interest.

1.79    **Parcel Senior Lien** means, for any claim in either DLH Class 3 Subclass A, or DLH Class 3 Subclass B, or DLH Class 3 Subclass D, the existing validly perfected lien or liens which secured such Allowed Secured Claim as of the Petition Date, for which a Pool 1 Note,   a Pool 2 Note or a Pool 4 Note will be issued under the Plan, as modified by the Parcel Senior Lien Modification to be executed and recorded on the Effective Date.

1.80    **Parcel Senior Lien Modification** means any Modification of Deed of Trust and Lien, to be executed by and between DLH and the holder of an Allowed Secured Claim in DLH Class 3 Subclass A and DLH Class 3 Subclass B (a separate Parcel Senior Lien Modification shall be executed by each holder of such an Allowed Secured Claim), which shall provide: (a) that the Allowed Secured Claim shall be evidenced by the Pool 1 Note or the Pool 2 Note, as the case may be; (b) that the Allowed Secured Claim shall continue to be secured by the Parcel Senior Lien held by the holder of such Allowed Secured Claim; (c) that the Pool 1 Note or the Pool 2 Note, as the case may be, held by the holder of such Allowed Secured Claim shall be further secured by the rights to participate in and receive distributions from the Pool 1 Net Sales Proceeds or the Pool 2 Net Sales Proceeds, as the case may be, as provided in Section 4.03 of this Plan; (d) that the Parcel Senior Lien shall be renewed and extended to the maturity date of the Pool 1 Note or the Pool 2 Note, as applicable; (e) that the Parcel Senior Lien shall be released and discharged with respect to any parcel upon payment in full of the Release Price for such parcel, as determined in accordance with this Plan; (f) that the holder of the Parcel Senior Lien with respect to Pool 2 consents to the granting of a subordinate lien, subject and subordinate in all respects to the Parcel Senior Liens, upon the parcels in Pool 2 to secure the rights of holders of the Pool 2 Notes to receive distributions from the Pool 2 Net Sales Proceeds, (g) permitting Reorganized DLH to grant such utility and right-of-way easements and/or dedications as may be reasonably necessary for the development of such parcel or as may be reasonably necessary to allow the construction of infrastructure improvements to enhance the value of such parcel, and (h) such other modifications or amendments to the Parcel Senior Lien as may be reasonably agreed to by DLH and the holder of the Allowed Secured Claim secured by such Parcel Senior Lien which are not inconsistent with the terms of this Plan.  The delivery by DLH of a Pool 1 Note or a Pool 2 Note may be conditioned upon the execution and delivery of a Parcel Senior Lien Modification in form and substance reasonably satisfactory to Reorganized DLH and consistent with the terms of this Plan.  The Parcel Senior Lien Modifications shall be recorded in the Deed Records of Dallas County, Texas.

1.81    **Person** means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, unincorporated organizations, or other legal entities, irrespective of whether they are governments, agencies or political subdivisions thereof.

1.82    **Petition Date** means January 25, 2010, the day Debtors commenced their jointly administered bankruptcy cases.

1.83    **Plan** means this Plan of Reorganization, either in its present form or as it may be altered, amended, or modified by Debtors from time to time.

1.84    **Pool 1 Net Sales Proceeds** means the DLH Net Sale Proceeds associated with the sale or other disposition of a parcel of land included in the Pool 1 Parcels, the DLH Net Financing Proceeds attributable to a Financing Transaction for a parcel of land included in the Pool 1 Parcels, or any payment on account of a retained interest associated with land included in the Pool 1 Parcels.

1.85    **Pool 1 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 1 in **Exhibit A-1** hereto, but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel prior to the Effective Date.

1.86    **Pool 2 Net Sales Proceeds** means the DLH Net Sale Proceeds from the sale of a parcel of land included in the Pool 2 Parcels, the DLH Net Financing Proceeds attributable to a Financing Transaction for a parcel of land included in the Pool 2 Parcels, or any payment on account of a retained interest associated with land included in the Pool 2 Parcels.

1.87    **Pool 4 Net Sales Proceeds** means the DLH Net Sale Proceeds from the sale of a parcel of land included in the Pool 4 Parcels, the DLH Net Financing Proceeds attributable to a Financing Transaction for a parcel of land included in the Pool 4 Parcels, or any payment on account of a retained interest associated with land included in the Pool 4 Parcels.

1.88    **Pool 2 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 2 in **Exhibit A-2** hereto but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel on or prior to the Effective Date.

1.89    **Pool 3 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 3 in **Exhibit A-3** hereto, but excluding any such parcels sold by the Debtor or surrendered to the Secured Creditor holding a first lien on such parcel prior to the Effective Date.

1.90    **Pool 4 Parcels** means the parcels of land which are designated by Debtor DLH as being in Pool 4 in **Exhibit A-4** hereto but excluding any such parcels sold by the Debtor prior to the Effective Date or surrendered to the Secured Creditor holding a first lien on such parcel.

1.91    **Priority Claim** means a Claim other than an Administrative Claim to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.92    **Priority Non-Tax Claim** means a Claim entitled to priority pursuant to sections 507(a)(1) - 507(a)(7) of the Bankruptcy Code.

1.93    **Priority Tax Claim** means a Claim of a governmental unit of a kind specified in section 507(a)(8) of the Bankruptcy Code.

1.94    **Release Price** means for any parcel of land owned by Reorganized DLH:

(a)    As of the Effective Date, for claims which are secured by only a single parcel of vacant land, the Release Price of the parcel shall be the total amount of the Allowed Secured Claim secured by the parcel in question unless the Parcel Noteholder consents to a lesser price.

(b)    For claims which are secured by a lien on more than one parcel of vacant land, the Release Price for each such parcel as of the Effective Date shall be as set forth in Exhibit A attached hereto; however, the total of the Release Prices for all parcels so set shall not be greater than 150% of the total Allowed Secured Claim of such Parcel Noteholder.

(c)    Once established as of the Effective Date of the Plan, the Release Price for each parcel securing a lien on more than one parcel of vacant land shall automatically increase annually, on each anniversary date of the Effective Date of the Plan, by an amount equal to a pro rata portion of the annual interest accrued but unpaid on the applicable Parcel Note.  After the Effective date, for claims which are secured by only a single parcel of vacant land, the Release Price of the parcel shall be the total amount due, both principal and interest, on the Parcel Note secured by such parcel.

(d)    To the extent to which a junior lien is granted to the holders of the Pool 2 Notes against any parcel pursuant to this Plan, the Release Price shall not include that junior lien interest. Any junior liens granted as additional security will be released automatically once the appropriate share of DLH Net Proceeds to be paid to creditors has been placed into escrow for the benefit of the holders of the Pool 2 Notes.

(e)    In the event Reorganized DLH requests the release of a partial parcel, or requests the consent of the holder of a Parcel Senior Lien to DLH's grant of an easement or dedication of right of way, any affected Parcel Noteholder and Reorganized DLH shall negotiate in good faith an allocation of the Release Price as of the Effective Date with respect to the release of the partial parcel, or the grant of an easement or dedication of right of way and the Release Price as of the Effective Date associated with the remaining parcel or, in the case of an easement or dedication of right of way, the parcel now subject to the easement or dedication of right of way. Thereafter, the partial parcel, easement or dedication of right of way and the remaining parcel shall be treated as if the parcels had been divided and the release price so allocated as of the Effective Date.

Where the Parcel Note is a non-recourse note and Reorganized DLH and Parcel Noteholder are unable, after good faith negotiations, to reach an agreement concerning the Release Prices for both: (i) the partial parcel, easement or right of way, and (ii) the remaining parcel, within thirty (30) days after the request for the release of a partial parcel, or the grant of an easement or right of way, Reorganized DLH may elect to: (a) request that the Bankruptcy Court determine the Release Price for any partial parcel, easement or right of way, and the Bankruptcy Court reserves jurisdiction to resolve any such dispute over the amount of a Release Price for any partial parcel, easement, or right-of-way, or right-of-way, or (b) transfer the parcel or parcels subject to the Parcel Senior Lien to Parcel Noteholder in full and complete satisfaction of the Parcel Note held by Parcel Noteholder. Reorganized DLH shall promptly notify Parcel Noteholder of such an election. Thirty (30) days after providing Parcel Noteholder with notice of its intent to transfer a parcel back to the Parcel Noteholder, to the extent that no agreement to the contrary with Parcel Noteholder is reached, Reorganized DLH shall transfer to Parcel Noteholder its interests in the undivided parcel or parcels subject to the Parcel Senior Lien in full and complete satisfaction of the Parcel Note held by Parcel Noteholder.

Where the Parcel Note is a recourse obligation of Reorganized DLH and Reorganized DLH and the Parcel Noteholder are unable, after good faith negotiations, to reach an agreement concerning the Release Price for any partial parcel, easement, or right-of-way which Reorganized DLH proposed to sell, DLH shall have the option to (a) request that the Bankruptcy Court determine the Release Price for any partial parcel, easement or right of way, and the Bankruptcy Court reserves jurisdiction to resolve any such dispute over the amount of a Release Price for any partial parcel, easement, or right-of-way, or right-of-way, or (b) transfer the entire parcel to the Parcel Noteholder in full satisfaction (if the Parcel Noteholder holds a Parcel Senior Lien on a single parcel), or partial satisfaction (if the Parcel Noteholder hold a Parcel Senior Lien on multiple parcels). If the Parcel Noteholder holds a lien on multiple parcels, the credit against the Parcel Note held by such Parcel Noteholder shall be the greater of; (i) the Release Price for the parcel surrendered to such Parcel Noteholder, or (ii) an amount equal to (x) the per square foot equivalent of the purchase price offered by any third party (excluding any insider or affiliate of the Debtors) and accepted by Reorganized DLH for a partial parcel multiplied by (y) the number of gross square foot of land contained within the entire parcel securing the Parcel Note. Reorganized DLH shall promptly notify Parcel Noteholder of such an election. Thirty (30) days after providing Parcel Noteholder with notice of its intent to transfer, to the extent that no agreement to the contrary with Parcel Noteholder is reached, Reorganized DLH shall transfer to Parcel Noteholder its interests in the individual parcel or parcels subject to the Parcel Senior Lien in reduction of the Parcel Note held by Parcel Noteholder as described above.

1.95    **Reorganized ACP** means Allen Capital Partners, LLC as of the Effective Date, reorganized pursuant to the terms of this Plan.

1.96    **Reorganized Debtors** means Reorganized DLH and Reorganized ACP.

1.97    **Reorganized DLH** means DLH Master Land Holdings, LLC as of the

Effective Date, reorganized pursuant to the terms of this Plan.

1.98 **Reimbursement Claim** means any claim which ACP, Richard S. Allen, or Richard S. Allen, Inc. (collectively "Guarantors") has against DLH for any payments or other distributions made by any of the Guarantors to a creditor of DLH on account of an obligation where the Guarantors executed a guaranty of such an obligation and DLH was directly liable under the obligation. Reimbursement Claim shall also mean any claim Richard S. Allen or Richard S. Allen, Inc. has against ACP for any payments or other distributions made by either of them on a debt where ACP is the primary obligor or a co-guarantor of such debt.

1.99 **Rejection Claim** means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any executory contract or unexpired lease.

1.100 **Schedule 1 Allowed Unsecured Claims** means the holders of Allowed Unsecured Claims listed on Schedule 1 to the Plan.

1.101 **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statement have been or may be subsequently amended.

1.102 **Secured Claim** means a claim which is secured pursuant to 11 U.S.C. § 506(a) of the Bankruptcy Code

1.103 **Secured Creditor Pool 1 Net Proceeds** means 30% of the Pool 1 Net Sales Proceeds.

1.104 **Secured Creditor Pool 2 Net Proceeds** means 30% of the Pool 2 Net Sales Proceeds.

1.105 **Subsidiary** means any entity in which ACP or Reorganized ACP (directly or indirectly) has an ownership interest, whether full or partial interest, whether a capital interest, a profits interest or otherwise.

1.106 **Taxes** shall mean and include any and all federal, state or local income, franchise, or business taxes, including any tax based upon income, gross receipts from a sale, exchange or distribution of money or property, and, with respect to any sale, exchange or distribution of property, shall include, stamp, transfer, or other taxes imposed upon a conveyance of property as well as any unpaid real estate taxes or allocation of unpaid real estate taxes.

1.107 **Term Loan** means that certain Term Loan, more particularly described in Section 6.07 of the Plan, pursuant to which the DIP Loan is to be satisfied.

1.108 **Term Loan Release Price** means, for any parcel of land owned by

Reorganized DLH, the Release Price payable to the holders of the Term Loan upon a sale of any such parcel in consideration of a release of the subordinate lien on such parcel securing the Term Loan. The Term Loan Release Price for any parcel shall be determined in accordance with Section 6.07 below.

1.109 **Unclaimed Funds** means any cash, distribution, or any other property of Debtors unclaimed for a period of one (1) year after the applicable distribution date as set forth in the Plan.

1.110 **Unsecured Claim** means a Claim of a Creditor that is not a Secured Claim, an Administrative Claim, Priority Claim, Reimbursement Claim or Administrative Convenience Claim.

## ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS

The following is a designation of the Classes of Claims and Interests under this Plan. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. Except as expressly provided within or with respect to the terms of any Class, a Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class. Each Debtor shall have its own separate Classes of Claims and Interests.

Any act by either Debtor to supply cash or other property to either Debtor in order to assist with implementation of the Plan shall not constitute an assumption of any such obligation. However, the definitions and treatment of the Classes of each of DLH and ACP, except as specified elsewhere in the Plan, shall be identical. Notwithstanding the foregoing, each of ACP and DLH shall maintain their own separate classes, one from the other, and they shall not assume any liability for any obligation of the other except as set forth otherwise in this Plan. Where appropriate, such Classes for ACP will be referred to as "ACP Class 1," "ACP Class 2," "ACP Class 3," etc., on the one hand, and, for DLH, as "DLH Class 1," "DLH Class 2," "DLH Class 3," etc., on the other hand. Otherwise, references to "Class 1," "Class 2," "Class 3," etc. shall refer to the respective Class of both of the Debtors, unless context requires that it refer to the specific Class of only one of the Debtors. Any holders of Allowed Claims which are jointly and severally owed by DLH and ACP shall be permitted to participate as creditors in both the DLH and ACP distributions under this Plan, but shall be subject to the "single recovery rule", and any such Allowed Claims against DLH shall be reduced *pro tanto* by the amount of any distributions under this Plan from Reorganized ACP, and any such Allowed Claims against ACP shall be reduced *pro tanto* by the amount of any distributions under this Plan from Reorganized DLH. For each Debtor, respectively, the following Class designations shall apply:

A. **Claims**

2.01 **Class 1** shall consist of all Allowed Administrative Expense Claims.

2.02    **Class 2** shall consist of all Allowed Priority Claims, including any Priority Claims which also claim security.

2.03    **Class 3** (including DLH Subclasses 3A, 3B, 3C, 3D, 3E, and 3F) shall consist of all Allowed Secured Claims.  Each creditor in Class 3 shall constitute its own class; however, participants in any such claim shall not constitute a separate subclass.  Each member of a Subclass, provided they are not mere participants in an Allowed Secured Claim, shall constitute its own Class as well.

2.04    **Class 4** shall consist of all Allowed Unsecured Claims.

2.05    **Class 5** shall consist of Unsecured Administrative Convenience Claims of $20,000 or less, and the Claims of any holder of a Class 4 Claim which elects to reduce its claim to $20,000, but excluding any Unsecured Claim for which the holder elects to be treated as a Class 4 Claim.

2.06    **Class 6** shall consist of Reimbursement Claims.

**B.  Interests**

**Class 7** shall consist of all Interests.


## ARTICLE III - IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS

3.01    **Unimpaired Classes of Claims and Interests**.  The following Classes are deemed unimpaired under the Plan:  Class 1 — Administrative Expense Claims; Class 2 — Priority Claims.  In addition, those Secured Creditors of DLH which are receiving their collateral back on or before the Effective Date, Coffman Investments (Parcels 161-164), Southport Properties, LP (Parcels 93-95 and Parcels 156-157), and ABOT (Pool 3), are also unimpaired under the Plan.  Further, in the event the sales of the ADESA Property and/or the Buildings which are the collateral for the Secured Claim of Compass on the Compass Building Loan are closed before the Effective Date, Great Western and Compass, with respect to the Compass Building Loan, are also unimpaired.

3.02    **Impaired Classes of Claims and Interests**.  With the exception of the unimpaired Classes specified above, all Classes of Claims and Interests are impaired under the Plan.

## ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS

**4.01  Class 1 — Allowed Administrative Expense Claims (Unimpaired)**.

Description: This Class consists of all Allowed Administrative Expense Claims against each of the Debtors independently.  This Class will also include any claim for an award by any party for any Fee Claim, including without limitation any Fee Claim for substantial contribution rendered to the estate or to any claimant or class (*i.e.*, in the sense of a class action) of claimants which results in any award by the Bankruptcy Court (by Final Order) of attorneys' fees payable by a Debtor's estate as Allowed Administrative Expense Claims.

Treatment:  All Allowed Administrative Expenses shall be treated as follows:

(a)  Administrative Expenses Bar Date (For Administrative Expense Claims Other than Fee Claims).  The holder of any Administrative Expense Claim other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by Debtors, or (iii) a previously Allowed Administrative Expense, must file with the Bankruptcy Court and serve on Debtors and its counsel, notice of such Administrative Expense within 15 days after the Confirmation Date.  At a minimum, such notice must identify (i) the name of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  Failure to file this notice timely and properly shall result in the Administrative Expense being forever barred and discharged.

