Robert Yaquinto, Jr.
State Bar No. 22115750
SHERMAN & YAQUINTO, L.L.P.
509 N. Montclair Avenue
Dallas, Texas 75208-5498
214/942-5502   Fax: 214/946-7601
ATTORNEY FOR POOL 2 SECURED CREDITORS

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **DLH Master Land Holding, LLC** | § | Case No.10-30561-hdh-11 |
| and | § | |
| **Allen Capital Partners, LLC,** | § | Chapter 11 |
| | § | |
| **Debtors.** | § | |

**POOL 2: HUTCHINS INDUSTRIAL POOL**
**SECURED CREDITORS' OBJECTIONS TO CONFIRMATION OF DEBTORS'**
**FIFTH AMENDED JOINT PLAN OF REORGANIZATION**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

**Preliminary Statement**

The below listed members of DLH Class 3 Subclass B. Pool 2: Hutchins Industrial Pool ("Pool 2") as defined in the Amended Fifth Joint Plan of Reorganization for Allen Capital Partners, LLC and DLH Master Land Holding, LLC, filed May 19, 2011 (the "Plan") each (i) object to Confirmation of the Plan because the plan is not feasible pursuant to section 1129(a)(11); and (ii) object to the Plan being confirmed over their objection, because the Plan is not fair and equitable pursuant to section 1129(b) of the Bankruptcy Code. Pool 2 includes the following members:

1. Each of the following is a note holder secured by a parcel or real property identified by DLH Master Land Holding, LLC in Exhibit A-2 to the Plan and included in Pool

2. Each join in these Objections to Confirmation: **Van de Green Investments Tract**, owners and holders of a promissory note secured by the real estate described as Parcel 3 in Exhibit A-2 to the Plan; **1086 Capital Partners I, Ltd & 1086 Hutchins/Wilmer L.P.**, owners and holders of promissory notes secured by the real estate described as Parcel 4 in Exhibit A-2 to the Plan; **1086 Capital Partners I, Ltd & 1086 Hutchins/Wilmer L.P.**, owners and holders of promissory notes secured by the real estate described as Parcel 5 in Exhibit A-2 to the Plan; **Wintergreen 42 Acre Dev. Tract**, owner and holder of a promissory note secured by the real estate described as Parcel 8 in Exhibit A-2 to the Plan; **Wintergreen Realty Corp.**, owner and holder of a promissory note secured by the real estate described as Parcel 9 in Exhibit A-2 to the Plan; **Wintergreen Investment Tract**, owner and holder of a promissory note secured by the real estate described as Parcel 10 in Exhibit A-2 to the Plan; **Wintergreen 188 Tract**, owner and holder of a promissory note secured by the real estate described as Parcel 11 in Exhibit A-2 to the Plan; **Dallas County Farm Joint Venture**, owner and holder of a promissory note secured by the real estate described as Parcel 13 in Exhibit A-2 to the Plan; **Dallas County Development Tract No. 5**, owner and holder of a promissory note secured by the real estate described as Parcel 20 in Exhibit A-2 to the Plan; **1086 Capital Partners I, Ltd & 1086 Hutchins/Wilmer L.P.**, owners and holders of a promissory note secured by the real estate described as Parcel 28 in Exhibit A-2 to the Plan; **1086 Capital Partners I, Ltd & 1086 Hutchins/Wilmer L.P.**, owners and holders of a promissory note secured by the real estate described as Parcel 29 in Exhibit A-2 to the Plan; **Forty-Three Acre Investment**, owner and holder of a promissory note secured

by the real estate described as Parcel 30 in Exhibit A-2 to the Plan; **Forty-Three Investment Tract 2**, owner and holder of a promissory note secured by the real estate described as Parcel 31 in Exhibit A-2 to the Plan; and **55-Acre Investment Tract**, owner and holder of a promissory note secured by the real estate described as Parcel 34 in Exhibit A-2 to the Plan. Each has been classified as a Pool 2 Secured Creditor of Debtor DLH Master Land Holding, L.L.C. ("DLH") and each is designated as its own class pursuant to the Disclosure Statement for Debtors' Amended Fifth Joint Plan of Reorganization and in the Plan and are hereinafter referred to as "**Pool 2 Secured Creditors**."

