

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Harlin DeWayne Hale*

**United States Bankruptcy Judge**

**Signed November 23, 2011**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 10-30561-HDH-11** |
| | § | |
| **DLH Master Land Holding, LLC,** | § | **CHAPTER 11** |
| **Allen Capital Partners, LLC,** | § | |
| **Richard S. Allen, Inc.** | § | **Jointly Administered** |
| **Richard S. Allen** | § | |
| | § | |
| **Debtors.** | § | |
| | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**
**CONFIRMING THE AMENDED AND RESTATED SEVENTH PLAN OF**
**<u>REORGANIZATION FOR DLH MASTER LAND HOLDING, LLC</u>**

CAME ON FOR HEARING AND CONFIRMATION (the "**Confirmation Hearing**")

the *Amended and Restated Seventh Plan of Reorganization for DLH Master Land Holding*

[Docket No. 1254], (the "**Plan**" or the "**DLH Plan**") filed with the Court on November 22, 2011

by Debtor and Debtor-in-Possession DLH MASTER LAND HOLDING, LLC ("**DLH**").[1]

---

[1] DLH and Allen Capital Partners, LLC ("**ACP**") are collectively referred to herein as the "**Debtors**." For the avoidance of doubt, the term "Debtors" as used in this Order shall not include related debtors Richard S. Allen, Inc. or Richard S. Allen, each of which is expressly excluded from the terms of the Plan (as defined herein) and will be administered separate and apart from the provisions of the Plan. ACP is subject to its own Chapter 11 plan, which was confirmed by order of this Court entered on October 12, 2011 [Docket No. 1201].

The Court, having considered the *Certificate of Service* [Docket No. 968] filed with the Court by the Debtors' agent on June 1, 2011 (the "**Certificate of Mailing**") regarding service of the (i) Disclosure Statement (as defined in the Plan);[2] (ii) Amended Fifth Joint Plan of the Debtors; (iii) *Order Approving Disclosure Statement for Debtors' Amended Fifth Joint Plan of Reorganization* [Docket No. 950] (the "**Disclosure Statement Order**"); (iv) *Notice of Approval of Disclosure Statement and Scheduling of (A) Voting Deadline, (B) Deadline for Objecting to Confirmation, and (C) Confirmation Hearing on Amended Fifth Joint Plan of Reorganization for Allen Capital Partners, LLC and DLH Master Land Holding, LLC* (the "**Notice**"); (v) *Notice of Debtors' Amended Fifth Joint Plan of Reorganization and of Classification of Unimpaired Classes* (the "**Unimpaired Notice**")**;** (vi) solicitation letter (the "**Solicitation Letter**") from the Official Committee of Unsecured Creditors (the "**Committee**"); and (vii) appropriate ballots related to the Plan (collectively, the "**Ballots**"), finds that due notice of the Disclosure Statement, the DLH Plan, the Disclosure Statement Order, the Notice, the Unimpaired Notice, the Solicitation Letter and the Ballots was given to all holders of Claims against, and Interests in, DLH, in accordance with Title 11 of the United States Code (the "**Bankruptcy Code**") and the Federal Rules of Bankruptcy Procedure (the "**Rules**"), and no other or further notice is required or need be given.

The Court, having further considered the Disclosure Statement, the DLH Plan, the Certificate of Service, the *Summary of Voting on the Plan* submitted to the Court on June 20, 2011 [Docket No. 1005] (the "**Ballot Summary**"), all filed objections to confirmation of the DLH Plan, including objections to the DLH Plan filed by creditors BBVA Compass Bank ("**Compass**"), the Pool 2 creditors ("**Pool 2**"), and the Pool 4 creditors ("**Pool 4**"), the arguments

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

of counsel, the evidence presented, and having taken judicial notice of the pleadings and evidence presented in, and the record of, this case, and after due deliberation and sufficient cause therefor, hereby enters its findings of fact and conclusions of law (the "**Findings and Conclusions**") with respect to confirmation of the DLH Plan as follows:

**I.**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**[3]

1.      This Court heard testimony over the course of approximately twelve days involving confirmation of the DLH Plan. After reviewing the evidence and record, on October 27, 2011, this Court orally announced its ruling on the DLH Plan. That ruling and the findings and conclusions contained therein are hereby incorporated in this Order as if fully restated herein. In response to the Court's ruling, DLH timely filed an *Amended and Restated Sixth Plan of Reorganization* [Docket No. 1234] on November 7, 2011, which generally complied with the conditions set forth by the Court on October 27, 2011; however, a clarification from the Court on November 7, 2011 necessitated the filing of the current DLH Plan, *i.e.*, the *Amended and Restated Seventh Plan of Reorganization of DLH Master Land Holding, LLC* [Docket No. 1254]. The Plan is now confirmable.

2.      The DLH Plan meets the requirements for confirmation set by this Court in its oral ruling on October 27, 2011, as supplemented at the hearing on November 8, 2011, subject to finalization of Plan documents agreed to by the Pool 1, Pool 2 and Pool 4 Secured Creditors or otherwise approved by the Court.

---

[3] These Findings and Conclusions together with any findings of fact or conclusions of law announced from the bench by the Court constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 9014. To the extent any findings of fact constitute conclusions of law, they are adopted as such. Likewise, to the extent any conclusions of law constitute findings of fact, they are adopted as such.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
CONFIRMING THE AMENDED AND RESTATED SEVENTH PLAN
OF REORGANIZATION FOR DLH MASTER LAND HOLDING, LLC                    PAGE 3 OF 43

A.    **Specific Findings and Conclusions Concerning Confirmation**

3.    **Jurisdiction**.  This Court has jurisdiction over DLH's Chapter 11 bankruptcy case pursuant to 28 U.S.C. § 1334.  Venue is proper before this Court pursuant to 28 U.S.C. § 1408. Confirmation of the DLH Plan is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has exclusive jurisdiction to determine whether the DLH Plan complies with the applicable provisions of the Bankruptcy Code.

4.    **Notice**.  The Disclosure Statement, the DLH Plan, the Disclosure Statement Order, the Notice, the Unimpaired Notice, the Solicitation Letter, and the Ballots were transmitted and served in compliance with the Rules and this Court's orders, and service thereof was adequate and sufficient to satisfy due process.  All parties, including, without limitation, those taxing authorities, attorneys general, and other governmental units entitled to notice of the Confirmation Hearing and the deadline for submitting Ballots and filing and serving objections to confirmation of the DLH Plan, received adequate notice in accordance with the Rules and have had an ample opportunity to appear and be heard.  No other or further notice is necessary or required.

5.    **Judicial Notice**.  This Court takes judicial notice of the docket maintained in the Debtors' bankruptcy cases by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Court in the above-referenced and jointly administered bankruptcy case.  These Findings and Conclusions incorporate the official record and the transcript of the Confirmation Hearing (the "**Record**")  for all purposes.

6.      **Compliance with the Applicable Provisions of the Bankruptcy Co**de.   As set forth below, DLH has met its burden of proving the elements required under the Bankruptcy Code for confirmation of the DLH Plan by a preponderance of the evidence.

a.      The DLH Plan Complies with Section 1129(a)(1).   The DLH Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying 11 U.S.C. § 1129(a)(1). Specifically,

i.      Proper Classification of Claims and Interests.   The DLH Plan designates seven (7) Classes of Claims and Interests against or in DLH.   The Claims or Interests placed in each Class are substantially similar to other Claims or Interests, as the case may be, in such Class.   Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the DLH Plan, and such Classes do not unfairly discriminate among holders of Claims or Interests.   Thus, the DLH Plan satisfies 11 U.S.C. §§ 1122 and 1123(a)(1).

ii.      Specification of Unimpaired Classes.   The DLH Plan specifies that Class 1 (Allowed Administrative Expense Claims against DLH) and Class 2 (Allowed Priority Claims against DLH) are not impaired under the DLH Plan and are deemed to have accepted the DLH Plan, thereby satisfying 11 U.S.C. § 1123(a)(2) of the Bankruptcy Code.

iii.      Specification of Treatment of Impaired Classes.   Article 4 of the DLH Plan designates each of Class 3 (Allowed Secured Claims against DLH), Class 4 (Allowed Unsecured Claims against DLH), Class 5 (Administrative Convenience Claims against DLH), Class 6

(Reimbursement Claims against DLH), and Class 7 (Equity Interest Holders in DLH) as impaired and specifies the treatment of Claims and Interests in those Classes, thereby satisfying 11 U.S.C. § 1123(a)(3).