(b)  Deadlines for Filing Fee Claim Estimates and Applications.  Each person asserting any Fee Claim for services rendered or expenses incurred on or before the Effective Date which is in whole or in part an Administrative Expense Claim, including without limitation any claim for "substantial contribution" under Section 503 of the Bankruptcy Code, shall be required to file with the Bankruptcy Court, and serve on Debtors and its counsel, (i) five (5) business days or more prior to the commencement of the Confirmation Hearing, a Fee Estimate, and (ii) within 60 days after the Effective Date, a formal Fee Application, by which any and all Fee Claims shall be Allowed or Disallowed.  Failure to file either a timely Fee Estimate or a timely Fee Application shall result in the Fee Claim of such Claimant or applicant being forever barred and discharged.

(c)  Payment of Allowed Administrative Expenses.  Each holder of an Allowed Claim for an Administrative Expense shall receive (i) the amount of such holder's Allowed Claim in cash on the later of (w) the Effective Date of the Plan, (x) the date such Claim was due and payable by its terms, (y) a date agreed to by the holder of such Claim and (z) within 30 days following the date such Claim, if contested, is Allowed by Final Order.  Fee Claims of professionals for services rendered and expenses incurred during the 90-day period after the Effective Date shall be submitted to and paid within 30 days after submission by Reorganized DLH or Reorganized ACP, as the case may be, without the need for Bankruptcy

Court approval. If there is any dispute by the respective Reorganized Debtor as to the amount requested that cannot be resolved by the parties directly, such dispute shall be submitted by motion to the Bankruptcy Court for resolution. A formal fee application shall not be required. Notwithstanding anything to the contrary contained in the Plan, an Administrative Expense allowed against DLH shall be paid only from the DLH Estate, and an Administrative Expense allowed against ACP shall be paid only from the ACP Estate.

4.02    **Class 2 — Allowed Priority Claims (Unimpaired)**.

**Description:**    Class 2 consists of all Allowed Priority Non-Tax Claims and Priority Tax Claims.

**Treatment:**  All Allowed Class 2 Claims, if any, shall be paid in full on the later of (v) the Effective Date of the Plan, (w) the date such Claim was due and payable by its terms, (x) a date agreed to by the holder of such Claim, (y) within 30 days following the date such Claim, if contested, is Allowed by Final Order, and (z) if applicable and at the sole discretion of the Reorganized Debtors, the date(s) specified in 11 U.S.C. § 1129(a)(9)(C) with equal monthly installments of principal plus interest at 7% determined pursuant to applicable bankruptcy or federal law. Notwithstanding anything to the contrary contained in the Plan, an Allowed Priority Claim allowed against DLH shall be paid only from the DLH Estate, and an Allowed Priority Claim allowed against ACP shall be paid only from the ACP Estate.

4.03    **DLH Class 3 — Allowed Secured Claims (Impaired)**.

**Description:** Class 3 (and each Subclass and subdivision thereof, respectively) consists of Claims against DLH that are Secured Claims by virtue of 11 U.S.C. § 506(a) of the Bankruptcy Code, to the extent of the value of Debtors' interest in the property securing such Claim.

DLH Secured Creditors fall into six general subclasses:

**DLH Class 3 Subclass A**.  **Pool 1:  Compass Bank Land Loan.**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 1. Pool 1 contains parcels subject to the liens of Compass as set forth in **Exhibit A-1** hereto. Most parcels in Pool 1 are Development Ready.

**DLH Class 3 Subclass B**.     **Pool 2:  Hutchins Industrial Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 2. Pool 2 contains parcels subject to the liens of various seller financings as set forth in **Exhibit A-2** hereto. All or substantially all of the parcels in Pool 2 are Development Ready.

**DLH Class 3 Subclass C**.     **Pool 3:  ABOT Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 3.  Pool 3 contains parcels subject to the liens of ABOT as set forth in **Exhibit A-3** hereto.  While some parcels in the ABOT Pool are Development Ready, others are anticipated to take longer to develop.

**DLH Class 3 Subclass D**.     **Pool 4:  Seller Financing Pool**

Claims:  All Allowed Secured Claims which are secured by liens upon any one or more parcels in Pool 4.  Pool 4 contains parcels subject to the liens of various seller financings as set forth in **Exhibit A-4** hereto.  While some parcels in the Seller Financing Pool are Development Ready, the majority of the parcels in Pool 4 are anticipated to take longer to be developed or sold.

**DLH Class 3 Subclass E**.     **Great Western Bank**

Claim:   The Allowed Secured Claim of Great Western Bank for a loan of approximately $47.4 million as of the Petition Date secured by (i) a first lien on land and improvements on a 178 acre auto auction facility leased to ADESA, Inc. under a 20 year, triple net lease, and (ii) a $1.2 million replacement lien provided by the Bankruptcy Court without prejudice to whether payments are under the replacement lien are to be applied to principal or interest.

**DLH Class 3 Subclass F.     Compass Bank – Building Loan**

Claim:   The Allowed Secured Claim of Compass Bank for a loan of approximately $26.3 million as of the Petition Date, secured by liens on the real property and improvements identified by DLH as Buildings A and B.  The Claim of Compass Bank in Subclass F is less than fully secured due to low occupancy.

**Treatment:**

**DLH Class 3 Subclass A:  Pool 1 – Compass Pool**

(a)     Creation of Pool 1 Notes.   Compass, as the holder of an Allowed Secured Claim against DLH secured by a lien against all of the Pool 1 Parcels, shall receive a Pool 1 Variable Pay Note (the "**Pool 1 Note**") in the amount of such Allowed Secured Claim.  The Pool 1 Note will be issued by Reorganized DLH.  All Parcel Senior Liens securing Allowed Secured Claims in this Subclass shall remain in place, as modified and extended pursuant to the Parcel Senior Lien Modifications to be executed and recorded concurrently with the issuance of the Pool 1 Note, and shall continue to be valid and perfected liens upon the Pool 1 Parcels until the earlier of the following: (i) any Parcel Senior Lien is released as described below, (ii) Compass forecloses upon the Parcel Senior Lien and Reorganized DLH has no remaining rights under applicable law to redeem the property so foreclosed, (iii) Reorganized DLH transfers any parcel or parcels subject to a Parcel Senior Lien to Compass in full or partial satisfaction of the Pool 1Note, or (iv) the Pool 1 Note issued to the holder of the Allowed Secured

Claim in this Subclass has been paid in full.

(b)     Terms of Pool 1 Note. Pool 1 Note shall accrue interest at 7.25% per annum and all unpaid principal and interest accrued shall become due and payable on the fifth (5th) anniversary of the Effective Date.  The Pool 1 Note will be paid from the (i) Release Price as to any parcel, when and if Compass is requested to release the Parcel Senior Lien on such a parcel, parcels or the remainder of a parcel securing such a Pool 1 Note, and (ii) quarterly from Secured Creditor Pool 1 Net Proceeds.  All payments  of the Release Price on the Pool 1 Note shall be applied in reduction of the principal balance of the Pool 1 Note, and all payments of the Secured Creditor Pool 1 Net Proceeds shall be applied first to payment of accrued but unpaid interest and then in reduction of the principal balance of the Pool 1 Note.

(c)     Security for Pool 1 Note.  The Pool 1 Note shall be secured by the existing Parcel Senior Liens securing the Allowed Secured Claim for which the Pool 1 Note is issued, as modified by the Parcel Senior Lien Modification.

Upon receiving the lesser of (i) the Release Price for any parcel, (ii) an agreed amount negotiated between Reorganized DLH and the Pool 1 Noteholder, or (iii) the remaining amount due and owing on the related Pool 1 Note, the Pool 1 Noteholder shall release the Parcel Senior Liens on such a parcel, parcels or the remainder of a parcel.  To the extent to which Parcel Noteholder agrees to release all of its Parcel Senior Liens for an amount less than the remaining amount due and owing on the related Pool 1 Note, such a Pool 1 Note shall be cancelled and the creditor shall not be entitled to assert an unsecured claim for any deficiency.  Notwithstanding the definition of DLH Net Sales Proceeds, a Parcel Noteholder shall not be required to release its Parcel Senior Lien unless such Parcel Noteholder actually receives the full amount set forth in this paragraph.  More specifically, no deduction from this amount shall be made for any of the adjustments set forth in the definition of DLH Net Sales Proceeds.

(d)     Reporting to Parcel Noteholders.   Reorganized DLH will provide quarterly reports, not later than sixty (60) days after the end of each calendar quarter, to the holder of the Pool 1 Note stating (i) whether any Pool 1 properties were sold during that quarter, and if so, setting forth the calculation of total Pool 1 Net Sales Proceeds for the quarter.  To the extent the holders of a Pool 1 Note execute an acceptable confidentiality agreement, as part of the quarterly report, Reorganized DLH shall make additional information with respect to the individual property sales available and shall provide a brief report regarding the current status of Reorganized DLH's attempts to sell the Pool 1 Parcels.  Upon request by the holder of a Pool 1 Note and after the holder of the Pool 1 Note executes a confidentiality agreement, Reorganized DLH shall provide all offers to purchase all or any portion of the Pool 1 Note's collateral to the Pool 1 Note holder within five (5) business days after receipt.

(e)     Trigger for Required Structured Sales.   In addition to the

foregoing, at the end of each month following the second (2nd), (3rd) and fourth (4th) anniversary dates of the Effective Date of the Plan (each such date being a "**Trigger Date**"), if the cumulative sum of all distributions to the holder of the Pool 1 Note including Release Prices and distributions to the holder of the Pool 1 Note from DLH Excess Cash Distributions, is less than the amount necessary to pay current through such Trigger Date all accrued but unpaid interest on the Pool 1 Note and to have reduced the balance of principal, interest and attorneys on the Pool 1 Note fees by not less than (i) $3.750 million by the second anniversary of the Effective Date, (ii) $ 6.0 million by the third anniversary of the Effective Date and, (iii) $9.0 million by the fourth anniversary of the Effective Date, then Compass may declare Reorganized DLH in default on the Pool 1 Note by written notice of default. Reorganized DLH shall have six months from receipt of such notice to cure and reinstate the Pool 1 Note. To effect a cure of such a default, Reorganized DLH may, at its option, either (1) pay interest current through such Trigger Date on the Pool 1 Note and make any required principal paydown out of other funds available to Reorganized DLH, or (2) convey the remaining Pool 1 property back to the Pool 1 Noteholder in full satisfaction of the Pool 1 Note, or (3) offer a structured sale, sealed bid or auction ("Structured Sale") of a sufficient portion of Pool 1 property to pay such interest current through the Trigger Date and make any required principal paydown or any Combination of (1) and (3). The reserve price for such parcels in such a Structured Sale shall be (i) at least equal to the Release Price for each parcel included in the Structured Sale, plus all normal and customary closing costs, and (ii) no greater than 175% of the Release Price for such a parcel unless the holder of the Pool 1 Note consents. In the event the Reserve Prices are not met for one or more parcels, Reorganized DLH shall consult with the Pool 1 Noteholder with respect to the appropriate disposition of the parcels. If Reorganized DLH elects to pay the accrued but unpaid interest and any required principal paydown on the Pool 1 Note current through the Trigger Date out of other available funds, such payment shall be made concurrently with the notice of such election. In the event that Reorganized DLH elects to conduct a Structured Sale, the written notice of such election shall include a description of the parcel or parcels selected for such Structured Sale, the proposed reserve prices for such parcels, and the manner in which such Structured Sale shall be conducted. Any Structured Sale must be closed and funded not later than six (6) months after the applicable Trigger Date.

(f)     Each Claim Separately Classified.     **DELETED – NOT APPLICABLE TO POOL 1.**

(g)     No Additional Liens or Refinancing Allowed Without Consent. Unless the Pool 1 Noteholder consents, beginning sixty (60) days after the Effective Date, Reorganized DLH may not grant new or additional liens on any Pool 1 Parcel unless the proceeds of the loan are to cure any default.

**DLH Class 3 Subclass B**:     **Pool 2 – Hutchins Industrial Pool**

(a)     Creation of Pool 2 Notes.  Each holder of an Allowed Secured Claim against DLH secured by a lien against one or more of the Pool 2 Parcels shall receive a Pool 2 Note (a "**Pool 2 Note**", and collectively the "**Pool 2 Notes**") in the amount of such Allowed Secured Claim.  The Pool 2 Notes will be issued by Reorganized DLH.  All Parcel Senior Liens securing Allowed Secured Claims in this Subclass shall remain in place, as modified and extended pursuant to the Parcel Senior Lien Modifications to be executed and recorded concurrently with the issuance of the Pool 2 Notes, and shall continue to be valid and perfected liens upon the Pool 2 Parcels until the earlier of the following: (i) any Senior Parcel Lien is released as described below, (ii) Parcel Noteholder forecloses the Senior Parcel Lien upon the parcel or parcels on which they have a lien and Reorganized DLH has no remaining rights under applicable law to redeem the property so foreclosed, (iii) Reorganized DLH transfers any  parcel or parcels subject to a Parcel Senior Lien to the applicable Parcel Noteholder in satisfaction of the Parcel Note, or (iv) until the Pool 2 Note issued to the holder of the Allowed Secured Claim in this Subclass has been paid in full.

(b)     Terms of Pool 2 Notes.  Pool 2 Notes shall accrue interest at 5.5% per annum and all unpaid principal and interest accrued shall become due and payable on the fifth (5th) anniversary of the Effective Date, subject to three (3) one-year extension options as provided below.  The Pool 2 Notes shall be payable in semi-annual payments, with interest only on such Pool 2 Notes payable for 3 years after the Effective Date, and thereafter in equal payments of principal and interest sufficient to fully amortize the then outstanding balance of the Pool 2 Notes over ten (10) years (calculated from the 3rd anniversary of the Effective Date), with a balloon payment due at the Maturity Date.  Payments of interest on the Pool 2 Notes shall be due semiannually in arrears, with the first payment due six months after the Effective Date.  Commencing with the date which is three and one-half years after the Effective Date, Reorganized DLH shall make semiannual payments of principal and interest on each Pool 2 Note in equal semiannual amounts calculated to fully amortize the Pool 2 Notes over ten (10) years, calculated  from the third anniversary of the Effective Date.   All distributions to the holders of Pool 2 Notes from Secured Creditor Pool 2 Net Proceeds shall be credited against semiannual payments of interest and principal due under the Pool 2 Notes, so that, for any six month period for which there is either an interest payment due to the holders of the Pool 2 Notes or a payment of principal and interest due to the holders of the Pool 2 Notes, such holders shall receive the greater of: (1) the Secured Creditor Pool 2 Net Proceeds distributed for such six month period; or (2) the semiannual payment of interest or principal and interest due for such six month period.  To the extent to which the underlying Allowed Secured Claim which gave rise to a Pool 2 Note was non-recourse to DLH, the Pool 2 Note issued to the holder of such Allowed Secured Claim shall also be non-recourse to DLH.  Each such Pool 2 Note will be paid from: (i) the Release Price for such Pool 2 Note when and if Parcel Noteholder is requested to release the Parcel Senior Lien on such a parcel, parcels or the remainder of a parcel securing such a Pool 2 Note, and (ii) quarterly, from Secured Creditor Pool

2 Net Proceeds (which shall be distributed pro rata based on the then outstanding balance on all remaining Pool 2 Notes after taking into account distributions of the Release Price to the various holders of Pool 2 Notes during the quarter in question). The payment of the Release Price shall be applied to all accrued but unpaid interest and all principal due on the Pool 2 Note to which such Release Price relates. All payments from Secured Creditor Pool 2 Net Proceeds on the Pool 2 Notes shall be applied: (x) first, to payment of accrued but unpaid interest on each Pool 2 Note that remains unpaid, and (y) second in reduction of the principal balance of the Pool 2 Note.

(c)     <u>Annual Adjustment of Pool 2 Note Principal Balances</u>. Commencing on the first anniversary of the Effective Date, and annually thereafter on each anniversary date of the Effective Date prior to (but not including) the Maturity Date of each Pool 2 Note (such Maturity Date being determined after taking into account the exercise of any extension option by Reorganized DLH for each Pool 2 Note), the then outstanding principal balance shall be adjusted by an amount equal to the <u>product </u>of (x) the principal balance of the Pool 2 Note being adjusted, multiplied by the <u>lesser</u> of: (1) the percentage increase in the Consumer Price Index (as hereinafter defined) from (i) the Effective Date to the first anniversary date of the Effective Date for the first such annual adjustment, or (ii) from the immediately preceding anniversary date of the Effective Date to the anniversary date of the Effective Date for which such adjustment is being calculated, or (2) 2.5%. On each such adjustment date, the adjustment amount shall be added to the principal balance of each Pool 2 Note then outstanding. As used herein, the term "Consumer Price Index" shall mean the Consumer Price Index - All Urban Consumers, published monthly by the Bureau of Labor Statistics, United States Department of Labor, and the Consumer Price Index for the Effective Date and for any anniversary thereof which is a date for which the determination under this Paragraph is to be made shall be the most recently monthly determination of the Consumer Price Index immediately preceding such date.

(d)     <u>Options To Extend Maturity of Pool 2 Notes</u>. Reorganized DLH shall have three (3) one-year options to extend the Maturity Date of the Pool 2 Notes beyond the stated maturity of the fifth (5th) anniversary date of the Effective Date. Each such option shall be exercised independently, and Reorganized DLH may elect, at its option, to exercise an extension option either for all Pool 2 Notes then outstanding, or for one or more, but less than all, of the Pool 2 Notes then outstanding. Reorganized DLH shall give written notice to the holder of each Pool 2 Note to be extended not less than 60 days prior to its Maturity Date (as it may have been extended pursuant to any previously exercised extension option). In order for Reorganized DLH to exercise any of the extension options as to any of the Pool 2 Notes, Reorganized DLH must: (a) not be in default of any payment of principal and or interest due under the Pool 2 Notes being extended; (b) have timely given written notice of its election to exercise the extension option; and (c) make a principal reduction payment, on or before the fifth anniversary date of the

Effective Date (for the first extension option), or on or before the then current maturity date of the Pool 2 Notes, as extended (for each subsequent extension option), in an amount equal to two percent (2%) of the then outstanding principal balance of the Pool 2 Notes being extended. Upon the extension of the Maturity Date of any Pool 2 Notes, semi-annual payments of principal and interest, calculated to fully amortize the Pool 2 Note over a ten (10) year period, shall continue to be due on the Pool 2 Notes until the extended Maturity Date, at which time all sums due, both principal and accrued but unpaid interest, shall become due and payable.