## Jurisdiction

3. This Court has jurisdiction over this matter pursuant to 11 U.S.C. §1129; 28 U.S.C. §§157 and 1134. This is a core proceeding.

## Background

4. Without exception each Pool 2 Secured Creditor holds a Non-recourse Note, originally executed February 13, 2006; March 10, 2006; or March 14, 2006, secured by a deed of trust on property which it sold to an entity other than DLH. Effective February 13, 2009, with two exceptions, these Non-Recourse Notes were modified to change the terms of payment because the borrower was unable to make payments required by the notes and was in default. The maturity date for each note was changed to February 13, 2012 with payment terms also modified.

5. As explained in DLH's Disclosure Statement, all of the parcels of real estate which are collateral for the Pool 2 Secured Creditors were transferred, without notice to or

consent of the note holder, to DLH in December, 2009 shortly before this bankruptcy was filed.

6. On January 25, 2010, DLH filed this Chapter 11. Since the filing of this case, none of the Pool 2 Secured Creditors has received a payment on its note or any adequate protection payments.

7. Many of the partnership and joint venture participants in the Pool 2 Secured Creditors are elderly with almost half of the participants 70 years of age or older. Some participants have died. All hoped to enjoy this money in this life.

8. All of the land that is collateral for Pool 2 Secured Creditors is raw, undeveloped land and will need substantial infrastructure work before it can be developed. This raw undeveloped land is surrounded by more raw undeveloped land that is also for sale.

9. The Plan provides for the surrender of all of the property in DLH Class 3 Subclass C. Pool 3: ABOT Pool ("Pool 3"). The Plan allows DLH Class 3 Subclass D. Pool 4: Seller Financing Pool ("Pool 4") to obtain surrender of its collateral within ninety (90) days of the effective date of the plan if requested and if there is not a contract pending that will close within 150 days of the effective date of the plan. Otherwise Pool 4 real estate will be offered for sale in auctions, by sealed bid, or other structured sale for six months from the Effective Date of the Plan. No mention is made of the other competing sites in the same geographic area.

## Feasibility

10. Section 1129(a)(11) requires that a "confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the

debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The plan must be feasible.

11. DLH worked diligently over the last seventeen (17) months to obtain exit financing. It has failed to obtain any. It now relies on the proceeds from the ADESA sale of approximately $2,100,000 which it says will carry it through confirmation and allow it to make the first round of interest payments to Pool 2 Secured Creditors without a sale of any of its land inventory. DLH estimates that the $846,403 will be used to pay Administrative Expenses, *Disclosure Statement Exhibit N,* and that $750,000 to pay Allowed Claims that have to be paid on or within 14 days of the Effective Date. *Debtors' Amended Fifth Joint Plan of Reorganization , Page 8.* The Unsecured Creditors Committee recently filed a notice of its estimated professional fees and expenses in the amount of $900,000. It is unclear what the total amount of allowed administrative claims will be. In addition to the ADESA sale proceeds, DLH is relying on prospective land sales, a loan from Allen Opportunity Fund, and/or a loan from Richard S. Allen, a chapter 11 debtor. There are no binding loan commitments from the Allen Opportunity Fund of Richard S. Allen, Debtor-in-Possession.

12. DLH's plan is speculative. It relies on the sale of raw land. DLH's Liquidation Analysis with regard to Pool 1, Pool 2, Pool 3 and Pool 4 acknowledges: "In liquidation, selling this land quickly would be impossible without deep discounts and any proceeds would be greatly eroded by closing costs, marketing & disposition expenses, default interest on the seller-financed land loans, and by the lender's attorney fees." *Disclosure Statement, Exhibit I, Page 4-5*. This is the same type of auction or structured sale DLH proposes for certain Pool 1, Pool 2, and Pool 4

properties. Further, while these auctions and structured sales are the crux of the DLH Plan, DLH has exhibited no capacity to complete such transactions and has not disclosed many of the details on the marketing process for auctions or structured sales.

13. DLH's solvency in year one is entirely dependent on profitable auctions and/or structured sales. Specifically, if DLH is unable to sell 294 acres of land in order to generate Pool 4 sales and net proceeds of more than $9 million less costs of sale and more than $5 million after payment of first lien holders, respectively, within six months of the Effective Date, DLH will lack the necessary funds to continue operations post confirmation. *Disclosure Statement, Exhibit E, Pages 19-21*. Yet this is exactly what DLH proposes: a quick liquidation of the land while leaving the risks on the secured creditors.