iv.    _Equal Treatment Within Classes._  The DLH Plan provides for the same treatment for each Claim or Interest in a particular Class unless the holder of a particular Claim or Interest in such Class has agreed to a less favorable treatment of its Claim or Interest, thereby satisfying 11 U.S.C. § 1123(a)(4).

v.    _Implementation of Plan._  The DLH Plan provides adequate and proper means for implementation of the DLH Plan, thereby satisfying 11 U.S.C. § 1123(a)(5).

vi.    _Non-Voting Securities._  The DLH Plan does not provide for the issuance of any non-voting securities in Reorganized DLH, and the Amended Limited Liability Company Operating Agreement for Reorganized DLH prohibits the issuance of any non-voting equity securities.  Further, the DLH Plan provides adequate means for the selection of directors of Reorganized DLH, thereby satisfying 11 U.S.C. § 1123(a)(6).

vii.    _Selection of Officers and Directors._  The Board of Directors of Reorganized DLH shall include one additional independent Director, a Creditors Representative selected by the Committee.  The Board of Directors of Reorganized DLH shall continue to include the Creditors Representative until the DLH 50% Notes and the DLH 100% Notes have been paid in full or otherwise discharged.  Accordingly, the DLH Plan is

consistent with the interests of creditors, equity security holders and public policy and therefore satisfies the requirements of 11 U.S.C. § 1123(a)(7).

viii.    <u>Rule 3016(a).</u>  The DLH Plan is dated and identifies the entity submitting it, thereby satisfying Federal Rule of Bankruptcy Procedure 3016(a).

ix.    <u>Additional DLH Plan Provisions.</u>  The provisions of the DLH Plan are appropriate and not inconsistent with any other applicable provisions of the Bankruptcy Code.

b.    <u>The DLH Plan Complies with Section 1129(a)(2).</u>  DLH has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying 11 U.S.C. § 1129(a)(2).  Specifically,

i.    <u>Proper Debtor and Plan Proponent.</u>  DLH is a proper debtor pursuant to 11 U.S.C. § 109 and proper proponent of the DLH Plan pursuant to 11 U.S.C. § 1121(c).

ii.    <u>Compliance With Applicable Bankruptcy Code Provisions.</u>  DLH has complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

iii.    <u>Compliance With Solicitation Requirements.</u>  DLH has complied with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Disclosure Statement Order in transmitting the solicitation materials identified therein and in the Certificate of Service and in soliciting and tabulating votes on the DLH Plan.

c.    <u>DLH Plan Proposed in Good Faith.</u>  DLH has proposed the DLH Plan in good faith and not by any means forbidden by law, thereby satisfying 11 U.S.C. § 1129(a)(3).  In determining that the DLH Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of DLH's bankruptcy case and the arms-length negotiations related to the formulation of the DLH Plan.  DLH's bankruptcy case was filed and the DLH Plan was proposed with the legitimate and honest purposes of developing and realizing upon the value of DLH's properties while maximizing returns to all Creditors and expeditiously making distributions to DLH's Creditors and Interest holders.  The DLH Plan reflects the results of these negotiations and is reflective of the interests of all of the DLH estate's constituencies.

d.    <u>Payments for Services or Costs and Expenses.</u>  Except as otherwise provided or permitted by the DLH Plan, any payment made or to be made by DLH for services or for costs and expenses in or in connection with its bankruptcy case, or in connection with the DLH Plan and incident to its bankruptcy case, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying 11 U.S.C. § 1129(a)(4).

e.    <u>Directors, Officers, and Insiders.</u>  DLH has complied with 11 U.S.C. § 1129(a)(5).  The DLH Plan identifies those individuals who will serve as directors and officers for DLH following confirmation of the DLH Plan, as well as any insiders.  The Board of Directors of Reorganized DLH will remain the same as prior to the filing of DLH's bankruptcy case, but shall also include one additional independent Director, the Creditors Representative.  The initial

Creditors Representative shall be Harold Kessler. The Board of Directors of Reorganized DLH shall continue to include the Creditors Representative until the DLH 50% Notes and the DLH 100% Notes have been paid in full or otherwise discharged. Accordingly, the DLH Plan is consistent with the interests of creditors, equity security holders and public policy.

f. <u>No Rate Changes.</u> The DLH Plan does not propose any rate changes that are subject to governmental regulation. Thus, 11 U.S.C. § 1129(a)(6) is not applicable and is deemed satisfied.

g. <u>Best Interests of Creditors.</u> The DLH Plan satisfies 11 U.S.C. § 1129(a)(7) as each holder of a Claim or Interest in an impaired Class either has accepted the DLH Plan or will receive or retain under the DLH Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the DLH Plan, that is not less than the amount that it would receive if DLH was liquidated under Chapter 7 of the Bankruptcy Code.

h. <u>Acceptance by Certain Classes.</u> With respect to DLH, Classes 3-D-12 (William and Linda Ernst) and 3-D-13 (Rosa Frumkin), and Classes 4, 5, 6 and 7 of DLH, which are impaired and eligible to vote under the Plan, have voted to accept the Plan. Class 3-A (Compass), Classes 3-B, 1 through 14 (the Pool 2 Creditors), and Classes 3-D, 1 through 11 (the Pool 4 Creditors) have voted to reject the Plan. Because at least one Class of Claims which is impaired under the Plan for DLH has voted to accept the Plan, determined without any acceptance of the Plan by any insider, the DLH Plan complies with 11 U.S.C. §1129(a)(10).

i.      Rejection by Certain Classes.  With respect to DLH, Classes 3-A (Compass), 3-B, 1 through 14 (the Pool 2 Creditors), and 3-D, 1 through 11 (and certain Pool 4 Creditors represented by Robert Yaquinto) have voted to reject the Plan. Therefore, in order to confirm the Plan as to DLH, the Plan must comply with 11 U.S.C. §1129(b)(1) as to each rejecting Class.

j.      Treatment of Administrative Expense Claims.  The DLH Plan's treatment of Allowed Administrative Expense Claims satisfies the requirements of 11 U.S.C. § 1129(a)(9). The DLH Plan provides for the payment in full, in Cash, of Allowed Administrative Expense Claims on the later of (i) the Effective Date of the DLH Plan, (ii) the date such Claim was due and payable by its terms, (iii) a date agreed to by the holder of such Claim, or (iv) within thirty (30) days following the date such Claim, if contested, is Allowed by Final Order.

k.      Acceptance of at Least One Impaired Class.  The DLH Plan satisfies 11 U.S.C. § 1129(a)(10).  As set forth in the Ballot Summary, at least one of the Impaired Classes of Claims voting under the DLH Plan has voted to accept the DLH Plan and has accepted the DLH Plan in requisite numbers and amounts without the need to include any acceptance of the DLH Plan by any insider.

l.      Feasibility.  The DLH Plan satisfies 11 U.S.C. § 1129(a)(11) as confirmation of the DLH Plan is not likely to be followed by further liquidation or the need for further financial reorganization.  The DLH Plan presents a workable framework of reorganization and there is a reasonable probability that the provisions of the DLH Plan will be performed.  The DLH Plan is found and determined to be feasible.

m. <u>Payment of Certain Fees.</u> All fees payable on or before the Effective Date under 28 U.S.C. § 1930 either have been paid or will be paid on the Effective Date pursuant to Section 13.05 of the DLH Plan. Accordingly, the DLH Plan satisfies 11 U.S.C. § 1129(a)(12).

n. <u>Continuation of Retiree Benefits.</u> DLH is not liable for the payment of any retiree benefits, as defined in 11 U.S.C. §1114. 11 U.S.C. §1129(a)(13) is not applicable to DLH.

o. <u>Principal Purpose.</u> The principal purpose of the DLH Plan is neither the avoidance of taxes nor of Section 5 of the Securities Act of 1933 (15 U.S.C. §77e, *et seq.*). The DLH Plan, therefore, satisfies the requirements of 11 U.S.C. § 1129(d).

p. <u>Transfers of Property.</u> All transfers of property under the DLH Plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of such property by DLH. The DLH Plan satisfies 11 U.S.C. § 1129(a)(16).

7. **<u>Good Faith Solicitation.</u>** Based upon the Record before the Court, DLH and its officers, directors, managers, members, affiliates, associates, employees, agents, attorneys, accountants, and other professionals have acted in good faith with respect to, and in compliance with, applicable provisions of the Bankruptcy Code in soliciting votes on the DLH Plan and such solicitation is hereby determined to have been in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the foregoing are entitled to the protections afforded by 11 U.S.C. § 1125(e) and the exculpatory protections set forth in Section 13.29 of the DLH Plan.