(e)    Special Treatment for Short Sales Recommended by Reorganized DLH. Notwithstanding any other provision in this section, in the event that the parcel or parcels securing the Allowed Secured Claim for which a non-recourse Pool 2 Note was issued are sold to a third party on the recommendation of Reorganized DLH and with the consent of the Parcel Noteholders of the Pool 2 Note(s) secured by such Pool 2 parcels, and the Pool 2 Note(s) secured by such parcel or parcels has not been paid in full as a result of such sale, such Pool 2 Note shall continue to participate in distributions, if any, of Secured Creditor Pool 2 Net Proceeds until either the Pool 2 Note has been paid in full or the Pool 2 Note matures according to its terms.

(f)    Security for Pool 2 Notes. Each Pool 2 Note is secured by (a) the existing Parcel Senior Lien securing the Allowed Secured Claim for which the Pool 2 Note was issued, and (b) an additional *pro rata* interest in a subordinate lien on all other Pool 2 Parcels. Reorganized DLH shall file in the Deed Records of Dallas County, Texas a Subordinate Lien Deed of Trust on the Pool 2 Parcels promptly after the later to occur of (i) the Effective Date, or (ii) the receipt by DLH of fully executed Parcel Senior Lien Modifications executed by the holders of all Pool 2 Notes. DLH, as the agent of the Pool 2 Noteholders, shall have full power and authority to execute and deliver partial releases from the Subordinate Lien Deed of Trust on the Pool 2 Parcels conditioned only upon delivery of directions to a Title Insurance Company or Escrow Agent to deliver the Secured Creditor Pool 2 Net Proceeds into an escrow account for the benefit of the holders of the Pool 2 Notes. No holder of a Pool 2 Note, either individually or collectively, shall have the right to foreclose upon the subordinate lien described herein unless and until the earlier of: (a) sixty (60) days after the final Maturity Date of the Pool 2 Notes; or (b) after any default by Reorganized DLH in (i) paying over any Secured Creditor Pool 2 Net Proceeds to an escrow account for the benefit of the holders of the Pool 2 Notes, or (ii) causing or directing the payment of quarterly distributions of the Secured Creditor Pool 2 Net Proceeds to the holders of the Pool 2 Notes, and either such default is not cured within ten (10) business days after written notice from any Pool 2 Note holder. In the event that a foreclosure of the Subordinate Lien Deed of Trust is authorized under the preceding sentence, such foreclosure shall be commenced upon the written consent and direction of the holders of two-thirds (2/3) in amount of the remaining outstanding balance of the Pool 2 Notes directed to the Trustee named

in the Subordinate Lien Deed of Trust, or to any substitute trustee which may be appointed by the holders of not less than two-thirds (2/3) in amount of the Pool 2 Notes.

Upon receiving the lesser of (i) the Release Price for any parcel, (ii) an agreed amount negotiated between Reorganized DLH and a Parcel Noteholder, or (iii) the remaining amount due and owing on the related Pool 2 Note, Parcel Noteholder shall release its Parcel Senior Lien on such a parcel. To the extent to which a creditor agrees to release all of its retained liens for an amount less than the remaining amount due and owing on the related Pool 2 Note, such a Pool 2 Note shall be cancelled and the creditor shall not be entitled to assert an unsecured claim for any deficiency. Notwithstanding the definition of DLH Net Sales Proceeds, Parcel Noteholder shall not be required to release their Parcel Senior Lien unless the creditor actually receives the amount set forth in this paragraph. More specifically, no deduction from this amount shall be made for any of the adjustments set forth in the definition of DLH Net Sales Proceeds.

With respect to the sale of any parcel in Pool 2, once the Secured Creditor Pool 2 Net Proceeds, if any, are directed to be deposited into an escrow or reserve account or are actually paid or distributed to the holders of the Pool 2 Notes, the subordinated lien granted against that parcel pursuant to this section shall be released and discharged automatically pursuant to this Plan. In such circumstances, Reorganized DLH shall have full power and authority to execute, as agent for the holders of the Pool 2 Notes, and deliver to any Title Company or closing agent, any partial release of the subordinated lien on the Pool 2 parcels, and the written consent of any Parcel Noteholder shall not be required to release and discharge the subordinated lien. In addition, to the extent to which Reorganized DLH transfers a parcel to the applicable Parcel Noteholder holding the Parcel Senior Lien on that parcel in satisfaction of the Pool 2 Note secured by such parcel, the subordinate lien granted against such parcel so transferred shall be automatically released and discharged as well, and Reorganized DLH shall be fully authorized and empowered to execute and deliver a partial release of the subordinate lien in connection with any transfer in lieu of foreclosure of a Parcel Senior Lien on a Pool 2 parcel without any further consent of the remaining holders of the Pool 2 Notes.

(g) <u>Reporting to Parcel Noteholders</u>. Reorganized DLH will provide quarterly reports, not later than sixty (60) days after the end of each calendar quarter, to all holders of Pool 2 Notes stating whether any Pool 2 properties were sold during that quarter, and if so, setting forth the calculation of total Pool 2 Net Sales Proceeds for the quarter. To the extent the holders of Pool 2 Notes execute an acceptable confidentiality agreement, as part of the quarterly report, Reorganized DLH shall make the additional information with respect to the individual property sales available and shall provide a brief report regarding the current status of Reorganized DLH's attempts to sell the Pool 2 Parcels.

(h) <u>Each Claim Separately Classified</u>. Each Allowed Claim in Pool 2 which has its own identifiable and separate collateral will be in its own class under the Plan such that each secured claim in this group will constitute its own

class for purposes of voting on the Plan; however, participants in any such claim do not constitute a separate class.

(i) No Additional Liens or Refinancing Allowed Without Consent. Unless 70% in the aggregate by principal amount of all Parcel Noteholders holding a Parcel Senior Lien on each Pool 2 Parcel owned by Reorganized DLH consent, beginning sixty (60) days after the Effective Date, Reorganized DLH may not grant a new or additional liens (exclusive of the Pool 2 Subordinate Lien Deed of Trust for the benefit of all Pool 2 Notes) on any Pool 2 Parcel unless and until all of the remaining Pool 2 Notes have been paid in full or will be paid in full as a result of the grant of such a lien.

**DLH Class 3 Subclass C**:    **Pool 3  ABOT  Pool**

**Treatment:**   On or before fourteen (14) days after the Effective Date, DLH shall surrender all of the property in the ABOT Pool to ABOT in full and complete satisfaction of ABOT's Claims.  Because the value of the property in Pool 3 exceeds the amount of ABOT's Allowed Secured Claim, the surrender of all Pool 3 property to ABOT shall be deemed to fully satisfy all obligations of any guarantor of ABOT's Secured Claim.

**DLH Class 3 Subclass D**:    **Pool 4  Seller Financing Pool**

**Treatment:**       DLH shall surrender to the Secured Creditors holding Pool 4 Allowed Secured Claims on the Pool 4 parcels identified as Parcels 161-164 (Coffman Investments) and Parcels 93-95 and 156-157 (Southport Properties, LP) on or before the Effective Date in full satisfaction all such Claims.  Those Pool 4 Secured Creditors are Unimpaired under the Plan.  With respect to the remaining Pool 4 parcels, Reorganized DLH shall retain such parcels for up to six (6) months after the Effective Date in order to market such Pool 4 parcels through auctions, sealed bid, or other structured sales. Certain other Pool 4 Parcels may be sold by auction by DLH with Bankruptcy Court approval prior to the Effective Date.  Each Secured Creditor holding a lien on a Pool 4 parcel being retained by Reorganized DLH shall receive a Note (a "**Pool 4 Note**") in the full amount of the Allowed Claim of such Pool 4 Secured Creditor as of the Effective date.

(a) Creation of Pool 4 Notes.  Each holder of an Allowed Secured Claim against DLH secured by a lien against one or more of the Pool 4 Parcels shall receive a Pool 4 Note (a "**Pool 4 Note**", and collectively the "**Pool 4 Notes**") in the amount of such Allowed Secured Claim.  The Pool 4 Notes will be issued by Reorganized DLH.  All Parcel Senior Liens securing Allowed Secured Claims in this Subclass shall remain in place, as modified and extended to reflect a maturity of six (6) months after the Effective Date, and shall continue to be valid and perfected liens upon the Pool 4 Parcels until the earlier of the following: (i) any Senior Parcel Lien is released as described below, (ii) Parcel Noteholder forecloses the Senior Parcel Lien upon the parcel or parcels on which they have a lien and Reorganized DLH has no remaining rights under applicable law to

redeem the property so foreclosed, (iii) Reorganized DLH transfers any parcel or parcels subject to a Parcel Senior Lien to the applicable Parcel Noteholder in satisfaction of the Parcel Note, or (iv) until the Pool 4 Note issued to the holder of the Allowed Secured Claim in this Subclass has been paid in full.

(b)     <u>Terms of Pool 4 Notes.</u>  Each Pool 4 Note shall accrue interest at same non-default contract rate of interest specified in the notes evidencing the Allowed Secured Claims in Pool 4.  All accrued but unpaid interest and all principal of the Pool 4 Notes shall become due and payable in full six (6) months after the Effective Date, unless the maturity date of a Pool 4 Note is extended as provided in Paragraph (f) below.  To the extent to which the underlying Allowed Secured Claim which gave rise to a Pool 4 Note was non-recourse to DLH, the Pool 4 Note issued to the holder of such Allowed Secured Claim shall also be non-recourse to Reorganized DLH.  Each such Pool 4 Note will be paid in full from the Net Sales Proceeds upon the sale of the parcel in Pool 4 securing such Pool 4 Note.

(c)     <u>Security for Pool 4 Notes.</u>  Each Pool 4 Note shall be secured by the existing Parcel Senior Lien securing the Allowed Secured Claim for which the Pool 4 Note was issued, as modified and extended to reflect a maturity date of six (6) months after the Effective Date.  Upon receiving the lesser of (i) the Release Price for any parcel, (ii) an agreed amount negotiated between Reorganized DLH and a Parcel Noteholder, or (iii) the remaining amount due and owing on the related Pool 4 Note, Parcel Noteholder shall release its Parcel Senior Lien on such a parcel.  To the extent to which a creditor agrees to release all of its retained liens for an amount less than the remaining amount due and owing on the related Pool 4 Note, such Pool 4 Note shall be cancelled and the creditor shall not be entitled to assert an unsecured claim for any deficiency.  Notwithstanding the definition of DLH Net Sales Proceeds, Parcel Noteholder shall not be required to release their Parcel Senior Lien unless the creditor actually receives the amount set forth in this paragraph. More specifically, no deduction from this amount shall be made for any of the adjustments set forth in the definition of DLH Net Sales Proceeds.

(d)     <u>Reporting to Parcel Noteholders</u>.  Reorganized DLH will provide quarterly reports, not later than sixty (60) days after the end of each calendar quarter, to all holders of Pool 4 Notes stating whether any Pool 4 properties were sold during that quarter.  To the extent the holders of Pool 4 Notes execute an acceptable confidentiality agreement, as part of the quarterly report, Reorganized DLH shall make the additional information with respect to the individual property sales available and shall provide a brief report regarding the current status of Reorganized DLH's attempts to sell the Pool 4 Parcels.

(e)     <u>Each Claim Separately Classified.</u>  Each Allowed Claim in this group which has its own identifiable and separate collateral will be in its own class under the Plan such that each secured claim in this group will constitute its own class for purposes of voting on the Plan; however, participants in any such

claim do not constitute a separate class.

(f) <u>Maturity of Pool 4 Notes</u>.  The Pool 4 Notes shall be payable in full, with interest, on the earlier to occur of: (a) the closing of the sale of any Pool 4 parcel securing a Pool 4 Note; or (b) either (i) six (6) months after the Effective Date, for any Pool 4 Note secured by a Pool 4 parcel which has not been sold by Reorganized DLH, and for which no binding contract for sale has been executed prior to such maturity date, or (ii) for any Pool 4 Note secured by a Pool 4 parcel for which Reorganized DLH has receive a binding contract to sell such parcel prior to the end of six (6) months after the Effective Date, sixty days after the end of the sixth month after the Effective Date.  Upon the maturity of any Pool 4 Note secured by a Pool 4 parcel which has not been sold by Reorganized DLH, Reorganized DLH shall, within twenty (20) days after such maturity date, either (1) pay the Pool 4 Note in full, both principal and interest, or (2) deliver to the holder of the Pool 4 Note secured by such Pool 4 parcel, either a deed in lieu of foreclosure or a written consent to immediate foreclosure and surrender of possession of such Pool 4 Parcel, together with an executed partial release of such parcel from the subordinate lien securing the Term Loan,  at the option of the holder of the Pool 4 Note in full satisfaction of its Pool Note.

(g) <u>Option to Require Surrender of Pool 4 Parcel</u>.  Any Secured Creditor in Pool 4 may elect, at its option, exercisable not earlier than ninety (90) days after the Effective Date, and provided that the Pool 4 parcel which secures such Secured Creditor's Allowed Secured Claim has not been previously sold, is not under contract to sell which is scheduled to close within 150 days after the Effective Date to receive the immediate surrender of its collateral, together with an executed partial release of such parcel from the subordinate lien securing the Term Loan, in full satisfaction of its Pool 4 Note.

**DLH Class 3 Subclass E.     Great Western Bank**

**Treatment**:  After notice and a hearing, the Bankruptcy Court entered the Great Western Settlement Order, approving the Great Western Settlement Agreement. The Great Western Settlement Agreement was timely accepted, signed and delivered by all parties thereto and is in full force and effect. The Great Western Settlement Order and Great Western Settlement Agreement are incorporated herein by reference for all purposes. Nothing contained in the Plan or any confirmation order shall alter or amend the terms and provisions of the Great Western Settlement Order and Great Western Settlement Agreement, and the claim of Great Western and BB&T shall be treated under the Plan only as they are treated therein.  The terms, conditions, and restrictions of the Great Western Settlement Agreement are incorporated herein by reference for all purposes, and so long as the Great Western Settlement Agreement has not been terminated by Great Western as therein provided, the treatment of Great Western's Allowed Secured Claim shall be as specified in the Great Western Settlement Order and Great Western Settlement Agreement.  No release, injunction, stay or other terms of the Plan shall apply to Great Western and BB&T, their claim, liens and Loan Documents,

except as set forth in the Great Western Settlement Order and the Great Western Settlement Agreement. Parties should review the Great Western Settlement Order and the attached Great Western Settlement Agreement for the entirety of the terms and conditions thereof. Great Western and BB&T shall retain all claims and rights and all liens, assignments of rents and other collateral as set forth in the relevant Loan Documents (as defined in the Great Western Settlement Order) to secure its claims against each and every of the Debtors in these bankruptcy cases. Notwithstanding anything contained herein seemingly to the contrary, the Great Western Settlement Order and the Great Western Settlement Agreement and all Loan Documents defined in the Great Western Settlement Order and the Great Western Settlement Agreement shall remain binding and enforceable against Debtors and their respective bankruptcy estates, Reorganized Debtors and their property, Great Western and BB&T, and all creditors and parties-in-interest. Debtors and Reorganized Debtors shall take any and all steps necessary to consummate and fully comply with the terms and provisions of the Great Western Settlement Order and the Great Western Settlement Agreement after confirmation of the Plan. It is not necessary for this provision to appear elsewhere in this document in order for it to apply to all provisions. Great Western is hereby granted an Allowed Secured DLH Class 3 Subclass E Claim in the amounts set forth in the Great Western Settlement Order and the Great Western Settlement Agreement.

Debtor has entered into a contract to sell the ADESA Property, which contract has been approved by the Bankruptcy Court. In the event that such contract to sell the ADESA Property is consummated, Great Western Bank shall be paid at the closing of such sale the full amount due under the Great Western Settlement Agreement. Currently, the closing of such sale is scheduled to occur on or about May 18, 2011. If that sale closes prior to the Effective Date, Great Western's Secured Claim will be Unimpaired under the Plan.

**DLH Class 3 Subclass F.     Compass Bank – Building Loan**

**Treatment:**     The following treatment, for purposes of discussion, assumes the current value of the buildings "as is" is approximately $23,537,000 and the face value of claims secured by the buildings is $26,313,000.

DLH has entered into a contract to sell the two buildings which secure the Compass Bank Building Loan, which contract has been approved by the Bankruptcy Court. In the event that such contract to sell the property securing the Compass Bank Building Loan is consummated, Compass Bank shall be paid at the closing of such sale in full satisfaction of its DLH Class 3 Subclass F Claim the full amount due to Compass from the sale proceeds (less all closing costs, including but not limited to title costs, survey, brokerage fees, tax prorations and all contractual obligations related to the EnKon Lease), and any Cash Collateral of Compass Bank (which may be used by Reorganized Debtor to satisfy any obligations to any tenant under any lease, and to pay tax prorations and costs of closing the sale) as provided by the terms of the Bankruptcy Court's Order approving such sale (the "**Compass Sale Order**"), and Compass Bank shall have an Allowed Unsecured Claim against DLH as a result of the deficiency in an amount

calculated as provided in such Compass Sale Order. The closing of this sale is currently scheduled to occur on or about May 16, 2011.  In the event the closing of the sale occurs prior to the Effective Date, Compass Bank's Secured Claim with respect to the Building Loan will be fully satisfied at the closing, and this Class will be Unimpaired under the Plan.  In the event any such sale does not close prior to the Effective Date, Compass Bank shall receive a Note with face value equal to Compass Bank's Allowed Secured Claim secured by Building A and Building B ("**Compass Bank Building Note**"), secured by its existing liens on DLH Buildings A and B, which shall accrue interest at 6.25% per annum and mature in 5 years.