14. Because DLH lacks the necessary capital to properly market this land for sale, an auction, sealed bid and/or structured sale signifies a desperate attempt to sell the land. It will be unlikely to bring the best price and it will adversely impact the value of the other DLH land. The Disclosure Statement reads, "If a Trustee attempts to sell all of the land in Pool 1 and Pool 2 in a bulk transaction over a 6-12 month window, it is debtor's opinion that the south Dallas submarket will not be able to absorb the large amount of land without greatly distorting values." *Disclosure Statement*, *Exhibit I, Page 4*. In direct contradiction to this statement, DLH assumes the collateral release, auction or structured sale of approximately 3,000 acres of Pool 1, Pool 2, Pool 3, and Pool 4 land will have no meaningful effect on market land prices. Despite these assumptions, the DLH financial projections assume DLH land price inflation of 5%,

5%, 7%, 8.5%, and 10% in years two through six post confirmation. These inflation assumptions on DLH land prices are extremely optimistic given the large supply of directly competitive land which will have a land basis of approximately half that of the reorganized DLH.

15. DLH's interests are not aligned with those of its creditors. The Plan offers no incentive for reorganized DLH to sell land at reasonable prices which would provide a full recovery to creditors. Instead the Plan essentially provides DLH with a free option to sell land at the expense of its creditors.

16. DLH has not been sitting idle while the bankruptcy is pending. DLH indicates that it has been aggressively marketing its real estate for at least the last twelve months. *Disclosure Statement*, *Exhibits R and S*. Yet, there have been no sales.

17. If land sales fail, there is no assurance that the loan from Allen Opportunity Fund will be made or when it will be made. There is no reasonable expectation that a Chapter 11 Debtor will be allowed to loan $750,000 to another Chapter 11 Debtor.

18. There is no land currently under contract. There are no motions to sell any land. As stated previously, the auction, sealed bid, or structured sale events described in the Disclosure Statement and Plan have not been presented.

19. Under the best circumstances, the absorption rate of the Pool 2 Secured Creditors parcels is 24 to 48 months. A more realistic absorption rate is 25 years.

## **Cram Down**

20. If the court finds that the Plan is feasible, DLH will have to obtain confirmation by Section 1129(b). This is confirmation of the plan over the rejection of the plan by a

class or classes of creditors. Each of the Pool 2 Secured Creditors has rejected the plan.

21. In order for a plan to be confirmed over rejection of a class of creditors, the plan must be fair and equitable. " With respect to a class of secured claims, the plan provides-

    (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

    (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; …

22. The "fair and equitable" rule requires that the holder of a secured claim receive, post effective date, a reasonable rate of interest based on risk factors assessed by the court. This is based on the assumption that money now is worth more than money later.

23. DLH proposes a fixed interest rate of 5.5% to be paid every six months in arrears for the first three years of the loan with the first payment due on the sixth month anniversary of the Effective Date. It also proposes to annual adjustments to principal beginning the first year after the Effective Date equal to the inflation rate as determined by the Consumer Price Index and capped at 2.5%. It proposes to begin semi- annual interest and principal payments beginning the third year following the Effective Date based on a ten (10) year amortization rate. The note will mature at the end of five (5) years unless DLH exercises its option to extend the note for an

additional year by making a 2% principal reduction. The plan allows DLH three extensions. DLH need not extend all Pool 2 Secured Creditor notes, but may select only those it deems worthy. The opportunity to "cherry pick" the parcels devalues those that are not selected.

24. In addition, the plan allows DLH to sell portions of parcels with the agreement of the secured lender, but if no agreement is reached, DLH may ask the bankruptcy court to set the release price.

25. The proposed treatment is not fair and equitable. The proposed interest rate, including the inflation protector is insufficient. There is no market to finance raw land. Any financing available would necessarily be on a short term basis. A reasonable interest rate would not be fixed and the term of the loan, assuming it could be obtained would not extend 5 to 8 years as contemplated in the Plan. "Given the continued constraint of the capital markets for essentially any raw land financing, the long-term nature of the assets and the small population of prospective bulk purchasers, it can reasonably be anticipated that prospective bulk purchasers would attempt to purchase the asset at very low prices and the senior lenders would be required to take significant discounts on their liens to liquidate their loans in a short time window." *Disclosure Statement Exhibit I, page 3 of 6* .