8.    **Exculpation.**    The Disclosure Statement, the DLH Plan, and the Record of the Confirmation Hearing are sufficient to support the exculpation provided for in Section 13.29 of the DLH Plan, and such exculpation is fair and reasonable.

B.    **Cramdown of DLH Class 3-A – Compass Secured Claim**

9.    Compass, the holder of the Class 3-A Secured Claim against DLH, has voted to reject the DLH Plan and has objected to confirmation of the DLH Plan.  Consequently, in order for the Court to confirm the DLH Plan over the rejection of Compass and its objection to confirmation of the DLH Plan, the Court must find that the DLH Plan complies with 11 U.S.C. §1129(b)(1).  Specifically, the Court must find that the DLH Plan does not unfairly discriminate against Compass, and that the DLH Plan is fair and equitable with respect to the treatment of Compass's Secured Claim.

10.    Compass holds a Secured Claim against DLH, not yet finally allowed, in the amount of approximately $19,500,000, secured by numerous parcels of real property within the Dallas Logistics Hub, totaling approximately 1,350 acres.   The Debtors offered appraisal testimony presented to the Court at the Confirmation Hearing was that the current fair market value of all of the various Compass collateral parcels exceeded not less $26,500,000.00, and, based upon the appraisal reports of Jamie Wickliffe, more than $86,000,000.00.  The Court does not adopt these precise amounts as the value of the Compass collateral.  However, Compass is over-secured on its Secured Claim.

11.    The DLH Plan proposes to transfer nine parcels, containing approximately 150 acres, to Compass on the Effective Date, with the amount of Compass's Allowed Secured Claim to be reduced by $5,300,000.00 (this Court's determined value of such parcels based upon all value evidence presented at the Confirmation Hearing), which value includes a discount to

reflect the carrying costs of the distributed parcels pending a sale and the risk to Compass of holding those parcels for sale. The credit against the Secured Claim of Compass for the distribution of these parcels shall be applied to the total Compass Allowed Secured Claim, first to Pre-Effective Date interest, then to attorneys' fees and costs, and then to principal. The remainder of Compass's Allowed Secured Claim would receive a Note, secured by Compass's existing first liens on the remainder of the Pool 1 Property, approximately 1,200 acres (*i.e.*, the 1,350 acres contained in all of the Pool 1 Parcels, less the 150 acres contained in the nine Parcels out of Pool 1 to be immediately distributed to Compass), bearing interest at a rate equal to 7.25% per annum to ensure that Compass shall receive deferred cash payments under the Pool 1 Note having a value, as of the Effective Date, equal to the principal balance of the Pool 1 Note. All accrued but unpaid interest and all principal shall become due five (5) years after the Effective Date. The DLH Plan provides that Compass will receive, upon the sale of any Pool 1 Property, a Release Price calculated for each specific parcel of land within Pool 1, the aggregate value of all such Release Prices averages more than 150% of the allocable portion of the Pool 1 Note, allocated over all of the remaining Pool 1 Collateral, plus a payment equal to 30% of the "Net Sales Proceeds" (as defined in the Plan) from the sale of any Pool 1 Property. Under the conditions imposed by this Court and the DLH Plan, Compass will receive full payment of interest by each anniversary of the Effective Date and required minimum principal reductions by the second, third, and fourth anniversary dates of the Effective Date.

12.    Because the Compass Pool 1 Note will continue to be secured by Compass's first lien upon all of Compass's collateral (with the exception of the Pool 1 Parcels being conveyed to Compass on the Effective Date in partial payment of Compass's Allowed Secured Claim), the DLH Plan complies with 11 U.S.C. §1129(b)(2)(A)(i) with respect to Compass.

13.     Compass has objected to that portion of the DLH Plan which proposes to distribute to Compass approximately 150 acres of its collateral in exchange for a credit against the Compass Allowed Secured Claim.   Counsel for Compass argued that the "dirt for debt" provisions were not proposed in good faith.   The Court disagrees.   When coupled with the projected payments to Compass from sales of Compass collateral, the DLH Plan, including the dirt for debt provisions, projects substantial added pay down of Compass principal.

14.     On November 8, 2011, at the status hearing on the modifications to the DLH Plan required by the Court, Compass first indicated that it wishes to obtain an environmental audit of the dirt-for-debt property being returned to Compass.   Any such environmental examination must be completed within sixty (60) days after the date of entry of this Order, and if any issues arise with respect to such environmental examination, Compass may bring that to the Court's attention by motion.   Unless Compass agrees in writing, during this sixty-day period, DLH shall not convey real property to Compass.   Otherwise, DLH is authorized to execute and record the various documents, in the form agreed to by Compass or approved by the Court, necessary to make the dirt-for-debt transfer(s) to Compass.   Notwithstanding the actual date or dates any such conveyances may be recorded, the transfer of the dirt for debt Parcels shall be deemed for all purposes to have occurred on the Effective Date, unless otherwise ordered by the Court.

15.     The Court must value the land to be conveyed to Compass for purposes of establishing the amount of the credit.   By determining the value of the land to be distributed to Compass, the appropriate discount from such value to account for carrying costs and risk, and thus the appropriate amount of the credit to be granted on Compass's Allowed Secured Claim, the Court can assure that indubitable equivalence has been established.   The Court carefully considered these issues for each Parcel to be transferred to Compass, taking into account

contracts on land in the area and the location of the parcels to be conveyed, resulting in a range of discounts from fair market value of 30% - 50%, which total amount was then rounded downward to a resulting aggregate credit of $5,300,000.00 against Compass's Allowed Secured Claim.

16.     The transfer of the nine parcels to Compass reduces the Secured Debt owed to Compass from an approximate amount of $19.5 million to approximately $14.3 million.

17.     Whether a reorganization plan provides a creditor the "indubitable equivalent" of its claim is a mixed question of law and fact. *In re Wiesrma*, 324 B.R. 92 (9th Cir. B.A.P. 2005) *aff'd in part, rev'd in part on other grounds*, 483 F.3rd 933 (9th Cir. 2007); *In re May*, 174 B.R.832 (Bankr. S.D. Ga. 1994); and *In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346 (5th Cir. 1989).

18.     DLH was required to prove by a preponderance of the evidence that the value of the proffered collateral is at least equal to the amount of the creditor's claim. *Matter of Briscoe Enterprises, Ltd., II*, 995 F.2d 1160, 1165, n.26 (5th Cir. 1993), *cert. denied*, 510 U.S. 992 (1993). This Court has set the dirt for debt credit lower than the credit requested by DLH to take into account a number of factors, including the carrying costs and costs and risks of disposition for Compass. The remaining tracts of land, after the dirt for debt conveyance, and the note secured by that land provide Compass with the indubitable equivalent of its claim

19.     The interest rate for the Compass claim was heavily litigated. There is not an efficient market for the Pool 1 or Pool 2 Notes. The interest rate offered to Compass and the Pool 2 creditors under the DLH Plan, as expressed in the ruling by the Court on October 27, 2011, is justified by present market conditions, the raw land nature of the collateral and the market interest rate analyses presented by the various interest rate experts, particularly that of

Mr. Kelly.  The Court finds that an interest rate of 7.25%, which is 4% over the current prime rate, satisfies the requirement of 11 U.S.C. § 1129(b)(2)(A)(i), in that Compass and the Pool 2 Noteholders will receive under the Compass Note and the Pool 2 Notes deferred payments having a value, as of the Effective Date of the DLH Plan, at least equal to the value of Compass's and the Pool 2 Noteholders' respective interests in their collateral.  After hearing the evidence, the Court finds that an interest rate of 7.25% is the appropriate interest rate to use for 11 U.S.C. § 1129(b)(2)(A)(i) purposes.

20.    Both Compass and DLH have provided conflicting appraisals.  The Court has observed the witnesses and received the appraisal reports of comparable sales and supporting acreage.   The Court finds that the proper amount of credit against Compass's Allowed Secured Claim for the transfer of the specified nine Parcels under the DLH Plan is $5,300,000.00, which includes appropriate discounts from fair market value ranging from 30% - 50% to account for the costs of carrying and selling such Parcels and to compensate Compass for the risk and time value of money while the Parcels remain unsold.  The Court finds that the size of these discounts appropriately takes into consideration that it could take Compass several years to sell these Parcels.