Compass Bank will receive all cash flow from buildings A and B after reasonable actual expenses and agreed amounts of reserves, including market property management fees payable to DLH or its designee.  Certain monies which would otherwise be paid to Compass Bank pursuant to this provision will be put into an escrow account (in which Compass Bank will hold a security interest) and used for costs necessary for design, permitting and construction of tenant improvements and legal and brokerage fees incurred in  connection with new leases ("**Leasing Escrow Account**").

Monies for real estate tax payments shall be escrowed from rents (for reorganized debtor) and from the additional reimbursements paid by tenants on a monthly basis. Compass Bank shall also be granted a security interest in that escrow account.

4.04   **DLH Class 4 — Allowed Unsecured Claims (Impaired)**.

**Description:** Class 4 consists of all Allowed Unsecured Claims against DLH, as more fully described and defined in the Article I definitions hereof.

**Treatment:**  Each holder of a Non-Schedule 1 Allowed Unsecured Claim against DLH may elect one or more of the following treatment options, and may divide its Non-Schedule 1 Allowed Unsecured Claim as it determines between such options:

a)   Receive a Variable Pay Note in the principal amount of  50% of the electing holder's Allowed Claim payable without interest from 75% of DLH Unsecured Creditor Net Proceeds, 75% of any DLH Excess Cash Distributions and 75% of the DLH Minimum Annual Distributions paid to the DLH Disbursing Agent, with a seven (7) year maturity from the Effective Date if not paid in full prior to that time ("**DLH 50% Notes**"); or

b)   Receive a Variable Pay Note in the principal amount of 100% of the electing holder's Allowed Claim payable with interest accruing at 2% per annum (unless Additional Interest applies) from 25% of DLH Unsecured Creditor Net Proceeds, 25% of any DLH Excess Cash Distributions and 25% of the DLH Minimum Annual Distributions paid to the DLH Disbursing Agent, until the DLH 50% Notes are paid in full and thereafter payable from 100% of DLH Unsecured Net Proceeds, 100% of any DLH Excess Cash Distributions and 100% of the

DLH Minimum Annual Distributions paid to the DLH Disbursing Agent, with a ten (10) year maturity from the Effective Date if not paid in full prior to that time ("**DLH 100% Notes**").

In the event the holder of a Non-Schedule 1 Allowed Unsecured Claim elects, in part or in whole, option (a) above, and the holder of the Non-Schedule 1 Allowed Unsecured Claim also has a guaranty of such claim from ACP, the holder of such Claim shall be not be permitted to make any different election (or in any different division) with respect to its Non-Schedule 1 Allowed Unsecured Claim against ACP, and, with respect to a divided election by the holder of any such Non-Schedule 1 Allowed Unsecured Claim, each DLH 50% Note and ACP 50% Note shall be considered a single Claim, and each DLH 100% Note and ACP 100% Note shall be considered a single Claim, for purposes of applying the "single recovery rule."

The Disbursing Agent shall be the recipient of the DLH Minimum Annual Distributions as paid by Reorganized DLH and they shall be used by the Disbursing Agent to fund payments to holders of Allowed DLH Class 4 Claims under the DLH 50% Notes and the DLH 100% Notes.

The Disbursing Agent for DLH shall hold and control all distributions of DLH Unsecured Creditor Net Sales Proceeds, all distributions of DLH Excess Cash Distributions which DLH elects to pay on Non-Schedule 1 Allowed Unsecured Claims and all DLH Minimum Annual Distributions in escrow, and shall make quarterly distributions from such escrowed funds pro rata to the beneficiaries of DLH 50% Notes and DLH 100% Notes as provided above. There shall be one DLH 50% Note issued to the Disbursing Agent on behalf of all holders of Allowed DLH Class 4 Claims electing to receive DLH 50% Notes and one DLH 100% Note issued to the Disbursing Agent on behalf of all holders of Allowed DLH Class 4 Claims electing to receive DLH 100% Notes. The Disbursing Agent for DLH shall have exclusive authority, acting on behalf of those electing DLH 50% Notes and those electing DLH 100% Notes, to take any action or give any notice or demand: (a) in connection with any claimed or asserted default by Reorganized DLH under the Plan or the Confirmation Order; (b) in connection with any claimed or asserted default by Reorganized DLH under the DLH 50% Notes or the DLH 100% Notes; and (c) in connection with the election or enforcement of any remedy under the DLH 50% Notes or the DLH 100% Notes, and no individual beneficiary of a DLH 50% Note or a DLH 100% Note shall have any right or authority to give any notice or demand or take any action with respect to any such events except through the Disbursing Agent. The holders of not less than 60%, in the aggregate, of the outstanding principal amount of the DLH 50% Notes and the DLH 100% Notes may: (a) serve a written demand upon the Disbursing Agent to deliver a notice or demand or take an action with respect to any of the foregoing events, or (b) in the event that the Disbursing Agent fails to deliver any such notice or demand or take any such action after written demand and without justification, call for an election of all of the holders of the DLH 50% Notes and the DLH 100% Notes to remove the Disbursing Agent and elect a successor Disbursing Agent.

The holders of Schedule 1 Allowed Unsecured Claims have agreed that all such Claims shall be subordinated in priority and payment until the DLH 50% Notes and the DLH 100% Notes have been paid in full. The holders of Schedule 1 Allowed Unsecured Claims shall not participate in the treatment of the holders of Non-Schedule 1 Allowed Unsecured Claims set forth herein, including the DLH 50% Notes and the DLH 100% Notes and any payments received from the Disbursing Agent with regard thereto. Schedule 1 Allowed Unsecured Claims shall be paid in full, but without interest, only after payment in full of Non-Schedule 1 Allowed Unsecured Claims and Allowed Class 5 Claims, but before payment of Allowed Class 6 Claims and Class 7 Interests.

Notwithstanding anything to the contrary set forth herein, the failure of Reorganized DLH to pay to the Disbursing Agent the DLH Minimum Annual Distributions due in any year, provided that all DLH Unsecured Creditor Net Proceeds are paid to the Disbursing Agent, shall not constitute a default under the Plan, and the consequence of any such failure shall be limited to the increased interest due from Reorganized DLH on any such shortfall and/or on the principal balance due under the DLH 100% Notes and/or the DLH 50% Notes and the suspension of Bonus Pool payments to Richard S. Allen, as provided in Section 1.59 of the Plan. Any failure by Reorganized DLH to pay to the Disbursing Agent all DLH Unsecured Creditor Net Proceeds as and when due shall constitute a default under the Plan.

4.05 **DLH Class 5 - Administrative Convenience Claims (Impaired)**.

**Description:** Class 5 consists of all Non-Schedule 1 Allowed Unsecured Claims (but not any Class 6 Claims) against DLH in amounts up to and including $20,000.00, together with all otherwise Allowed Class 4 Claims (but not any Class 6 Claims) exceeding $20,000.00 where the holder of any such Claim voluntarily agrees to reduce all of such holder's Claims to $20,000.00 on or before the deadline for filing ballots accepting or rejecting the Plan as may be set by the Bankruptcy Court, but excluding all otherwise Allowed Class 5 Claims where the holder of any such claim opts to be treated as a member of Class 4. Any holder of an Allowed Class 5 Claim which votes to reject the Plan shall be deemed to have elected to be treated as a member of DLH Class 4 and shall receive a DLH Ten Year Note in full satisfaction of its Claim.

**Treatment:** All holders of Allowed Class 5 Claims, if any, shall receive a cash payment equal to twenty percent (20%) of the amount of their Allowed Class 5 Claim in full satisfaction of such Claim. Such payment shall be paid in full on the later of (v) sixty (60) days after the Effective Date of the Plan, (w) the date such Claim was due and payable by its terms, (x) a date agreed to by the holder of such Claim, or (y) within 30 days following the date such Claim, if contested, is Allowed by Final Order.

4.06 **DLH Class 6 - Reimbursement Claims Against DLH (Impaired)**

**Description:** ACP has remaining obligations under guaranties of DLH

obligations in the amount of approximately $2.99 Million owed to Compass Bank. In addition, Richard S. Allen and Richard S. Allen, Inc. have also guaranteed certain indebtedness owed by DLH.

**Treatment:** To the extent to which (i) ACP, Richard S. Allen and/or Richard S. Allen, Inc. makes a payment under one or more of their guaranties of DLH indebtedness and (ii) such payment satisfies or otherwise discharges, in whole or in part, the obligation of Reorganized DLH under the Plan to the holder of the guaranty, ACP, Richard S. Allen and/or Richard S. Allen, Inc., as appropriate, shall receive DLH Class B Preferred Interests in DLH, in a par value equal to the amount of such Claims, in full satisfaction of such Reimbursement Claims.

### 4.07 **DLH Class 7 — Equity Interest Holders (Impaired)**.

**Description:** Class 7 consists of all holders of equity Interests in DLH.

**Treatment:** Except for (i) equity interests in DLH issued as part of the Exit Financing with the consent of the existing interest holders and/or (ii) DLH Class B Preferred Interests in DLH issued to ACP, Richard S. Allen, and/or Richard S. Allen, Inc. under the Plan on account of their DLH Class 6 Claims, all equity holders in DLH shall retain their existing equity interests in DLH. Existing Equity Interests in DLH are impaired under the Plan as a result of: (a) the dilution of the interests of existing Equity Interest holders resulting from the issuance of any new Equity Interests required as part of the Exit Financing, and the issuance of new Equity Interests with preferences as to both returns and liquidation distributions over existing Equity Interests with the creation and distribution of the DLH Class B Interests; and (b) the dilution of existing Equity Interests' control over Reorganized DLH resulting from the voting rights granted to the Creditors Representative on the Board of Reorganized DLH, the voting rights of all new Equity Interests issued, as a result of the Exit Financing or under the Plan, and the right of the holders of the new DLH Class B Interests.

### 4.08 **ACP Class 3 — Allowed Secured Claims (Impaired)**.

**Description:** Class 3 (and each Subclass and subdivision thereof, respectively) consists of Allowed Secured Claims against ACP that are secured Claims by virtue of 11 U.S.C. § 506(a) of the Bankruptcy Code, to the extent of the value of Debtors' interest in the property securing such Claim.

**Treatment:** Each holder of an Allowed Secured Claim secured by a lien against assets of ACP will receive an ACP Secured Variable Pay Note ("**ACP Secured Variable Pay Note**" or collectively "**ACP Secured Variable Pay Notes**") in the amount of such Allowed Claim. Each ACP Secured Variable Pay Note shall be secured by the security interest securing the applicable Allowed Secured Claim.

ACP Secured Variable Pay Notes shall accrue interest at 7.25% per annum.

       (i)     **Tim Foley Claim**. To the extent Mr. Foley's Claim is allowed as

a Secured Claim, the ACP Secured Variable Pay Note issued to Mr. Foley will be paid from the proceeds and distributions received by ACP on which Mr. Foley has a validly perfected lien until the Allowed Amount of such claim is paid in full plus interest at 7.25% per annum or five years after the Effective Date at which time all amounts will be due and owing.

(ii)     **Pacific Western Claim.**  To the extent Pacific Western's Claim is allowed as a Secured Claim, Pacific Western shall receive 10% of all ACP Net Sales Proceeds, not to exceed $400,000 of principal and interest payments for any calendar year from the Effective Date.  On each anniversary of the Effective Date, if Pacific Western has not received at least $250,000 in proceeds for the proceeding year, Reorganized ACP shall make an additional payment to Pacific Western within sixty (60) days equal to the difference between $250,000 and what proceeds Pacific Western received in the preceding year.  Pacific Western's ACP Secured Variable Pay Note shall mature five (5) years after the Effective Date at which time all amounts will be due and owing.

### 4.09     ACP Class 4 — Allowed Unsecured Claims (Impaired).

**Description:**  ACP Class 4 consists of all Allowed Unsecured Claims against ACP, as more fully described and defined in the Article I definitions hereof.

**Treatment:**  Each holder of a Non-Schedule 1 Allowed Unsecured Claim against ACP may elect one or more of the following treatment options, and may divide its Non-Schedule 1 Allowed Unsecured Claim as it determines between such options:

(a)     Receive an ACP Variable Pay Note ("**ACP 50% Notes**") in the principal amount of 50% of the electing holder's Allowed Claim payable without interest from 75% of ACP Unsecured Creditor Net Proceeds, 75% of ACP Excess Cash Distributions and 75% of the ACP Minimum Annual Distributions paid to the ACP Disbursing Agent, with a seven year maturity from the Effective Date if not paid in full prior to that time; or

(b)     Receive an ACP Variable Pay Note ("**ACP 100% Notes**") in the principal amount of 100% of the electing holder's Allowed Claim with interest accruing at 2% per annum (unless Additional Interest applies), payable from 25% of ACP Unsecured Creditor Net Proceeds, 25% of ACP Excess Cash Distributions and 25% of the ACP Minimum Annual Distributions until the ACP 50% Notes are paid in full, and thereafter payable from 100% of ACP Unsecured Creditor Net Proceeds, 100% of ACP Excess Cash Distributions and 100% of the ACP Minimum Annual Distributions with a ten year maturity from the Effective Date if not paid in full prior to that time.

In the event the holder of a Non-Schedule 1 Allowed Unsecured Claim which is

based upon the guaranty of an obligation which is a Non-Schedule 1 Allowed Unsecured Claim against DLH and such holder elects, in part or in whole, option (a) above, the holder of such Claim shall be not be permitted to make any different election (or in any different division) with respect to its Non-Schedule 1 Allowed Unsecured Claim against DLH, and, with respect to a divided election by the holder of any such Non-Schedule 1 Allowed Unsecured Claim, each DLH 50% Note and ACP 50% Note shall be considered a single Claim, and each DLH 100% Note and ACP 100% Note shall be considered a single Claim, for purposes of applying the "single recovery rule."

The Disbursing Agent shall be the recipient of the ACP Minimum Annual Distributions as paid by Reorganized ACP and they shall be used by the Disbursing Agent to fund payments to holders of Allowed ACP Class 4 Claims under the ACP 50% Notes and the ACP 100% Notes.

The Disbursing Agent for ACP shall hold and control all distributions of ACP Unsecured Creditor Net Sales Proceeds, all distributions of ACP Excess Cash Distributions which ACP elects to pay on Non-Schedule 1 Allowed Unsecured Claims and all ACP Minimum Annual Distributions in escrow, and shall make quarterly distributions from such escrowed funds pro rata to the beneficiaries of ACP 50% Notes and ACP 100% Notes as provided above. There shall be one ACP 50% Note issued to the Disbursing Agent on behalf of all holders of Allowed ACP Class 4 Claims electing to receive ACP 50% Notes and one ACP 100% Note issued to the Disbursing Agent on behalf of all holders of Allowed ACP Class 4 Claims electing to receive ACP 100% Notes. The Disbursing Agent for ACP shall have exclusive authority, acting on behalf of those electing ACP 50% Notes and those electing ACP 100% Notes, to take any action or give any notice or demand: (a) in connection with any claimed or asserted default by Reorganized ACP under the Plan or the Confirmation Order; (b) in connection with any claimed or asserted default by Reorganized ACP under the ACP 50% Notes or the ACP 100% Notes; and (c) in connection with the election or enforcement of any remedy under the ACP 50% Notes or the ACP 100% Notes, and no individual beneficiary of an ACP 50% Note or an ACP 100% Note shall have any right or authority to give any notice or demand or take any action with respect to any such events except through the Disbursing Agent. The holders of not less than 60%, in the aggregate, of the outstanding principal amount of the ACP 50% Notes and the ACP 100% Notes may: (a) serve a written demand upon the Disbursing Agent to deliver a notice or demand or take an action with respect to any of the foregoing events, and (b) in the event that the Disbursing Agent fails to deliver any such notice or demand or take any such action after written demand and without justification, call for an election of all of the holders of the ACP 50% Notes and the ACP 100% Notes to remove the Disbursing Agent and elect a successor Disbursing Agent.

Notwithstanding the foregoing, the terms of the stipulation between Committee and Edward B. Romanov, Jr. are hereby incorporated into the Plan and the treatment of ACP Class 4.

The holders of Schedule 1 Allowed Unsecured Claims have agreed that all such Claims

shall be subordinated in priority and payment until the ACP 50% Notes and the ACP 100% Notes have been paid in full. The holders of Schedule 1 Allowed Unsecured Claims shall not participate in the treatment of the holders of Non-Schedule 1 Allowed Unsecured Claims set forth herein, including the ACP 50% Notes and the ACP 100% Notes and any payments received from the Disbursing Agent with regard thereto. Schedule 1 Allowed Unsecured Claims shall be paid in full, but without interest, only after payment in full of Non-Schedule 1 Allowed Unsecured Claims and Allowed Class 5 Claims, but before payment of Allowed Class 6 Claims and Class 7 Interests.

Notwithstanding anything to the contrary set forth herein, the failure of Reorganized ACP to pay to the Disbursing Agent the ACP Minimum Annual Distributions due in any year, provided that all ACP Unsecured Creditor Net Proceeds are paid to the Disbursing Agent, shall not constitute a default under the Plan, and the consequence of any such failure shall be limited to the increased interest due from Reorganized ACP on any such shortfall or on the principal balance due under the ACP 100% Notes and/or the ACP 50% Notes, as provided in Section 1.09 of the Plan. Any failure by Reorganized ACP to pay to the Disbursing Agent all ACP Unsecured Creditor Net Proceeds as and when due shall constitute a default under the Plan.

### 4.10  __ACP Class 5 — Administrative Convenience Claims (Impaired)__.

**Description:**  Class 5 consists of all Non-Schedule 1 Allowed Unsecured Claims (but not any Class 6 Claims) against ACP in amounts up to and including $20,000.00, together with all otherwise Allowed Class 4 Claims (but not any Class 6 Claims) exceeding $20,000.00 where the holder of any such Claim voluntarily agrees to reduce all of such holder's Claims to $20,000.00 on or before the deadline for filing ballots accepting or rejecting the Plan as may be set by the Bankruptcy Court, but excluding all otherwise Allowed Class 5 Claims where the holder of any such claim opts to be treated as a member of Class 4. Any holder of an Allowed Class 5 Claim which votes to reject the Plan shall be deemed to have elected to be treated as a member of ACP Class 4 and shall receive an ACP 100% Note in full satisfaction of its Claim.