26. DLH does not offer deferred cash payments. DLH offers nothing to Pool 2 Secured Creditors other than projection that there will be sufficient funds to make an interest payment six (6) months after the Effective Date even if no land sales occur. [Additionally, land sale proceeds (if any) are subject to a carve-out reserved for the payment of taxes incurred by equity holders of any reorganized DLH interests as a

direct result of taxable income or gains recognized by such holders resulting from the sale, exchange or disposition of property, essentially converting the Pool 2 Secured Creditors' collateral to the immediate and direct benefit of the equity holders. *Plan, Section 13.14(e).*]

27. Even assuming that DLH were to have the funds to make at least the first deferred cash payment, a reasonable rate of interest, given the financial condition of DLH, "constraint of the capital markets for essentially any raw land financing," and weighing these risks, is a floating rate with a floor of approximately 10% with a much shorter term, (not longer than one year) than proposed in the plan.

28. DLH has no risk other than a loss of opportunity. Each of the Pool 2 Secured Creditor Notes is Non-Recourse. The structure of the plan essentially gives DLH a six month option. DLH can stretch this six month option period into a three year option period a minimal cost. This deprives the Pool 2 Secured Creditors the opportunity to market the property or to look for a third party with the ability to actually pay for and develop the land. On the six month anniversary when the interest payment is due, DLH has the ability to select the parcels on which it chooses to pay interest. The ability to "cherry pick" the best parcels shifts additional risk from the debtor to the Pool 2 Secured Lenders.

29. The proposed treatment of the Pool 2 Secured Creditors is not the deferred cash payments totaling the amount of the claim with a value equal to the value of the claim on the Effective Date that the Bankruptcy Code mandates.

## Other Opportunities

30. For the last seventeen (17) months, DLH has sought exit financing. This Court approved the retention of NewSource Partners and a commission agreement to be paid upon securing exit financing. None has been presented.

31. The Pool 2 Creditors understand that various parties have approached DLH with alternative transactions or proposals to the Plan, which could yield better recoveries for DLH's creditors. However, DLH required any interested party to agree to a non-market confidentiality agreement in order to commence negotiations with DLH, which confidentiality agreement restricted interested parties from engaging in discussions with other parties besides DLH regarding a prospective transaction and required DLH to approve any proposed transaction. DLH has failed in its role as a fiduciary, and its process has resulted in freezing any alternatives that could enhance and solidify creditor recoveries or result in a transaction that realizes the potential of the Dallas Logistics Hub for the benefit of creditors and the community at large.

32. Notwithstanding the inhospitable environment created by the Debtors, members of Pool 2 Secured Creditors are aware that at least two parties, which have the financial wherewithal to develop the inland port as the creditors and various municipalities originally envisioned, are highly interested in developing an alternative plan that would pay cash in full or other substantial cash recoveries to Pool 2 Secured Creditors and other creditors upon confirmation.

33. Both of these parties are substantial companies with strong financial attributes and both are very knowledgeable about the Inland Port concept and the various agreements with the surrounding local governments. These parties have conducted

diligence on the project based on publicly available information, but would need access to DLH's due diligence materials to confirm their current assumptions in order to move forward with their proposals.

## Prayer

Pool 2 Secured Creditors request that this Court SUSTAIN the foregoing objections to Confirmation of the Plan; request this Court deny confirmation of the Plan; and request any and all other relief to which Pool 2 Secured Creditors may show themselves entitled.

RESPECTFULLY SUBMITTED,

__/s/ Robert Yaquinto, Jr_____
Robert Yaquinto, Jr.
State Bar No. 22115750
SHERMAN & YAQUINTO, L.L.P.
509 N. Montclair Avenue
Dallas, Texas 75208-5498
214/942-5502   Fax: 214/946-7601
ATTORNEY FOR
POOL 2 SECURED CREDITORS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 17, 2011, a true and correct copy of the foregoing document was served on the parties listed on the court's ECF noticing system via electronic mail.

*/s/ Robert Yaquinto, Jr.*
Robert Yaquinto, Jr