21.    The Court further finds that the value of the dirt for debt Parcels to be transferred to Compass plus the new Compass Note at the Court-determined rate of 7.25% to be received by Compass will fully compensate Compass so that it is receiving the indubitable equivalent of its rights on the Effective Date. Thus, the Plan complies with 11 U.S.C. § 1129(b)(2)(A)(iii).  In addition, the Court finds that the interest rate determined by the Court provides a significant cushion in determining indubitable equivalence.

22.    The Court finds that the DLH Plan does not unfairly discriminate against Compass, and that the treatment of Compass's Allowed Secured Claim is fair and equitable. Thus, the DLH Plan complies with 11 U.S.C. §1129(b) with respect to Compass.

23.    All objections to confirmation of the DLH Plan by Compass, including its supplemental objections, are overruled.

C.    **Cramdown of DLH Class 3-B – Pool 2 Secured Claims**

24.    The holders of the Class 3-B Secured Claims against DLH, the Pool 2 Creditors, also have voted to reject the DLH Plan and also have objected to confirmation of the DLH Plan. Consequently, in order for the Court to confirm the DLH Plan over the rejection of Pool 2 Creditors and their objection to confirmation of the DLH Plan, the Court must find that the DLH Plan complies with 11 U.S.C. §1129(b)(1). Specifically, the Court must find that the DLH Plan does not unfairly discriminate against any of the Pool 2 Creditors, and that the DLH Plan is fair and equitable with respect to the treatment of each Pool 2 Creditor's Secured Claim.

25.    Class 3-B 1 (Van de Green Investment Tract Parcel 3) holds an Allowed Secured Claim in the amount of approximately $2,442,568, secured by a single parcel of real property, Parcel 3, within the Dallas Logistics Hub, containing approximately 44 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 3 was $3,945,186.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

26.    Class 3-B 2 (1086 Capital Partners I, Ltd. and 1086 Hutchins/Wilmer, L.P.) holds an Allowed Secured Claim in the amount of approximately $573,026, secured by a single parcel of real property, Parcel 28, within the Dallas Logistics Hub, containing approximately 39.5 acres.

The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 28 was $3,093,980.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

27. Class 3-B 3 (1086 Capital Partners I, Ltd. and 1086 Hutchins/Wilmer, L.P.) holds an Allowed Secured Claim in the amount of approximately $463,387, secured by a single parcel of real property, Parcel 29, within the Dallas Logistics Hub, containing approximately 32 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 29 was $2,710,499.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

28. Class 3-B 4 (Wintergreen 42 Acre Development Tract Parcel 8) holds an Allowed Secured Claim in the amount of approximately $1,002,170, secured by a single parcel of real property, Parcel 8, within the Dallas Logistics Hub, containing approximately 43 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 8 was $2,605,846.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

29. Class 3-B 5 (Forty-Three Acre Investment Tract - Parcel 30) holds an Allowed Secured Claim in the amount of approximately $817,570, secured by a single parcel of real property, Parcel 30, within the Dallas Logistics Hub, containing approximately 43 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 30 was

$2,629,630.00.  The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

30.    Class 3-B 6 (Forty-Three Acre Investment Tract No. 2 - Parcel 31) holds an Allowed Secured Claim in the amount of approximately $816,434, secured by a single parcel of real property, Parcel 31, within the Dallas Logistics Hub, containing approximately 43 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 31 was $2,625,971.00.  The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

31.    Class 3-B 7 (55 Acre Investment Tract Parcel - 34) holds an Allowed Secured Claim in the amount of approximately $799,202, secured by a single parcel of real property, Parcel 34, within the Dallas Logistics Hub, containing approximately 55 acres.  The testimony presented to the Court by Daniel McAuliffe, the only witness who testified as to the value on Parcel 34, was that the current fair market value of Parcel 34 was not less than $987,000.  The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

32.    Class 3-B 8 (Dallas County Development Tract Parcel 20) holds an Allowed Secured Claim in the amount of approximately $2,392,836, secured by a single parcel of real property, Parcel 20, within the Dallas Logistics Hub, containing approximately 100 acres.  The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 20 was $6,078,275.00.  The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

33. Class 3-B 9 (Dallas County Farm Joint Venture Parcel 13) holds an Allowed Secured Claim in the amount of approximately $4,356,637, secured by a single parcel of real property, Parcel 13, within the Dallas Logistics Hub, containing approximately 216 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 13 was $12,210,129.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

34. Class 3-B 10 (Wintergreen 188 Tract Parcel 11) holds an Allowed Secured Claim in the amount of approximately $4,003,164, secured by a single parcel of real property, Parcel 11, within the Dallas Logistics Hub, containing approximately 141.5 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 11 was $10,170,890.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

35. Class 3-B 11 (Wintergreen Investment Tract Parcel 10) holds an Allowed Secured Claim in the amount of approximately $1,915,951, secured by a single parcel of real property, Parcel 10, within the Dallas Logistics Hub, containing approximately 68 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 10 was $5,961,404.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

36. Class 3-B 12 (Wintergreen Realty Corp. Parcel 9) holds an Allowed Secured Claim in the amount of approximately $1,490,214, secured by a single parcel of real property,

Parcel 9, within the Dallas Logistics Hub, containing approximately 51 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 9 was $4,425,696.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

37.     Class 3-B 13 (1086 Capital Partners I, Ltd. and 1086 Hutchins/Wilmer, L.P. Parcel 5) holds an Allowed Secured Claim in the amount of approximately $4,688,891, secured by a single parcel of real property, Parcel 5, within the Dallas Logistics Hub, containing approximately 134 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 5 was $10,187,377.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

38.     Class 3-B 14 (1086 Capital Partners I, Ltd. and 1086 Hutchins/Wilmer, L.P. Parcel 4) holds an Allowed Secured Claim in the amount of approximately $2,353,891, secured by a single parcel of real property, Parcel 4, within the Dallas Logistics Hub, containing approximately 82.02 acres. The appraisal testimony presented to the Court by Jamie Wickliffe, the only expert who testified as to value on any of the Pool 2 Property, was that the current fair market value of Parcel 4 was $5,930,833.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

39.     Class 3-B 15 (Frossard) holds an Allowed Secured Claim in the amount of approximately $1,011,988, secured by a single parcel of real property, Parcel 114, within the Dallas Logistics Hub, containing approximately 115 acres. The testimony presented to the Court by Daniel McAuliffe, the only witness who testified as to value of Parcel 114, as well as the

Appraisal of the Dallas County Appraisal District for Parcel 114, support a finding that the current fair market value of Parcel 114 is not less than $1,724,250.00. The Court did not assign a precise value to the parcel; however, the record establishes this Class is over-secured.

40. Each holder of a Pool 2 Allowed Secured Claim would receive under the DLH Plan a Note in the amount of such holder's Allowed Secured Claim (the "Pool 2 Notes"), each such Pool 2 Note secured by the holder's existing first lien on the Pool 2 Property securing such Allowed Secured Claim. Thus, the DLH Plan complies with 11 U.S.C. §1129(b)(2)(A)(i) with respect to each Pool 2 Secured Creditor.

41. The Pool 2 Notes would be further secured by a subordinate lien on the remainder of the Pool 2 Property (*i.e.*, all of the Pool 2 Parcels), with such Subordinate Lien securing the right of each Pool 2 Creditor to receive its pro rata share of 30% of DLH Net Sales Proceeds from the sale of any Pool 2 Parcel, after the sales proceeds were first used to pay the Release Price for the Pool 2 Parcel being sold (*i.e.*, the full amount of the Secured Claim, together with interest, secured by the first lien on such Parcel), closing costs, and other deductions provided for under the DLH Plan. Thus, each holder of a Pool 2 Note: (a) will receive payment in full upon the sale of the Parcel securing such Note; and (b) may receive additional quarterly payments upon the sale of any other Pool 2 Parcel, until the Pool 2 Notes are paid in full. These quarterly payments are not guaranteed and will only be made if the sales price received from other Pool 2 Parcels is sufficient to allow this additional payment.