**Treatment:**  All holders of Allowed Class 5 Claims, if any, shall receive a cash payment equal to twenty percent (20%) of the amount of their Allowed Class 5 Claim in full satisfaction of such Claim. Such payment shall be paid in full on the later of (v) sixty (60) days after the Effective Date of the Plan, (w) the date such Claim was due and payable by its terms, (x) a date agreed to by the holder of such Claim, or (y) within 30 days following the date such Claim, if contested, is Allowed by Final Order.

### 4.11  __ACP Class 6 - Reimbursement Claims Against ACP (Impaired)__

**Description:**  Richard S. Allen and Richard S. Allen, Inc. have guaranteed certain indebtedness owed by ACP. To the extent Richard S. Allen or Richard S. Allen, Inc. make payments or distributions on a debt where ACP is the primary obligor or a co-

guarantor, they will have a reimbursement Claim against ACP in that amount.

**Treatment:** All holders of Allowed ACP Class 6 Claims shall have their Claims subordinated in priority and payment until the ACP 50% Notes and the ACP 100% Notes have been paid in full. After the ACP 50% Notes and the ACP 100% Notes have been paid in full, ACP shall pay all Allowed Reimbursement Claims against ACP from available cash prior to distributions to ACP Equity Interest Holders.

### 4.12   **ACP Class 7 — Equity Interest Holders (Impaired)**.

**Description**: ACP Class 7 consists of all holders of equity Interests in ACP.

**Treatment**: Except for equity interests issued as a part of the Exit Financing with the consent of the interest holders, all equity or interest holders in ACP shall retain their existing equity or interests in ACP. Existing Equity Interests in ACP are impaired under the Plan as a result of the dilution of the interests of existing Equity Interest holders resulting from the issuance of any new Equity Interests in ACP required as part of the Exit Financing, and the dilution of existing Equity Interests' control over Reorganized ACP resulting from the voting rights granted to the Creditors Representative on the Board of Reorganized ACP.

## ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN

5.01   **Classes Entitled to Vote**. Each impaired Class of Claims shall be entitled to vote separately to accept or reject the Plan. Moreover, any Unimpaired Class of Claims or Interests as defined herein is deemed to have accepted the Plan shall not be entitled to vote to accept or reject the Plan.

5.02   **Class Acceptance Requirement**. As provided more fully in the Bankruptcy Code, a Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the authorized, issued, and outstanding equity securities in such Class that have voted on the Plan. Any Class of Claims or Interests which receives nothing under the Plan (which only happens in the event of a Cramdown) is deemed to have rejected the Plan. In addition, in order to confirm the Plan, there must be at least one impaired Class of Claims which accepts the Plan as outlined above and the acceptance must be determined without including any acceptance of the Plan by any insider.

## ARTICLE VI - MEANS OF IMPLEMENTATION AND GENERAL DESCRIPTION OF THE PLAN

6.01   **Vesting of Assets**. Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date, all property of Debtors' estate, wherever situated, shall vest in the Reorganized Debtors, free and clear of all Claims to the full extent permitted by law including the Bankruptcy Code.

6.02 **Resolution of Claims**. Commencing on the Effective Date, the Reorganized Debtors shall be authorized to object to, settle or liquidate all Claims entitled to payment which Claims are not otherwise Allowed Claims pursuant to the terms of this Plan. The Reorganized Debtors shall consult with the Disbursing Agent and the Creditors Committee while it is still in existence with regard to issues relating to objections to Claims. All costs and expenses relating to the foregoing, including, without limitation, fees of Professional Persons, shall be paid from the proceeds of liquidation.

6.03. **No Merger or Substantive Consolidation**. Debtors shall not be merged with or into or substantively consolidated with or into any entity.

6.04. **Mandatory Distributions of Excess Cash.** If, at the end of any calendar quarter after the Effective Date, there is DLH Excess Cash, Reorganized DLH shall be required to distribute all such DLH Excess Cash as DLH Excess Cash Distributions. The DLH Excess Cash Distributions shall be distributed only: (a) in repayment of the Term Loan; (b) in repayment of any loans obtained by Reorganized DLH as part of its Exit Financing; (c) in voluntary repayments of principal or interest on the Pool 1 Note, the Pool 2 Notes, or the Pool 4 Notes; or (d) in payment to the Disbursing Agent for DLH for distribution on the DLH 50% Notes and/or the DLH 100% Notes. While Reorganized DLH will be obligated to make the DLH Excess Cash Distributions and only as provided above, the actual allocation among such creditors of DLH Excess Cash Distributions shall be in the discretion of the Board of Directors of Reorganized DLH, provided that the Board of Directors shall not have any discretion with regard to making the Additional DLH Minimum Payments (if such payments are due and owing).

Notwithstanding anything to the contrary contained herein, if at the end of any calendar quarter, Reorganized DLH has a cash balance of less than $2.75 Million, and the Disbursing Agent for DLH has received distributions of DLH Unsecured creditor Net Proceeds for such calendar quarter. The Disbursing Agent for DLH shall disburse to Reorganized DLH a sufficient sum to bring the cash balance to $2.75 Million prior to making any distributions on the DLH 50% Notes on the DLH 100% Notes.

If, at the end of any calendar quarter after the Effective Date, there is ACP Excess Cash, Reorganized ACP shall be required to distribute all such ACP Excess Cash as ACP Excess Cash Distributions. The ACP Excess Cash Distributions shall be distributed only: (a) in repayment of any loans obtained by Reorganized ACP as part of its Exit Financing; (b) in voluntary repayments of principal or interest on the ACP Secured Variable Pay Notes; or (c) in payment to the Disbursing Agent for ACP for distribution on the ACP 50% Notes and/or the ACP 100% Notes. While Reorganized ACP will be obligated to make the ACP Excess Cash Distributions and only as provided above, the actual allocation among such creditors of ACP Excess Cash Distributions shall be in the discretion of the Board of Directors of Reorganized ACP.

Notwithstanding anything to the contrary contained herein, if at the end of any calendar quarter, Reorganized ACP has a cash balance of less than the ACP Cash

Reserve, and the Disbursing Agent for ACP has received distributions of ACP Unsecured Creditor Net Proceeds for such calendar quarter, the Disbursing Agent for ACP shall disburse to Reorganized ACP a sufficient sum to bring the cash balance up to the ACP Cash Reserve prior to making any distributions on the ACP 50% Notes on the ACP 100% Notes.

6.05. **Governance of Reorganized DLH and Reorganized ACP.** The Operating Agreements of Reorganized DLH and Reorganized ACP shall be amended as of the Effective Date to provide as follows:

(a) **Board Representation of Unsecured Creditors.** The Board of Directors of each of Reorganized DLH and Reorganized ACP shall include, as further provided in Sections 13.15 and 13.16 below, one additional independent Director, the Creditors Representative. The Board of Directors of Reorganized DLH shall continue to include the Creditors Representative until the DLH 50% Notes and the DLH 100% Notes have been paid in full or otherwise discharged. The Board of Directors of Reorganized ACP shall continue to include the Creditors Representative until the ACP 50% Notes and the ACP 100% Notes have been paid in full or otherwise discharged.

(b) **Board Approval of Insider or Affiliate Transactions**. Except as expressly provided in this subsection (b), all transactions between Reorganized DLH or Reorganized ACP and any insider or affiliate of such entities (as the terms "insider" and "affiliate' are defined in Section 101 of the Bankruptcy Code) or senior management of such entities (whether or not such person or entity is an insider or affiliate) shall require unanimous approval of the Board of Directors of such Reorganized Debtor, including approval by the Creditors Representative. Notwithstanding the foregoing, a simple majority of the Board of Directors may approve any of the following transactions with insiders, affiliates or senior management:

(1) The renewal, extension or non-material modification of any existing agreement that has been approved by the Creditors Committee on or before the Effective Date with an insider, affiliate or senior management to provide services to the Reorganized Debtors, including any agreement to provide employment, accounting, tax reporting, or other services;

(2) Any payments under the Bonus Pool adopted for Reorganized DLH as such Bonus Pool has been approved by the Creditors Committee on or before the Effective Date;

(3)     The repayment of the Term Loan from the DIP Lenders in accordance with its terms as approved by the Bankruptcy Court on or before the Confirmation Date including any voluntary prepayments from DLH Excess Cash Distributions;

(4)     The repayment in accordance with its terms of any other loan or obligation to an insider, affiliate or senior management which loan or obligation has been approved by the Creditors Committee on or before the Effective Date, including but not limited to the repayment of any loans made as part of the Exit Financing for DLH or ACP in accordance with terms approved by the Creditors Committee and payment in accordance with their terms of the service agreements described in subsection (1) above; and

(5)     Any loan from Reorganized ACP to any direct or indirect subsidiary or other affiliate of Reorganized ACP, provided that such loan: (i) is not, itself or in combination with any other loans to such subsidiary or affiliate after the Confirmation Date, in excess of $500,000.00; (ii) is made in accordance with commercially reasonable business terms; and (iii) is either secured by adequate collateral or is determined to be reasonably necessary for Reorganized ACP to preserve or protect its investment in a direct or indirect subsidiary or affiliate.

If there is a dispute as to the terms of any agreement, the Bonus Pool or any loans or obligations that DLH or ACP has submitted to the Creditors Committee for approval on or before the Effective Date in accordance with subsections (b)(1), (2) or (4) above, such dispute shall be submitted upon motion to the Bankruptcy Court for determination. Any such agreement, Bonus Pool or loan or obligation which is approved by Final Order of the Bankruptcy Court shall satisfy the Creditors Committee approval requirement of subsections (b)(1), (2) and (4) above.

(c)     **Other Board Approval**. In addition, unanimous approval of the Board of Directors including approval by the Creditors Representative, shall be required for the following:

(1)     Any merger, sale of all or substantially all assets or dissolution of Reorganized DLH or Reorganized ACP;

(2)     Any sales, dispositions, transfers, non-cash exchanges, joint

ventures, partnerships or similar transactions of Reorganized DLH, Reorganized ACP or any direct or indirect Subsidiary of Reorganized ACP which involves, with respect to Reorganized DLH, 500 acres or more of land or $10,000,000 or more in transaction value (in one transaction or in combination with any related transactions), and, with respect to Reorganized ACP or any of its direct or indirect Subsidiaries other than LPKC, $3,000,000 or more In Value (in one transaction or in combination with any related transactions) and, with respect to LPKC, $8,000,000 or more In Value (in one transaction or in combination with any related transactions), provided however that as part of the Creditors Representative's approval of a joint venture transaction for any of Reorganized DLH, Reorganized ACP or a Subsidiary of Reorganized ACP, such approval may include advance approval by the Creditors Representative, upon such terms as may be agreed to by the Creditors Representative, of future transactions by the joint venture without requiring approval of each such future joint venture transaction on a transaction by transaction basis (any such approval must be documented in a writing signed by the Creditors Representative);

(3)     Any new liens or encumbrances after the Confirmation Date on property of Reorganized DLH, Reorganized ACP or direct or indirect Subsidiaries of Reorganized ACP other than any refinancings that do not involve additional debt or additional collateral and other than easements being granted in the ordinary course of business and according to commercially reasonable terms provided, however, that with respect to any direct or indirect Subsidiary of ACP or Reorganized ACP, any partnership, joint venture, or other venture agreement which contemplates the purchase or financing of any property of such Subsidiary may be submitted to the Creditors Representative for approval (whether or not such approval is required under subsection 6.05(c)(2) above), and such approval may include advance approval by the Creditors Representative, upon such terms as may be agreed to by the Creditors Representative, of future transactions by the joint venture without requiring approval of each such future joint venture transaction on a transaction by transaction basis (any such approval must be documented in a writing signed by the Creditors Representative), and any transaction approved or preapproved under subsection 6.05(c)(2) above shall be

deemed approved under this subsection;

(4)     Any new bankruptcy filing by DLH or ACP, any bankruptcy filing by Reorganized DLH or Reorganized ACP and any consent to judgment or order for relief in bankruptcy or other insolvency proceeding by DLH, ACP, Reorganized DLH or Reorganized ACP; and

(5)     Any corporate or LLC restructuring of Reorganized DLH or Reorganized ACP, including, but not limited to, any amendments to the operating agreements of Reorganized DLH or Reorganized ACP that involve insiders, affiliates or senior management of Reorganized DLH or Reorganized ACP, that impact or may impact payments to creditors under the DLH 50% Notes, the DLH 100% Notes, the ACP 50% Notes or the ACP 100% Notes, or that impact or may impact the Creditors Representative or his/her rights and role with respect to Reorganized DLH or Reorganized ACP.

6.06.  **Sale of Properties Subject To Non-Recourse Note**.  Certain claims against DLH are based on non-recourse notes issued pre-petition.  Those non-recourse notes are receiving new non-recourse notes pursuant to this Plan.  Within the six months prior to any such a note maturing, to the extent to which the property securing the claim has not been sold or the note otherwise repaid, in consultation with Parcel Noteholder, Reorganized DLH shall create a structured sale, sealed bid or auction ("Structured Sale") for such a parcel.  If (i) Reorganized DLH fails to begin such a Structured Sale within four months of the non-recourse note maturing, (ii) Parcel Noteholder notifies Reorganized DLH of its default under this provision and requests Reorganized DLH to commence such a Structured Sale and (iii) the Structure Sale does not commence within thirty (30) days of Reorganized DLH receiving the notice of default and request from Parcel Noteholder, the Parcel Note shall become a recourse obligation of Reorganized DLH, but only on a parity with other pre-petition recourse obligations of DLH, and not as an Administrative Expense or post-Confirmation claim against Reorganized DLH.

The reserve price for such parcels in such a Structure Sale shall be (i) at least equal to the Release Price for such parcel plus all normal and customary closing costs and (ii) no greater than 175% of the Release Price for such a parcel unless Parcel Noteholder consents.  In the event the Reserve Price is not met, Reorganized DLH shall consult with Parcel Noteholders holding the Parcel Senior Lien on such parcels with respect to the appropriate disposition of the parcel.  If the parties cannot reach an agreement with respect to the appropriate disposition, Reorganized DLH may, at its sole discretion, either (a) retain such a parcel for subsequent sale or (b) transfers each parcel or parcels subject to the applicable Parcel Senior Lien to Parcel Noteholder in satisfaction of the applicable Parcel Note.  In the event Reorganized DLH retains the parcel for subsequent sale, the applicable Parcel Note shall become a recourse obligation of Reorganized DLH.

6.07. **Conversion of DIP Loan to Term Loan.**

    A.     DLH

On the Effective Date, the DLH DIP Loan (including that portion of the DIP Loan which was advanced to DLH prepetition) shall be satisfied by converting the DIP Loan into the Term Loan. DLH estimates that, as of the Effective Date, the outstanding balance of the DIP Loan will be approximately $2.782 Million (including all accrued interest thereon); all of such principal balance, together with all accrued but unpaid interest thereon as of the Effective Date, shall be converted to the Term Loan. The Term Loan shall be evidenced by a new note executed on the Effective Date. The Term Loan shall retain its perfected subordinate liens on the DLH Property but excluding any Pool 3 or Pool 4 property surrendered to the secured creditors with a senior interest in such property and excluding any property sold or surrendered by DLH prior to the Effective Date, and a Subordinate Lien Deed of Trust on the Pool 1, Pool 2 and Pool 4 Properties shall be filed on the Effective Date to evidence and perfect such liens; that Subordinate Lien Deed of Trust shall be expressly subject and subordinate to any Senior Parcel Lien securing the claim of any Pool 1, Pool 2 or Pool 4 Noteholder. The Plan establishes Release Prices for the Term Loan for each parcel, as set forth on Exhibit A attached hereto, calculated at 150% of the allocable portion of the Term Loan for each parcel on the Effective Date of the Plan. The Term Loan shall bear a variable rate of interest, adjusted quarterly on the first business day of each calendar quarter, which is equal, from time to time, at the prime rate of interest published by the Wall Street Journal plus ten percent (10%); provided that the Prime rate shall be capped at a rate no higher than 500 basis points above the Prime rate in effect on the Effective Date. Interest on the Term Loan shall accrue annually, and shall be payable solely from the Net Sales Proceeds of the Pool 1 and Pool 2 properties. The Term Loan shall mature on the last business day of the month occurring after the third (3rd) anniversary date of the Effective Date of the Plan. On the Effective Date, the amount of the DIP Loan to be converted into the Term Loan shall be increased by: (a) an Origination Fee equal to one percent (1%) of the initial principal balance of the DLH Term Loan, and (b) all reasonable fees and costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination and closing of the Term Loan, subject to approval by the Bankruptcy Court.

    B.     ACP

    On the Effective Date, the ACP DIP Loan (including that portion of the DIP Loan which was advanced to ACP prepetition) shall be satisfied by converting the DIP Loan into the Term Loan. ACP estimates that, as of the Effective Date, the outstanding balance of the DIP Loan will be approximately $999,319 (including all accrued interest thereon; all of such principal balance, together with all accrued but unpaid interest thereon as of the Effective Date, shall be converted to the Term Loan. The Term Loan shall be evidenced by a new

note executed on the Effective Date. The Term Loan shall retain its perfected subordinate liens on the ACP Property. The Term Loan shall bear a variable rate of interest, adjusted quarterly on the first business day of each calendar quarter, which is equal, from time to time, at the prime rate of interest published by the Wall Street Journal plus ten percent (10%) provided that the Prime rate shall be capped at a rate no higher than 500 basis points above the Prime rate in effect on the Effective Date. Interest on the Term Loan shall accrue semiannually, and shall be payable solely from the ACP Net Sales. The Term Loan shall mature on the last business day of the month occurring after the second (2nd) anniversary date of the Effective Date of the Plan. On the Effective Date, the amount of the DIP Loan to be converted into the Term Loan shall be increased by: (a) an origination fee equal to one percent (1%) of the initial principal balance of the ACP Term Loan, and (b) all reasonable fees and costs, including reasonable attorneys' fees, incurred by the DIP Lenders in connection with the origination and closing of the Term Loan, subject to approval by the Bankruptcy Court.