42. The Pool 2 Notes are payable interest only for the first three (3) years, with the first interest payment coming due twelve (12) months after the Effective Date of the DLH Plan, and semiannually thereafter. This required payment of interest on the Pool 2 Notes cures any potential negative amortization problem. Commencing three (3) years after the Effective Date,

Reorganized DLH is required to make equal semi-annual payments of principal and interest on the Pool 2 Notes sufficient to fully amortize the then-outstanding principal balance of the Pool 2 Notes over ten (10) years. The Pool 2 Notes are due in full five (5) years after the Effective Date. Each Pool 2 Note will bear interest at the Court-determined rate of 7.25% per annum, which ensures that each Pool 2 Noteholder shall receive deferred cash payments under its Pool 2 Note having a value, as of the Effective Date, equal to the principal balance of the Pool 2 Note. All accrued but unpaid interest and all principal become due five (5) years after the Effective Date.

43. The interest rate offered to the Pool 2 Creditors under the DLH Plan is justified by market conditions, the raw land nature of the collateral and the market interest rate analysis presented by the various interest rate experts, particularly that of Mr. Kelly. As discussed above, the Court finds that such interest rate satisfies the requirement of 11 U.S.C. §1129(b)(2)(A)(i), in that each Pool 2 Noteholder will receive under its Pool 2 Note deferred payments having a value, as of the Effective Date of the DLH Plan, at least equal to the value of such Pool 2 Noteholder's interest in its collateral.

44. The Court further finds, for the reasons set forth above, that the DLH Plan is both feasible and achievable with respect to the Pool 2 Creditors. The testimony of Dwayne Toler, Daniel McAuliffe, and Richard Allen supports the conclusion that DLH can meet its projections of land sales and will be able to make the payments to the Pool 2 Noteholders required under the terms of the DLH Plan. Mr. Toler's testimony was particularly persuasive on these issues.

45. In addition, Mr. Birtcher of Birtcher Development has testified that his firm, which is also seeking to become a joint developer with DLH to finance vertical development of industrial warehouses, has submitted a non-binding letter of intent for the purpose of purchasing

approximately 134 acres of Parcel 5, which is a Pool 2 parcel. Although this proposed non-binding letter of intent has a contingency, *i.e.* that Birtcher Development is the successful bidder on an 850,000 square foot build-to-suit project for an end-user of warehouse-industrial space, the existence of the non-binding letter of intent will assist Birtcher Development in becoming the successful bidder on the Request for Proposal from an A-1 credit tenant. This proposed non-binding letter of intent to purchase Parcel 5, while still contingent, further supports the Court's finding that the DLH Plan is feasible and achievable.

46.     The Court finds that the DLH Plan does not unfairly discriminate against any of the Pool 2 Secured Creditors, and that the treatment of each Pool 2 Secured Creditor's Allowed Secured Claim is fair and equitable. Thus, the DLH Plan complies with 11 U.S.C. §1129(b) with respect to each Pool 2 Creditor.

47.     All objections to confirmation of the DLH Plan by the Pool 2 Creditors not otherwise withdrawn are overruled.

**D.      Cramdown DLH Class 3-D – Pool 4 Secured Creditors**

48.     Two of the Secured Creditors in Pool 4 have accepted the DLH Plan. Two of the Secured Creditors in Pool 4, Coffman and Southport Investments, have received their collateral back from DLH and are unimpaired under the Plan. All of the remaining Pool 4 Creditors (11 in total) have rejected the DLH Plan and have objected to the confirmation of the DLH Plan. The rejecting Pool 4 Creditors, with the exception of the Madrigal Trust (Parcel 78) have all been represented during the Confirmation Hearing by Robert Yaquinto, Jr., and the evidence presented during confirmation demonstrates that many of the Pool 4 Creditors represented by Mr. Yaquinto share ownership interests and control, and all have acted in unison with respect to their respective Secured Claims in this case.

49.    The Pool 4 Property consists of fifteen separate parcels of real estate, as listed and described on Exhibit A-4 to the Plan, containing in the aggregate approximately 1,813 acres of land.  There are fifteen separate Secured Creditors within Pool 4, each holding a Note secured by a first lien in favor of one of the Secured Creditors.  As noted above, two of those Pool 4 Secured Creditors, Coffman and Southport, have already been permitted to foreclose upon their collateral and are unimpaired by the DLH Plan.  Those foreclosures resulted in the elimination of approximately 197 acres from Pool 4.  Two more Pool 4 Secured Creditors, Rosa Frumpkin (Parcel 98-99, 193.01 acres), and William and Linda Ernst (Parcel 177, 24.17 acres), have voted in favor of the DLH Plan.  There are eleven remaining objecting Pool 4 Creditors, each holding a first lien upon a single parcel of the Pool 4 Property.  The aggregate of the Pool 4 Property encumbered by first liens in favor of the objecting Pool 4 Secured Creditors is approximately 1,399 acres of land.  The representatives of DLH have testified that this land is primarily located at the southern end of the Dallas Logistics Hub, is generally among the less desirable of the tracts which DLH still owns, and is expected to be the last to be developed.

50.    The DLH Plan provides that each Pool 4 Secured Creditor will receive a Note (a "Pool 4 Note") in the principal amount of each such Secured Creditor's Allowed Secured Claim as of the Effective Date.  The Pool 4 Notes will bear interest at the same rate of interest, fees and other charges as provided in the notes and loan documents evidencing each such Secured Creditor's claim.  The Pool 4 Notes are due and payable in full and with interest, fees and other charges 180 days after the Effective Date unless there is in place a contract to sell the Pool 4 Parcel securing a Pool 4 Note, in which case such maturity may be extended for up to 60 days (*i.e.*, 240 days after the Effective Date).  The Pool 4 Notes will be secured by the existing first liens held by each of the Pool 4 Secured Creditors.  Moreover, each Pool 4 Secured Creditor has

the option under the DLH Plan, if the Parcel securing a Pool 4 Note has not already been sold and is not under a contract to sell scheduled to close within 150 days after the Effective Date, to require Reorganized DLH to surrender the Pool 4 Property to the holder of the Pool 4 Note in full satisfaction of such Pool 4 Note as early as 90 days after the Effective Date.

51.    All of the notes evidencing the claims of the Pool 4 Secured Creditors are non-recourse to the Debtor.  Consequently, under applicable non-bankruptcy law, each such Pool 4 Secured Creditor's rights against DLH are limited to a recovery of the Pool 4 Property securing such claims.

52.    The testimony of the representatives of DLH during the Confirmation Hearing was that it is the intention of Reorganized DLH to actively market the Pool 4 Property retained by DLH through auctions or other structured sales for six months after the Effective Date, and that if Reorganized DLH is not successful in selling any Pool 4 Parcel for an amount sufficient to pay in full the Allowed Secured Claim of the Pool 4 Secured Creditor (or such lesser amount as such Pool 4 Secured Creditor may voluntarily agree to accept), together with closing and selling costs and an amount sufficient to compensate Reorganized DLH for its efforts, that it is the intention of Reorganized DLH to surrender the remaining Pool 4 Property to the particular Pool 4 Secured Creditor.  Unless a parcel is actually under contract to sell, any Pool 4 Secured Creditor has the right under the DLH Plan to compel Reorganized DLH to surrender the Pool 4 Property securing a Pool 4 Note to the first lien holder in as little as 90 days after the Effective Date.

53.    The Court finds that each objecting Pool 4 Secured Creditor is retaining the lien securing its secured claim.  Thus the Plan complies with 11 U.S.C. §1129(b)(2(A)(i)(I).

54.    The Court further finds that the terms of the Pool 4 Notes, including interest at the rates, fees and other charges set forth in the existing notes evidencing each Pool 4 Secured Claim, will ensure, for any Pool 4 Parcel which may be sold within 180 days by Reorganized DLH, that such Pool 4 Secured Creditor will receive cash payments on such Secured Claim having a value, as of the Effective Date, of at least the value of the Pool 4 Secured Creditor's interest in the Pool 4 Property.  Thus the Plan complies with 11 U.S.C. §1129(b)(2(A)(i)(II).