6.08.   **Provision for Exit Financing.**   DLH anticipates obtaining Exit Financing from one or more sources, including:  (a) an auction of several parcels of land to be conducted prior to the Effective Date, with Bankruptcy Court approval which shall be closed and funded within 60 days of the Effective Date, which is anticipated to generate sufficient proceeds to pay in full all costs of the sale, all Secured Claims secured by liens on the parcels to be sold, and excess cash which DLH may use to consummate the Plan; and/or (b) a loan from Allen Opportunity Fund, a non-Debtor entity affiliated with DLH which owns a parcel of property near the DLH property, in an amount of up to $400,000; and/or (c) a loan from Richard S. Allen, individually, in amount of up to $750,000.00. DLH shall use such Exit Financing to pay Administrative Expenses and other costs necessary to exit Bankruptcy, and to provide a reserve to pay for operating, marketing, and administrative costs of Reorganized DLH until Reorganized DLH can generate cash flow from sales of its property.

The ACP Debtor in Possession Financing is being converted to a two year term loan.

6.09.   **Modifications to the DLH Plan and/or ACP Plan to Resolve Objections**.  Debtors reserve the right to modify the treatment of any Class of Creditors under the Plan in order to resolve any objections to Confirmation of the Plan, or in order to obtain confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any non-consenting Class; provided that any modification affecting Unsecured Creditors or provisions of the Plan negotiated with the Creditors Committee must be approved by the Creditors Committee. Provided that any such modifications do not materially and adversely affect the treatment of any other Class of Creditors or Interest Holders under the Plan (without the consent of such Creditors or Interest Holders), Debtors shall not be required to re-solicit acceptances of the Plan as so modified, and any accepting Class of Creditors or Interest Holders which has either consented to the modification, or whose treatment under the Plan is not materially and adversely affected by any such  modification, shall be deemed to have accepted the Plan

as so modified.

6.10 **Contributions of Property by Reorganized DLH.** Notwithstanding anything to the contrary in the Plan, Reorganized DLH shall have the right, from time to time, to contribute any one or more parcels of the Pool 1 Property or the Pool 2 Property, subject to the Parcel Senior Liens secured by such property and, with respect to any Pool 2 Parcel, the Subordinate Lien securing the payment of any portion of Pool 2 Net Sales Proceeds to the holders of the Pool 2 Notes, and subject to the lien securing the Term Loan, to any partnership, joint venture, limited liability company, or other entity formed for the purpose of developing or constructing improvements on such parcel or parcels. Provided that the contribution is solely in exchange for an ownership interest in such newly formed entity, any such contribution shall not be deemed a sale or transfer of such parcel for purposes of calculating DLH Net Sales Proceeds, and the transfer of any such parcel shall be ignored for purposes of calculating subsequent distributions of DLH Net Sales Proceeds to the holders of the Pool 1 Note and the Pool 2 Notes. To the extent that: (a) DLH receives any cash consideration as part of any such contribution of a Pool 1 Parcel or a Pool 2 Parcel to any such newly formed entity, except to the extent such cash is necessary to pay allowed Administrative Expenses incurred in the DLH Bankruptcy or otherwise to make distributions required to be made under the DLH Plan within ninety (90) days of the Effective Date, or (b) DLH receives distributions from any such entity resulting from the proceeds of any sale, lease, or other disposition, then all such cash consideration and distributions to DLH shall be deemed to be DLH Net Sales Proceeds with respect to such parcel, and shall be distributed in accordance with the Plan.

6.11 **Creditors Trusts**. On the Effective Date, the DLH Creditors Trust and the ACP Creditors Trust shall become effective to administer certain post-Effective Date responsibilities and exercise post-Effective Date rights under the Plan. The powers, authority, responsibilities and duties of the DLH Creditors Trustee and the ACP Creditors Trustee shall be set forth in and governed by the respective DLH Creditors Trust Agreement and ACP Creditors Trust Agreement. Other documents in connection with the Creditors Trusts may be executed and entered into by the respective Creditors Trust Trustees on behalf of the beneficiaries of the Creditors Trusts. The DLH Creditors Trust Trustee shall be the representative of the DLH Creditors Trust, and the ACP Creditors Trust Trustee shall be the representative of the ACP Creditors Trust.

## ARTICLE VII - PROCEDURES FOR RESOLVING AND TREATING CONTESTED AND CONTINGENT CLAIMS

7.01 **Objection Deadline**. Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed by ninety (90) days after the Effective Date. Unless arising from an Avoidance Action, any Proof of Claim filed more than ninety (90) days after the Effective Date shall be of no force and effect and need not be objected to. All Contested Claims shall be litigated to Final Order unless estimated by the Bankruptcy Court for purposes of distribution; provided, however, that the Reorganized Debtors may compromise and settle any Contested Claim, subject to the approval of the Bankruptcy Court and the provisions of this Plan.

7.02    **Distributions on Account of Contested Claims**.  (a)  <u>No Distribution Pending Allowance</u>.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim by Final Order or is estimated for purposes of distribution by the Bankruptcy Court.  In the case of a holder of a Claim who is also alleged to be holding property that is recoverable by virtue of any Avoidance Action or liable on any Avoidance Action brought, filed, joined, or adopted by Debtors as of the date of a particular distribution, such holder's Claim shall then be and shall thereafter continue to be a Contested Claim until such Avoidance Action is fully resolved by Final Order and, if and to the extent the holder of such Claims is found to be obliged to turnover property or to pay a monetary amount, such Final Order is fully performed and satisfied by such holder, such holder shall receive no distributions under this Plan.

(b)  <u>Distribution After Allowance</u>.  As soon as practicable after a Contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount of dollars equal to the aggregate of all the distributions which such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date.  Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs.  The Reorganized Debtors or Disbursing Agent shall have the right to make or direct the making of all distributions to the holders of Allowed Claims.

7.03    **Reservation of Rights to Object to Claims.**  Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Plan, or otherwise becomes an Allowed Claim prior to or after the Effective Date, the Reorganized Debtors (on behalf of the Estates) reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including, without limitation, any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, General Unsecured Claims, Intercompany Claims, Interest Related Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.

7.04    **Standing and Responsibility to Object to Claims.**  Prior to the Effective Date, except as otherwise specified under the Bankruptcy Code and Bankruptcy Rules, Debtors shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, Reorganized Debtors will, subject to the provisions of this Plan, retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions, if any, with respect to all Claims.

7.05    **Service.**  An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if Reorganized Debtors effect service in accordance with Bankruptcy Rule 3007.

**ARTICLE VIII - PROVISIONS GOVERNING DISTRIBUTION**

8.01    **Distributions to be Made by Reorganized Debtors**.  Unless expressly otherwise provided in this Plan or in the Confirmation Order, distributions to Creditors required pursuant to the Plan shall be made by the Reorganized Debtors.  All distributions to the holders of non-Schedule 1 DLH Class 4 Claims and ACP Class 4 Claims shall be made by the Disbursing Agent for DLH and ACP, as the case may be.  After all DLH 50% Notes and all DLH 100% Notes have been paid in full, Reorganized DLH shall be responsible for distributions to Schedule 1 DLH Class 4 Claims, and, after all ACP 50% Notes and all ACP 100% Notes have been paid in full, Reorganized ACP shall be responsible for distributions to Schedule 1 ACP Class 4 Claims

8.02    **Means of Cash Payment**.    Payments of cash to be made by the Reorganized Debtors or the Disbursing Agent, as the case may be, pursuant to the Plan shall be made by check drawn on a domestic bank, by wire transfer or by ACH.

8.03    **Delivery of Distributions**.  Distributions of cash to holders of Allowed Claims shall be made at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if the Reorganized Debtors or the Disbursing Agent, as the case may be, have been notified in writing of a change of address).  If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtors or the Disbursing Agent, as the case may be, is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  All claims for undeliverable distributions shall be made on or before the one-year anniversary of the distribution to the Creditor that was undeliverable. After such date, such undeliverable distributions shall become an asset available to the Reorganized Debtors, or the respective DLH Creditors Trust or ACP Creditors Trust in the case of distributions to non-Schedule 1 Class 4 Claims, and the Creditors entitled to the undeliverable distributions shall thereafter have no further rights or entitlements to the undeliverable distributions.

8.04    **Time Bar to Payments and Distributions**.    Checks issued by the Reorganized Debtors or Disbursing Agent, as the case may be, on account of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtors or the Disbursing Agent, as the case may be, by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of the first (1st) anniversary of the Initial Distribution Date or ninety (90) days after the date of the issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the subject funds shall become an asset available to Reorganized Debtors or the respective DLH Creditors Trust or ACP Creditors Trust in the case of distributions to non-Schedule 1 Allowed Class 4 Claims.

8.05    **De minimis Distributions.**  Any distribution of less than $25.00 will be considered *de minimis*, and Holders of Allowed Claims that are entitled to any distribution of less than $25.00 may not receive any distribution (at the sole discretion of

the Reorganized Debtors or the Disbursing Agent, as applicable) unless and until the aggregate of such distributions exceeds $25.00. To the extent that the aggregate of such distributions does not exceed $25.00 within one year of when the funds would originally have been distributed, such funds shall be paid on the first anniversary of when *de minimis* distribution would otherwise have become due and payable except for the provisions of this section.

8.06 **Rounding of Fractional Distributions.** Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Any such distributions will be in whole cents (rounded to the nearest whole cent when and as necessary).

8.07 **Single Recovery Rule.** To the extent that any Creditor may obtain payment from either DLH or ACP or both, or from either Debtor and any other sources, including any guarantor of a Claim on which DLH or ACP is the principal obligor, the "single recovery rule" shall apply, and any such Creditor shall not be entitled to receive any further distributions on its claim after its claim has been fully satisfied, taking into consideration payments on such claim from all sources. By way of example, if a Secured Creditor of DLH also has an unsecured claim against ACP by reason of any guaranty or other agreement, or has a claim against Richard S. Allen or Richard S. Allen, Inc., once the total of distributions to such creditor from all sources are sufficient to fully satisfy that creditor's claim, that creditor shall not be entitled to any further distributions from any source on account of the satisfied claim.

## ARTICLE IX - EXECUTORY CONTRACTS AND LEASES

9.01 **General Treatment - If Not Rejected, Assumed**.

The Plan constitutes and incorporates one or more motions by the respective Debtor proponents to assume, as of the Confirmation Date and conditioned upon the occurrence of the Effective Date, all prepetition executory contracts and unexpired leases to which one or both of the Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, or (b) are the subject of a separate motion (or appeal from the ruling on such motion) filed pursuant to section 365 of the Bankruptcy Code by one or both of the Debtors prior to the Effective Date or a separate motion (or appeal of the ruling from such motion) to compel or permit assumption or rejection pursuant to section 365 of the Bankruptcy Code filed by the Committee prior to the Effective Date and such unexpired lease or executory contract shall be assumed or rejected, as the case may be, by virtue of a Final Order of the Bankruptcy Court, which may be entered after the Effective Date.

9.02 **Bar to Rejection Damages**. If the rejection of an executory contract or an unexpired lease results in damages to the other party to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable unless a Proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after the Confirmation Date.

9.03    **Service Agreement.**  Reorganized ACP and Allen Employment Services, LLC shall continue to provide certain services for Reorganized DLH.  The Services Agreement shall be amended to reflect the services and changes in payment amounts set forth in the budgets, from time to time, anticipated to be provided by ACP and AES to Reorganized DLH.   As amended, the Services Agreement shall be assumed by Reorganized ACP and Reorganized DLH pursuant to the Plan. The form of the Amendment to the Services Agreement shall be filed by the Debtors with the Bankruptcy Court five (5) business days prior to the Confirmation Date.

9.04    **ADESA Texas, Inc. Lease.**   DLH Hutchins Wintergreen 178, LLC (a predecessor to DLH) as landlord and ADESA Texas, Inc. were parties to a Reverse Build-to-Suit Single Tenant Lease (Triple Net) (as amended, the "**ADESA Lease**") and Project Improvement Agreement incorporated thereto (the "**ADESA PIA**") made and entered into as of March 31, 2008, as amended pursuant to that First Amended to Reverse Build-to-Suit Single Tenant Lease (Triple Net) and Projects Improvement Agreement dated July 18, 2008.  Prior to the confirmation date, DLH has filed a separate motion to assume and assign the ADESA Lease and the ADESA PIA which was granted in the ADESA Sale Order.

## ARTICLE X - MAINTENANCE OF CAUSES OF ACTION

10.01    **Treatment of Avoidance Actions**.  All Avoidance Actionsare preserved in the estate for the benefit of creditors.  All Avoidance Actions shall, by operation of the Confirmation Order, be assigned free and clear of all liens (as defined in Section 101(37) of the Bankruptcy Code), Claims and Interests to the respective DLH Creditors Trust or ACP Creditors Trust on the Effective Date, and after the Effective Date, the Creditors Trust Trustee(s) may pursue, release, abandon, settle or otherwise resolve any and all Avoidance Actions or claims relating to Avoidance Actions.  The net proceeds and recoveries from any Avoidance Actions brought by the DLH or ACP Creditors Trust Trustee shall be added to funds available to the Disbursing Agent to distribute to Allowed Class 4 Claims.  Any costs and expenses including professional fees incurred pursuing Avoidance Actions by or on behalf of the DLH Creditors Trust or the ACP Creditors Trust shall be paid out of funds in the respective Creditors Trust.  The Creditors Trust Trustee may, but is not required to, retain professionals on a contingency basis.

10.02    **Maintenance of Causes of Action**.  All creditors and parties in interest are hereby placed on notice that despite provisions which may be contained in this Plan, including without limitation those providing for satisfaction of Claims, if Allowed, the Reorganized Debtors and the Creditors Trust Trustee(s) in accordance with the preceding section reserve the right to (a) commence, prosecute to judgment, settle and collect upon any cause of action (including the Avoidance Actions), whether or not such cause of action is listed in the Schedules and Statements of Affairs as an asset of Debtors' chapter 11 Estate and to (b) include as defendants in a suit any and all parties which are, at this time, named and unnamed.  Currently, the Reorganized Debtors are unable to estimate the size of any recovery from such a lawsuit. The Reorganized Debtors and the Creditors Trust Trustee(s) in accordance with the preceding section are authorized under the Plan,

in their sole discretion, to litigate to final judgment, prosecute appeals as are necessary and enter into such settlement agreements as are deemed appropriate with respect to any and all suits initiated as provided herein. Persons subject to a successful Avoidance Action may file a Claim, as appropriate, within such time as is established by the Bankruptcy Court.

## ARTICLE XI - DISCHARGE

11.01 **General Discharge Under Plan**. Except with respect to Classes of Claims unimpaired pursuant to this Plan, the distributions and rights afforded in this Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and Interests in Debtors or any of their respective assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in this Plan, all Claim holders and Interest holders shall be precluded forever from asserting against Debtors, their respective agents and attorneys or their respective assets and properties, any other or further liabilities, liens, obligations, Claims or Interests, or causes of action belonging to Debtors pursuant to 11 U.S.C. § 541 which could arise up through the Effective Date of the Plan including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of Debtors, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed. As of the Effective Date, Debtors shall be discharged and released from and shall hold all the assets and properties received or retained by them pursuant to this Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except as set forth pursuant to this Plan. All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and interests or obligations of any nature against Debtors or assets or properties received or retained by Debtors with respect to debts and obligations, if any, of the estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in this Plan. Notwithstanding the foregoing, this provision shall not be interpreted to release any third party claims, liabilities or other causes of action against the affiliates and principals of the Debtors unless the claim or cause of action so released is derivative of a claim or cause of action which was or could have been asserted against a Debtor in this Bankruptcy, or constitutes property of either of the Debtors' bankruptcy estates.

11.02 **Cancellation Of Instruments And Agreements.** Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest (but expressly excluding: (a) the Parcel Senior Liens, as modified by the Parcel Senior Lien Modifications, and any other Mortgage, Deed of Trust, Security Agreement, Financing Statement or other lien or security interest, evidencing any lien or security interest which is to survive the Effective Date under the terms of this Plan; (b) any Guaranty Agreement executed by ACP for which the holder of such Guaranty elects to have the Guaranty ride through unaffected by the Plan; and (c) the Operating Agreements of ACP and DLH, as amended pursuant to the Plan) shall be

deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; obligations of Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against Debtors, the Estates or the Reorganized Debtors; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan. Notwithstanding the foregoing, the cancellation of such instruments and agreements shall be solely effective as to the Debtors' obligation under such Instruments and Agreements and shall not be interpreted to discharge or release any claims against guarantors or any claims against any third party under those Instruments or Agreements.

# ARTICLE XII - RETENTION OF JURISDICTION

12.01 **Retention of Jurisdiction**. Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Case and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

a. to hear and determine all Claims and Objections to Claims, including all Fee Claims and all Claims arising from the rejection of any executory contract or unexpired lease and any Objections which may be made thereto;

b. to liquidate or estimate the amount or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

c. to adjudicate all Claims (and other claims) and controversies arising during the pendency of the Case;

d. to allow or disallow any Fee Claim and any request for compensation or reimbursement of expenses by a professional related to post-confirmation services, but only for services rendered prior to the Effective Date of the Plan;

e. to enter any orders which may be necessary and appropriate to carry out and enforce the provisions of the Plan, including but not limited to the resolution of any dispute between Reorganized DLH and any Secured Creditor concerning the Release Price applicable to the sale of any partial parcel in Pool 1, Pool 2, or Pool 4;

f.    to determine and allow amendments or modifications to the Plan, to the extent permitted in the Bankruptcy Code;

g.    to hear and determine any and all adversary proceedings, applications, or contested matters, including any remands or appeals;

h.    to hear, determine, adjudicate, and enforce any and all adversary proceedings or contested matters which may be commenced before or after the Effective Date, including, but not limited to, all Avoidance Actions and any other adversary proceeding to avoid or recover any preference, fraudulent transfer or other avoidable transfer, lien or security interest whatsoever under 11 U.S.C. §§ 544, 545, 547, 548, 549, 550, 551, 552 or 553(b), and any and all adversary proceedings to recover any claim, direct or derivative, of Debtors or its estate against any Insider of Debtors, including any remands or appeals;

i.    to enable the Reorganized Debtors as successor to Debtors-in-Possession and, as applicable, the Creditors Trust Trustee on behalf of the DLH Creditors Trust or ACP Creditors Trust, as representatives of the estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, to prosecute any and all proceedings which may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties or damages to which Debtors may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between Debtors and any other party, including but not limited to, the retained Causes of Action and Avoidance Actions; and,

j.    to enter a Final Decree pursuant to § 350 of the Bankruptcy Code and Bankruptcy Rule 3022.