55.    The Court further finds that the surrender of the Pool 4 Parcels within 180 days combined with the right to require Reorganized DLH to surrender a Pool 4 Parcel in as little as 90 days after the Effective Date provides for the realization by each objecting Pool 4 Secured Creditor of the indubitable equivalent of its claim.  No objecting Pool 4 Secured Creditor has moved to lift the stay during the twenty months that DLH's chapter 11 case has been pending. Even if the Court were to assume that a Motion to Lift the Automatic Stay were to be promptly filed by a Pool 4 Secured Creditor, it might not be heard or finally determined for another 30-60 days, and, assuming that such a motion were granted, under the procedures for non-judicial foreclosure under Texas law, such Secured Creditor might require at least another 25-45 days (depending upon timing, since a non-judicial foreclosure may only be conducted on the first Tuesday of each calendar month, and only after 21-days written notice to DLH and posting and filing the required Notice of Trustee's Sale) before it could actually foreclose its lien.  Under the Plan, once a Pool 4 Creditor has timely elected the option to require a surrender of its collateral by the Reorganized Debtor, it can obtain an immediate surrender of ownership, possession and control of its Pool 4 Property, together with an executed Release by the Term Lenders of their subordinate lien on the Pool 4 Parcel or the right to conduct a non-judicial foreclosure, in as little as 90 days.  The Court finds that this provides each objecting Pool 4 Secured Creditor with the

indubitable equivalent of its rights under applicable law with respect to its collateral, and satisfies 11 U.S.C. §1129(b)(2(A)(iii).

56.     The Court finds that the DLH Plan does not unfairly discriminate against the objecting Pool 4 Secured Creditors, and is fair and equitable with respect to each objecting Pool 4 Secured Creditor.   Thus, the DLH Plan complies with 11 U.S.C. §1129(b) with respect to each Pool 4 Creditor and should be confirmed over the objections of the Pool 4 Secured Creditors.

57.     All objections to confirmation of the DLH Plan by the Pool 4 Creditors are overruled.

**E.      Approval of Term Loan to Reorganized DLH**

58.     The DLH Plan provides for a line of credit to be provided to Reorganized DLH in the amount of $2,000,000.00 to be provided by various insiders of DLH, including one or more of the existing DIP/Term Lenders, Luke Allen, and Richard Allen.   Richard Allen, who, individually, is a debtor in a Chapter 11 proceeding which is jointly administered with the present case, has sought this Court's authorization to make a loan of up to $875,000 to Reorganized DLH as his portion of the $2,000,000.00 Line of Credit.

59.     The Court has reviewed and heard testimony on the concurrently considered motion of Richard Allen for permission to lend up to $875,000 to DLH as part of a $2 million Line of Credit which will become part of the Term Loan.   That Line of Credit is secured *pari passu* with all existing advances by the DIP Lenders.   Those existing advances to DLH as of the Effective Date total approximately $2.8 million.   The fair market value of the collateral securing any existing and future advances is approximately twenty times the amount of such maximum advance.   If the Parcel 4 and Parcel 5 sales close, relatively few dollars will be required and Richard Allen as a debtor in possession is exercising appropriate business judgment by

potentially making a high interest loan at 13.25% per annum, which is well secured by collateral, in order to preserve more than $13 million in potential value of Richard Allen's indirect ownership interest in DLH. The Court has directed that no payments shall be made by Reorganized DLH on the Richard Allen loan unless Reorganized DLH is current on all of its obligations owed under the DLH Plan at the time of any such proposed payment.

60.    The Court finds that the decision by Richard Allen to participate in the Line of Credit to Reorganized DLH in an amount of up to $875,000.00 is a sound exercise of business judgment. Richard Allen's *Motion to Approve Extension of Post-Confirmation Line of Credit of DLH* [Docket No. 1087] is hereby approved.[4]

61.    The willingness of the DIP Lenders to convert the DIP Loan to a Term Loan under the DLH Plan provides Reorganized DLH financial flexibility which would not be available if the DIP Lenders insisted upon payment in full of the DIP Loan on the Effective Date (which the DIP Lenders have a legal right to insist upon). Further, the agreement of one or more of the DIP Lenders, together with Richard Allen and Luke Allen, to provide a Line of Credit of up to $2,000,000 provides an additional source of funds so that Reorganized DLH will be capable of performing under the Plan. The Court finds that the terms of the Term Loan under the DLH Plan, and the terms of the Line of Credit provided by one or more of the DIP Lenders, Richard Allen, and Luke Allen, as modified in the DLH Plan at the direction of the Court (including a fixed interest rate on the Term Loan of 13.25% per annum), are fair and reasonable under the circumstances. Jeff Jones outlined the unsuccessful efforts of both DLH and Barrier for the Committee to obtain financing on any terms and amounts from any parties other than the DIP Lenders and the parties to the additional Line of Credit. The Court finds the Term Loan and

---

[4] Mr. Allen also has filed a similar motion in his individual Chapter 11 case. That motion will be approved by separate order entered in Mr. Allen's individual case.

the additional Line of Credit as described in the First Modification should be approved.

**F.     Distributions to Permit Payment of Taxes**

62.     It is unlawful for a reorganization plan to be proposed for the purpose of evading taxes. Richard Allen, individually, is currently in Chapter 11, and absent confirmation of the DLH Plan, his estate and any succeeding Chapter 7 case would have no means to pay taxes generated by the sale of DLH and ACP assets, but for the provisions of the Plan.

63.     The unsecured creditors have negotiated concerning this point and support the DLH Plan with these provisions as revised pursuant to those negotiations.

64.     Because the unsecured creditors have voted to support the DLH Plan, including these provisions, and Compass and Pool 2 and Pool 4 creditors are receiving the indubitable equivalent of their secured claims, the proposed tax distributions are lawful and appropriate. However, this Court has required, and the DLH Plan so provides, that no such tax payments may be made unless Reorganized DLH is complying with its obligations under the Plan.

**G.     Approval of Assumption and Amendment of McAuliffe Employment Agreement**

65.     Concurrently with the Confirmation Hearing, the Court also heard and considered the *Motion to Assume and Amend the Employment Agreement of Daniel McAuliffe* [Docket No. 886]. Mr. McAuliffe is the President of DLH Development Manager, LLC, which is, in turn, the Manager of DLH. Upon confirmation of the DLH Plan, DLH Development Manager, LLC will be the Manager of Reorganized DLH, and Daniel McAuliffe will be the President and Chief Operating Officer of Reorganized DLH.

66.     The *Motion to Assume and Amend the Employment Agreement with Daniel McAuliffe* requests the Court's approval of the assumption, pursuant to 11 U.S.C. § 365, and the amendment to the Employment Agreement between Daniel McAuliffe and DLH. ACP had

previously guaranteed the Employment Agreement between DLH and Daniel McAuliffe, and the Motion seeks authority for ACP to assume that guaranty obligation. ACP owns, directly or indirectly, an equity interest in DLH of approximately 40%, so ACP has a significant stake in the success of a Reorganized DLH.

67.     The evidence presented during the Confirmation Hearing establishes that Mr. McAuliffe has been the President and Chief Operating Officer of DLH or its predecessor entities[5] since November 2005. He directly participated in the acquisition of a substantial portion of the land which DLH presently owns, and he directly participated in the efforts to rezone the land, develop infrastructure, and market the property and the Dallas Logistics Hub. He was actively involved in dealing with various governmental units, including the cities of Dallas, Hutchins, Lancaster, and Wilmer, as well as Dallas County and Federal agencies and representatives, to develop and implement unified zoning and infrastructure plans for the Dallas Logistics Hub. Mr. McAuliffe was instrumental in obtaining governmental funding for infrastructure and Free Trade Zone status for the Dallas Logistics Hub, which will enhance the value of the Dallas Logistics Hub. The evidence establishes that Mr. McAuliffe is intimately familiar with the property, its physical characteristics, the infrastructure, including both access roads and utilities, both present and contemplated, and the overall zoning, access, and infrastructure plans for the Dallas Logistics Hub. The evidence further establishes that Mr. McAuliffe has been actively involved in the marketing of the property of DLH, and is the person principally responsible for the negotiation and closing of sales and other contracts for DLH.

68.     Based upon the evidence presented during the confirmation hearing, the Court

---

[5] DLH Master Land Holding, LLC, in its present form, resulted from the merger of over 70 separate entities in December, 2009. Most of the predecessor entities were LLCs which owned a single parcel of real property within the Dallas Logistics Hub, all having some common ownership (although in varying percentages), and all of those entities which owned or controlled land within the Dallas Logistics Hub were managed or controlled by DLH Development Manager.

finds that the continued employment of Mr. McAuliffe is important to the success of Reorganized DLH. The Court finds that it is in the best interests of the DLH Estate and creditors of DLH to retain the services of Mr. McAuliffe, and that the assumption of Mr. McAuliffe's Employment Agreement, as amended, is within the sound business judgment of DLH. Further, the Court finds that, in light of ACP's equity ownership in DLH, and the importance of Daniel McAuliffe to the success of a Reorganized DLH, it is in the best interests of ACP and its creditors to assume the obligations of ACP's guaranty of the Employment Agreement between DLH and Mr. McAuliffe, and that the assumption of such obligation is within the sound business judgment of ACP.