## ARTICLE XIII - MISCELLANEOUS PROVISIONS

13.01  **Continued Existence of Reorganized Debtors.**    Subject to the restructuring and reorganization contemplated by, and described more fully in this Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, and all Interests held by a Debtor in another Debtor or a subsidiary thereof shall be reinstated, with all the powers available to such legal entity, in accordance with applicable law and pursuant to the Plan Debtor Constituent Documents, which shall become effective upon the occurrence of the Effective Date or such other later date contemplated thereby.

13.02  **Compliance With All Applicable Laws**.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, Debtors shall comply with such law, rule, regulation, or order; provided that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in

appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of Debtors. Confirmation of this Plan shall constitute a determination by the Bankruptcy Court that no provision of this Plan violates any applicable state or federal law or regulation; however, if any person, party, or governmental agency obtains a determination from the Bankruptcy Court or other court of competent jurisdiction that any provision of this Plan is violative of any state or federal law, such provision shall be severed from the Plan and the remainder of the Plan shall constitute the Plan.

13.03 **Binding Effect**. The Plan shall be binding upon, and shall inure to the benefit of Debtors, any Disbursing Agent, the holders of Claims or Interests and their respective successors and assigns. On and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

13.04 **Governing Law**. Except as hereinafter provided, unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law. Notwithstanding the foregoing, any agreements, documents, or instruments executed pursuant to this Plan which, by their terms, are to be governed by the laws of another jurisdiction, including, but not limited to: (a) the Certificates of Organization and LLC Operating Agreements for DLH ADESA Parcel, LLC and DLH Buildings AB, LLC (which are to be governed by Delaware law); (b) the Amendment to the LLC Operating Agreement of DLH as provided in Section 13.15 of the Plan (which is to be governed by Delaware law); and (c) any new Membership Interests in either ACP or DLH, including the DLH Class B Interests and the DLH Class C Interests, issued pursuant to this Plan (which shall be governed by Delaware law), shall be construed and interpreted in accordance with the laws of the jurisdiction specified in any such agreement, document, or instrument.

13.05 **Payment of Statutory Fees**. All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date. All fees through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date to the extent that an invoice for such fees has been provided to the Debtors prior to the Effective Date. All fees invoiced after the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by Reorganized Debtors.

13.06 **Timing of Distributions**. Any payment or distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

13.07 **Post Confirmation Notices**. After the Confirmation Date but before the Effective Date, unless otherwise directed by the Bankruptcy Court, notice of any motion creating a contested matter shall be given under the 20-day provision of Local Bankruptcy Rule 9007 to the parties on the service list maintained by Debtors which may be amended or supplemented to include any party in interest requesting notice. In addition, any notices required under the Plan or any notices or requests of Debtors or Reorganized Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties: (a) Mark E. MacDonald, (b) Jenny Saubert, (c) Richard S. Allen, (d) Daniel J. McAuliffe and (e) the Creditors Trust Trustee(s) at the address designated in the Order confirming this Plan of Reorganization.

13.08 **General Savings Clause**. If any provision or portion of this Plan or consideration issued hereunder is subsequently determined to be illegal (*i.e.*, to violate a criminal statute so that the actions or inactions by Debtors or any party under the Plan would constitute a crime) or to violate any applicable law or regulation, such violative provision shall thereupon be deleted and expunged from this Plan, notwithstanding substantial consummation thereof, and the remainder of this Plan shall thereafter be construed to exclude such violative provision, portion or consideration and shall be enforced to the full extent legally permitted in the absence thereof.

13.09 **Reservation of Right to Seek Confirmation under 1129(b)**. The proponent of the Plan expressly reserves the right, pursuant to section 1129(b) of the Bankruptcy Code, to request the Court to confirm the Plan if all of the applicable requirements of section 1129(a) of the Bankruptcy Code have been met other than those of section 1129(a)(8).

13.10 **Dates.** The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Plan.

13.11 **Further Action.** Nothing contained in the Plan shall prevent Debtors or its successor from taking such actions as may be necessary to consummate the Plan, even though such actions may not specifically be provided for within the Plan.

13.12 **Plan Amendments.** Debtors may propose amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time before the Confirmation Date. Any proposed modifications or amendments to the Plan that affect Unsecured Creditors, or provisions of the Plan negotiated with the Creditors Committee, must be approved by the Creditors Committee. Prior to the Confirmation Date, Debtors specifically reserve the right to change the treatment for any class of secured creditors, including the interest rate, term and duration of any note to be provided under the Plan or, in the alternative, to provide that the property securing any secured claim be sold via a Structure Sale or to provide that such property be transferred to the holder of the secured claim in full satisfaction of such a secured claim.

Provided that any amendment or modification to the Plan proposed by a Debtor does not materially and adversely the treatment of any Creditor or Interest holder affected by such amendment or modification, the amendment or modification shall be deemed to comply with section 1125 of the Bankruptcy Code without the need for any additional disclosure by the Debtors through a new Disclosure Statement, and Debtors will not be required to re-solicit votes on the Plan. The Debtors expressly reserve the right to agree to amendments or modifications to the Plan requested by any Creditor in a Class which has rejected the Plan, and to permit such Creditor to withdraw its rejection of the Plan and change its vote to acceptance of the Plan after the voting deadline, and such amendment or modification shall be deemed to comply with Section 1125 of the Bankruptcy Code without the need for additional disclosure or a resolicitation of votes on the Plan so long as it is consented to by any Class of Creditors or Interest holders (if any) adversely affected by such amendment or modification.

After the Confirmation Date, Debtors or their successors may, subject to section 1127(b) of the Bankruptcy Code and with Bankruptcy Court approval, and so long as it does not materially or adversely affect the rights set forth in the Plan of Creditors and other parties in interest, amend or modify the Plan to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner that may be necessary to carry out the purposes and intent of the Plan. At the Confirmation Hearing, Debtors may, either in writing or on oral motion, request a modification of any provision of the Plan to address any objection to confirmation of the Plan and may seek confirmation of the Plan, as modified. In addition to the foregoing, on or before substantial consummation of the Plan, and without the need for any further order or authority, Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.13 **Substantial Consummation.** The Plan shall be deemed substantially consummated immediately on the completion of all actions required to be undertaken on or within ninety (90) days after the Effective Date.

13.14 **Creation of Class B Preferred Callable Membership Interests in DLH.** The LLC Agreement for DLH shall be amended to provide for separate Class B Membership Interests as follows:

(a) The DLH Class B Membership Interests shall have a stated par value, a cumulative preference on returns at 3% per annum, and a preference on liquidation to receive the par value of such Interests, so that all DLH Class B Membership Interests shall receive a return of their Par Value plus accrued but unpaid preferred return before any distributions to Class A Membership Interests as described below.

(b) The DLH Class B Membership Interests shall be callable, in whole or in part, at any time that it is legally permissible for DLH to redeem Membership Interests under applicable law (i.e., the Delaware Limited Liability Company Act), for a period of

ten (10) years after the Effective Date of the DLH Plan, but shall not be called before the DLH 50% Notes and the DLH 100% Notes have been paid in full.

(c)      The DLH Class B Membership Interest Holders shall have voting rights in Reorganized DLH as required by applicable law, but the DLH Class B Membership Interests shall have no right to vote on any proposal to call and redeem, in whole or in part, the DLH Class B Membership Interests.

(d)      If the aggregate par value of Class B Membership Interests exceeds $2,000,000, the DLH Class B Membership Interests shall have the right to vote separately as a single class to elect one (1) additional director to the board of DLH.  Such right to elect a director shall continue in effect for so long as: (i) the aggregate outstanding par value of the DLH Class B Membership Interests exceeds $2,000,000.00, or (ii) any accrued preference as to returns on DLH Class B Membership Interests remains unpaid for four (4) consecutive calendar quarters.

(e)      Provided that all accrued preferences as to returns on the DLH Class B Membership Interests have been paid currently, Reorganized DLH may, to the extent permitted by governing Delaware law, by the Exit Financing, and by any other contract or agreement by which it is bound, make additional distributions to DLH Class B Interests.  The DLH Class B Interests shall have no right to share in any additional distributions to the equity interests in DLH over and above the preferred returns on the DLH Class B Interests.  Notwithstanding the preference in returns granted to the DLH Class B Interests, Reorganized DLH shall be permitted to make distributions to the existing DLH Class A Interest holders on an annual basis, but only if and to the extent that such distributions are necessary for the payment of Taxes actually incurred (on a cash basis) by the holders (direct or indirect) of such DLH Interests as a direct result of taxable income or gains recognized by such holders (direct or indirect) of DLH Interests resulting from the sale, exchange, or other disposition of property by Reorganized DLH, or any forgiveness of indebtedness income, or income from the operations of DLH.

13.15   **Board Representation in Reorganized DLH**.  The initial Board for Reorganized DLH shall consist of Richard S. Allen, Luke Allen, Laura Allen Jefferies, Rex Allen, Richard E. Allen and Ryan Allen and as provided in Section 6.05 above, the Creditors Committee may designate one additional member of the Board representative for holders of Unsecured Claims against DLH.  In addition, the holders of DLH Class B Interests may have the right to elect one additional director to the Board, but only if and for so long as the aggregate par value of their interests exceeds $2,000,000 (and thereafter if the accrued preferred return on the DLH Class B Membership Interests remains unpaid for four (4) consecutive quarters).  The right of the DLH Class B Interests to elect a director for Reorganized DLH shall terminate when: (a) the aggregate outstanding par value of the DLH Class B Interests has been reduced, by redemption or otherwise, below the amount of $2,000,000.00, and (ii) all accrued preference as to returns on the DLH Class B Interests has been paid current.  The right of the Creditors Representative to serve as a Director of Reorganized DLH shall terminate when all DLH 50% Notes and all DLH 100% Notes have been paid in full or otherwise discharged. Notwithstanding the

foregoing and prior to any election of the additional director, the identity and affiliations of each proposed initial director or officers following the Effective Date (and, to the extent such Person is an insider of the Debtors, the nature of any compensation of such Person, as well as the related terms) shall be disclosed no later than two (2) calendar days prior to the Confirmation Hearing.

13.16 **Board Representation in Reorganized ACP**.  The initial Board of Directors for Reorganized ACP shall consist of five (5) members being Richard S. Allen, Luke Allen, Rex Allen and Laura Jefferies and as provided in Section 6.05 above, the Creditors Committee may designate one additional member of the Board for Reorganized ACP as a representative for holders of Unsecured Claims against ACP.  Two (2) of the Board Members named above, Rex Allen and Laura Jeffries, are representatives of the Term Lenders, and shall remain on the Board until the ACP Term Loan is repaid in full. The right of the Creditors Representative to serve as a Director of Reorganized ACP shall terminate when all ACP 50% Notes and all ACP 100% Notes have been paid in full or otherwise discharged. Notwithstanding the foregoing and prior to any election of the additional director, the identity and affiliations of each proposed initial director or officers following the Effective Date (and, to the extent such Person is an insider of the Debtors, the nature of any compensation of such Person, as well as the related terms) shall be disclosed no later than two (2) calendar days prior to the Confirmation Hearing.

13.17 **Limits on Equity Distributions at Reorganized DLH**.  While the obligations under the Term Loan are outstanding, no distributions to interest holders of DLH shall be made, whether for the annual preferred return on the callable DLH Class B Interests or otherwise, unless:

     a)     Allowed under the terms of the Term Loan, and

     b)     All Secured Creditors in Pools 1 and 2 have received payment of at least the amount of interest accrued on their respective Pool Notes from the Effective Date until the end of the calendar quarter immediately preceding the payment date.

Until the DLH 50% Notes and the DLH 100% Notes are paid in full, there shall be no distributions to interest holders of Reorganized DLH except for the limited purpose of paying Taxes as provided in Section 1.61(d) above.  Until the ACP 50% Notes and the ACP 100% Notes are paid in full, there shall be no distributions to interest holders of Reorganized ACP except for the limited purpose of paying Taxes as provided in Section 1.11(iii) above.

13.18 **Setoff and Recoupment**. The Reorganized Debtors or Disbursing Agent, as the case may be, may, but shall not be required to, set off or exercise recoupment rights against any Claim including any  payments or other distributions to be made pursuant to this Plan in respect of such Claim, any Claims of any nature whatsoever Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release of any such Claim that Debtors may have against such holder.

13.19 **Dissolution of the Creditors Committee.** The Creditors Committee shall continue in existence for a period of ninety (90) days after the Effective Date, at which time the Creditors Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Creditors Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Creditors Committee after the 90-day period after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses; provided, however, that to the extent any such fees and expenses are incurred after the date that is fifteen business days prior to the deadline to file final fee applications, any such fees and expenses shall be submitted directly to the Reorganized Debtors for payment and shall not require Bankruptcy Court approval.

13.20 **Matters Requiring Board or Member Authorization**. On the Effective Date, the matters under the Plan involving or requiring corporate or limited liability company action of Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors, members or shareholders, as applicable, and execution of all documentation incident to the Plan, notwithstanding any otherwise applicable non-bankruptcy law or the Organization Documents of Debtors, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers, directors, members or shareholders, as applicable, of the Debtors.

13.21 **Saturday, Sunday or Legal Holiday.** If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.22 **No Segregation of Reserves or Funds to Be Distributed.** Notwithstanding any contrary provision contained herein, except as set forth in this section, Reorganized Debtors shall not be obligated to physically segregate and maintain separate accounts for reserves or for distribution funds and separate reserves and funds may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable Reorganized Debtors to determine Distributable Cash, reserves and amounts to be paid to parties in interest.

Reorganized DLH and Reorganized ACP, as the case may be, shall segregate and maintain separate accounts for the following purposes:

(i)    escrowing rents, common area maintenance and taxes received from the tenants of Building A and B unless and until Compass Bank consents to the commingling of all or a part of such funds,

(ii)    escrowing monies received for taxes and insurance from ADESA until such time as those taxes and/or insurance bills are paid,

(iii)    escrowing monies which are to be distributed quarterly to the unsecured creditors of ACP (ACP Unsecured Creditor Net Proceeds), and

(iv)    escrowing monies which are to be distributed quarterly to the unsecured creditors of DLH (DLH Unsecured Creditor Net Proceeds),

(v)    escrowing monies which are to be distributed quarterly to the holders of Pool 1 Notes (Secured Creditor Pool 1 Net Proceeds), and

(vi)    escrowing monies which are to be distributed quarterly to the holders of Pool 2 Notes (Secured Creditor Pool 2 Net Proceeds).
.
13.23  **Creditors Holding Multiple Claims.**  All Claims held by a single creditor against a Debtor in a single class shall be aggregated and treated as a single Claim in such a class against that Debtor. At the written request of Reorganized Debtors, any creditor holding multiple Allowed Claims shall provide Reorganized Debtors a single address to which any Distributions shall be sent.

13.24  **Revocation, Withdrawal Or Non-Consummation Of The Plan**.  If, after the Confirmation Order is entered, each condition precedent to the Effective Date has not been satisfied or duly waived by Debtors on or by ninety (90) days after the Confirmation Date, then upon motion by Debtors, the Confirmation Order  may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in Debtors, (iii) prejudice in any manner the rights of Debtors in the Chapter 11 Cases, or (iv) constitute a release, indemnification or exculpation by Debtors, the Estates or any other party pursuant to the Plan.

13.25  **Organizational Documents.**  To  the  extent  necessary,  any Organizational Documents which will be revised or amended pursuant to the Plan or to effectuate the provisions of the Plan shall be filed by Debtors with the Court at least

seven (7) days prior to the Effective Date.

      **13.26  Plan Consummation.**  The Plan will become fully consummated six months after the entry of a final order of confirmation of the Plan and the first distribution on the Effective Date.  The Plan Consummation will be evidenced by filing a certificate of consummation with the Bankruptcy Court.

      **13.27  Duties of Parcel Noteholders.**  No Parcel Noteholder shall have any express or implied duties to any other Parcel Noteholder.

      **13.28  Ability to Confirm Plan as to DLH or ACP Only**.  In the event the Plan is confirmed with respect to DLH and not with respect to ACP, the Plan may become Effective as to DLH and not as to ACP.  In the event the Plan is confirmed with respect to ACP and not with respect to DLH, the Plan may become Effective as to ACP and not as to DLH.

      **13.29  Exculpation.**  Neither the Debtors, nor the Committee or the Creditors Trust Trustees, nor any of their respective members, officers, directors, employees, agents, advisors, affiliates, attorneys, accountants, nor any other professional person retained or employed by any of them (collectively, the "**Exculpated Persons**") shall have or incur any liability to any Creditor, Interest holder, or any other person or entity for any act taken or omission made in good faith in connection with or relating to the formulation, negotiation, implementation, confirmation, or consummation of this Plan, including any settlement referenced or described herein, or in connection with or relating to the Disclosure Statement or any document, instrument, note or agreement executed or to be executed and delivered pursuant to the Plan.  The Exculpated Persons shall have no liability to the Debtors, any Creditor, Interest holder, or any other party in interest in the Debtors' Bankruptcy Case, or any other person or entity, for actions taken or not taken under the Plan, in connection herewith, or with respect hereto, or arising out of their administration of the Plan or distributions of money or property under the Plan, in good faith, including, without limitation, the failure to obtain confirmation of the Plan, or the failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties, rights, and obligations under the Plan.