69. The Court finds that the *Motion to Assume and Amend the Employment Agreement of Daniel McAuliffe* [Docket No.886] should be granted in all respects.

**H.   Other Matters Relating to Confirmation**

70. **Satisfaction of Confirmation Requirements.** The DLH Plan satisfies all requirements for confirmation set forth in 11 U.S.C. § 1129(a).

71. **Retention of Jurisdiction.** The Court finds and concludes that it may properly retain jurisdiction over the matters set forth in the DLH Plan.

**I.  Credibility of the Witnesses**

72. This Court had approximately 12 days of testimony about the Plan. The testimony of Mr. Toler regarding feasibility was credible and is given great weight. Overall, the value evidence offered by the Debtors was more persuasive.

## II.
## DECREES

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, DECREED AND DETERMINED AS FOLLOWS:

1.      The DLH Plan, attached hereto as <u>Exhibit A</u>, as may be amended, modified, clarified and/or supplemented in accordance with this Order, is **CONFIRMED** in accordance with 11 U.S.C. § 1129, and all terms and conditions set forth therein are **APPROVED** as modified herein.

2.      The foregoing Findings and Conclusions, as well as the oral ruling by the Court on October 27, 2011, are incorporated into this Decree as if fully restated herein.

3.      All objections to the DLH Plan not withdrawn or otherwise resolved are expressly overruled.

4.      The provisions of the DLH Plan and this Order are binding on each holder of a Claim against or Interest in DLH, any party in interest in DLH's chapter 11 case, and any other Person receiving notice of the DLH Plan or Confirmation Hearing, and their respective heirs, successors and assigns.

5.      The Court finds that the fair market value of the approximately 150 acres being returned to Compass as a "dirt-for-debt" credit against the Allowed Compass Secured Claim, after applying all appropriate discounts, is $5,300,000.00.

6.      Any environmental examination by Compass of the dirt for debt Parcels must be completed within sixty (60) days after the date of entry of this Order, and if any issues arise with respect to such environmental examination, Compass may bring that to the Court's attention by motion.  Unless Compass agrees in writing, during this sixty-day period, DLH shall not convey real property to Compass.  Otherwise, DLH is authorized to execute and record the various documents, in the form agreed to by Compass or approved by the Court, necessary to make the dirt-for-debt transfer(s) to Compass.  Notwithstanding the actual date or dates any such dirt for

debt conveyances may be recorded, the transfer of the dirt for debt Parcels shall be deemed for all purposes to have occurred on the Effective Date, unless otherwise ordered by the Court.

7.    The Court finds that, in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2007), Compass shall receive interest, as of the Effective Date, on the balance of its Allowed Secured Claim at a rate of 7.25% per annum.

8.    The Court finds that, in accordance with *Till*, the Pool 2 Creditors shall receive interest, as of the Effective Date, on the balance of their Allowed Secured Claims at a rate of 7.25% per annum.

9.    Except as otherwise provided in the DLH Plan, upon the Effective Date, all Claims against DLH that arose before the Effective Date are discharged and terminated, and all holders of Claims against and Interest in DLH are permanently enjoined from threatening, commencing or continuing any lawsuit or other legal or equitable action against DLH and Reorganized DLH (and its successors and assigns) or its property to recover any Claim based on any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim or Interest and whether or not the facts or legal basis therefor were known or existed prior to the Effective Date.  Except as provided in the DLH Plan, all holders of Claims against and Interests in DLH (and all representatives, trustees or agents on behalf of each such holder) shall be precluded and permanently enjoined from asserting against the Exculpated Persons, any Claim based on any act or omission, transaction, or other activity of any kind or nature that occurred in connection with DLH's chapter 11 case from the Petition Date through the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.     Unless otherwise provided in the DLH Plan or this Order, any and all injunctions or automatic stays provided for in DLH's chapter 11 case pursuant to 11 U.S.C. §§ 105 and 362, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect through the Effective Date.

11.     Except as otherwise provided in the DLH Plan or this Order, on the Effective Date, all executory contracts and unexpired leases to which DLH or its estate were parties on or prior to the Confirmation Date, and that have not been already assumed by DLH or otherwise rejected by other order of this Court, are assumed pursuant to Bankruptcy Code §§ 365 and 1123.

12.     Any Claim for damages arising from the rejection of an executory contract or unexpired lease of DLH under the DLH Plan will be forever barred and shall not be enforceable against DLH unless a Proof of Claim is filed with the Bankruptcy Court and served upon Reorganized DLH no later than thirty (30) days after the Confirmation Date. Notwithstanding the rejection of any executory contract or unexpired lease at any time during DLH's chapter 11 Case, DLH reserves all rights and defenses it may have or have had against the other parties to such contracts and leases.

13.     Pursuant to Article IV of the DLH Plan, requests for payment of Administrative Expense Claims (other than Fee Claims, a liability incurred and paid in the ordinary course of business of DLH, and previously Allowed Administrative Expenses) must be filed with the Court and served on DLH and its counsel, and any other party entitled to receive such notice, no later than fifteen (15) days after the Confirmation Date. Failure to properly and timely file and serve notice of an Administrative Expense Claim as described in the DLH Plan and this Order shall result in such Administrative Expense Claim being forever barred and discharged.

14. Pursuant to Article IV of the DLH Plan, each person or entity asserting a Fee Claim for services rendered or expenses incurred prior to the Effective Date shall file and serve on DLH and its counsel, and any other party entitled to receive such notice, a formal Fee Application for final allowance (or disallowance) of a Fee Claim no later than sixty (60) days after the Effective Date. Failure to timely file and serve a Fee Application as described in the DLH Plan and this Order shall result in the corresponding Fee Claim being forever barred and discharged.

15. Pursuant to Article X of the DLH Plan, all Avoidance Actions are preserved in the DLH estate for the benefit of DLH's creditors. Such Avoidance Actions shall, by operation of this Order, be assigned free and clear of all liens (as defined in section 101(37) of the Bankruptcy Code), Claims and Interests to the DLH Creditors Trust on the Effective Date. Additionally, Reorganized DLH and the DLH Creditors Trust Trustee retain the right to (a) commence, prosecute to judgment, settle and collect upon any cause of action (including Avoidance Actions), whether or not such cause of action is listed in the Schedules and Statement of Financial Affairs as an asset of DLH's chapter 11 estate, and (b) include as defendants in any suit all parties which are, at this time, named and unnamed.

16. Except with respect to Classes of Claims unimpaired pursuant to the DLH Plan, the distributions and rights afforded in the DLH Plan shall be in complete and full satisfaction, discharge and release, effective as of the Effective Date, of all Claims against and Interests in DLH or any of its respective assets or properties of any nature whatsoever. Commencing on the Effective Date, except as expressly otherwise provided in the DLH Plan, all Claim holders and Interest holders shall be precluded forever from asserting against DLH, its agents and attorneys, or its assets and properties, any other or further liabilities, liens, obligations, Claims or Interests,

or causes of action belonging to DLH  pursuant to 11 U.S.C. § 541 which could arise up through the Effective Date including but not limited to, all principal and accrued and unpaid interest and penalties on the debts of DLH, based on any act or omission, transaction or other activity or security interest or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or interest, whether or not Allowed.  As of the Effective Date, DLH shall be discharged and released from and shall hold all the assets and properties received or retained by it pursuant to the DLH Plan, free of all liabilities, liens, Claims and obligations or other claims of any nature, known or unknown, except as to the security interests and liens and obligations contained in any Deed of Trust, Mortgage, Security Agreement, Financing Statement or other security interest and lien held by the Pool 1 Secured Creditor, Pool 2 Secured Creditors, Pool 4 Secured Creditors and the DIP Term Loan Secured Creditors and the Plan documents executed to implement the treatment of the Pool 1, Pool 2, Pool 4 and DIP Term Loan Secured Creditors and except as otherwise set forth pursuant to the DLH Plan.  All legal or other proceedings and actions seeking to establish or enforce liabilities, liens, Claims and Interests or obligations of any nature against DLH or assets or properties received or retained by DLH with respect to debts and obligations, if any, of the DLH estate arising before the Effective Date shall be permanently stayed or enjoined, except as otherwise specifically provided in the DLH Plan and the Plan documents executed pursuant to the DLH Plan.  As over-secured creditors, the final allowed secured claims of the Pool 1, Pool 2, and Pool 4 Secured Creditors has not been finally determined.  Nothing in this order determines or precludes the determination of the amount of the final allowed secured claims of the Pool 1 Pool 2, and Pool 4 Secured Creditors, which amount shall be subsequently determined by the Court if the parties are unable to reach agreement.  Notwithstanding the foregoing, this paragraph

shall not be interpreted to release any third party claims, liabilities or other causes of action against the affiliates and principals of DLH unless the claim or cause of action so released is derivative of a claim or cause of action which was or could have been asserted against DLH in its chapter 11 case, or constitutes property of the DLH estate.