      **13.30  Additional Documents to Be Filed With the Bankruptcy Court.** Certain additional documents necessary for the implementation of the Plan, like the form of the notes to be issued under this Plan, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents so filed may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims or Interests without their consent. The documents so filed are incorporated into and made a part of the Plan as if set forth in full herein. Notwithstanding the foregoing, the terms set forth in the additional documents will be consistent with the provisions and terms set forth in this Plan.

     **13.31**  **No Effect on Rosedale Land Venture I, LLC Operating Agreement.** Notwithstanding any other provision in the Plan, the Disclosure Statement, or the Confirmation Order to the contrary, it is expressly provided that neither the Plan nor the confirmation thereof, nor the Confirmation Order shall be deemed or construed to affect or impair in any way the rights of Allen Rosedale Land Venture I, LLC or FKM Associates, LLC to enforce the Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (dated June 15, 2006) and the First Amendment to Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (effective as of August 17, 2009)(collectively, the "Operating Agreement"), in accordance with applicable law.

        Respectfully submitted,


        By: /s/  Daniel J. Artz                   
        Mark E. MacDonald, TX Bar No. 12758300
        Daniel J. Artz, TX Bar No. 01365570
        MacDonald + MacDonald, P.C.
        10300 N. Central Expressway, Suite 335
        Dallas, TX 75231
        Phone: (214) 237-4220
        Facsimile: (214) 890-0818
        Email: mark@macdonaldlaw.com
        Email: djartz@aol.com
        **COUNSEL FOR DLH MASTER LAND HOLDING, LLC AND ALLEN CAPITAL PARTNERS, LLC, DEBTORS AND DEBTORS IN POSSESSION**

## <u>Schedule 1</u>

With respect to DLH,

       Allen Development of Central California
       Cloverleaf 82 Acres, LP
       DLH Development Manager, LLC
       DLH Hutchins Wintergreen 15, LLC
       Richard S. Allen

With respect to ACP,

       Allen Employment Services, Inc.
       Richard S. Allen
       TAG Holdings, LLC
       DLH Master Land Holding, LLC

# EXHIBIT A - 1
## POOL 1 - "COMPASS POOL"

| Parcel # | Gross Acres | COMPASS BANK PAR Value - $ / GSF | RELEASE PRICE Total | $ /GSF | $ / Gross Acre | % of PAR | TERM LOAN PAR Value - $ / GSF | RELEASE PRICE % of PAR | $ /GSF | $ / Gross Acre | Total Release Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | 12.49 | $ 0.30 | $ 3,313 | $ 0.01 | $ 265 | 2% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 19,290 |
| 43 | 129.09 | $ 0.30 | $ 2,683,560 | $ 0.48 | $ 20,788 | 157% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 199,374 |
| 44 | 9.95 | $ 0.30 | $ 188,843 | $ 0.44 | $ 18,979 | 144% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 15,367 |
| 45 | 53.92 | $ 0.30 | $ 1,167,846 | $ 0.50 | $ 21,659 | 164% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 83,277 |
| 46 | 52.68 | $ 0.30 | $ 1,093,302 | $ 0.48 | $ 20,754 | 157% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 81,362 |
| 47 | 90.97 | $ 0.30 | $ 2,102,122 | $ 0.53 | $ 23,108 | 175% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 140,500 |
| 48 | 0.41 | $ 0.30 | $ 812 | $ 0.05 | $ 1,981 | 15% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 633 |
| 49 | 2.46 | $ 0.30 | $ 4,872 | $ 0.05 | $ 1,981 | 15% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 3,799 |
| 50 | 9.50 | $ 0.30 | $ 203,752 | $ 0.49 | $ 21,448 | 162% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 14,672 |
| 51 | 0.18 | $ 0.30 | $ 265 | $ 0.03 | $ 1,472 | 11% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 278 |
| 52 | 83.09 | $ 0.30 | $ 1,977,883 | $ 0.55 | $ 23,804 | 180% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 128,329 |
| 53 | 5.66 | $ 0.30 | $ 7,473 | $ 0.03 | $ 1,320 | 10% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 8,742 |
| 55 | 0.05 | $ 0.30 | $ 132 | $ 0.06 | $ 2,641 | 20% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 77 |
| 56 | 81.02 | $ 0.30 | $ 1,619,251 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 125,132 |
| 57 | 19.00 | $ 0.30 | $ 442,290 | $ 0.53 | $ 23,278 | 176% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 29,345 |
| 58 | 55.34 | $ 0.30 | $ 1,282,145 | $ 0.53 | $ 23,169 | 175% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 85,470 |
| 59 | 13.06 | $ 0.30 | $ 261,015 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 20,171 |
| 60 | 8.79 | $ 0.30 | $ 175,675 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,576 |
| 61 | 9.85 | $ 0.30 | $ 196,860 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 15,213 |
| 64 | 25.69 | $ 0.30 | $ 601,316 | $ 0.54 | $ 23,407 | 177% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 39,677 |
| 66 | 37.87 | $ 0.30 | $ 503,582 | $ 0.31 | $ 13,298 | 101% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 58,489 |
| 67 | 106.20 | $ 0.30 | $ 1,338,467 | $ 0.29 | $ 12,603 | 95% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 164,022 |
| 68 | 100.00 | $ 0.30 | $ 1,192,693 | $ 0.27 | $ 11,927 | 90% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 154,446 |

# EXHIBIT  A - 1
## POOL 1 - "COMPASS POOL"

| Parcel # | Gross Acres | COMPASS BANK | | | | | | TERM LOAN | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | PAR Value - $ / GSF | RELEASE PRICE | | | | | PAR Value - $ / GSF | RELEASE PRICE | | | |
| | | | Total | $ /GSF | $ / Gross Acre | % of PAR | | | % of PAR | $ /GSF | $ / Gross Acre | Total Release Price |
| 70 | 53.61 | $ 0.30 | $ 2,683,560 | $ 1.15 | $ 50,057 | 379% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 82,799 |
| 71.2 | 33.53 | $ 0.30 | $ 745,433 | $ 0.51 | $ 22,232 | 168% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 51,786 |
| 79 | 3.80 | $ 0.30 | $ 109,330 | $ 0.66 | $ 28,771 | 218% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 5,869 |
| 80 | 15.42 | $ 0.30 | $ 352,838 | $ 0.53 | $ 22,882 | 173% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 23,816 |
| 81 | 5.00 | $ 0.30 | $ 119,269 | $ 0.55 | $ 23,854 | 181% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 7,722 |
| 82 | 5.00 | $ 0.30 | $ 119,269 | $ 0.55 | $ 23,854 | 181% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 7,722 |
| 83 | 5.00 | $ 0.30 | $ 119,269 | $ 0.55 | $ 23,854 | 181% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 7,722 |
| 84 | 5.30 | $ 0.30 | $ 105,925 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 8,186 |
| 85 | 4.20 | $ 0.30 | $ 74,543 | $ 0.41 | $ 17,748 | 134% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 6,487 |
| 86 | 49.61 | $ 0.30 | $ 1,287,115 | $ 0.60 | $ 25,945 | 196% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 76,621 |
| 88 | 19.85 | $ 0.30 | $ 944,216 | $ 1.09 | $ 47,568 | 360% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 30,658 |
| 89 | 95.49 | $ 0.30 | $ 834,885 | $ 0.20 | $ 8,743 | 66% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 147,481 |
| 97 | 10.38 | $ 0.30 | $ 106,017 | $ 0.23 | $ 10,214 | 77% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 16,032 |
| 104 | 25.11 | $ 0.30 | $ 281,812 | $ 0.26 | $ 11,223 | 85% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 38,781 |
| 108 | 8.99 | $ 0.30 | $ 106,017 | $ 0.27 | $ 11,793 | 89% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,885 |
| 109 | 8.98 | $ 0.30 | $ 106,017 | $ 0.27 | $ 11,806 | 89% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,869 |
| 110 | 8.97 | $ 0.30 | $ 106,017 | $ 0.27 | $ 11,819 | 90% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,854 |
| 111 | 8.96 | $ 0.30 | $ 106,017 | $ 0.27 | $ 11,832 | 90% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,838 |
| 115 | 18.41 | $ 0.30 | $ 109,993 | $ 0.14 | $ 5,975 | 45% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 28,434 |
| 139 | 1.08 | $ 0.30 | $ 16,400 | $ 0.35 | $ 15,185 | 115% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 1,668 |
| 140 | 3.52 | $ 0.30 | $ 74,543 | $ 0.49 | $ 21,177 | 160% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 5,437 |
| 188 | 4.50 | $ 0.30 | $ 89,936 | $ 0.46 | $ 19,986 | 151% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 6,950 |
| 197 | 4.03 | $ 0.30 | $ 39,756 | $ 0.23 | $ 9,865 | 75% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 6,224 |

# EXHIBIT A - 1
## POOL 1 - "COMPASS POOL"

| Parcel # | Gross Acres | PAR Value - $ / GSF | COMPASS BANK RELEASE PRICE Total | $ /GSF | $ / Gross Acre | % of PAR | TERM LOAN PAR Value - $ / GSF | RELEASE PRICE % of PAR | $ /GSF | $ / Gross Acre | Total Release Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 71-1 | 28.32 | $ 0.30 | $ 631,134 | $ 0.51 | $ 22,286 | 169% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 43,739 |
| 71-3 | 0.58 | $ 0.30 | $ 12,921 | $ 0.51 | $ 22,277 | 169% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 896 |
| 72-1 | 8.57 | $ 0.30 | $ 208,721 | $ 0.56 | $ 24,355 | 184% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 13,236 |
| 72-2 | 2.54 | $ 0.30 | $ 59,635 | $ 0.54 | $ 23,478 | 178% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 3,923 |
| 72-3 | 6.70 | $ 0.30 | $ 161,511 | $ 0.55 | $ 24,106 | 183% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 10,348 |
| | 1,352.72 | $ 0.30 | $ 26,759,573 | $ 0.45 | $ 19,782 | 150% | $0.024 | 150% | $ 0.035 | $ 1,544 | $ 2,089,223 |

| Total Releases as % of Estimated Claim | 150% |
|---|---|
| Estimated Claim @ Confirmation | $ 17,860,860 |
| Par Value - $ / Acre | $ 13,204 |
| Par Value - $ / Gross SF | $ 0.30 |

| Total Releases as % of Estimated Claim | 150% |
|---|---|
| Estimated Balance of Term Loan @ Confirmation | $ 2,634,356 |
| Estimated # of Gross Acres in Pools 1 & 2 @ Confirmation | 2,558.52 |
| Par Value - $ / Acre | $ 1,030 |
| Par Value - $ / Gross SF | $ 0.02 |

NOTE: All monetary amounts will be finalized and recalculated as of the Confirmation Date; all percentages shall remain fixed.

# Exhibit A - 2
## Pool 2 - Hutchins Industrial Pool

| Parcel # | Creditor | Acreage | | Secured Creditors | | Term Loan | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Current Acres | Usable Acres | Estimated Claim at Confirmation | Release Price | Estimated Claim at Confirmation | PAR Value - $ / Gross Square Foot | % of PAR | $ / Gross Square Foot | $ / Gross Acre | Total Release Price |
| 3 | Van de Green Investments Tract | 44.18 | 36.79 | $ 2,415,817 | $ 2,415,817 | $ 45,489 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | $ 68,233 |
| 4 | 1086 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 82.02 | 82.02 | $ 2,303,512 | $ 2,303,512 | $ 84,450 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 126,675 |
| 5 | 1087 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 133.64 | 130.22 | $ 4,588,382 | $ 4,588,382 | $ 137,599 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 206,399 |
| 8 | Wintergreen 42 Acre Dev. Tract | 42.73 | 42.73 | $ 980,757 | $ 980,757 | $ 43,996 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 65,994 |
| 9 | Wintergreen Realty Corp. | 50.80 | 50.80 | $ 1,458,315 | $ 1,458,315 | $ 52,305 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 78,458 |
| 10 | Wintergreen Investment Tract | 67.75 | 67.75 | $ 1,874,950 | $ 1,874,950 | $ 69,757 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 104,636 |
| 11 | Wintergreen 188 Tract | 141.51 | 141.51 | $ 3,917,496 | $ 3,917,496 | $ 145,703 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 218,554 |
| 13 | Dallas County Farm Joint Vent. | 215.62 | 215.62 | $ 4,263,693 | $ 4,263,693 | $ 222,008 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 333,012 |
| 20 | Dallas County Dev. Tract No. 5 | 99.67 | 95.91 | $ 2,341,682 | $ 2,341,682 | $ 102,623 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 153,934 |
| 28 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 39.46 | 39.46 | $ 566,823 | $ 566,823 | $ 40,629 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 60,944 |
| 29 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 31.91 | 31.91 | $ 458,371 | $ 458,371 | $ 32,855 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 49,283 |
| 30 | Forty-Three Acre Investment | 43.12 | 43.12 | $ 800,141 | $ 800,141 | $ 44,398 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 66,596 |
| 31 | Forty-Three Investment Tract 2 | 43.06 | 43.06 | $ 799,028 | $ 799,028 | $ 44,336 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 66,504 |
| 34 | 55-Acre Investment Tract | 55.38 | 55.38 | $ 782,226 | $ 782,226 | $ 57,021 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 85,531 |
| 114 | T.E. Frossard, Jr. | 114.95 | 114.95 | $ 990,703 | $ 990,703 | $ 118,356 | $ 0.024 | 150% | $ 0.035 | $ 1,544 | 177,534 |
| | | 1,205.80 | 1,191.23 | $ 28,541,897 | $ 28,541,897 | $ 1,241,525 | $ 0.024 | 147% | $ 0.035 | $ 1,544 | $ 1,862,288 |

**NOTE: All monetary amounts will be finalized and recalculated as of the Confirmation Date; all percentages shall remain fixed.**

# Exhibit A - 3
# Pool 3 - ABOT Pool

| Parcel # | Acreage | | Secured Creditors | | Term Loan | |
| --- | --- | --- | --- | --- | --- | --- |
| | Current Acres | Usable Acres | Estimated Claim at Confirmation | Release Price | Estimated Claim at Confirmation | Release Price |
| 21 | 202.24 | 202.24 | $ 3,597,979 | n/a | n/a | n/a |
| 33 | 173.53 | 161.82 | $ 3,421,900 | n/a | n/a | n/a |
| 41 | 186.47 | 186.47 | $ 3,679,628 | n/a | n/a | n/a |
| 54 | 54.08 | 54.08 | $ 1,067,005 | n/a | n/a | n/a |
| 87 | 156.00 | 114.99 | $ 3,101,083 | n/a | n/a | n/a |
| 198-200 | 62.52 | 61.19 | $ 2,551,456 | n/a | n/a | n/a |
| 35&38 | 121.62 | 121.62 | $ 2,399,717 | n/a | n/a | n/a |
| 39&40 | 75.61 | 75.61 | $ 1,491,883 | n/a | n/a | n/a |
| | **1,032.07** | **978.02** | **$ 21,310,650** | | | |

**NOTE: All monetary amounts will be finalized and recalculated as of the Confirmation Date; all percentages shall remain fixed.**

# Exhibit A - 4
# Seller Notes Pool

| Parcel # | Creditor | Current Acres | Usable Acres | Secured Creditor Estimated Claim at Confirmation | Secured Creditor Release Price | Term Loan Estimated Claim at Confirmation | Term Loan Release Price |
|---|---|---|---|---|---|---|---|
| 6 | 1088 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 106.65 | 104.10 | $ 3,050,669 | $ 3,050,669 | | |
| 7 | 1089 Capital Partners I, LTD & 1086 Hutchins/Wilmer L.P. | 27.01 | 20.01 | $ 526,343 | $ 526,343 | | |
| 14 | 99 Acre Investment Tract | 98.84 | 98.84 | $ 3,884,590 | $ 3,884,590 | | |
| 15 | Talco Investment Tract | 101.45 | 94.94 | $ 2,157,182 | $ 2,157,182 | | |
| 19 | Pleasant Run Investment Tract | 212.33 | 170.38 | $ 4,778,242 | $ 4,778,242 | | |
| 26 | Beltline Investment Tract | 111.58 | 111.58 | $ 2,558,264 | $ 2,558,264 | | |
| 27 | Greene Road Investment Tract | 76.10 | 76.10 | $ 1,744,833 | $ 1,744,833 | | |
| 78 | Juanita, Celeste & Eleno Madrigal | 39.82 | 38.41 | $ 679,921 | $ 679,921 | | |
| 177 | William and Linda Ernst | 24.17 | 17.37 | $ 219,313 | $ 219,313 | | |
| 16,17,18 | Dallas 216 AC. J.V. | 215.27 | 200.79 | $ 4,379,027 | $ 4,379,027 | | |
| 161-164 | Coffman Investments | 94.18 | 77.08 | $ 2,028,302 | $ 2,028,302 | | |
| 22,23 | Pilsner Holding Corp. | 314.62 | 314.62 | $ 5,503,225 | $ 5,503,225 | | |
| 24,25 | Beltline Investment Tract | 95.57 | 95.57 | $ 1,973,829 | $ 1,973,829 | | |
| 93-95 &156-157 | Southport Properties, LP | 102.82 | 64.61 | $ 2,801,867 | $ 2,801,867 | | |
| 98-99 | Roza Frumkin | 193.01 | 170.65 | $ 1,903,765 | $ 1,903,765 | | |
| | | 1,813.42 | 1,655.05 | $ 38,189,373 | $ 38,189,373 | | |

10% OF "NET SALES PROCEEDS" GENERATED FROM THE SALE OF ANY POOL 4 PARCEL

NOTE: All monetary amounts will be finalized and recalculated as of the Confirmation Date; all percentages shall remain fixed.