17.    Upon the Effective Date, except as otherwise provided in the DLH Plan, all promissory notes, shares, certificates, instruments, indentures, stock or agreements evidencing, giving rise to or governing any Claim or Interest against or in DLH (but expressly excluding: (a) the Parcel Senior Liens, as modified by the Parcel Senior Lien Modifications, and any other Mortgage, Deed of Trust, Security Agreement, Financing Statement or other lien or security interest, evidencing any lien  or security interest which is to survive the Effective Date under the terms of the DLH Plan and the Plan documents executed to implement the treatment of Pool 1, Pool 2, Pool 4 and DIP Term Loan Secured Creditors under the DLH Plan; and (b) the Operating Agreement of DLH, as amended pursuant to the DLH Plan) shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule.   Obligations of DLH under such promissory notes, share certificates, instruments, indentures or agreements shall be discharged and the Holders thereof shall have no rights against DLH, the DLH Estate or Reorganized DLH, and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the DLH Plan (but expressly excluding the Parcel Senior Liens, as modified by the Parcel Senior Lien Modifications, and any other Mortgage, Deed of Trust, Security Agreement, Financing Statement or other lien or security interest, evidencing any lien or security interest which is to survive the Effective Date under the terms of the DLH Plan and the Plan documents executed to implement the treatment of Pool 1, Pool 2, Pool 4 and DIP Term

Loan Secured Creditors).  Notwithstanding the foregoing, the cancellation of such instruments and agreements shall be solely effective as to DLH's obligation under such Instruments and Agreements and shall not be interpreted to discharge or release any claims against guarantors or any claims against any third party under those Instruments or Agreements.

18.    Neither DLH, nor the Committee or the DLH Creditors Trust Trustee, nor any of their respective members, officers, directors, employees, agents, advisors, affiliates, attorneys, accountants, nor any other professional person retained or employed by any of them (collectively, the "**Exculpated Persons**") shall have or incur any liability to any Creditor, Interest holder, or any other person or entity for any act taken or omission made in good faith in connection with or relating to the formulation, negotiation, implementation, confirmation, or consummation of the DLH Plan, including any settlement referenced or described therein, or in connection with or relating to the Disclosure Statement or any document, instrument, note or agreement executed or to be executed and delivered pursuant to the DLH Plan.  Such Exculpated Persons shall have no liability to DLH, any Creditor, Interest holder, or any other party in interest in DLH's chapter 11 case, or any other person or entity, for actions taken or not taken under the DLH Plan, in connection therewith, or with respect thereto, or arising out of their administration of the DLH Plan or distributions of money or property under the DLH Plan, in good faith, including, without limitation, the failure to satisfy any condition or conditions, or refusal to waive any condition or conditions, to the occurrence of the Effective Date, and in all respects the Exculpated Persons shall be entitled to rely upon the advice of counsel with respect to their duties, rights, and obligations under the DLH Plan.

19.    On the Effective Date, DLH is specifically authorized, empowered and directed to take any and all actions necessary or appropriate to implement, effectuate and consummate the DLH Plan.

20.    On the Effective Date, the DLH Creditors Trust shall become effective.  The DLH Creditors Trust is hereby authorized, as of the Effective Date, to assume the responsibilities and exercise the rights as provided in the DLH Plan and the DLH Creditors Trust Agreement.  The initial DLH Creditors Trust Trustee shall be SLTN TRST LLC d/b/a Solution Trust.  The powers, authority, responsibilities and duties of the DLH Creditors Trust Trustee shall be as set forth in and governed by the DLH Creditors Trust Agreement, in form and substance in conformity with Exhibit C-1 to Debtors' Supplement to the Plan [Docket No. 978], the terms of which are hereby approved.  Other documents in connection with the DLH Creditors Trust may be executed and entered into by the DLH Creditors Trustee on behalf of the beneficiaries of the DLH Creditors Trust.  The DLH Creditors Trust Trustee shall be the representative of the DLH Creditors Trust.  The DLH Creditors Trust Trustee shall also serve as the Disbursing Agent under the DLH Plan.

21.    On the Effective Date, all duplicative Claims (identical in both amount and subject matter) filed against DLH automatically will be expunged so that only one Claim survives against DLH (but in no way shall such surviving Claim be deemed Allowed by reason of this Order).

22.    The Committee, as concerns DLH, shall continue in existence for a period of ninety (90) days after the Effective Date of the DLH Plan, at which point it shall dissolve automatically with respect to DLH, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the DLH chapter 11 case and under the

Bankruptcy Code, except as otherwise provided in the DLH Plan. The Committee for ACP shall continue and dissolve under the terms of the ACP Plan and the order confirming the ACP Plan.

23. Notwithstanding any provision in the DLH Plan, the Disclosure Statement or this Order to the contrary, it is expressly ordered that neither the DLH Plan nor the confirmation thereof nor this Order shall be deemed or construed to affect or impair in any way the rights of Allen Rosedale Land I, LLC or FKM Associates, LLC to enforce the Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (dated June 15, 2006) and the First Amendment to Amended and Restated Operating Agreement of Rosedale Land Venture I, LLC (effective as of August 17, 2009) in accordance with applicable law.

24. Generally, in the event of any inconsistency between the express provisions of the DLH Plan and any other agreement, instrument or document intended to implement the provisions of the DLH Plan, the provisions of the DLH Plan shall govern; and in the event of any inconsistency between the express provisions of the DLH Plan and any other agreement, instrument or document intended to implement the provisions of the DLH Plan and this Order, the provisions of this Order shall govern. However, the provisions of the notes, modification of liens and conveyance documents executed to implement the treatment of the Pool 1, Pool 2 and Pool 4 Secured Creditors shall control unless there is a direct contradiction or inconsistency with an express provision of the Plan. Pursuant to Bankruptcy Code §§ 1123(a) and 1142(a) and this Order, the DLH Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

25. Upon consultation with, and agreement by (with such agreement not to be unreasonably withheld) the Committee, Compass and Pool 2, DLH is authorized to make any

technical, clerical and non-material modifications to the DLH Plan without further order of this Court.

26. To the extent that, under applicable non-bankruptcy law, any of the actions required by the DLH Plan and/or this Order would otherwise require the consent or approval of the holders of Interests in DLH, this Order shall constitute such consent or approval, and such actions shall be, and are deemed to have been, taken by unanimous action of the holder of all Interests in DLH.

27. This Order is in recordable form and shall be accepted by any filing or recording officer or authority of any applicable governmental unit for filing and recording purposes without further or additional orders, certifications or other supporting documents.

28. Neither the failure to specifically reference herein any particular provision of the DLH Plan nor the mistaken reference of any particular provision of the DLH Plan shall have any effect on the validity or enforceability of such provision, all of which provisions are hereby authorized and approved.

29. In accordance with Bankruptcy Rules 2002 and 3020(c), on or before the Effective Date, DLH shall give notice of the entry of this Order, including a copy of this Order in the form entered by the Court, by first-class, postage-prepaid, U.S. Mail to all holders of Claims against or Interests In DLH and to all parties who requested notice pursuant to Bankruptcy Rule 2002.

30. Promptly after the occurrence of the Effective Date, Reorganized DLH shall give written notice of entry of the Effective Date by first-class, postage-prepaid, U.S. Mail to all holders of Claims against or Interests in DLH and to all parties who requested notice pursuant to Bankruptcy Rule 2002.

31.     Notwithstanding Bankruptcy Rules 3020(e), 6004(h) and 6006(d), or any other provisions of the Bankruptcy Code or the Bankruptcy Rules, this Order shall be effective and enforceable immediately upon its entry.

32.     On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, notwithstanding entry of this Order, over all matters arising out of or related to DLH's chapter 11 case as specifically set forth under Article XII of the DLH Plan.

###End of Order###